**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| Joshua Folks, | |
|      Plaintiff, | |
| v. | |
| Louisiana Attorney General Jeff Landry, Louisiana Department of Public Safety & Corrections, Warden Tim Hooper, Assistant Warden for Health Services Doe, Director of Medical Services Paul Toce, Medical Department Director Dan Lefleur, Acute Treatment Unit Director Doe, ADA Administrator Ashli Oliveaux, Dr. Gamble, Officer Doe, and EMT Doe, | Civ. Case No.  23-cv-01289-SDD-RLB |
|      Defendants. | |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Mr. Joshua Folks is a Louisiana resident with a serious mental illness that causes him to compulsively self-harm. In early 2021, Mr. Folks was booked into the St. Mary's Parish Jail, locked in a cell, and taken off all of his medications. As a result, his mental health decompensated and he ultimately self-harmed so seriously that he had to be hospitalized—twice. Instead of treating Mr. Folks, the state of Louisiana punished him as it had previously: Mr. Folks was charged with two counts of felony "self-mutilation of a prisoner," a part of the Louisiana criminal code that punishes people, like Mr. Folks, who compulsively self-harm.

2.      A few weeks after he was booked into St. Mary's Parish Jail, Mr. Folks was transferred to the Louisiana State Penitentiary (Angola). He was put back on his medications but, was locked into the "time-out cell": a cell with almost no furnishings, no out-of-cell time, and near total isolation from other humans or the outside world. In that cell, Mr. Folks' mental health decompensated even further, and he self-harmed so seriously that on three occasions he had to be hospitalized. Each time, he was returned to the same cell and placed in severe restraints for days or weeks at a time. Mr. Folks was kept there for 17 months. He was eventually released from Angola in fall 2022.

3.      There is no more obvious case of disability discrimination then when a person is punished for the fact of their disability. That is what happened here. Mr. Folks has an obvious and well-documented disability, which causes him to compulsively self-harm. Instead of accommodating him, Louisiana state employees ignored his needs—indeed, *punished* him for having any. The criminal statute, Mr. Folks' treatment at the Jail, and his isolation at Angola, are all of a piece: the state is seeking to punish away or hide away people like Mr. Folks. But federal law does not allow that.

4.      In addition to violating disability law, Mr. Folks' treatment at Angola violated the Constitution. His conditions of near-total isolation in the time-out cell, at times shackled with 5-point restraints to his bed, were cruel and unusual by any measure. Particularly, given Mr. Folks' serious mental health needs, his conditions were intolerable.

5.      Mr. Folks brings this suit seeking accountability for his treatment relief that ensures such treatment will not happen again.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

7.    This Court has supplemental jurisdiction over Plaintiff's claims under Louisiana law pursuant to 28 U.S.C. § 1367.

8.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1)(2) because Defendants reside in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**Plaintiff**

9.    Mr. Joshua Folks is a 44-year-old resident of Franklin, Louisiana who has a serious mental illness that causes him to compulsively self-harm. Mr. Folks was held in pretrial detention at St. Mary's Parish Jail from March to April 2021, where he self-harmed and was charged with felony self-mutilation of a prisoner. He was then incarcerated at Angola on a parole violation from April 2021 to November 2022, and was kept in an isolation cell for 17 months and self-harmed at least three more times.

**Defendants**

10.    The Louisiana Department of Public Safety & Corrections is the state prison system, a division of the State of Louisiana. It is charged with overseeing the custody and care of offenders in Louisiana. At all relevant times, the DOC operated the Louisiana State Penitentiary (Angola), a public facility with programs and services. The DOC is the recipient of federal funds.

11.    Tim Hooper, sued in his individual capacity, is the Warden of Angola who failed to provide Mr. Folks with safe or appropriate housing. Warden Hooper oversees day-to-day operations at Angola, including operations related to discipline, housing, and care for people with

serious mental illnesses. By law, Warden Hooper is responsible for ensuring safety and care of all prisoners in Angola, and protecting their constitutional and other rights.

12.    Assistant Warden for Health Services Doe, sued in their individual capacity, has operational control over the medical unit at Angola. This includes, among other responsibilities, budgeting, hiring, staffing, and ensuring the health and safety of prisoners. Assistant Warden for Health Services Doe failed to provide Mr. Folks with safe and appropriate housing.

13.    Paul Toce, sued in his individual capacity, is the Director of Medical Services at Angola who failed to provide Mr. Folks with safe and appropriate housing. Director Toce oversees the treatment of prisoners with severe mental illness and is responsible for their care and safety.

14.    Ashli Oliveaux, sued in her individual capacity, is the ADA Administrator at Angola who failed to provide Mr. Folks with safe and appropriate housing. Administrator Oliveaux oversees the provision of accommodations for prisoners with disabilities and is responsible for their care and safety.

