## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOSHUA FOLKS** | * | **CIVIL ACTION** |
| | * | |
| | * | |
| **VERSUS** | * | |
| | * | **NO.:  3:23-cv-01289-SDD-RLB** |
| **LOUISIANA ATTORNEY GENERAL JEFF** | * | |
| **LANDRY, LOUISIANA DEPARTMENT OF** | * | |
| **PUBLIC SAFETY & CORRECTIONS,** | * | |
| **WARDEN TIM HOOPER, ASSISTANT** | * | **JUDGE: SHELLY D. DICK** |
| **WARDEN FOR HEALTH SERVICES DOE,** | * | |
| **DIRECTOR OF MEDICAL SERVICES** | * | |
| **PAUL TOCE, MEDICAL DEPARTMENT** | * | |
| **DIRECTOR DAN LEFLEUR, ACUTE** | * | **MAGISTRATE JUDGE:** |
| **TREATMENT UNIT DIRECTOR DOE,** | * | **RICHARD L. BOURGEOIS** |
| **ADA ADMINISTRATOR ASHLI OLIVEAUX,** | * | |
| **DR. GAMBLE, OFFICER DOE, and** | * | |
| **EMT DOE** | * | |

**************************************************************************

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, come Defendants, the Louisiana Department of Public Safety & Corrections, Tim Hooper, Paul Toce, Dan Lafleur, Ashli Oliveaux and Matthew Gamble, who file this memorandum in support of their motion for summary judgment.  Plaintiffs' claims arise out of his incarceration at Louisiana State Penitentiary. At the outset, Folks failed to exhaust administrative remedies and therefore all claims must be dismissed.

As to the merits, Folks' §1983 and ADA/RA claims fail. Folks was a pre-trial detainee housed at LSP pursuant to La. R.S. 15:824 at the request of St. Mary's Parish jail following multiple self-harm attempts after Folks' arrest. While incarcerated at LSP, Folks engaged in multiple self-harm acts, followed by threats of self-harm, resulting in placing Folks in therapeutic restraints, all of which complied with DPSC policies. To protect Folks, and in order to comply with La. R.S. 15:824

1

that requires pre-trial detainees to be housed separate from DPSC offenders, Folks was housed in a single man cell in the mental health unit, which provided 24-hour cameras allowing for direct observation. Folks was continuously treated by mental health staff through his incarceration, and was seen over 140 times in a 17-month period. Plaintiff cannot show any constitutional violation, or a violation of the ADA/RA. All Defendants are entitled to qualified immunity and Plaintiff's claims should be dismissed.

## I.    FACTUAL BACKGROUND

### A.  DPSC Policies Concerning Suicide Watch and Restraints

This case concerns the mental health treatment of Plaintiff, who had a history of self-harm and who actively self-harmed, or threatened to self-harm, during most of his incarceration at LSP.

HCP40 is the DPSC policy that governs utilization of restraints pursuant to mental health orders.[1] HCP 40 provides that restraints shall be used only when clinically indicated for management of serious threats of self-harm or as a part of an authorized suicide watch.[2]

HCP 30 governs procedures for suicide prevention and "establishes a written suicide prevention plan for managing inmates who display suicidal tendencies or behaviors and establishes a formal procedure for staff and inmate critical incident debriefing that covers the management of suicidal incidents."[3] HCP 30 outlines requirements for any suicide watch.

There are two levels of suicide watch: standard and extreme. When an inmate is identified as in need of suicide watch precautions, on-site staff shall maintain continuous observation of the inmate until either standard or extreme watch procedure is implemented. An inmate placed on a standard suicide watch shall be assessed by mental health staff at a minimum of every 24 hours.

---

[1] See Affidavit of Dr. Gamble, Exhibit A; Exhibit A-2,  HCP 40.
[2] *Id*.
[3] See Affidavit of Dr. Gamble, Exhibit A; Exhibit A-1, HCP 30.

2

Extreme suicide watch shall be ordered only for the management of an inmate who presents a clear and continual risk of significant self-injurious behavior, which may include behaviors deemed life threatening/suicidal and non-suicidal self-injurious behaviors.[4] Restraints may be ordered where clinically indicated in accordance with HCP 40.[5] Upon initiation of extreme suicide watch, inmates shall be assessed by mental health staff at least every 12 hours.[6] While in restraints, offenders must be let out of the restraints every two hours and the restraints are checked every 15 minutes for circulation.[7]

Extreme suicide watch may be modified or downgraded only by a health care practitioner/provider. Extreme suicide watch shall be downgraded to a standard suicide watch for a length of time sufficient to assess the inmate's stability. In any implementation of an extreme suicide watch, it is LSP's goal to get the offender to a place of less restriction as soon as possible, based on the offender's intent to self-harm.[8]

### B. Folks' Incarceration and Mental Health Treatment

On March 26, 2021, Joshua Folks was arrested in St. Mary's Parish on a felony charge. He was booked into the local facility. Within two days of being in St. Mary's custody, Folks self-harmed twice. The self inflicted injuries were so significant, Folks was rushed to a local hospital in both instances. St. Mary's Parish requested that Folks be transferred to a DPSC facility due to the severe self-harm.[9]

Folks was not a DPSC offender, as he had not been convicted of the new charges. In some instances, local facilities can request that pre-trial offenders be housed in a DPSC facility. Pursuant

---

[4] *Id*.
[5] *Id*.
[6] *Id*.
[7] *Id*.
[8] Exhibit E, Deposition of Dr. Gamble, pg. 98-99.
[9] Exhibit C, Email, bates 105.

