1              IN THE UNITED STATES DISTRICT COURT
             THE MIDDLE DISTRICT OF LOUISIANA
2

3      _____)
                              )
4      JOSHUA FOLKS,          )
                              )
5           Plaintiff,        )
                              )
6        vs.                  )   Case No.
                              )   23-cv-01289-SDD-
7      LOUISIANA ATTORNEY     )   RLB
       GENERAL JEFF LANDRY,   )
8      et al.,                )
                              )
9           Defendants.       )
       _____)
10

11

12

13

14

15              DEPOSITION of DR. MATTHEW GAMBLE,

16      produced as a witness at the instance of the

17      Plaintiff, and duly sworn, was taken in the

18      above-styled and numbered cause on the 13th day of

19      March, 2025, from 11:02 a.m. to 3:14 p.m., before

20      Christy R. Sievert, CSR, RPR, in and for the State

21      of Texas, reported remotely by machine shorthand,

22      pursuant to the Federal Rules of Civil Procedure and

23      the provisions stated on the record or attached

24      hereto.

25

**EXHIBIT E**

Dr. Matthew Gamble - March 13, 2025

```
 1    A P P E A R A N C E S

 2      (Appearing remotely)

 3

 4    FOR THE PLAINTIFF:

 5      MS. ELIZABETH A. EDMONDSON
        Jenner & Block, LLP
 6      1155 Avenue of the Americas
        New York, New York  10036
 7      212-891-1600
        eedmondson@jenner.com
 8

 9    FOR THE DEFENDANTS:

10      MR. ANDREW BLANCHFIELD
        Keogh, Cox & Wilson
11      701 Main Street
        Baton Rouge, Louisiana  70801
12      225-383-3796
        ablanchfield@keoghcox
13

14    ALSO PRESENT:

15      JOSE RIVERA, Videographer
        MOLLY OBERSTEIN-ALLEN
16

17                    * * * * *

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                                              PAGE

3    Appearances.................................  2

4    Exhibits....................................  4

5    Proceedings.................................  5

6    DR. MATTHEW GAMBLE:

7       Examination by Ms. Edmondson...............  6

8
     Reporter's Certification............... 128-129
9

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Matthew Gamble - March 13, 2025

```
 1              E X H I B I T S

 2     NUMBER        DESCRIPTION                 PAGE

 3     Exhibit 1     Medical and Mental Health    40
                     Records
 4                   000978 - 1244

 5     Exhibit 2     E-mail correspondence        48
                     3-31-21, Re: Emergent Transfer
 6                   Joshua Folks #361917
                     Folks Emails 00007 - 9
 7
       Exhibit 3     E-mail correspondence        77
 8                   6-3-21, Re: Locked Room Patients
                     Folks Emails 00005
 9
       Exhibit 4     E-mail correspondence       100
10                   10-15-21, Re: TU Timeout Cell
                     Accessibility
11                   Folks Emails 00001

12

13                   * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

Dr. Matthew Gamble - March 13, 2025

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the

 3      record.

 4              This is the remote video-recorded

 5      deposition of Dr. Matthew Gamble.

 6              Today is Thursday, March 13, 2025.

 7      The time is now 11:02 a.m. in the Eastern Time Zone.

 8              We are here in the matter of Joshua

 9      Folks vs. Louisiana Attorney General Jeff Landry, et

10      al.

11              My name is Jose Rivera, remote video

12      technician on behalf of Gregory Edwards, LLC.  I am

13      not related to any party in this action, nor am I

14      financially interested in the outcome.

15              The court reporter today is Christy

16      Sievert, also on behalf of Gregory Edwards, LLC.

17              Counsel will now introduce themselves

18      for the record; after which, the court reporter will

19      swear in the witness.

20              MS. EDMONDSON:  Good morning.

21      Elizabeth Edmondson from Jenner & Block for

22      plaintiff, Joshua Folks.  And with me is my

23      colleague, Molly Oberstein-Allen.

24              MR. BLANCHFIELD:  Andrew Blanchfield

25      on behalf of the defendants, Keogh, Cox & Wilson.
```

Dr. Matthew Gamble - March 13, 2025

Page 6

```
 1                    DR. MATTHEW GAMBLE,
 2              having been first duly sworn,
 3                  testified as follows:
 4              THE WITNESS:  Yes, ma'am.
 5                      EXAMINATION
 6   BY MS. EDMONDSON:
 7       Q.   Good morning, Dr. Gamble.
 8            Dr. Gamble, could you please state your
 9   full name for the record?
10       A.   Yes, ma'am.  It's Matthew David Gamble,
11   G-a-m-b-l-e.
12       Q.   And, Dr. Gamble, where are you currently
13   employed?
14       A.   I'm employed at Louisiana State
15   Penitentiary by the State of Louisiana Department of
16   Corrections.
17       Q.   And what is your current role at Louisiana
18   State Penitentiary?
19       A.   I'm the treating psychiatrist at Louisiana
20   State Penitentiary.
21       Q.   Dr. Gamble, have you been deposed before?
22       A.   No, ma'am, I've never been deposed.
23       Q.   Okay.  Have you ever given testimony at a
24   trial?
25       A.   Yes, ma'am.
```

Dr. Matthew Gamble - March 13, 2025

1      Q.    Approximately how many times?

2      A.    Oh, gosh.  Hundreds of times through the

3    capacity in forced medication hearings.

4      Q.    So you understand that your testimony today

5    is under oath, just the same as when you were in

6    trial, correct?

7      A.    Yes, ma'am.

8      Q.    And because you haven't had the pleasure of

9    being deposed before, I'm going to go over a few

10    things that are the ground rules for a deposition.

11         The deposition is being transcribed by the

12    court reporter, so it's important that you answer in

13    words rather than nods or facial expressions or

14    anything else.  Understood?

15     A.    Yes, ma'am.

16     Q.    And please make sure that you let me finish

17    asking a question before you answer, and I'll try to

18    do the same.  And please also give your counsel,

19    Mr. Blanchfield, a chance to object if he so

20    chooses.  Okay?

21     A.    Okay.

22     Q.    If he does object, you can still answer

23    unless he instructs you not to answer.  Okay?

24     A.    Okay.

25     Q.    If there's any question you don't

Dr. Matthew Gamble - March 13, 2025

Page 8

1    understand, please just ask me to rephrase or

2    clarify, and I will do so.   Understood?

3         A.   Okay.   Yes.

4         Q.   And we've referred to Louisiana State

5    Penitentiary today.   I might sometimes refer to that

6    as "LSP" or "Angola" for short.   Understood?

7         A.   Yes.

8         Q.   Okay.   If at any point you need a break,

9    please let us know.   If a question is pending, we'll

10   just ask you to answer the question, but happy to

11   take a break anytime you need.   Okay?

12        A.   Okay.

13        Q.   Before we begin today, is there any reason

14   you can't give complete and truthful testimony

15   today, for example, because of any medication you

16   are taking?

17        A.   No, ma'am.

18        Q.   Dr. Gamble, did you prepare at all for

19   today's deposition?

20        A.   I did review the records that I have for

21   Mr. Folks, but in a fairly cursory manner.

22        Q.   Okay.   And did you -- without telling me

23   the substance of anything that was discussed, did

24   you meet with counsel?

25        A.   Yes, ma'am.

Dr. Matthew Gamble - March 13, 2025

Page 9

1      Q.    For approximately how long?

2      A.    Forty-five minutes.

3      Q.    Okay.  Have you reviewed the complaint in

4    this action?

5      A.    I remember looking it over when I first

6    received it.  I -- I hadn't looked at it in quite

7    some time.

8      Q.    Okay.  And do you understand that you are

9    named as a defendant in that complaint?

10      A.    Yes, ma'am, that's my understanding.

11      Q.    When you referenced reviewing Mr. Folks'

12    file or medical history in advance of this

13    deposition, can you describe just at a high level

14    what -- what that entailed?

15      A.    I really just looked at my -- my past

16    psychiatric notes, my personal notes from my

17    interactions with Mr. Folks.

18      Q.    Okay.  So not necessarily the entire

19    medical file for Mr. Folks; is that correct?

20      A.    No, ma'am, I did not look at the entire

21    medical file.

22      Q.    Dr. Gamble, I would like to just speak a

23    little bit about your background.

24            Do you have a medical degree?

25      A.    Yes, ma'am.

Dr. Matthew Gamble - March 13, 2025

1  Q. From where?

2  A. Louisiana School of Medicine in New

3 Orleans.

4  Q. And have you been -- do you have a

5 specialty?

6  A. No, ma'am.  I'm just an adult psychiatrist.

7  Q. But did you do a residency in psychiatry?

8  A. I did.  I went to LSU Ochsner, residency in

9 psychiatry in New Orleans from 2004 to 2008.

10  Q. And are you licensed to practice medicine

11 in Louisiana?

12  A. Yes, ma'am.

13  Q. Are you licensed in any other states?

14  A. No, ma'am.

15  Q. Have you ever been subject to any

16 professional discipline as a doctor?

17  A. No, ma'am.

18  Q. And have there been any formal complaints

19 made against you to the medical licensing board?

20  A. Yes, ma'am.

21  Q. Approximately how many?

22  A. If I recall, maybe five, six.  A couple

23 were made by the same prisoner during a period of

24 time at Elayn Hunt.  I've probably answered five to

25 six complaints over the years.

Dr. Matthew Gamble - March 13, 2025

1      Q.    And were all -- oh, I'm sorry, go ahead.

2      A.    Yeah, the medical board receives those

3  complaints, and they forward that to us to respond

4  to those complaints.

5      Q.    Okay.  And were all of those complaints

6  made by individuals who are incarcerated?

7      A.    Yes, ma'am.

8      Q.    Have you ever been named as a defendant in

9  any lawsuit related to your professional capacity?

10     A.    Not that I'm aware of.  This is the first

11  one where I have ever, I think, had my name on a

12  lawsuit that I ever -- it ever came to any fruition.

13          In other words, I've never had a lawsuit

14  where somebody said, you're named in a lawsuit and

15  we have to go through these procedures.  This is the

16  first time that I recall.

17     Q.    Okay.  Okay.  Dr. Gamble, when did you

18  first start working for Louisiana State

19  Penitentiary?

20     A.    Louisiana State Penitentiary, I believe I

21  began to moonlight for Angola around -- it may have

22  been 2010 or '11.  They lost their psychiatrist at

23  Angola.  I was employed as a contract psychiatrist

24  for Elayn Hunt Correctional Center, which is in

25  St. Gabriel, Louisiana.  And during the time period

Dr. Matthew Gamble - March 13, 2025

1    that they did not have full-time psychiatric

2    coverage at Angola, they asked that I work at Hunt

3    four days a week as part of my contract.  And the

4    fifth day I went to Angola, as I said, as a

5    moonlighter, basically trying to help them to see

6    the patients during the time period when they

7    searched for a psychiatrist.

8        That was my first interaction with them.

9    I think I went to work full-time for Angola in 2012,

10   maybe July 2012.

11       Q.    You anticipated my next question.

12       When did you first work for the Louisiana

13   Department of Corrections?  Go ahead.

14       A.    I went to work for the Louisiana Department

15   of Corrections -- I was on contract as an LSU

16   psychiatrist to work at Elayn Hunt in April of 2009.

17       Q.    And I think you -- I may just not have

18   understood what you said.  You were on contract as a

19   something psychiatrist?  I didn't catch that word.

20       A.    Yes, I was employed by LSU --

21       Q.    Oh, okay.

22       A.    -- by the Department of Psychiatry.  And

23   what will often happen is different entities, be it

24   prison systems, nursing homes, medical clinics, you

25   name it, they'll call LSU and say, we have a need

Dr. Matthew Gamble - March 13, 2025

1    for a psychiatrist for this many hours, do you have

2    a -- a psychiatrist that's available for that?

3         And so our boss at LSU got that call from

4    the Department of Corrections, and I was basically

5    placed under contract for -- for Elayn Hunt, but I

6    still worked for LSU, if you will.

7         Does that make sense?

8    Q.   Okay.  So just to make sure I understand,

9    at that time your paychecks were coming from LSU,

10   but LSU had a contract with Elayn Hunt for

11   psychiatry; is that accurate?

12   A.   That is correct.

13   Q.   Okay.  And at what point -- what work had

14   you been doing at LSU prior to being contracted out

15   to Elayn Hunt?

16   A.   I ended residency, as I said, in July of

17   2008.  I went to work in University Medical Center's

18   psychiatric emergency room from -- I guess it would

19   be August 2008 until -- again, my boss, who is the

20   chair of the psychiatric department at LSU, received

21   that -- that request from the DOC in April of 2009.

22        So for eight months, I was the -- one of

23   the psychiatric consultants at the emergency room at

24   University Medical Center New Orleans.

25   Q.   And at some point, did you start working

Dr. Matthew Gamble - March 13, 2025

1    directly for Louisiana Department of Corrections

2    where your paychecks were coming from them?

3        A.   Yes, ma'am.

4        Q.   Approximately when?

5        A.   I think that that change was officially

6    made maybe July 2018.   I can't put my finger on it.

7        Q.   But --

8        A.   But it ended --

9        Q.   Oh, I'm sorry, go ahead.

10       A.   -- ended work for LSU as a contractor for

11   DOC and went to work directly for DOC.   To be

12   honest, I can't remember the exact dates for when

13   all that happened.

14       Q.   That's fine.

15            Do you think it was before March of 2021?

16       A.   Yes, ma'am.

17       Q.   When you started to work -- when you -- so

18   I think I have this correct.   You began working

19   full-time at LSP Angola in and around 2012; is that

20   accurate?

21       A.   That sounds right.

22       Q.   Okay.   I'm just -- I'm just trying to --

23       A.   It's been a long time.

24       Q.   Okay.   More or less.

25            So when you went -- when you started at

Dr. Matthew Gamble - March 13, 2025

1    Angola, regardless of when exactly it was, what was
2    your title?
3        A.    Treating psychiatrist.  The psychiatrist is
4    there full-time, Monday through Friday, eight hours
5    a day to treat the patient population at Angola.
6    That's my job.
7        Q.    Okay.  And has that been your job for the
8    entirety of your time at LSP Angola?
9        A.    Yes, ma'am.
10       Q.    Are there any other treating psychiatrists
11   on site at LSP Angola?
12       A.    No, ma'am.  There are now -- I don't know
13   if you want to know, but there are now three
14   registered nurse practitioners with mental health
15   specialties there, but I am the only treating
16   psychiatrist.
17       Q.    Do the registered nurses with mental health
18   specialities have the ability to prescribe medicine?
19       A.    Yes, ma'am, they do.
20       Q.    All types of medicine or only certain
21   categories?
22       A.    They're going to be -- the way that it
23   works there is that they're going to see and only
24   prescribe psychiatric medicine, but there is --
25   there's no limitation as to the psychiatric

Dr. Matthew Gamble - March 13, 2025

1    medicines that they can prescribe other than we're

2    not going to use scheduled -- DEA scheduled

3    medications or -- those are the only restrictions.

4        Q.    And do those restrictions apply to you as

5    well, as the treating psychiatrist, that no DEA

6    scheduled medicines are used?

7        A.    Yes, ma'am.  We don't use those unless it's

8    a -- so the only time we would use them is if

9    there's an episode of agitation that's so intense

10   that we need to use the medication to help somebody

11   settle down.  But that's the only time we use it.

12   We never prescribe them for long periods of time.

13       Q.    For the entirety of your time at Angola,

14   understanding you're the only full-time treating

15   psychiatrist, are there any other psychiatrists on a

16   contract basis or consulting basis?

17       A.    During that time period, when I first was

18   asked -- remember, I said there was a time period

19   where there wasn't a full-time psychiatrist there.

20   There were other psychiatrists that were coming in

21   as -- to do the same thing I was.

22            So I was there a full day a week.  And

23   there were other psychiatrists that were asked to

24   come out maybe during weekend hours or give a full

25   day a week here or a full day a week there.  And

Dr. Matthew Gamble - March 13, 2025

1      once they hired me as the full-time psychiatrist,

2      those other doctors that were, you know, coming in

3      to be stopgaps, you know, to try to help see the

4      patient population, that stopped and I was the only

5      one as the treating psychiatrist.

6              And over the last couple of years, I think

7      they've had at the -- the highest level, the

8      administrative level of the Department of

9      Corrections, had a consulting psychiatrist that had

10     some oversight of note-taking, administrative

11     issues, medication.  His name is Dr. Soong.  And so

12     he worked at downtown DOC as a -- as a contractor to

13     consult and just to kind of make sure that at a

14     systematic administrative level, things were going

15     well at Elayn Hunt, LSP David Wade.  But he's the

16     only other psychiatrist that has kind of set foot

17     out there as far as -- but he was as an oversight,

18     not a treating psychiatrist.

19         Q.   Okay.  And at LSP, approximately how many

20     patients are under your -- well, I guess how many

21     patients are at -- withdrawn.  Let me try a

22     different way.

23              Do you have responsibility for the

24     psychiatric care, then, for all of the patients at

25     LSP Angola?

Dr. Matthew Gamble - March 13, 2025

1      A.    Yes, ma'am.

2      Q.    And do you regularly see a smaller subset

3    of that total patient population?

4      A.    Since we've begun to -- there was a time

5    period where I saw the entire patient population

6    personally on a rotating basis.  I believe it was

7    the fall, give or take -- I can't remember if it was

8    '21 or '22 -- where we did hire our first nurse

9    practitioner and, you know, she began to take on

10    patient responsibilities as well.  So -- and then

11    we've since hired two more.

12          So ultimately, we work together in that

13    it's -- it's hard to describe because there's so

14    much movement of prisoners around Angola.  Angola is

15    not just one monolithic prison, it has several what

16    are called prison camps.  You may be familiar with

17    that.

18      Q.    Yeah.

19      A.    Don't let me talk to you about something

20    you already know.

21          But guys rotate.  Right?  So they may be

22    at Camp C one month and then we may -- they move

23    over to main prison.  And the idea is that we -- we

24    also kind of rotate with and see after those guys.

25          And so my nurse practitioners are in

Dr. Matthew Gamble - March 13, 2025

1    communication with me, and we now have an electronic
2    medical record where we can see each other's notes
3    about a particular individual.  But there was a long
4    period of time where, yes, I was the only treating
5    psychiatrist.
6         Q.    And today, do you -- you supervise the
7    three nurse practitioners that are there?
8         A.    Yes, ma'am.
9         Q.    And what are their names?
10        A.    Ms. Tonya Stelly, last name S-t-e-l-l-y,
11   Ms. Daphne Webster, last name Webster,
12   W-e-b-s-t-e-r.  And our newest addition is
13   Ms. Isabelle DuBois, D-u-B-o-i-s.
14        Q.    And to the best of your recollection, were
15   any of those nurse practitioners employed by LSP
16   between March of 2021 and November of 2022?
17        A.    It's possible Ms. Stelly may have been
18   hired during that period.  I know that Ms. Webster
19   and Ms. DuBois were.
20        Q.    Who do you report to?
21        A.    As far as the oversight that I have, my
22   direct supervisor is the medical director of
23   Louisiana State Penitentiary.  His name is Dr. Toce,
24   T-o-c-e.  Beyond him -- so that's at a medical
25   level, direct medical supervision.

Dr. Matthew Gamble - March 13, 2025

1          At an administrative or security level,
2     there's also a warden that is the warden of medical
3     and mental health.  And that has been different
4     individuals over my time period there.  Right now,
5     it is a lady named Ashli Oliveaux, last name
6     O-l-i-v-e-a-u-x.  Heavy-duty Louisiana stuff there.
7          Q.    Thank you.
8          A.    And then beyond that, you also -- we have
9     had, I guess, for the past four years or so, sounds
10    about right -- there was a position of a hospital
11    administrator that was outside of security, meaning
12    -- so we had the direct medical supervision of my
13    medical director, Dr. Toce, we had the security
14    oversight of the assistant warden of medical and
15    mental health, and then we also had a hospital
16    director by the name of Dr. Jacob Johnson,
17    J-o-h-n-s-o-n, and he had some, you know, oversight.
18          So more or less, if there was a meeting of
19    the minds about a particular medical issue,
20    psychiatric issue, oftentimes it would be -- you
21    know, Dr. Toce would have input.  The assistant
22    warden of medical and mental health would have some
23    input.  Dr. Johnson may have some input as well.
24          Q.    And is Dr. Johnson still in that role?
25          A.    No.  He just took a new job with the Office

Dr. Matthew Gamble - March 13, 2025

Page 21

1    of Juvenile Justice.  I think he's doing the same

2    thing for the Office of Juvenile Justice, which I

3    think is perhaps now in Monroe.  It's at another

4    facility.  It's the facility within Louisiana that

5    deals with our juvenile offenders.

6        Q.    And is the hospital administrator role

7    currently empty?

8        A.    It is.

9        Q.    Did you have any what we would call a

10   dotted-line responsibility, reporting responsibility

11   to Dr. Soong or anyone else at the DOC overall?

12       A.    There's an overarching administrator at the

13   headquarters of DOC level named Mr. Blake LeBlanc,

14   capital L, lowercase e, I think he's got a capital

15   B-l-a-n-c.  And he, again, is an administrator.

16   He's -- he's looking at the systematic mental health

17   stuff, how many patients are you seeing, how many --

18   where are they located, are we doing everything by

19   policy.

20           So, yeah, I have some conversations with

21   him from time to time, but, I mean, it's maybe

22   quarterly, or he gives me a call about something

23   needs to be done or somebody's coming from a parish

24   prison, things like that.

25       Q.    Do you know if he's a -- if he has an M.D.?

Dr. Matthew Gamble - March 13, 2025

1    Is he a psychiatrist?  Do you know?

2         A.    No, ma'am, I don't know his -- I think he

3    might be a counselor by training or a social worker.

4         Q.    Does anybody else report directly to you

5    other than the three nurse practitioners you

6    mentioned?

7         A.    Yes.  There's a multi-disciplinary team.

8    So you have social workers, counselors.  That's kind

9    of the -- the folks that also see psychiatric

10   patients.  So you will have a social worker or two

11   that is assigned to a particular area of the prison.

12        Like I said, say, there's a main prison,

13   right, and within that main prison, you have general

14   population and you also have what are called the

15   cell blocks, people who may be placed in the cell

16   blocks for certain, you know, violations or what

17   have you.  So you may have a social worker that's

18   assigned to the dormitories in the main prison, you

19   have a social worker that's assigned to the cell

20   blocks in the main prison, and you have the same

21   situation in Camp C, Camp D, death row.

22        And, yes, those people will come back to

23   me and say, hey, Dr. Gamble, somebody stopped me and

24   said, you know, they were interested in chatting

25   with you about a particular medicine or a particular

Dr. Matthew Gamble - March 13, 2025

Page 23

1    issue or somebody's parole was denied, somebody's
2    sister passed away, they were interested in chatting
3    with you or one of your social workers or one of
4    your nurse practitioners.  So they definitely -- you
5    know, I get them out the door five times a day from
6    social workers and counselors.
7        Q.    And how many of them are there
8    approximately, the social workers and counselors?
9        A.    I think as we speak, there's probably ten.
10       Q.    Was it about the same -- I'm sorry, go
11   ahead.
12       A.    That number's fluctuated.  You know, it's
13   gone -- I think we have had as many as 16, we've had
14   as low as 8.  So it just fluctuates with people
15   coming and going through the job.  Because it's --
16   it's an intense job and it's also kind of in an
17   isolated, rural place, so we do have some turnover
18   in that department.
19       Q.    When you meet with patients for, you know,
20   a psychiatric session or something else, where does
21   that occur?  Is that in their cell?  In your office?
22   Somewhere else?
23       A.    It all depends on the circumstance.  I see
24   patients in the office, I see patients at the cell
25   side, I see patients at -- if they happen to be in a

Dr. Matthew Gamble - March 13, 2025

1    hospital setting or -- or emergency room setting out

2    there.  I mean, there's -- it all depends.

3        Q.    Okay.

4        A.    But I think the majority of people that I

5    see in the last several years have been in the cell

6    blocks and at the cell side.

7        Q.    I think you mentioned in passing that now

8    there's also an electronic health record at LSP; was

9    that correct?

10       A.    Yes, ma'am.

11       Q.    Do you recall approximately when that came

12   into practice?

13       A.    If I recall, it was implemented or we began

14   to use it exclusively -- I think it was something

15   that -- we were able to handwrite notes.  I think in

16   the latter part of 2022, they began to upload those

17   into the electronic medical record, and then it was

18   mandated that we do everything in August of 2023.

19            So August of 2023, everything that we do

20   is now electronic.  But you -- you can see some of

21   the older records that have been uploaded in the

22   latter part of 2022.

23       Q.    When the records were still in paper, are

24   they kept in a centralized file by patient?  How

25   does that work?

Dr. Matthew Gamble - March 13, 2025

Page 25

