```
 1              IN THE UNITED STATES DISTRICT COURT
                THE MIDDLE DISTRICT OF LOUISIANA
 2

 3        _____
                                  )
 4        JOSHUA FOLKS,           )
                                  )
 5              Plaintiff,        )
                                  )
 6           vs.                  )   Case No.
                                  )   23-cv-01289-SDD-
 7        LOUISIANA ATTORNEY      )   RLB
          GENERAL JEFF LANDRY,    )
 8        et al.,                 )
                                  )
 9              Defendants.       )
          _____)
10

11

12

13

14

15

16

17

18           REMOTE VIDEOTAPED DEPOSITION OF:
                      ASHLI OLIVEAUX
19                    March 19, 2025
                      9:03 a.m. CST
20

21

22

23
          Reported by: Karen Friedlander, CCR-NJ, NYRCR,
24        RDR, CRR

25
```

**EXHIBIT G**

Ashli Oliveaux - March 19, 2025

```
1     APPEARANCES:

2     JENNER & BLOCK LLP
      BY:  Sarah A. Purtill, Esquire
3     1155 Avenue of the Americas
      New York, NY 10036-2711
4     (212) 891-1600
      SPurtill@jenner.com
5     - and -
      JENNER & BLOCK LLP
6     BY:  Kenneth D. Beale, Esquire
      1099 New York Ave NW #900
7     Washington, DC 20001
      (202) 639-6000
8     KBeale@jenner.com
      Attorneys for Plaintiff
9
      Special Assistant Attorneys General
10    BY:  Andrew Blanchfield, Esquire
      701 Main Street
11    Post Office Box 1151
      Baton Rouge, Louisiana 70821
12    (225) 383-3796
      Ablanchfield@keoghcox.com
13    Attorneys for Defendant

14      ALSO PRESENT:

15      Jason Snyder, Videographer
        Molly Oberstein
16

17

18                        * * * * *

19

20

21

22

23

24

25
```

Ashli Oliveaux - March 19, 2025

```
1                        I N D E X

2

3        ASHLI OLIVEAUX

4        Examinations                          Page

5        Ms. Purtill                            5

6

7

8                        * * * * *

9

10                     E X H I B I T S

11

12       No.       Description                   Page

13       Exhibit 1    HCP 37                      46

14       Exhibit 2    ARP document                52

15

16                        * * * * *

17

18

19

20

21

22

23

24

25
```

Ashli Oliveaux - March 19, 2025

1           THE VIDEOGRAPHER:  This begins

2    file Number 1, Volume 1, in the deposition of

3    Ashli Oliveaux, in the matter of Joshua Folks

4    versus Louisiana Attorney General Jeff Landry,

5    et al.

6           Today's date is March 19th of the

7    year 2025.  The time is 9:03 a.m. Central Time.

8           This deposition is being taken

9    remotely via the Zoom videoconferencing platform

10   and was made at the request of counsel for the

11   plaintiff.

12           My name is Jason Snyder.  I'm the

13   videographer.  The court reporter today is Karen

14   Friedlander from Gregory Edwards, LLC.

15           Counsel, please identify

16   yourselves and state whom you represent,

17   beginning with the plaintiff, after which the

18   court reporter will please swear in the witness.

19           MS. PURTILL:  My name is Sarah

20   Purtill from the law firm Jenner & Block on

21   behalf of the plaintiff.  I'm joined here today

22   by my colleagues, Kenneth Beale, and Molly

23   Oberstein.

24           MR. BLANCHFIELD:  Andrew

25   Blanchfield on behalf of the defendants.

Ashli Oliveaux - March 19, 2025

```
 1                         (ASHLI OLIVEAUX, having been duly

 2      sworn as a witness, testified as follows:)

 3      EXAMINATION

 4      BY MS. PURTILL:

 5                 Q.       Good morning, Ashli, I'm Sarah,

 6      and I represent the plaintiff in this action,

 7      Joshua Folks.  I am with the law firm Jenner &

 8      Block, and I am going to ask you some questions

 9      today.

10                          First, could you let me know

11      where you are currently employed.

12                 A.       Louisiana State Penitentiary.

13                 Q.       And what is your current job

14      title there?

15                 A.       Deputy warden, quality assurance

16      and management.

17                 Q.       But first today, I'm going to go

18      over some ground rules for the deposition, which

19      may be familiar to you.  You may have talked

20      with your attorney about these same rules, but

21      I'm going to go over them just one more time,

22      and let me know if you have any questions.

23                          So first today, if I ask you a

24      question and you don't understand my question,

25      please let me know and I'm happy to rephrase the
```

Ashli Oliveaux - March 19, 2025

1      question.

2                            If you don't ask me to rephrase

3      or ask for clarification, I'm going to assume

4      that you understood what I asked you.

5                            Does that make sense?

6            A.      Yes.

7            Q.      Okay.  And our court reporter

8      here today is taking a transcript of my

9      questions and your responses.  In order to get a

10     transcript, we're going to try our best not to

11     speak over each other.  So I ask that you let me

12     finish answering [sic] my question before you

13     begin responding.

14                           Likewise, I will wait for you to

15     finish answering your question -- or finish

16     answering my question before I ask you the next

17     question.  It can be a little bit tricky over

18     Zoom, but we will do the very best we can.

19                           Likewise, because our court

20     reporter is taking down a transcript, please

21     answer questions verbally.  Don't use uh-huhs or

22     head nods.  Those are just difficult for our

23     court reporter to take down.

24                           Do you have any questions about

25     that?

Ashli Oliveaux - March 19, 2025

```
 1              A.        No.

 2              Q.        Your counsel might object to some

 3    of my questions today, but please go ahead and

 4    answer, unless he instructs you not to do so.

 5                        Today, I'm going to refer to the

 6    Louisiana State Penitentiary as LSP or Angola.

 7                        If you have any questions at any

 8    time about what entity I'm asking about, please

 9    ask me to clarify.

10                        I'll also refer to the Americans

11    with Disabilities Act, codified beginning at 42

12    U.S.C. Section 12101 as the ADA.

13                        But again, please let me know if

14    you ever have any questions about what I'm

15    asking you.

16                        Does that all make sense?

17              A.        Yes.

18              Q.        Finally, if you ever need a

19    break, please just let me know.  We'll plan to

20    take a break every hour or so, but if you need a

21    break sooner, just let me know.  I'll ask that

22    you finish answering the question that's

23    pending, and then we can go on a break.

24                        Is there any reason you can't

25    provide accurate and truthful testimony today?
```

Ashli Oliveaux – March 19, 2025

1    A.    No.

2    Q.    How did you prepare for your

3  deposition today?

4    A.    Met with Mr. Blanchfield.

5    Q.    How many times did you meet with

6  Mr. Blanchfield?

7    A.    Once.

8    Q.    How long did you meet?

9    A.    15 minutes.

10    Q.    Did you meet with anyone else to

11  prepare for your deposition?

12    A.    Miss Chelsea Payne was on the

13  phone too.

14    Q.    Was anyone else on the phone?

15    A.    That's it.

16    Q.    Okay.  Were you provided a copy

17  of the Complaint in this case?

18    A.    No, ma'am.

19    Q.    Have you seen it?

20    Did you review any documents or

21  records to prepare for today's deposition?

22    A.    No.

23    Q.    Did you do any independent

24  research to prepare for today's deposition?

