Timothy Hooper - March 17, 2025

1          IN THE UNITED STATES DISTRICT COURT
           THE MIDDLE DISTRICT OF LOUISIANA

2

3     _____
                         )

4    JOSHUA FOLKS,           )
                         )

5        Plaintiff,    )
                         )

6     vs.             )  Case No.
                         )  23-cv-01289-SDD-

7    LOUISIANA ATTORNEY    )  RLB
    GENERAL JEFF LANDRY,  )

8    et al.,            )
                         )

9        Defendants.    )
     _____)

10

11

12

13

14

15          DATE: March 17th, 2025

16          TIME: 8:54 a.m. EST

17

18      DEPOSITION of TIMOTHY HOOPER, a

19  Witness on behalf of Defendants herein,

20  taken by the Plaintiff, pursuant to Federal

21  Rules of Civil Procedure, and Notice, held

22  virtually via Zoom, at the above-mentioned

23  date and time, before MARINA DUBSON, a

24  Notary Public of the State of New York.

25

**EXHIBIT H**

```
 1      A P P E A R A N C E S:

 2

 3


 4      JENNER & BLOCK
        Attorney for Plaintiff
 5      1155 Avenue of the Americas
        New York, New York 10036
 6      BY:   GEORGE ALLAN, ESQ.
                 Gallan@jenner.com
 7

 8            KENNETH BEALE, ESQ.
                 KBeale@jenner.com
 9

10            REBECCA DIAMOND, ESQ.
                 Rdiamond@jenner.com
11


12
        KEOGH, COX & WILSON LTD.
13      Attorney for Defendant
        701 Main Street
14      Baton Rouge, Louisiana 70802
        BY:   ANDREW BLANCHFIELD, ESQ.
15               Ablanchfield@keoghcox.com

16            AZURE D. RISBROOK, ESQ.
                 Azure@keoghcox.com
17

18


19      ALSO PRESENT:

20      GUS PHILLIPS, Videographer

21                       * * * * *

22

23

24

25
```

1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25

Timothy Hooper - March 17, 2025

1                  T. Hooper

2            THE REPORTER: Mr. Blanchfield,

3       are you ordering a copy of this

4       transcript?

5            MR. BLANCHFIELD: Yes.

6                     XXXX

7            THE VIDEOGRAPHER:  We're now on

8       the record for the video deposition

9       of Warden Timothy Hooper.

10           The time is 8:54 a.m., March

11      17, 2025, in the matter of Joshua

12      Folks versus Louisiana Attorney

13      General Jeff Landry, et al.  Civil

14      Action Number 23-CV-01289(SDD)(RLB),

15      being held in the United States

16      District Court for the Middle

17      District of Louisiana.

18           The court reporter is Marina

19      Dubson.  The videographer is Gus

20      Phillips.  And both are

21      representatives of Gregory Edwards,

22      LLC.

23           Will counsel please state their

24      appearances for the record beginning

25      with the plaintiff.

Timothy Hooper - March 17, 2025

1              T. Hooper

2          MR. ALLAN:  Hello.  My name is

3      George Allan, Jr.  I am with the law

4      firm of Jenner & Block representing

5      Joshua Folks.

6          MR. BEALE:  Kenneth Beale,

7      Jenner & Block for Mr. Folks as well.

8          MR. BLANCHFIELD:  Andrew

9      Blanchfield on behalf of the

10     defendants.

11         THE VIDEOGRAPHER:  Will the

12     court reporter please administer the

13     oath.

14         THE REPORTER:  Will Counsel

15     please stipulate that, in lieu of

16     formally swearing in the witness in

17     person, the Reporter will instead ask

18     the witness to acknowledge that their

19     testimony will be true under the

20     penalties of perjury.

21         That, Counsel will not object

22     to the admissibility of the

23     transcript based on proceeding in

24     this way, meaning virtually.