15.    Dan Lafleur, sued in his individual capacity, is the Medical Department Director at Angola who failed to provide Mr. Folks with safe and appropriate housing. Director Lafleur oversees the treatment of prisoners with severe mental illness and is responsible for their care and safety.

16.    Residential/Acute Treatment Unit (RTU/ATU) Director Doe, sued in their individual capacity, is an employee of the Louisiana Department of Public Safety & Corrections who failed to provide Mr. Folks with safe and appropriate housing. ATU Director Doe oversees the ATU, which holds people at Angola with severe mental illnesses and is responsible for their care and safety.

17.    Doctor Gamble, sued in his individual capacity, is an employee of the Louisiana Department of Public Safety & Corrections who was staffed in the ATU, and failed to provide Mr. Folks with safe and appropriate housing, and also failed to provide Mr. Folks with necessary additional treatment.

18.    Officer Doe, sued in their individual capacity, is an employee of the Louisiana Department of Public Safety & Corrections who was staffed in the ATU, and failed to provide Mr. Folks with safe and appropriate housing.

19.    Emergency Medical Technician (EMT) Doe, sued in their individual capacity, is an employee Department of Public Safety & Corrections who was staffed in the ATU, and failed to provide Mr. Folks with safe and appropriate housing, and also failed to provide Mr. Folks with appropriate medical treatment.

## FACTUAL ALLEGATIONS

### I.    Background & history of mental illness.

20.    Mr. Folks is a 44-year-old resident of Franklin, Louisiana, which is also where he grew up. When Mr. Folks was in his late teens, he started exhibiting some signs of mental illness, including a tendency to self-harm.

21.    Mr. Folks' self-harm started with less serious injuries, like shallow cuts and burns. But this behavior escalated and as he got older, Mr. Folks started causing himself more severe injuries.

22.    Mr. Folks' father was dedicated to his son's health and well-being. As soon as Mr. Folks started to self-harm, his father sought help and took him to a mental health professional for an evaluation.

23.    In his late teens Mr. Folks was diagnosed with bipolar disorder and paranoid schizophrenia.

24.     He started treatment, which he continued regularly before he was arrested in 2021. For example, Mr. Folks regularly saw a treating doctor, as well as a social worker for talk therapy. Based on his providers' recommendations and prescriptions, Mr. Folks took a combination of Welbutrin and Trazidone, which are antidepressants, and Nalaxone.

25.     This treatment plan worked. Once stabilized on his medications, and with regular visits with his providers, Mr. Folks' impulse to self-harm was drastically reduced.

26.     Mr. Folks enjoyed his life, which included a steady job and family. He lived on a parcel of land on a sugar cane plantation with his father and other relatives. His family, which owns the land and leases out the fields to a company that farms them, also owns a handful of rental properties in Franklin. Mr. Folks is skilled at mechanical and electrical work, and he worked as a handyman to maintain the properties.

27.     With the assistance of appropriate treatment and medication, Mr. Folks had a healthy and stable life.

**II.    Criminal charge in January 2021.**

28.     In early January 2021, at around 2:00am, Mr. Folks drove to a truck stop in Franklin. He had been working all day, and bought himself a barbecue burger to eat on his drive home. Mr. Folks pulled out of the gas station and started his drive. Unbeknownst to Mr. Folks, a police officer began to follow him.

29.     Mr. Folks continued driving, and the officer continued to follow him. At some point, the officer turned on his headlights. Mr. Folks did not notice the headlights and kept driving. The police officer then put on his high beams, which Mr. Folks finally did notice.

30.     A symptom of Mr. Folks' mental illness is paranoia, and the high beams scared him. Unaware that the person following him was a police officer, he raced back home. The police

officer continued to follow him. When Mr. Folks arrived home, he leapt out of his truck and ran into the sugar cane field behind his family's home, where he slipped and fell in the mud. The officer tried to find Mr. Folks but could not. Mr. Folks eventually fell asleep in the cane field and awoke there the next morning.

### III.   March 2021 arrest and detention in St. Mary's Parish Jail.

31.     On or about March 26, 2021, Mr. Folks was driving with a friend. The same officer—the one who had followed Mr. Folks home in January—pulled over the car. The officer told Mr. Folks that he had an outstanding warrant for aggravated flight from a police officer, based on the January incident. He arrested Mr. Folks and took him to the St. Mary's Parish Jail. Mr. Folks was arraigned on or about the same day. Because Mr. Folks was on parole at the time, no bail was offered, and Mr. Folks was booked into the Jail.