to La. R.S. 15:824, an individual who has not been convicted or sentenced to DPSC custody may be housed at a DPSC facility if the local facility determines that it has insufficient facility to house the individual and the transfer is necessary to prevent danger to the individual, staff, inmates or general public.  However, La. R.S. 15:824 provides that pre-trial detainees housed at DPSC facility shall be housed separate and apart from offenders sentenced to DPSC custody.[10]

When Folks arrived at LSP, he was housed in the skilled nursing unit. This was in part because Folks was a pre-trial detainee, in part so that Folks could have access to 24/7 medical care in his housing area, and in part so that he would be in a room by himself to minimize his access to foreign objects for self-harm purposes.[11]

Folks was seen upon arrival at LSP on March 31, 2021. He arrived with cuts on his wrists and knees and advised he had swallowed a metal object used to cut himself prior to arriving at LSP.[12] On April 11, 2021, Folks cut his neck and knees and refused medical treatment.[13] Folks was placed on suicide watch. On April 12, 2021, Folks was seen by a social worker. Folks reported that he planned to cause enough problems that DOC would send him back to parish prison.[14] Extreme suicide watch was continued. Again on April 13, 2021, Folks was seen by a social worker and reported that when he gets off watch he will do something that requires a doctor to fix.[15] Extreme suicide watch was continued. Folks was seen every 12 hours for suicide watch. On April 15, 2021, he was downgraded to a two-point restraint.[16]

---

[10] See also Exhibit J, IS-B-1.
[11] Exhibit E, Deposition of Dr. Gamble, p. 61-62.
[12] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3369.
[13] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3356.
[14] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3350.
[15] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3340.
[16] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3325.

On April 16, 2021, Folks was seen and continued to make threats of self-harm.[17] He was seen every twelve hours for suicide watch. He made threats of self-harm on April 19[18] and April 20.[19] Folks threatened self-harm was the reason  suicide watch was not discontinued.[20] On April 21, Dr. Lavespere met with Folks and discontinued extreme suicide watch and downgraded to a standard suicide watch.[21]

On April 23, 2021, Folks was seen by LSP psychiatrist Dr. Matthew Gamble. The notes reflect that Folks was well known to Dr. Gamble from prior incarceration period. Dr. Gamble noted that Folks had a long history of non-suicidal self-injuries. He was currently on suicide watch. Folks identified no clear plan of self-harm or harm to others. The plan was to continue psychiatric medications and return to clinic in two weeks.[22]

The same day, Folks reported to a social worker that he endorsed suicidal ideations if his demands are not met.[23] On April 24, 2021, Folks was seen and told social worker that he knew he was not coming off of suicide watch because of his behavior.[24] While Folks reported on April 25 that he was doing well, on April 26, 2021 Folks told security that he wanted to cut himself.[25] He remained on suicide watch.[26]  On April 28, 2021, Folks told Dr. Lavespere that he would blow up the judge's house if he was not let out of jail.[27] Suicide watch was continued.

On April 30, 2021, LSP mental health prepared a Mental Health Plan of Care with Folks. The identified concern was the restrictive housing environment. The goals included compliance with

---

[17] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3314.
[18] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3283 and 3285.
[19] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3279.
[20] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3279.
[21] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3271.
[22] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3241.
[23] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3242.
[24] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3239.
[25] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3225 and 3222.
[26] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3222.
[27] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3203.

LPS regulations, to demonstrate appropriate activities of daily living in his assigned housing area and to demonstrate appropriate boundaries with staff and inmates. The interventions included Folks demonstrating appropriate social skills for living in a less restrictive housing assignment, compliance with medication and remission of symptoms. This plan of care was signed by the clinician, Dr. Gamble and Folks.[28]

From May 1 through May 6, 2021, Folks was seen every 24 hours.[29] During this time, Folks advised he was doing well, but that he could stay on watch. Suicide watch discontinued on May 6, 2021.[30]

Folks was seen by Dr. Gamble on May 24, 2021. Dr Gamble noted that Folks experienced legal related anxieties. Dr. Gamble noted no complaints of depression, mania or psychosis. There were no suicidal ideations and no plans for self-harm. The plan was to continue psychiatric medications and to return to clinic in 8 weeks.[31]

On June 13, 2021, Folks stabbed himself in the neck and stomach.[32] He was placed on extreme suicide watch. On June 14, 2021, Folks was seen and expressed frustration at being a Parish inmate and said he was not meant to be at LSP. Folks expressed ambivalence towards killing himself. Extreme suicide watch continued.[33] On June 15, 2021, Folks reported to a social worker that he had lunch with Warden Hooper and gave him 96 hours to get Folks out of here. Extreme suicide watch was continued.[34]

---

[28] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3191-3193.
[29] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3196, 3179, 3175, 3167, 3160, 3152, 3142, 3146.
[30] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3196, 3179, 3175, 3167, 3160, 3152, 3142, 3146.
[31] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3139.
[32] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3134.
[33] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3124.
[34] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3113.

On June 16, 2021, Folks was seen by Dr. Gamble. Dr. Gamble noted that the recent self-harm was in the context of placement seeking because he was moved to TU and he has made it known that he would like to stay on the skilled nursing unit. Dr. Gamble noted little improvement despite medication, placements, or attempts to offer therapy. Dr. Gamble noted that Folks' behavior was volitional and often aimed at external incentives, i.e., contingent threats. Dr. Gamble noted cluster B character pathology and there was no indication of disorganized mental illness. Folks had good grooming and hygiene, he was calm and cooperative, his weight was appropriate, and he expressed no plan or intent for self-harm. The plan was to continue psychiatric medications and return to clinic in two weeks.[35]

From June 16 through June 27, 2021, Folks was seen every twelve hours for extreme suicide watch. Because of his tendency to eat staples and metal objects, he would remain on extreme watch until his wounds healed.[36] During this 11 day time period, Folks told social workers that he "can do what he wants to do,"[37] that he wasn't suicidal "yet,"[38] he would confirm that he was suicidal[39] and would express that he is thinking of various ways to kill himself if he was let off of restraints.[40] He was downgraded to a two-point restraint on June 22, 2021, and advised the same day that he would kill himself if they let him off watch.[41] He was then placed back in four-point restraints.