```
1        A.    Yeah, so the written records -- and
2    everything was written up until at least 2022.
3    Those records are centralized into a main medical
4    chart that includes identifying information about
5    a patient, their emergency contacts, things of
6    that nature, informed consent forms.  And then
7    you're going to have the medical part, which would
8    be laboratory, medical visits, things of that
9    nature.
10        There's a psychiatric or mental health
11    section that will include my notes, any notes by
12    social workers, counselors, group therapies.  All
13    those things will be in one area.  And then -- so
14    that's all collated and kept in a central medical
15    record, which is in the hospital building at Angola.
16        Q.    And are the psychiatric and social worker
17    notes kept separate from the rest of the medical
18    file?  Like, even within the medical file, are they
19    kept in a separate part of it, or are they sort of
20    in chronological order?  That's what I'm just trying
21    to get at.
22        A.    No, no.  In other words, there's going to
23    be -- it's going to be a divided chart.  And there
24    will be a place where, when you open the chart,
25    you're going to be looking at laboratory, radiology,
```

Dr. Matthew Gamble - March 13, 2025

1    all that sort of thing.  And then you'll see the
2    medical records themselves, any type of sick call
3    visits, visits to the emergency room, visits with
4    primary care.  You flip that, and you're going to
5    see oftentimes a chronological record of visits with
6    social workers.  You'll see my notes.  You'll see
7    various and sundry notes from mental health.  So it
8    is -- it is within the main record, but it is
9    separated within the record.
10        Q.    Okay.  Is it accurate, though, that all of
11   the social worker notes, your notes, any other
12   mental health-related notes should be in that file?
13        A.    They should be, yes, ma'am.
14        Q.    Do you keep any other separate copy of your
15   psychiatric notes?
16        A.    I have, yeah.  Because of the cumbersome
17   nature of those big files, if I have a clinic where
18   I have 12 people -- and I did this for a year or a
19   year and a half, so I can tell you it was very
20   cumbersome.  We -- we would actually get -- because
21   I wasn't familiar with everybody and I wasn't as
22   familiar with their medical stuff, we would bring
23   out the big files, and I had to have, like, three
24   grown gentlemen, you know, hauling these files all
25   over the good Lord's creation at Angola.

Dr. Matthew Gamble - March 13, 2025

1          And we did that for about a year, and then

2     we began to just take my copy of the last note.  And

3     I would keep smaller files.  I may have -- maybe the

4     social worker left me a note or what have you, and I

5     would take those to my clinic instead.

6          Q.   When you reviewed your notes ahead of this

7     deposition, did you review the -- for Mr. Folks, did

8     you review your own copy of those or did you look at

9     the main medical file for Mr. Folks?

10         A.   I looked mostly at my own copies because

11    I -- when they pulled the files, I recognized by the

12    -- just the sheer number of documents that it was

13    going to be tough to find everything that I

14    wanted -- I just kind of wanted a thumbnail sketch.

15    So I did not -- I did not break out the big, bad

16    boys.  I had them in the office, but I did not go

17    after them.

18         Q.   Okay.  Understood.

19              Switching gears for a moment, Dr. Gamble,

20    do you have a role in developing the mental health

21    policies for LSP, or for the Department of

22    Corrections, more broadly?

23         A.   I don't have a real lead role there.  As

24    far as any policy development; is that what you

25    mean?

Dr. Matthew Gamble - March 13, 2025

Page 28

1      Q.    Yes, or revision.

2      A.    Yeah, I mean, it's a great rarity that I'm

3   going to have a lot to say about the various and

4   sundry policies because oftentimes that's taken care

5   of at a little bit higher administrative level and

6   even within LSP itself.

7           Those policies have been pretty -- I don't

8   know.  They haven't changed a ton.  They may come to

9   me with some small asterisk, but, I mean, it's a

10  great rarity that I have a lot to say about that.

11     Q.    Do you have any role in training security

12  personnel or others on the mental health policies of

13  LSP?

14     A.    There's no full thing that I do with

15  security.

16     Q.    Do you do any formal training with the

17  social workers or RNs or nurse practitioners?

18     A.    Yes, ma'am.

19     Q.    And is that part of their onboarding when

20  they start in the role?

21     A.    Yes, ma'am, for sure.  If we're talking

22  about the nurse practitioners, the nurse

23  practitioners will be with myself and/or a senior

24  nurse practitioner every day for probably two months

25  before they -- it's at least four weeks, six weeks,

Dr. Matthew Gamble - March 13, 2025

1    two months where they -- they don't see a patient

2    personally.  They're hanging out with us just

3    shadowing, learning the medical records, learning

4    the terminology, the locations.

5              Because it is -- it can be kind of

6    overwhelming to say, okay, I need you to go to

7    Camp C, Tiger 3 right, and I need you to see this

8    person.

9              They're, like, where is Camp C, Tiger 3

10   right?  And who -- you know, who is this person?

11   Who are the security officers?  We have got to

12   introduce them.

13             And then even when they begin to see

14   patients independently, it's, like, five patients a

15   day, three patients a day.  And so that's how the

16   nurse practitioners are trained.

17             And then we have pretty constant contact,

18   to be honest with you.  I often do my notes at a

19   conference table like this, and so there's a

20   constant swirl of people.  And social work and

21   psychiatry, nurse practitioners all interact about

22   patients and how we're going to care for a

23   particular patient or who's not taking their

24   medication.

25             So that whole area where we work in the

Dr. Matthew Gamble - March 13, 2025

Page 30

1    hospital is -- is kind of a busy little hive of

2    people talking, probably much like a law firm or any

3    other hospital setting or professional setting.  As

4    far as security and formal training with them,

5    though, I do not do that.

6         Q.   Okay.  Do you do any training --

7         A.   But they stick their heads in there a lot,

8    too, to ask questions.

9         Q.   Do you do any formal training of the social

10   workers?

11        A.   Yes, ma'am.  We have -- it would be

12   twice-a-month meetings that we all get together at a

13   conference table like this.  We go over levels of

14   care, what's going on with a particular group in a

15   particular area, can we move this person to less

16   restriction or perhaps a job change, or what's going

17   on with this person's education.  So it's basically

18   a multi-disciplinary team meeting with the

19   counselors, the social workers, the psychiatrists,

20   and the nurse practitioners.

21        Q.   How is it decided which cases are going to

22   be discussed at those meetings?

23        A.   Usually that's going to be something that

24   sometimes it's fairly formal in that, again, we have

25   the -- with what's called a mental health -- mental

Dr. Matthew Gamble - March 13, 2025

1      health level of care system, meaning which patients

2      may need more psychiatric attention or mental health

3      attention.

4             And we'll formally go through the camps

5      and say, okay, well, here are our level of care 4s,

6      here are our level of care 3s, can anybody move --

7      does anybody need to move down, whether --

8      interestingly, if you go from 4 to 3, that's more

9      care.  Right?  Go from 3 to 4, that's less.  And so

10     we -- we discuss that issue, should we be paying

11     more attention to this gentleman, less attention to

12     this gentleman?

13            There are people that come from our area

14     of highest acuity, meaning that their level of care

15     is low, like a 2.  That means that you're -- you're

16     actually in a treatment area, specifically

17     psychiatry.  And let's say you move from that area

18     to an open population area, can we actually raise

19     that level of care from 2 to 3 is usually the

20     discussion there.

21            Because a level of care 2 requires, you

22     know, a lot of social work contact, mental health

23     contact, and is this person now functioning at a

24     high level?  It would be the same idea as if you

25     were in a hospital setting or a group home setting

Dr. Matthew Gamble - March 13, 2025

Page 32

1    and you were saying, well, you know, how can we --
2    are we -- do we need to, you know, move this person
3    back to a hospital setting?  Are they able go into
4    the community now?  It's that kind of discussion.
5    That's more formalized.
6          And then there's more open -- you know,
7    this gentleman is really struggling.  Hey,
8    Dr. Gamble, this person has had this issue come up,
9    their loved one has passed, they're distraught.
10   This person is new, they just moved into Angola,
11   they've got a life sentence, they're young, this is
12   a person that needs your attention.  That sort of
13   thing.
14      Q.   And is there an agenda for those meetings?
15   Like, before you go into the meeting, do you know
16   which -- which individuals are going to be
17   discussed?
18      A.   Not exactly a formal agenda.  There may be
19   a document that has, you know, a bullet for
20   discussion of patients or -- but it's not like I'm
21   going to have an individual name.  That would be
22   rare.
23          Does that make sense?
24      Q.   So you're saying there's not -- there's not
25   a list of names that are going to be discussed on --

Dr. Matthew Gamble - March 13, 2025

1    on the document?

2    A.    Only -- only if it's a level of care

3    meeting because that's actually going to be -- each

4    and every social worker will have their caseload.

5    And they'll say, hey, you know, Dr. Gamble, I think

6    Mr. So-and-So that's a level of care 3, I think he

7    actually could be a level of care 4, or, Dr. Gamble,

8    this gentleman is not doing so hot.

9         So yes, they will have meetings, but

10    that's, like, for their own records.  It's not --

11    Q.    Okay.

12    A.    It's not like it's an agenda paper.  We're

13    not -- there's not often, like, a very formalized

14    agenda.

15    Q.    For a level of care, just to get a sense of

16    what these levels of care mean, what that might be

17    like, a level of care 1 is the most severe; is that

18    accurate, then?

19    A.    Yes, ma'am.

20    Q.    Okay.  And then what kinds of conditions or

21    behaviors or situations might need someone to be

22    classified as level of care 1?

23    A.    Level of care 1 is going to be a mental

24    health illness that is requiring not only

25    psychiatric oversight, acutely or chronically, but

Dr. Matthew Gamble - March 13, 2025

1    also in -- I'm sorry, involuntary medications.

2    That's usually when you get to a level of care 1.

3         So not only are you struggling with your

4    mental health, but also you are now under

5    involuntary medication.

6         Q.   Okay.

7         A.   That's level of --

8         Q.   And then level -- sorry, go ahead.  I don't

9    mean to speak over you.

10        A.   Not at all.  That's level of care 1.

11        Q.   Okay.  And then level of care 2?

12        A.   Level of care 2 indicates that you've got a

13   mental health issue that has required you to be

14   isolated into a specialized mental health treatment

15   program.  It would be the equivalent of being

16   psychiatrically hospitalized if you were in the free

17   world.  So now you're in a specialized cell block

18   with specialized staffing.  And we have about 90

19   beds for that level of care 2.

20        Q.   And is that within the -- I understand

21   there's the -- I think it's the RBCTU and then the

22   -- well, let me -- let me get this right.

23        Where is that located?  Are those 90 beds

24   all in the same place?

25        A.   Yes, ma'am.  And I don't know if it's

Dr. Matthew Gamble - March 13, 2025

Page 35

1      always -- we just call it the "TU," which is the
2      transitional unit.
3          Q.   Okay.  Okay.
4          A.   And that is a two-story cell block.  90
5      beds upstairs are actually what we call
6      Preventative 1.  In other words, that's not a mental
7      health administrator.  And then downstairs is,
8      indeed, exclusively mental health.
9               So there are 90 cells, 6 cells of 15, that
10     are set aside for acute and chronic mental health
11     care that requires single-cell placement due to the
12     severity and/or chronicity of a mental health issue.
13     And that's called the TU mental health program.
14         Q.   There was a word I didn't catch there, the
15     acuity or the chronicity maybe?
16         A.   Chronicity.
17         Q.   Oh, just that it's chronic.  Okay.
18         A.   Yeah, so --
19         Q.   Is that right?
20         A.   Yeah.  In other words, we have gentlemen
21     that are refractorily ill, i.e., no matter what we
22     do as far as their medication, they're still going
23     to be at a very low mental health functioning, and
24     that -- those guys oftentimes, you know, choose to
25     live in a single-cell area because they're

Dr. Matthew Gamble - March 13, 2025

1    susceptible to other prison difficulties if they're

2    in the general population.  So that's the chronic

3    guys.

4           And then we have people who get acutely

5    mentally ill just, like, in the general population

6    that we need to be -- you know, you need to see

7    them.  They're out of the dormitory, and they're not

8    well to the point where I'm, like, we actually need

9    to bring this guy in and make sure he's taking his

10   medications.  So that's what those beds are for.

11       Q.   And then --

12       A.   But if we --

13       Q.   -- level of care 3 and 4?

14       A.   I'm sorry, I didn't mean to talk over you.

15       Q.   No, no, that's okay.

16       A.   If you were actually admitted to the --

17   those 90 beds, that is a level of care 2.

18       Q.   Okay.

19       A.   Okay.

20       Q.   And then level of care 3 and 4, just at a

21   high level?

22       A.   Yeah, level of care 3 means that you do --

23   your diagnosis is one of a severe mental illness.

24   That would be -- it could be major depression, it

25   could be bipolar disorder, it could be a psychotic

Dr. Matthew Gamble - March 13, 2025

1     disorder like schizophrenia or delusional disorder,
2     it could be a severe anxiety disorder.  Usually we
3     don't have a lot of people classified as a level of
4     care 3 for that reason.
5            And so that's basically what it is.  At
6     level of care 3, that means that you are diagnosed
7     with a severe mental illness.  You are under
8     psychiatric care, but you are no longer in need of
9     single-cell placement in the TU mental health
10    program.  You're living in the general population.
11           In other words, you've -- you've achieved
12    some degree of stability, ability to live within the
13    general population.
14        Q.    Okay.
15        A.    But you still --
16        Q.    Level of care 4?
17        A.    Level of care 4 is nonsevere mental
18    illnesses, less severe depressive issues.  Most
19    anxiety disorders, as I said, insomnia, things that
20    are not as severe are going to be -- you carry a
21    diagnosis, you may take mental health medications,
22    but you do not have a diagnosis that is severe
23    mental illness.  That's level of care 4.
24        Q.    Okay.  Switching gears.
25               Dr. Gamble, are you familiar with the

Dr. Matthew Gamble - March 13, 2025

1      plaintiff in this action, Joshua Folks, by name?

2          A.   Yes, ma'am.

3          Q.   And did you care for him when he was at LSP

4      from March of 2021 to November of 2022?

5          A.   Yes, ma'am.

6          Q.   The -- that's the time frame that this

7      complaint focuses on, but Mr. Folks was at LSP on a

8      prior occasion in 2019.  Do you recall whether you

9      cared for him in that time period as well?

10         A.   I did.

11         Q.   And I know you see a lot of patients.  Do

12     you recall offhand what, if any, mental illnesses

13     Mr. Folks was diagnosed with?

14         A.   Yes, ma'am.  I had diagnosed Mr. Folks with

15     antisocial personality disorder, borderline

16     personality disorder, and unspecified disruptive,

17     impulse-control, and conduct disorder.  I know that

18     sounds -- that's probably something that needs some

19     explanation right there.

20         Q.   Sure, yeah.

21              So the unspecified disruptive and conduct

22     disorder, why unspecified?

23         A.   It's unspecified in that as far as my

24     interaction and diagnostic look at this, what that's

25     really speaking to is the impulse of self-injury.

Dr. Matthew Gamble - March 13, 2025

1    So within the DSM-5, we have diagnoses for

2    compulsive gambling.  Right?  We have -- you may

3    have issues with drugs and we have monikers for

4    that.  Right?  And then there's impulse control

5    disorder that's really unspecified, meaning there

6    could be a video gaming issue, there could be a

7    self-injury issue, and that's really what that's

8    about.

9         So an unspecified disruptive,

10   impulse-control, and conduct disorder is a bit of an

11   umbrella term that says we've got some impulse

12   control issues that are overtly disordered.  In this

13   case, it would be self-injury.

14       Q.   Okay.  And do you recall whether Mr. Folks

15   had previously been diagnosed with any other mental

16   health or psychiatric issues?

17       A.   I believe that Mr. Folks has a -- a litany

18   of past diagnoses.  I mean, he's got a significant

19   mental health history.  As far as the -- all the

20   different psychiatric disorders that -- that he

21   enumerated, I can't really recall them.  I know that

22   he has an extensive psychiatric history.

23       Q.   Okay.  I would like to look at our first

24   documents.

25            MS. EDMONDSON:  I'm going to ask

Dr. Matthew Gamble - March 13, 2025

1      Ms. Oberstein-Allen to put on the screen and into

2      the chat for the court reporter a document

3      Bates-stamped 980, which is part of the --

4      Ms. Allen, maybe let's just put the entire mental

5      health and medical record on and then we can

6      identify specific pages, if that works.  It's one

7      file.  So we're going to find the right page.

8                    MS. OBERSTEIN-ALLEN:  Yep.  I'm going

9      to put this in the chat and then I'll screen share.

10                   MS. EDMONDSON:  Thank you.  We'll see

11     how this works, and if we need to adjust, we'll

12     adjust.

13                   MS. OBERSTEIN-ALLEN:  One moment.

14           Okay.  Can you-all see this?

15                   MS. EDMONDSON:  Yes.  And, Ms. Allen,

16     why don't you just close -- it's actually fine.

17           I'm going to ask the court reporter to

18     mark this document as Exhibit 1.

19                   (Exhibit No. 1 marked.)

20                   MS. EDMONDSON:  And I'll represent

21     that this document is a 267-page document that was

22     produced as the entirety or some portion of

23     Mr. Folks' medical and mental health file.

24           And we are looking -- if you can zoom out,

25     Ms. Oberstein-Allen for a moment, we're looking at a

Dr. Matthew Gamble — March 13, 2025

Page 41