25    A.    No.

Ashli Oliveaux - March 19, 2025

Page 9

```
1              Q.     Besides counsel, did you speak
2     with anyone to prepare for today?
3              A.     No.
4              Q.     In general, have you talked to
5     anyone other than counsel about this case?
6              A.     Other than saying I have a
7     deposition on the Joshua Folks case, no.
8              Q.     Who did you tell that you had a
9     deposition today?
10             A.     Mr. Jonathan Bonning.  Then my
11    secretary that works for me.  So she would know
12    what I was doing.  I believe that was everyone.
13    My supervisor has to know too.
14             Q.     Who is your supervisor?
15             A.     Darryl Vannoy.
16             Q.     Have you talked to Timothy Hooper
17    about this case?
18             A.     No.
19             Q.     Have you talked to Dan LaFleur
20    about this case?
21             A.     No.
22             Q.     Have you talked to Paul Toce
23    about this case?
24             A.     No.  Well, I take that back.
25                    He told me he was being deposed
```

Ashli Oliveaux - March 19, 2025

```
1        the other day when I went into the office,

2        because I asked the secretary where he was.  He

3        came out on a break and he said he was being

4        deposed by ya'll and I walked out of his office.

5                Q.        Okay.  At that time, did you all

6        discuss anything else?

7                A.        No.

8                Q.        Okay.  Have you seen a transcript

9        of any of the other depositions in this case?

10               A.        No.

11               Q.        Ashli, what is your understanding

12       of what this litigation is about?

13               A.        Just from briefly talking with

14       Mr. Blanchfield and Ms. Payne this morning, it's

15       about Mr. Folks' housing area during his time

16       here at Angola.

17               Q.        Do you have any understanding

18       what Mr. Folks is complaining about with respect

19       to his housing area?

20               A.        No, I don't.

21               Q.        How did you come to learn about

22       this case?

23               A.        Whenever they called and told me

24       you were going to depose me today, and then I

25       had to ask, who he -- who is Joshua Folks.  I
```

Ashli Oliveaux - March 19, 2025

1       didn't know who Joshua Folks is.  Still don't

2       know who he is.

3               Q.      Okay.  So you don't personally

4       know Joshua Folks?

5               A.      No.

6               Q.      To your knowledge, you never had

7       a conversation with him while he was

8       incarcerated at LSP?

9               A.      Not to my knowledge at all.

10              Q.      To your knowledge, have you ever

11      reviewed any ARPs from Joshua Folks?

12              A.      No.

13              Q.      To your knowledge, have you ever

14      considered any requests for accommodations from

15      Joshua Folks?

16              A.      No.

17              Q.      Have you ever talked with any

18      employee at LSP about Joshua Folks?

19              A.      Other than Dr. Toce telling me he

20      was on the deposition with ya'll.

21              Q.      Ashli, I'm going to run through

22      your time of employment at LSP or at the

23      Louisiana Department of Public Safety and

24      Corrections from the beginning to the end, and I

25      apologize, this might feel a little bit

Ashli Oliveaux - March 19, 2025

```
 1        repetitive, but I want to cover, for your entire
 2        period of employment, what your role was, what
 3        your core responsibilities were in that role,
 4        and roughly, the time period that you occupied
 5        that role.
 6                        So let's start with when you were
 7        first employed by the Louisiana Department of
 8        Public Safety and Corrections.
 9                        When was that?
10        A.        August of 2002, an LPN.  Now,
11        these are approximate dates, so just bear with
12        me on this.
13                        I worked at Angola as an LPN
14        probably 10, 12 years, various locations, as an
15        LPN, pill call, central supply, trips
16        department, nursing unit, pretty much anywhere
17        an LPN could work, I worked.  I worked overtime
18        wherever was needed.
19                        Then around 2014, '16, I went to
20        headquarters and that's when the charity
21        hospital system closed down, so we had to work
22        getting specialty care for the offenders.
23        There, I held the job title admin program
24        specialist A then B.
25                        For a short time, while I was
```

1    there, I transferred to the business side, like,

2    maybe six to eight months, and then I

3    transferred back into medical, the medical side,

4    where I became the executive management officer.

5              I stayed at headquarters until

6    February of '21, when I took an assistant warden

7    3's position at Elayn Hunt Correctional Center,

8    and that was over in medical and mental health.

9              Then -- hang on.  Bear with me.

10   Trying to get my dates together.

11              I'm thinking it was around July,

12   August of '21, I transferred to Dixon

13   Correctional Institute, it was a lateral

14   transfer, into an assistant warden's 3 position.

15   Again, it was over in their medical and mental

16   health department, their business side of

17   things, their maintenance department.

18              And then in March of -- wait.  I

19   told you July of '21, right?  I meant July of

20   '21.  Did I say July of '21?

21        Q.    Yeah.

22        A.    Okay.  Then in March of '22, '22,

23   I came to Angola in this current position.

24        Q.    Way back when, when you were an

25   LPN at Angola, did you treat inmates with mental

1       health conditions?

2               A.       I wasn't part of the mental

3       health nursing team.  I'm not going to say I

4       didn't, like, put a bandage on someone that may

5       have had a mental health diagnosis or anything

6       like that, but I wasn't part of the mental

7       health nursing team.

8               Q.       What training did you receive to

9       become an LPN?

10              A.       I went to a vocational school in

11      Louisiana.  It was an 18-month course at the

12      time.

13              Q.       Did you take a licensing exam?

14              A.       Yes, you do.

15              Q.       Does that exam encompass

16      treatment of mental health conditions?

17              A.       Any of your -- I mean, during our

18      nursing classes -- you've got to remember, this

19      is, like, 25 years ago, probably.  Any of our

20      nursing classes, any nursing field has a

21      behavorial health section in it.  But I didn't

22      specialize in anything like that.

23                       So the exam very well could have

24      had that on there.  It's a random set of

25      questions that you get on the exam.

Ashli Oliveaux - March 19, 2025

1          Q.        Prior to coming to Angola as an

2    LPN, did you receive any training on the ADA?

3          A.        I didn't receive any ADA training

4    until -- I probably started training -- I took

5    the position in March of -- this position, that

6    I'm in now, March of '22.  So it was after that

7    time, whenever I started training for ADA

8    coordinator.

9          Q.        Prior to starting this position

10   in March 20 -- 2022, did you receive any

11   training at all on the ADA?

12         A.        Unless it was -- to the best of

13   my knowledge, no, unless it was something that

14   was built into our annual training, which there

15   is some things built into our annual training.

16   But I don't -- to answer truthfully, I don't

17   have that transcript in front of me or anything.

18         Q.        You don't remember one way or the

19   other if there was an ADA component to that

20   training?

21         A.        No, ma'am, I don't.  I really

22   don't.

23         Q.        In substance, what was the first

24   training that you got on the ADA?

25         A.        It would have been after March of

1    '22 when I came into this position, Ms. Sharita

2    Spears reaches out to all the new ADA

3    coordinators.  She set me up with some classes.

4    I believe they were taken through University of

5    Missouri.  It's a virtual symposium that you

6    attend, and there's different classes that you

7    took to get certified to be an ADA coordinator.

8              Mr. Tracy Falgout was the

9    coordinator before I came here, so he worked

10   with me and helped me along the way until I got

11   my certification.

12         Q.      You said that Ms. Spears got you

13   set up with classes.

14              How many classes were there and

15   how long were they?

16         A.      It was -- you're required to have

17   so many hours to complete it, and then you get

18   the certification from the University, and I

19   completed everything in my hours by April of

20   '23.

21         Q.      Do you know roughly how many

22   hours you had to complete?

23         A.      I don't know why 36 is sticking

24   out in my head.  But I really don't know.