25         And that, the witness has

Timothy Hooper - March 17, 2025

Page 6

```
 1                T. Hooper
 2        verified that he is, in fact, Timothy
 3        Hooper.
 4             So stipulated?  Mr.
 5        Blanchfield?
 6             MR. BLANCHFIELD:  Yes.
 7             THE REPORTER:  Mr. Allan?
 8             MR. ALLAN:  Yes.
 9             (Whereupon, the witness was
10        sworn in by the Court Reporter.)
11
12   T I M O T H Y   H O O P E R,
13        after having first been duly sworn by
14        a Notary Public of the State of New
15        York, was examined and testified as
16        follows:
17   EXAMINATION
18   BY MR. ALLAN:
19        Q.   Hi.  My name is George Allan,
20   Jr.  I am with the law firm Jenner & Block.
21   Like I mentioned earlier, I represent
22   Plaintiff Joshua Folks in this case.  Thank
23   you so much for joining me today,
24   Mr. Hooper.
25             Could you please state your
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2    full name for the record.
3         A.    Timothy Lee Hooper.
4         Q.    Where are you currently
5    employed?
6         A.    Elayn Hunt Correctional Center.
7         Q.    And have you been deposed
8    before?
9         A.    Yes.
10        Q.    Approximately how many times?
11        A.    Four.
12        Q.    Understood.  So, you have done
13   this before, but I am going to lay out a
14   few ground rules I think will be helpful
15   for our discussion here today.
16               You understand that you're
17   under oath and obligated to tell the truth?
18        A.    I do.
19        Q.    You understand that your
20   testimony today is the same as if you were
21   testifying in a court in front of a judge
22   or jury?
23        A.    I do.
24        Q.    Is there any reason you cannot
25   give honest and accurate testimony today?
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2          A.    No.
 3          Q.    Our court reporter needs
 4    audible responses.   So, please make sure
 5    that you clearly articulate your answers
 6    and not nod your head or some other
 7    nonverbal response.
 8              And it's important to have a
 9    clear record, so please wait for me to
10    finish my question before answering, and
11    I'll be sure to do my best to let you
12    finish your answer before I say something
13    else.
14              Does that work?
15          A.    Yes.
16          Q.    If my question is not clear to
17    you, please let me know.
18              Okay?
19          A.    Okay.
20          Q.    If you answer my question, I am
21    going to assume you understand it.
22              Is that fair?
23          A.    Yes.
24          Q.    Your counsel may object to some
25    of my questions, but please go ahead and
```

```
 1                    T. Hooper
 2    answer unless counsel instructs you not to
 3    do so.
 4            Is that clear?
 5       A.   Yes.
 6       Q.   Finally, if you ever need a
 7    break, please let me know.  But if there's
 8    a question pending, please finish answering
 9    and then we can take a break.
10            So, how did you prepare for
11    this deposition today?
12       A.   I didn't.
13       Q.   Did you meet with counsel at
14    all?
15       A.   Briefly.
16       Q.   Roughly how long would you
17    estimate?
18       A.   Five minutes.
19            THE VIDEOGRAPHER:  Mr. Allan,
20         this is the videographer.  Can we
21         take a quick technical break?  I
22         apologize.
23            MR. GEORGE:  Absolutely.
24            THE VIDEOGRAPHER:  We're off
25         the record.  Time is 8:59 a.m.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2              (Whereupon, an off-the-record
 3          discussion was held.)
 4              THE VIDEOGRAPHER:  We're back
 5          on the record.   The time is 9:02 a.m.
 6    BY MR. ALLAN:
 7         Q.    And besides counsel, did you
 8    speak with anyone to prepare for your
 9    deposition, Mr. Hooper?
10         A.    Did not.
11         Q.    Mr. Hooper, do you have a
12    preference?  Do you prefer Mr. Hooper or
13    Warden Hooper?  Or do you have any
14    preference?
15         A.    None.
16         Q.    Can you think of anything else
17    you might have done to prepare for this
18    deposition?
19         A.    Nothing.
20         Q.    What's the highest level of
21    education you have received?
22         A.    Twelfth grade.
23         Q.    Do you have any medical
24    training?
25         A.    No.
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2        Q.    Do you have any certifications
3   or training that might not have resulted in
4   a degree that you haven't mentioned?
5        A.    No.
6        Q.    I understand you're employed --
7   you are currently employed as warden,
8   correct?
9        A.    Correct.
10       Q.    Is the facility generally
11  referred to as Angola?
12       A.    I am currently at Elayn Hunt
13  Correctional Center.
14       Q.    Okay.  Were you at any time
15  employed at the Louisiana State
16  Penitentiary?
17       A.    I was employed at Louisiana
18  State Penitentiary, yes.
19       Q.    Is that penitentiary generally
20  referred to as Angola?
21       A.    The town is called Angola.  The
22  penitentiary is Louisiana State
23  Penitentiary.
24       Q.    When did you begin working
25  there?
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2         A.    April of '21.
3         Q.    And did your position change
4    from warden to any other position?
5         A.    I was the warden.
6         Q.    And how long were you in that
7    role?
8         A.    Till December 1st of 2024.
9         Q.    This case relates and pertains
10   to events at the Louisiana State
11   Penitentiary from approximately April 2021
12   to November 2022 when Mr. Folks was
13   incarcerated there.  So, that's the
14   timeframe I am going to focus on during our
15   discussion.  What are your -- excuse me.
16           What were your primary
17   responsibilities as warden?
18        A.    General operation of the prison
19   system, day-to-day operations.
20        Q.    How closely did you interact
21   with individual inmates?
22        A.    I made rounds.  We'd have
23   conversations.  The way it works is there's
24   departments over each area.  So, I would
25   refer you back to the different department
```

Timothy Hooper - March 17, 2025

```
 1                     T. Hooper
 2    if I had a complaint.
 3         Q.    Speaking of complaints, if
 4    there's a prisoner who self-harms, what
 5    role do you as warden play with respect to
 6    that?
 7         A.    None.
 8         Q.    Are you at all notified if
 9    someone self-harms?
10         A.    Not necessarily unless it's a
11    serious enough event.
12         Q.    What would determine if it
13    would be a serious enough event?
14         A.    Life-threatening.
15         Q.    To what extent do you interact
16    with the medical staff?
17         A.    Make rounds through there, talk
18    to them.  Nothing towards the medical
19    decisions.  That's the professionals that
20    handle that side of it.
21         Q.    And you mentioned previously
22    that, if self-harm is serious enough, it
23    would make it to you.
24              How are reports of inmates'
25    self-harm typically communicated to you?
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2         A.    Through a phone call.
 3         Q.    Is there ever a formal report
 4    made, whether e-mailed or written down or
 5    filed somewhere, to you?
 6         A.    It would be an unusual
 7    occurrence is what they call it, a UOR.
 8         Q.    Have you reviewed the complaint
 9    in this litigation?
10         A.    A long time ago.
11         Q.    Are you familiar with Joshua
12    Folks?
13         A.    I've heard the name.
14         Q.    Do you play any role as warden
15    in the admission of inmates?
16         A.    No.
17         Q.    When someone like Mr. Folks is
18    admitted, would you have seen their
19    admission summary records or otherwise been
20    made aware of that?
21         A.    No.
22         Q.    When did you become aware that
23    Mr. Folks was engaged in self-harming
24    behavior?
25         A.    I don't recall.
```

Timothy Hooper - March 17, 2025

1                      T. Hooper

2          Q.     Do you recall how you learned

3    about his self-harming behavior?

4          A.     I don't recall.

5          Q.     Do you recall being present for

6    any of the incidents where he would

7    self-harm?

8          A.     I don't recall.

9          Q.     Did you review any medical or

10   incident reports related to Mr. Folks?

11         A.     Again, no.

12         Q.     Warden Hooper, I would like to

13   show you a document.  I'm going to share my

14   screen, and as I am pulling it up here, I

15   will represent to you it's a 290-page PDF

16   document.  It's Joshua Folks' master prison

17   file.  So, I'm going to get in my Zoom and

18   share this here.

19                Are you currently able to see a

20   screen with text on it shared from my

21   computer?

22         A.     Okay.

23         Q.     Is that yes, you are able to

24   see it?