32.     On or about the same day, Mr. Folks' father learned informally, through a friend, that Mr. Folks had been arrested and detained. He immediately called the Jail. Mr. Folks' father told a Jail employee over the phone that Mr. Folks had serious mental health conditions, was likely to self-harm, and had medications that prevented him from self-harming. Mr. Folks' father also explained which medications Mr. Folks was on and offered to bring more medication to the Jail (beyond what Mr. Folks already had with him).

33.     Jail employees did not provide Mr. Folks with his medication. And, locked in a cell without treatment or medication, Mr. Folks' mental health decompensated over the next two days. His mental state became more fragile and he experienced heightened anxiety. He shouted, loudly enough for the staff to hear, that he was going to hurt himself—and then he did.

34.     On or about March 28, 2021, in the midst of a mental health crisis, Mr. Folks found a piece of metal in his cell and used it to cut himself 5 or 6 times on the leg, including one very deep gash on the top of his leg. He also punctured himself in the neck one or two times.

35.     Bleeding profusely, Mr. Folks was transported to Franklin Foundation Hospital, which treated his injuries. Eventually he was discharged, and Jail employees put Mr. Folks into a transport van and started to take him back to the Jail. Nothing was done in the van to protect Mr. Folks from hurting himself. So, inside the van, Mr. Folks found a metal spring and used it to stab himself again. He also swallowed a piece of metal, which perforated his intestines and caused serious injury. Jail employees took Mr. Folks back to the Hospital, where he underwent emergency surgery to remove large parts of his intestines.

36.     He was eventually discharged from the Hospital a second time into police custody and returned to the Jail. His mental health continued to deteriorate.

**IV.    Charge with felony self-mutilation of a prisoner.**

37.     On or about March 29, 2021, the St. Mary's Parish District Attorney, M. Boffill Duhe, filed new charges against Mr. Folks: two counts of felony self-mutilation of a prisoner.

38.     As the charge suggests, Louisiana makes it a crime for a person to harm themselves while in custody. *See* La. Stat. Ann. § 14:404.

39.     The criminal statute defines the offense as:

the intentional infliction of injuries to himself by a prisoner incarcerated in any state penitentiary or any local penal or correctional institution or while in the lawful custody of a peace officer, or the procuring or permitting of another person to inflict injury on such prisoner by means of shooting, stabbing, cutting, applying chemicals or other substances to the body, drinking or eating poisonous or toxic substances, or in any manner, when such results in permanent or temporary injury.

40.     "Self-mutilation of a prisoner" is a felony offense—which means that, as with other felonies, a conviction may open a person up to new restrictions on their ability to vote, use public housing, hold some occupational licenses, and so on.

41.     This offense is also subject to sentence enhancements under Louisiana's Habitual Offender Law. *See id.* § 15:529.1. The result is that a prisoner who is convicted for self-harming might face a steeper punishment for that crime depending on his prior convictions, or could in the future face harsher sanctions because he was convicted of this offense.

42.     Unsurprisingly, "self-mutilation of a prisoner" is not a common crime among States, and an even less common felony.

43.     The way it got into the Louisiana criminal code is troubling, to say the least. In the 1950's, prisoners at Angola slashed their Achilles tendons so that prison officials could not force them to work, as a kind of protest to inhumane and exploitative conditions. Because the prison depended so much on the prisoners' labor, the protest succeeded and the administration conceded some important reforms. But the state also took action to prevent prisoners from marshalling this kind of power in the future: in 1966, the Louisiana legislature amended the criminal code to add as a felony offense self-harm by a prisoner "when such injury results in permanent or temporary incapacity to perform work or duties" in the prison.

44.     Over time, the scope of the statute expanded and the element of the offense that tied self-harm to work was deleted.

45.     Since the work clause disappeared, officials have used the statute to prosecute people who self-harm for all kinds of reasons—including because they can't help it. In other words, the state of Louisiana can, and does, punish people who have a disability that compels them to self-harm.

46.     By 2021, Mr. Folks was already familiar with this fact, because had been charged with violating this statute before. In 2018, while serving a sentence for theft and simple criminal damage to property at Elayn Hunt Correctional Center, Mr. Folks' mental health decompensated and he started to self-harm. He cut himself twice, severely.

47.     Like in 2021, the District Attorney responded by charging Mr. Folks with two counts of felony self-mutilation of a prisoner.

48.     The charges from 2018 and 2021 were both dismissed, but nonetheless affected his criminal cases by extending the criminal proceedings and incentivizing plea agreements. Specifically, Mr. Folks was pleaded guilty to other lesser charges as part of an agreement that secured dismissal of this potential felony charge.