On June 28, 2021, Folks was seen by Dr. Gamble. Folks adamantly denied suicidal ideation and denied plans for self-harm or harm to others. The notes reflect that Dr. Gamble noted that there were no objective signs of disorganized mental illness, no complaints or depression, anxiety, mania

---

[35] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3097.
[36] Affidavit of Dr. Gamble. Deposition of Dr. Toce, pg. 82-83.
[37] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3077.
[38] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3069.
[39] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3060.
[40] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3044.
[41] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3040.

or psychosis. Folks verbally contracted for his safety to Dr. Gamble. As such, Dr. Gamble downgraded the suicide watch to a 2-point restraint.[42]

On June 30, 2021 Folks was seen by Dr. Gamble again. There were no episodes of self-harm in the last 48 hours on two-point restraints. No complaints or depression, anxiety, mania or psychosis. Folks verbally contracted for his safety again and Dr. Gamble downgraded Folks to standard suicide watch.[43]

From July 1 through July 6, Folks was seen every 24 hours for standard suicide watch.[44] On July 6, 2021, Folks adamantly denied suicide ideations. Standard suicide watch was discontinued.[45] Less than an hour later, after suicide watch was discontinued, Folks was taken to the ATU due to self-harm.[46] Folks presented angry and verbally abusive to ATU staff. Folks repeatedly punched himself in the stomach and said he was ready to die. The social worker was informed that he shoved metal into his stomach. Folks was again placed on extreme suicide watch with four point restraints.[47] Folks was brought to a hospital and underwent surgery.

Folks came back from the hospital on July 13, 2021. He was placed on extreme suicide watch and seen every 12 hours. He refused to talk and was angry that he had surgery.[48] He was seen by Dr. Gamble on July 14, 20212. Folks reported anxiety related to recent surgery and GI upset. Dr. Gamble added Naltraxone.[49]

---

[42] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2982.
[43] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2962.
[44] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2955, 2951, 2946, 2933.
[45] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2926.
[46] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2924, 2918.
[47] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2918.
[48] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2914.
[49] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2889-2990.

From July 15 through July 20, 2021, Folks was seen every 12 hours.[50] Folks would report on some occasions that he wanted to stay on extreme watch[51] and even continued to threaten self-harm if he came off of watch.[52] Folks also expressed that he was aware that he was on suicide watch due to extreme impulsive and unpredictable self-injurious behavior in the recent past and stated that he understood that staff were trying to keep him safe.[53] Regardless, due to impulsivity of behavior and severity of self-injuries, he was continued on extreme suicide watch as a precaution.

On July 21, 2021, while on four-point restraint, Folks inserted metal into his body.[54] Folks was taken to the hospital again, where he underwent a small bowel resection and a colectomy of the transverse colon was performed.[55] Folks was in the hospital for 10 days and returned to LSP on July 31, 2021. He was placed on extreme suicide watch.[56] Folks was seen by Dr. Gamble on August 2, 2021. Dr. Gamble noted that Folks continued to make arguments for less restrictive housing but then made threats of self-harm.[57] Extreme watch was continued.

Between August 3 and August 10, Folks was seen every 12 hours for extreme suicide watch assessment.[58] He was downgraded to standard suicide watch on August 10 and moved to the TU.[59] Folks was seen by Dr. Gamble on August 11, 2021. Folks expressed sadness and anxiety over his recent bowel resection.[60] From August 11 through August 17, Folks was seen every 24 hours for

---

[50] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2891, 2884, 2886, 2876, 2877, 2868,2870, 2857, 2866, 2064, 2066, 2851.
[51] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2893, 2857.
[52] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2064, 2851.
[53] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2870.
[54] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2843, 2841.
[55] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2843, 2841.
[56] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2820.
[57] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2810.
[58] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2799, 2807, 2794, 2797, 2780, 2782, 2769, 2771, 2775, 2760, 2767, 2753, 2755, 2742, 2745, 2739.
[59] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2738.
[60] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2106.

standard suicide watch. Each note determined that Folks would remain on watch due to multiple attempts of self-harm and for his safety. On August 17, 2021, Dr, Gamble discontinued suicide watch.[61] Folks was seen by mental health on August 18, August 24, November 11 and January 22 and no significant mental health issues were reported.[62]

On August 10, 2022, Folks signed his Waiver of Final Revocation Hearing, which revoked his parole, making him a DPSC offender.[63] Folks was moved to the Death Row cells on September 16, 2022.[64] Folks was released on November 14, 2022.[65]

## II.    LAW AND ARGUMENT

### A.    Plaintiff Failed to Exhaust Administrative Remedies

#### i.    Exhaustion requirements

According to 42 U.S.C. § 1997e(a): "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1996). The purposes of this exhaustion requirement are to "give an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court" and to allow for claim resolution in proceedings before an agency because it is faster and more economical than litigation in federal court. *Woodford*, 126 S.Ct. at 2385.