```
1      page Bates-stamped 980.
2      BY MS. EDMONDSON:
3          Q.   First of all, Dr. Gamble, is that at all
4      legible, or how much do we need to zoom in so you
5      can actually see it?
6          A.   Would it be a big deal if I came to the
7      other side of the table or --
8                    MR. BLANCHFIELD:  Yeah, it was better
9      when you first had it up.
10                   THE WITNESS:  Yeah, I can see a little
11     bit --
12                   MS. EDMONDSON:  Okay.  All right.
13     Well, why don't we zoom in then and. . .
14         A.   Yeah, I can --
15     BY MS. EDMONDSON:
16         Q.   Can you see it?
17         A.   I can -- certainly there.  Yeah, that's
18     great.
19         Q.   Okay.  And, Dr. Gamble, just so you know,
20     if there's anytime you want us to scroll through the
21     document so you can see the whole thing, we're happy
22     to show it to you.  Not the whole 267 pages because
23     you'll be here all day, but any portion of this or
24     the next page, we're happy to -- to do that.
25         A.   Okay.
```

Dr. Matthew Gamble - March 13, 2025

Page 42

```
1        Q.   So, Dr. Gamble, this is a document that's
2   described as November 10th, 2022, Discharge PP
3   Summary:  Health Care Discharge Summary for Joshua
4   Folks.
5            Do you see that?
6        A.   Yes, ma'am, I do.
7        Q.   And are you familiar with this format of
8   document?
9        A.   I don't often review the last discharge,
10  but I'm familiar with what -- what this document is,
11  yes, ma'am.
12       Q.   Okay.  And you'll see that on the
13  additional comments there are a number of what looks
14  like possibly diagnoses, and I just want to
15  understand what some of these might be.
16           So the first one is HTN.  Does that mean
17  something to you?
18       A.   Yes, ma'am.  That's hypertension.
19       Q.   Okay.  And then LTBI?
20       A.   I'm not sure what that particular acronym
21  may be talking about there.  I'm sorry, I don't know
22  the. . .
23       Q.   Okay.  That's okay.
24           The next one is schizophrenia.  Did you
25  ever diagnose Mr. Folks with schizophrenia?
```

Dr. Matthew Gamble - March 13, 2025

1          A.    Not to my recollection, no, ma'am.

2          Q.    The next one seems to relate to his right

3    heel, so we can skip it.

4          A.    Right heel fracture.

5          Q.    Okay.  And the next one is HX

6    self-mutilation.  Can you explain what that means?

7          A.    Yeah, usually a history of self-mutilation.

8          Q.    And then bipolar disorder antisocial, is

9    that different from the antisocial personality

10   disorder that you mentioned earlier?

11         A.    I think that that probably should be

12   separate.  In other words, bipolar is sort of within

13   antisocial.

14               As far as bipolar disorder, again, I do

15   not recall ever diagnosing Mr. Folks with bipolar

16   disorder.

17         Q.    Okay.  So perhaps the -- it's -- bipolar

18   disorder is one diagnosis and then the next one is

19   antisocial narcissistic personality disorder; is

20   that fair?

21         A.    I think that what it probably should be,

22   bipolar, antisocial, narcissistic personality

23   disorder, and then you have that comma.

24         Q.    Okay.

25         A.    It's not -- I don't think it's meant to be

Dr. Matthew Gamble - March 13, 2025

1    antisocial narcissistic personality disorder.

2         Q.   Okay.  Do you recall diagnosing Mr. Folks

3    with narcicisstic personality disorder?

4         A.   I do not.

5         Q.   And then here it says, "Multiple foreign

6    body ingestion."  Can you explain what that means?

7         A.   Yes.  Mr. Folks, over the course of his

8    incarcerations, had multiple incidents of foreign

9    body ingestions.  So he would swallow different

10   foreign bodies, everything from paperclips to nails

11   to screws to coins.  I can't remember all the

12   different things that -- that he swallowed.

13        Q.   Then on the -- well, I guess the last

14   diagnosis is prepatellar bursitis.  Does that refer

15   to a problem with his knee?

16        A.   Yes, ma'am.

17        Q.   And then under "Meds," the first one is

18   bupropion XL.  Can you describe what that is for?

19        A.   Yes, ma'am.  That is an antidepressant.

20   It's commonly known as Wellbutrin extended release.

21   And Mr. Folks took that as an antidepressant

22   medication.

23        Q.   And the next one, trihexiphenydil?

24        A.   Yes, trihexiphenydil is more commonly known

25   as Artane.  It is a medication used for side effects

Dr. Matthew Gamble - March 13, 2025

Page 45

1    of the next medication you see, which is

2    chlorpromazine, more commonly known as Thorazine.

3    So trihexiphenydil, or Artane, can be used not only

4    for some mitigation of the side effects of

5    Thorazine, but it also has some degree of anxiolytic

6    properties itself.

7         And then if you would like me to go ahead

8    to the next one, I can.

9    Q.    Please do.

10   A.    Chlorpromazine, again, more commonly known

11   as Thorazine, is a medication that Mr. Folks has

12   been medicated with even prior to coming to the

13   Department of Corrections.  I had had him both at

14   Elayn Hunt and Angola, and I think he took Thorazine

15   in some capacity throughout or for the greater part

16   of his incarceration at multiple points during

17   different time -- incarcerations.

18        So that medication regimen of Wellbutrin,

19   Artane, and chlorpromazine, or Thorazine, was

20   pretty -- it was pretty standard for what we had

21   done for him.

22   Q.    And the chlorpromazine or Thorazine, what

23   is -- what is the -- what are the indications for

24   that medicine?

25   A.    That medication is -- was designed as an

Dr. Matthew Gamble - March 13, 2025

1     antipsychotic medication, one of the very first

2     antipsychotic medications.  Throughout the decades

3     that it's been used, though I did not -- though I

4     didn't feel that Mr. Folks had any type of psychotic

5     disorder, as I said, he had been treated with

6     Thorazine in the past.  And it can be used for

7     impulse control issues in particular.  Seems to have

8     been somewhat comfortable for him to take it.

9            And so that was a medication that he -- he

10    sort of sought out and was okay with taking because

11    he had taken it for many years, and largely in the

12    context of impulse control and severe what we would

13    call personality disorder.

14    Q.    Do you recall if these medicines were -- I

15    think you may have said consistently Mr. Folks'

16    medication program during his 2021 to 2022 stay at

17    Angola?

18    A.    Yes, ma'am, those -- those medications were

19    certainly part of his treatment regimen.  There was

20    an additional medication that I don't see listed

21    there -- I'm not sure he was taking it by the time

22    of his discharge -- called naloxone.  I remember

23    that as well.

24    Q.    And what is naloxone for?

25    A.    Naloxone a medication that can be used --

Dr. Matthew Gamble - March 13, 2025

1      it blocks the opiate receptor in the brain.  So it

2      can be used for addiction issues, specifically with

3      opiates.  But there's also some what we would call a

4      -- not an overt indication, but rather a use for

5      people with impulse control disorders like

6      nonsuicidal self-injury, that naloxone therapy could

7      mitigate some of that.  So we did give that a try

8      for him.

9          Q.    And to clarify, then, the naloxone

10     prescription for Mr. Folks was for that latter use

11     of possible impulse control for people with

12     indications for self-injury; is that accurate?

13         A.    Yes, ma'am.  It was not for opiate use

14     disorder.

15         Q.    And I believe you mentioned earlier that

16     you recall treating Mr. Folks at Elayn Hunt as well?

17         A.    Yes, ma'am.

18         Q.    Approximately how long did you treat

19     Mr. Folks at Elayn Hunt, if you recall?

20         A.    Oh, gosh.  I don't recall.  Maybe

21     18 months.  It was in a prior incarceration.

22         Q.    And do you recall if Mr. Folks had a

23     history of self-harm while at Elayn Hunt?

24         A.    Yes, ma'am, for sure.

25         Q.    And do you recall if he had a history of

Dr. Matthew Gamble - March 13, 2025

1    self-harm in his stay at Angola prior to 2021, the

2    earlier stay at Angola?

3        A.    Yes, ma'am.

4              MS. EDMONDSON:  Let's go off the

5    record for a moment.

6              MR. BLANCHFIELD:  All right.

7              THE VIDEOGRAPHER:  Okay.  Stand by.

8        The time is 12:06 p.m. and we're going off

9    the record.

10             (Break taken, 12:06 p.m. to 12:11 p.m.)

11             THE VIDEOGRAPHER:  The time is 12:11

12   p.m. and we're back on record.

13             MS. EDMONDSON:  Ms. Oberstein-Allen,

14   I'm going to ask you to put the document

15   Bates-stamped Folks Emails-0007 into the chat and

16   show it on the screen when you have a chance.

17        When it's there, Ms. Sievert, I'm going to

18   ask you to mark that as Exhibit 2.

19             (Exhibit No. 2 marked.)

20             MS. EDMONDSON:  For the record, I'll

21   note that this is a document Bates-stamped Folks

22   Emails-0007 through 0009, which is an e-mail chain

23   beginning on March 30, 2021, and ending on

24   March 31st, 2021.

25             Ms. Oberstein-Allen, if I can ask you to

Dr. Matthew Gamble - March 13, 2025

1    scroll down to the first e-mail in time, which is at

2    the bottom of the chain.

3         There you go.  And if you can zoom in a

4    little bit so it's easier for Dr. Gamble and

5    Mr. Blanchfield to read.

6    BY MS. EDMONDSON:

7         Q.   So, Dr. Gamble, this is an e-mail from

8    Blake LeBlanc to various people.  I'll note you're

9    not cc'd on this e-mail, but I want to ask you a

10   couple of questions about the people who are, if I

11   may.

12        Is this Blake LeBlanc the individual you

13   were mentioning earlier who is at the Department of

14   Corrections?

15        A.   Yes, ma'am, that's correct.

16        Q.   Are any of the individuals listed on the

17   "To" or "Cc" lines here individuals who are at --

18   who work at LSP?  We can zoom in more if you would

19   like.

20        A.   No, I can see okay.  So I think

21   Dr. Lavespere, Randy Lavespere, was already the

22   medical director of the Department of Corrections at

23   this time.  I could be wrong about that.  So he was

24   not at Angola, but he was rather the medical

25   director of the Department of Corrections.

Dr. Matthew Gamble - March 13, 2025

1           Second is Dr. Jacob Johnson.  That's the

2     hospital administrator that I made mention of

3     earlier.

4           Tracy Falgout was the assistant warden of

5     medical and mental health at the time.  So remember,

6     I mentioned Warden Ashli Oliveaux earlier.  This was

7     her predecessor, Warden Tracy Falgout.

8           Marcia Booker was our -- I believe our

9     director of mental health social work.

10          Stacye Falgout is not a person that works

11    at Angola.  And I don't know Mr. James Wesley.

12          On the "To" line, I don't know Ms. Angela

13    Griffin.

14          Seth Smith is the chief of operations at

15    the Department of Corrections.  So he's a Baton

16    Rouge administrative official.  He's not at Angola.

17          Faith Dufour, I do not know.

18    Q.    Okay.  Thank you very much.

19          This e-mail references in the text,

20    "Joshua Folks 361917 is well known to us and was

21    released not long ago.  Now he's back in St. Mary

22    Parish and has self-injured twice along with tearing

23    up the place.  The parish wants him moved ASAP."

24          Is it common for a parish jail or prison

25    to move particular prisoners to LSP due to medical

Dr. Matthew Gamble - March 13, 2025

Page 51

1      concerns?

2           A.    No, ma'am, it's not uncommon.   If there is

3      a rural parish and a rural parish that may not have

4      particular psychiatric or medical services,

5      oftentimes you'll get -- perhaps the warden of that

6      facility and/or the sheriff of that parish may call

7      the Department of Corrections and say, we have a

8      patient that either has medical or mental health

9      needs that are beyond our ability to care for that

10     patient.

11          And if it's a medical or psychiatric

12     issue, it will come to oftentimes the chief of

13     operations.   The medical director of the Department

14     of Corrections will review the case.   And it

15     oftentimes goes to -- that particular offender or

16     prisoner may go to either Elayn Hunt or Angola.

17     Why?  Because both Elayn Hunt and Angola have not

18     only skilled nursing facilities, both for acute

19     medical patients and chronic medical patients, but

20     also full-time psychiatric services.

21          So offenders like Mr. Folks can either go

22     to Angola or Hunt, but it is usually Angola or Hunt

23     because of those reasons.   They have the most

24     physicians, the most psychiatric services.

25          Q.    Okay.   And is that true for individuals who

Dr. Matthew Gamble - March 13, 2025

Page 52

1      are pretrial, who haven't yet been convicted of a

2      particular offense?

3          A.   Yes, ma'am, that can happen, and it does

4      happen with some degree of regularity.  If you have

5      a patient that is either struggling psychiatrically

6      or, again, medically with something that's a little

7      beyond a parish's ability to care for them, they

8      will be transferred to the Department of Corrections

9      for their ongoing medical and psychiatric care even

10     pretrial.

11         Q.   Do you recall whether you were consulted or

12     involved in any way in the transfer -- the decision

13     to transfer Mr. Folks to Angola?

14         A.   No, ma'am, there wasn't a lot of discussion

15     about it with me.  It was just -- I believe it was a

16     statement, not a question.

17         Q.   Okay.  Is it standard --

18              MS. EDMONDSON:  Ms. Oberstein-Allen,

19     you can put that document down.

20     BY MS. EDMONDSON:

21         Q.   Is it standard for -- when a new prisoner

22     enters Angola, for there to be a medical intake

23     process?

24         A.   Yes, ma'am.

25         Q.   Are you involved in -- generally, are you

Dr. Matthew Gamble - March 13, 2025

1    involved in the medical intake process for a new

2    prisoner?

3        A.    No, ma'am, I'm not one of the first people

4    to see a patient.

5        Q.    If there's a patient who is being

6    transferred from another facility where he has

7    experienced mental health issues, are you involved

8    in the intake process for -- for such a patient?

9        A.    I'm aware of when they will arrive.

10   There's going to be some things that are done, you

11   know, before I usually will see a patient.  There's

12   some, you know, medical protocols, security

13   protocols.

14            So they're going to enter the facility,

15   see various and sundry administrative officials.

16   Usually they're going to have a cursory physical

17   exam and interaction with either medical doctors or

18   primary care social workers.  And then I'll be made

19   aware that a particular person has made it, they've

20   gone through the things that they need to go through

21   and they're now housed at this particular area, and

22   I'm going to make my way to that patient if it's a

23   mental health reason.

24       Q.    Is there -- does part of that intake

25   process involve setting a level of care for patients

Dr. Matthew Gamble - March 13, 2025

1    who have mental health?

2        A.    Yes, ma'am.  Oftentimes one of our social

3    workers or counselors is going to be part of the

4    team that visits with the patient when they first

5    get there.  And, you know, again, you're going to

6    have medical there, you'll have representatives from

7    mental health saying -- getting historical

8    information, what's been going on with a particular

9    individual, and as you said, they will assign a

10   level of care, mental health level of care.

11       Q.    And is there a form or other document that

12   documents the intake procedure and the assignment of

13   the level of care for mental health?

14       A.    Oftentimes there is, yes, ma'am.

15       Q.    Is there any times when such a form

16   wouldn't be completed?

17       A.    I can't think of a time where it wouldn't

18   be.  Usually that's part of, as I said, an intake

19   process.  When you have a gentleman come in, usually

20   they're going to sit at a table and they're going to

21   move literally down like this.  They'll move from

22   person to person, classification officer, mental

23   health, primary care, security themselves to, you

24   know, search an offender, go through their -- their

25   belongings.

Dr. Matthew Gamble - March 13, 2025

1          So that's called an AU process, but to be

2    honest with you, I don't know what that acronym

3    stands for.  So they'll say there's a new AU

4    meeting, there's a new person that's to be seen.

5          Q.    Does the mental health evaluation as part

6    of that AU or assignment of level of care involve

7    looking at the person's prior medical records from a

8    transferring facility, if there are any?

9          A.    Yeah, if they're available, if there's some

10    record available of their past history at this

11    particular parish prison or other correctional

12    facility, if we have any information like that,

13    hopefully that would be made available to the mental

14    health person that is bringing that person on board.

15          Q.    And do you recall what level of care

16    Mr. Folks was assigned when he arrived at Angola in

17    or around March or April of 2021?

18          A.    I don't recall it, no, ma'am.

19          Q.    Based on his history and your previous

20    experience with him, would you have an understanding

21    of what his condition would -- would likely be

22    classified as?

23          A.    It's likely at -- in this particular

24    incarceration, coming from St. Mary's Parish, based

25    on the last diagnosis that we had in the previous --

Dr. Matthew Gamble - March 13, 2025

Page 56

1    I'm sorry, the previous incarceration of 2019, that
2    it would be a level of care 4 because a couple of
3    things were different about this incarceration.
4    One, he was pretrial.  Right?  So if we went with
5    just the diagnosis that I had for him in, like,
6    2019, it would have been a level of care 4.
7        Q.   And would the fact that St. Mary's Parish
8    had communicated that he had been self-harming there
9    have changed that level of care if that had been
10   available to the intake personnel?
11       A.   I can't really speak to that necessarily.
12   I guess most of the level of cares are going to be
13   algorithmically tied to the diagnosis itself.
14            In other words, an un- -- an antisocial
15   personality disorder, borderline personality
16   disorder, unspecified disruptive, impulse-control,
17   and conduct disorder is going to be a level of care
18   4 based on that particular diagnosis.
19            Now, depending on the person that's there
20   in the moment and what records they're reviewing --
21   for instance, you showed me a record earlier that
22   had schizophrenia and bipolar listed.  Why is it
23   listed there?  My guess is that documents from the
24   past -- on a patient like Mr. Folks, you may have
25   documents that say he has a history of

Dr. Matthew Gamble — March 13, 2025

1    schizophrenia, he has a history of bipolar.  And if

2    that leaps out, you may see a person say, okay,

3    well, we're going to assign a level of care 3, but

4    based on my diagnosis from '19 algorithmically, it

5    should have been a level of care 4.

6        Q.    Would -- separate from the diagnosis, would

7    the history of behavior change that level of care?

8    So specifically the self-harming behaviors, if

9    known, would that raise the level of care to a 3 or

10   a 2?

11       A.    Only if we were to house Mr. Folks -- like,

12   say, it's in a mental health treatment program,

13   right, that would make it a 2.

14           As a level of care 3, though, it -- I

15   would not classify him personally as a level of care

16   3; although, that is a multi-disciplinary team

17   decision.  The reason I say that is that antisocial

18   personality disorder or borderline personality

19   disorder and unspecified impulse control or

20   conduct -- disruptive, impulse-control, and conduct

21   disorder doesn't meet the criteria for level of care

22   3.  It's going to be a level of care 4.

23           And, again, that's partly the way that I

24   see those levels of care, because it's -- in my

25   mind's eye, it has to do with who may be impaired

Dr. Matthew Gamble - March 13, 2025