25         Q.      And were all these hours

```
 1        completed through the University of Missouri?

 2              A.        I believe it was the University

 3        of Missouri is the actual University.  I'm not a

 4        hundred percent on that.  But that's what's

 5        sticking in my head.  But, yes, they were all

 6        completed through their program.

 7                        I may be wrong with the exact

 8        University, but I think it's that.

 9              Q.        And in substance, what did those

10        classes --

11              A.        Can I move around a minute so the

12        lights will come back.

13              Q.        Yes.

14              A.        Sorry.

15              Q.        No problem.

16                        In substance, can you tell me a

17        little bit about what those classes covered?

18              A.        It could cover wheelchair space,

19        you know, like, at a table.  It would cover

20        sidewalk spacing, basic ADL needs for anyone,

21        like, you know, the rails for them in the

22        bathrooms, shower benches, communication of

23        someone, you know, that could be a deaf person

24        or something like that, the best way of

25        conversations, your TTY phones, your video
```

1    conferencing phones, things like that.  Just a

2    variety of things.

3            Q.      Was the training focused on the

4    prison context?

5            A.      I think it was more geared

6    towards, like, public entities and things like

7    that.

8            Q.      Did the training cover how

9    prisons might comply with their obligations

10   under the ADA?

11           A.      No, ma'am.  Not that I'm aware

12   of, that I remember.

13           Q.      Did the training cover mental

14   health disabilities?

15           A.      No, ma'am, it did not.  Or should

16   I say, anything that I opted did not.  I don't

17   know -- I don't remember if that was offered or

18   not.

19           Q.      Is it your understanding that

20   mental health disabilities are disabilities

21   within the meaning of the ADA?

22           A.      It is my understanding that you

23   can have a mental health disability that's part

24   of the ADA.  It would have to be diagnosed and

25   everything.

Ashli Oliveaux - March 19, 2025

1    Q.    We talked about the classes at

2    the University of Missouri.

3    Is there any other training

4    you've received on the ADA?

5    A.    So Miss Sharita Spears is our

6    head person at headquarters, and we do quarterly

7    training and she picks a variety of different

8    topics to discuss with us.

9    Q.    Do you remember what some of

10    those topics have been?

11    A.    No, I really don't.

12    Q.    Do you remember if she has ever

13    covered mental health disabilities?

14    A.    I don't believe that she has.

15    Q.    Has the training ever covered the

16    ways that prisons specifically can meet their

17    obligations under the ADA?

18    A.    She will -- maybe not necessarily

19    the trainings, but she did have to come out and

20    she has to do an evaluation of the prison and,

21    like, the bathrooms, the household areas, your

22    exam tables, to make sure that we're in

23    compliance with things of that nature.

24    Like, if you're in a wheelchair

25    and you need to transfer.  Activities of daily

Ashli Oliveaux - March 19, 2025

```
1        living type things like that.
2               Q.        How often does she do those
3        evaluations?
4               A.        She -- you would have to ask her
5        how often she has to do them.  She's been here
6        twice, to the best of my knowledge, within the,
7        you know, the three years that I've been here.
8        She's been here twice for, like, a type of
9        evaluation like that.
10              Q.        Do you know what that evaluation
11       encompassed other than a review of the
12       bathrooms, the household areas, the exam tables,
13       to make sure those are compliant?
14              A.        I walked around with her and she
15       looked at all areas of the prison.  So it could
16       have been -- she looked at our phones and
17       different things like that as well, so she would
18       be the better one to answer on what she
19       evaluated.  I was just her tour guide.
20              Q.        On her tour, did she interact
21       with any inmates?
22              A.        Yes, she does.  I mean, you have
23       to remember Ms. Spears worked here one time
24       years ago, so a lot of them do know her from her
25       other previous jobs here.
```

```
 1                Q.       Do you recall any of the

 2     conversations she had with the inmates?

 3                A.       On our tours, it might just be,

 4     hey, Ms. Spears, haven't seen you in a while,

 5     just casual conversations, nothing work-related.

 6                Q.       Did she have any conversations

 7     with inmates about their needs for

 8     accommodations?

 9                A.       So Ms. Spears, if an inmate has a

10     need for accommodation and they don't like the

11     accommodation that the unit gives, that's Ms.

12     Spears' job, she's the appeal person.  They

13     appeal to her, then she comes out to the

14     facilities and she does -- then does her

15     one-on-one conversation with the inmates.

16                         So she does have to talk to them

17     about accommodating needs.  She has been here

18     before with some of our offenders about -- you

19     know, if they write to her, she has to come out

20     and speak with them.

21                Q.       To your knowledge, has she ever

22     spoken with Joshua Folks?

23                A.       No, not with me.

24                Q.       Does Ms. Spears make a site visit

25     in connection with every request for
```

1      accommodations from an inmate?

2              A.      If it goes to her office, she

3      does, or a representative from her office will

4      come out, with my experience at Angola.  I can't

5      speak to anywhere else.

6              Q.      And in practice, how often do

7      those visits happen?

8              A.      In three years, I've probably had

9      her come two times maybe.

10             Q.      To your understanding, is that

11     because only two ADA requests for accommodations

12     have come before her?

13             A.      That would be my understanding,

14     yes.  The -- only, like, two people have

15     appealed to her, or she's gotten notice to her

16     personally, they wrote her personally.

17             Q.      How does an inmate appeal a

18     decision on their accommodation request?

19             A.      Oh, they get notification that --

20     after they're notified of the accommodation that

21     they've requested and whether we could provide

22     them with the accommodation or the accommodation

23     wasn't needed.

24                     So I'm speaking of, from the time

25     I'm here, like, current situation, I don't know

Ashli Oliveaux - March 19, 2025

1      anything before March of '22.

2                          So they -- you write them a

3      letter, you let them know or you notify them

4      that their accommodation has been met or their

5      accommodation has not been met.  If they're not

6      happy with the accommodation, then you provide

7      them with the address to appeal to Ms. Spears,

8      and they write her a letter.

9              Q.      Can an inmate ask an officer to

10     communicate an appeal on their behalf?

11             A.      I'm not -- not that I'm aware of.

12     No, they need to write their own appeals.

13             Q.      Is there a way for an inmate to

14     communicate an appeal to Ms. Spears verbally?

15             A.      I mean, I guess they could if

16     they caught her here and they seen her in

17     passing.

18             Q.      Who else at LSP, if anyone, has

19     completed the same University of Missouri

20     training that you did, to your knowledge?

21             A.      We have somebody currently that's

22     working on completing theirs, Ms. Jennifer

23     Stickles.  And she's been working, you know,

24     it's probably about the past year maybe.

25             Q.      Do medical providers at Angola

Ashli Oliveaux - March 19, 2025

1      complete the University of Missouri training?

2              A.      No, ma'am.

3              Q.      Do mental health providers

4      complete the training?

5              A.      No, ma'am.

6              Q.      Do officers, other than the ADA

7      coordinators, complete the training?

8              A.      No, just the coordinators go

9      through the training.

10             Q.      Who else at LSP, if anyone,

11     participates in the quarterly trainings by Ms.

12     Sharita Spears?

13             A.      It would just be me and Ms.

14     Jennifer Stickles.  At one time, Mr. Lawrence

15     Decoute was, but he's no longer -- he didn't

16     complete his training and he's moved on to a

17     different job title.

18             Q.      To your knowledge, do medical

19     providers at LSP receive training on the ADA?

20             A.      Like I said, I believe we all

21     have to take some type of training annually.