25         A.     I can see it.

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2        Q.    Great.  As I represented, this
 3   is Joshua Folks's master prison file.  This
 4   is -- you have a copy of it.  If one has a
 5   copy of it, it's on page 207, but the Bates
 6   number is 1454 at the bottom here.
 7             This document that you will see
 8   is dated March 29, 2021.  And the document
 9   states, starting at the end here:  Due to
10   Folks's aggressive behavior and suicidal
11   tendencies -- suicidal tendencies, myself
12   and DY Oliver had placed him in the library
13   until Borne was ready to see him in the
14   front of the camera.  Once Borne was ready
15   to see Folks, Oliver and I brought Folks in
16   the first appearance room in a wheelchair
17   due to him cutting himself on both his
18   knees.
19             Do you recall this incident?
20        A.    No.
21             MR. BLANCHFIELD:  Just for the
22        record, this is not an LSP document.
23        This is from the local parish.
24             (Clarified by the Court
25        Reporter.)
```

Timothy Hooper - March 17, 2025

1                    T. Hooper

2    BY MR. ALLAN:

3        Q.    And just to be clear, Warden

4    Hooper, you said you did not recall this

5    incident, correct?

6        A.    Correct.

7        Q.    I would like to look at a

8    different page from this same exhibit.

9            MR. ALLAN:  And for the record,

10           I would like to mark this as

11           Exhibit 1.

12           (Plaintiff's Exhibit 1, master

13           prison file, was marked for

14           identification as of this date by the

15           Attorney.)

16   BY MR. ALLAN:

17       Q.    And this time the page will be

18   269, and I would like to represent to you

19   that the Bates number is 1-5-1-6, 1516.

20           At the top do you see where it

21   says, Unusual Occurrence Report?

22       A.    Yes.

23       Q.    And could you just describe

24   what -- I know it says in the name, but

25   what is an unusual occurrence report as you

Timothy Hooper - March 17, 2025

1                    T. Hooper

2    understand it?

3         A.    It's anything that falls in

4    that category, A, B, C, incidents that

5    we're required to report to the department.

6         Q.    Now the location of the

7    incident is TC Ward 1, Locked Room 8.

8    Could you describe what -- what does a TC

9    or is it -- excuse me.

10          Do you -- can you describe what

11   the TC stands for?

12        A.    Treatment center, Ward 1,

13   locked room.

14        Q.    And under Category C, Incidents

15   here, the box is for suicide gesture --

16   suicide gesture as well as the use of

17   force, immediate use of force are checked.

18          And I want to go to the next

19   page here, and I want to represent for the

20   record that this next page is 1517 Bates

21   number, and it's page 270 of the PDF.

22          Here it says that Joshua Folks

23   was observed sitting on his mattress with

24   deep cuts to both his knees, a cut to the

25   front of his throat, and a cut on the back

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2      of his head.
3              Do you recall this incident?
4          A.    I wouldn't have been at
5      Louisiana State Penitentiary on that date.
6          Q.    So, is that a no or yes?
7          A.    No.
8          Q.    Thank you.
9              You mentioned you were not at
10     the penitentiary on that date.
11             Does that mean you were not
12     employed by the penitentiary on that date
13     or just were not physically there on that
14     date?
15         A.    I was not employed.
16         Q.    I'd now like to show you a
17     different page from this exhibit.  This
18     page will be page 225.
19             MR. ALLAN:  I would also like
20          to represent for the record that this
21          would be Bates number 1472.
22     BY MR. ALLAN:
23         Q.    This is another unusual
24     occurrence report.  It's dated July 20,
25     2021.  Under the description, it states
```

Timothy Hooper - March 17, 2025

```
 1                 T. Hooper
 2    that Nurse Robinson was checking
 3    Mr. Folks's restraints upon being informed
 4    that he had stuck -- that he had stuck four
 5    metal slender objects into his stomach but
 6    only one was visible.
 7              Do you recall this incident?
 8         A.    No.
 9         Q.    After this third incident --
10    and I understand you do not recall it.
11              But after this third incident,
12    do you believe enough was being done to
13    protect Mr. Folks's health and welfare?
14              MR. BLANCHFIELD:  Object to the
15          form of your question, Andrew
16          Blanchfield.
17              You can answer it if you can.
18         A.    Repeat the question.
19    BY MR. ALLAN:
20         Q.    Yes.  Do you believe -- after
21    this incident, and I recognize you said you
22    were not -- you didn't recall it, but do
23    you believe enough was being done to
24    protect Mr. Folks's health and welfare?
25         A.    I have confidence in my medical
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2    staff that they were taking care of
 3    Mr. Folks.
 4         Q.    One moment.  As I stated prior,
 5    this is dated July 20, 2021, four months
 6    after it had been noted that Mr. Folks had
 7    suicidal tendencies and a history of
 8    self-harm.
 9              But I want to highlight
10    something here.  Under type of incident, it
11    says, Check appropriate boxes.  I see that
12    mental health is unchecked.
13              Do you know why this would not
14    be considered -- why this would not be
15    checked in this incident?
16              Can you hear us?
17              MR. ALLAN:  I think there might
18         be a connection issue.
19              THE VIDEOGRAPHER:  Off the
20         record, Counsel?  Should I take us
21         off the record?  I apologize.
22              MR. ALLAN:  Sure.
23              THE VIDEOGRAPHER:  We are off
24         the record.  The time is 9:17 a.m.
25              (Whereupon, an off-the-record
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2          discussion was held.)
 3              THE VIDEOGRAPHER:  We are back
 4          on the record.  The time is 9:23 a.m.
 5    BY MR. ALLAN
 6          Q.   Warden Hooper, as you were just
 7    discussing, we're on this -- looking at
 8    this form right now, unusual -- actually,
 9    let me go ahead and share my screen so you
10    can make sure you can see it here.
11              Are you able to see my screen
12    there, Mr. Warden Hooper?
13          A.   Yes.
14          Q.   Previously as I mentioned, it
15    says July 20, 2021.  This is an unusual
16    occurrence report, and under type of
17    incident, you see that several boxes are
18    checked here.  There's contraband inside
19    facility.  There's medical, shakedowns
20    routine.
21              You see that mental health
22    unchecked?
23          A.   Okay.
24          Q.   My question is:  Why was this
25    incident, to your knowledge, not considered
```

Timothy Hooper - March 17, 2025

1                    T. Hooper

2      to be related to his mental health?

3          A.    I would not have any --

4              MR. BLANCHFIELD:  Go ahead.

5          You can answer.

6          A.    I wouldn't have any information

7      on that.