49.     This pattern of charging Mr. Folks with "self-mutilation of a prisoner" is highly likely to continue.

50.     For one, Mr. Folks compulsively self-harms as a result of his mental illness when that illness is not treated or accommodated. In those circumstances, he cannot keep himself from self-harming, no matter how much he tries.

51.     Mr. Folks' self-harming behavior reemerges and escalates when he is in prison or jail. That is the case because, *inter alia*, the environment is bad for his mental health, and his usual treatment is interrupted. The fact that Mr. Folks self-harmed multiple times while in custody at Elayn Hunt Correctional Center, St. Mary's Parish Jail, and (as discussed below) Angola, demonstrates that he will very likely self-harm if he is incarcerated again.

52.     Finally, Louisiana prosecutors have actually charged Mr. Folks under this statute multiple times—which indicates that they are not only willing, but eager, to prosecute people for

this offense. In other words, the statute is not a dead letter, and the actual history of enforcement against Mr. Folks and others lends credibility to his concern that he'll be charged again.

**V.      Detention at Angola from April 2021 to November 2022**

53.      On or about April 15, 2021, Mr. Folks was removed from St. Mary's Parish Jail and taken into the custody of Louisiana Department of Public Safety & Corrections to continue to serve time on an alleged parole violation. The Department transported Mr. Folks to the Louisiana State Prison, Angola.

54.      Angola staff screened Mr. Folks for medical and mental health conditions when he arrived and identified his diagnoses of bipolar disorder and paranoid schizophrenia as well as his history of self-harm.

55.      When Mr. Folks arrived, his father called Angola and told the staff that Mr. Folks had serious mental illnesses for which he took medication, and that he was at risk of self-harm.

56.      Angola staff immediately assigned Mr. Folks to the "time-out cell" in the ATU.

57.      Conditions in the time-out cell are brutal.

58.      A person in the time-out cell is in total isolation: they have no out-of-cell time, and no contact with other people imprisoned at Angola.

59.      The cell is sparce, with only a bed, toilet, and sink inside.

60.      Because conditions are so harsh, the time-out cell is intended to be used only on a temporary basis, for people who are experiencing acute mental health crises.

61.      But Mr. Folks was confined in that cell for 17 months.

62.      During that time, he was not released from the cell except when he was sent to the outside hospital for emergency care. And, except for when he was in the hospital, he did not see a

single other human besides his treating physician—Dr. Gamble—and the guards and medical staff on the unit.

63.     The conditions in the time-out cell, including the extreme isolation and the fact that it was not suicide-resistant, contributed to Mr. Folks' mental deterioration and escalated his self-harm behavior.  Prior to his incarceration at Angola, Mr. Folks had cut himself and had swallowed metal. But he had previously never inflicted deep stab wounds on himself. Inside the time-out cell, and because of the effect of the conditions on his mental health, Mr. Folks stabbed himself twice deeply in the stomach and cut himself severely once.

64.     Mr. Folks' condition and self-harming behavior were well-known to Angola staff.

65.     Defendants at Angola knew that:

a.   Mr. Folks' was diagnosed with severe mental illness, had a history of self-harm, and was likely to self-harm again,

b.   Mr. Folks had been placed in the time-out cell and held there for indefinitely,

c.   Because of his mental illness, Mr. Folks seriously self-harmed while in the time-out cell at least three times, requiring hospitalization each time, and each time was returned to the time-out cell after he was discharged from the hospital, and

d.   That conditions in the time-out cell were not appropriate for someone with his diagnosis and likely provoked his self-harming behavior.

66.     Specifically, the Defendants knew about Mr. Folks' mental illness, incidents of self-harm, and placement in the time-out cell at Angola because:

a. Dr. Gamble, Officer Doe, and EMT Doe personally saw Mr. Folks in the time-out cell, including many times in restraints; reviewed his medical records; and either saw him self-harm or were notified afterwards.

b. On information and belief, Warden Hooper, Assistant Warden for Health Services Doe, Director of Medical Services Toce, Medical Department Director Lefleur, ATU Director Doe, and ADA Administrator Oliveaux—the "administrative Defendants"—were aware of Josh either through personal interaction or because a person with such a severe mental health condition is rare, even at Angola. A person with such serious and obvious mental health needs would have been brought to the attention of these Defendants, given the special circumstances of his care and incarceration. Further, and Mr. Folks' 17-month stay in the time-out cell extraordinarily long and unprecedented, and required approval from higher-up administrators.

67. Defendants knew that the time-out cell was provoking Mr. Folks' self-harming behavior because: the connection between extreme isolation and adverse mental health consequences is well-established and obvious, hence the temporary nature of the "time out" cell; Mr. Folks harmed himself multiple times while in the time-out cell; and Mr. Folks asked to be moved to a different housing assignment, where he was not in complete isolation.