In 42 U.S.C. § 1997e(a) Congress has mandated exhaustion of administrative remedies, regardless of the relief offered through administrative procedures. *Booth v. Churner*, 121 S.Ct. 1819, 1825 (2001). All claims that involve matters of prison life must be exhausted, including

---

[61] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2078.
[62] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2067, 2061, 2059, 2058, 2056.
[63] Exhibit M.
[64] Exhibit M.
[65] Exhibit M.

claims under 1983 and the ADA. *Wiley v. McKellar*, 167 F. App'x 385, 386 (5th Cir. 2006). Exhaustion of administrative remedies is mandatory. *Porter v. Nussle*, 122 S.Ct. 983, 988.

Louisiana has a two-step Administrative Remedy Procedure ("ARP") for inmates, which they are required to use before filing suit in district court. La. Admin. Code tit. 22, § 325(A) (2009). Generally, the inmate commences the first step of the grievance process by writing a letter to the warden of his or her institution briefly setting out the basis for his or her claim and the relief sought. § 325(G)(1)(a). The grievance letter should be written within 90 days of the alleged event that is the subject of the complaint. *Id*. The Warden has 40 days from the day the grievance is received to respond to the request. *Id*. If following transfer to a new institution, the inmate files a grievance regarding an action taken by his or her former institution, the former institution "will complete the processing through the first step." § 325(G)(8). Furthermore, "[i]f the inmate believes the complaint is sensitive and would be adversely affected if the complaint became known at [his or her] institution," he or she may skip the first step and file his or her complaint directly with Louisiana's Assistant Secretary of Adult Services. § 325(G)(6)(a).

The inmate may proceed to the second step of the ARP by appealing to the Secretary of the DPSC if he or she is dissatisfied with the first step response. § 325(G)(2)(a). If the inmate never receives a response to a first step grievance, then he or she is entitled to proceed to the second step of the process upon the expiration of the first step response time limit. § 325(G)(4)(a). If the inmate is not satisfied with the second step response, he or she may then file suit in district court. § 325(G)(2)(b). A prisoner whose ARP is rejected as untimely has not exhausted Louisiana's ARP process. 22 La. Admin. Code Pt. I, § 325 (E) ("A request for administrative remedy which is rejected is not considered properly exhausted, as such request has not been addressed on its merits at either of the two steps.")

The Supreme Court in *Woodford* held that the exhaustion requirement requires "proper exhaustion," meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). In *Woodford*, the prisoner was placed in administrative segregation for two months for certain inappropriate acts he committed in the prison chapel. *Id*. at 2383. The prisoner claimed he was thereafter prohibited from participating in "special programs," including a variety of religious activities. *Id*. Approximately six months later, he filed his first and only administrative complaint—a grievance with prison officials which was rejected as untimely because it was not filed within fifteen days of the action being challenged. *Id*. at 2383–84. After holding that proper exhaustion was required, the Court also explained that it was not addressing a situation in which the prison's system deliberately devised procedural requirements designed to "trap" and "defeat [the] claims" of unwary prisoners. *Id*. at 2392–93.

### ii.     Plaintiff failed to exhaust administrative remedies

During his incarceration at LSP during the relevant time period, Folks filed four ARPs, none of which properly exhausted the claims brought in this lawsuit.

On November 9, 2021, Folks filed ARP 2021-2850 wherein he requested mental health records, medical records and photographs related to his self-harm at LSP in connection with the "defense of pending charges" in St. Mary's Parish.[66] The First Step Response stated that the Medical Records Department was processing Folks' request for his records. Folks proceeds to Step two wherein it was found that Folks' request was appropriately addressed.

---

[66] See Exhibit D-1.

On November 9, 2021, Folks filed ARP 2021-2851 wherein he requested a copy of his rap sheet and parole hold.[67] The request was backlogged pursuant to the ARP process. In the First Step response, LSP provided the detainer letter and list of pending charges. LSP further outlined that Folks' parole violation will depend on the outcome of the pending charges in St. Mary's Parish. Folks did not proceed to the second step.

On April 18, 2022, Folks submitted ARP 2022-0859 concerning alleged flooding of his cell and unsanitary conditions from leaks in the roof.[68] He requested that the cell be repaired. On May 14, 2022, Folks voluntarily withdrew his ARP.

On July 27, 2022, Folks filed ARP 2022-1428.[69] Folks claimed "cruel and unusual punishment by use of force by restraints" between April and August of 2021. On July 28, 2022, ARP 2022-1428 was rejected because it was filed more than 90 days after the incident.

The only ARP that was properly exhausted was ARP 2021-2850. In that ARP Folks requested mental health records and medical records. This ARP did not put Defendants on notice of any claims under the ADA (Count 1 and 6), RA (Count 2), §1983 Eighth Amendment – Deliberate Indifference (Count 3), or §1983 Eighth Amendment – Conditions of Confinement (Count 4) . Plaintiff failed to exhaust his administrative remedies.

ARP 2022-1428 filed in July of 2022, nearly a year after the events complained of, was rejected as untimely. Under Louisiana law and the Supreme Court ruling in *Woodford*, an untimely ARP is not properly exhausted. 22 La. Admin. Code Pt. I, § 325 (E); *Woodford* v. Ngo, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). As such Folks failed to exhaust and his claims must be dismissed.

---

[67] See Exhibit D-2.
[68] See Exhibit D-3.
[69] See Exhibit D-4.