```
1    with a psychotic illness, who may be impaired with
2    more of a personality issue, and who needs to be
3    in some sort of specialized treatment area and who
4    may not need to be who can live in general
5    population.
6        Q.   What about a history of suicidal ideation
7    or suicidal behavior, would that change the level of
8    care?
9        A.   Only if that particular individual had
10   suicidality or self-injury that would lead me to
11   say, okay, I'd like this gentleman to be in the
12   mental health treatment area.
13           In other words, I do -- I do have lots of
14   patients that intermittently self-injure.  Sometimes
15   they self-injure in significant ways, but it doesn't
16   necessarily change their level of care unless, for
17   instance, I say, okay, well, let's -- let's go ahead
18   and move this particular individual into a treatment
19   setting.  And because of the fact that he's in that
20   treatment setting, it will lower his level of care,
21   say, from 4 to 2 just by the fact that he happens to
22   be in that area.
23       Q.   What level --
24       A.   If he moved --
25       Q.   I'm sorry.
```

Dr. Matthew Gamble - March 13, 2025

1     A.    Just to continue, if he moved out of that

2    area and back to general population, he would be

3    back to a 4.

4          Does that make sense?

5     Q.    Okay.  So what -- what prompts your

6    decision for someone whose diagnosis would be a

7    level of care 4 to move them to the treatment --

8    excuse me -- the mental health treatment unit or --

9    notwithstanding the fact that their level of care

10   would be 4 based on their diagnosis?

11    A.    Yeah, it would be -- it's subjective.  It

12   would be if I felt that there would be a benefit to

13   that individual by being in a treatment area or a

14   milieu that might be beneficial to them.  Whether or

15   not that particular individual would disrupt that

16   milieu, because it is a treatment milieu, and

17   probably nine out of every ten gentlemen, so 90 out

18   of the 100 or so that we have there are going to be,

19   again, severely acutely and/or chronically mentally

20   ill.

21          And so when you have an individual that

22   does not have a psychotic disorder going into that

23   milieu, it can be difficult for that person, right,

24   because it's -- it can be covetous down there.

25   You've got a lot of people that are seriously

Dr. Matthew Gamble - March 13, 2025

1    mentally ill.

2            And then vice versa, a person that does

3    not have a psychotic disorder and may have more of a

4    behavioral disturbance can also be problematic to

5    the milieu of patients that are chronically and/or

6    acutely mentally ill.  So --

7        Q.    So for individual -- oh, I'm sorry, go

8    ahead.

9        A.    Yeah, those are the decisions that

10   sometimes have to be made about that particular type

11   of patient.

12       Q.    And so for individuals who are suicidal, is

13   there some level of suicidality that would lead you

14   to put the person in the -- in the treatment milieu?

15       A.    Yes, ma'am, for sure.

16       Q.    So sort of on that spectrum, you know, I'm

17   sure there's some people who have experienced

18   suicidal ideation in the past and others who are

19   acutely suicidal, how do you decide -- seems like a

20   difficult decision, but how do you decide at what

21   point along that spectrum the person should be moved

22   to the treatment area?

23       A.    Again, if I feel like there would be some

24   benefit for that patient of being in that

25   environment, a treatment environment with a little

Dr. Matthew Gamble - March 13, 2025

1    bit more social work contact, obviously you have a

2    few more eyes on an individual that may be

3    chronically self-injurious, those are the types of

4    patients that I'm going to say, okay, well, this

5    person might actually do okay in that particular

6    setting, let's give that a try.  That's certainly

7    something that we do.

8         Q.    Do you recall where Mr. Folks was housed

9    when he first entered Angola in early April 2021?

10        A.    Yes, ma'am.  It was in the skilled nursing

11   unit.  There are two skilled nursing units.  He was

12   in -- housed in Skilled Nursing Unit 1.

13        Q.    And why was he assigned there, if you

14   recall?

15        A.    I believe that -- because of the history of

16   self-injury and the fact that he was pretrial.  So

17   there were a couple of things going on.  And he had,

18   I believe, overtly injured himself prior to leaving

19   St. Mary's Parish.  They wanted him in a place that

20   had skilled nursing, you know, physicians, nurse

21   practitioners, that were readily available, 24/7

22   nursing, in a single housing area.

23             So in the skilled nursing units at Angola,

24   you'll see an open ward with patient beds side by

25   side, people convalescing from illnesses, you know,

Dr. Matthew Gamble - March 13, 2025

Page 62

1    surgeries, things of nature.  But they're in general
2    population, so they're housed in, like, an open
3    ward.  And then there are locked rooms that would
4    house our guys that might be in preventative
5    housing, some sort of segregated housing.  Pretrial
6    is another one of those.
7            He was placed in there because, again, he
8    had some injuries that they wanted to see after
9    medically.  They wanted him to be in a room by
10   himself so that, hopefully, it would minimize his
11   access to foreign objects.  And you're also required
12   to be in a room by yourself if you're pretrial and
13   you're on the DOC's campuses.
14       Q.   Sorry, on the DOC's canvases?  I don't
15   know --
16       A.   Campuses.  In other words --
17       Q.   Campuses.  I see, yes.  I understand now.
18   I just misheard the word.
19            Just to check, is the -- his assignment to
20   the skilled nursing unit when he arrived, is that
21   something you remembered, or did you refresh your
22   recollection with your notes based on that?
23       A.   I remembered that.  And it was also -- my
24   notes have a location, but I do remember our -- when
25   he came in this go-round.

Dr. Matthew Gamble - March 13, 2025