22     I'm not a hundred percent sure on what the

23     training is.  I couldn't tell you verbatim.  But

24     if it's part of our annual training that's

25     required by DOC, then everybody in the

Ashli Oliveaux - March 19, 2025

```
1       department would take the training.
2                Q.       But you don't remember one way or
3       the other whether the annual training has an ADA
4       component?
5                A.       I want to say it does, but I
6       don't know.  I'm not a hundred percent sure.
7                Q.       Do all LSP employees have to take
8       that annual training?
9                A.       If it's a required annual
10      training through the department, then we do.
11               Q.       Who leads the annual training?
12               A.       I don't remember if you get it in
13      classroom instruction where it's instruction led
14      or if it's something that we do, where's it's on
15      our computer where it's computer led and you do
16      it yourself.  I don't recall exactly which one
17      it is.  Ms. Spears would actually be the better
18      one to ask about the training.
19               Q.       Do you remember the last time you
20      personally completed the annual training?
21               A.       So it would have had to have been
22      within the last calendar year, because all of
23      our training has to be completed by
24      December 31st.
25               Q.       Do you remember the -- I
```

1    apologize.  Go ahead.

2         A.        You have to remember that I'm

3    doing training every quarter with Ms. Spears

4    anyway, so we will have another one coming up.

5         Q.        Do you remember when you last had

6    a quarterly training with Ms. Spears?

7         A.        I want to say last quarter.  So

8    she should be getting ready to have another one

9    this quarter.  She's pretty good about every

10   quarter having one.

11        Q.        At any point during your

12   employment at LSP, did you have a training on

13   mental health conditions?

14        A.        What do you mean by "mental

15   health conditions"?

16        Q.        What they are, how to accommodate

17   them, what they might look like in inmates.

18   Things like that.

19        A.        So as a nurse, we talked about

20   that you go through behavorial health part of

21   your nursing things.  So I would have had that

22   in nursing.

23                  If you're talking about

24   someone -- I guess they do do what they call a

25   mental health first aid training, but that's

Ashli Oliveaux - March 19, 2025

1      more geared towards, like, someone in distress,

2      like, they're feeling like they want to harm

3      themselves or something.  That's what that's

4      geared towards.

5              Q.      Who at LSP, if anyone, completes

6      the mental health first aid training?

7              A.      Oh, that's a required training

8      through the department.  It's done annually.

9              Q.      For all employees?

10             A.      Yes.  For some reason -- yeah,

11     all employees do that every year, yes, during

12     our annual training time.

13             Q.      You said that training is geared

14     towards someone in distress.

15                     Can you explain to me a little

16     bit more what that training encompasses?

17             A.      So, just an overview.  It would

18     be like -- it's more geared towards your

19     officers that are working right there in the

20     housing area with the inmates.

21                     So if they're walking by them and

22     the inmate say, you know, that he's usually

23     talkative but you find today he's just sitting

24     there and he looks sad.

25                     So it teaches you how to notice

Ashli Oliveaux - March 19, 2025

Page 28

1        things like that.  Things that are out of the

2        ordinary to help prevent them from harming

3        themselves.

4               Q.        Do you recall some of the things

5        that the training, you know, teaches you to look

6        out for as a sign as of mental health distress?

7               A.        I don't know off the top of my

8        head, but I know that they're -- I mean, you

9        just kind of talk about, just because routine

10       mental health first aid training talks about

11       signs of -- I'm saying depression, like, sitting

12       there sad, they're looking sad when normally

13       they're upbeat.  A change in their personality,

14       a change in their demeanor.

15                      Or if you notice an inmate that

16       never gives his items away, he's giving them

17       away to someone.  Why are you giving them away.

18       Things of that nature.  Something out of the

19       ordinary.

20              Q.        I believe you referred to

21       yourself as a coordinator; is that right?

22              A.        Yes, ma'am.

23              Q.        Your job title is deputy warden?

24              A.        Yes.

25              Q.        Can you explain to me a little

1      bit what your role encompasses?

2              A.      As a deputy warden or as an ADA

3      coordinator?

4              Q.      I guess -- I'm trying to

5      understand.

6                      So if your job title is deputy

7      warden but you are also the ADA coordinator, is

8      that a separate job title that you have at the

9      same time?  Is it a particular set of

10     responsibilities that deputy wardens always

11     have?

12                     Tell me a little bit more about

13     the relationship between the role of deputy

14     warden and ADA coordinator.

15             A.      The ADA coordinator is a separate

16     job title.  Each institution has to have a

17     coordinator, and the coordinator at the

18     institution, no matter where it is, they get the

19     accommodation request for accommodations, be it

20     for an inmate, a visitor or an employee, you

21     review it, you try to -- always, always -- I do

22     personally always try to provide the

23     accommodation that they need.

24                     If you can't, then you discuss it

25     with them, and try to come up with an

```
1        accommodation that will work for them.  So
2        that's what I mean when I say ADA coordinator.
3                  My deputy warden job title, I'm
4        over, you know, different areas, mostly medical.
5        The ACA office, which is an accreditation office
6        that the department has, and our legal programs
7        department.
8             Q.      Are ADA coordinators always
9        deputy wardens?
10            A.      No, they're not.  That's why I
11       ask one of our -- I've got -- one of our nurses
12       to help us assist with that as well.
13                 It could be someone in the human
14       resources department, it could be someone in the
15       mental health department.  It's not --
16            Q.      When you say you asked one of
17       your nurses to help assist you, you mean assist
18       you as a ADA coordinator at LSP or --
19            A.      Yeah.  Let her -- Ms. Jennifer
20       Stickles, the one that I told you was being
21       trained, I felt though it would be best if she
22       got the training too, because when the inmates
23       come in in intake, she's one of the first people
24       that they see, so if there's an accommodation
25       needed, we can go ahead and address that need
```

Ashli Oliveaux - March 19, 2025

1          right then.

2                       I currently focus more on our

3          visitors and our employees, because she has --

4          she sees the inmates firsthand when they come

5          in.

6                  Q.        Were you given the job title of

7          ADA coordinator at the same time you were

8          promoted to deputy warden?

9                  A.        Whenever I accepted the job for

10         deputy warden, it was part of this job.

11                 Q.        How did you come to be promoted

12         to deputy warden?

13                 A.        They posted the position, I

14         applied, and there was an interview process.

15                 Q.        Who interviewed you?

16                 A.        Warden Tim Hooper.  Miss Chastity

17         Rheams from HR, and another warden from a

18         different facility.  I think it was Warden

19         Guerin at the time.  I think that was his name.

20                 Q.        At the time you were applying,

21         did you understand that role to encompass the

22         ADA coordinator role?

23                 A.        It wasn't presented to me during

24         the interview process, but at the time they were

25         interviewing for two deputy wardens, so the

```
1          interview process was very generic.
2                  Q.       In your interview, were you asked
3          any questions about the ADA?
4                  A.       No, ma'am.  As I said, it was a
5          very generic interview.
6                  Q.       In the interview, were you asked
7          if you had had any training in the past on the
8          ADA?
9                  A.       No.
10                 Q.       Did you have any interviews other
11         than that one interview with those three folks?
12                 A.       For this position?
13                 Q.       Yes.
14                 A.       That was it, just the one
15         interview.
16                          I have to stand up again.
17                 Q.       We have the same problem in our
18         office, so I might be standing in a bit myself.
19                          Who, if anyone, at LSP, is in
20         charge of ensuring ADA compliance?
21                 A.       So that would fall on the ADA
22         coordinator.
23                 Q.       That would be you?
24                 A.       Yes.  But what do you mean by
25         "compliance"?
```

Ashli Oliveaux - March 19, 2025

Page 33

```
1            Q.      Is the prison required to comply
2    with the ADA, to your understanding?
3            A.      So do you mean me as the person
4    or the person asking for the accommodation?
5            Q.      I mean you.
6            A.      So repeat what you're asking me.
7            Q.      Sure.  Let me break it down a
8    little bit.
9            A.      Okay.
10           Q.      So to your understanding, is the
11   prison required to comply with the ADA?
12           A.      So everyone is required in any
13   type of, like, business, with the X number of
14   people, other than a small, small business, I
15   think it's 50 or less, if I'm not mistaken, to
16   comply with the American and Disabilities Act.
17   That's a federal law, so every -- we are, yes.
18           Q.      And who, if anyone, at LSP is
19   responsible for ensuring that folks at LSP are
20   complying with the ADA?
21           A.      So anything that comes from our
22   headquarter level, Ms. Sharita Spears, like I
23   said, she does the evaluation, she does the walk
24   through, she sends it down to us and I just have
25   to make sure that we are doing what she, you
```

1   know, she's like the auditor and I make sure

2   we're doing it.