8              (Clarified by the Court

9          Reporter.)

10              MR. BLANCHFIELD:  I objected to

11          the form, Andrew Blanchfield.

12      BY MR. ALLAN:

13          Q.    And I am going to pause sharing

14      my screen briefly.  One moment here.

15              So, Warden Hooper, do you

16      recall any specific incidents of self-harm

17      by Mr. Folks?

18          A.    I do not.

19          Q.    Do you recall medical or other

20      staff ever telling you about any such

21      incidents?

22          A.    I do not.

23          Q.    Are you surprised this was

24      never brought to your attention?

25          A.    I didn't see anything that

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2    should be brought to my attention yet.
 3         Q.    What would need to occur for an
 4    inmate's self-harm to be brought to your
 5    attention?
 6         A.    Again, it would be
 7    life-threatening.
 8         Q.    Is it your view that these
 9    instances were not life-threatening?
10         A.    That will be a doctor's
11    decision to make, not mine.
12         Q.    One moment, Warden Hooper.
13    Warden Hooper, I am going to share my
14    screen again.  This will be the same master
15    prison file.  It's the same Exhibit 1.
16    This time I am going to go to a different
17    page.  I am going to page 220.
18              MR. ALLAN:  And I would like to
19           represent for the record that's Bates
20           number 1467.
21    BY MR. ALLAN:
22         Q.    This is a lockdown review
23    summary.  And while the title seems
24    self-explanatory, can you explain why these
25    lockdown review summaries are made
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper

 2     generally.

 3          A.    For the boards to review to

 4     make sure they're in the right places.

 5          Q.    It indicates that Mr. Folks was

 6     placed in the location right here, TU upper

 7     B.  Can you explain what TU means and what

 8     the B means.

 9          A.    TU is an upper.  It's a

10     two-story building, treatment center.  And

11     it's -- he was on B tier.

12          Q.    How many different tiers are in

13     that area?

14          A.    A through F.

15          Q.    Approximately how many, I

16     guess, inmates --

17          A.    How many?  I'm sorry.

18          Q.    I'm sorry, yeah.

19                Approximately how many inmates

20     would be in this A through F, the -- how

21     many inmates would be in that zone

22     approximately?

23          A.    Again, I can't answer that

24     question.

25          Q.    Under the list of reasons why
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2     Mr. Folks was not released, there's an X
 3     to -- next to the pending felony charges
 4     here and nature of original reason for a
 5     lockdown.  Can you explain -- or excuse me.
 6             Do you recall what the felony
 7     pend- -- the felony charges pending were in
 8     this instance?
 9        A.    I do not.
10        Q.    Would it surprise you that the
11     felony charges were for self-mutilation of
12     a prisoner?
13        A.    I would not have known that.
14        Q.    Further down the page, it says:
15     Physically dangerous to himself or others
16     as evidenced by.
17             Why was that not marked, in
18     your view?
19        A.    I can't answer that question.
20        Q.    In your view would this mean
21     that Mr. Folks was no longer considered
22     physically dangerous to himself and others?
23        A.    I can't answer the question.
24        Q.    What are the consequences for
25     not checking this box?
```

Timothy Hooper - March 17, 2025

Page 27

```
 1                    T. Hooper
 2        A.    Sir, I do not fill out the form
 3   so I do not know.
 4        Q.    So, just to be clear:  If you
 5   were to see this form and see that this box
 6   was not checked, you would have no opinion
 7   on that one way or the other?
 8        A.    None.
 9        Q.    Okay.  Do you ever see these
10   forms?
11        A.    No.
12        Q.    You mentioned you can't answer
13   the question as to what the consequences
14   are for whether he's physically dangerous
15   to himself or not, what those consequences
16   would be.
17            Why can't you answer that
18   question?
19            MR. BLANCHFIELD:  Asked and
20        answered.
21            You can answer.
22        A.    I did not fill out the form and
23   I did not evaluate it.
24   BY MR. ALLAN:
25        Q.    Down below here it says:
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2     Reviewed by Jarvis Callihan.
 3              Who is Jarvis Callihan?
 4        A.    I'm not certain.
 5        Q.    There's also a name Lakeshia
 6     Jackson.
 7              Do you know who this is?
 8        A.    I am assuming it would be a
 9     classification officer.
10        Q.    Do you know this individual
11     personally?
12        A.    No.
13        Q.    I am going to stop sharing my
14     screen here briefly.
15            MR. ALLAN:  Warden Hooper and
16            Counsel, would you be willing to take
17            a ten-minute pause here?
18            MR. BLANCHFIELD:  Yeah, if you
19            need to do that, we can do that.
20            MR. ALLAN:  Great.  I will be
21            back here.  I need to get some
22            technical issues resolved.  But take
23            a quick pause here.  We'll come back
24            at 9:41 if that woks for you all --
25            or, excuse me, 10:41 your time?
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2              MR. BLANCHFIELD:  That's --
 3         that's fine.
 4              MR. ALLAN:  Great.  Thank you,
 5         Counsel.
 6              THE VIDEOGRAPHER:  We are off
 7         the record.  The time is 9:32 a.m.
 8              (Whereupon, an off-the-record
 9         discussion was held.)
10              THE VIDEOGRAPHER:  We are back
11         on the record.  The time is 9:42 a.m.
12    BY MR. ALLAN:
13         Q.    Thank you.  I would like to
14    stay on the same exhibit, Exhibit 1.  I am
15    going to share my screen here.  Please let
16    me know if you can see my shared screen.
17              Are you able to see the screen,
18    Warden Hooper?
19         A.    Yes.
20         Q.    Great.  I'd like to represent
21    that this is on page 253.  The Bates number
22    is 1500, 1-5-0-0.  This is a
23    disciplinary -- disciplinary report dated
24    June 13th, 2021.  And the description, it
25    states that an Angelo Webb observed
```

Timothy Hooper - March 17, 2025

Page 30