68. But none of the Defendants provided Mr. Folks with a different housing assignment, or transfer to a more appropriate facility—or even investigated whether those accommodations were possible.

*First self-harm incident on June 1, 2021*

69.    Predictably, inside the time-out cell, Mr. Folks' mental health deteriorated.

70.    On June 1, 2021, about a month and a half after arriving at Angola, Mr. Folks found a long piece of metal in his time-out cell and stabbed himself with it repeatedly in the abdomen.

71.    An Angola employee found him in the cell, bleeding, and he was taken to the hospital. When he arrived, the metal was still inside him, so the hospital performed an emergency surgery, which left Mr. Folks with a long scar down the center of his stomach and his navel off-center.

72.    At the hospital, the Angola guards kept Mr. Folks in 5-point restraints for his entire visit. The restraints went against the medical staff's wishes and recommendations, and were unnecessary. Because Mr. Folks was immobilized for so long, the hospital staff gave him blood thinners to prevent blood clots from forming in his legs.

73.    Mr. Folks was eventually discharged from the hospital and returned to Angola and his time-out cell, where guards chained him to his bed with 5-point restraints.

74.    Mr. Folks was kept in the restraints until June 27, 2021.

*Second self-harm incident on July 6, 2021*

75.    Predictably, with no change in his conditions, Mr. Folks' mental health crisis persisted.

76.    On July 6, 2021, Mr. Folks found a piece of metal and used it to stab himself again.

77.    This time, he had noticed a bulge in his stomach and believed it was a sign that something had gone wrong with his surgery the previous month. Distressed and anxious, he stabbed himself in part in order to get back to the hospital to have the problem fixed.

78.    Bleeding profusely, Mr. Folks went to the door of his cell and told the guard sitting outside that he had stabbed himself and needed to go to the hospital. The guard retorted that her

lunch of fried chicken had just been delivered from the prison cafeteria, and he would have to wait until she finished eating. Mr. Folks waited, continuing to bleed, while the guard ate her lunch. When she eventually finished, she called medical staff.

79.    Mr. Folks was transported to the hospital for emergency treatment.

80.    Either while he was at the hospital or after he returned to Angola, another prison official told Mr. Folks that she was irritated with how often he went to the hospital. She told him that next time, he should cut himself in the neck—and pointed to her carotid artery, implying that he should kill himself.

81.    At the hospital, the guards again chained Mr. Folks to the bed with 5-point restraints. Again, the guards' use of restraints went against the recommendations of the doctors and was unnecessary. Hospital staff placed him on blood thinners to keep clots from forming in his legs.

82.    This time, an MRI identified some blockage in Mr. Folks' abdomen that had in fact resulted from the first surgery, so the doctors performed another surgery to fix the problem.

83.    Mr. Folks was eventually discharged from the hospital and he returned—again—to the time-out cell in Angola.

84.    Again, the guards placed him in 5-point restraints, and kept him there for five weeks.

*Third self-harm incident*

85.    Mr. Folks' conditions did not change, and so neither did his mental health crisis.

86.    At some point, while he was in the time-out cell, Mr. Folks self-harmed a third time. This time he cut himself severely enough that he had to be hospitalized.

87.     After the hospital treated and discharged him, Mr. Folks returned to his time-out cell. The guards again put Mr. Folks in 5-point restraints, and left him in those restraints for 12 days.

*Release from the time-out cell*

88.     Mr. Folks stayed in the time-out cell, and in mental distress, for 17 months, until he was finally moved to death row in late September 2022.

89.     Mr. Folks was not facing the death penalty (he was serving time for a probation violation). And the conditions on death row are notoriously brutal—so brutal, in fact, that they have been the subject of many lawsuits and are under a number of injunctive orders and settlement agreements.

90.     But Mr. Folks actually preferred being there, not because the conditions on death row were good, but because the time-out cell had been *so bad*. For example, prisoners on death row were allowed out of their cell for only one hour per day, but in the time-out cell, Mr. Folks was *never* allowed out.

91.     On death row, Mr. Folks' mental health improved, at least marginally. He did not attempt to self-harm again while he was there.

92.     On November 14, 2022, Mr. Folks was released from Angola.

93.     Mr. Folks continues to suffer severe mental anguish from the prolonged isolation and restraints and also physical injuries and limitations. For example, Mr. Folks' stomach and bowels have been affected from his self-harm in Angola, and he can no longer effectively regulate his bowel movements. He lost a large amount of muscle mass in his legs from his prolonged restraint and is still working to build up that muscle so that he can walk like he did before.