**B. Plaintiff's Claims are Prescribed**

Even if Plaintiff's claims were properly exhausted, which they were not, Plaintiff's claims are prescribed. Because  there is no federal statute of limitations for claims brought pursuant to 42 U.S.C. § 1983 or the ADA, a federal court must borrow the forum state's general personal injury limitations period for such claims. *Owens v. Okure*, 488 U.S. 235, 240 (1989); *Brockman v. Texas Dep't of Criminal Justice*, 397 F. App'x 18, 21 (5th Cir. 2010). In Louisiana, the applicable period of limitations is one year. La. Civ.Code Art. 3492.[70] Further, in both the § 1983 and ADA contexts, the Fifth Circuit has held that even if state law provides the underlying limitations period, federal law establishes the date upon which claims accrue, which is "'when the plaintiff knows or has reason to know of the injury which is the basis of the action.' " *Jackson v. Johnson*, 950 F.2d 263, 265 (5th Cir.1992); *Brockman v. Texas Dep't of Criminal Justice*, 397 F. App'x 18, 22 (5th Cir. 2010). A plaintiff need not realize that a legal cause of action exists but must only have knowledge of the facts that support a claim. *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995).

At the very least, Plaintiff knew or had reason to know of the injury complained of in July 2022 when he filed his untimely ARP concerning alleged excessive force due to restraints. Plaintiff filed suit in September 2023, more than a year later.

**C. Plaintiff's 1983 Claims Fail**

Plaintiff asserts two claims under §1983 concerning his treatment and incarceration at LSP. Plaintiff asserts a deliberate indifference claim against all defendants alleging that defendants were deliberately indifferent to Folks' substantial risk of injuring himself, given his prolonged placement in the TU cells. R.Doc. 13, para. 116-125.  Plaintiff alleges that Defendants could have

---

[70] Article 3492 was repealed by Acts 2024, No. 423. The Louisiana Legislature specifically included that "[t]he provisions of this Act [Act 2024, No. 423] shall be given prospective application only and shall apply to delictual actions arising after the effective date of this Act." The effective date of Act 2024 No. 423 was July 1, 2024. Because Folks' claim arose before July 1, 2024, Article 3492, and the one year prescriptive period, applies.

transferred Folks to a different cell at LSP, transferred him to a different facility, or provided supervised releases. Plaintiff also asserts a §1983 conditions of confinement claim alleging that the TU cell compromised Folks' safety. R.Doc. 126-132.

The evidence demonstrates that Folks was placed in the TU cell because: (1) he was a pretrial detainee and could not be placed in general population or around any DPSC prisoners;[71] and (2) given Folks' self-harm, the TU cells were the safest place for him to be given the 24 hour camera access, direct visual observation, and less access to foreign objects.[72]

Plaintiff's expert asserts that Folks' prolonged isolation and the restraints exacerbated his mental health conditions and self-harming behavior. However, she admitted that restraints can be an appropriate intervention to protect a patient or protect others around the patient.[73] Plaintiff's expert opines that LSP did not provide <u>enough</u> therapeutic interventions to reduce the risk of self-harm.[74] In essence, Plaintiff's expert simply disagrees with the mental health care provided.

Defendants' expert, Dr. Penn, a triple board-certified psychiatric physician and clinical professor with vast experience with correctional health care, reviewed Folks' treatment while at LSP.[75] Dr. Penn opined that Folks has a clear and distinct pattern of repeated intentional self-injury.[76] As such, LSP staff were on notice that without suicide watch and other safety precautions, Folks would continue to self-harm.[77] Due to Folks' continued intentional efforts to harm himself even while on 24 hour direct observation, LSP was required to implement suicide watches and ultimately the application of therapeutic restraints to prevent serious injury and death.[78]

---

[71] La. R.S. 15:824.
[72] Exhibit A, Affidavit of Dr. Gamble.
[73] Exhibit L, Deposition of Dr. Glindmeyer, p. 36.
[74] See Exhibit K, Glindmeyer report, pg. 2.
[75] Exhibit B, Expert report of Dr. Penn.
[76] *Id*. at pg. 51.
[77] *Id*. at pg. 35.
[78] *Id*.

Dr. Penn opined that Folks received appropriate mental health care, including over 146 individual mental health contacts with qualified mental health care professions between March 2021 and November 2022.[79] Further, Folks was seen by Dr. Gamble at least 12 times between April 2021 and January 2022.[80] Dr. Penn opines that the mental health care provided met or exceeded community and correctional health care standards.[81]

### i.     Plaintiff's Deliberate Indifference Claims Fail

It is well-settled that to prevail on an Eighth Amendment claim for the deprivation of medical care, a prisoner must be able to show that appropriate care has been denied and that the denial has constituted "deliberate indifference to serious medical needs." *Thomas v. Carter*, 593 Fed. Appx. 338, 342 (5th Cir.2014), citing *Estelle v. Gamble*, 429 U.S. 97 (1976). Whether the plaintiff has received the treatment or accommodation that he believes he should have is not the issue because a prisoner's mere disagreement with his medical treatment, absent exceptional circumstances, does not support a claim of deliberate medical indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir.2006). Nor do negligence, neglect, medical malpractice or unsuccessful medical treatment give rise to a § 1983 cause of action. *Bagneris v. Collins*, No. CV 14-0724, 2016 WL 1122995, at *3 (M.D. La. Mar. 7, 2016), *report and recommendation adopted*, No. CV 14-724-SDD-EWD, 2016 WL 1189336 (M.D. La. Mar. 22, 2016).

Rather, "subjective recklessness as used in the criminal law" is the appropriate definition of "deliberate indifference" under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 83930 (1994). A prison official acts with deliberate indifference only if the official (1) "knows that inmates face a substantial risk of serious bodily harm," and (2) "disregards that risk by failing to

---

[79] *Id*. at pg. 39.
[80] *Id*.
[81] *Id*.

take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d at 346, quoting *Farmer v. Brennan*, 511 U.S. at 847.