```
 1        Q.   Do you remember approximately when you
 2   first met with Mr. Folks after he arrived this
 3   go-round?
 4        A.   It would be pretty soon after his arrival.
 5   I don't know if it was the day he arrived or the
 6   days following, but it was in -- I mean, I was aware
 7   he was coming.  And so I'm pretty sure that when
 8   they said, hey, he's here, I probably made my way
 9   over to the nursing unit pretty -- in the -- the
10   first little while he was there.  I don't know if
11   it was the first day, the first 48 hours, the first
12   72.
13        Q.   But you think it was under a week?
14        A.   I feel like it was, yes, ma'am.  I don't
15   have it right in front of me.
16        Q.   Understood.
17             Do you recall anything about that first
18   visit with him after he arrived from St. Mary's
19   Parish?
20        A.   Nothing in particular other than it was a
21   fairly typical interaction between myself and
22   Mr. Folks.  We've known each other quite a bit over
23   the years.  I don't remember -- remember anything
24   remarkable about it.
25        Q.   About how long would it have lasted?
```

Dr. Matthew Gamble - March 13, 2025

Page 64

1          A.    Oh, five to ten minutes.  You know, because

2     just a brief chat oftentimes through the -- it's a

3     doorway, right, with a window, and it has a hatch

4     that you can open.  And I'll either, you know, take

5     a knee at the hatch and chat with the gentleman or

6     sit a chair down and chat with the gentleman.

7     That's usually how that -- that interaction would

8     go.

9          Q.    And since he was coming in this time, did

10    you -- was that visit necessary in order to

11    prescribe him psychiatric medication?

12         A.    Yes, ma'am.  Usually I'm going to see

13    whether a particular patient has been taking -- or

14    have you been taking any medicine while you were

15    over at St. Mary's or wherever you may have been

16    before.  What were you taking, do we have any

17    documentation of that?  You and I saw each other a

18    couple years ago, it hadn't been long since I saw

19    you last.  We were doing something with your

20    medications back then.  I remember you -- you liked

21    that pretty well.  Is that what you want to go back

22    to?

23              So we have that discussion at that time,

24    and then I do prescribe medications usually at

25    that first visit.

Dr. Matthew Gamble - March 13, 2025

1    Q.    And do you recall if in that visit, you

2    asked or Mr. Folks volunteered whether he had been

3    self-harming before being arrested, i.e., on the

4    outside?

5    A.    I don't recall a discussion like that, no.

6    I know we certainly chatted about the recent

7    self-injury within St. Mary's Parish.

8    Q.    Did Mr. Folks offer any reason for having

9    done that self-injury at St. Mary's Parish?

10    A.    Just angry with the circumstances of his

11    arrest and charges.  I mean, a certain, you know,

12    situation that had happened there made him angry.

13    Q.    Do you recall approximately how long after

14    Mr. Folks arrived at Angola that he self-harmed

15    again?

16    A.    Oh, I don't recall the exact dates.  I know

17    that it probably wasn't very long after his arrival.

18    We may have had a period of -- some degree of no

19    self-injuries.  But it wasn't terribly long after he

20    arrived that I'm sure there was some form of

21    self-injury because that was -- that's a fairly

22    frequent thing with him, unfortunately.

23    Q.    To your recollection, was it -- so let me

24    -- let me back up for a second, Dr. Gamble.

25           Is it fair to say you have treated

Dr. Matthew Gamble - March 13, 2025

1    Mr. Folks at Elayn Hunt and then -- and Angola the

2    first time and then at Angola from 2021 to 2022?  Is

3    that correct?

4        A.   Yes, ma'am.  I first met Mr. Folks at Elayn

5    Hunt.  I believe it was under similar circumstances.

6    Perhaps he was being incarcerated at another

7    facility that felt as though they couldn't exactly

8    handle what was going on with Mr. Folks and he was

9    transferred to Elayn Hunt in a similar way he was

10   transferred to Angola.

11        Because, as I said, you can either go to

12   Hunt or Angola, and at the time I was the treating

13   psychiatrist at Hunt.  And I remember him being

14   brought to us, and that's where I met Mr. Folks the

15   first time.

16       Q.   Do you recall, between those three

17   different stays at different facilities, were

18   Mr. Folks' symptoms consistent throughout or were

19   they worse this last time at Angola?

20       A.   I would say consistent throughout.  I think

21   the only real difference was that he -- you know, he

22   had a very serious self-injury.  He's had a lot of

23   serious self-injuries.  But perhaps the most

24   significant just happened to be during this last

25   incarceration.  It could have happened many times

Dr. Matthew Gamble - March 13, 2025

Page 67

1    before.  It just -- in many ways, he was fortunate
2    that it never (audio disruption) in such a
3    significant way.
4              THE STENOGRAPHER:  That it never --
5    I'm sorry, what?  I'm sorry, I didn't understand the
6    last part of your answer, that it never -- it was
7    fortunate it never hit what?
8              THE WITNESS:  It was fortunate that he
9    had never injured himself in such a serious way.  He
10   had certainly done things to himself over the years
11   that could have led to this very same sort of
12   injury, it just never happened.  He was -- he was
13   overtly fortunate.
14   BY MS. EDMONDSON:
15       Q.    And to your -- in your opinion, was that
16   just sort of the luck of the draw as to where he
17   happened to stab himself on one of the occasions in
18   this latter stay at Angola?
19       A.    Yes, in the -- some weeks prior to his --
20   there were two -- I remember two hospitalizations.
21   One was earlier.  Right?  And he had, I think,
22   inserted -- he had a wound in his abdomen and he had
23   inserted foreign objects into that wound through his
24   abdominal wall, into the cavity of his abdomen.  And
25   that's not the first time that it happened.  Right?

Dr. Matthew Gamble - March 13, 2025

1          So he not only has ingested wild foreign
2    objects, but he also -- this time he put them into
3    his abdominal cavity.  And that could have led -- it
4    led to an exploratory laparotomy, meaning we have to
5    go get these foreign objects out of his abdomen or
6    it's going to perforate his gut or it's going to
7    cause an infection.  You've got to go get it.
8    Anytime you have a foreign object penetrate the
9    abdominal wall, there's going to be an exploratory
10   laparotomy.  It's a surgical procedure.
11         So he had already that, meaning that when
12   he did not have serious consequences for that, that
13   was a miracle, and that had happened many times
14   before.  And then some weeks later, he does the
15   exact same thing, and sure enough, it actually did
16   perforate the bowel.
17         And so, again, I saw those behaviors at
18   Hunt.  I saw them the first time at Angola, I saw
19   them the last time at Angola.  It could have
20   happened at any point during those time periods.
21      Q.   In your experience, were there any time
22   periods within his stays where he was relatively
23   more stable or not engaging in -- in at least the
24   most severe behaviors?
25      A.   Yes, I've seen him settle down into

Dr. Matthew Gamble - March 13, 2025

1    months'-long periods of relative stability, and I've
2    seen him ramp up into, you know, self-injury that is
3    the worst case of self-injury that I have ever seen
4    in my psychiatric career.
5        Q.    Were you able to identify any triggers or
6    circumstances that were associated with the worst
7    periods of self-injury for Mr. Folks?
8        A.    Yes, ma'am.  I mean, it really is in the
9    context of anger and irritability oftentimes with
10   some sort of authority, be it the auspices of the
11   law or the auspices of the Department of
12   Corrections.  And unfortunately, Mr. Folks, again,
13   his major diagnosis is antisocial personality
14   disorder, and within the context of that character
15   pathology, that personality disorder -- so you have
16   a personality style that becomes disordered in that
17   it becomes so deleterious to either yourself, to
18   your family, to society that it -- it warrants a
19   disordered personality moniker.
20           Does that make sense?
21           And so when those two things come into
22   conflict, i.e., I feel that I have an argument with
23   this particular authority, and it becomes a tit for
24   tat, zero-sum game that I must win, so there's a
25   headbutting contest going on, and if you do that,

Dr. Matthew Gamble - March 13, 2025

1    then I do that.  And so everything becomes

2    contingent.  My behaviors are contingent, I want to

3    win.

4            And unfortunately, some people can begin

5    to self-injure, injure other people, injure

6    themselves in this sort of ramping-up behavior.  And

7    those are the things that -- that exacerbate

8    Mr. Folks' self-injury.  Unfortunately, it's -- it's

9    something that, you know, we can sit down and we

10   could have a room full of people with Mr. Folks here

11   and say, you know, it seems like you're going too

12   far.

13           And he'd say, well, they -- they've done

14   this, they arrested me at St. Mary's, I disagree

15   with the arrest, I disagree with the legal process,

16   this is how I'm going to show my displeasure about

17   that.

18       Q.   So in your view, Mr. Folks' self-harm

19   wasn't related to depression or suicidal ideation in

20   any respect?

21       A.   I believe -- I mean, certainly you can say

22   suicidal ideation, yeah.  I mean, I guess he thinks

23   about injuring himself.  I don't think it's overtly

24   suicidal.  I don't think the end game is to kill

25   myself.  In fact, I've heard Mr. Folks say that many

Dr. Matthew Gamble — March 13, 2025

1    times, I'm not trying to kill myself, I am angry and

2    this is a tool.  It's almost a weapon of war.

3    Unfortunately, it's -- it's --

4        Q.    I'm sorry.

5        A.    -- it's with himself.

6              In other words, he's the weapon.

7        Q.    Is self-harm a recognized -- "side effect"

8    is the wrong words, but is it connected with

9    antisocial personality disorder?

10       A.    It's more -- it can be in the way that I'm

11   describing it.

12             In other words, I am in such a conflict

13   with whatever authority or whatever it may be,

14   within a family, within a society, I'm in such

15   conflict that I do use my own body as a weapon.

16   That can happen.  But it's more associated with the

17   other diagnosis, which is borderline personality

18   disorder, which I've also diagnosed for Mr. Folks.

19       Q.    And so -- go ahead, I'm sorry.

20       A.    Yeah, self-injury and nonsuicidal

21   self-injury is a little bit more associated with

22   borderline personality disorder.  That's one of the

23   reasons he also carries that diagnosis.

24       Q.    So going back for a moment -- withdrawn.

25             In your experience with Mr. Folks at these

Dr. Matthew Gamble - March 13, 2025

1    three different stays he had at institutions where

2    you had treated him, were there any circumstances or

3    medications that lessened his tendency to self-harm?

4        A.    The medications that I had him on, both

5    the -- if we look back at the records, it may well

6    be that I had him on this regimen probably fairly

7    consistently.  Because I know that Wellbutrin as an

8    antidepressant was one that he liked, and it's

9    actually a restricted medication for the Department

10   of Corrections.  They sort of frown on its use

11   because it can be misused.  But I felt strongly

12   enough about it for Mr. Folks that I -- I asked for

13   a nonformulary request.  I got it for him -- because

14   he had been on it before it was restricted.  Right?

15        In other words, back when we had him at

16   Hunt, we had him on it.  I'm almost certain he was

17   on Thorazine at Hunt.  If I'm not mistaken, those

18   were pretty -- pretty much two of our fairly

19   consistent medications.

20        When he arrived at Angola, he was -- I

21   think it was even restricted in his first visit to

22   Angola.  And I asked for it then and I asked for it

23   again when he re-arrived.

24        So, yeah, was it helpful to him?  He said

25   it was.  I took his word for it and went down the --

Dr. Matthew Gamble - March 13, 2025

Page 73

1     the road with him on Wellbutrin.

2              And the Thorazine therapy, as I said, was

3     something that he reported to me was helpful for him

4     among all the different medications that you could

5     use for the suppression of impulse control.  You

6     know, you can use different medications for that.

7     But he had been on every medication you can think of

8     and he -- he would always say, I'm okay with

9     Thorazine, let me go ahead with that.

10       Q.    Do you recall ever considering whether to

11    experiment with other medications given the

12    significant self-harm incidents he was having in

13    that last time at Angola?

14       A.    I mean, there are many medications that

15    Mr. Folks himself has taken, so he's, to be honest

16    with you, familiar with -- every single psychiatric

17    medication that you could probably imagine has

18    probably been offered to him and/or he's taken it.

19    Therefore, any of my patients like Mr. Folks, I will

20    allow, you know, that communication to be two-way.

21    What is it that you think helps you the most, I'm

22    going to put you on it.

23              And I would have been open to any

24    combination of medications to get him better.  I

25    think that he chose this combination of medication

Dr. Matthew Gamble - March 13, 2025

Page 74

1    and he -- he continued to self-injure because, again

2    -- I do remember this, in one of my notes I -- I

3    said that it -- my psychiatric medication regimen

4    and psychotherapeutics is -- is unlikely to change

5    some of the outcomes of this case.

6        Q.    Do you recall --

7        A.    Just past experience with him,

8    unfortunately.

9        Q.    Do you recall, did you ever consider

10   consulting with other psychiatrists or did you

11   review any literature about severe cases like

12   Mr. Folks?

13       A.    Yes, ma'am, for sure.  Back -- it's very

14   possible, I would have to look back at it, but when

15   Mr. Folks first came in to Elayn Hunt, as I said, it

16   was the worst case of self-injury I had ever seen to

17   the point where it was hard to believe that he had

18   actually done all this injury to himself.

19           So, yes, I mean, I dug into literature

20   review about nonsuicidal self-injury, impulse

21   control and self-injury, what could we possibly try,

22   do, use.  I want to say that Dr. -- it's possible

23   Dr. Flemming may have seen Mr. Folks at some point.

24   She took over my position at Elayn Hunt when I went

25   to Angola.  So, I mean, there were lots of eyes and

Dr. Matthew Gamble - March 13, 2025

1   opinions about it.  I didn't necessarily seek out an

2   overt -- but there were other physicians at

3   hospitals.  Right?

4          So when Mr. Folks would injure himself and

5   he would wind up in the hospital at the University

6   Medical Center, you know, I would get a call about

7   it because inevitably, what is called consult

8   liaison psychiatry -- are you familiar with that?

9       Q.   No, I'm not.

10      A.   Consult liaison psychiatry are the

11  psychiatrists that will be consulted within a

12  hospital system.  So let's say you come in and

13  you've swallowed foreign objects and you -- you're

14  obviously a person that has self-injured in ways

15  that they see you in the emergency room, and surgery

16  has to go and take a look at you because you've

17  swallowed these objects, and they're also going to

18  consult psychiatry within the hospital system.

19         And many of these are my colleagues from

20  LSU, right, physicians that I may have worked with

21  as a resident and/or as a staff physician at LSU.

22  And so I get a call, are you familiar with

23  Mr. Folks?

24         Yes, I'm familiar with Mr. Folks.

25         I mean, there were plenty of psychiatrists

Dr. Matthew Gamble - March 13, 2025

1    that laid eyes on Mr. Folks over the years, but I'm

2    afraid that I didn't -- I didn't hear a solution

3    necessarily.  We talked a lot about it, but there --

4    this is a case that is very difficult.

5        Q.    Do you recall if Mr. Folks ever

6    communicated to you that -- that changes in his

7    conditions of confinement might improve his -- lower

8    his propensity to self-harm?

9        A.    I mean, I can't recall specific instances.

10   I know that he -- he would seek out different places

11   of incarceration.  Right?  We get that from time to

12   time.  I would rather be on this tier, I would

13   rather be in this situation, I would rather be in

14   that situation.  It's a very common thing.  But I

15   don't recall a lot of detail about it because --

16       Q.    No, go ahead, I'm sorry.

17       A.    Yeah, just because of having different

18   facilities and all the different housing areas that

19   are possible, I don't recall a lot of -- I know it

20   was brought up, but I don't know of any real

21   specifics there.

22       Q.    Did you review any of Mr. -- did you have

23   the opportunity to review any of Mr. Folks' medical

24   records from outside the correctional system?

25       A.    No.  The -- not exactly, no.  I don't

1    recall, like, any hospital records from outside
2    facilities.  The only thing I remember having a lot
3    to review of is when he did go to the hospital.  You
4    know, what did the consult liaison team say, what
5    did the surgery team say?
6              As far as, like, before he was
7    incarcerated, mental health visits, prior psychiatry
8    visits, hospital visits, I don't have -- I don't
9    recall seeing anything like that.
10    Q.    Do you recall whether in giving his own
11    history, Mr. Folks described having significant
12    self-harm incidents when he was not incarcerated?
13    A.    Yes.  Again, I -- when I first met him at
14    Elayn Hunt, it was objectively obvious that he had a
15    significant self-injury history.  He is scarred in a
16    way that is marked and significant.  So not all of
17    that self-injury went on during his incarceration.
18    A lot of it was, I believe, during his time as a
19    free man as well.
20    Q.    One moment.
21              MS. EDMONDSON:  Ms. Oberstein-Allen,
22    can you bring up Folks Emails-0005, please?
23              And, Ms. Sievert, for the record, I think
24    this is Exhibit 3.
25              (Exhibit No. 3 marked.)

Dr. Matthew Gamble - March 13, 2025

1              MS. EDMONDSON:  For the record, this

2      is a document Bates-stamped Folks Emails-0005.  It's

3      an e-mail from Katie Ard -- excuse me, from Jacob

4      Jacobson -- Jacob Johnson to Katie Ard, Gina Todd,

5      Dr. Gamble, and cc'ing Randy -- Lavespere, is that

6      how you said it?

7          A.   Yes, ma'am, Lavespere.

8      MS. EDMONDSON:

9          Q.   Lavespere, dated June 3rd, 2021.  So the

10     subject of this e-mail is "Locked Room Patients."

11              Just that terminology, does that mean --

12     well, can you explain to me what that terminology

13     means, to your understanding?

14         A.   Yes.  This is coming from our hospital

15     administrator, as I said, Dr. Jacob Johnson.  And

16     what you're seeing is to Dr. Ard, who is our -- you

17     may remember in the first e-mail, it was Ms. Marcia

18     Booker, and then Dr. Ard took over as our mental

19     health social work administrator.  Gina Todd was her

20     number two in social work administration, and then

21     myself.

22              The locked room patients, what he's

23     speaking of here is, again, back in the nursing

24     unit, there's an open ward and then there are about

25     ten locked rooms for patients that cannot live in

Dr. Matthew Gamble - March 13, 2025

1    general population.  For Mr. Folks, that was in the

2    context of his being a pretrial individual.

3            And so it looks like Dr. Johnson is asking

4    if he's going to move from skilled nursing Locked

5    Room 1 -- not locker room.  I think he probably

6    meant Locked Room 1 -- to TU.  And that -- remember,

7    TU is the cell block where our mental health program

8    is located, but it has specialized housing in there

9    as well that is under camera supervision.  And it's

10   also separated from the general population in -- so

11   what they're asking here is, can Mr. Folks move from

12   a locked room in the nursing unit to a locked room

13   within the transitional unit, or TU, under a camera

14   and also separated from the rest of general

15   population because he's pretrial.

16           Does that make sense?

17       Q.   Yes, I think so.

18       A.   Okay.

19       Q.   So was it your understanding in this e-mail

20   -- first, perhaps just to clarify, the -- I believe

21   the black box there is redacted because it refers to

22   a different patient.  That's how we received it.

23           So the reference here is to Dr. Lavespere

24   wanting to move Joshua Folks from Locked Room 2 to

25   the TU?

Dr. Matthew Gamble - March 13, 2025

Page 80

1      A.    Uh-huh.

2      Q.    Do you have a recollection of what prompted

3   moving Josh -- Joshua Folks from a locked room in

4   the skilled nursing unit to the TU at this time?

5      A.    I can tell that -- or I can tell you that

6   in the case of Mr. Folks in particular, he was

7   housed in the nursing unit and -- initially.  So one

8   of the things about the nursing unit and mental

9   health patients, especially those like Mr. Folks

10  that are being self-injurious, is that the

11  visualization at the skilled nursing unit is not as

12  good of a patient as it might be at TU.  Because at

13  TU in these specialized cells, you have a couple of

14  advantages as far as visualization and minimization

15  of foreign objects.

16         And so that's -- the discussion here is,

17  can we move him from the locked room at the nursing

18  unit where you have a lot less direct visualization,

19  you have a lot more opportunity, I would argue, for

20  passing of foreign objects.

21         Why?  Because in this open ward, right,

22  around this area, you have orderlies, you have other

23  patients, you have medical equipment.  You have a

24  lot of stuff that could be, I don't know, grabbed,

25  it could be slipped under the door.  There's a lot

Dr. Matthew Gamble - March 13, 2025

1      of things that could happen in the nursing unit, and
2      we can't visualize it with video camera.
3             So the discussion was, Mr. Folks has been
4      injurious, he gets his hands on a lot of foreign
5      objects, can we move him to the TU area where we
6      have direct 24/7 camera supervision, we have a door
7      that leads onto an anteroom that leads onto the cell
8      such that even if someone goes through that door
9      and, say, slips him a foreign object or anything
10     like that, we can see it on camera.
11            We can also, if he were to be retrained --
12     Mr. Folks is fairly notorious for being able to
13     injure himself even in restraints -- we could see
14     him ultimately wiggle down to begin to manipulate
15     either his hand restraints, his leg restraints,
16     and/or any injuries that he may have.
17            So that's more or less of why this
18     discussion was had, can we move him into a place
19     where, particularly me, have more ability to observe
20     him because the locked room in the nursing unit is
21     not the most ideal area for direct observation.  So
22     that's why we were thinking about that move.
23        Q.   And the room in the TU that's being
24     contemplated for him to move to here, is that a room
25     that's part of the mental health unit?

Dr. Matthew Gamble - March 13, 2025

Page 82

1        A.    It is not in the -- these are four
2    specialized cells.  And they're the --
3    interestingly -- and a lot of people are surprised,
4    and perhaps I'm even surprised -- it's the only four
5    cells at Louisiana State Penitentiary, to my
6    knowledge, that have 24/7 video observation into
7    a -- you know, a large television or a viewing
8    screen that is sitting by security at all times.
9    And that's ultimately the only place at Angola that
10   you have like that.
11        In addition, it has that layer of
12   security, foreign objects, illicit drug-wise, you
13   name it, where there's a door and you have to enter
14   it.  By the way, security is 10 feet from that door.
15   So other offenders, security, medical personnel,
16   they're aware of who is going through that door.
17   And once you step into that door, you're on camera,
18   so if you slide him something, if you hand him
19   something, any of that, it's going to be visualized
20   on camera.  And I personally wanted that, and I
21   doubt I was alone.
22        Q.    Do you recall whether you considered moving
23   him to that specialized cell in the TU right when he
24   arrived?
25        A.    I don't really recall that.  I know that he

Dr. Matthew Gamble - March 13, 2025

Page 83

1    was in the nursing unit.  I wasn't super fussy about

2    the -- the nursing unit placement; in other words, I

3    wasn't, like, hell bent on getting him to that

4    locked room right away.  Because it was my great

5    hope that perhaps we would have some period of

6    stability with Mr. Folks.  I also was very hopeful

7    that this was going to be something that was short

8    lived, perhaps worked out at the parish level.

9            In other words, I did not know how long

10   Mr. Folks would be with us.  I was kind of hopeful

11   that, you know, he got arrested, he got upset and he

12   hurt himself, and they said, we want him back at the

13   DOC.  And it was my great hope that perhaps they

14   would look at the charges, get with attorneys, and

15   say, okay, well, we can do this or that with this

16   particular charge, go back to St. Mary's, and off he

17   goes right.  Right?  But that didn't seem to be the

18   case and kept marching forward and there was

19   self-injury.

20           So by this time in the -- the stay with

21   us, you know, six weeks or so after he got there, I

22   thought that that was probably not a bad idea, to go

23   ahead and get him in that monitored room.

24       Q.   Do you -- is the -- that monitored room

25   also called the time-out cell?

Dr. Matthew Gamble - March 13, 2025