3            Q.      And I believe you mentioned

4   earlier that your role as ADA coordinator

5   encompasses adjudicating inmates' requests for

6   accommodations; is that right?

7            A.      Yes, we evaluate them, yes.

8            Q.      What are the factors that you

9   take into consideration in deciding whether to

10  grant an accommodation request?

11           A.      So first of all, we'll speak with

12  the offender, talk to him, to find out what the

13  request is, how we can accommodate it.  If I

14  have questions, I will reach out to the medical

15  team.  All of my requests have always been

16  medical requests.  I'll reach out to the medical

17  team, get their opinion on it.

18                   If it's a request for a walker or

19  something, or a wheelchair, they have the

20  physical therapist work with me in evaluating to

21  see what need we need, what exactly do we need,

22  the walker or the wheelchair.

23                   If I have questions or anything

24  from there, then I refer to Ms. Sharita Spears

25  at headquarters for guidance, being that she is

Ashli Oliveaux - March 19, 2025

Page 35

```
1      over us.
2              Q.        What are the factors that you
3      take into consideration in deciding whether to
4      deny a request for accommodations?
5              A.        If they're already getting that
6      accommodation, sometimes, I'll have an
7      accommodation written, hey, I need a wheelchair,
8      and I'll send back, you're already assigned a
9      wheelchair, this is where you've signed for it,
10     you know, or I've gone down there and looked,
11     you have your wheelchair.  Something like that.
12                      I don't know that I've ever
13     really denied one or altered one in any way.
14     When I say "altered," I mean, like, offered
15     something differently.  I've always been able to
16     give them what they've needed or asked for.
17             Q.        In your time in this role,
18     approximately how many of --
19             A.        I have to take back what I said.
20                      Sometimes, I can't -- if they ask
21     me about a housing, like, if they're in a
22     housing area, I can't necessarily move them.
23     Like, I don't have that authority.  I can just
24     make sure they're moved.  If we have a
25     handicapped cell at that housing area, I can
```

Ashli Oliveaux - March 19, 2025

Page 36

1    make sure they are moved into that

2    handicapped-accessible cell, you know, like, if

3    it's someone in a wheelchair.

4                    But I can't necessarily just move

5    your housing area unless you are needing that

6    handicapped accessibility.

7        Q.        Why not?

8        A.        Because if you write me a letter

9    and tell me -- say, you're living in a dorm

10   that's a normal dorm, doesn't have wheelchair

11   access, but you don't need it, and you're just

12   writing me because -- sometimes they just write

13   me because they want to move from dorm 1 to dorm

14   2, you know.  I can't -- that's not a reason for

15   me to move you, just because you want to be

16   moved.

17                    If you have a reason, then I can

18   move you.  Like, you're in a wheelchair and they

19   don't have the shower handle that you need, then

20   I can move you to a handicapped-accessible

21   housing unit.

22       Q.        Have you ever granted a request

23   for a housing-related accommodation that you can

24   remember?

25       A.        Actually, no, because everybody

Ashli Oliveaux - March 19, 2025

1    is pretty good about it.  They're in wheelchairs

2    or anything like that, that we go straight to

3    our handicapped housing areas.

4              Q.       But theoretically, a housing

5    accommodation might be an accommodation

6    available under the ADA at the prison?

7              A.       If it requires something

8    handicapped accessible, yes.

9              Q.       What do you mean by "handicapped

10   accessible"?

11             A.       I mean, like, you're in a

12   wheelchair, you need a wider cell, you need a

13   shower bench to shower, you need a special

14   shower to pull down to bathe yourself.  Things

15   of that nature.  An outlet to plug your CPAP in.

16   Something like that.

17             Q.       Would you consider a housing

18   accommodation for a mental health disability?

19             A.       That would be one that I would

20   probably defer to Ms. Sharita Spears to help me

21   on the mental health disability part.  If it was

22   requested to me, and then I would also have to

23   reach out to Dr. Gamble, our psychiatrist, and

24   our other mental health team and work with them.

25                      So that would be one that I

```
1        couldn't answer you yes or no.

2              Q.       How do inmates communicate

3        requests for accommodation to you?

4              A.       So they can write a letter, they

5        can tell me down the walk when they see me or

6        they can go through the ARP process.  So any

7        means that they can.

8              Q.       Are there any other ways that

9        requests for accommodation might come to your

10       attention?

11             A.       At intake.  Like I said, like, I

12       had Ms. Jennifer Stickles at intake, when

13       they're evaluating them, they might notice if

14       they need an accommodation and they'll just take

15       care of it right then.  So it's not really a

16       request.

17                       We just go in and notice that the

18       inmate needs that walker or that cane, you know,

19       and take care of it right then.

20             Q.       Have there been cases where --

21       following some medical treatment, you identified

22       an accommodation that an inmate should receive?

23             A.       So what do you mean by "medical

24       treatment"?  Like, I broke my leg and I need

25       some crutches?  Or -- what do you mean?
```

Ashli Oliveaux - March 19, 2025

```
 1              Q.      Sure.  That's one example.
 2              A.      So naturally, if you come back
 3     from the orthopedic, they're already going to
 4     send you back with your crutches and stuff and
 5     that's something short-lived and they have their
 6     accommodation then there.  Most of the time, the
 7     inmate, they don't even address the issue of
 8     needing an accommodation to me.
 9              Because it's already -- they're
10     already been accommodated before they even get
11     back.  We've provided it to them before they
12     could ask.
13              Q.      So is it right that inmates don't
14     always have to request an accommodation in order
15     to receive one?
16              A.      So I think we're looking at it
17     two different ways.  So if you -- we're going to
18     use the broken leg for example.  I mean, that's
19     part of your medical care at that time.  You
20     broke a leg, you can't walk.  You're going to
21     need some means of trans -- some means to walk,
22     get around.
23              So the crutches would be a means.
24     A wheelchair would be a means.
25              So when they're in there seeing
```

Ashli Oliveaux - March 19, 2025

Page 40

```
1        the doctor and they're being medically
2        evaluated, they're going to go ahead and order
3        that assistive device for them.
4                Q.       Let's focus on mental health for
5        a second.
6                         Do you recall ever granting a
7        request for accommodation in connection with a
8        mental health disability?
9                A.       No.
10               Q.       Is it possible that a mental
11       health disability would require an
12       accommodation?
13               A.       I guess anything is possible.  If
14       I did have something with mental health, again,
15       like I said before, that's something I'd have to
16       reach out to Miss Sharita Spears, Dr. Gamble,
17       because that would be something very new to me.
18       I would need to be educated on that.
19               Q.       If an inmate engaged in
20       self-harm, is that the kind of thing that might
21       prompt you to consider an accommodation?
22               A.       That wouldn't prompt me to
23       consider an accommodation.  That would prompt me
24       to say that he probably needs to reach out to
25       our mental health staff to evaluate him.
```

Page 41

```
 1              Q.        And just to confirm, to your
 2    knowledge, you have never considered a request
 3    for accommodation from the plaintiff in this
 4    case, Joshua Folks.
 5              A.        Not to my knowledge.
 6              Q.        To your knowledge, you've never
 7    received a request for accommodation from an
 8    officer on behalf of Joshua Folks.
 9              A.        No, ma'am, not me, personally.
10              MS. PURTILL:  Okay.  We've been
11    going for just about an hour.  Why don't we take
12    a ten-minute break here.
13              THE WITNESS:  Okay.
14              MR. BLANCHFIELD:  Okay.
15              THE VIDEOGRAPHER:  Going off the
16    record.  The time is 9:55 a.m.
17              (RECESS.)
18              THE VIDEOGRAPHER:  Going back on
19    the record.  The time is 10:05 a.m.  This marks
20    the beginning of media Number 2.  Please
21    continue.
22    BY MS. PURTILL:
23              Q.        Ashli, do you know who, if
24    anyone, was the ADA coordinator at LSP before
25    you arrived in 2022?
```

1          A.        Tracy Falgout.

2          Q.        Do you know how long Tracy

3   Falgout was the ADA coordinator?

4          A.        Oh, I think for a long time.

5   Probably ten-plus years.

6          Q.        Is anyone, other than the ADA

7   coordinator, involved in reviewing inmate

8   requests for accommodations?