```
 1                    T. Hooper
 2    offender Joshua Folks, Number 361917,
 3    laying on his mattress with deep cuts to
 4    both his knees and legs and stomach.  He
 5    also has a sharpened toothbrush poked in
 6    the right side of his neck.  Lower on the
 7    page under 22, motions, it says:  Defer for
 8    mental health evaluation.
 9              Do you see that?
10        A.    Yes.
11        Q.    Do you know if a mental health
12    evaluation was ever performed in this
13    situation?
14        A.    I do not.
15        Q.    What procedures are in place to
16    ensure that, when evaluations are requested
17    like this, that they are performed?
18        A.    The disciplinary board would
19    have sent it to mental health for them to
20    respond.
21        Q.    And as warden, would you have
22    any role in ensuring that it took place?
23        A.    No.
24        Q.    At the bottom of the page where
25    it says sentence -- 25 sentence, it says:
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2    Was sentenced to 20-day disciplinary
 3    segregation.
 4              Do you know why he was given
 5    this particular sentence?
 6         A.    Do not.
 7         Q.    When this occurs -- by "this,"
 8    I mean being put into disciplinary
 9    segregation -- is there any consideration
10    of the effect that disciplinary segregation
11    would have on an inmate's mental health?
12         A.    I don't understand your
13    question.
14         Q.    Sure.  So, effectively when
15    you're giving out sentences -- or not you
16    in particular, but whoever was responsible
17    for giving out the sentence, in making
18    those determinations, is there any
19    consideration given to the inmate's mental
20    health?
21         A.    I was not on the board, so I
22    cannot answer that question.
23         Q.    Earlier you mentioned that, you
24    know, you would generally not get involved
25    unless there was a life-threatening
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2    situation.  And, actually, let me rephrase
3    that.  You would not be notified unless it
4    was a life-threatening situation.
5              What capacity would you get
6    involved in if there was a self-harm
7    situation in which it was life-threatening?
8         A.    Our role would be a report to
9    Baton Rouge.
10        Q.    Who in Baton Rouge would you
11   report to?
12        A.    It's a generic reporting
13   e-mail.  Operations, everybody would see
14   it.
15        Q.    Is this associated with the
16   Bureau of Prisons?
17        A.    No.
18        Q.    Who would this be?
19              You said it's generic, please
20   explain that a little bit more about --
21        A.    State of Louisiana Department
22   of Corrections.
23        Q.    So, just to make sure I
24   understand correctly:  A life-threatening
25   situation occurs; your role would simply be
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2   to report that to the Louisiana State of
 3   Corrections?
 4        A.    Yes.
 5        Q.    I am going to stop sharing my
 6   screen here.
 7              As far as you know,
 8   approximately how many prisoners at the
 9   penitentiary at any given time are
10   self-harming?
11        A.    25 to 30.
12        Q.    Of those who are self-harming,
13   again, approximately how many of those are
14   life-threatening?
15        A.    None.
16        Q.    During your time as warden
17   there, was there ever a time to your
18   knowledge that someone had self-harmed and
19   it was life-threatening?
20        A.    Yes.
21        Q.    Approximately how many?
22        A.    Six.
23        Q.    And of that approximation --
24   again, I understand it's approximate.
25              Of that six, do you recall any
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2    of them having mental illness?
3         A.    No.
4         Q.    And of those who -- their
5    self-harming is not life-threatening,
6    approximately how many of those have been
7    diagnosed with mental illness?
8         A.    I would not know.
9         Q.    So, what steps, if any, did you
10   personally take to address Mr. Folks's
11   self-harming behavior?
12        A.    None.
13        Q.    Did you ever direct any staff
14   members to implement any special
15   precautions for Mr. Folks?
16        A.    Not that I am aware, no.
17        Q.    Are you aware that your medical
18   team was prescribing him drugs for mental
19   illness?
20        A.    Would not know that.
21        Q.    Even though you would not know
22   that, would you have any reason to think
23   that your medical team was misprescribing
24   him?
25        A.    I would not.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2        Q.    So, did you understand from
 3   your staff that he was mentally ill?
 4        A.    I wouldn't have had a
 5   conversation with my staff.
 6        Q.    So, it is -- based on your
 7   prior answers, it's your view that his
 8   self-harming was not life-threatening,
 9   correct?
10        A.    Correct.
11        Q.    Is it -- do you have any
12   inclination as to why he was doing this to
13   himself?
14        A.    That would be a question you
15   would have to ask him.  I don't know.
16        Q.    Are you aware of anyone writing
17   down or memorializing this judgment that he
18   was not mentally ill?
19        A.    I'm not.
20        Q.    In your view as warden, should
21   Mr. Folks have been transferred to another
22   facility after his incidents at the prison?
23        A.    No, he should not have been
24   transferred.
25        Q.    One moment.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2              Did you ever receive complaints
 3    or were made aware that the medical team at
 4    the prison was overwhelmed?
 5         A.    No.
 6         Q.    Did you have any reason to
 7    believe that they may have been
 8    overwhelmed?
 9         A.    No.
10         Q.    Do you believe the medical
11    staff was able to give the individualized
12    attention that was necessary?
13         A.    Yes.
14         Q.    How familiar are you with the
15    Americans with Disabilities Act?
16         A.    I am not.
17         Q.    Have you heard of it before?
18         A.    Yes.
19         Q.    Did you ever discuss
20    Mr. Folks's case with the ADA coordinator?
21         A.    Have not.
22         Q.    And I got at it briefly
23    earlier, but I just want to clarify just --
24    and I am not looking for anything too
25    specific.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2             Just very generally, what do
 3   you know about the ADA or Americans With
 4   Disabilities Act, just generally?
 5        A.    Everybody has a right to
 6   medical/mental health.
 7        Q.    Did you ever think the ADA
 8   might ever apply to Mr. Folks?
 9        A.    I had people that would address
10   that -- I had people that would address his
11   issues if he had filed a complaint.
12        Q.    Did any of those people ever
13   reach out to you about this as far as you
14   know?
15        A.    Do not recall, no.
16        Q.    Would you have expected your
17   medical staff to consider whether the ADA
18   might apply to Mr. Folks?
19        A.    I can't answer that question.
20        Q.    Warden Hooper, I would like to
21   share my screen again with you.
22             MR. ALLAN:  And just for the
23        record, I'd like to introduce another
24        document.  I am going to share my
25        screen now.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2     BY MR. ALLAN:
 3          Q.    Please let me know if you can
 4     see my screen being shared.
 5          A.    Yes.
 6                MR. ALLAN:  Okay.  As I said,
 7            this document which I am sharing
 8            which I would like to mark as
 9            Exhibit 2 -- and I'll send that into
10            the chat here shortly -- this is
11            Mr. Folks's medical and mental health
12            records.  And this is on page 3.
13                And I'd like to represent the
14            Bates number is 980, 9-8-0.
15                Before I ask the question, I am
16            going to send this to the chat.
17                (Plaintiff's Exhibit 2, medical
18            and mental health records, was marked
19            for identification as of this date by
20            the Attorney.)
21                MR. ALLAN:  And I just want to
22            make sure counsel and the court
23            reporter can see that in the chat.
24            It's been sent.
25                (Whereupon, an off-the-record
```

Timothy Hooper - March 17, 2025