Psychologically, the treatment at Angola has exacerbated Mr. Folks' underlying mental illness and increased his anxiety and depression significantly.

## CLAIMS FOR RELIEF

## COUNT 1

**Americans with Disabilities Act**
**Against Louisiana Department of Public Safety & Corrections**
**Damages**

94.     Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

95.     On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1).  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

96.     A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the natures of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

97.     To make out a *prima facie* case under Title II, a plaintiff must show: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Cadena v. El Paso Cty.*, 946 F.3d 717, 723 (5th Cir. 2020) (citations omitted). A plaintiff seeking damages must

also show that the defendant intentionally discriminated against him. *See Philips next friend of J.H. v. Prator*, 2021 WL 3376524, at *2 (5th Cir. 2021).

98.     The Louisiana Department of Public Safety & Correction (by and through the individual Defendants acting in their official capacities) is a public entity as defined in 42 U.S.C. § 12131(1)(A).

99.     Mr. Folks is a qualified individual with a disability as defined in 42 U.S.C. § 12131(2). He has, among other conditions, bipolar disorder and paranoid schizophrenia, which "substantially limit[]" him in "one or more of his major life activities," including work, relationships, self-care, and so on.

100.     Mr. Folks was denied meaningful access to a safe place to sleep at Angola, because he could not use the time-out cell without an "unreasonable level of difficulty," including pain brought on self-harming. *Frame v. City of Arlington*, 616 F.3d 476, 484 (5th Cir. 2010) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985))

101.     The Department discriminated against Mr. Folks "by reason of" his disability. Specifically, Defendants failed to reasonably accommodate Mr. Folks, despite the fact that he specifically asked to be transferred to a different housing assignment, and despite the fact that his need for an accommodation was "open, obvious, and apparent"—because, *inter alia*, he had serious mental health diagnoses, a pattern of self-harming, and the link between extreme isolation and deterioration of mental health. *Windham v. Harris County*, 875 F.3d 229, 236 (5th Cir. 2017).

102.     The Department had actual notice of its duty to accommodate for the same reasons. *Smith v. Harris Cty., Texas*, 956 F.3d 311, 318 (5th Cir. 2020).

103.     Further the Department was aware that confinement in the time-out cell was not the least restrictive setting and had ample alternative available housing placements for Mr. Folks. The

choice to keep Mr. Folks in the most restrictive setting because of his mental illness defies the Department's duty under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

104.    The Department's unlawful actions were and continue to be intentional, willful, malicious, and/or done with reckless disregard to the right of Plaintiffs and other people similarly situated to be free from discrimination based on disability.

## COUNT 2

### Rehabilitation Act
### Against Louisiana Department of Public Safety & Corrections
### Damages

105.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

106.    Section 504 of the Rehabilitation Act states that no "qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (a).

107.    "[T]he rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 (5th Cir. 2005).

108.    Section 504, however, imposes liability where the plaintiff's disability is the *sole* reason that he was excluded from the entity's services, programs, or activities. *See id.*

109.    The Department receives funding, and so is subject to Section 504 of the Rehabilitation Act.

110.    Mr. Folks' mental health diagnoses qualify him as an "individual with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

111.    At Angola, he was placed in a time-out cell, which denied him access to a safe place to sleep.

112.    The Department failed to reasonably accommodate Mr. Folks, despite the fact that he specifically asked to be transferred to a different housing assignment, and despite the fact that his need for an accommodation was obvious—because, *inter alia*, he had serious mental health diagnoses, a pattern of self-harming, and the link between extreme isolation and deterioration of mental health.

113.    The Department had actual notice of Mr. Folks' need for an accommodation for the same reasons.

114.    Mr. Folks' disability was the sole reason he was denied meaningful access to a safe place to sleep. Mr. Folks' mental illnesses is what made his regular cell and the time-out cell specifically dangerous to him, and what caused his mental health to deteriorate and provoked his self-harming behavior.

115.    The Department's unlawful actions were and continue to be intentional, willful, malicious, and/or done with reckless disregard to the right of Plaintiffs and other people similarly situated to be free from discrimination based on disability.

## COUNT 3

**42 U.S.C. § 1983 – Eighth and Fourteenth Amendments – Deliberate Indifference Against Warden Hooper, Assistant Warden for Health Services Doe, Director of Medical Services Toce, Medical Department Director Lefleur, Acute Treatment Unit Director Doe, ADA Administrator Oliveaux, Dr. Gamble, Officer Doe, and EMT Doe Damages**

116.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

117.    Under the Eighth and Fourteenth Amendments to the U.S. Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

118.    A prison official violates the Eighth Amendment when they are deliberately indifferent to a substantial risk of serious harm to an incarcerated person. *Arenas v. Calhoun*, 922 F.3d 616, 620–21 (5th Cir. 2019).