The deliberate indifference standard sets a very high bar. The plaintiff must be able to establish that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001), quoting *Estelle v. Gamble*, supra. Further, a mere delay in providing medical treatment does not amount to a constitutional violation without both deliberate indifference and a resulting substantial harm. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir.2006), citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir.1993). Further, the Fifth Circuit has held that 'deliberate indifference is especially hard to show when the inmate was provided with ongoing medical treatment.' " *Henderson v. Tanner*, No. CV 15-804-SDD-EWD, 2019 WL 885914, at *5 (M.D. La. Feb. 22, 2019), quoting *Fails v. DeShields*, 349 F. App'x 973, 976 (5th Cir. 2009). In the context of mental health treatment, the Fifth Circuit has explained, "[s]uicide is inherently difficult ... to predict, particularly in the depressing prison setting," and an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference. Domino, 239 F.3d at 754-56 (quote at 756).

Here, the undisputed medical records demonstrate that Plaintiff was continuously treated for his mental health concerns. He was seen by mental health personnel 146 times between April 2021and November 2022 and at seen at least 12 times by Dr. Gamble between April 2021 and January 2022. Under Dr. Gamble's professional medical judgment, placement in the TU cells with direct observation was the safest place to address the serious risk of self-harm. As plaintiff's expert

admits, therapeutic restraints can be appropriate to protect a patient. Plaintiffs' disagreement with the mental health care received cannot establish deliberate indifference.

### ii.    Defendants are Entitled to Qualified Immunity

Plaintiff's claims against defendants in their individual capacities must be dismissed, as defendants are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from civil liability for damages if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Flores v. City of Palacios*, 381 F.3d 391, 393-394 (5th Cir. 1984).   The qualified immunity defense affords government officials not just immunity from liability, but immunity from suit.  *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985)). Qualified immunity allows officials the freedom to exercise fair judgment, protecting "all but plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Actions and decisions made by officials that are merely inept, erroneous, ineffective or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton v. Texas A&M University*, 168 F.3d 196, 201 (5th Cir. 1999). The defense of qualified immunity must be resolved at the earliest possible stage of litigation since it entails an immunity from suit and entitlement not to stand trial or face other burdens of litigation. *Pearson v. Callahan* 555, U.S. 223, 232 (2009).

The qualified immunity defense has two prongs: (1) whether an official's conduct violated a constitutional right of the plaintiff; and (2) whether the right was clearly established at the time of the violation. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir.2009). A court may rely on either prong of the defense in its analysis. *Id.* If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established

at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir.2004) (citations omitted). To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir.2008). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir.1994).

Although a plaintiff need not find "a case directly on point, ... existing precedent must have placed the ... constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741. That is, existing precedent must have replaced beyond debate the unconstitutionality of the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor*, 135 S.Ct. at 2044. Accordingly, the Supreme Court explained, "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618, 119 S. Ct. 1692, 1701.

Given the foregoing doctrine, the question in this case must be: viewing the evidence in the light most favorable to plaintiff, at the time the defendants acted, was it "beyond debate" that their conduct violated the Constitution? If the answer is no– if the officials' actions did not clearly violate Folks' rights under the Eighth Amendment– then the officials are entitled to qualified immunity, and summary judgment must be entered in their favor. See *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

As established above, defendants did not violate any constitutional rights. Plaintiff's disagreement with medical care is not tantamount to deliberate indifference under the Eighth Amendment. *Domino*, 239 F.3d at 756 ("[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.").

In *Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018), a pretrial detainee involuntarily committed to a mental health facility, brought 1983 claims against the treating psychiatrists at the mental health facility after he sustained injuries from altercations with patients and guards. The Fifth Circuit specifically addressed qualified immunity regarding the claim that additional or different treatments were not offered to plaintiff. Plaintiff's expert testified that there were other untried treatment options. However, the Fifth Circuit held that "existence of alternative treatment options does not itself render the treatment received unconstitutional." The Fifth Circuit overturned the denial of qualified immunity.

In *Grogan v. Kumar*, 873 F.3d 273, 278 (5th Cir. 2017), a state prisoner brought 1983 claims against prison officials alleging that officials were deliberately indifferent to his serious psychiatric needs when they provided inadequate treatment for his depression. The Fifth Circuit held that the mental health records demonstrated that the defendants made good faith efforts to treat plaintiff's mental illness. Defendants met with plaintiff 12 times during a year period, a treatment plan was documented and that plaintiff met with other mental health professionals. Summary judgment was warranted.

The same reasoning applies here. Plaintiff's real complaint, as demonstrated by his expert's opinions, is that additional or different mental health care was not provided to address Plaintiff's self-harm. See Dr. Glindmeyer expert report, pg. 2. This is insufficient to support a constitutional claim.

In addition, the evidence demonstrates that Defendants' actions were objectively reasonable. Folks was housed in a single man cell to comply with state law, and to protect him from his intentional and repeated self-harm. Following his self-harm events, therapeutic restraints

were appropriately used to abate the risk, especially given Folks' repeated threats that he would self-harm both if he remained in restraints and if he was taken off extreme suicide watch.