```
 1        A.    That's kind of an old term that --yes, it's
 2    kind of like a time-out cell.  I've heard that
 3    moniker ever since I got to Angola.  Oh, so-and-so
 4    is in the time-out cell at TU.  But really what is
 5    it is, just if there's something that happens that
 6    is violent, there may be this need for the -- you
 7    know, somebody has been threatened in such a way
 8    that it's so serious that they're, like, okay, we
 9    need to put this person into this level of security
10    where you've got a security guard not only seeing
11    them visually, but also physically can see that
12    door, and if that door is open, they can see into
13    that cell.  Right?  So it's just a --
14        Q.    Other than the --
15        A.    -- high level of security.
16        Q.    Other than an individual who's been
17    threatened or an individual who's -- has a
18    propensity for self-harm, is there anything -- are
19    there other reasons that individuals are put in the
20    time-out cell or the specialized cell?
21        A.    Yeah, sometimes you'll have -- say, a
22    high-profile pretrial offender has been housed in
23    that cell or those cells because, again, they're
24    pretrial, so they have to be separated from
25    everybody on Angola's campus.  Right?  But they're
```

Dr. Matthew Gamble - March 13, 2025

1    high profile enough where they -- an escape attempt

2    would be another example that -- like, if you

3    actually got out of a facility, crossed state lines,

4    and they're, like, we've just got to have this guy

5    in a particular area where we can really visualize

6    this.

7         Another one, adolescent offenders that are

8    not old enough to be exposed to the rest of the

9    population.  Like, we have had a life sentence,

10   like, 17-year-old and he had maybe eight months

11   until he's 18, they housed him in there so that he

12   was completely isolated from other offenders for

13   safety purposes for him.

14        And then --

15        MS. EDMONDSON:  Let's go off the

16   record -- oh, I'm sorry.  Go ahead, finish your

17   answer and then --

18   A.    Lastly, like, if there's some sort of major

19   league violence offenders who offend -- or offended

20   security, they will take the offender, the aggressor

21   of that, and house him in those until they find a

22   place for him to be.

23   BY MS. EDMONDSON:

24   Q.    Okay.  Thank you.

25        MS. EDMONDSON:  Can we go off the

1    record?

2              THE VIDEOGRAPHER:  Sure.  Okay.  Stand

3    by.

4         The time is 1:13 p.m. and we're going off

5    the record.

6              (Break taken, 1:13 p.m. to 1:41 p.m.)

7              THE VIDEOGRAPHER:  The time is 1:41

8    p.m. and we're back on the record.

9    BY MS. EDMONDSON:

10        Q.   Dr. Gamble, when we last spoke, we were

11   speaking about the four cells on the TU that have

12   the cameras on them, correct?

13        A.   Yes, ma'am.

14        Q.   Okay.  And I had asked if those were

15   referred to as time-out cells.  Is there any other

16   name you used for those four cells?

17        A.   You know, I don't know that there are any

18   other names that I've heard used for those cells.

19        Q.   Okay.  For people who are housed in those

20   four cells in the TU, I'm going to call them the

21   "time-out cells" just to -- for short, if that's all

22   right.  Is that okay?

23        A.   Sure.

24        Q.   Okay.  For -- for the time-out cells, would

25   the individuals in those cells be regularly visited

Dr. Matthew Gamble - March 13, 2025

Page 87

1      by a social worker?

2          A.   Yes.

3          Q.   Was there any particular cadence or

4      frequency of visits by a social worker for people in

5      those cells?

6          A.   I don't know that there's a wrote

7      frequency, but I know that they would be visited.

8          Q.   Would there be a specified frequency for

9      social worker visits for individuals housed on the

10     mental health -- mental health portion of the TU?

11         A.   Yes, ma'am.

12         Q.   And what is that frequency?

13         A.   I don't know the exact frequency of the

14     social work visits.  It has to do with the level of

15     care itself.  So if you are housed in that mental

16     health area, you're a level of care 2, and that's

17     going to trigger a certain frequency of visits from

18     the social work staff.

19              Similarly, if you were in the time-out

20     cell and on a suicide watch of any sort, that, too,

21     has its own dictated frequency of visits from the

22     social work staff.  If you're on standard watch, for

23     instance, you're going to be seen at least once a

24     day.

25         Q.   And just to understand that terminology, is

Dr. Matthew Gamble - March 13, 2025

1     the standard watch a suicide watch or is it a

2     different kind of watch?

3         A.    Yes, a standard suicide watch is kind of

4     the lowest-level suicide watch, meaning someone has

5     either said, I'm thinking about harming myself, I'm

6     thinking about harming somebody else, I have a plan

7     to hurt myself, I have a plan to hurt somebody else,

8     you would be placed on what we would call a standard

9     suicide watch.  That means no property, paper gown,

10    inside a single-man cell of some sort throughout

11    the -- the facility with every-15-minute security

12    checks to -- to see about you and every-24-hour

13    social work visits.

14        Q.    I'm going to come back to that in a minute,

15    but I want to stay on the social workers on the

16    mental health unit for a moment.

17             Do you have an approximation of how often

18    a social worker would visit a level of care 2?

19        A.    To be honest with you, I don't know the --

20    the exact approximation.  I don't know all the --

21    the algorithms on that.

22        Q.    Sure.

23             Were there frequencies in the mental

24    health unit by level of care for your visits as the

25    psychiatrist?

Dr. Matthew Gamble - March 13, 2025

1      A.    Are my visits dictated by level of care as

2   well?  Is that what you --

3      Q.    You know, I asked a bad question.  Let me

4   try again.  Let me ask -- withdraw my question and

5   try it again.

6            Did you have a specified frequency of

7   visits for individuals on the mental health unit by

8   level of care?

9      A.    Yes, if -- if you are housed on the mental

10  health unit and you, by proxy, would be a level of

11  care 2, then the -- the policy is that you are seen

12  at least every 90 days.  Oftentimes we definitely

13  see people a lot more often than that, but I believe

14  that that is the -- the overarching policy.  If a

15  person is in the -- the mental health area, they're

16  meant to be seen at least every 90 days, and

17  certainly in practice it's much more frequently.

18     Q.    Is there a policy for how often individuals

19  on a standard suicide watch need to be seen by a

20  psychiatrist?

21     A.    I don't know that there is a strict policy

22  issue there, because I think that ultimately --

23  suicide watches are -- depending on the way that

24  they're handled within the facility, there's a way

25  of handling the -- suicide watches can go on for

Dr. Matthew Gamble - March 13, 2025

1    quite some time because they usually are in the

2    context of -- unfortunately, they're usually in the

3    context of placement seeking and malingering, if you

4    will.

5            There are other administrative ways to

6    deal with suicide watch where you see less of that.

7    Why?  Because they're housed on the same unit from

8    which they came, meaning if you were Camp C and you

9    went on watch at Camp C, you stayed at Camp C.  That

10   usually mitigates a lot of watches or

11   placement-seeking issues, i.e., I'm not comfortable

12   where I am; therefore, I'm going to go on watch.  I

13   go on watch, I might see administration, I am going

14   to see mental health, and they can work this out for

15   me.  Right?  I'm not happy where I am.

16           When you centralize suicide watches in a

17   particular area -- and I've seen this happen at

18   Hunt, I've seen it happen at Angola, I've seen it

19   happen at Rayburn.  When you do that, you actually

20   -- you see suicidal watches go up and they're

21   longer.  I know it's a long way to answer your

22   question.  I apologize.

23           But if somebody is on suicide watch for --

24   usually it's just not for a very long -- Mr. Folks'

25   case was unusual in that regard because he was on

Dr. Matthew Gamble - March 13, 2025

Page 91

1    suicide watch for a long period of time.

2        Q.    For individuals who are on the mental

3    health unit, are they afforded an opportunity to get

4    any exercise?

5        A.    Yes, yes.  You have -- you have tier time

6    opportunities where -- you know, depending on the

7    person, you may do calisthenics within the building

8    itself up and down the tier.  You also have the

9    opportunity to go outside if you choose.

10       Q.    And for individuals housed in the time-out

11   cell, is there an opportunity for exercise or for

12   going outside?

13       A.    There should be.  I don't know that -- in

14   Mr. Folks' case, I don't know if that was an

15   alternative because of his pretrial status, and his

16   suicide watch status also made that difficult.

17       Q.    How did his pretrial -- I'm sorry, go

18   ahead.

19       A.    Yeah, because he's pretrial, he has to be

20   separated from all the offenders.  Right?  So if you

21   have other offenders on the yard, that's not going

22   to be something you can do as far as -- there can't

23   be contact between a pretrial offender and an

24   offender that's doing a DOC sentencing.  So that's

25   one roadblock there.  And if you're on the suicide

Dr. Matthew Gamble - March 13, 2025

1     watch, that's also going to be difficult.

2            The other thing about Mr. Folks in

3     particular was the worry about foreign objects in

4     the yard, or wherever it may be, between his cell

5     and -- and that opportunity.

6                  MS. EDMONDSON:  Okay.

7     Ms. Oberstein-Allen, let's look at -- I think it's

8     part of Exhibit 1, but it's the Bates stamp 1120.

9                  MS. OBERSTEIN-ALLEN:  Yeah, I'll put

10    that up in one moment.

11                 MS. EDMONDSON:  Sure.

12    BY MS. EDMONDSON:

13    Q.    Dr. Gamble, this is one of the pages from

14    the mental health and medical record that we looked

15    at earlier.

16                 MS. EDMONDSON:  Ms. Oberstein-Allen,

17    can you zoom in a little bit to the top part of this

18    document?

19    BY MS. EDMONDSON:

20    Q.    There's a term referenced in handwriting on

21    this document that's "4-point Extreme Watch."

22            Do you know what that means; and if so,

23    can you describe it to us?

24    A.    Yes.  So we had spoken a little bit earlier

25    about standard suicide watch being, you know, paper

Dr. Matthew Gamble - March 13, 2025

1    gown, property is removed from the cell, there's a

2    suicide mattress, meaning it's a fortified mattress

3    that you can't tear or turn into something that you

4    can injure yourself with.

5         Four-point extreme suicide watch is going

6    to be a restrained -- four-point restraint in a bed.

7    And it's only usually used when someone has overtly

8    injured themselves.

9    Q.   Okay.  And there's a note on the form that

10   says, "Offender to Complete This Section Only -

11   Complaint and/or Request."

12        Is it your understanding that in this

13   case, that that would have been filled out by

14   Mr. Folks himself?

15   A.   No, it looks like what -- when there is

16   an -- a four-point restraint or a four-point extreme

17   suicide watch, what you're seeing here is this --

18   this form can be used for offender-initiated medical

19   requests.  Right?  So if Mr. Folks or any other

20   offender wanted to see medical, you know, I have a

21   fever, they would ask the security on the -- the

22   unit and/or the dormitory, hey, I need what's called

23   a sick call.  That's the sort of vernacular on this.

24   And so they'll fill out their name and DOC number,

25   their age, where they're housed.

Dr. Matthew Gamble - March 13, 2025

1          And then the section where you see
2     "Offender to Complete This Section," they say, I
3     have a fever and I'm achy and I'm coughing.  Right?
4     And that's going to be turned in, and then either an
5     EMT or an RN or a nurse technician will go out and
6     see the person.  That's the next thing you'll see,
7     healthcare personnel screening.  And they'll take
8     vital signs, blood pressure, pulse, respiration,
9     temperature, and they'll make some sort of comment.
10          So when there's an extreme watch, one of
11    our healthcare personnel, be it an EMT or a nurse,
12    is going to go out to see the patient while they're
13    restrained.  Right?  And it's going to be at the
14    initiation of that restraint, and then there's going
15    to be protocols about checking these vital signs
16    throughout the restraint period.  This is probably
17    the initiation of it, and they just check his blood
18    pressure, his pulse, respiration.  And it's almost
19    certainly the healthcare personnel themselves that
20    wrote in why they did it and used this particular
21    form.
22          Does that make sense?
23    Q.    Yeah, I think so.
24          Do you know whose -- there are some
25    signatures at the bottom of this.  Do you recognize

Dr. Matthew Gamble - March 13, 2025

1        -- well, we have to go down.

2               But do you recognize these signatures, and

3        in particular, is any of them yours?

4        A.    I recognize -- under "Health Care

5        Practitioner Notes," there's kind of an initial in

6        there.  That's, I believe, Ms. Cynthia Parks, which

7        is one of our primary care nurse practitioners.  And

8        it says, "Follow up per policy," meaning we're going

9        to continue to see after Mr. Folks while he's in

10       restraints.  This is more of a medical form.

11              So in other words, what she's saying is,

12       per nursing, EMTs, primary care, nurse practitioners

13       in position, we're going to see after, you know, his

14       restraints.  Are they allowing for -- are they

15       allowing for circulation or is it causing any

16       difficulty or pain, they're going to be checking

17       that per a policy for extreme suicide watch.  That's

18       what she's saying there, follow up per policy.

19              As far as the other signatures, I can't

20       say that I recognize them.  It looks like one of

21       them was a -- probably an EMT captain.  Because I

22       can see "captain" there, and I can only assume that

23       that was one of our -- our EMTs because they -- they

24       do oftentimes have security designations almost like

25       captain and lieutenant or sergeant.

Dr. Matthew Gamble — March 13, 2025

1              So that's probably an EMT that went out

2       and just did a quick cursory of blood pressure and

3       making sure that the patient was lucid, awake,

4       alert, oriented, speaking.

5          Q.    Okay.  Do you recall when Mr. Folks was

6       first placed in four-point restraints?  Was it --

7       let me -- let me withdraw it and ask a different

8       question.

9              It's correct that Mr. Folks was in

10      four-point restraints for some of his time in the

11      time-out cell, correct?

12         A.    Yes, for sure.

13         Q.    And do you recollect -- can you give us a

14      sense of was it for days out of that time, weeks,

15      some sense of the duration of the time that he was

16      in four-point restraints?

17         A.    I mean, intermittently it could have been

18      days.  It may well have stretched into weeks during

19      the period of intense self-injury.  There -- the way

20      that I recall it -- and, again, without the records

21      in front of me -- he had gone over to the TU, to the

22      cell that we have, the visualization.  And the goal

23      at that time was to get him off of any type of

24      watch, like standard, extreme.  We wanted to get to

25      a place where he could have property, jumpsuit, you

Dr. Matthew Gamble - March 13, 2025

1    know, make it comfortable for him within that TU

2    time-out cell.

3            Because as I said earlier, it was kind of

4    my hope that maybe St. Mary's Parish could sort this

5    out, but it looked like it wasn't going to be that

6    way.  And so I said, man, if you're going to be

7    here, let's certainly get you into a more

8    comfortable situation where you can have your

9    property, books, things of that nature.

10           And if I remember correctly, we got to a

11   place where he actually came all the way off of

12   watch and was -- it was very short lived.  He

13   injured him significantly.  It may have been -- this

14   may have been around that time period that we had to

15   go to a place of four-point restraint to prevent

16   self-injury.  And it wasn't too long after this that

17   I think that more serious injury occurred.  I would

18   have to look at the records, piecemeal to quote

19   dates and times and things.

20      Q.   Of course.

21           When a patient is in four-point

22   restraints, does that change at all the frequency of

23   how often they have to be seen by a social worker or

24   a psychiatrist?

25      A.   Yes, as far as social work, I'm pretty sure

Dr. Matthew Gamble - March 13, 2025

Page 98

1       that that would be -- it makes it every 12 hours

2       versus 24 hours.  And as a psychiatrist, I'm in

3       communication with those social workers, what's

4       going on, are we moving toward less restriction.  I

5       don't know that there's an overt time period for me.

6           But we're in communication daily on

7       something like that because ultimately, it's usually

8       myself and/or the other physicians that have to sign

9       off on the continuation of restraint.  So the social

10      workers say, hey, Dr. Gamble, I'm afraid Mr. Folks

11      is saying he still wants to hurt himself.

12          Q.   So that was going to be my next question,

13      when a person is on four-point restraint, what

14      circumstances are the indications to you that

15      they've improved enough to go down to a lower level

16      of restraint?

17          A.   They can communicate that verbally.  I

18      mean, that's our goal from the beginning of an

19      extreme is to get to a place of less restriction as

20      soon as possible.  And so that is communicated at

21      least twice daily from our mental health social work

22      staff to a particular patient that is on restraints,

23      hey there, we really want to get you up.  And how

24      are you feeling?  Do you want to hurt yourself?  Are

25      you thinking about hurting yourself?  Do you have a

Dr. Matthew Gamble - March 13, 2025

Page 99