9          A.        You reach out to your medical

10  team.  Like I said, all of mine have been

11  medical.  So if it's something I can't address

12  right then, then I reach out to the medical team

13  or I'll get Miss Spears to help me with the

14  reviewal [sic] process.

15         Q.        In those cases, is it still

16  ultimately your decision as the ADA coordinator

17  whether to grant a request?

18         A.        So most -- I mean, I grant them

19  based off of those conversation that we have.

20                   So if we come up with something

21  reasonable, which we do usually, and usually

22  Miss Spears is just there to guide us, because,

23  like I said, if the offender appeals, than she

24  ultimately has to review the case.

25                   So the doctor and I come up with

Ashli Oliveaux - March 19, 2025

Page 43

```
1        something that's reasonable.  We'll discuss it
2        with the inmate and then, you know, go from
3        there and provide the accommodation.
4                Q.       You mentioned that -- in the case
5        where, you know, an inmate self-harms, that
6        that's something that you would likely pass off
7        to Dr. Gamble and the medical team.
8                         Is that because that's not an ADA
9        issue at that point?
10               A.       So I would pass it off to the
11       Dr. Gamble and the mental health team, not the
12       medical team, because Dr. Gamble is our
13       psychiatrist.
14                        And if they're self-harming
15       themselves at that time, then I feel like that's
16       something that mental health needs to be
17       involved in, because routinely, someone doesn't
18       just self-harm themselves.
19               Q.       But it's not something that would
20       require an accommodation from your perspective?
21               A.       Not from my perspective.
22                        (Court reporter seeks
23       clarification.)
24                        MR. BLANCHFIELD:  Yeah, Andrew
25       Blanchfield objected to the form.
```

Ashli Oliveaux - March 19, 2025

```
1     BY MS. PURTILL:

2          Q.      If an inmate complained about

3     being restrained for a long -- for a prolonged

4     period of time, due to mental illness, would

5     that fall under your purview as ADA coordinator?

6          A.      No, ma'am.

7          Q.      Would that be mental health?

8          A.      I honestly don't know what that

9     would fall under.  If they had a complaint of

10    that, I think I would bring it to the warden of

11    the area.  I don't know what it would fall

12    under.

13         Q.      Have you ever considered a

14    request for accommodations involving the use of

15    restraints?

16         A.      I've never had a request in that

17    nature.

18         Q.      You had mentioned earlier that

19    one reason you might deny a request for

20    accommodation, is because the inmate already has

21    the accommodation they need.  For example, they

22    already have a wheelchair.

23                 Are there other reasons why you

24    might deny a request for accommodations?

25         A.      So, I mean, it could just be an
```

Ashli Oliveaux - March 19, 2025

Page 45

1      unreasonable accommodation due to cost factor.

2              Q.      How do you determine the cost of

3      a particular accommodation?

4              A.      So, if it's something that we

5      don't provide on-site, then I would have to

6      research what the item was that was needed, and

7      get the cost.

8                      I mean, when I say "cost factor,"

9      I mean, like, if I had to take a housing unit

10     and knock a wall down and totally revamp it, you

11     know, I might, we have to deny the request then,

12     but, I mean, that would -- because it would take

13     time to get that done.

14                     It would just have to be an undue

15     cost to the facility.  I'm not even -- I'm not

16     the budget person, so I don't know what the

17     undue cost would even be.

18             Q.      Have you ever worked to determine

19     the potential cost of an accommodation requested

20     by an inmate?

21             A.      No, I've never had to do that.

22             Q.      Other than the inmate already

23     having the requested accommodation or an

24     appropriate accommodation and costs, are there

25     any other reasons you might deny a request for

1    accommodation?

2          A.       Me, personally, not that I can

3    think of, nothing.

4          Q.       Is there a written policy at LSP

5    concerning the ADA?

6          A.       There is.  I don't know the

7    policy number.  I know the department reg

8    numbers off the top of my head, but I don't know

9    my -- I don't know the policy numbers off the

10   top of my head.

11         Q.       What is the department reg

12   number?

13         A.       It's either going to be HCP 36 or

14   HCP 37.

15         Q.       Okay.  Ms. Oliveaux, I'm going to

16   show you an exhibit.

17                  NS.  PURTILL:  I would like to

18   introduce this as Exhibit 1.

19                  (Exhibit 1, HCP 37, marked for

20   identification.)

21                  MS. PURTILL:  Molly here is going

22   to drop the exhibit in the Zoom chat, and we'll

23   also share her screen.

24   BY MS. PURTILL:

25         Q.       So feel free to look at whichever

Ashli Oliveaux - March 19, 2025

Page 47

```
1        is more convenient for you, and let me know when
2        you have the document up.
3               A.      Okay.  I see it.
4               Q.      Do you recognize this document,
5        Ashli?
6               A.      Yes.
7               Q.      What is this document?
8               A.      It's HCP 37.  It's a department
9        regulation, it's a health care policy about the
10       Americans with Disability Act -- a combination
11       of Americans with Disability Act for offenders.
12              Q.      Do you see on the top right, the
13       date 23rd or March 2018?
14              A.      Yes.
15              Q.      Is it your understanding that
16       that's the date that this policy became
17       effective?
18              A.      Yes.
19              Q.      Is this the version of the policy
20       that's still in effect?
21              A.      Yes.
22              Q.      Ashli, I'm going to ask you to
23       turn to the page -- that in the bottom right
24       corner, shows 001886.
25                      And do you see the big letter C
```

Ashli Oliveaux - March 19, 2025

Page 48

```
1       and then the sub-number 1?
2               A.      Yes.
3               Q.      Where it says:  "Requesting
4       accommodations submitting a disability
5       discrimination grievance."
6               A.      Yes.
7               Q.      Do you see where it says:  "The
8       ADA does not require that a request for
9       accommodation be provided in any particular
10      manner.  Therefore, the department is charged
11      with having knowledge or deemed with having
12      knowledge of the request, regardless of the form
13      of the request."
14              A.      Yes.
15              Q.      What is your understanding of
16      what this provision means?
17              A.      It means that they can ask for an
18      accommodation in any way that they can.  It
19      doesn't have to be written.  It doesn't have to
20      be through the ARP process, it can be verbal.
21      Any -- any which means that they can.
22              Q.      What do you understand it to mean
23      that:  "The department is charged with having
24      knowledge or deemed with having knowledge of the
25      request, regardless of the form"?
```