```
 1                  T. Hooper
 2          discussion was held.)
 3    BY MR. ALLAN:
 4        Q.    We'll go back to the screen I'm
 5    sharing here.  I'd like to mark that
 6    Exhibit 2.
 7              Looking at page 3, Bates number
 8    980, on this page under Reentry Planning
 9    Overview, next to additional comments -- so
10    under Reentry Planning Overview, you'll
11    notice under additional comments, right
12    here, it says:  Bipolar disorder.
13              And, Warden Hooper, do you have
14    any reason to believe that diagnosis was
15    incorrect?
16              MR. BLANCHFIELD:  Object to the
17         form.
18              You can answer.
19        A.    I'm not a doctor.  I wouldn't
20    know.
21    BY MR. ALLAN:
22        Q.    And generally when a prisoner
23    claims to have a mental disorder, do you
24    require the medical staff to investigate
25    that diagnosis?
```

Timothy Hooper - March 17, 2025

```
1                       T. Hooper
2          A.    Again, I am not a doctor.  I
3     would assume that they would do their jobs.
4          Q.    Okay.  I am going to stop
5     sharing my screen here.
6                And, Warden, how does -- how
7     did the penitentiary identify the prisoner
8     has a mental condition or disability?
9          A.    I don't understand your
10    question.
11         Q.    When someone gets arrested and
12    brought to the prison or, you know,
13    detained, brought to the prison, is there a
14    process for determining if the person has
15    some type of mental issue or disability?
16         A.    Mental health would interview
17    him at the time of arrival.
18         Q.    And how are those individuals
19    trained who do the screening for mental
20    health?
21         A.    Through their degrees.
22         Q.    Is there a policy on the use of
23    restraints?
24         A.    Yes.
25         Q.    What is that policy?
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  844-483-2643

Timothy Hooper - March 17, 2025

```
1                      T. Hooper
2          A.    I couldn't tell you.  I don't
3     have it in front of me.
4          Q.    I know you obviously don't have
5     it in front of you.
6               But what is your understanding
7     of the use of restraints generally at the
8     prison?
9          A.    In reference to what?
10          Q.    In reference to individuals
11     undergoing a type of mental or emotional
12     crisis.
13          A.    Again, that would be addressed
14     through the psychiatrist on a management
15     order, whether they want him on a
16     four-point or a standard suicide watch.
17     That would be up to the psychiatrist on
18     management order on what type of restraints
19     he would request through a management
20     order.
21          Q.    And when the psychiatrist makes
22     that request, is that psychiatrist making
23     the request to you or to -- who are they
24     making the request to for the particular
25     type of restraints?
```

Timothy Hooper - March 17, 2025

Page 42

1                    T. Hooper

2        A.    Through the area that he would

3    be going to, the supervisors.

4        Q.    So, let's say in a situation

5    the psychiatrist speaks -- has a

6    conversation or interacts with a prisoner,

7    determines, yes, we need to put some type

8    of restraints on this prisoner, they would

9    make that request through the supervisor

10   where they're going to be housed?

11       A.    Correct.

12       Q.    Can you describe just briefly

13   four-point restraints, what that

14   effectively looks like or entails.

15       A.    Basically a handcuff to the

16   wrists, both your wrists, and then to your

17   legs, leg irons.  So, you're chained to a

18   bed basically.

19       Q.    And are you like horizontal or

20   vertical or at it -- are you like basically

21   horizontal while you're in this?

22       A.    Horizontal.

23       Q.    How often are restraints used

24   as a punishment for a mental health crisis?

25       A.    Never.

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2              MR. ALLAN:  And just for the
 3         record, I want to clarify that the
 4         document we addressed earlier, I
 5         think it's -- I submitted in the
 6         chat, but that was Exhibit 2.  So, I
 7         just want to make sure I say it for
 8         the record.
 9    BY MR. ALLAN:
10         Q.    But to you, Warden Hooper, once
11    a prisoner is in restraints, in particular
12    the four-point restraints, how often is a
13    prisoner checked on by a staff member?
14         A.    It really depends on the
15    management order, but they're normally let
16    up at least every 2 hours to go to the
17    restroom, if not earlier.
18         Q.    So, when -- let's say those
19    two-hour intervals, is that just during the
20    day or is that throughout the night as
21    well?
22         A.    The whole time he's on
23    four-point restraints.
24         Q.    What's the process for
25    evaluating prisoners once they're in
```

Timothy Hooper - March 17, 2025

Page 44