119.    Mr. Folks, because of his diagnoses and his prolonged placement in the time-out cell, faced a substantial risk of inflicting serious injuries on himself.

120.    Defendants knew that Mr. Folks faced this risk when he arrived at Angola and was placed in the time-out cell.

> a.    Dr. Gamble, Officer Doe, and EMT Doe saw Mr. Folks in the time-out cell, reviewed his medical records or were told about his diagnoses, and either saw him self-harm or were notified immediately afterwards.
>
> b.    The administrative Defendants were alerted to the arrival of Mr. Folks because of his serious mental health conditions and history of self-harm; notified each time he self-harmed and was sent to the hospital; and either approved or were alerted to the fact that Mr. Folks was continuing to be held in the time-out cell for an unprecedented length of time.

121.    All Defendants were also aware that the conditions in the time-out cell provoked Mr. Folks' self-harming behavior, because they knew that he self-harmed multiple times in the cell, and because the link between extreme isolation and adverse mental health consequences is well-established and so obvious.

122.    Despite their knowledge that Mr. Folks faced this risk, Defendants refused to "take reasonable measures to abate it." *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).

123.    Defendants could have, for example, transferred Mr. Folks to a different cell in Angola, or transferred him to a different facility or institution, or placed him on home confinement or supervised release.

124.    But Defendants failed to take these actions, or any others, and Mr. Folks remained in a cell that was dangerous to him for 17 months.

125.    As a result, Mr. Folks' repeatedly and serious self-harmed while in their custody.


**COUNT 4**

**42 U.S.C. § 1983 – Eighth and Fourteenth Amendments – Conditions of Confinement Against Warden Hooper, Assistant Warden for Health Services Doe, Director of Medical Services Toce, Medical Department Director Lefleur, Acute Treatment Unit Director Doe, ADA Administrator Oliveaux, Dr. Gamble, Officer Doe, and EMT Doe**
**Damages**

126.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

127.    The Eighth and Fourteenth Amendments prohibit inhumane conditions of confinement. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999).

128.    A two-part test determines whether a prisoner has been subjected unconstitutional conditions. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). The first part involves an "objective component of conditions 'so serious as to deprive prisoners of the minimal measure of life's necessities, as when it denies the prisoner some basic human need.'" *Id.* (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995)). The second part is must subjective "deliberate indifference" by "the responsible prison officials." *Id.*

129.    The conditions in the time-out cell, including the extreme isolation and periodic use of restraints for long stretches of time, deprived Mr. Folks of his physical safety and "peace of mind" for 17 months. *Id*.

130.    Defendants knew that the conditions in the time-out cell compromised Mr. Folks' safety, but disregarded that harm. Defendants knew about the effect of the conditions on Mr. Folks because:

    a.    Dr. Gamble, Officer Doe, and EMT Doe saw Mr. Folks in the time-out cell, reviewed his medical records or were told about his diagnoses, and either saw him self-harm or were notified immediately afterwards.

    b.    The administrative Defendants were alerted to the arrival of Mr. Folks because of his serious mental health conditions and history of self-harm; notified each time he self-harmed and was sent to the hospital; and either approved or were alerted to the fact that Mr. Folks was continuing to be held in the time-out cell for an unprecedented length of time.

131.    All Defendants were also aware of the conditions in the time-out cell, and the effect of those conditions on mental health generally—which is well-established and so obvious.

132.    Despite this knowledge, Defendants refused to "take reasonable measures"— indeed, failed to take any measures—to correct Mr. Folks' conditions of confinement so that he was safe. *See Gobert*, 463 F.3d at 346.

## COUNT 5

**Louisiana State Tort– Negligence**
**Against Warden Hooper, Assistant Warden for Health Services Doe, Director of Medical Services Toce, Medical Department Director Lefleur, Acute Treatment Unit Director Doe, ADA Administrator Oliveaux, Dr. Gamble, Officer Doe, and EMT Doe**
**Damages**

133.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

134.    A plaintiff claiming negligence under Louisiana state law must show: that the defendant owed the plaintiff a duty, which he breached; that the breach was the "cause-in-fact" and "legal cause" of the plaintiff's injury; and that the plaintiff suffered "actual damages." *Roberts v. Benoit*, 605 So. 2d 1032, 1051–52 (La. 1991), *on reh'g* (May 28, 1992); La. Civ. Code arts. 2315–2316. In other words, Louisiana law "prescribes a typical duty/risk analysis." *See Mart v. Hill*, 505 So. 2d 1120, 1122 (La. 1987).