### a. Dr. Gamble is entitled to qualified immunity

Dr. Gamble was Folks' treating psychiatrist. Dr. Gamble has previously treated Folks in a prior incarceration period. Dr. Gamble saw Folks at least 12 times between April 2021 and January 2022. In his professional medical judgment, Dr. Gamble felt that the TU cells were the safest place to house Folks given Folks' status as a pre-trial detainee and his intentional and repeated self-harm.[82] The TU cells provided 24-hour camera observation, and included an anterior door such that other offenders could not pass foreign objects to Folks that could provide means for self-harm.[83]

Dr. Gamble's notes reflect that Folks showed little improvement despite medications, different housing placements, and attempts to offer therapy.[84] Folks' behavior was intentional and often based on contingent threats. Dr. Gamble's opinions are bolstered by the mental health records, where Folks would state that he "planned to cause enough problems that DOC would send him back to parish prison," or would state that when gets off watch he will "do something that requires a doctor to fix" or would verbalize threats of self-harm if suicide watch was not discontinued, or would express that he is thinking of various ways to kill himself if he was let off of restraints.[85] The placement of Folks in therapeutic restraints complied with DPSC policies.

---

[82] Exhibit A, Affidavit of Dr. Gamble.
[83] Exhibit E, Deposition of Dr. Gamble, pg. 81.
[84] Exhibit A, Affidavit of Dr. Gamble, Mental Health Records, bates 3097.
[85] Exhibit A, Affidavit of Dr. Gamble, Mental Health Records, bates 3350, 3340, 3044.

As plaintiff's expert admits, Folk's treatment was "challenging."[86] Given Folks' history of self-harm, threats of self-harm, and intentional self-harm, Folks' housing placement and use of therapeutic restraints when necessary were objectively reasonable to protect Folks.

### b. Dr. Paul Toce is entitled to qualified immunity

Dr. Toce was the medical director at LSP starting in July 2021. Dr. Toce does not provide mental health care. While he generally oversees the mental health department, he does not review or approve mental health treatment plans.[87] Mental health treatment is provided by the mental health department.

Dr. Toce testified that the TU cell where Folks was housed was the "safest, most high visibility, limited access cells right in front of the guard station."[88] The TU cells were the "best chance at getting him not to hurt himself."[89] As Dr. Toce testified, the impact of someone being placed in a one-man cell pales in comparison to the impact of self-harm.[90] Dr. Toce also testified that LSP cannot remove restraints from an offender when they believe they will hurt themselves; inmates must be protected.[91]

There is no evidence that Dr. Toce was objectively unreasonable. Folks continued to self-harm and make threats of self-harm during the relevant time period. Folks was housed in a safe environment, and restraints were placed on him to protect him from himself and to allow his wounds to heal, given Folks' propensity to open up old wounds to self-harm. Dr. Toce's actions were objectively reasonable, and he is entitled to qualified immunity.

---

[86] Exhibit L, Deposition of Glindmeyer, pg. 52.
[87] Exhibit F, Deposition of Dr. Toce, pg. 28
[88] Exhibit F, Deposition of Dr. Toce, pg. 48-49.
[89] Exhibit F, Deposition of Dr. Toce, pg. 48-49.
[90] *Id*. at 52.
[91] *Id*. at 83.

**c.  Dr. Dan Lafleur is entitled to qualified immunity**

Dr. Lafleur was employed by LSP only one month during Folks' incarceration. Dr. Lafleur left in May 2021, a month after Folks arrived at LSP.[92] During that month of incarceration, Folks was housed in the skilled nursing unit, not the TU cells that plaintiff complains about in his Complaint. Further,  Folks self-harmed 11 days after he arrived at LSP,[93] reported that he planned to cause enough problems that DOC would send him back to parish prison;[94] threatened self-harm if he came off suicide;[95] made three more threats of self-harm; and came off of extreme suicide watch. There is no evidence that Folks' housing placement, mental health treatment, or time in therapeutic restraints, was unreasonable during his entire incarceration period, much less the one month that Dr. Lafleur was employed at LSP. Dr. Lafleur is entitled to qualified immunity.

**d.  Warden Hooper is entitled to qualified immunity**

For the same reasons as discussed above with Dr. Gamble, Dr. Toce and Dr.  Lafleur, the evidence also establishes that Warden Hooper is entitled to qualified immunity.

Further, Warden Hooper plays no role in medical or mental health decisions for particular inmates.[96] Nor would he intervene with a medical professional's decision on how to treat a patient.[97]

**e.  Ashli Oliveaux is entitled to qualified immunity**

At the outset, there is no evidence of Defendant Oliveaux's personal involvement in the alleged constitutional violation. Because  "[p]ersonal involvement is an essential element of a civil rights cause of action,"[98] Plaintiff's claims against her fail.

---

[92] Exhibit I, Deposition of Dr. Lafluer, pg. 17, 41.
[93] Exhibit A, Affidavit of Dr. Gamble, Mental Health records, bates 3356.
[94] Exhibit A, Affidavit of Dr. Gamble, Mental Health records, bates 3350.
[95] Exhibit A, Affidavit of Dr. Gamble, Mental Health records,  bates 3340.
[96] Exhibit H, Deposition of Hooper, p. 13.
[97] Exhibit H, Deposition of Hooper, p. 49.
[98] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir.1983).

Plaintiff asserts that Ashli Oliveaux, as ADA Administrator, failed to provide Mr. Folks with safe and appropriate housing. Oliveaux testified that she did not know Folks during his incarceration, did not have any conversations with him, did not review any ARPs from Folks and did not review any ADA requests.[99]

Oliveaux started at LSP in March 2022,[100] months after Folks' last time period in restraints. Oliveaux was not involved in Folks' medical or mental health treatment. Plaintiff cannot show that Oliveaux was personally involved in the alleged constitutional injuries. Further, while Plaintiff names Oliveaux in her capacity as the ADA Administrator, Plaintiff cannot bring ADA claims against individuals. *Poupart v. Department of Public Safety*, 2025 WL 1749985, at *4 (M.D. La. May 28, 2025), report and recommendation adopted sub nom. *Poupart v. Dep't of Pub. Safety*, No. CV 24-931-SDD-RLB, 2025 WL 1749648 (M.D. La. June 24, 2025). As such, Oliveaux's role as an ADA Administrator has no bearing on Folks' claim for conditions of confinement and his mental health treatment.