```
1      plan or intention to hurt yourself?
2             And unfortunately, Mr. Folks, in the --
3      when it's at its worst, it's usually if you let me
4      out, I am going to hurt myself.  So it becomes a
5      contingent threat situation, which makes life very
6      difficult and getting to a place of less restriction
7      very difficult.
8             But, I mean, that's always my goal, and it
9      was always my goal with Mr. Folks, please let me get
10     you out of restraints because I don't want a man in
11     restraints, that's for sure.
12     Q.    Is there such a thing as two-point watch?
13     A.    Yes, there is.  It's going to be a step
14     down, if you will, from the four-point restraints.
15            In other words, like, we have significant
16     self-injury, someone's cut themselves, swallowed
17     foreign objects, those sorts of things, you know,
18     banged their head, whatever it may be, and they're
19     in four-point restraint, it's meant to say, okay,
20     what we want to do here is in this 12-hour period,
21     we want to let your ankles -- we want to take these
22     bottom restraints off so that you can be a little
23     bit more comfortable, we don't have your ankles
24     restrained, and it's our great hope that when we
25     come back and visit you later today, we can go ahead
```

Dr. Matthew Gamble - March 13, 2025

1    and get you up.

2            So yes, there is a -- that's usually how

3    -- that steps down toward -- so it's going to go

4    from a four-point, the most extreme, if you will, to

5    two-point, and then with the hopes that at that next

6    12-hour visit, we can say, okay, let me take this

7    off of you and get you back to a standard suicide

8    watch where you can get up, you're in a paper gown,

9    you know, you can move around.

10       Q.   Okay.

11            MS. EDMONDSON:  Ms. Oberstein-Allen,

12   you can take that down.

13            Can you bring up Folks Emails-0001, which

14   I think is a new exhibit?

15            MS. OBERSTEIN-ALLEN:  Let me drop that

16   in the chat and then bring it up.

17            MS. EDMONDSON:  Okay.  And I think

18   that will be Exhibit 4, Ms. Sievert.  Please correct

19   me if I'm wrong.

20            (Exhibit No. 4 marked.)

21            MS. EDMONDSON:  For the record, I'll

22   note that this is a document Bates-stamped Folks

23   Emails-0001 from Katie Ard to Jacob Johnson, cc'ing

24   Blake LeBlanc at DOC.

25   BY MS. EDMONDSON:

Dr. Matthew Gamble - March 13, 2025

1      Q.    Dr. Gamble, we'll zoom in on that and then

2    give you a chance to read that, and then I would

3    just like to ask you a question or two.

4      A.    (Reviews document.)

5            Okay.

6      Q.    So just a question, Ms. Ard says, "If TU is

7    going to be our designated area in housing/treating

8    our mentally ill who require such placement, we need

9    to have the ability to use these timeout cells for

10   offenders and purposes that mental health deems

11   appropriate."

12           Do you see that?

13     A.    I do.

14     Q.    So was there some question about whether

15   the TU -- these four cells in the TU were going to

16   be the area for treating mental health, or was there

17   an alternative being considered at this time?

18     A.    I don't know that there was any serious

19   alternative about certainly Mr. Folks in particular.

20   I think what this was about was, if we had someone

21   that got acutely psychotic elsewhere in the facility

22   and we felt strongly that it would be best to see

23   that person in, again, one of these cells where we

24   had direct visibility, I think that if they were

25   housing people that were largely there for security

Dr. Matthew Gamble - March 13, 2025

```
 1      reasons -- like, one of the issues that we were
 2      having, I think, in this period of time -- and
 3      perhaps this happened with some degree of
 4      regularity -- maybe they had a person that's been
 5      acting and behaving pretty badly, right, and they
 6      will place them in one of these TU time-out cells
 7      while they figure out, okay, where can we place this
 8      guy that he doesn't have enemies, that he can live
 9      in a way that hopefully is less aggressive and
10      fussy?  Right?
11              And so they put a guy like that there,
12      they would -- they would -- if we said, hey, man,
13      we've got a guy that's not doing really well, we
14      need to get him in one of those time-out cells,
15      sometimes you get pushback from security about that.
16              And I think what Dr. Ard, our mental
17      health social worker director here, is saying is, we
18      would like Dr. Johnson, our hospital
19      administrator's, help with overcoming some security
20      reticence about that.  I think that's kind of the
21      nature of this e-mail.  We need this bed, please
22      help us out to get security to do what we would like
23      them to do.
24      Q.    Do you -- I'm sorry, go ahead.
25      A.    No, that's fine.  I think that's about it.
```

Dr. Matthew Gamble - March 13, 2025

1     Q.    Do you -- I know you're not on this e-mail,

2    but do you have an understanding of why Ms. Ard

3    would have cc'd Mr. LeBlanc on this e-mail?

4     A.    Maybe because -- I don't recall if -- if it

5    had to do -- you can see this first sort of couple

6    of sentences here.  It may have been -- so

7    Mr. LeBlanc is -- he's kind of air traffic control,

8    if you will, between the parish prison system, what

9    are commonly known as satellite camps, meaning

10   correctional facilities that house DOC offenders,

11   but do not have as much mental health or medical

12   staffing as some of the larger DOC facilities and

13   then among the DOC facilities themselves, be it

14   Dickson, Rayburn.

15          So Mr. LeBlanc, if there's something that

16   comes up medically or mental health-wise that's

17   going to need to come from the parishes, the

18   satellite camps, even smaller DOC facilities into

19   the larger, more well-staffed DOC facilities, i.e.,

20   Elayn Hunt or -- or LSP, he might hear about that

21   and he may say, okay, LSP, you're going to get this

22   particular individual, okay, Hunt, you're going to

23   get this particular individual.

24          And if we have any type of cell crunch or

25   he's telling us that there's a real issue, we may

Dr. Matthew Gamble - March 13, 2025

1    say, okay, I'd really like to see that guy in the TU

2    time-out cell, right, and then security would say,

3    well, I've got a guy that's been doing some

4    heavy-duty penitentiary stuff, and we want him in

5    that time-out cell, so you get a little bit of a

6    battle there.

7           And so that's the only thing I can think

8    of as to why he would be cc'd on that.  Because I

9    wouldn't be -- I wouldn't be surprised if somebody

10   came that was from outside that was very difficult

11   or fussy or specialized that we needed a cell and we

12   had to do some movement to make it happen, and she's

13   trying to make that smoother.

14      Q.    Okay.  In the middle of her e-mail here,

15   she has a reference to Mr. Folks' extensive

16   self-harm history, and then she says, "... and he

17   has been relatively quiet for quite some time."

18          Do you recall that there was a drop-off in

19   Mr. Folks' propensity for self-harm?

20      A.    Yes, and it was kind of on the back end of

21   this significant self-injury that led to another

22   exploratory laparotomy, a resection of part of his

23   bowel due to a perforation .  On the back end of

24   that self-injury, I think that he recognized that he

25   had injured himself in such a way that it was

Dr. Matthew Gamble - March 13, 2025

1    overtly dangerous and was life threatening, number

2    one.  Number two, it had impacted his life for the

3    rest of his life in that he had had part of his

4    bowel resected over something that he had done to

5    himself.

6          And I remember him being very regretful

7    about that, i.e., I let my anger and my self-will

8    sort of get me into a situation where I've hurt

9    myself, you know, and now it's a permanent injury,

10   and I think that that led to some degree of -- of a

11   very slowing down of that self-injury.  I don't

12   recall whether or not he went back on a lot of

13   watches or certainly not a lot of extreme suicide

14   watches.  I could be wrong about that.  But I feel

15   like that happened in the summer of '21 and this is

16   in the fall of '21.

17        Q.    Okay.

18        A.    And I think he may have left in fall of

19   '22.

20          My point being, I think that certainly

21   that was the -- the very climax of his self-injury

22   was that -- that episode in summer of '21 where he

23   really hurt himself.  He certainly was different

24   after that.

25        Q.    Do you recall that Mr. Folks was at some

Dr. Matthew Gamble - March 13, 2025

1    point moved out of the TU?

2               MS. EDMONDSON:  You can take that

3    down, Ms. Oberstein-Allen.

4       A.    Yes.  I think he was taken out of the TU

5    once all the probation and parole stuff was dealt

6    with.

7               In other words, he was no longer a,

8    quote/unquote, pretrial offender.

9               Let's say that you have probation and

10   parole, and you've gone out like Mr. Folks did in

11   2019, right, he left the facility, but he was almost

12   certainly on probation or parole.  Right?  And if

13   you commit another crime, my understanding is that

14   until you -- you're charged with that crime, and

15   until probation and parole overtly violate you,

16   again, you're seen as a pretrial guy.  Once they

17   violate you, you're seen as a guy that's now

18   doing -- I hate to use the vernacular, but it's --

19   you're backing up time.  Right?  Now you're actually

20   serving time on whatever that probation and parole

21   is, and you can now go back out into some degree of

22   general population setting.

23               And I think that's what happened.  I think

24   that he got that revocation and now he's just a

25   regular old DOC offender that happened to be facing

Dr. Matthew Gamble - March 13, 2025

1     some outside charges.

2     BY MS. EDMONDSON:

3         Q.    Do you recall that Mr. Folks -- sorry.

4         A.    Yeah, and I think he moved at some point in

5     2022, like, into a more general population-type

6     situation.

7         Q.    Do you recall where he moved?

8         A.    I think it was death row, closed cell

9     restriction, which is also known as CCR.

10        Q.    And was that a single celling as well?

11        A.    Yes, it is single cell.

12        Q.    And is that a place where a pretrial

13    detainee could also be housed?

14        A.    There are some -- it depends on when the --

15    how the warden wants to house those pretrial guys.

16    There are -- there are gentlemen that are pretrial

17    that are housed usually on the CCR tiers, oftentimes

18    at the death row area, just because death row does

19    not -- I can't even count how many tiers it has, but

20    it's certainly by no means full of people that have

21    overt death sentences, and they use the remainder of

22    these tiers for what is called closed cell

23    restriction, some of which house pretrial

24    individuals.

25        Q.    Do you recall Mr. Folks having any

Dr. Matthew Gamble - March 13, 2025

```
 1      self-harm incidents when he was in CCR or death row?
 2          A.   No, I don't recall anything.
 3          Q.   Do you recall visiting him at all when he
 4      was in CCR or death row?
 5          A.   I don't, no.   The last time I remember
 6      seeing him was still at the TU.
 7          Q.   Okay.
 8          A.   And that was towards the end of his
 9      incarceration.
10               MS. EDMONDSON:   Ms. Oberstein-Allen,
11      can you put up the combined exhibit of notes -- of
12      psychiatric notes?  Or did we decide to do it
13      differently?
14               We did?  Okay.  So we'll go back to
15      Exhibit 1, then.  Excuse me.  I can't remember what
16      we decided on the break.
17               MS. OBERSTEIN-ALLEN:   Yeah, I can
18      go -- excuse me, I can go to the document here in
19      Exhibit 1.
20               MS. EDMONDSON:   So if we can start on
21      1228.
22               MS. OBERSTEIN-ALLEN:   All right.
23               MS. EDMONDSON:   So for the record,
24      this is page 1228 of the medical and mental health
25      file for Mr. Folks.
```

Dr. Matthew Gamble - March 13, 2025

 1          And, Ms. Oberstein-Allen, if you can zoom

 2    in, but also so we can see the signature.

 3    BY MS. EDMONDSON:

 4      Q.    So, Dr. Gamble, first -- sorry -- is that

 5    your signature at the bottom?

 6      A.    Yes, it is.

 7      Q.    And are these your notes?

 8      A.    Yes, they are.

 9      Q.    Okay.  So I apologize for this being a

10    little painful, but if you could decipher your

11    handwriting for us, that would be helpful.

12      A.    Yeah, you're not the first to ask that

13    question, believe me.

14      Q.    Thank you.

15      A.    So what you're going to see there is just a

16    little -- and that slash means psychiatric

17    attending.

18          Patient seen.  No complaints of mania or

19    psychosis, so that's that M/P.  Some issues with,

20    quote/unquote, regret leading to some sadness and

21    anxiety over his recent nonsuicidal self-injury

22    leading to a bowel resection.  So this is obviously

23    after his very serious injury where he had his bowel

24    resected.

25          No suicidal or homicidal ideations.  No

Dr. Matthew Gamble — March 13, 2025

1    plan or intention for self-harm or harm to others.

2    No current auditory or visual hallucinations.  He

3    volunteers no delusions.  There's no disorganization

4    of his speech, thought, or behavior.  No other

5    overwhelming complaints and no complaints of adverse

6    effects.

7         The next little -- it looks like chicken

8    scratch is going to be basically for impression and

9    plan.  This is calling for a discontinuation of a

10    suppository that was offered to him because of

11    his -- his bowel issues.

12         And then the next one is for a comfort

13    medication that also had to do with his bowel issues

14    because, you know, there was a significant amount of

15    upset of his stomach and his GI tract.  And then I

16    went on to refer him to Dr. Toce and/or his primary

17    care.

18         Reviewing his diet and his Ensure, et

19    cetera, that's probably in the context of his

20    reporting to me that, you know, I don't love this

21    bland diet that I'm on, or perhaps I would like

22    something else after his surgery because they kept

23    him on a -- you know, a pretty clear liquid diet for

24    a little while.

25         And return to clinic -- oh, at next TU

Dr. Matthew Gamble - March 13, 2025

1    clinic, meaning the next time that I visited the TU,

2    I was meant to see Mr. Folks.

3        Q.    Okay.  Great.  Thank you.

4              And then on the -- there's AIMS

5    evaluation, six months, one year, other, and then it

6    says, "per MO"?

7        A.    Right, per --

8        Q.    Okay.

9        A.    Meaning -- the AIMS evaluation is meant to

10    evaluate for what we call extrapyramidal side

11    effects of antipsychotic medications.  And so when

12    you have a gentleman like Mr. Folks that takes

13    medications and antipsychotic, I'm going to observe

14    that each visit, if you will.

15              In other words, I'm looking for certain

16    things that indicate a patient is maybe having

17    trouble with EPS.  And you see the no side effects

18    reported and the -- the no AE, right, no adverse

19    effects, and I'm also observing him objectively.

20              And so what I'm saying is as far as the

21    AIMS evaluation, I'm going to be taking care of

22    that.  Because in the past, you could also -- you

23    can see my nurse there, Amy Herbert, she said,

24    "Referral sent to Dr. Toce."  If I circled "6

25    months" or "1 year," Ms. Herbert would do a

Dr. Matthew Gamble - March 13, 2025

1    formalized EPS evaluation every six months or one

2    year.  What I'm telling her is I am actually

3    observing this patient more frequently than that in

4    my own psychiatric.

5        Q.   Okay.  Great.  Thank you.

6           A little bit more of this, but we're

7    coming to the end here.

8           MS. EDMONDSON:  Ms. Oberstein-Allen,

9    if you can go to 1183, which is actually later in

10   time.

11   BY MS. EDMONDSON:

12       Q.   And I hate to ask it, but can you do the

13   same of --

14       A.   Sure, can do.

15          Psychiatric attending, that is me.

16   Patient seen and chart reviewed.  No complaints of

17   depression, mania, anxiety, or psychotic symptoms.

18   Again, no auditory or visual hallucinations.  He

19   volunteers no delusions.  No suicidal or homicidal

20   ideation reported.  No plan or intention for

21   self-harm or harm to others.  He denies adverse

22   effects.  We're going to continue current

23   psychiatric medicines.  I'll return to clinic -- or

24   return to clinic, next TU clinic.  So, basically,

25   the next time I'm in the building, I'm going to

Dr. Matthew Gamble - March 13, 2025

1     check -- you know, check back in with Mr. Folks.

2          And then a note to my nurse, Amy, I need

3     EMARs, which are electronic medical administration

4     records from 10/19 to 2/20 and a face sheet for

5     diagnosis.

6          The reason that I asked for that is

7     Mr. Folks wanted that, I believe, for legal

8     purposes.  So he basically asked, Dr. Gamble, what

9     am I taking -- or what was I taking during the

10    period of time from October '19 to February of 2020?

11    And we also have a sheet -- and you may have some of

12    these in your records, but a sheet that actually

13    says diagnosis -- and, of course, we've gone over

14    the antisocial personality disorder, borderline

15    personality disorder, unspecified disruptive,

16    impulse-control, and conduct disorder.

17         And so Mr. Folks asked for that for his

18    own records and for perhaps legal reasons.  So I

19    asked Ms. -- my nurse to get a copy of the

20    electronic medical administrative record from

21    October of '19 to February 2020 and his face sheet.

22         So basically, I handed to him his face

23    sheet with his diagnoses on it and his medical

24    records with his medical -- basically his

25    psychiatric and medical medicines because he asked

Dr. Matthew Gamble - March 13, 2025

1    for it.  So that was kind a rapport-building

2    exercise there.

3        Q.    A reward-building exercise; is that what

4    you said?

5        A.    I said a rapport-building exercise.

6        Q.    I see.

7        A.    In other words, he asked, I delivered.

8        Q.    I see.  Okay.

9        A.    And as far as the AIMS evaluation, I said

10   we don't really have any problems here.

11       Q.    Okay.  Great.

12            Let's go to 1179.  This is from --

13   January 7th, 2022, it's marked.

14            And I think I'm learning your handwriting

15   better, but if you could do the same.

16       A.    Okay.  Sure.

17            Psychiatric attending.  Patient seen and

18   chart reviewed.  Patient with legal and

19   incarceration-related stressors that he volunteered

20   to me.  No auditory or visual hallucinations.

21   Volunteered no delusions.  No thoughts of

22   self-harm -- I'm sorry, no suicidal or homicidal

23   ideations.  No plans or intentions for self-harm or

24   harm to others.  And, once more, denied adverse

25   effects of his medication.

Dr. Matthew Gamble - March 13, 2025

1           This time, I did go ahead and write out my
2    impressions.  Unspecified disruptive,
3    impulse-control, and conduct disorder, borderline
4    personality disorder and antisocial personality
5    disorder.
6           The plan was to continue current
7    psychiatric medications and return at the next TU A
8    and B clinic, which is another way of saying the
9    next time I walk into the TU building, I would like
10   to chat with Mr. Folks.
11          And it looks like I forgot to put per M.D.
12   I put "per," no M.D.  And that's that.
13      Q.   Okay.  Great.
14          MS. EDMONDSON:  Ms. Oberstein-Allen,
15   if you could look at 1177.
16   BY MS. EDMONDSON:
17      Q.   This is from 8/29/22.  And if you can
18   translate this one as well.
19      A.   Psychiatric attending.  Patient seen and
20   chart reviewed.  Patient with incarceration and
21   legal-related stressors.  No overwhelming symptoms
22   reported to me today.  No mania or psychosis either
23   symptomatically reported and/or objectively
24   observed.  No auditory or visual hallucinations.
25   Volunteered no delusions.  No suicidal or homicidal

Dr. Matthew Gamble - March 13, 2025

Page 116

1    ideation.  No plan or intention for self-harm or

2    harm to others.  He was well dressed with good

3    hygiene.  His cell was neat and clean.  He was calm

4    and cooperative, in no apparent distress.

5          Plan was to continue current psychiatric

6    medications and the return to clinic is in eight

7    weeks at that point.

8    Q.    Okay.  Thanks.

9          MS. EDMONDSON:  Ms. Oberstein-Allen,

10   you can put that down.

11   BY MS. EDMONDSON:

12   Q.    Thank you very much for that.

13         Dr. Gamble, those four notes are -- I'll

14   represent, I believe they're the only notes of that

15   format that we have in our file.

16         Are there others that -- do you believe

17   you took notes on other occasions?

18   A.    Yes, ma'am, for sure.

19   Q.    Okay.  And the first one we looked at was

20   dated August 27th, 2021.

21         Do you believe you would have taken notes

22   -- psychiatric notes on Mr. Folks at some point

23   between when he arrived at Angola at the beginning

24   of April 2021 to the end of August?

25   A.    Oh, for sure, yes.

Dr. Matthew Gamble - March 13, 2025

1      Q.    Okay.

2             MS. EDMONDSON:  Then I think let's

3      take a short break.  I'm just going to see whether I

4      have anything else, go over my notes.

5             We can go off the record.

6             THE VIDEOGRAPHER:  Okay.  Stand by.

7             The time is 2:29 p.m. and we're going off

8      the record.

9             (Break taken, 2:29 p.m. to 2:32 p.m.)

10            THE VIDEOGRAPHER:  The time is 2:32

11     p.m. and we're back on record.

12            MS. EDMONDSON:  Dr. Gamble, I have no

13     further questions for you today.

14            To the extent that there are additional

15     psychiatric notes, we would call for their

16     production, if there are additional psychiatric

17     notes from between the beginning of April 2021 to

18     the end of November 2022 or identifying them within

19     the production for Mr. Blanchard.  Thank you.

20            MR. BLANCHFIELD:  Blanchfield.

21            MS. EDMONDSON:  Oh, Blanchfield.  I'm

22     sorry, excuse me.

23            MR. BLANCHFIELD:  There was a

24     supplemental records production.

25            MS. EDMONDSON:  Okay.

Dr. Matthew Gamble - March 13, 2025

1     MR. BLANCHFIELD:  So you may want to

2 look in there.

3     MS. EDMONDSON:  I believe we've looked

4 there as well.

5     MR. BLANCHFIELD:  Okay.  We can take a

6 look --

7     MS. EDMONDSON:  Let's go off the

8 record very briefly because we obviously want to

9 have any -- avoid any chance of calling Dr. Gamble

10 back again.

11   So let's go off the record very briefly.

12     THE VIDEOGRAPHER:  Okay.  Stand by.

13   The time is 2:33 p.m. and we're going off

14 the record.

15    (Break taken, 2:33 p.m. to 3:00 p.m.)

16     THE VIDEOGRAPHER:  The time is

17 3:00 p.m. and we're back on record.

18     MS. EDMONDSON:  I'll ask

19 Ms. Oberstein-Allen to put the second document up on

20 the -- in the chat and bring up -- I believe it's

21 2005.  It might be 2805.  One moment.

22     MS. OBERSTEIN-ALLEN:  I think this may

23 be too big to put in the chat, but I can just put it

24 on the screen.

25     MS. EDMONDSON:  Okay.  And then,

Dr. Matthew Gamble - March 13, 2025

1      Ms. Sievert, we'll send it to you afterwards.

2                  MS. OBERSTEIN-ALLEN:  Can you repeat

3      the Bates number, please?

4                  MS. EDMONDSON:  I think it's 2885.

5      It's a little obscured.  No, it must be 2005.  One

6      moment.

7            Okay.  It is 2809.

8                  MS. OBERSTEIN-ALLEN:  Okay.

9      BY MS. EDMONDSON:

10         Q.   Dr. Gamble, I think I have most of your

11     handwriting by now, but there's the middle line that

12     says, "Now on Thorazine," and then has a few things

13     before "Wellbutrin."

14         A.   Yes.  Do you want me to read the whole

15     thing or just the part you're speaking about?

16         Q.   Just the part I'm speaking about.

17         A.   Okay.  Now on Thorazine, 200 at noon.

18     Artane, 5 milligrams, three times daily.  Wellbutrin

19     XL, 300 milligrams in the morning and 150 milligrams

20     at noon.

21         Q.   Okay.  And then if you go down to the next

22     line, there's a word that looks like "continues."

23         A.   Yes.

24         Q.   And if that's, indeed, "continues," if you

25     can read those two lines.

Dr. Matthew Gamble - March 13, 2025