Ashli Oliveaux - March 19, 2025

```
1              A.       To me, that's saying it doesn't

2     matter if it's written, verbal or whatever, if

3     you were told and it's saying, you know, that

4     you have the knowledge so you act upon it,

5     whatever manner it was provided to you.

6              Q.       Okay.  I am going to scroll to

7     the very next page.

8                       At the top of the next page,

9     which is Bates 1887, do you see the very first

10    paragraph there where it says:  "Employees who

11    are aware of or have reason to believe that an

12    offender has a disability for which he may need

13    accommodation, shall make a request in writing

14    to the unit ADA coordinator who shall evaluate

15    the circumstances to determine if accommodations

16    are required."

17             A.       Yes, I see that.

18             Q.       What do you understand that

19    paragraph to mean?

20             A.       What does it say right above

21    that?  Can you go back to the next page, so I

22    can see what the bottom of that says.

23                      (Court reporter seeks

24    clarification.)

25                      THE WITNESS:  I'm sorry, I was
```

```
1        just reading it.  Okay.  I can't just -- do you
2        want me to read everything to you to put on
3        record?  I was just reading it.
4                    "Employees were pressed on behalf
5        of the offender, employees who were aware or
6        have had reason to believe that an offender has
7        a disability for which he may need
8        accommodations, shall make a request in writing
9        to the unit ADA coordinator who shall evaluate
10       the use circumstance to determine if the
11       accommodations were met."
12                    So it's saying that the employee
13       can make it on behalf of the offender if they
14       think that they have a need to do so.
15       BY MS. PURTILL:
16            Q.      What do you understand it to mean
17       here when it says:  "Employees who are aware of
18       or have reason to believe that an offender has a
19       disability"?
20            A.      To me, if the employer is aware
21       of it, then they can ask the ADA coordinator to
22       help out with the disability or they can call
23       and say, hey -- like I said, all mine have been
24       medical.  Mr. Brown has -- is having trouble
25       walking.  Can you get him evaluated for a
```

Ashli Oliveaux - March 19, 2025

Page 51

```
1      wheelchair or a walker.
2           Q.       I'm going to backtrack just a
3      little bit to page 1883.
4                    And at the bottom of that page,
5      do you see big letter E, disability, the
6      definition of disability, and then the Number 2,
7      where it says:  "Any mental or psychological
8      disorder, such as mental retardation, organic
9      brain syndrome, emotional or mental illness, and
10     specific learning disabilities."
11          A.       Yes.
12          Q.       Is it your understanding that
13     emotional or mental illness are disabilities
14     within the meaning of the prison's ADA policy?
15          A.       Repeat that again, please.
16          Q.       Is it your understanding that
17     emotional or mental illness is within the
18     meaning of -- is a disability within the meaning
19     of the prison's ADA policy?
20          A.       It states it right there that it
21     is, so yes.
22          Q.       Does this department regulation
23     govern LSP?
24          A.       A department regulation, do
25     govern LSP, you take the department regulation
```

```
 1        and you put your policy to use.  You make it
 2        your policy.
 3                       MS. PURTILL:  Okay.  We can go
 4        ahead and take Exhibit 1 down.
 5                       I'm going to show you one more
 6        exhibit that I'd like to introduce as Exhibit 2.
 7        This is an ARP.
 8                       (Exhibit 2, ARP document, marked
 9        for identification.)
10                       THE WITNESS:  Okay.
11                       MS. PURTILL:  Give Molly one
12        moment and she's again going to drop that in the
13        chat and then share her screen.
14        BY MS. PURTILL:
15             Q.      Ashli, can you see that exhibit?
16             A.      Yes.
17             Q.      Okay.  Do you recognize this
18        exhibit?
19             A.       I recognize it as a paper that
20        was sent from LSP.
21             Q.      Are you looking at the document
22        that Molly is screen-sharing or the document you
23        have open on your computer?
24             A.       It's the one that she has
25        screen-shared.  It says:  "I hereby certify that
```

Ashli Oliveaux - March 19, 2025

```
 1        the attached document is true and correct copies
 2        of the original that are maintained at LSP."
 3              Q.        Okay.
 4              A.        It has a signature on it.
 5                        MS. PURTILL:  Can you scroll down
 6        just one page.  Okay.  And keep scrolling down.
 7        We're at Bates 59 to Bates 60.
 8                        THE WITNESS:  Okay.
 9        BY MS. PURTILL:
10              Q.        Ashli, I'm going to give you a
11        moment to take a look at this document.
12                        Let me know when you're ready for
13        Molly to scroll down, and I'm just going to ask
14        you a couple questions about this.
15              A.        Okay.
16                        MS. PURTILL:  Okay.  Let's scroll
17        back to the top of 60.
18        BY MS. PURTILL:
19              Q.        And, Ashli, you know, let me know
20        if there are any other parts of the document you
21        want to see.  But I just have a couple questions
22        about this.
23              A.        Okay.
24              Q.        Do you recognize this document?
25              A.        I've never seen this document.
```

```
 1       And if I did, I don't recall that -- I don't
 2       recall ever seeing this document.
 3                Q.       Okay.  Do you recall anyone at
 4       LSP ever discussing this document with you?
 5                A.       No, ma'am.
 6                Q.       And do you understand this
 7       document to be an ARP?
 8                A.       Yes.  It says it's an
 9       administrative remedy process.  It says ARP at
10       the top.
11                Q.       You testified earlier that
12       inmates can possibly communicate requests for
13       accommodation through ARPs; is that right?
14                A.       Yes.
15                Q.       Do you review all ARPs to see
16       whether they include requests for
17       accommodations?
18                A.       I do not personally review them.
19                Q.       How are ARPs identified as having
20       a request for accommodations and then sent to
21       you?
22                A.       So that goes through our ARP
23       department.  They review them.  Most of the
24       time, the inmate will put on there, this is an
25       ADA ARP.  They will put the complaint, as I said
```

```
1        before.  All the complaints that I've ever
2        received have been medical.  Basically
3        wheelchair, walkers, things of that nature.
4                    But I don't -- I've never seen
5        this one, and I don't see where -- I didn't read
6        anywhere where it said it was an ADA
7        accommodation or where they were requesting an
8        ADA accommodation.
9             Q.      Do the employees of the ARP
10       department complete the University of Missouri
11       training on the ADA?
12            A.      No, ma'am, they do not.
13            Q.      Do they receive the quarterly
14       training on the ADA that Sharita Spears
15       conducts?
16            A.      No, ma'am, they do not.
17            Q.      Do they receive any other
18       specialized training on the ADA?
19            A.      It would be -- I believe, like I
20       said, we all get the yearly training with
21       different ADA stuff.  I can't remember if it's
22       classroom instructions or online, so it would be
23       that.
24            Q.      How long is the ADA portion of
25       the annual training?
```

```
 1                   A.      I don't know off the -- I'd be
 2      lying to you even if I told you.  I don't know.
 3                   Q.      Do you know if it's more or less
 4      than an hour?
 5                   A.      At least an hour, probably.  Most
 6      of our trainings are around an hour.
 7                   Q.      The entire training or the ADA
 8      component of it?
 9                   A.      That's one component of the
10      training.  That would be one component.
11                   Q.      So the ADA component, to your
12      understanding, is less than an hour; is that
13      right?
14                   A.      Most of our trainings -- when I
15      say "training," we have multiple trainings.
16      Most of the training component -- components are
17      about an hour.
18                   Q.      Okay.  And it's your recollection
19      that the annual training does have an ADA
20      component?
21                   A.      Yes, ma'am.
22                   Q.      Did it have an ADA component in
23      2021?
24                   A.      I don't recall that.  I don't
25      recall that component.  You would have to ask
```

Ashli Oliveaux - March 19, 2025

1          someone in the training department.

2                    Q.          Are you aware of any formal

3     complaints about LSP's compliance with the ADA?