```
 1                    T. Hooper
 2     restraints?
 3          A.    Again, I can't answer that
 4     question because it's going to be under the
 5     psychiatrist's orders.
 6          Q.    Would you happen to know how
 7     frequently checkups were made on Mr. Folks
 8     while he was in restraints?
 9          A.    I would not.
10          Q.    Would you happen to know how
11     frequently the medical staff investigated
12     Mr. Folks's condition?
13          A.    I would not.
14          Q.    Are you aware of how long the
15     medical restraint order was in place for
16     Mr. Folks?
17          A.    I do not know.
18          Q.    You mentioned that
19     approximately every 2 hours, that's when
20     they, you know, let them up to use the
21     restroom or, you know.
22                But generally how long -- even
23     understanding there are breaks, how long
24     might someone be in the four-point
25     restraints?
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2         A.    It all depends on the
3    psychiatrist that does the order.
4         Q.    Is there like -- is there a
5    general timeframe?  Like, for example, we
6    usually give them ten days in restraints
7    and kind of check back in after.  Is there
8    anything like that?  Or is it all unique?
9         A.    Normally, you would see a 24-
10   or 48-hour.
11        Q.    So, after that, let's say,
12   48 hours, it starts; you put them in
13   restraints.  Over the course of the next
14   48 hours, every 2 hours or so you let him
15   up to use the restroom.
16              Is that pretty much how it
17   would go during that 48 hours?
18        A.    If he is on four points.
19        Q.    Okay.  And then at the end of
20   that 48 hours, you know, you got up every
21   couple hours to use the restroom, what have
22   you; and at the end of that 48 hours, who
23   basically says he needs to be in this
24   longer or he needs to be let out of these?
25   Who makes that determination?
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2        A.    Psychiatrist.
3        Q.    One moment, Warden Hooper.
4              And that's -- when that
5    psychiatrist, you know, makes that
6    determination after that 24 or 48 hours, I
7    assume -- and correct me if I -- is this
8    done in person, correct?
9        A.    I would assume, yes.
10       Q.    Based on your understanding of
11   department -- or, you know, prison
12   policies, what should have been done when
13   an inmate -- excuse me.
14             Based on your understanding of
15   prison policies, what should be done when
16   an inmate repeatedly engages in self-harm?
17             MR. BLANCHFIELD:  Object to the
18        form.
19             You can answer it, if you can.
20       A.    Again, that would be a question
21   for the doctor.
22   BY MR. ALLAN:
23       Q.    As far as you know, did the
24   actions taken in Joshua -- or Mr. Folks's
25   case align with department policies?
```

Timothy Hooper - March 17, 2025

1                    T. Hooper

2        A.    Yes.

3        Q.    Would you agree that inmate

4    safety is one of your primary

5    responsibilities as warden?

6        A.    Yes.

7        Q.    Do you agree that self-harming

8    behavior presents a serious risk to an

9    inmate's health and safety?

10       A.    Yes.

11       Q.    Do you believe that, when a

12   prison official knows an inmate is

13   repeatedly self-harming, that the official

14   has an obligation to take affirmative steps

15   to protect the inmate?

16       A.    Yes.

17       Q.    So, if prison policies required

18   certain action to be taken in response to

19   self-harming behavior and those actions

20   were not taken, would that be a failure --

21   would that violate department policy?

22       A.    Yes.

23       Q.    And so, I asked you a question

24   previously about taking affirmative steps

25   to protect an inmate, and we talked about

Timothy Hooper - March 17, 2025

1                    T. Hooper

2     some of it here.

3              But just for clarity:  In

4     taking affirmative steps to protect an

5     inmate, what would those steps look like?

6          A.    Again, you would have to give

7     me the scenario that you're referring to.

8          Q.    Sure.  Well, let's use the

9     scenario for Mr. Folks's situation.  As we

10    discussed prior in this deposition, he

11    ingested or stuck a series of metal rods

12    into his body and had to be taken to the

13    hospital for that.

14              In that scenario, what type of

15    affirmative steps should be taken?

16         A.    Again I think the psychiatrist

17    was following Mr. Folks very closely at the

18    time.  So, I think all the steps were taken

19    correctly.

20         Q.    Do you believe there was

21    anything more that could have been done to

22    protect Mr. Folks?

23         A.    No.

24         Q.    And following up on a prior

25    question, you mentioned it was the

Timothy Hooper - March 17, 2025

```
 1                  T. Hooper
 2    psychiatrist's responsibility to check on
 3    the prisoner and recommend steps to be
 4    taken with the medical staff -- medical
 5    staff as well.
 6             Are there any procedures in
 7    place to ensure -- or let me rephrase that.
 8             How are they being supervised
 9    to ensure those policies are being
10    conducted appropriately?
11        A.    I don't understand your
12    question.
13        Q.    Sure.  Let me rephrase.
14             The medical -- in performing
15    their responsibilities, whether it's the
16    psychiatrist or the medical staff, medical
17    team -- as warden, do you have any
18    supervision over them to ensure they are
19    carrying out their responsibilities
20    correctly?
21        A.    Again, they're the medical
22    professionals, so I would not intervene
23    with their professional decisions on how to
24    treat a patient.
25        Q.    Understood.
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2              In their treating of -- you
 3      know, you don't want to interfere with
 4      their treating of a patient.  I understand
 5      that.
 6              Who supervises them to ensure
 7      they're treating the patients properly?
 8         A.    One of the doctors would be the
 9      supervisor that oversees all the medical
10      decisions.
11         Q.    And that doctor in that role,
12      who does that doctor report to?
13         A.    To the deputy warden of
14      medical.
15         Q.    And who would the deputy warden
16      of medical report to?
17         A.    Well, actually it would have
18      been to the hospital administrator at that
19      time.
20         Q.    Okay.  So, the psychiatrist,
21      medical staff team, they report up to -- so
22      you have a psychiatrist or just the medical
23      team in general.  They will prescribe a
24      plan for an inmate -- a treatment for the
25      inmate.  And the person they report to is a
```

Timothy Hooper - March 17, 2025

```
 1                      T. Hooper
 2     more senior doctor, and then from that more
 3     senior doctor is a medical professional.
 4              Is that correct?
 5         A.   Correct.
 6         Q.   And then from that medical
 7     professional, they report up to the deputy
 8     warden; is that correct?
 9         A.   Well, they would go -- they
10     would -- they would report to the doctor at
11     headquarters.
12         Q.   To the extent you can for
13     clarity, can you describe essentially the
14     chain of command from the medical staff all
15     the way up.
16         A.   So, you have the doctor that's
17     going to oversee the medical side of it.
18     And if he had any questions, he would take
19     it to another doctor that's the doctor at
20     headquarters.  Okay.
21              Now, in the chain of command,
22     there's a hospital administrator that would
23     help on -- he's not going to make a medical
24     decision.  And then the deputy warden would
25     be also in that chain, but again, she would
```

Timothy Hooper - March 17, 2025