135.    Defendants owed Mr. Folks, who was a prisoner in their custody, "a duty to use reasonable care to protect [him] from harm" including "self-inflicted injury." *See Scott v. State*, 618 So. 2d 1053, 1059 (La. App. 1st Cir. 1993); *see also Leonard v. Torres*, 2016-1484 (La. App. 1 Cir. 9/26/17), 2017 WL 4301898.

136.    These Defendants "either knew or should have known of the risk of harm presented" to Mr. Folks. *Guidry v. Jackson*, 2017-0398 (La. App. 1st Cir. 2018).

137.    Because of either their roles in the administration or their personal contact with Mr. Folks: Defendants were alerted or should have been alerted to Mr. Folks diagnoses as well as his history or risk of self-harm when he was admitted to Angola; Defendants were informed or should have been informed each time Mr. Folks severely self-harmed while in their custody; and Defendants knew or should have known that he was held in the time-out cell for, eventually, 17 months in total. Defendants all knew or should have known that those conditions, combined with Mr. Folks' diagnoses, put him at significant risk of harm.

138.    Defendants breached their duty to Mr. Folks by failing to provide him with an appropriate housing assignment, including one that did not keep him in total isolation or provide him access to pieces of metal that he could use to self-harm.

139.    But for Defendants' failure to have him transferred out of the cell, Mr. Folks would not have self-harmed; and their failure was also the proximate cause that Mr. Folks self-harmed.

140.    Mr. Folks' injuries included wounds to his abdomen and neck, as well as months of mental anguish and suffering.

### COUNT 6

**Americans with Disabilities Act**
**Against Louisiana Department of Public Safety & Corrections, Warden Tim Hooper in his**
**Official Capacity**
**Injunctive Relief**

141.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

142.    Mr. Folks, who has, among other conditions, bipolar disorder and paranoid schizophrenia, is a qualified individual with a disability. 42 U.S.C. § 12131(2).

143.    Defendant discriminated against Mr. Folks "by reason of" his disability, because the statute, though facially neutral, has adverse and disproportionate effects on people with mental health problems that cause them to compulsively self-harm. *See Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018).

144.    As a result of the discrimination, Mr. Folks was denied meaningful access to non-discriminatory criminal charging and prosecution.

145.    Further, incarceration is not the least restrictive setting available for treating a Mr. Folk's compulsive self-harming behavior and thus violates the ADA's mandate as interpreted in e *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

### COUNT 7

**Fourteenth Amendment – Equal Protection**
**Against Louisiana Department of Public Safety & Corrections, Warden Tim Hooper in his**
**Official Capacity**
**Injunctive Relief**

146.    Mr. Folks incorporates each paragraph of this Complaint as if fully restated here.

147.    "[L]egislation that distinguishes between" groups, including between people with mental illness "and others[,] must be rationally related to a legitimate governmental purpose." *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 441–42 (1985).

148.    The Louisiana statute creates differential treatment between groups, because it produces an unequal effect between people who have a serious mental illness, and people who do not. *See* La. Stat. Ann. § 14:404.

149.    Mr. Folks, who self-harms compulsively because of his mental illness, was harmed by enforcement of this statute.

150.    The government lacks a rational basis for enforcing this statute against Mr. Folks and others who belong to that group (people with mental illness).

151.    As applied to prisoners who self-harm compulsively, because of mental illness, the statute is not a rational means for achieving any governmental objective. For example, because the behavior is compulsive and involuntary, sanctioning it has no deterrent effect, and it is not deserving of retribution.

**PRAYER FOR RELIEF**

Plaintiff, Joshua Folks, respectfully requests that this Court:

1.  Enter a declaratory judgment in his favor declaring La. Stat. Ann. § 14:404 to violate the ADA and Constitution as alleged;

2.  Enter a permanent injunction preventing Defendants from using La. Stat. Ann. § 14:404 to punish Plaintiff for manifestations of his serious mental illness;

3. Award compensatory, punitive, and nominal damages against Defendants for the harms

   alleged herein;

4. Award reasonable attorneys' fees and costs;

5. Award any other such relief that this Court deems just and proper.

Respectfully submitted,

*/s/ William Most*
William Most (La. Bar. No. 36914)
Caroline Gabriel (La. Bar No. 38224)
Most & Associates
201 St. Charles Avenue, Ste. 2500, # 9685
New Orleans, LA 70170
Phone: (504) 509-5023
E-mail: williammost@gmail.com

Oren Nimni (MA BBO No. 691821)*
RIGHTS BEHIND BARS
416 Florida Avenue, NW #26152
Washington, D.C. 20001
(206) 200-9088
oren@rightsbehindbars.org

*\* pro hac vice*

*Attorneys for Plaintiff Joshua Folks*