Oliveaux was not personally involved in the events giving rise to this lawsuit. As such, there cannot be constitutional claims against her and she is entitled to qualified immunity.

**D. Plaintiff's ADA/RA Claims Fail**

To make out a prima facie case under Title II, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Wilson v. Baucom*, No. 22-50066, 2023 WL 4288350, at *4 (5th Cir. June 30, 2023). This Court has previously noted, "[g]enerally, the

---

[99] Exhibit G, Deposition of Oliveaux, p. 10-11.
[100] Exhibit G, Deposition of Oliveaux, p. 13.

ADA prohibits discrimination because of disability, not inadequate treatment for disability. Thusly interpreted by sundry courts, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners." *Peters v. Singh*, No. CV 16-842-SDD-RLB, 2020 WL 853517, at *15 (M.D. La. Feb. 20, 2020).

An ADA plaintiff must also show that he was discriminated in some fashion "by reason of his disability." *Cadena v. El Paso Cty*., 946 F.3d 717, 723-24 (5th Cir. 2020). This prong can be satisfied with evidence that the defendant failed to make reasonable accommodations for a plaintiff's disability. *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021). In addition to prohibiting discrimination, the ADA "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020). An accommodation is reasonable if "it does not impose undue financial or administrative burdens or 'fundamentally alter the nature of the service, program or activity.'" Id. "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020).

To establish failure to make a reasonable accommodation, a Plaintiff has the burden "to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms" or show that "the disability, resulting limitation, and  necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant  agents." *Class v. Lumpkin*, No. 21-20560, 2023 WL 4763334, at *3 (5th Cir. July 26, 2023) "Mere knowledge of the disability is not enough; the service provider must also have  understood the limitations the plaintiff experienced ... as a result of that disability." *Id*. However, this Court has

found that disagreement with medical treatment and/or dissatisfaction with not receiving a preferred accommodation, rather than blatant failures to accommodate does not establish an ADA claim. *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *53 (M.D. La. Mar. 31, 2021), reconsideration denied, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

Plaintiff relies on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) for the proposition that DPSC violated the ADA by housing Folks in the "most restrictive setting because of his mental illness." At the outset, *Olmstead* concerns the institutionalization of mentally ill individuals, and does not apply to the prison context. Nevertheless, the issue in Olmstead was whether the ADA was violated where the individual's doctors deemed that they could get treatment in a community based program, but the individual remained institutionalized. The Olmstead court noted the following:

> The State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. **Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting**. See 28 CFR § 35.130(d) (1998) (public entity shall administer services and programs in "the most integrated setting appropriate to the needs of qualified individuals with disabilities" (emphasis added)); cf. School Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) ( "[C]ourts normally should defer to the reasonable medical judgments of public health officials.").

(Emphasis added), *Olmstead*, 602-603. Here, qualified health care providers made the determination that the TU cells were the best placement to keep Folks safe. Further, given Folks' repeated acts and threats of self-harm, the therapeutic restraints were required. No "less restrictive" housing was feasible for Folks, and Folks was placed in the most integrated setting appropriate for his needs. 28 CFR § 35.130(d). Further, because Folks was a pre-trial detainee, he did not qualify for housing that would permit contact with DPSC offenders.

Folks was not being discriminated against by reason of any disability; he was continuously being treated for his constant risk of self-harm. Plaintiff cannot show a violation of the ADA.

**E. This Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claims**

28 U.S.C. § 1367 permits a district court to decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it had original jurisdiction. Here, because plaintiff's federal law claims should be dismissed, this Court should not exercise supplemental jurisdiction over plaintiff's state law claims. The Court has not devoted significant judicial resources to the state law negligence claims or become "intimately familiar" with plaintiff's state law arguments, and thus dismissal is proper. See *Anderson v. Marshall Cty., Miss*., 637 F. App'x 127, 135 (5th Cir.), cert. denied, 137 S. Ct. 67, 196 L. Ed. 2d 34 (2016).

**III.    Conclusion**

For the reasons set forth herein, Defendants pray that their motion for summary judgment be granted, dismissing Joshua Folks' claims, with prejudice.

*(Signatures on Following Page)*

27

Respectfully submitted,

**LIZ MURRILL**
**Attorney General**

By:    s/ Andrew Blanchfield
       Andrew Blanchfield, T.A. (#16812)
       Email: ablanchfield@keoghcox.com
       Collin J. LeBlanc (#24519)
       Email: cleblanc@keoghcox.com
       C. Reynolds LeBlanc (#33937)
       Email: rleblanc@keoghcox.com
       Catherine S. Giering (#26495)
       Email: cgiering@keoghcox.com
       Chelsea A. Payne (#35952)
       Email: cpayne@keoghcox.com
       Special Assistant Attorneys General
       701 Main Street (70802)
       Post Office Box 1151
       Baton Rouge, Louisiana 70821
       Telephone: (225) 383-3796
       Facsimile: (225) 343-9612

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, which will provide electronic notice of the filing to all CM/ECF participants. I further certify that all parties in this action are represented by CM/ECF participants.

Baton Rouge, Louisiana, this 18th day of July, 2025.

s/ Andrew Blanchfield
Andrew Blanchfield