```
1        A.    Sure.  Continues to make arguments for less
2    restriction, but then makes continued threats.  No
3    clear plan or intention for self-harm or harm to
4    others.
5        Q.    And then the plan?
6        A.    Continue current psychiatric medicines as
7    ordered at hospitalization.
8        Q.    Okay.
9        A.     In other words, what it appears to me here
10   is that there may have been some change to the
11   medication regimen timing at the hospital.  Because
12   the regimen looks similar, perhaps, to what was
13   going on, but I think he was at his -- yes, this was
14   after the -- the major injury to his bowel, and this
15   is likely upon his return.
16          And so there's changes of medication
17   timing, perhaps.  That's why I made note, "Now on
18   Thorazine 200," you know, and so on and so forth in
19   the note.
20       Q.    And then this -- we'll go to a different
21   one.
22             MS. EDMONDSON:  Ms. Oberstein-Allen,
23   if you can go to 2962.
24   BY MS. EDMONDSON:
25       Q.    There's a word halfway down that looks like
```

Dr. Matthew Gamble - March 13, 2025

1        "verbally," perhaps.

2            A.   Yes.

3            Q.   If you could read the next couple of lines

4        there, that would be helpful.

5            A.   Yes.  So verbally contracts for safety.  He

6        is future oriented.  Will attempt less restrictive

7        measures and downgrade to a standard suicide watch.

8            Q.   Okay.

9            A.   And --

10           Q.   And then under "Plan," does it say,

11       discontinue two-point restraints?

12           A.   Yeah, I'm sorry, yeah.  So discontinue

13       two-point restraints and place on a standard suicide

14       watch with a return --

15           Q.   Okay.  Thank you.

16           A.   -- I guess the next day or two days.  I

17       can't ever remember if June has 30 or 31.

18           Q.   Okay.  Thank you.

19               MS. EDMONDSON:  And then if we can

20       look at 3097.

21       BY MS. EDMONDSON:

22           Q.   This is marked as being from June 10th,

23       2021.

24           A.   June 16th.  I'm sorry.

25           Q.   Oh, okay.  Thank you.

Dr. Matthew Gamble - March 13, 2025

1        A.    I think I may have messed that up.

2              Would you like me to --

3        Q.    Can you read from the top here -- this one,

4    I think if you could read in its entirety, it would

5    be helpful, actually.

6        A.    Okay.  Psychiatric attending.  Patient with

7    recent self-injury that was nonsuicidal and likely

8    in the context of placement seeking.  He was moved

9    to the time-out cell at TU, but injured himself.  He

10   made it known that he would like to stay on Skilled

11   Nursing Unit 1.  Again, these types of behaviors are

12   very typical of this patient's presentation and have

13   shown little improvement despite medications,

14   placements, attempts to offer therapy, et cetera.

15   Ultimately, his behaviors are volitional, often

16   aimed at external incentives, i.e., contingent

17   threats and in the context of psychopathic quality

18   Cluster B character pathology.  There is not any

19   part of his presentation I have felt to be in the

20   context of a disorganizing mental health illness.

21   Objectively, there's no disorganization of thoughts,

22   speech, or behavior.  Good grooming and good

23   hygiene.  Calm and cooperative.  Weight is

24   appropriate.  He denies current suicidal or

25   homicidal ideations or any plan or intention for

Dr. Matthew Gamble - March 13, 2025

1    self-harm or harm to others.

2         Plan is likely to continue current

3    medicine.  The rest is obscured.

4    Q.   Okay.  Do you recall Mr. Folks on this

5    occasion making it known that he'd like to stay in

6    the -- I assume "SNU1" stands for special nursing

7    unit?

8    A.   Skilled nursing unit, yes.

9    Q.   Skilled.  I'm sorry.

10   A.   Uh-huh.  Yes --

11   Q.   Do you recall him expressing that?

12   A.   It looks to me like he was -- there was an

13   attempt made to move him to the TU time-out cell,

14   but somewhere between either them saying, we're

15   going to move you or maybe he was moved -- I don't

16   recall that part -- he injured himself.

17        And so what I'm saying here is that there

18   were many sorts of contingent threats here.  If you

19   move me, then I will do this.  And this particular

20   contingent threat was, I guess, followed through

21   with some degree of self-injury either when they

22   told him verbally, we're going to move you and/or

23   when they attempted to move him.

24   Q.   Do you recall him ever expressing to you

25   that he preferred to be in the skilled nursing unit

Dr. Matthew Gamble — March 13, 2025

1    versus the time-out cell?

2        A.    Yes, he may have said something like that

3    in that I'd rather be here, not there.

4        Q.    Did you give any thought to moving him to

5    a skilled nursing unit cell, that maybe his

6    self-harm would be mitigated in that arena if he

7    preferred it?

8        A.    I guess I would say that I was aware that

9    in -- he might like to stay in the skilled nursing

10    unit, but I also was concerned about, again, lack of

11    visualization.  Because it's been my experience with

12    Mr. Folks that no matter where he may be housed, you

13    may well have some self-injury.  And for my part, I

14    liked the idea of more visualization with more real,

15    live human eyes, again, visualizing this -- this

16    placement, not only from the security booth, but

17    also on the monitored screen.

18            And so it was -- despite the fact that he

19    said he wanted to stay in a nursing unit, he had

20    continued to injure himself in a nursing unit

21    intermittently, and I felt it was safer for him to

22    be in the time-out cell where we could see as much

23    as we could see for consistent monitoring.

24        Q.    Do you recall where he was located when

25    he -- the injury that led to his bowel perforation?

Dr. Matthew Gamble - March 13, 2025

```
 1        A.    I think it probably was the time-out cell
 2    at TU.  I don't know that for a fact, but I think it
 3    was.
 4        Q.    Okay.
 5        A.    It would be -- based on the timing, I think
 6    that shortly after this time period, he was,
 7    indeed -- I can't see the -- can you back that up
 8    just a --
 9        Q.    Sure.  We can go up to the top.
10        A.    So I can see the location on this note?  It
11    may catch in the top right-hand corner.
12              MS. OBERSTEIN-ALLEN:  The screen is
13    actually frozen, but hopefully in a second, we can
14    go up.
15        A.    My point being that this particular note --
16    I don't know if they actually got him over to the TU
17    despite the self-injury, i.e., moved him over there,
18    restrained him in the -- the time-out cell.
19              MS. OBERSTEIN-ALLEN:  Sorry, there we
20    go.
21              MS. EDMONDSON:  It's 3097.
22    BY MS. EDMONDSON:
23        Q.    The location is NU1?
24        A.    Yeah, he's at the nursing unit, still
25    there.  So in many ways, it looks as though they
```

Dr. Matthew Gamble - March 13, 2025

1      left him there that particular day.

2          Q.    Okay.

3          A.    And then -- eventually, though, he made his

4      way into the time-out cell because, again, I wanted

5      that.  Because we still had self-injury.  I needed

6      as much observation of him and restriction of

7      foreign objects as I possibly could get, and I felt

8      that that was best accomplished in the time-out cell

9      at TU.

10              So, eventually, he was moved over there.

11      And I think that that is -- I can't recall exactly

12      where.  The way I recall it, he had injured himself

13      in the first part of July where he had an

14      exploratory laparotomy to remove foreign objects.

15      That exploratory laparotomy wound was still healing

16      when he injured himself once more by placing,

17      again, foreign objects in that wound and striking

18      himself.  And where that was, I don't know if he was

19      in the nursing unit or at TU.  He's at one of the

20      places.

21              MS. EDMONDSON:  Nothing further,

22      Dr. Gamble.  Thank you for your time.

23              THE WITNESS:  Yes, ma'am.  Thank you.

24              MR. BLANCHFIELD:  Thank y'all.

25              THE VIDEOGRAPHER:  Okay.  Stand by.

Dr. Matthew Gamble - March 13, 2025

Page 127

1          The time is 3:14 p.m., and we're going off

2     the record.

3               (Deposition concluded at 3:14 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Matthew Gamble – March 13, 2025

```
 1              UNITED STATES DISTRICT COURT
             THE MIDDLE DISTRICT OF LOUISIANA
 2    _____
                                  )
 3    JOSHUA FOLKS,               )
              Plaintiff,          )
 4                                )
      VS.                         )    23-CV-01289-SDD-RLB
 5                                )
      LOUISIANA ATTORNEY GENERAL  )
 6    JEFF LANDRY, ET AL.,        )
              Defendants.         )
 7    _____)

 8              REPORTER'S CERTIFICATION
            DEPOSITION OF DR. MATTHEW GAMBLE
 9                   MARCH 13, 2025

10              I, CHRISTY R. SIEVERT, CSR, RPR, in

11    and for the State of Texas, hereby certify to the

12    following:

13              That the witness, DR. MATTHEW GAMBLE, was

14    duly sworn by the officer and that the transcript of

15    the oral deposition is a true record of the

16    testimony given by the witness;

17              I further certify that the signature of

18    the deponent was NOT requested by the deponent or a

19    party;

20              I further certify that I am neither

21    counsel for, related to, nor employed by any of the

22    parties or attorneys in the action in which this

23    proceeding was taken, and further that I am not

24    financially or otherwise interested in the outcome

25    of the action.
```

Dr. Matthew Gamble - March 13, 2025

1          Subscribed and sworn to on this the 15th

2     day of March, 2025.

3

4

5     _____

6     CHRISTY R. SIEVERT, CSR, RPR
      Texas CSR 8172
7     Expiration Date:  4-30-2025

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Matthew Gamble — March 13, 2025

1                          LAWYER'S NOTES

2        PAGE  LINE

3        ____  ____    _____

4        ____  ____    _____

5        ____  ____    _____

6        ____  ____    _____

7        ____  ____    _____

8        ____  ____    _____

9        ____  ____    _____

10       ____  ____    _____

11       ____  ____    _____

12       ____  ____    _____

13       ____  ____    _____

14       ____  ____    _____

15       ____  ____    _____

16       ____  ____    _____

17       ____  ____    _____

18       ____  ____    _____

19       ____  ____    _____

20       ____  ____    _____

21       ____  ____    _____

22       ____  ____    _____

23       ____  ____    _____

24       ____  ____    _____

25       ____  ____    _____

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read the

4    foregoing pages of my deposition testimony in

5    this proceeding, and with the exception of

6    changes and/or corrections, if any, find them to

7    be a true and correct transcription thereof.

8

9        _____

10                    Deponent

11

12       _____

13                     Date

14

15                  NOTARY PUBLIC

16           Subscribed and sworn to before me this

17    _____ day of _____, 20___.

18    _____

19                  Notary Republic

20    My Commission Expires:_____

21

22

23

24

25

Dr. Matthew Gamble - March 13, 2025

Page 132

1              INSTRUCTIONS TO WITNESS

2

3      Please read your deposition over carefully

4    and make any necessary corrections.  You

5    should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8      After doing so, please sign the errata

9    sheet and date it.

10     You are signing same subject to the changes

11   you have noted on the errata sheet, which

12   will be attached to your deposition.

13     It is imperative that you return the

14   original errata sheet to the deposing

15   attorney within thirty (30) days of

16   receipt of the deposition transcript by

17   you. If you fail to do so, the deposition

18   transcript may be deemed to be accurate

19   and may be used in court.

20

21

22

23

24

25

Dr. Matthew Gamble — March 13, 2025

```
1                        ERRATA SHEET

2

3    PAGE -- LINE -- CORRECTION/REASON

4    _____    _____    _____

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

25   _____    _____    _____
```

Dr. Matthew Gamble — March 13, 2025

1                          ERRATA SHEET

2

3        PAGE —— LINE —— CORRECTION/REASON

4        _____    _____    _____

5        _____    _____    _____

6        _____    _____    _____

7        _____    _____    _____

8        _____    _____    _____

9        _____    _____    _____

10       _____    _____    _____

11       _____    _____    _____

12       _____    _____    _____

13       _____    _____    _____

14       _____    _____    _____

15       _____    _____    _____

16       _____    _____    _____

17       _____    _____    _____

18       _____    _____    _____

19       _____    _____    _____

20       _____    _____    _____

21       _____    _____    _____

22       _____    _____    _____

23       _____    _____    _____

24       _____    _____    _____

25       _____    _____    _____