4                    A.          Formal complaint to who?

5                    Q.          Let's start with lawsuits.

6                              In your time at LSP, are you

7     aware of any lawsuits against LSP in connection

8     with requests for accommodations under the ADA?

9                    A.          So if you're asking me how many

10    times I've been deposed on this, it's been

11    numerous times.  But I don't know of any, like,

12    so I would assume that those were all lawsuits

13    per se, if that's what you're asking me.

14                   Q.          What is your recollection of the

15    nature of those suits?

16                   A.          Well, one of them, you deposed me

17    on, not too long ago, is very similar to this

18    one, that case.

19                              I mean, another one would be our

20    Field Line lawsuit that we have.  They talk

21    about ADA in there.  But it has nothing to do --

22    it's not even similar to -- it has nothing to do

23    with mental health, that's not the ADA part

24    they're talking about.  I mean, it's just a

25    variety of different ones.  In probably six

Ashli Oliveaux - March 19, 2025

1        months, this is the third deposition I've done

2        on this, and you've done two.

3                Q.        In the deposition we were in

4        together, is it your recollection that that was

5        in connection with Adams versus LDOC, et. al?

6                A.        Yes, I didn't know if I could

7        state that on this record, so I didn't say that.

8                        Since you brought -- these are

9        the only two that I've ever been deposed on with

10       mental health.  That's it.  Everything else has

11       been medical.

12               Q.        Do you recall being deposed in

13       connection with Parker v. Tim Hooper, a 2015

14       case filed in the Middle District of Louisiana?

15               A.        I was deposed on that on

16       different levels, not just necessarily ADA.  I

17       wasn't an ADA coordinator at that time.

18               Q.        Is it your understanding that

19       Parker V Hooper, et al., involved complaints

20       related to the ADA?

21               A.        I don't recall it so much being

22       the ADA complaints.  It was --

23               Q.        What --

24               A.        Huh?

25               Q.        I apologize.  Go ahead.

1          A.       It was -- it was medical -- it
2     was more medical-geared care provides.  That's
3     what it's about.
4          Q.       Did you provide testimony in
5     Lewis v. Cain, a 2015 case filed in the Middle
6     District of Louisiana?
7          A.       Yes, I did.  But I don't recall
8     it being anything with ADA.
9          Q.       In your time at LSP, are you
10    aware of any internal review or audit to ensure
11    ADA compliance?
12         A.       We discussed that when I told you
13    that Miss Spears had to do a walk-about to see
14    if -- what we had to do to become compliant.
15    But she did that at every institution.
16         Q.       Can you think of any other kind
17    of review or audit internally of ADA compliance,
18    other that Miss Spears's walk-abouts?
19         A.       Not that I can recall.
20         Q.       Okay.
21              MS. PURTILL:  Ashli, why don't we
22    take a ten-minute break.  I'm just going to
23    circle up with my team and see what else we have
24    for you, if anything, before we come back on the
25    record.

Ashli Oliveaux - March 19, 2025

Page 60

```
 1                        THE WITNESS:  Perfect.  Thank
 2      you.
 3                        THE VIDEOGRAPHER:  Going off the
 4      record.  The time is 10:31 a.m.
 5                        (RECESS.)
 6                        THE VIDEOGRAPHER:  Going back on
 7      the record.  The time is 10:39 a.m.  This marks
 8      the beginning of media Number 3.  Please
 9      continue.
10                        MS. PURTILL:  Ashli, thank you
11      for your time today.  We don't have any more
12      questions for you.
13                        THE WITNESS:  Thank you.
14                        MR. BLANCHFIELD:  Thank you,
15      ya'll.
16                        MS. PURTILL:  Ashli, if you want
17      to hang on just a second though, I just want to
18      make sure that the court reporter has the
19      spellings that she needs.
20                        THE VIDEOGRAPHER:  Going off the
21      record.  This marks the end of media 3 of 3.
22      The time is 10:39 a.m.
23                        (11:43 a.m.)
24
25
```

Ashli Oliveaux - March 19, 2025

```
1                        CERTIFICATE

2

3

4                        I, Karen Friedlander, a

5       Certified Court Reporter of the State of New

6       Jersey, do hereby certify that prior to the

7       commencement of the examination, the witness

8       and/or witnesses were sworn by me to testify to

9       the truth and nothing but the truth.

10                       I do further certify that the

11      foregoing is a true and accurate computer-aided

12      transcript of the testimony as taken

13      stenographically by and before me at the time,

14      place and on the date hereinbefore set forth.

15                       I do further certify that I am

16      neither of counsel nor attorney for any party in

17      this action that I am not interested in the

18      event nor outcome of this litigation.

19

20                       S/Karen Friedlander
                         Certified Court Reporter
21                       License No. XI01282

22

23

24      Dated:    3-31-25
25
```

Ashli Oliveaux - March 19, 2025

1                              LAWYER'S NOTES

2        PAGE  LINE

3        ____  ____        _____

4        ____  ____        _____

5        ____  ____        _____

6        ____  ____        _____

7        ____  ____        _____

8        ____  ____        _____

9        ____  ____        _____

10       ____  ____        _____

11       ____  ____        _____

12       ____  ____        _____

13       ____  ____        _____

14       ____  ____        _____

15       ____  ____        _____

16       ____  ____        _____

17       ____  ____        _____

18       ____  ____        _____

19       ____  ____        _____

20       ____  ____        _____

21       ____  ____        _____

22       ____  ____        _____

23       ____  ____        _____

24       ____  ____        _____

25       ____  ____        _____

Ashli Oliveaux - March 19, 2025

Page 63

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read the

4      foregoing pages of my deposition testimony in

5      this proceeding, and with the exception of

6      changes and/or corrections, if any, find them to

7      be a true and correct transcription thereof.

8

9      _____

10                        Deponent

11

12     _____

13                          Date

14

15                     NOTARY PUBLIC

16          Subscribed and sworn to before me this

17     _____ day of _____, 20___.

18

19     _____

20                     Notary Republic

21

22     My Commission Expires:_____

23

24

25

Ashli Oliveaux - March 19, 2025

Page 64

```
 1              INSTRUCTIONS TO WITNESS

 2

 3         Please read your deposition over carefully

 4     and make any necessary corrections.   You

 5     should state the reason in the appropriate

 6     space on the errata sheet for any corrections

 7     that are made.

 8

 9         After doing so, please sign the errata

10     sheet and date it.

11

12         You are signing same subject to the changes

13     you have noted on the errata sheet, which

14     will be attached to your deposition.

15

16         It is imperative that you return the

17     original errata sheet to the deposing

18     attorney within thirty (30) days of

19     receipt of the deposition transcript by

20     you. If you fail to do so, the deposition

21     transcript may be deemed to be accurate

22     and may be used in court.

23

24

25
```

1                          ERRATA SHEET

2

3       PAGE -- LINE -- CORRECTION/REASON

4

5       _____    _____    _____

6

7       _____    _____    _____

8

9       _____    _____    _____

10

11      _____    _____    _____

12

13      _____    _____    _____

14

15      _____    _____    _____

16

17      _____    _____    _____

18

19      _____    _____    _____

20

21      _____    _____    _____

22

23      _____    _____    _____

24

25      _____    _____    _____

Ashli Oliveaux - March 19, 2025

Page 66

1                          ERRATA SHEET

2

3        PAGE -- LINE -- CORRECTION/REASON

4

5        _____     _____      _____

6

7        _____     _____      _____

8

9        _____     _____      _____

10

11       _____     _____      _____

12

13       _____     _____      _____

14

15       _____     _____      _____

16

17       _____     _____      _____

18

19       _____     _____      _____

20

21       _____     _____      _____

22

23       _____     _____      _____

24

25       _____     _____      _____