```
1                    T. Hooper
2    not make a decision when it comes to the
3    medical treatment side of the course to be
4    taken on an offender.
5         Q.    So, that deputy warden, even
6    though they're not going to tell the doctor
7    to take a specific medical action,
8    they're -- they're responsible for just
9    supervising, ensuring that the medical
10   staff is acting appropriately; is that
11   correct?
12        A.    Correct.  To help them get to
13   where they need to to get it all resolved
14   on a situation.
15        Q.    And then from that deputy
16   warden, does that deputy warden report up
17   to you as the main warden?
18        A.    Correct.
19             MR. ALLAN:  Counsel, would you
20        mind taking one more five-minute
21        break?  I think we might for the most
22        part have the questions addressed
23        here, but I just want to take one
24        more five-minute break if that's okay
25        with you.
```

Timothy Hooper - March 17, 2025

Page 53

```
 1              T. Hooper
 2         MR. BLANCHFIELD:  Fine.
 3         MR. ALLAN:  Thank you.  I'll be
 4    back here -- I'll call it 11:21 your
 5    time.
 6         THE VIDEOGRAPHER:  We are off
 7    the record.  The time is 10:13 a.m.
 8         (Whereupon, a short break was
 9    taken at this time.)
10         THE VIDEOGRAPHER:  We are back
11    on the record.  The time is
12    10:21 a.m.
13  BY MR. ALLAN
14    Q.    Thank you.  And, Warden Hooper,
15  I only have a couple more questions here.
16  Thank you for your cooperation during this
17  deposition, and same to opposing counsel.
18         My question here is:  We
19  discussed some of the chain of command
20  there previously, and my question is, if
21  the deputy warden flags someone as having a
22  crisis -- let me rephrase that.
23         So, if deputy warden alerted
24  you that there is someone who was
25  self-harming and it was life-threatening,
```

Timothy Hooper - March 17, 2025

```
 1                    T. Hooper
 2    they would report that to you, correct?
 3         A.    Correct.
 4         Q.    And if someone was self-harming
 5    and it was not life-threatening, they would
 6    not report that to you, correct?
 7         A.    No.
 8         Q.    Could you repeat that?
 9         A.    No.
10         Q.    Okay.  In those situations
11    where it is life-threatening, when would
12    you expect that report or that -- to be
13    made aware of it?  When would you expect
14    that?
15         A.    Immediately.
16         Q.    And in those situations where
17    it was reported to you it was
18    life-threatening and let's say they report
19    it promptly thereafter, what would be your
20    response as warden?
21              (Page break to accommodate
22         jurat.)
23
24
25
```

1                    T. Hooper

2          A.    They would have a report to

3    Baton Rouge detailing the incident that

4    occurred.   That would be my role.

5                    MR. ALLAN:  Thank you.

6                    And, Warden, those are all the

7          questions I had at this time.

8                    THE WITNESS:  Thank you.

9                    MR. BLANCHFIELD:  Okay.  We're

10         done.   Thank you.

11                   THE VIDEOGRAPHER:  We are off

12         the record.   Time is 10:23 a.m.

13                   (Whereupon, at 10:25 a.m., the

14         Examination of this Witness was

15         concluded.)

16

17

18         _____
                       TIMOTHY HOOPER

19

20   Subscribed and sworn to before me

21   this _____ day of _____ 20___.

22

23   _____
         NOTARY PUBLIC

24

25

Timothy Hooper - March 17, 2025

Page 56

```
1                    E X H I B I T S
2
3
4        PLAINTIFF EXHIBITS
5
6        EXHIBIT          DESCRIPTION            PAGE
7        NUMBER
8    EXHIBIT 1        master prison file      17
9    EXHIBIT 2        medical and mental      38
10                    health records
11
12                    * * * *
13
14                    I N D E X
15
16   EXAMINATION BY                  PAGE
17   MR. ALLAN                       6
18
19      INFORMATION AND/OR DOCUMENTS REQUESTED
20      INFORMATION AND/OR DOCUMENTS       PAGE
21      (None)
22
23         QUESTIONS MARKED FOR RULINGS
24      PAGE LINE QUESTION
25      (None)
```

1              C E R T I F I C A T E

2

3

4    STATE OF NEW YORK      )
                            :
5    COUNTY OF RICHMOND     )

6

7         I, MARINA DUBSON, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 17th day of March 2025.

21

22

23                       _____
                              MARINA DUBSON

24

25

Timothy Hooper - March 17, 2025

```
1                    ERRATA SHEET

2       WITNESS NAME: TIMOTHY HOOPER

3       PAGE  LINE(s)        CHANGE        REASON

4       ___|_____|    _____|  _____

5       ___|_____|    _____|  _____

6       ___|_____|    _____|  _____

7       ___|_____|    _____|  _____

8       ___|_____|    _____|  _____

9       ___|_____|    _____|  _____

10      ___|_____|    _____|  _____

11      ___|_____|    _____|  _____

12      ___|_____|    _____|  _____

13      ___|_____|    _____|  _____

14      ___|_____|    _____|  _____

15      ___|_____|    _____|  _____

16      ___|_____|    _____|  _____

17      ___|_____|    _____|  _____

18      ___|_____|    _____|  _____

19      ___|_____|    _____|  _____

20      ___|_____|    _____|  _____

21      ___|_____|    _____|  _____

22      ___|_____|    _____|  _____

23      ___|_____|    _____|  _____

24      ___|_____|    _____|  _____

25      ___|_____|    _____|  _____
```

Timothy Hooper - March 17, 2025

```
 1                     ERRATA SHEET

 2      WITNESS NAME: TIMOTHY HOOPER

 3      PAGE  LINE (s)        CHANGE          REASON

 4      ____|_____|  _____|_____

 5      ____|_____|  _____|_____

 6      ____|_____|  _____|_____

 7      ____|_____|  _____|_____

 8      ____|_____|  _____|_____

 9      ____|_____|  _____|_____

10      ____|_____|  _____|_____

11      ____|_____|  _____|_____

12      ____|_____|  _____|_____

13      ____|_____|  _____|_____

14      ____|_____|  _____|_____

15      ____|_____|  _____|_____

16      ____|_____|  _____|_____

17      ____|_____|  _____|_____

18      ____|_____|  _____|_____

19      ____|_____|  _____|_____

20      ____|_____|  _____|_____

21

22      _____
        TIMOTHY HOOPER

23      SUBSCRIBED AND SWORN BEFORE ME
        THIS ____ DAY OF _____, 20__.

24

25      _____  _____
        (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```