Dr. Dan LaFleur - March 18, 2025

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                THE MIDDLE DISTRICT OF LOUISIANA
 2

 3        _____)
                                      )
 4        JOSHUA FOLKS,               )
                                      )
 5               Plaintiff,           )
                                      )
 6           vs.                      )   Case No.
                                      )   23-cv-01289-SDD-
 7        LOUISIANA ATTORNEY          )   RLB
          GENERAL JEFF LANDRY,        )
 8        et al.,                     )
                                      )
 9               Defendants.          )
          _____)
10

11

12

13

14            REMOTE VIDEOTAPED DEPOSITION OF:
                      DR. DAN LaFLEUR
15                   March 18, 2025
                     12:31 p.m. ET
16

17

18

19

20

21

22

23
          Reported by:  Karen Friedlander, CCR-NJ, NYRCR,
24        RDR, CRR

25
```

# EXHIBIT I

Dr. Dan LaFleur - March 18, 2025

Page 2

```
 1      A P P E A R A N C E S:

 2      JENNER & BLOCK LLP
        BY:  Amanda Walsh, Esquire
 3      1155 Avenue of the Americas
        New York, NY 10036-2711
 4      (212) 891-1600
        Awalsh@jenner.com
 5      - and -
        JENNER & BLOCK LLP
 6      BY:  Kenneth D. Beale, Esquire
        1099 New York Ave NW #900
 7      Washington, DC 20001
        (202) 639-6000
 8      KBeale@jenner.com
        Attorneys for Plaintiff

 9

10      Special Assistant Attorneys General
        BY:  Andrew Blanchfield, Esquire
11      701 Main Street
        Post Office Box 1151
12      Baton Rouge, Louisiana 70821
        (225) 383-3796
13      Ablanchfield@keoghcox.com
        Attorneys for Defendant

14
          ALSO PRESENT:

15
          Jason Snyder, Videographer

16
                         * * * * *

17

18

19

20

21

22

23

24

25
```

Dr. Dan LaFleur - March 18, 2025

```
1                    I N D E X

2

3       Examinations                        Page

4       DR. DAN LaFLEUR

5       BY MS. WALSH:                         4

6                    * * * * *

7                  E X H I B I T S

8       No.    Description                   Page

9       Exhibit 1   2021-03-30, Folks email 106      92

10      Exhibit 2   2021-03-30, Folks email 107      93

11      Exhibit 3   2021-03-31, Mental Health        106

12                  Individual Progress Notes 1

13      Exhibit 4   2021-03-21, Mental Health        111

14                  Service Codes and Level of

15                  Care Review

16      Exhibit 5   2019 directive 13.073,           115

17                  Offender Identification and

18                  Tracking documents

19      Exhibit 6   2021-04-08, Mental Health        125

20                  Service Codes and Level of

21                  Care Review 2

22      Exhibit 7   Exhibit 2021-04-14, Mental       143

23                  Health Individual Progress

24                  Note 5

25                       * * * * *
```

Dr. Dan LaFleur - March 18, 2025

```
 1                    THE VIDEOGRAPHER:  We are now on

 2     the record for the video deposition of Dr. Dan

 3     LaFleur.  The time is 12:31 p.m., March 18th,

 4     2025, in the matter of Joshua Folks versus

 5     Louisiana Attorney General Jeff Landry, et al.

 6     Civil action number 23-CV-01289 SDD, RLB, being

 7     held in the United States District Court for the

 8     middle district of Louisiana.

 9                    The court reporter is Karen

10     Friedlander.  The videographer is Gus Phillips,

11     and both are representatives of Gregory Edwards,

12     LLC.

13                    Will counsel please state their

14     appearances for the record beginning with the

15     plaintiff.

16                    MS. WALSH:  Amanda Walsh, Kenneth

17     Beale, and Erin Murphy for the plaintiff.

18                    MR. BLANCHFIELD:  Andrew

19     Blanchfield on behalf of the defendants.

20                    (DR. DAN LaFLEUR, having been

21     duly sworn as a witness, testified as follows:)

22     EXAMINATION

23     BY MS. WALSH:

24          Q.      Hi, Dr. LaFleur.

25          A.      Hello.
```

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.      My name is Amanda Walsh, and I am
 2     one of the attorneys representing Joshua Folks,
 3     so I'll be taking your deposition.
 4                      Would you please state and spell
 5     your name for the record.
 6              A.      Yes.  My name is Dan J. LaFleur,
 7     M.D. D-A-N J capital L-a-F-L-E-U-R.
 8              Q.      Thank you.  Are you represented
 9     by an attorney today, Doctor?
10              A.      Yes, I am.
11              Q.      And who is that attorney?
12              A.      Mr. Andrew Blanchfield.
13              Q.      Have you ever been deposed
14     before, Doctor?
15              A.      Have I ever been deposed?  Yes, I
16     have.
17              Q.      How many times, approximately,
18     have you been deposed?
19              A.      I'd say about four or five times.
20              Q.      What types of things have you
21     been deposed before?
22              A.      Discussing patients' cases with
23     the malpractice lawyers.
24              Q.      Do you recall when those
25     depositions were, approximately?
```

Dr. Dan LaFleur - March 18, 2025

```
 1              A.      I did one about four years ago,
 2      and then I did some in the '80s and '90s.
 3              Q.      Okay.  Have you ever testified
 4      under oath in any other type of proceeding?
 5              A.      Yes, I have.
 6              Q.      When was that?
 7              A.      That was about three or four
 8      years ago.
 9              Q.      And what caused that?
10              A.      There was a defendant from Angola
11      that was suing the state, and I testified on
12      behalf of the state.
13              Q.      Okay.  I know that you have been
14      in depositions before, but we are going to go
15      over some ground rules just to refresh your
16      memory.  Okay?
17              A.      Okay.
18              Q.      So I'll be asking you some
19      questions and you'll be answering them.  Okay?
20              A.      Yes.
21              Q.      And you understand that you are
22      under oath today?
23              A.      Yes, I do.
24              Q.      What does that mean to you?
25              A.      It means that I promise to God
```

Dr. Dan LaFleur - March 18, 2025

1    that I'm going to tell the truth.

2              Q.       And you will tell the whole truth

3    today?

4              A.       Yes, I will.

5              Q.       So everything that you and I say

6    is going to be written down by our court

7    reporter.  Because our court reporter is writing

8    everything down, it's really important that you

9    answer questions audibly, so with words rather

10   than facial expressions or movements.  Okay?

11             A.       I understand.

12             Q.       And it is very difficult for our

13   court reporter to do her job if we talk over

14   each other.  So I will do my very best to make

15   sure that I do not talk over you while you're

16   answering questions, and I ask that you do the

17   same when I'm asking them.  Okay?

18             A.       Okay.

19             Q.       Now, your attorney may object to

20   some of my questions, and that's okay, but

21   unless your attorney tells you not to answer,

22   you do have to answer my questions.  Okay?

23             A.       Okay.

24             Q.       Now, there may be times where you

25   don't understand something that I'm asking.  If

Dr. Dan LaFleur - March 18, 2025

```
1      you don't understand my question, will you let
2      me know?
3              A.      Yes.
4              Q.      And if you don't let me know,
5      then we will all assume that you do understand
6      the question.   Okay?
7              A.      Okay.
8              Q.      Now, during this deposition, I'll
9      be referring to the Louisiana Department of
10     Public Safety and Corrections as the "D.O.C."
11     Is that okay?
12             A.      Yes.
13                     MR. BLANCHFIELD:  Can I stop you
14     one second?  Is it your intent to leave your
15     camera off for the entirety of this deposition?
16                     MS. WALSH:  Oh, no.  I -- are you
17     guys not able to see me?
18                     MR. BLANCHFIELD:  I just --
19                     THE WITNESS:  No.
20                     MR. BLANCHFIELD:  No, we're not.
21                     MS. WALSH:  Okay.
22                     THE VIDEOGRAPHER:  I think I --
23     if we take us off the record for one second, I
24     think I can fix it, though.
25                     We are off the record.  The time
```

Dr. Dan LaFleur — March 18, 2025

Page 9

```
1        is 12:36 p.m.

2                           (Off the record.)

3                           THE VIDEOGRAPHER:  We are back on

4        the record.  The time is 12:38 p.m.

5        BY MS. WALSH:

6                Q.      So before we went off the record,

7        we were discussing some of the ground rules for

8        our deposition.

9                        So I'll just be going straight

10       back to that.

11                       So we already discussed that I'll

12       refer to the Louisiana Department of Public

13       Safety and Corrections as the D.O.C.  just

14       confirming that's okay with you, Doctor.

15               A.      Yes.

16               Q.      And I'll refer to the Louisiana

17       State Penitentiary as "Angola."  Okay?

18               A.      Yes.

19               Q.      Now, sometimes when we're

20       talking, you might answer a question and then

21       later on during the deposition, you might

22       realize that your answer wasn't entirely correct

23       or there's something that you would like to add.

24       That's okay.

25                       When that happens, will you tell
```

Dr. Dan LaFleur - March 18, 2025

Page 10

```
1      us that you'd like to add or correct your
2      answer?
3              A.      Yes.
4              Q.      And at times during this
5      deposition, you may need a break.  If you do
6      need a break, please let me know.
7              A.      Okay.
8              Q.      If you do ask for a break, and
9      I've already asked a question, you will need to
10     finish your answer before we take a break.  Do
11     you understand?
12             A.      Yes.
13             Q.      And is there any reason you
14     cannot give full, complete, and accurate
15     testimony today?
16             A.      No.
17             Q.      Great.
18                     How did you prepare for this
19     deposition, Doctor?
20             A.      I spoke with my attorney and I
21     read some medical records.  And I sat in and
22     reflected and thought back on the time when this
23     happened and tried to remember anything that I
24     could remember at that particular time.
25             Q.      I don't want to get into any
```

Dr. Dan LaFleur - March 18, 2025

1     specific conversations that you had with your

2     attorney.  But how many times, approximately,

3     did you speak to your counsel?

4              A.      Spoke with him once about this

5     case.

6              Q.      When was that?

7              A.      Yesterday.

8              Q.      And approximately how long was

9     that conversation?

10             A.      About 20 minutes.

11             Q.      Was that in person, over the

12    phone?

13             A.      Over the phone.

14             Q.      Now, I also know that you said

15    you reviewed some documents.  What documents did

16    you review?

17             A.      I reviewed -- reviewed some

18    mental health records, and I reviewed some

19    security records, and I reviewed also

20    compliance.

21             Q.      Those are all related to

22    Mr. Joshua Folks?

23             A.      That's correct.

24             Q.      How did you get those documents?

25             A.      I had them over the email.

Dr. Dan LaFleur - March 18, 2025

Page 12

```
 1              Q.      Were they sent by your counsel?

 2              A.      Yes.

 3              Q.      Did you talk to anybody else

 4   about your deposition today?

 5              A.      I spoke to the medical director

 6   of the D.O.C. and told him that I was doing a

 7   deposition on Joshua Folks, and that is

 8   Dr. Randy Lavespere, but we didn't discuss the

 9   case in particular.

10              Q.      When was that conversation with

11   Dr. Lavespere?

12              A.      I'd say about a month ago.

13              Q.      And approximately how long did

14   that conversation last?

15              A.      About two minutes.

16              Q.      Can you just go over what exactly

17   was said?

18              A.      I said, You know, I'm going to

19   have to do a deposition on Joshua Folks.  And he

20   said, Good luck and have fun.  I said, Okay.

21   Something like that.

22              Q.      All right.  What do you

23   understand this case to be about, Doctor?

24              A.      I understand that this case is an

25   accusation that the state wasn't aware of his
```

Dr. Dan LaFleur - March 18, 2025

```
 1    severe mental illnesses that he was claiming to

 2    have.  And as I reviewed the case, I realized

 3    that some of the claims that he made were not

 4    correct.  And as far as his mental illnesses,

 5    they were mainly personality disorders, rather

 6    than thought disorders.  So he was still in

 7    control of his behavior and his attitude.

 8            Q.      Why do you think that,

 9    Dr. LaFleur?

10            A.      Because with thought disorders

11    like psychoses, a person can lose control of

12    their behavior and their attitude and get lost

13    in their delusions and hallucinations and not be

14    aware of what's going on in the real world.

15                    But Mr. Folks did not have any

16    such diagnosis as far as I was concerned.

17            Q.      How do you know that?

18            A.      Based upon my psychiatrist's

19    diagnosis, Dr. Gamble, who diagnosed him with

20    conduct disorder, antisocial personality, and

21    disruptive personality, and borderline

22    personality.  In none of these conditions is

23    there a thought disorder or psychosis or

24    delusions.

25            Q.      How would you classify those
```

Dr. Dan LaFleur - March 18, 2025

Page 14

1    disorders, if they're not thought disorders?

2            A.      They are personality disorders,

3    personality defects, and -- you know, some

4    people want to control their environment as much

5    as they can, and I believe that's what Mr. Folks

6    was trying to do with his behavior.  He was

7    trying to be in control and didn't accept the

8    fact that he was in prison and he was not in --

9    under control -- or in control.

10           Q.      Why do you think that?

11           A.      I just said because of his

12   personality disorders and the way he behaved and

13   what he did.

14           Q.      We will certainly be turning back

15   to that, Doctor.

16                   For a second, though, I do want

17   to talk to you about the other defendants in the

18   case.

19                   Do you personally know any of the

20   other defendants in this case?

21           A.      Yes.

22           Q.      Do you know Jeff Landry?

23           A.      No.

24           Q.      Do you know Tim Hooper?

25           A.      No.

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.      Do you know Paul Toce?
 2              A.      Yes.
 3              Q.      How do you know Paul Toce?
 4              A.      I worked with him at Angola for a
 5      number of years.
 6              Q.      Do you know approximately how
 7      long you worked with him?
 8              A.      Approximately two years, I would
 9      say, give or take.  Six months.
10              Q.      What was your relationship with
11      him while you were both in Angola?
12              A.      We both took care of patients at
13      Angola.
14              Q.      Did either one of you act in a
15      supervisory capacity to the other?
16              A.      Not at that time, no.
17              Q.      Do you know -- I may butcher
18      this -- Ashli Oliveaux?
19              A.      Yes, I do know Ashli Oliveaux.
20              Q.      How do you know Ashli?
21              A.      Ashli was working at DCI,
22      where -- I went from Angola to DCI to work, and
23      she was one of the wardens at DCI, and that is
24      how I got to know her, before she went back to
25      Angola.
```

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.      My apologies, Doctor.  What does
 2      DCI mean?
 3              A.      Dixon Correctional Institute.
 4              Q.      And how long did you know her?
 5              A.      I would say I worked with her for
 6      about three years, and then she transferred from
 7      DCI to Angola.
 8              Q.      And I know you previously said
 9      that you worked with Matthew Gamble, correct?
10              A.      That's correct.
11              Q.      What was your relationship with
12      Mr. -- or Dr. Gamble?
13              A.      Dr. Gamble was a psychiatrist at
14      Angola and he took care of the patients with
15      severe thought disorders and schizophrenia, as
16      such, at the PU unit at Angola.
17              Q.      Did Dr. Gamble take care of
18      Mr. Folks?
19              A.      Yes.
20              Q.      And how long did you work with
21      Dr. Gamble?
22              A.      About three and a half years.
23              Q.      Were you ever his supervisor?
24              A.      No -- well, yes, I was for a
25      short period of time when I was a medical
```

Dr. Dan LaFleur - March 18, 2025

```
 1      director from, I think, November to -- November
 2      of '20 to May of '21.
 3              Q.      Did you know of Joshua Folks
 4      while you worked at Angola?
 5              A.      Yes, I did.
 6              Q.      Did you ever have personal
 7      interactions with Mr. Folks?
 8              A.      I can't remember, to be honest
 9      with you.  I don't know if there's a medical --
10      it's possible I could have seen him on the ward
11      and written a medical note, but I don't recall.
12              Q.      Okay.  Let's now discuss your
13      background.  Can you describe your educational
14      background for me, Doctor?
15              A.      Okay.  Where do you want me to
16      start?
17              Q.      Let's start with college.  Where
18      did you go to school?
19              A.      Went to school at LSU.
20              Q.      What years were you at LSU?
21              A.      From 1970 to '73.
22              Q.      What did you study?
23              A.      Premed.
24              Q.      Did you have any certifications
25      or specializations when you were at LSU?
```

Dr. Dan LaFleur - March 18, 2025

Page 18

```
1              A.      No.  I went from undergraduate
2    school to medical school in 1973 to '77 at LSU
3    medical school in Shreveport.
4              Q.      When you were at medical school,
5    are you allowed to have specializations or
6    certifications while you are there?
7              A.      No.
8              Q.      What did you do after medical
9    school?
10             A.      I did a residency in family
11   medicine.
12             Q.      Where was that residency?
13             A.      Excuse me?
14             Q.      Where was that residency?
15             A.      At Eglin Air Force base in
16   Florida.
17             Q.      And in that residency, what were
18   you are specializing in?
19             A.      Family medicine.
20             Q.      Can you describe what family
21   medicine means?
22             A.      It means you take care of the
23   entire patient from medical issues, injuries, to
24   psychiatric, to delivering babies.  So it covers
25   a wide gamut of fields or areas.
```

Dr. Dan LaFleur - March 18, 2025

```
1              Q.       You mentioned that you take care
2     of the psychiatric needs of a patient, correct?
3              A.       Yes.
4              Q.       Did you receive any specialized
5     training in psychiatry?
6              A.       Yes.  We had a block on
7     psychiatry, where we spent time with a
8     psychiatrist and learned how to treat them and
9     different diagnoses and what the treatments
10    were.
11             Q.       What does "a block" mean?
12             A.       It is a period of time in the
13    three years that we spent training, block of
14    time on psychiatry.
15             Q.       Approximately how long was that
16    block?
17             A.       It was about a month.
18             Q.       And what are the types of things
19    that you learned about when you were learning
20    about psychiatry?
21             A.       We learned about the different
22    disorders, the most common disorders, the ones
23    that we were expected to treat, and the ones
24    that we were expected to get help with to treat.
25             Q.       What were the ones that you were
```

Dr. Dan LaFleur - March 18, 2025

1    expected to treat?

2             A.       Mainly depression.   That was the

3    big one.

4             Q.       Why were you --

5             A.       Anxiety disorders.   Anxiety

6    disorders, depression, that sort of thing.

7             Q.       Why were those the type of

8    disorders that you were expected to treat?

9             A.       Because they were the most common

10   and the easiest to diagnose and the easiest to

11   give medication for, and the easiest to follow.

12            Q.       You also mentioned that you

13   learned about disorders that you were expected

14   to get help to treat, correct?

15            A.       Yes.

16            Q.       What were those?

17            A.       The major psychosis, like

18   schizophrenia, bipolar 1 disorders, those sort

19   of things.

20            Q.       Would that include manic

21   depressive disorder?

22            A.       Yeah.   Manic depressive goes with

23   the bipolar.   That's the same thing.

24            Q.       Why were you expected to get help

25   with those?

Dr. Dan LaFleur - March 18, 2025

```
 1              A.      Because the -- the seriousness of

 2     the -- the mental issues that they were having

 3     and the need for antipsychotic medication, and

 4     the need to have someone who has a longer

 5     history of taking care of these problems and

 6     dealing with these potent types of medication.

 7              Q.      So what type of person would you

 8     ask for help from?

 9              A.      What type of -- I would ask for

10     help from a psychiatrist.

11              Q.      Now, do you have any

12     certifications, licenses, or special -- besides

13     your residency?

14              A.      No.

15              Q.      Do you have a medical license?

16              A.      Yes.

17              Q.      And when did you get that medical

18     license?

19              A.      In 1977.

20              Q.      And that's still active?

21              A.      Yes.

22              Q.      Do you have any specialized

23     training, besides the block of your residency,

24     dealing with mental health?

25              A.      No.
```

Dr. Dan LaFleur - March 18, 2025

1          Q.       Do you have any specialized

2     training, certifications in dealing with prison

3     populations?

4          A.       No.

5          Q.       Has your medical license ever

6     been suspended or revoked?

7          A.       Yes.

8          Q.       When was that?

9          A.       That was in 2013.

10          Q.       I'm assuming that was a

11     suspension.

12          A.       It was suspended from -- from

13     February to August of 2013.

14          Q.       What caused that suspension?

15          A.       I had a drug problem and I was

16     writing prescriptions for myself.

17          Q.       Have you ever faced any criminal

18     charges?

19          A.       Yes.

20          Q.       When was that?

21          A.       In 2013.

22          Q.       What was that for?

23          A.       That was for writing

24     prescriptions for myself.

25          Q.       And what was the outcome of those

Dr. Dan LaFleur - March 18, 2025

Page 23

1     charges?

2              A.       I had to spend six months of time

3     in federal prison.

4              Q.       Thank you.

5                       Let's go ahead now and discuss

6     your work experience prior to becoming the

7     medical director at Angola.

8                       What jobs did you have leading up

9     to your time at Angola, Doctor?

10             A.       Well, first job I had was with

11    the Air Force.   I was a family practitioner in

12    the Air Force from 1977 to 1985, and I spent

13    four years at Barksdale Air Force base, and was

14    the medical director of the family medicine

15    program at Barksdale.

16                      Then in '85, I got out of the Air

17    Force and went into private practice in

18    Shreveport with the Highland group and spent

19    about a year with them.

20                      And then I moved over and went to

21    be a country doctor in practice about 25 years

22    in a little town by the name of Rayville in

23    North Louisiana.

24             Q.       Let's take those one at a time,

25    if we could.   So first, you said that you were

Dr. Dan LaFleur - March 18, 2025

Page 24

1       with the Air Force, you were a family

2       practitioner, correct?

3               A.      That's correct.

4               Q.      And that was from 1977 to 1985?

5               A.      That's correct.  And three of

6       those years were spent in training, from '77 to

7       '80?

8               Q.      Can you describe that training to

9       me, Doctor?

10              A.      Yes.  We had a program -- a

11      family medicine program at Eglin Air Force base

12      regional hospital, and we had a director who ran

13      the program, and they had a -- different courses

14      that we had to take to complete the program, and

15      we did that over a period of three years.

16              Q.      And did you receive any mental

17      health training as part of that?

18              A.      Yes.  That's where I was talking

19      about the block of time.

20              Q.      Okay.  My apologies.

21                      So after that, you were at -- you

22      were in private practice.  Did I get that right?

23              A.      Yes.  After I got out of the Air

24      Force in '85, I went into private practice with

25      the Highland Clinic in Shreveport for about a

Dr. Dan LaFleur - March 18, 2025

Page 25

```
1      year.
2              Q.      What did you do as part of that
3      private practice?
4              A.      I practiced family medicine and
5      saw patients, hospitalized patients, took care
6      of patients.
7              Q.      Did you ever act in a supervisory
8      capacity in that role?
9              A.      In terms of my clinic, yeah.  I
10     was the chief of the clinic, and I had nurses
11     working for me and x-ray technicians working for
12     me.  Yeah.
13             Q.      What did you do as their
14     supervisor?
15             A.      I made sure that they did their
16     job.  If there was something wrong, I'd ask them
17     to correct it.  That sort of thing.
18             Q.      When you were at that job, how
19     did you determine if someone was, in fact, doing
20     their job?
21             A.      If they would provide the results
22     that I needed to take care of my patients.
23             Q.      Now, after that, you moved to be
24     a country doctor, you said?
25             A.      That's correct.
```

Dr. Dan LaFleur - March 18, 2025

Page 26

```
1              Q.       Talk to me about that, Doctor.
2              A.       I had a friend in medical school,
3    Dr. David Thompson, who asked me to go into
4    practice with him.  He had an older doctor
5    working with him that was getting ready to
6    retire.  And I went on to -- over to Rayville
7    and checked out his clinic and his work
8    situation.  And we felt like it would be a good
9    idea for me to go over there and help him out.
10   And we worked as a team for about 25 years.
11             Q.       What type of work were you doing
12   while there?
13             A.       Family medicine work, taking care
14   of patients, and run the gamut from pediatrics
15   to geriatrics, the nursing home patients.
16             Q.       And while there, did you ever
17   deal with mental health patients?
18             A.       Yes, I did.
19             Q.       Did you ever deal with patients
20   who had the more severe mental illnesses that we
21   talked about earlier, schizophrenia and bipolar
22   disorder?
23             A.       Yes.  We would see patients like
24   that and -- and make a diagnosis or refer them
25   to -- to get further workup and treatment.
```

Dr. Dan LaFleur - March 18, 2025

```
1              Q.      Were you directly involved in

2      making those diagnoses?

3              A.      Yes.

4              Q.      So while practicing there, you

5      did diagnose patients with schizophrenia?

6              A.      Yes.

7              Q.      And bipolar disorder?

8              A.      Yes.

9              Q.      And similar mental --

10             A.      Similar-type illnesses.

11             Q.      So after those 25 years, what did

12     you do?

13             A.      I moved to Baton Rouge and became

14     a teacher at the Baton Rouge Family Practice

15     Residency Program.

16             Q.      What did you teach while you were

17     there?

18             A.      Family medicine.

19             Q.      Did you teach any specific type

20     of class about family medicine?

21             A.      Well, we had all kinds of

22     different classes on different topics in

23     medicine, anything from giving patients IV

24     fluids who were dehydrated to treating strep

25     throat.  You name it, we did it.
```

Dr. Dan LaFleur - March 18, 2025

1          Q.          When you were teaching, were you

2     teaching more academic classes, where you were

3     lecturing to students, or was it very hands on?

4          A.          It was both.   There were lectures

5     and hands on.   We made rounds with the residents

6     in the hospital and saw patients with them and

7     helped guide their treatment.

8          Q.          How many years did you do that?

9          A.          I think I did it for about two

10    years --

11         Q.          My apologies.

12         A.          -- and I didn't really like it

13    that much, so I got back out into private

14    practice.

15         Q.          When you were teaching, did you

16    ever teach any courses about mental health?

17         A.          Not that I can recall.

18         Q.          So you were there for two years.

19                      What did you do next?

20         A.          Then I moved back to North

21    Louisiana and started practicing family medicine

22    with my old partner that I went into practice

23    with originally in Rayville.

24         Q.          And there, again you were doing

25    family medicine, I presume.

Dr. Dan LaFleur — March 18, 2025

Page 29

```
1              A.      That's correct.

2              Q.      Talk to me about the types of

3    patients you were seeing.

4              A.      A wide variety of patients.  We

5    had a clinic where patients who had any

6    particular problem could come in and make their

7    complaints, and we'd try to help them deal with

8    their complaints.  So I would refer them to a

9    specialist, if they needed one.

10                     So it was a wide variety.  And

11   like I said, babies to older patients, and

12   everything in between.

13             Q.      Approximately how long did you do

14   that for?

15             A.      I did that for about 13 years,

16   until I got in trouble.

17             Q.      Okay.

18                     And while you were in that

19   practice, were you seeing mental health

20   patients?

21             A.      Yes.  Mainly depression and

22   anxiety-type problems.

23             Q.      Did you ever have any patients

24   who had one of those more severe mental health

25   issues?
```

Dr. Dan LaFleur - March 18, 2025

1        A.        Yeah, we did, and usually we
2    did -- my partner was a coroner, and we would do
3    either physician emergency certificate or
4    coroner's emergency certificate and get those
5    patients evaluated by a psychiatrist.
6        Q.        So you would send those patients
7    to a psychiatrist for an evaluation?
8        A.        That's correct.
9        Q.        You weren't evaluating them
10   yourself?
11       A.        Well, I would do an initial
12   evaluation that they needed to be seen by a
13   psychiatrist to back up my diagnosis or make
14   another diagnosis.
15       Q.        But ultimately, that
16   responsibility was on the psychiatrist?
17       A.        Yes.
18       Q.        So after that, what did you do?
19       A.        So after what?
20       Q.        So after that period of time, I
21   know you said you had gotten into trouble.  What
22   happened after that?
23       A.        Okay.  Well, after that, I had to
24   go into treatment, and I spent three months in
25   treatment.  And then, as I said before, I went

```
 1    back to the Louisiana State Board of Medical

 2    Examiners.  And in August of 2013, they gave me

 3    a -- a -- what do you call those things?

 4                  MR. BLANCHFIELD:  Probation.

 5           A.       Well, provisional -- I forget the

 6    name of whatever it is.  It's some kind of

 7    proceeding that I had to go get help and that I

 8    had to submit myself to drug screens and alcohol

 9    screens for a number of years, which I signed on

10    to.  So they gave me my license back.

11                  And then I eventually moved to

12    Tallulah to a rural health clinic and practiced

13    family medicine up there until 2017.  And that's

14    when I had to go to prison for six months for my

15    sentence.

16    BY MS. WALSH:

17           Q.       So let's talk about what you were

18    doing before that.  I know you said, again, you

19    were practicing family medicine.  Can you again

20    talk to me about the type of patients that you

21    saw?

22           A.       The same type of patients.

23    Pediatric patients all the way up to geriatric

24    patients.  Orthopedics.  Didn't deliver any

25    patients during that period of time.  We stopped
```

Dr. Dan LaFleur — March 18, 2025

1     delivering back in the '80s.  But a wide range

2     of medical issues.

3         Q.      And I'm going to ask again, did

4     you see any mental health patients during that

5     time?

6         A.      Yes.

7         Q.      And were any of those patients,

8     patients with more severe mental health issues?

9         A.      At that time in my career, no.

10        Q.      Okay.  So what kind of mental

11    health issues were those patients having?

12        A.      Mainly depression and anxiety.

13        Q.      And for those, would you deal

14    with those issues yourself or refer them out?

15        A.      For the most part, myself.

16        Q.      So after that -- we went away for

17    a little bit.  What did we do after that?

18        A.      After that, I got a job in Angola

19    in November of 2017.

20        Q.      When you first started at Angola,

21    what was your job title?

22        A.      Practicing physician.

23        Q.      As a practicing physician, what

24    did you do?

25        A.      Take care of the inmates' health

Dr. Dan LaFleur - March 18, 2025

1    needs.

2         Q.      Could you talk to me more about

3    that?

4         A.      Yeah.  We would see them -- we

5    had a clinic and they would come in, and we'd

6    make medical diagnoses, prescribe medications,

7    do labs and followups to make sure they were

8    responding to their treatments, and, you know,

9    chronic illnesses, we'd see at least twice a

10   year.  So that's predominantly what we were

11   doing.

12               And then we also had what we

13   called ATU, which was kind of like our little

14   emergency room where we took care of patients

15   who had emergencies that would come in.  And we

16   had nurses, emergency medical technicians and

17   paramedics who helped us take care of those

18   patients.

19               And that was about the -- that's

20   my description of what happened over there.

21        Q.      So you said that you would make

22   medical diagnoses.

23        A.      Yes.

24        Q.      Talk to us about what that

25   entails.

Dr. Dan LaFleur - March 18, 2025

```
 1              A.       Well, patient comes, sits down in
 2      a chair and you look at them, they look at you,
 3      and you start talking, ask them, What's your
 4      problem today?  Are you having any issues that
 5      you want to discuss?
 6                       And they may bring up a
 7      particular problem they're having.   And we ask
 8      further questions and try to hone it down and
 9      find out -- or get to a diagnosis -- or get to a
10      differential diagnosis where we can start doing
11      tests and kind of hone it down to a single
12      diagnosis and then prescribe treatment for them.
13              Q.       So when you were making a medical
14      diagnosis, involves talking to the patients?
15              A.       Talking.  80 percent of the
16      diagnosis is based on talking.  About 20 percent
17      is based on physical examination.
18              Q.       And when you were making these
19      diagnoses, were they predominantly for physical
20      ailments, mental ailments?
21              A.       Any kind of ailment they would
22      present to us.
23              Q.       Approximately how many times did
24      you, over the course of you being in that role,
25      diagnose someone with a mental health issue?
```

Case 3:23-cv-01289-SDD-RLB     Document 55-20     07/18/25     Page 35 of 159

```
 1            A.      I didn't diagnose anyone with a
 2   mental health issue at Angola.  If a patient had
 3   a problem that was in the purview of psychiatry,
 4   we would get a mental health consult, or a
 5   direct psychiatric consult with Dr. Gamble.
 6            Q.      Can you describe that process for
 7   me?
 8            A.      Sure.  Back then we wrote on
 9   paper charts, and at the bottom of the chart,
10   whenever we would have a plan, we would do SOAP
11   assessments, subjective, objective, assessment
12   and a plan.  In the plan, we would say something
13   like, this patient needs a psychiatry consult,
14   and then we would put in a psychiatry consult
15   and they would go over to psychiatry and be
16   seen.
17            Q.      How did you decide if a patient
18   needed a psychiatry consult?
19            A.      Based upon what they told me.
20            Q.      If a patient --
21                    Sorry.  Go ahead.
22            A.      I would be sitting there
23   listening to them and I couldn't make sense
24   about what they were saying, and I figured
25   either they were crazy or I was crazy, one of
```

Dr. Dan LaFleur - March 18, 2025

Page 36

1          the two, and I would get a consult.

2                    If you can't -- if you can't

3          follow their thought processes, there's a good

4          chance something's going on with them.  And even

5          issues of depression and anxiety, we would get

6          psych consults because the institution preferred

7          that we have a psychiatrist handle the

8          psychiatric problems rather than us, rather than

9          the practicing doctors.  So that's what we did.

10              Q.      Is that a policy, like a written

11         policy?

12              A.      I don't know.

13              Q.      All right.  So we've discussed

14         that you would make medical diagnoses.

15                    You also mentioned that you would

16         prescribe medications; is that correct?

17              A.      Yes.

18              Q.      Talk to me about that.

19              A.      Well, I'll give you an example.

20         Somebody came in with a sore throat and they had

21         pus on their tonsils.  If I felt like they had

22         strep throat, I would do a strep screen.  If it

23         was positive, then I would prescribe, like,

24         penicillin to them.  That would be an example.

25              Q.      You would prescribe medications

Dr. Dan LaFleur - March 18, 2025

1      based on what a person was telling you their

2      symptoms were?

3              A.      Yep.   Sometimes I would make a

4      diagnosis based upon the history.   Sometimes I

5      would add lab to fortify the diagnosis.   It just

6      depended on the situation.

7              Q.      How did you approach medication

8      management while at Angola?

9              A.      How did I approach medicine

10     management?  Write a prescription, give the

11     patient the medication.   The patient takes the

12     medication.   If it's KOP or keep on person, the

13     person would be responsible for taking his own

14     medication.

15              Sometimes patients weren't able

16     to be responsible and they had to be dispensed,

17     the medication, by the nurses, and they would

18     have to come to the -- what they call pill call,

19     present themselves and ask for their medication.

20     It varied, depending on what the medication,

21     what the illness was, what the diagnosis was.

22             Q.      So you were making diagnoses,

23     prescribing medications.

24              You also said that you were doing

25     labs and follow-ups to make sure patients were

Dr. Dan LaFleur - March 18, 2025

1    responding to their treatments; is that correct?

2         A.        That's correct.

3         Q.        How did you ensure patients were

4    responding to their treatments?

5         A.        Predominantly with followup

6    visits.

7         Q.        Can you describe what those

8    visits entail?

9         A.        They would just show back up at

10   the clinic after a specified period of time and

11   we would ask them how they are doing and if they

12   responded to their medication or not, if they

13   were better.

14        Q.        So that followup was mostly

15   self-report from the patients?

16        A.        Mostly.

17        Q.        Would you ever do followup labs

18   to make sure the problem had dissipated?

19        A.        Yes, of course.

20                  If somebody had a thyroid

21   disorder, and we placed them on, say,

22   methimazole, for example, to slow the thyroid

23   down, we would do followup labs to check their

24   thyroid hormone levels to make sure that they've

25   come down.  That sort of thing is commonly done.

Dr. Dan LaFleur - March 18, 2025

Page 39

```
 1            Q.       Were you ever in charge of doing
 2     followups for mental health patients or was that
 3     psychiatry?
 4            A.       That was mainly psychiatry, but
 5     if the patient had other medical issues, they
 6     would follow up for those other medical issues,
 7     and I would, you know, check on their
 8     psychiatric situation, certainly.
 9            Q.       Describe how you would check up
10     on that psychiatric situation.
11            A.       By talking to them, asking them
12     how they're doing, how their symptoms are.
13            Q.       Okay.  You also noted that you
14     had the ATU.  Can you talk to me about your work
15     in the ATU?
16            A.       Yes.  Sometimes we were assigned
17     to the ATU rather than to the clinic, and the
18     ATU is a place where emergencies would show up.
19     And at Angola, we had emergencies that we -- all
20     the way from doing codes on the patients to keep
21     them alive to minor issues that the patient
22     would complain that they had an emergency.
23     Whenever a patient complained they had an
24     emergency, we had to see them, even if it wasn't
25     an emergency.
```

Dr. Dan LaFleur - March 18, 2025

Page 40

```
 1                    So that's -- we saw, you know, a
 2     wide range.  Lacerations, we had to sew up
 3     lacerations, do laceration repairs.  Trauma.
 4     There was a lot of trauma.  People liked to bite
 5     at Angola.  So we see a lot of issues with
 6     broken jaws, black eyes, that sort of thing.
 7            Q.      Were mental health emergencies
 8     ever reported to the ATU?
 9            A.      Were they reported?  Well,
10     occasionally, a patient would come in with acute
11     psychosis, yes, and we would consult our
12     psychiatrist about those.
13            Q.      And that was Dr. Gamble?
14            A.      Yes.
15            Q.      And so I just want to make sure
16     that I have everything correct.  While you were
17     a practicing physician, you made medical
18     diagnoses?
19            A.      Yes.
20            Q.      You prescribed medications?
21            A.      Yes.
22            Q.      You did labs?
23            A.      Yes.
24            Q.      You followed up to make sure your
25     patients were responding to their treatments?
```

Dr. Dan LaFleur - March 18, 2025

```
 1            A.      Yes.

 2            Q.      And you worked in the ATU?

 3            A.      Yes.

 4            Q.      Is there anything else?

 5            A.      Not that I can think of right

 6    now.

 7            Q.      How long were you a practicing

 8    physician?

 9            A.      My total career?

10            Q.      Just at Angola.

11            A.      Three and a half years.

12            Q.      So that would be November 2017

13    through?

14            A.      May of 2021.

15            Q.      When you were there, did you ever

16    interact with Mr. Folks?

17            A.      I don't recall if I actually laid

18    my eyes upon him.

19            Q.      Do you recall ever speaking about

20    him?

21            A.      Yes.  We had a morning report and

22    some of the healthcare providers would be

23    assigned certain patients to write notes on and

24    to evaluate, check on.  They would see him and

25    write a medical note on him.  And I don't know
```

Dr. Dan LaFleur - March 18, 2025

Page 42

1       whether -- I can't remember whether I actually

2       saw and wrote a medical note on him.

3               Q.      But you do remember others

4       writing medical notes about him?

5               A.      Yes.

6               Q.      What is typically included in a

7       medical note?

8               A.      It's also a SOAP note where you

9       go in and ask them how they're doing.  So they

10      give you a subjective response about how they

11      are doing and how they're feeling.

12                      And then there's the objective

13      part where you do an examination, check their

14      vital signs, look at the labs, put in an

15      assessment part where you assess with what the

16      problems are.  And the plan is for how to deal

17      with the problems.

18              Q.      These reports are discussed in

19      morning meetings?

20              A.      Yes, we -- we discussed the

21      patients in the morning meetings.

22              Q.      Do you discuss all patients in

23      the morning meetings?

24              A.      No.  I wouldn't say all the

25      patients.  Patients that the practitioners were

Dr. Dan LaFleur - March 18, 2025

Page 43

```
1       having problems with, we certainly would
2       discuss.
3               Q.      Do you know why Mr. Folks was
4       discussed at these meetings?
5               A.      I think Mr. Folks had been at
6       Angola before and I had heard his name before,
7       that he was an individual who would do some
8       self-mutilation and needed close supervision to
9       try to prevent him from harming himself.  I do
10      remember that.
11              Q.      Do you recall how many times
12      Mr. Folks was discussed in these meetings?
13              A.      I -- I don't.
14              Q.      Would you say it was more or less
15      than half of the time?
16              A.      Probably less than half the time.
17              Q.      Would it be more or less than 25
18      percent of the time?
19              A.      I can't get that specific.  I
20      can't remember that far back.
21              Q.      While you were at these morning
22      meetings, were there discussions of diagnoses?
23              A.      No.  We left -- we were mainly
24      concerned about the medical issues.  And our
25      main medical issue was to try to prevent him
```

Dr. Dan LaFleur - March 18, 2025

1    from harming himself.

2             Q.       Did you communicate with the

3    mental health department on how to prevent that

4    self-harm in these morning meetings?

5             A.       No.  The mental health was not

6    there.

7             Q.       So you were a practicing

8    physician for three years.

9                      What did you do after that at

10   Angola?

11            A.       I moved to a smaller prison.

12   It's called DCI.  It's in Jackson, Louisiana.

13   It's the prison that does all of the dialysis

14   for the state, and I started taking care of

15   patients there.

16            Q.       Were you practicing -- is it

17   similar to family medicine there?

18            A.       Yeah, similar.  Of course, it's

19   all adult males that we take care of there.  No

20   females, no children.

21            Q.       Did you take care of any mental

22   health illnesses while you were there?

23            A.       Yeah, we seen some mental health

24   illnesses.  We have a psychiatrist who comes to

25   help us there.  His name is Dr. Soong, and he

Dr. Dan LaFleur — March 18, 2025

1        helps us with our psychiatric problems.

2                Q.        When would you seek that

3        psychiatrist's help?

4                A.        Whenever we had patients who —

5        whose behavior was out of the ordinary and made

6        it difficult to be taken care of, we would

7        consult him — or we still consult him.

8                Q.        What would you describe as

9        behavior out of the ordinary?

10               A.        Like, I can give you an example

11       of one.  We have one guy who likes to bang his

12       head, and we had to put a helmet on him to

13       prevent him from harming himself.

14               Q.        So any other examples you can

15       give me?

16               A.        We have a lot of people who do

17       hunger strikes for prolonged periods of time,

18       and sometimes we get the psychiatrist involved

19       with them.

20               Q.        Why would you involve the

21       psychiatrist in a hunger strike?

22               A.        To find out what their issues are

23       and to see if there's a psychiatric illness

24       going on.

25               Q.        Why would you involve the

Dr. Dan LaFleur - March 18, 2025

Page 46

1    psychiatrist in head banging?

2            A.        To try to determine if he has a

3    thought disorder that needs antipsychotic

4    medicine or a major tranquilizer to calm him

5    down.

6            Q.        Would you be comfortable making

7    those determinations yourself?

8            A.        In an emergency situation, when

9    somebody is harming themselves, yes, I would be

10   comfortable in administering an antipsychotic

11   medication to calm him down until we can get a

12   psychiatrist involved.  Yes.

13           Q.        What about in those diagnostic

14   situations, were you comfortable diagnosing

15   those people with mental health issues or

16   disabilities?

17           A.        Yeah.  In my own head, I was very

18   comfortable with making diagnosis.  But I would

19   not make the diagnosis until a psychiatrist has

20   seen him and that we could talk about it and

21   make a decision, kind of a joint decision.

22           Q.        Why?

23           A.        Why?  Because that was his

24   specialty, and I needed it.  If I'm going to

25   consult a consultant, I'm going to listen to

Dr. Dan LaFleur - March 18, 2025

Page 47

```
 1    what he says and try to work with him and come
 2    up with the right diagnosis.
 3                  If I was just going to make the
 4    diagnosis anyway without any help, why would I
 5    even consult him?
 6          Q.     Why did you feel you needed that
 7    consult?
 8          A.     Because they are a specialist and
 9    this is a specialty problem.
10          Q.     Okay.  So after -- how long did
11    you work there for?
12          A.     I'm still working there
13    part-time.
14          Q.     Okay.  So let's go back to your
15    time, then, at Angola.  You were there for three
16    years you said.
17          A.     Yes.  About three and a half
18    years.
19          Q.     Three and a half years.  Okay.
20    So while you were there, you were a practicing
21    physician.
22          A.     That's correct.
23          Q.     Did you ever hold another
24    position at Angola?
25          A.     Yeah.  I became the medical
```

Dr. Dan LaFleur - March 18, 2025

1    director, I think in November or December of

2    2020, and was the medical director until I left

3    in May of 2021.

4           Q.      All right.  I want to talk

5    specifically about your position as medical

6    director.  What are your responsibilities as a

7    medical director?

8           A.      I had to evaluate the people that

9    worked under me, I had to check to make sure

10   that the practitioners that were -- I was

11   supervising were doing their jobs, seeing

12   patients and taking care of them, and -- that

13   was predominantly it.

14          Q.      So you evaluated the people who

15   worked below you, your supervisees, correct?

16          A.      That's correct.

17          Q.      How many people did you

18   supervise?

19          A.      I don't remember the number.

20          Q.      Do you have an approximation?

21          A.      I would guess about 50 people,

22   something like that.

23          Q.      Do you remember the names of any

24   of the people who you supervised?

25          A.      Yes.

Dr. Dan LaFleur - March 18, 2025

1          Q.      What are those names?

2          A.      Cindy Park.  That's all I can

3     remember off the top of my head.

4          Q.      And what did Cindy Park do?

5          A.      She was a nurse practitioner.

6          Q.      What do nurse practitioners do at

7     Angola?

8          A.      They see patients and do similar

9     things to what family practitioners do.

10         Q.      Did you supervise Dr. Gamble

11    during that time?

12         A.      Yes.

13         Q.      Were you the supervisor of the

14    mental health department?

15         A.      I was the overall medical

16    supervisor of the entire medical department.

17         Q.      What does that mean?

18         A.      That means that I evaluate the

19    practitioners below me, and I look at how

20    medical care is given and try to make sure that

21    it's done in a professional and acceptable

22    manner.

23         Q.      Did you supervise EMT staff?

24         A.      I don't remember whether EMTs --

25    I think that I did.  I think they were under me.

Dr. Dan LaFleur - March 18, 2025

1          Q.        What would that supervision have
2     been like?
3          A.        I didn't do any of the
4     evaluations on them, but I was overall over
5     them.  And if any one of them did something that
6     I didn't agree with, I would go to their
7     supervisor and talk to them about it.
8          Q.        How would you have found out if
9     EMT staff did something you didn't agree with?
10         A.        Because I was right there working
11    in the ATU, taking care of patients when EMTs
12    would bring them in.
13         Q.        So in addition to your
14    supervisory capacities as medical director, you
15    also had direct patient contact?
16         A.        I had direct patient -- yes, I
17    did have direct patient contact.
18         Q.        How often did you directly
19    interact with inmates?
20         A.        On a daily basis.
21         Q.        What percentage of your time per
22    day was spent directly interacting with inmates?
23         A.        You're talking about the time
24    that I was a medical director?
25         Q.        Yes.  So exclusively medical

Dr. Dan LaFleur - March 18, 2025

Page 51

1      director right now.

2             A.      I would say 75 percent.

3             Q.      Was the other 25 percent your

4      supervisory or administrative role?

5             A.      Yes.

6             Q.      What were your interactions with

7      patients like?

8             A.      I would go to the clinic.  The

9      patients had a call-out.  They would come to the

10     clinic.  I would stick my head out in the hall

11     and I would call their names and then they would

12     come into the clinic, sit down opposite me, and

13     we would start the interview at that point.

14            Q.      So it was an interview?

15            A.      It started as an interview.

16     Could build up to a physical examination, to

17     blood drawing, that sort of thing, yeah.

18            Q.      How long were each of these

19     interactions?

20            A.      Oh, they varied in time,

21     depending upon the needs of the patient.  I

22     would say anywhere from five minutes to an hour

23     on the typical patient.

24            Q.      Why might you spend an hour with

25     one patient?

Dr. Dan LaFleur - March 18, 2025

Page 52

```
 1            A.      If they had multiple problems,
 2    you have to go through each one.  Each one takes
 3    time.
 4                    If you see a young man with no
 5    problems, just an acute illness, and he presents
 6    with one issue, and it's obvious what it is,
 7    it's obviously going to take less time to deal
 8    with.
 9            Q.      Did anyone else sit in on those
10    interactions.
11            A.      No.  Occasionally, if I needed
12    help, I would call a nurse in.
13            Q.      When would you need help?  When
14    would you call a nurse in?
15            A.      If I needed to lance a boil.
16                    (Court reporter seeks
17    clarification.)
18            A.      If I had to incise and drain a
19    carbuncle or boil.  The nurses would bring in
20    all the material I needed to do the procedure,
21    then they would help me set up everything and
22    get it done.  That would be an example of when I
23    needed a nurse.
24            Q.      Did you ever interact with
25    patients outside of the clinic?
```

Dr. Dan LaFleur - March 18, 2025

Page 53

```
1           A.      Yeah.  Occasionally, some of the
2    patients ran certain concessions and we would
3    buy things from them.  And there was no money
4    exchanged, but they would, you know, charge a
5    certain amount and then we would pay it to
6    the -- to some bursar somewhere and get our
7    goods from them.  That happened occasionally.
8                    But pretty much, I would say, for
9    the most part, there was no interaction, other
10   than me practicing medicine, I'd say 99 percent
11   of the time.
12          Q.      Did you ever interact with sick
13   patients who may be put into the clinic, maybe
14   who were in segregation or weren't able to be
15   moved to the clinic?
16          A.      Yeah.  We had a nursing unit
17   where patients were kept that required more
18   intense nursing care, for example, IV
19   antibiotics, for example, suicide watch.  We had
20   segregation cells where they would be kept.
21          Q.      Did you interact with patients in
22   those?
23          A.      Yes.
24          Q.      Describe those interactions to
25   me.
```

Dr. Dan LaFleur - March 18, 2025

```
1              A.      Well, I'd go into the nursing

2       unit, get their chart, review their chart, see

3       what their primary problem is, how we're

4       treating it, what point in the illness are they

5       at, how much progress they've made.  And then we

6       go out and see them, evaluate them again, and

7       decide where doing from there.

8              Q.      What went into the decision about

9       where to go from there?

10             A.      Well, if they're making

11      improvement, sometimes it's just a matter of

12      continuing the treatment until the problem is

13      resolved.

14                     If they're not making

15      improvement, then you have to reevaluate and

16      consider a different treatment or a different

17      diagnosis.  So that's the sort of things that we

18      had to deal with.

19             Q.      How do you determine that someone

20      is improving?

21             A.      They're getting better.  They're

22      complaining less.  Fewer physical findings.

23             Q.      Did you ever evaluate or -- did

24      you ever interact with mental health patients

25      while you were the medical director?
```

Dr. Dan LaFleur - March 18, 2025

```
1            A.      Yes.   We would go in and a
2     practitioner would see the patient.  But we
3     predominantly were concerned with the physical
4     aspects of the patient and their medical
5     problems, and the psychiatrist was more
6     concerned with the mental and how they were
7     treated for the mental situation.
8            Q.      How did you approach interactions
9     if mental health and physical health were
10    intertwined?
11           A.      Well, I would take care of the
12    physical problems, and the psychiatrist would
13    take care of the mental problems.
14           Q.      So you didn't have much
15    interaction with a mental health diagnoses?
16           A.      Well, we would pay attention to
17    and we would know they had them and we would
18    know that they were being taken care of.  So,
19    yeah, we were aware of what was going on.
20           Q.      Did you have any input on the
21    treatment for a person with a mental health
22    illness?
23           A.      As I said before, only in an
24    emergency situation did we sometimes give them
25    treatment for certain problems that they had.
```

Dr. Dan LaFleur - March 18, 2025

Page 56

```
 1              Q.      I want to go back now and talk a

 2     little bit about your interactions with

 3     Dr. Gamble.

 4                      How much interaction did you and

 5     Dr. Gamble have while you were the medical

 6     director?

 7              A.      Well, quite a bit interaction.

 8     If we had a patient that had a serious

 9     psychiatric illness, we would talk to each other

10     about it, yeah.

11              Q.      Did you ever have formal meetings

12     with Dr. Gamble?

13              A.      No.  Predominantly phone calls.

14     And sometimes I would go in when he would be

15     seeing a patient and -- and observe him

16     examining and doing a mental health exam on the

17     patient, a mental status exam.

18              Q.      Why would you observe him doing

19     that?

20              A.      Because I just wanted to know

21     what was going on with the patient.

22              Q.      Why would it be important for you

23     to know what is going on with one of

24     Dr. Gamble's patients?

25              A.      Because they are my patient too.
```

Dr. Dan LaFleur - March 18, 2025

Page 57

1              Q.        So even if somebody is

2       exclusively suffering from a mental health

3       issue, they're still your patient?

4              A.        Sometimes yes; sometimes no.  If

5       they're suffering exclusively from a mental

6       health issue and they're being kept at TU, then

7       I don't see the patient, unless they had a

8       physical complaint, and then we'll go over and

9       take care of it.

10             Q.        What is TU?

11             A.        I don't know what the T and the U

12      stand for, but that's the psychiatric unit.

13             Q.        What kind of patients does the TU

14      house?

15             A.        Psychiatric illnesses that

16      require close observation by a psychiatrist, and

17      he would determine who would be there and how

18      long they would be there and how he treated him.

19             Q.        So Dr. Gamble is in charge of who

20      goes to the TU?

21             A.        Yes.

22             Q.        And how they're treated?

23             A.        Yes.

24             Q.        And only psychiatric patients are

25      housed at the TU?

Dr. Dan LaFleur - March 18, 2025

Page 58

```
1              A.      Yes.  Now, you know, psychiatric
2     patients are patients too.  They have other
3     problems, other medical issues, and we dealt
4     with those.
5              Q.      I'd like to talk about your
6     oversight of the mental health services
7     department.  I know that you were over them.
8     What was your oversight of that department like?
9              A.      Talked to Dr. Gamble and asked
10    him how he was doing over there, if he needed
11    anything, that sort of oversight.
12             Q.      Did you interact with any other
13    mental health professionals in your supervisory
14    capacity?
15             A.      Yeah.  We had social workers who
16    saw patients, and a lot of times when they were
17    having issues, the social workers would come out
18    and they would be the first contact for the
19    mental health providers.
20             Q.      Why would you interact with
21    social workers.
22             A.      Because they would see the
23    patient.
24             Q.      So as the medical director, how
25    often would you interact with social workers?
```

Dr. Dan LaFleur - March 18, 2025

Page 59

1           A.        As a medical director, rarely;

2    but as a practicing physician, often.

3           Q.        Okay.  So to clarify, when you

4    were a practicing physician, you would have

5    consistent interaction with social workers?

6           A.        Yes.

7           Q.        But as the medical director, you

8    would not?

9           A.        That's right.

10          Q.        So let's talk specifically about

11   your time as medical director.  So when you're

12   overseeing the mental health department, are you

13   interacting with anyone from the mental health

14   department besides Dr. Gamble?

15          A.        Yeah.  We had social workers that

16   came through our medical meetings in the morning

17   on occasions to explain what was going on with

18   their patients, and issues.

19                    Or if we had any problems getting

20   social workers to see patients when we -- when

21   we wanted them to see them, if we had any issues

22   with that, we would have them come over and

23   discuss the best way to take care of the

24   patients.  So, yeah, we had interactions.

25          Q.        Did you ever supervise any of

Dr. Dan LaFleur - March 18, 2025

Page 60

```
1        those social workers?
2               A.      No.  I don't -- I wasn't the
3        direct supervisor of social workers.
4               Q.      Did you have any say into what
5        the mental health services department was doing
6        on a day-to-day basis?
7               A.      I'm sure if I wanted to, I could
8        have, but they were running their show pretty
9        well, so I didn't want to fix anything that
10       wasn't broken.
11              Q.      How did you know they were
12       running it well?
13              A.      Because they were taking care of
14       the patients.
15              Q.      How did you know they were taking
16       care of the patients?
17              A.      Because when I see the patients,
18       I would see notes on their chart and plans and
19       so forth.
20              Q.      How often did you ask to see
21       these notes on their charts?
22              A.      Usually, if I was seeing the
23       patient on the nursing unit, I would want to see
24       their notes.
25              Q.      So you were predominantly
```

Dr. Dan LaFleur - March 18, 2025

```
1        reviewing notes from patients that you were

2        seeing?

3                A.        That's correct.

4                Q.        While you were the medical

5        director?

6                A.        It was integrated care, you know,

7        medical, and -- and psychiatric.

8                Q.        Did you ever ask to see the notes

9        of patients you weren't directly taking care of?

10               A.        I don't remember.

11               Q.        Did you determine whether mental

12       health services was doing their job in any other

13       way, besides seeing these patient notes?

14               A.        Yeah.  I saw the patients and

15       could tell whether they were being treated or

16       not.

17               Q.        How did you make a determination

18       as to whether or not the patient was being

19       treated?

20               A.        I knew what medications they were

21       on, and the psychiatric medications were

22       prescribed by the psychiatrist.  And I would see

23       the patient and see how they were doing, ask

24       them how they were feeling, and they would

25       respond to me, and I'd make a determination on
```

Dr. Dan LaFleur - March 18, 2025

1      that.

2              Q.      If you determined that a patient

3      was not doing better, what did you do?

4              A.      I would want to talk to

5      Dr. Gamble.

6              Q.      Did that ever happen during your

7      time as medical director?

8              A.      Yes.  There were multiple

9      instances where I would call him up and ask him

10     what was going on, what the plan was, yeah.

11             Q.      Did you, as a result of those

12     conversations, ever make a change in the

13     treatment for a patient?

14             A.      Did I make a change?

15             Q.      Yes.

16             A.      Well, I made many changes on

17     their medical treatment, but if they -- a

18     psychiatric medication needed to be changed, it

19     would be Dr. Gamble who would change it.

20             Q.      So if you determined that mental

21     health services was not progressing a patient's

22     treatments, what would you do?

23             A.      I would want to know what his

24     plans were.

25             Q.      Was there ever a situation where

Dr. Dan LaFleur - March 18, 2025

Page 63

1    you disagreed with Dr. Gamble's plans?

2           A.      Not that I recall.

3           Q.      I want to go ahead now and talk

4    about some of your other responsibilities as

5    medical director.  Were you ever in charge of

6    hiring as the medical director.

7           A.      I wouldn't say I was in charge,

8    but I was part of the team that would interview

9    and make a decision on whether to hire somebody.

10          Q.      Can you describe your role on

11   that team?

12          A.      Yeah.  We would meet the person

13   at human resources and ask them questions about

14   their past medical training, and at times even

15   present them with particular scenarios and ask

16   them how they would handle it.

17          Q.      So you were part of the team that

18   interviewed?

19          A.      Yes.

20          Q.      Did you ever determine whether

21   there were inappropriate vacancies at Angola?

22          A.      Say that again.

23          Q.      Did you ever determine that there

24   were vacancies that needed to be filled at

25   Angola?

Dr. Dan LaFleur - March 18, 2025

Page 64

1          A.        We always needed more help,

2    nursing help, yeah, I mean -- but I don't recall

3    any particular vacancy that comes to mind.

4          Q.        How did vacancies impact your

5    work?

6          A.        How did vacancies -- like -- I

7    don't -- I don't recall any particular vacancies

8    that impacted my work.

9          Q.        Were you in charge of training

10   while medical director at Angola?

11         A.        No.

12         Q.        So you were not involved in

13   orientation?

14         A.        No.

15         Q.        Not for doctors or nurses?

16         A.        No, I take that back.  I did have

17   an orientation booklet that I would give new

18   doctors.  But I don't think I had -- I had one

19   new doctor who presented while I was the medical

20   director, and I gave him the booklet, yeah.

21         Q.        Did you do any other training

22   besides handing that employee the booklet?

23         A.        Yeah.  I mean, I would see

24   patients with them initially and show them how

25   to do consults and how to order labs and how to

1    go through the process, where they needed to be,

2    that sort of thing, yeah.

3             Q.        And that was the only time that

4    you trained an employee?

5             A.        It was mainly physicians, yeah,

6    if a new physician came in.  And that happened

7    once while I was there.

8             Q.        Did you ever do any training for

9    nurses?

10            A.        I don't think so.

11            Q.        Any training for security staff

12   about prisoners with medical issues?

13            A.        I don't think so.  Yeah.  Did I

14   personally do the training for them?  No.  I

15   know that they all had training, but I wasn't

16   the one doing the training.

17            Q.        Do you know what that training

18   involved?

19            A.        Yeah.  We did ACLS training.

20   That was run by the EMTs, and, you know, the

21   whole of our licenses, we have to do a certain

22   number of hours of continuing medical education.

23   So we all had to do those.

24            Q.        When you, yourself, were doing

25   continuing medical education sessions, did any

Dr. Dan LaFleur - March 18, 2025

1    of those involve patients with mental health

2    issues?

3            A.      Yes.

4            Q.      Can you describe those to me?

5            A.      I can't recall each and every

6    one, but I belong to the American Academy of

7    Family Physicians, and I subscribe to The

8    American Family Physician and Family Practice

9    Essentials, which we get all of our continuing

10   education.  And in those editions, we get one a

11   month that covers various topics, anything from

12   mental health to -- to different medical

13   problems, and we read the monograph and we take

14   a quiz and get credit for that, yeah.

15           Q.      Do you recall any specific

16   trainings on mental health?

17           A.      Yeah.  There's some on

18   depression, some on anxiety states.  Those were

19   the predominant ones that I recall.  I'm sure

20   there are others that I can't recall.

21           Q.      Any specific trainings on

22   diagnosing mental health issues?

23           A.      Yeah.  All of those issues talked

24   about how to diagnose a psychiatric problem, how

25   to diagnose anxiety, how to diagnose depression,

Dr. Dan LaFleur — March 18, 2025

1    how to treat them, that sort of thing, yeah.

2         Q.      Were there any of that discussed

3    at diagnosing more severe mental illness, like

4    schizophrenia or bipolar disorder?

5         A.      Yeah, but we had issues that

6    covered that, yeah.

7         Q.      Do you remember a specific issue

8    that discussed that?

9         A.      Well, I have about a thousand

10   monographs, and I can't recall a specific one,

11   no.

12        Q.      Now, as medical director, are you

13   in charge of setting policies that apply to

14   medical staff?

15        A.      Yes.  I was in charge of

16   approving policies that were written by other

17   people, and I could interject or add or detract

18   from the policies that were written.

19             So I had to review them and sign

20   them, or review them and make changes.

21        Q.      Can you describe that process to

22   me?

23        A.      Yeah.  It's done on the computer,

24   and I forget the name of the program, but they

25   would send me the policies over the computer and

1     I would read them.  And there was a way that I

2     could make changes or add or I could just sign

3     off on it.

4          Q.     What policies were you in charge

5     of reviewing?

6          A.     All medical policies.

7          Q.     That would include policies

8     related to mental health?

9          A.     Yes.

10          Q.     What did you do when you were

11     reviewing a policy?

12          A.     I would read it, think about it,

13     decide whether I agreed with it or not.

14          Q.     When you were reviewing policies,

15     what were you looking for?

16          A.     I was looking for the content of

17     what they were trying to say in the policy and

18     deciding whether it was appropriate or not.  And

19     if it was, I would sign off on it; if it wasn't,

20     I would make changes.

21          Q.     How would you decide whether a

22     policy was appropriate?

23          A.     By reading it and knowing whether

24     it was appropriate or not.

25          Q.     How did you know?

Dr. Dan LaFleur - March 18, 2025

1          A.          From past experience and past

2     education.

3          Q.          Did you ever consult with anyone

4     else while you were reviewing policies?

5          A.          Yes, because whenever I would

6     review a policy and I would request that a

7     change be made on it, it would go out to all of

8     the individuals who were involved in writing

9     policy.

10          Q.          Prior to requesting a change, did

11     you ever ask someone to consult on a policy?

12          A.          No.

13          Q.          Why not?

14          A.          Because if I agreed with it, I

15     would sign it and that would be it, it would be

16     the policy.

17          Q.          So describe the process when you

18     determined a policy was not appropriate?

19          A.          There's a little box where I

20     could write down what I thought about it, what I

21     didn't like about it, what I thought should be

22     done, and I would write it in there.  And then

23     the other people who were involved in the policy

24     would read that and either agree with me or

25     disagree with me.

Dr. Dan LaFleur - March 18, 2025

1          Q.        So did you have the ultimate say

2     about which policies were and were not adopted?

3          A.        No.  I didn't have the ultimate

4     say.  It was a group decision.

5          Q.        What people were involved in that

6     group decision?

7          A.        Other medical people who wrote

8     the policies.

9          Q.        Did you write a policy yourself?

10         A.        No.  I never wrote a policy.

11         Q.        When you were medical director,

12    how many policies did you determine were

13    inappropriate?

14         A.        I can't remember that -- an

15    answer to that.  I would say a few, two to three

16    to four, something like that.

17         Q.        So less than ten?

18         A.        Yeah.

19         Q.        Did you review mental health

20    policies?

21         A.        I don't recall.  I don't know

22    whether I did or Dr. Gamble did.  I think it was

23    Dr. Gamble that reviewed them.

24         Q.        How do you ensure that these

25    policies are followed as medical director?

Dr. Dan LaFleur - March 18, 2025

```
 1              A.      How did I ensure they were
 2    followed?  Well, I asked all of the people who
 3    worked that -- to follow the standard policies
 4    that were written, all the way --
 5              Q.      How did you --
 6              A.      -- all the way from the security
 7    people to the medical people.
 8                      And there were instances when
 9    extraordinary circumstances, you know, precluded
10    to following certain policies.
11              Q.      Can you describe some of those
12    extraordinary circumstances to me?
13              A.      Yeah.  Somebody was dying before
14    our eyes and stopped breathing and their heart
15    stopped beating.  That would be an extraordinary
16    policy where we had to look at them and decide
17    whether they were able to be resuscitated or not
18    and had to make a decision on when to stop the
19    resuscitation.  And I don't think any policy can
20    tell you exactly when that point is.
21              Q.      So you ensured that staff members
22    were following policies because you asked for
23    them to follow the policies, correct?
24              A.      Yes.
25              Q.      Did you do anything else to
```

Dr. Dan LaFleur - March 18, 2025

Page 72

```
1       ensure people were following these policies?

2              A.      Did I do anything else?  No.

3              Q.      How would you know if a policy

4       was not being followed?

5              A.      I don't know.

6              Q.      And do you know what happens if a

7       policy is not being followed?

8              A.      If we discover somebody is not

9       following a policy, we bring them in and ask

10      them to follow policy.

11             Q.      Approximately how many times did

12      that happen when you were a medical director at

13      Angola?

14             A.      I don't recall doing that.

15             Q.      Do you know how many policies

16      relate to medical health at Angola?

17             A.      No.

18             Q.      Approximately how many of the

19      policies were you expected to be familiar with?

20             A.      I don't know.

21             Q.      How did you ensure your

22      familiarity with these policies?

23             A.      By reading them.

24             Q.      Did you do anything besides

25      reading them?
```

Dr. Dan LaFleur - March 18, 2025

Page 73

1           A.        Well, I said a while ago, you

2    know, if the policy had something in it that I

3    disagreed with, I could request a change be made

4    in it.

5           Q.        And how often as medical director

6    did you refer to a policy in your day-to-day

7    responsibilities?

8           A.        How often?  I would say about

9    once a day.

10          Q.        And why might you refer to a

11   policy?

12          A.        Well, because there are certain

13   issues in prison that I'm not exactly familiar

14   with, because I see things from a medical point

15   of view, but I have to take the prison's point

16   of view into context with certain issues.  So I

17   have to read the policy to know how they -- how

18   they work together.  And that happens

19   occasionally.

20                    Like, for example, like I said,

21   the -- when patients would go on hunger strikes,

22   we would have to know what the policy was to

23   carry out the policy in detail, and the only way

24   I could know that is by reading the policy.

25                    MS. WALSH:  We now have been

Dr. Dan LaFleur - March 18, 2025

Page 74

```
1      going for about an hour and a half.  I know that
2      I could use a break.  Do we want to go ahead and
3      take, let's say, seven minutes, come back at
4      2 -- well, it's 2:05 for us.
5                      MR. BLANCHFIELD:  That's fine.
6                      THE VIDEOGRAPHER:  Off record,
7      Counsel?
8                      MS. WALSH:  Yes, please.
9                      THE VIDEOGRAPHER:  We are off the
10     record.  The time is 1:58 p.m.
11                     (Recess.)
12                     THE VIDEOGRAPHER:  We are back on
13     the record.  The time is 2:10 p.m.
14     BY MS. WALSH:
15          Q.      Doctor, before the break, we were
16     discussing your roles and responsibilities as
17     medical director.  I want to continue on that
18     for a little bit longer.
19                     In your role as the medical
20     director, did you ever discuss inmates with the
21     deputy warden of the prison?
22          A.      I'm sure I did, but I can't
23     recall any specific instances.
24          Q.      Why would you discuss an inmate
25     with a deputy warden?
```

Dr. Dan LaFleur - March 18, 2025

Page 75

```
 1                  A.       When there were prison issues
 2      associated with their medical issues, that --
 3      when the two collided or there was a problem
 4      that needed to be addressed.
 5                  Q.       What is a prison issue?
 6                  A.       Excuse me?
 7                  Q.       You mentioned that you would talk
 8      to the deputy warden when a prison issue and a
 9      medical issue collided.  What is a prison issue?
10                  A.       Prison issue would be we can't
11      just send the patient out for specialty care
12      without involving the wardens to make sure that
13      security is involved and the patient is handled
14      properly from the prison point of view for
15      public safety aspects and so on.
16                  Q.       How often did you discuss inmates
17      with the deputy warden of the prison?
18                  A.       Rarely.
19                  Q.       When you did discuss, what were
20      those communications like?
21                  MR. BLANCHFIELD:  Object to the
22      form.  We've been at this for over an hour and a
23      half, and this is a defendant who was present at
24      Angola for a little over a month during the time
25      that the plaintiff was there.  I'm going to ask
```

Dr. Dan LaFleur - March 18, 2025

1          you to get to some relevant questioning, because

2          most of the questions you asked in the last hour

3          and a half, other than his background, have been

4          fairly meaningless.

5     BY MS. WALSH:

6               Q.      Dr. LaFleur, please answer my

7     question.

8               A.      What question?

9               Q.      What were your communications

10    with the deputy warden like?

11                      MR. BLANCHFIELD:  Object to the

12    form.

13                      THE WITNESS:  They were -- when I

14    did have one -- I can't really recall any

15    specific one -- but they were business like.

16    BY MS. WALSH:

17              Q.      Were they in person?

18              A.      Sometimes yes.

19              Q.      Were they over the phone?

20              A.      Sometimes yes.

21              Q.      In your role as medical director,

22    did you ever discuss inmates with the warden of

23    the prison?

24              A.      I can't recall.  I don't think

25    so.

Dr. Dan LaFleur — March 18, 2025

Page 77

```
1              Q.       Were there any issues that would
2    require communication with the warden?
3              A.       I don't recall.
4              Q.       Let's switch gears a little bit.
5    Let's now talk about The Americans with
6    Disabilities Act.  Doctor, as medical director,
7    are you familiar with The Americans with
8    Disabilities Act?
9              A.       Yes, I've heard of it.
10             Q.       What is your understanding of
11   that act?
12             A.       To make life better for people
13   with disabilities.
14             Q.       How did you become familiar with
15   the act?
16             A.       I remember when it was passed.
17   It was -- President Bush was president back
18   then, first Bush.
19             Q.       Did you receive any training on
20   the ADA?
21             A.       No.
22             Q.       Are you in charge of ensuring
23   that the prison is compliant with the ADA?
24             A.       No.
25             Q.       Who at the prison would be in
```

Dr. Dan LaFleur - March 18, 2025

Page 78

```
1    charge of making sure Angola is compliant with
2    the ADA?
3                    MR. BLANCHFIELD:  Are you talking
4    about now, today?
5    BY MS. WALSH:
6            Q.      When you were medical director,
7    who was in charge of making sure the prison was
8    compliant with the ADA?
9            A.      I think the wardens were.
10           Q.      Who at the prison should be
11   familiar with the ADA?
12           A.      The doctors and the wardens.
13           Q.      Let's now transition and talk
14   about housing arrangements at Angola.  What type
15   of housing can inmates receive when they
16   transition into Angola?
17           A.      You know, I'm not an expert on
18   prison housing, but I do know that there are
19   dorms out there, and for behavior problems,
20   there are cell blocks where they are locked up.
21   And I do know that at Angola, there was a
22   psychiatric unit called TU.  And then I do know
23   that there is a Robert Wharton Treatment Center
24   where the clinics were held and where the ATU
25   was for medical care for the patients.
```

Dr. Dan LaFleur - March 18, 2025

Page 79

```
 1              Q.       Let's talk a bit more about the
 2    TU.  It's my understanding that there is an
 3    upper TU; is that correct?
 4              A.       I know that it was more than one
 5    floor, yeah.
 6              Q.       Do you know who was housed on the
 7    upper floor of TU?
 8              A.       I don't recall.
 9              Q.       Who was housed on the lower floor
10    of TU?
11              A.       I don't recall.
12              Q.       Have you heard of something
13    called the time-out cell, Doctor?
14              A.       Yeah.  I read about it in the
15    Complaint.
16              Q.       As medical director, did you have
17    familiarity with the time-out cell?
18              A.       I don't know that that's what we
19    called it, but I was familiar with all of the
20    cells, yeah.
21              Q.       What would you have called it?
22              A.       I would have called it a single
23    person cell.
24              Q.       So what you're calling a single
25    person cell is what's referred to as the
```

Dr. Dan LaFleur - March 18, 2025

Page 80

```
1      time-out cell in the Complaint?
2              A.      I don't know.
3              Q.      Describe a single person cell to
4      me.
5              A.      It's a cell with a -- one bed in
6      it and one inmate in the cell.
7              Q.      Where is that single cell
8      located?
9              A.      I don't -- we had single cells in
10     the nursing unit, and I -- I don't know where
11     they were in the TU.
12             Q.      You are familiar with single
13     cells in TU, though, correct?
14             A.      Yes.
15             Q.      Are there policies that govern
16     single cells in TU?
17             A.      Yes.
18             Q.      What are those policies?
19             A.      I don't know.
20             Q.      -- when you were a medical --
21             A.      I can't answer that.  I don't
22     have that information in front of me.
23             Q.      When you were a medical director,
24     were you familiar with those policies?
25             A.      Was I familiar with them?  I knew
```

Dr. Dan LaFleur - March 18, 2025

Page 81

1          they existed.

2                  Q.      Did you read those policies when

3          you were a medical director?

4                  A.      I can't remember.

5                  Q.      Who can be placed in a single

6          cell inside the TU?

7                  A.      Anyone could be placed in the

8          single cell in the TU.  But there were certain

9          instances where I believe it was for the

10         patient's safety or other inmates' safety that

11         they were placed in a single cell.

12                 Q.      Can a patient be placed in a

13         single cell in the TU if they do not suffer from

14         a psychiatric illness?

15                 A.      They wouldn't be in the TU if

16         they didn't suffer from some sort of psychiatric

17         illness.

18                 Q.      Can that single cell be used for

19         disciplinary purposes?

20                 A.      I don't think that's in the

21         policy.

22                 Q.      So they cannot be used for

23         disciplinary purposes?

24                 A.      I think that's correct.

25                 Q.      How long can a person be placed

Dr. Dan LaFleur - March 18, 2025

Page 82

1      in that TU single cell?

2              A.      I'm not sure.  I don't have the

3      policy in front of me.

4              Q.      Do you know how long an inmate,

5      on average, might be placed in that single cell

6      in the TU?

7              A.      No.

8              Q.      What makes the single cell in the

9      TU necessary?

10             A.      As I stated previously, for the

11     patient's protection and for the protection of

12     other inmates.

13             Q.      Why might a patient need the

14     protection that that single cell can offer?

15             A.      Well, I gave a good example

16     previously about the head banger that we were

17     dealing with at DCI.  We had to place him in a

18     single cell and had to restrain him to keep him

19     from banging his head and harming himself.  That

20     would be an example of someone that would be in

21     a single cell.

22             Q.      Do you have other examples?

23             A.      Not offhand, no.

24             Q.      Do you know how much supervision

25     an inmate in the TU single cell would receive?

Dr. Dan LaFleur - March 18, 2025

Page 83

1           A.      I don't have the policy in front
2      of me, so I can't tell you right offhand, no.
3           Q.      From your personal recollection,
4      how much supervision were inmates in single
5      cells in the TU receiving?
6           A.      Fairly close observation.
7           Q.      At what interval were these
8      patients being supervised?
9           A.      I don't have the policy in front
10     of me, so I can't tell you the exact number of
11     minutes or whatever.
12          Q.      To your personal recollection, do
13     you know?
14          A.      No.  I can't tell you offhand.
15          Q.      Do you recall what kinds of
16     personal property or materials are allowed in
17     that single cell?
18          A.      I think it depends on the
19     situation.
20          Q.      What are the dependent factors?
21          A.      Whether they are on extreme
22     suicide watch or not.  Patient is restrained and
23     they are worried about, you know, harming
24     himself, they'll put him in a paper gown, and
25     restrain him.  Anything from a four-point to a

Dr. Dan LaFleur - March 18, 2025

Page 84

1          five-point restraint.

2                    Q.      What is extreme suicide watch?

3                    A.      When you're concerned that a

4          patient is going to kill themselves.

5                    Q.       Is that different than standard

6          suicide watch?

7                    A.      Well, standard is less extreme

8          than extreme.

9                    Q.      Could you describe the

10         differences for me?

11                   A.      Standard is you don't have a

12         five-point restraint on them.  You may have a

13         two-point restraint or a four-point restraint,

14         you're not as concerned, they're not as an acute

15         phase of their problem when you step it down

16         from extreme to standard.

17                   Q.      How do you determine if someone

18         is on standard suicide swatch or extreme suicide

19         watch?

20                   A.      By talking to them.

21                   Q.      What types of things are said in

22         that conversation that make you determine --

23         let's withdraw that.

24                   A.      Somebody says, I'm going to kill

25         myself, or somebody says, I'm not going to kill

1    myself, that will have an effect on how you

2    handle the situation.

3          Q.      Anything else?

4          A.      Their past history, their

5    diagnoses.  All of those things play a part in

6    your decision in what the next step is.

7          Q.      How does a person's past history

8    impact that determination?

9          A.      People sometimes repeat their

10   past history, so you have to -- if they've done

11   something in the past, you have to be aware of

12   it and keep an eye on it so that they don't

13   repeat it.

14         Q.      How does someone's diagnosis

15   impact that determination?

16         A.      I don't know.

17         Q.      Were you ever involved in

18   determining whether someone should be on

19   standard or extreme suicide watch?

20         A.      Yes.  With the social workers who

21   saw the patient that felt like they were in

22   danger would call us and get permission to place

23   them on suicide watch.

24         Q.      How were you involved?

25         A.      They would call us and ask us,

Dr. Dan LaFleur - March 18, 2025

Page 86

1      and if we felt like they needed it, we would let

2      them do it.

3              Q.      How did you determine whether or

4      not it was appropriate?

5              A.      Based on what they told us.

6              Q.      Did you ever do physical or

7      in-person evaluations of inmates --

8              A.      Yes.

9              Q.      -- when determining whether or

10     not they would be standard or extreme?

11             A.      No.  That was based upon what

12     social workers told us.

13             Q.      So when you --

14             A.      You follow up with the patient

15     and see them and make a decision whether to

16     continue or not.

17             Q.      So when you were first

18     determining if someone was going to be on

19     standard or extreme suicide watch, you were

20     exclusively basing your decision on what the

21     social worker said?

22             A.      I wouldn't say exclusively,

23     because a lot of times, we knew who these

24     patients were and already had information about

25     them.

Dr. Dan LaFleur - March 18, 2025

Page 87

```
 1                    But usually, when they would call
 2     us, it would be in a crisis situation where
 3     there was concern about the patient's welfare
 4     and -- but it was based on our knowledge of them
 5     and what the social workers were saying, yeah.
 6            Q.      When you say your knowledge of
 7     them, what are you referring to?
 8            A.      If we knew the patient.  Because
 9     a lot of the guys up there were -- you know,
10     like I said, their past history told their
11     story, they would do the same thing over and
12     over again.  So we knew a lot of them.
13            Q.      If you weren't familiar with a
14     patient, what would you do?
15            A.      We would take the social worker's
16     word for the situation and do what was necessary
17     to protect the patient.
18            Q.      Are social workers trained on
19     diagnosing mental illnesses?
20            A.      No, but they're trained on
21     evaluating situations and determining whether
22     they are dangerous or not.
23            Q.      Do you know how a person's
24     physical health is monitored in that TU single
25     cell?
```

Dr. Dan LaFleur - March 18, 2025

Page 88

```
 1              A.      I can't remember the policy on
 2      that.
 3              Q.      From your personal recollection,
 4      do you recall?
 5              A.      I can't remember the policy on
 6      that.
 7              Q.      Do you have any recollection at
 8      all, not of the policy --
 9              A.      I can't remember the policy on
10      that.
11              Q.      Do you recall how a person's
12      mental health is monitored in a time-out cell?
13              A.      I can't remember the policy on
14      that.
15              Q.      So again, I'm not asking about
16      the policy, Dr. LaFleur, I'm asking about your
17      own personal recollection about what happened
18      when you were the medical director.
19              A.      I'm not certain what you're
20      talking about.
21              Q.      I can rephrase.
22                      Based on your memory of the time
23      that you were medical director, how was a
24      person's mental health monitored in that TU
25      single cell?
```

Dr. Dan LaFleur - March 18, 2025

Page 89

```
 1            A.        It was monitored by the social
 2   workers and the psychiatrists.
 3            Q.        How did they monitor a person's
 4   mental health?
 5            A.        I don't have the policy in front
 6   of me, so I'm not certain of the exact procedure
 7   of how they did it.
 8            Q.        Again, Doctor, I'm asking about
 9   your own personal recollection, so not your
10   recollection of the policy, but how you recall
11   that these people were monitored -- how these
12   inmates were monitored.
13            A.        I didn't supervise the social
14   workers and the psychiatrists personally
15   monitoring the patients, so I can't answer your
16   question.
17            Q.        Let's go ahead and quickly
18   discuss the admissions process for inmates at
19   Angola.  Were you ever involved in that
20   admissions process?
21            A.        Yes.
22            Q.        Describe your involvement.
23            A.        Well, we would see each inmate,
24   and as practitioners there, we would find out
25   what their medical diagnoses were, what
```

Dr. Dan LaFleur - March 18, 2025

```
 1    medications they were on, and make sure that

 2    they -- that their medications were ordered and

 3    we would get them.  To schedule future

 4    appointments or make sure that if they had any

 5    specialty appointments that needed to be taken

 6    care of, that we would get that information from

 7    trips where they could get the appointments

 8    arranged.

 9                    And then follow them up in a

10    clinic visit, when we call an intake visit.

11          Q.      How did you find out a prisoner's

12    medical diagnoses?

13          A.      Well, they were sent with the

14    prisoner.  We had records and we had history

15    from the prisoner himself.

16          Q.      Who sent over those medical

17    records?

18          A.      Whoever took care of the patients

19    before we did.

20          Q.      So that could have been another

21    prison?

22          A.      Could have been another prison,

23    could have been a hospital.

24          Q.       It could have been a primary care

25    provider?
```

Dr. Dan LaFleur - March 18, 2025

Page 91

1           A.      Yes.

2           Q.      How did you find out the
3    medications that a person was on?

4           A.      A few ways.  from the records and
5    from what the prisoners told us.

6           Q.      Can you describe what happened
7    during the intake visit?

8           A.      Yeah.  There's a big table with
9    different areas of medical, dental, mental
10   health, and various other disciplines that would
11   see the patient.  And they would go through that
12   process, and once the process was completed,
13   they were assigned a housing, vacate the
14   housing.

15          Q.      As part of that intake process,
16   you mentioned mental health; is that correct?

17          A.      Yes.

18          Q.      What was that mental health
19   screening like?

20          A.      I'm not sure of the exact detail
21   what mental health people did.  I don't recall
22   off the top of my head.

23          Q.      Were you involved in those mental
24   health proceedings?

25          A.      No.

Dr. Dan LaFleur - March 18, 2025

```
1            Q.       Who would have completed those
2    screenings?
3            A.       It would have been the social
4    workers.
5            Q.       Let's specifically discuss
6    Mr. Folks's admission to Angola in April 2021.
7    So Mr. Folks was transferred to Angola in April
8    2021; is that correct?
9            A.       Yes.
10           Q.       Do you know where he was
11   transferred from?
12           A.       From a local prison in Franklin
13   or somewhere like that.
14           Q.       Does St. Mary's sound correct?
15           A.       Yes.
16           Q.       Wonderful.  I'm now going to
17   introduce two documents.  They should be shared
18   through the chat, Dr. LaFleur, so you should be
19   able to access them that way.
20                    We'll mark these as Exhibit 1 and
21   Exhibit 2, respectively.
22                    MS. WALSH:  So Ms. Murphy, the
23   first document is going to be 2021-03-30, Folks
24   email 106.  That would be Exhibit 1.
25                    (Exhibit 1, 2021-03-30, Folks
```

Dr. Dan LaFleur - March 18, 2025

1      email 106, marked for identification.)

2                          MS. WALSH:  And the second

3      document will be 2021-03-30.  Folks email 107,

4      transfer request.

5                          (Exhibit 2, 2021-03-30, Folks

6      email 107, marked for identification.)

7      BY MS. WALSH:

8            Q.        Dr. LaFleur, I'm going to ask you

9      to pull these up, take a look at them, and let

10     me know when you're ready to discuss.

11                         Were you able to pull those

12     documents up, Doctor?

13                         MR. BLANCHFIELD:  No, we're not.

14                         MS. WALSH:  Okay.

15                         MR. BLANCHFIELD:  We're not able

16     to open them in the chat.  They're in the chat,

17     but we're not able to open them.

18                         MS. WALSH:  Do we want to go off

19     the record for a minute so we can work out those

20     technical difficulties?

21                         MR. BLANCHFIELD:  Yes.  Can you

22     share the screen, perhaps?

23                         MS. WALSH:  Can we go off the

24     record?

25                         THE VIDEOGRAPHER:  Yes, ma'am.

Dr. Dan LaFleur - March 18, 2025

Page 94

```
 1                    We are off the record.  The time
 2     is 2:35 p.m.
 3                    (Recess.)
 4                    THE VIDEOGRAPHER:  We are back on
 5     the record.  The time is 2:36 p.m.
 6                    MS. WALSH:  Wonderful.
 7     BY MS. WALSH:
 8           Q.      Before the break, we were
 9     discussing two documents, which were marked
10     exhibits 1 and exhibits 2.
11                    Can we go ahead and screen share
12     Exhibit 1.
13     BY MS. WALSH:
14           Q.      Doctor, go ahead, look over this
15     document, and let me know when you're ready to
16     discuss.
17           A.      Okay.
18           Q.      Doctor, Exhibit 1 is an email
19     from Jacob Johnson, yes?
20           A.      Yes.
21           Q.      Who is that?
22           A.      He was the administrator at
23     Angola.
24           Q.      Was he your direct supervisor
25     when you were a medical director?
```

Dr. Dan LaFleur - March 18, 2025

Page 95

```
 1              A.      Was he what now?

 2              Q.      Your direct supervisor when you

 3      were medical director?

 4              A.      Yes.

 5              Q.      And this email cc's Stacye

 6      Falgout and Randy Lavespere?

 7              A.      Yes.

 8              Q.      We already discussed who

 9      Dr. Lavespere is here.

10                      Tell us who Stacye Falgout is.

11      Do you know?

12              A.      Yeah, he was the warden of the

13      medical unit at Angola.

14              Q.      And the e-mail is from Blake

15      LeBlanc, correct?

16              A.      Yes.

17              Q.      Do you know who that is?

18              A.      Yes.

19              Q.      Who is that?

20              A.      He is a director of mental

21      health, and he's located at -- at Hunt.

22              Q.      The email was sent March 30th,

23      2021?

24              A.      That's correct.

25              Q.      And the subject line is "St. Mary
```

Dr. Dan LaFleur - March 18, 2025

Page 96

```
 1     Parish request to transfer," correct?
 2              A.      Yes.
 3              Q.      This email transfers Mr. Folks'
 4     records to Dr. Johnson, Mr. Falgout and
 5     Dr. Lavespere, correct?
 6                      MR. BLANCHFIELD:  Object to the
 7     form.
 8                      You can answer.
 9                      THE WITNESS:  Yeah, it looks like
10     that, I mean, what I'm seeing on the screen.
11     BY MS. WALSH:
12              Q.      Do you see under the subject line
13     there is an attachment indicated?
14              A.      Yes.
15              Q.      Let's go ahead now and look at
16     what we've marked as Exhibit 2.  I'll represent
17     that that's the attachment, Exhibit 2 is the
18     attachment.
19                      MS. WALSH:  Let's go ahead and
20     scroll through just so the doctor gets some
21     familiarity with the exhibit.
22                      MR. BLANCHFIELD:  Is there a
23     particular thing you want him to look at?
24     because we can't read this.
25                      MS. WALSH:  Okay.  What we can do
```

Dr. Dan LaFleur - March 18, 2025

Page 97

```
1      is we'll go through sort of page by page to the

2      relevant pages.

3      BY MS. WALSH:

4            Q.      Doctor, would you be comfortable

5      just looking at those individually instead of

6      seeing the entire file?

7                        THE WITNESS:  Yes.

8      BY MS. WALSH:

9            Q.      Have you seen a form -- so this

10     first page, have you seen a form like this

11     before?

12           A.      I don't recall.

13           Q.      Do you have any familiarity with

14     this type of document?

15           A.      I don't recall using that

16     document for anything.

17           Q.      Were you -- did you ever see a

18     prisoner's intake form?

19           A.      Yes.

20           Q.      Does this look like an intake

21     form to you?

22           A.      I really can't answer that.  I'm

23     not sure.

24           Q.      Would knowing a prisoner's

25     medical or mental health history be helpful to
```

Dr. Dan LaFleur - March 18, 2025

Page 98

```
1       you at intake?
2               A.      Yes.
3               Q.      Why?
4               A.      To have an idea of what his
5       previous diagnosis was.
6               Q.      How would knowing his previous
7       diagnosis help you?
8               A.      It would just point you in a
9       certain direction to look at the patient in a
10      particular way.
11              Q.      Okay.
12              A.      I mean, sometimes diagnoses are
13      wrong and you have to make -- you know, go
14      through it again and make the correct diagnosis.
15      But having an idea of what they were taking
16      before is always -- always helpful.
17              Q.      Why is knowing what they thought
18      before helpful?
19              A.      To point you in a particular
20      direction.
21              Q.      So we're going to stay on this
22      first page, which is Bates stamped 00107.  We're
23      going to scroll down a little bit.
24                      And I'll direct your attention to
25      where this document says:  "Current Medical
```

Dr. Dan LaFleur - March 18, 2025

Page 99

```
1         Diagnosis?"
2                     Do you see that, Doctor?
3              A.       Yes.
4              Q.       So these would be the medical
5    diagnoses of Mr. Folks, correct?
6              A.       By whoever wrote that, yes, but
7    again, some -- the psychiatrist would have to
8    evaluate him and decide whether those medical
9    diagnoses actually apply to this patient.
10             Q.       Do you --
11             A.       I mean, just because it's written
12   down doesn't make it true.
13             Q.       What were the current medical
14   diagnoses as of the date of this intake form?
15             A.       Intention self-harm by sharp
16   object, bipolar, anxiety reaction.
17             Q.       Okay.  And were those consistent
18   with what you believed Mr. Folks was suffering
19   from?
20             A.       No.
21             Q.       Why not?
22             A.       Because I did not -- or
23   Dr. Gamble did not believe that he had bipolar.
24   He felt like he had a borderline personality.
25             Q.       Why did Dr. Gamble think that?
```

Dr. Dan LaFleur - March 18, 2025

Page 100

```
1              A.      Because he examined him and did a
2       mental status examination on him and came up
3       with his diagnosis.
4              Q.      Did you discuss the specific
5       reasons that Dr. Gamble rediagnosed Mr. Folks
6       with Dr. Gamble?
7              A.      No.
8              Q.      Let's also take a look at the
9       list of current medications listed on this form.
10             Do you see that, Doctor?
11             A.      Yes.
12             Q.      What medications was Mr. Folks on
13      at the time of this intake form?
14             A.      He was on Thorazine, naltrexone,
15      Wellbutrin, and I think that's Oracaine up
16      there.
17             Q.      What is Thorazine used to treat?
18             A.      Thorazine is a -- is a major
19      tranquilizer, and it can be used to treat any
20      kind of severe psychic reaction.
21             Q.      Can Thorazine be used to treat
22      bipolar disorder?
23             A.      It usually isn't, unless they are
24      in a psychotic state.
25             Q.      Is Thorazine used to treat
```

1     schizophrenia?

2           A.      Yes, it is.  It's also used to

3     treat any kind of major psychic event.

4           Q.      Let's now talk about

5     trihexyphenidyl.

6           A.      Yes.

7           Q.      What is that used to treat?

8           A.      It's to prevent certain reactions

9     from the Thorazine.

10          Q.      Can you explain that a little

11    further to me?

12          A.      Yeah.  There are certain

13    conditions that cause your mouth to twitch,

14    abnormal movements.  They're called

15    extrapyramidal side effects.  And

16    trihexiphenydil is used to prevent that.

17          Q.      What about naltrexone, what is

18    that used to treat?

19          A.      Generally, as family physicians,

20    we use it to treat alcoholism.

21          Q.      Why does it help with alcoholism,

22    Doctor?

23          A.      I don't know.  I can't tell you

24    the exact reason it works, but it's used for

25    that.

Dr. Dan LaFleur - March 18, 2025

1        Q.        What symptoms of alcoholism does
2    it impact?
3        A.        The craving, the desire to drink.
4        Q.        Can it be used to treat symptoms
5    of severe mental illness?
6        A.        Not generally.
7        Q.        What is Wellbutrin used to treat?
8        A.        An antidepressant.
9        Q.        Would you ever prescribe this for
10   a person suffering from a severe mental illness?
11       A.        Well, I prescribed Wellbutrin
12   before to treat depressed people who got
13   diagnosed with depression, and also used it to
14   treat patient people to stop cigarette smoking.
15       Q.        And why does it help people in
16   those situations?
17       A.        I can't describe the exact
18   mechanism; it just does.
19       Q.        Okay.  Let's go ahead now and
20   we're going to take a look at pages Bates
21   stamped 00115 through 00121.  But we'll just
22   pull up 00115 and go from there.
23                 THE VIDEOGRAPHER:  Sorry,
24   Counsel, 15115.  I apologize.  I was looking for
25   105.

Dr. Dan LaFleur - March 18, 2025

Page 103

```
1       BY MS. WALSH:
2              Q.      Are you familiar with this type
3       of form, Doctor?
4              A.      Not really.  Not off the top of
5       my head.
6              Q.      This is titled "Intake History
7       and Physical Assessment."  Yes?
8              A.      Yes.
9              Q.      And this is an intake history for
10      a Joshua Folks, correct?
11             A.      Yes.
12             Q.      Let's go to that next page,
13      00116.  Now, we'll see if you can see this,
14      Doctor, and if you can't, we'll make it bigger
15      for you.
16                     Do you see the line under
17      "HIV/AIDS," where it says "Other Specified"?
18             A.      Yes.
19             Q.      What diagnoses are listed there?
20             A.      Manic depressive disorder and
21      schizophrenia.
22             Q.      So this form indicates that as of
23      intake, Folks had manic depressive disorder?
24             A.      Yeah.  That's -- if that's the
25      correct form, yeah, that's what it says.
```

Dr. Dan LaFleur - March 18, 2025

Page 104

1          Q.        And it also says that Mr. Folks

2     has schizophrenia, correct?

3          A.        Yes.

4          Q.        Now, let's scroll down to 116.

5     We're still on 116, where it says "Mental Health

6     Evaluation."  This says that Mr. Folks has a

7     history of psychiatric treatment, correct?

8          A.        Yes.

9          Q.        As a medical director, what would

10    that mean to you upon intake?

11         A.        Exactly what it says, he has a

12    history of psychiatric treatment.

13         Q.        Does this form indicate that

14    Mr. Folks is on psychotropic medication?

15         A.        Yes.

16         Q.        Let's now look at those current

17    symptoms.  So we will scroll down a little bit,

18    please.

19                   Mr. Folks reported that he was

20    depressed; is that correct?

21         A.        I don't know if he reported that

22    or somebody just put that he was depressed.  All

23    I see is "Depressed.  Yes."

24         Q.        The form indicates Mr. Folks was

25    suicidal?

Dr. Dan LaFleur - March 18, 2025

```
 1              A.       Yes.

 2              Q.       And that he was agitated?

 3              A.       Yes.

 4              Q.       When you would see these symptoms

 5      on an intake form, what did that mean for the

 6      prisoner's intake process?

 7              A.       I don't know.  I don't know what

 8      you mean.

 9              Q.       Was any specific care given to an

10      inmate who expressed those symptoms?

11              A.       Like I said, the social worker

12      sees the patient and asks questions and makes an

13      evaluation based on the total picture of the

14      patient and whatever medical records they get.

15              Q.       Let's go ahead and pull this

16      down, because I'd like to talk about that

17      evaluation.

18                       What assessments did Mr. Folks go

19      through when he entered Angola?

20              A.       For intake you mean?

21              Q.       Yes.

22              A.       He was seen by a social worker

23      and he was seen by a -- a provider.  And by

24      other people, different areas.

25              Q.       So what sort of assessment did
```

Dr. Dan LaFleur - March 18, 2025

Page 106

1      the social worker provide?

2              A.      Well, they do their questions.

3      They have questions, and they review the

4      history, and then they make a disposition on

5      them.

6              Q.      How do they make that

7      disposition?

8              A.      Based upon the history and the

9      records, and they then ask the psychiatrist to

10     see him, if that's what's needed.

11             Q.      You also said that a provider

12     sees them.  Can you describe that?

13             A.      Healthcare provider.

14             Q.      What is that evaluation like?

15             A.      Going over their entire health

16     history.

17             Q.      Were you involved in any of those

18     conversations when Mr. Folks was admitted?

19             A.      No.

20             Q.      I'm now going to introduce a

21     document that we'll mark as Exhibit 3.

22                     MS. WALSH:  Ms. Murphy, this

23     document is labeled 2021-03-31, "Mental Health

24     Individual Progress Notes 1."

25                     (Exhibit 3, 2021-03-31, Mental

Dr. Dan LaFleur - March 18, 2025

```
1      Health Individual Progress Notes 1, marked for

2      identification.)

3      BY MS. WALSH:

4             Q.      So we'll send that in the chat

5      and pull it up on the screen, Doctor.

6                    MS. WALSH:  Can we scroll down.

7      It's just one page, so it should be pretty quick

8      to get the doctor familiar with it.  Maybe two.

9      BY MS. WALSH:

10            Q.      Doctor, have you seen a document

11     like this before?

12            A.      Yes.

13            Q.      What is this document?

14            A.      It's the Mental Health Progress

15     Note.

16            Q.      What would you use this type of

17     document for?

18            A.      What would I use it for?  Just to

19     look at it and see what the mental health people

20     are thinking about this patient.

21            Q.      And why would the mental health

22     people be using this document?

23            A.      Because they are doing a mental

24     status evaluation and making a diagnosis on this

25     patient.
```

Dr. Dan LaFleur - March 18, 2025

1          Q.        What is the date of this Mental

2    Health Individual Progress Note?

3          A.        3-31-2021.

4          Q.        That's the date Mr. Folks arrived

5    at Angola, correct?

6          A.        Yes.

7                    MS. WALSH:  Let's scroll down to

8    Section 3, which says "Clinician Notes."  If we

9    could blow that up, and then I'll give the

10   doctor just a little bit to take a look at -- to

11   read it and to get familiar with it.

12   BY MS. WALSH:

13         Q.        And, then, Doctor, let us know

14   when you're ready to talk about it.  Okay?

15                   Have you had enough time to read

16   that, Doctor?

17         A.        I'm still reading it.

18         Q.        Gotcha.

19         A.        Okay.

20         Q.        Does this report mention any

21   mental health symptoms?

22         A.        Well, yeah.  It talks about him

23   injuring himself and that symptoms include

24   schizophrenia, manic depression.  Medications

25   are Thorazine, Wellbutrin and Oracaine.  He has

Dr. Dan LaFleur - March 18, 2025

1       a history of self-mutilation.

2              Q.      Why would these things be --

3              A.      He had physical findings of

4       abrasions and cuts on his wrist and knees,

5       numerous cuts and scrapes.

6              Q.      Why would these things be written

7       in the clinician notes?

8              A.      Well, they are including

9       everything that's said to them and what they see

10      and they're putting it down and making that

11      available for when the psychiatrist does his

12      examination to decide what his diagnoses are

13      for -- or are.

14                     MS. WALSH:  Let's go ahead and

15      take this document down.

16      BY MS. WALSH:

17             Q.      Dr. LaFleur, do you recall what

18      was done as a result of that initial evaluation?

19             A.      I don't recall him, when he came

20      in.  I wasn't involved in that process.

21             Q.      Typically, if a prisoner presents

22      with severe mental health illness, would they be

23      seen by Psychiatry?

24             A.      Eventually, yes.

25             Q.      What does "eventually" mean?

Dr. Dan LaFleur - March 18, 2025

```
1              A.       It means that they set up an

2       appointment, that the psychiatrist sees them and

3       examines them and evaluates them.

4              Q.       What is the usual time frame for

5       that?

6              A.       It varies.  It depends on the

7       situation in the knee.

8              Q.       For a person presenting with

9       Mr. Folks' symptoms, how fast would you want

10      them see the psychiatrist?

11             A.       Since that is not my direct

12      field, I usually leave it up to the social

13      workers to get the patient to the psychiatrist.

14             Q.       As part of the intake process, is

15      a patient's medication reviewed?

16             A.       Yes.

17             Q.       Who does that review?

18             A.       The social workers and the

19      healthcare providers and the psychiatrist, if

20      there are psychiatric medications.

21             Q.       Would you be involved in a review

22      of medication for --

23             A.       No.  We weren't allowed to write

24      antipsychotic medications for patients.  So, no,

25      we wouldn't make that decision.
```

Dr. Dan LaFleur - March 18, 2025

```
1              Q.      So that decision would be left to
2    Dr. Gamble?
3              A.      That's correct.
4                      MS. WALSH:  Let's go ahead and
5    introduce another exhibit.  I believe that will
6    be Exhibit 4.
7                      Ms. Murphy, that document is
8    labeled 2021-03-21, "Mental Health Service Codes
9    and Level of Care Review."
10                     (Exhibit 4, 2021-03-21, "Mental
11   Health Service Codes and Level of Care Review,
12   marked for identification.)
13                     MR. BEALE:  I'm sorry, did you
14   say 03-31?
15                     MS. WALSH:  Yes.  Sorry.
16                     MS. MURPHY:  And it's 1, not 2,
17   correct?
18                     MS. WALSH:  Correct.  Thank you,
19   Ms. Murphy.
20   BY MS. WALSH:
21             Q.      Dr. LaFleur, have you seen a
22   document like this before?
23             A.      I don't recall.
24             Q.      This is titled "Mental Health
25   Service Codes and Level of Care Review,"
```

Dr. Dan LaFleur — March 18, 2025

```
 1     correct?
 2              A.       Yes.
 3              Q.       And it's for Mr. Folks?
 4              A.       Yes.
 5              Q.       And it's dated March 31st, 2021,
 6     correct?
 7              A.       That's correct.
 8              Q.       What are levels of care?
 9              A.       Let's see.  You have some levels
10     of care that a patient needs to be on the
11     nursing unit, and they have such severe illness
12     that they require daily care.  That's a level 1.
13                       And in a level 2 is when you have
14     a specialist involved on a continuing basis to
15     treat a serious chronic medical illness.
16                       Level 3 is when they have chronic
17     medical conditions and can be taken care of on
18     regular physical examinations and follow-up.
19                       And level 4 would be when they
20     are healthy and have medical problems that are
21     under control completely and occasionally see a
22     healthcare provider.
23              Q.       Okay.  So this document might be
24     a review of a prisoner's level of care?
25              A.       Yeah.
```

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.      All right.  Let's go through some
 2      of the indications on this document.
 3                      Do you see where it says "Code
 4      SH"?
 5              A.      Yes.
 6              Q.      That's marked as present?
 7              A.      Yes.
 8              Q.      What does SH mean?
 9              A.      I don't know.
10                      MS. WALSH:  Let's scroll down a
11      little bit.
12      BY MS. WALSH:
13              Q.      Do you know what ID means,
14      Doctor?
15              A.      No.
16              Q.      Do you know what SU means?
17              A.      I'm not familiar with this form.
18      I don't use this in my practice.  So, no, I
19      don't know -- I don't use that.
20                      MS. WALSH:  All right.  Let's
21      scroll down a little bit more, please:  Just a
22      little bit more, please.  That's perfect.  Thank
23      you.
24      BY MS. WALSH:
25              Q.      Would it surprise you to learn
```

Dr. Dan LaFleur - March 18, 2025

 1      that DI means diagnostic impression,

 2      Dr. LaFleur?

 3                      MR. BLANCHFIELD:  Object to the

 4      form.

 5                      THE WITNESS:  Since I don't use

 6      this form, I don't know what it means.

 7      BY MS. WALSH:

 8              Q.      Well, let's take a look here at

 9      the level of care.  What level of care is

10      indicated?

11              A.      Three.

12              Q.      Could you describe to me again in

13      more detail what that level of care 3 means?

14              A.      That means that he has the

15      medical problems that he needs to be seen on a

16      regular basis for.

17              Q.      And this form does not have a

18      diagnosis checked, correct?

19              A.      That's correct.

20              Q.      Do you know why that would not be

21      checked?

22              A.      I would -- I could make an

23      assumption that they wanted the psychiatrist to

24      evaluate the patient and make the diagnosis.

25      But the social worker didn't want to fill that

Dr. Dan LaFleur - March 18, 2025

Page 115

1      in.

2              Q.       So the social worker was

3      comfortable indicating a level care but not

4      giving a diagnosis, correct?

5                      MR. BLANCHFIELD:  Object to form.

6      BY MS. WALSH:

7              Q.       Please answer my question,

8      Dr. LaFleur.

9              A.       Do you mind if I think for a

10     second?

11             Q.       Of course.

12             A.       Well, they are the initial

13     evaluator and they look at the patient, and

14     based upon what they're seeing and the past

15     history, they make a decision on what level of

16     care and when they're going to see the

17     psychiatrist.  That's how they do it.

18             Q.       Let's go ahead and take this

19     document down.  And I'll introduce one more.

20     This will be Exhibit 5.

21                     MS. WALSH:  Ms. Murphy, that's

22     2019 directive 13.073, Offender Identification

23     and Tracking documents.

24                          (Exhibit 5, 2019 directive

25     13.073, Offender Identification and Tracking

Dr. Dan LaFleur - March 18, 2025

```
1      documents, marked for identification.)
2      BY MS. WALSH:
3             Q.      I'll give you a moment to get
4      familiar with this document.  Please let me know
5      when you're ready to proceed, Dr. LaFleur.
6             A.      Okay.
7             Q.      Is this directive number 13.073
8      an Offender Identification and Tracking?
9             A.      That's what it looks like to me.
10            Q.      Have you seen this document
11     before?
12            A.      I can't recall.
13            Q.      Are you familiar with this policy
14     on Offender Notification and Tracking?
15            A.      I can't remember it.
16            Q.      Let's go through it and see if we
17     can jog your memory a bit.  Let's go to Bates
18     stamp 000133.  It's the second page of the
19     document.
20                    Perfect.
21                    Do you see where it says "serious
22     mental illness," Doctor?
23            A.      Yes.
24            Q.      What does this policy define as a
25     serious mental illness?
```

1          A.      Bipolar disorder, major

2   depressive disorder, schizo-affective disorder,

3   schizophrenia, severe anxiety disorder,

4   unspecified schizophrenia spectrum.

5          Q.      Do you agree that those six

6   disabilities should be defined as serious mental

7   illness?

8          A.      Yes.

9          Q.      Why?

10         A.      Because they have a higher

11  potential for patient harm from the disease

12  process itself or from the patient harming

13  himself.

14         Q.      Can you tell me what you mean?

15         A.      Well, if a patient -- you have

16  different diagnoses up there, all the way

17  psychotic problems to depression, to anxiety,

18  and each patient group, that's going to have

19  different symptoms.  But the potential for

20  disturbances with the patient where they may

21  harm themselves is higher with certain groups --

22  or with actually all of those groups.

23         Q.      Okay.  Let's now talk about the

24  levels of care that this policy sets out.  So

25  let's go to the page Bates stamped 000136.  And

Dr. Dan LaFleur - March 18, 2025

1      we'll take a look a level of care 1 first.

2                      What does this policy say level

3      of care 1 is?

4              A.      "Shall be assigned to offenders

5      who have significant disability, primarily due

6      to their mental health condition."

7              Q.      During your time as medical

8      director, approximately how many inmates were at

9      level of care 1 at any given time?

10             A.      I can't answer that question.

11             Q.      Do you not know?

12             A.      No, I don't know.

13                     MS. WALSH:  Let's take a look now

14     at level of care 2.  So let's scroll down.

15     BY MS. WALSH:

16             Q.      What is a level of care 2

17     according to this policy, Doctor?

18             A.      "Shall be assigned to offenders

19     with a diagnosis of serious mental illness and

20     who have been in remission for less than six

21     months or have displayed a pattern of

22     instability."

23             Q.      So this level is for inmates who

24     have a diagnosed severe mental illness, correct?

25             A.      Yes.

Dr. Dan LaFleur - March 18, 2025

1          Q.        Do you recall the number of

2    inmates while you were medical director that

3    were on a level of care 2?

4          A.        No, I don't.

5                    MS. WALSH:  Let's now scroll down

6    to that next page for level of care 3.

7    BY MS. WALSH:

8          Q.        What does this say about inmates

9    who are level of care 3?

10         A.        "Level of care 3 shall be

11   assigned to offenders with serious mental

12   illness and who have been in remission or have

13   been stable for at least six months."

14         Q.        So level of care 3 is for

15   offenders with a serious mental illness,

16   correct?

17         A.        Yes.

18         Q.        And it's one of those six serious

19   mental illnesses that we discussed previously?

20         A.        Yes.

21         Q.        So that includes schizophrenia?

22         A.        Yes.

23         Q.        Bipolar disorder?

24         A.        Yes.

25         Q.        A major depressive disorder?

Dr. Dan LaFleur - March 18, 2025

```
 1              A.      What did you say?

 2              Q.      A major depressive disorder.

 3              A.      Yes.

 4              Q.      Now, you'll see here that it

 5      notes that an SMI diagnosis is typically chronic

 6      in nature.

 7                      Do you see that?

 8              A.      Yes.

 9              Q.      What does that mean, Doctor?

10              A.      Chronic usually means a certain

11      period of time, in excess of a minimum, say,

12      three months.

13              Q.      It also says that "offenders will

14      most likely remain diagnosed with SMI for the

15      remainder of the offender's life."

16                      Do you see that?

17              A.      Yes.

18              Q.      Is that consistent with your

19      understanding of severe mental illnesses?

20              A.      Not completely.

21              Q.      Talk to me more about that.

22              A.      Well, people with major

23      depression can get over their illness.

24              Q.      What things might help a person

25      get over a major depressive disorder?
```

1          A.          Psychotherapy,

2    psychotherapeutics, talk therapy, group therapy.

3          Q.          In your time as a doctor, how

4    many people have you seen cured of a major

5    depressive disorder?

6          A.          Hundreds, but they are more

7    likely to relapse, and that's what goes to

8    knowing the history of a particular patient.

9    But if they do relapse, they are treatable.

10          Q.          What do you mean by that?

11          A.          Put them on medicine and they get

12    better, or you do talk therapy and they get

13    better, or you do cognitive behavorial therapy

14    and they get better, so you can treat their

15    illness.

16          MS. WALSH:  Let's now scroll down

17    to level of care 4.  Thank you.

18    BY MS. WALSH:

19          Q.          What does this policy say level

20    of care 4 is?

21          A.          "Shall be assigned to offenders

22    with any diagnostic impression, excluding severe

23    mental illness, addiction disorder diagnosis or

24    those requiring mental health interventions

25    within the previous 12 months."

Dr. Dan LaFleur - March 18, 2025

1          Q.        Do you recall approximately how

2    many people were on level of care 4 while you

3    were a medical director?

4          A.        No.

5          Q.        And I didn't ask the question

6    before, but for a level of care 3, do you recall

7    how many people, while you were medical

8    director, were on level of care 3?

9          A.        No, I don't recall.

10          Q.        Now, let's discuss level of care

11    5.   What does this document say about that?

12          A.        "Shall be assigned to offenders

13    not prescribed any psychotropic medication and

14    who have no mental health intervention for more

15    than one year."

16          Q.        And is that consistent with your

17    understanding of level of care 5?

18          A.        Yes.

19          MS. WALSH:  Let's now take this

20    document down, please.

21    BY MS. WALSH:

22          Q.        Now, Doctor, at any given time,

23    approximately how many prisoners at Angola are

24    self-harming?

25          A.        Say that again.

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.        At any given time, approximately
 2   how many prisoners at Angola are self-harming,
 3   exhibiting self-harming behaviors?
 4              A.        I don't know the answer to that
 5   question.
 6              Q.        Would it be more or less than
 7   ten?
 8              A.        I would say more than ten.
 9              Q.        More or less than 25?
10              A.        Probably more than 25.
11              Q.        Of those prisoners who are self
12   harming, how many are self-harming in a way that
13   is life threatening?
14              A.        Less than five.
15              Q.        Of those five or less, how many
16   are diagnosed with severe mental illnesses?
17              A.        I'm not sure.
18              Q.        Would you know one way or the
19   other -- the ones who are not self-harming in a
20   life threatening way, how many of those have
21   diagnosed mental health illnesses?
22              A.        No, I can't answer that either.
23              MS. WALSH:  Looks like we've been
24   going now over an hour.  Let's take another
25   five-minute break and come back.
```

Dr. Dan LaFleur - March 18, 2025

```
 1                    THE WITNESS:  I would prefer not.
 2                    MS. WALSH:  If you would like to
 3      keep going, then -- this is your show, Doctor --
 4      we can certainly keep going if you'd like.
 5                    You'd like to keep going?
 6                    THE WITNESS:  I'd like to keep
 7      going.
 8                    MS. WALSH:  All right, Doctor,
 9      let's keep going.
10                    THE COURT REPORTER:  I'm sorry,
11      is it possible for the court reporter to take a
12      five-minute break?
13                    MS. WALSH:  Yes, absolutely.
14                    THE VIDEOGRAPHER:  Off record,
15      Counsel?
16                    MS. WALSH:  Yes.
17                    THE VIDEOGRAPHER:  We are off the
18      record.  The time is 3:19 p.m.
19                    (Recess.)
20                    THE VIDEOGRAPHER:  We are back on
21      the record.  The time is 3:26 p.m.
22      BY MS. WALSH:
23           Q.    Dr. LaFleur, before the break, we
24      were discussing levels of care.  Do you recall
25      Mr. Folks going through a level of care
```

Dr. Dan LaFleur - March 18, 2025

1    evaluation and review in April of 2021?

2         A.    No, I don't.

3              MS. WALSH:  Ms. Murphy, let's go

4    ahead and pull up the documents labeled

5    2021-04-08, Mental Health Service Codes and

6    Level of Care Review 2.  I think this is

7    Exhibit 6.

8              (Exhibit 6, 2021-04-08, Mental

9    Health Service Codes and Level of Care Review 2,

10   marked for identification.)

11   BY MS. WALSH:

12        Q.    Dr. LaFleur, you see that this is

13   dated April 8th, 2021?

14        A.    Yes.

15        Q.    And it is titled "Mental Health

16   Service Codes and Level of Care Review"?

17        A.    Yes.

18        Q.    And it is for Mr. Folks?

19        A.    Where is his name?

20              Yeah, I see offender Joshua

21   Folks.

22        Q.    Are you familiar with this

23   document?

24        A.    I'm familiar with it, but I

25   didn't use it.  That was not one of the forms I

Dr. Dan LaFleur - March 18, 2025

Page 126

```
1        used as a doctor, no.
2               Q.      How are you familiar with this
3        document?
4               A.      Seeing it on his chart.
5               Q.      When you reviewed medical
6        records, did you see it?
7               A.      Yes.
8               Q.      Did you see it in preparation of
9        this case or while you were medical director?
10              A.      While I was medical director.
11              MS. WALSH:  Let's scroll down to
12       where it says "Level of care."  So we'll keep
13       scrolling past the indicators.
14              Perfect.
15       BY MS. WALSH:
16              Q.      You'll see on the right-hand side
17       of the document, it says "New level of care."
18              What is his level of care?
19              A.      Three.
20              Q.      Does the form indicate that Mr.
21       Folks has a severe mental illness?
22              A.      No, it doesn't.
23              Q.      What are the diagnostic
24       impressions listed on this form?
25              A.      Unspecified disruptive impulse
```

Dr. Dan LaFleur - March 18, 2025

Page 127

1    control and conduct disorder, antisocial

2    personality disorder, borderline personality

3    disorder?

4              Q.        What is unspecified disruptive

5    impulse control and conduct disorder?

6              A.        When people don't act right, they

7    do things to get attention or get -- try to get

8    control of their situation.

9              Q.        Why might someone be diagnosed

10   with that disorder?

11             A.        If they have that disorder, they

12   are diagnosed with that disorder.

13             Q.        So what are some of the

14   indicators of an unspecified disruptive impulse

15   control and conduct disorder?

16             A.        People who do things that create

17   chaos at the -- at their whim to try to gain

18   control of their environment.

19             Q.        How do you know that someone is

20   doing things to try to gain control of their

21   environment rather than suffering from a severe

22   mental illness?

23             A.        Well, it depends on what severe

24   mental illness you're talking about.  If you're

25   talking about schizophrenia, you're looking for

Dr. Dan LaFleur - March 18, 2025

```
1        somebody with a thought disorder who is
2        psychotic, has an association defect,
3        ambivalence, autism, that sort of thing.
4               Q.      So how can you tell the
5        difference between the two?
6               A.      By the -- doing an interview and
7        a mental status examination on the patient.
8               Q.      What things in an interview would
9        indicate that a person suffers from this
10       unspecified disorder instead of schizophrenia?
11              A.      When they have a thought
12       disorder, an association defect.  When they say
13       things that don't make sense, when they're
14       psychotic.  Those are the things that point to a
15       schizophrenia.
16              Q.      Let's now talk about antisocial
17       personality disorder.  Can you walk me through
18       that?
19              A.      Yeah.  An antisocial personality
20       disorder, they're generally people who don't
21       have a conscience.  They do things to please
22       themselves.  They can't develop personal
23       interrelationships because they are more
24       concerned about themselves than anyone else, and
25       that's an antisocial personality.
```

Dr. Dan LaFleur - March 18, 2025

1          Q.        And what is borderline

2     personality disorder?

3          A.        Borderline personality disorder

4     is not a psychotic thing, it's a personality

5     disorder where they don't function well in

6     society, don't function well in interpersonal

7     relationships, tend to be a little paranoid.

8     That would be borderline.

9          Q.        Why would a person be placed on a

10    level of care 3 if they do not have a severe

11    mental illness?

12         A.        I don't know.

13         Q.        Okay.  Is --

14         A.        I would assume that if a person

15    had a severe mental illness, they -- they would

16    be placed in level of care 3.  So I don't know

17    the answer to that.

18         Q.        Is placing someone on a level of

19    care 3 who does not have a severe mental illness

20    in contravention of Angola's policies?

21         A.        Looking at that directive, I

22    would say that it's incongruent with the level

23    of care 3.

24         Q.        Now, Doctor, these diagnoses are

25    different than the diagnoses that was on

Dr. Dan LaFleur - March 18, 2025

Page 130

1     Mr. Folks' intake form, correct?

2          A.     That's correct.

3          Q.     How often does a reclassification

4     or a rediagnosis of a mental health illness

5     happen when a prisoner comes to Angola?

6                 MR. BLANCHFIELD:  Object to form.

7                 THE WITNESS:  I don't know.

8     BY MS. WALSH:

9          Q.     Do you know if it's common?

10         A.     I don't know.

11         Q.     Do you know how often inmates are

12    diagnosed with severe mental health illnesses as

13    a result of the health intake process at Angola?

14                MR. BLANCHFIELD:  Object to the

15    form.

16                THE WITNESS:  I can't tell you

17    how often that happens, but it does happen when

18    the person has severe mental illness.

19    BY MS. WALSH:

20         Q.     In your time as medical director,

21    was a person ever diagnosed with a severe mental

22    health illness while at Angola?

23         A.     Yes.

24         Q.     How many times?

25         A.     I don't know.

Dr. Dan LaFleur - March 18, 2025

Page 131

```
1                    MS. WALSH:  Let's take that
2      document down.
3      BY MS. WALSH:
4             Q.      Now, Doctor, earlier today you
5      stated that you believe Mr. Folks has a
6      personality, not a thought disorder.  Is that
7      correct?
8             A.      That's correct.
9             Q.      A personality disorder, although
10     different than a thought disorder, is a mental
11     health condition, correct?
12            A.      That's correct.
13            Q.      And Mr. Folks has been diagnosed
14     with one or more personality disorders, correct?
15            A.      That's correct.
16            Q.      Can you clarify which ones he's
17     been diagnosed with?
18            A.      Impulse control and conduct
19     disorder, borderline personality disorder,
20     antisocial personality disorder and unspecified
21     disruptive personality disorder.
22            Q.      He was on medication for these
23     disorders, correct?
24            A.      Yes.
25            Q.      A personality disorder can cause
```

Dr. Dan LaFleur - March 18, 2025

1        a person to act impulsively, right?

2                A.      Yes.

3                Q.      Is it true that someone with a

4        personality disorder might also have trouble

5        tolerating distress?

6                A.      Yes.

7                Q.      Can a personality disorder cause

8        distorted perceptions of reality?

9                A.      Yeah, and borderline

10       personalities, there are some disruptions in

11       that, yeah.

12               Q.      Can a personality disorder cause

13       abnormal behaviors?

14               A.      Well, actually, I'd like to look

15       at it from a different perspective.  With

16       personality disorders, they have the ability to

17       control their behavior and their attitude.

18               Q.      So with a personality disorder, a

19       person is always in control of their attitude?

20               A.      I can just say generally they

21       are.

22               Q.      What do you mean by "generally"?

23               A.      Most of the time they are.

24               Q.      Can a personality disorder cause

25       difficult with emotional regulation?

Dr. Dan LaFleur - March 18, 2025

```
 1           A.      Yes.

 2           Q.      What about intense anger?

 3           A.      What about what?

 4           Q.      Intense anger.

 5                   MR. BLANCHFIELD:  Object to the

 6      form.

 7                   THE WITNESS:  I do not know the

 8      answer to that question.  I mean, yeah -- but

 9      everybody gets angry, so I wouldn't say it's a

10      personality disorder.

11      BY MS. WALSH:

12           Q.      So a personality disorder would

13      not cause intense anger?

14           A.      There are certain personality

15      disorders that exhibit problems with anger

16      control, yeah.

17           Q.      What are those personality

18      disorders?

19           A.      I don't know.  I can't list them

20      for you.

21           Q.      Would it be any of the

22      personality disorders that Mr. Folks was

23      diagnosed with?

24           A.      I don't know the answer to that

25      question.
```

Dr. Dan LaFleur - March 18, 2025

Page 134

```
 1              Q.       Can a personality disorder make
 2      it difficult for a person to control their
 3      behavior?
 4              A.       Again, you have it backwards.  I
 5      think personality disorders do have control of
 6      their behavior and do have control of their
 7      attitude and -- because they don't have a
 8      thought process -- I mean, a thought process
 9      disorder going on.  It's all in their
10      personality.
11              Q.       So they can control their
12      behavior all of the time?
13              A.       They should be able to, yes.
14              Q.       Can a personality disorder like
15      borderline personality disorder cause a patient
16      to engage in impulsive self-destructive
17      behavior?
18              A.       I don't know that.  I'm not an
19      expert in this field.
20              Q.       Can a personality disorder cause
21      someone to engage in self-harm?
22              A.       I don't know.
23              Q.       Is self-harm common in patients
24      with borderline personality disorder?
25              A.       I don't think so.
```

Dr. Dan LaFleur — March 18, 2025

```
 1              Q.      Are you familiar with any medical
 2    literature on any links between personality
 3    disorders and self-harm?
 4              A.      No, I take that back.  There are
 5    personality disorders that do self-mutilation,
 6    self-cutting.
 7              Q.      What are those?
 8              A.      Well, one of them is borderline
 9    personality.
10              Q.      Borderline personality disorder.
11    Any others?
12              A.      I'm sure there are others.  I
13    just don't know off the top of my head to tell
14    you.
15              Q.      So we already discussed these
16    personality disorders that Mr. Folks was
17    diagnosed with at Angola.  Let's go one by one
18    and sort of discuss these.  Let's start with
19    borderline personality disorder.
20              A.      Yes.  Didn't we just discuss
21    that?
22              Q.      But we're going to get into more
23    specifics now.
24              A.      Well, I'm not a specialist in
25    that field, so I can't give much more specific
```

Dr. Dan LaFleur - March 18, 2025

Page 136

1      than I already gave you.

2            Q.      I appreciate that.  We'll see how

3      specific we can go.  Do you know which section

4      of the DSM-V borderline personality disorder is

5      found in?

6            A.      No.

7            Q.      Do you know the clinical

8      indications of the disorder?

9            A.      I can't go into detail on that,

10     no.

11           Q.      What factors led to Mr. Folks

12     being diagnosed with borderline personality

13     disorder?

14           A.      I wasn't there, so I don't know.

15           Q.      Did you discuss that with are

16     Dr. Gamble?

17           A.      No, I didn't.

18           Q.      What is the treatment for

19     borderline personality disorder?

20           A.      To grow up and act right.

21           Q.      No other treatment?

22           A.      Not that I know of.  They can --

23     they can do some psychotherapy or group therapy,

24     but generally, they get better as they get

25     older.

Dr. Dan LaFleur - March 18, 2025

```
 1              Q.        What factors make borderline
 2     personality worse?
 3              A.        I don't know.
 4              Q.        You don't know of anything that
 5     could increase its symptoms or manifestations?
 6              A.        They have a hard time dealing
 7     with people, I know that.  And I do know that as
 8     they grow older, sometimes -- well, most of the
 9     time, they get better if they -- if they are
10     able to live long enough.
11              Q.        Let's turn now to antisocial
12     personality disorder.  Do you know what section
13     of the DSM that is found in?
14              A.        No.  I can't tell you what
15     section it's in.
16              Q.        What are the clinical indications
17     of that disorder?
18              A.        When people do things that harm
19     other people and have no regret about it.  When
20     they live their life totally for themselves
21     without any concern for any other individual or
22     their situation.  They're typically antisocial.
23              Q.        Do you know what factors led to
24     Mr. Folks being diagnosed with that?
25              A.        I didn't make the diagnosis on
```

Dr. Dan LaFleur - March 18, 2025

1        him.

2                Q.       Did you discuss it with

3        Dr. Gamble?

4                A.       No, I didn't.

5                Q.       What is the treatment for

6        antisocial personality disorder?

7                A.       Generally, with personality

8        disorders, there's no specific medication.  It's

9        usually psychotherapy and talk therapy.  But

10       they're very resistant to change.  Personality

11       disorders are some of the most difficult

12       psychiatric diagnoses to take care of.

13               Q.       Why is that?

14               A.       You're born with what you have.

15       You are who you are.  It's your personality.

16       And it's very difficult to change.  Sometimes if

17       you take an individual who's -- has a certain

18       personality disorder and he undergoes a great

19       deal of pain, he can change.  But generally, it

20       takes a great -- it takes hitting rock bottom in

21       pain to change a person's personality.

22               Q.       So are you talking about physical

23       pain or mental pain?

24               A.       Physical or mental.

25               Q.       You said that there are some

Dr. Dan LaFleur - March 18, 2025

1      treatments like psychotherapy.  Is that correct?

2              A.      Yes.

3              Q.      Was Mr. Folks provided

4      psychotherapy at Angola?

5              A.      I don't know.

6              Q.      Do you know of any treatment he

7      received for antisocial personality disorder

8      while at Angola?

9              A.      Not that I'm aware of.  You can

10     ask Dr. Gamble.  He was in charge of that.

11             Q.      What about any treatment for

12     borderline personality disorder?

13             A.      Staying alive long enough.

14             Q.      Understood.  What factors would

15     make the symptoms of antisocial personality

16     disorder worse?

17             A.      Say that again.

18             Q.      What factors would make these

19     symptoms of antisocial security personality

20     disorder worse?

21             A.      If -- if that particular person

22     is violent, it can get very dangerous for anyone

23     on the receiving end.  That would make it worse.

24             Q.      What about worse for the person,

25     what they are experiencing?

Dr. Dan LaFleur - March 18, 2025

Page 140

```
1              A.      As I said before, it's very hard
2      to treat those type of people.
3              Q.      Does stress make antisocial
4      personality disorder worse?
5              A.      I'm not sure.  I think stress
6      makes everything worse.
7              Q.      What about isolation?
8              A.      Again, I don't know.  I don't see
9      how that can affect the antisocial personality
10     disorder.
11             Q.      Let's now talk about the impulse
12     control conduct disorder.  Do you know what
13     section of the DSM-V that is found in?
14             A.      No.  I don't.
15             Q.      What are the clinical indications
16     of that disorder?
17             A.      People who have control of --
18     difficulty controlling their impulses.  If
19     you -- like, for example, anger, people can get
20     angry very quickly over small things.  That
21     would be something that would go along with an
22     impulse control.
23             Q.      Do you know the factors that led
24     to Mr. Folks being diagnosed with it?
25             A.      No.  I wasn't there, I didn't see
```

Dr. Dan LaFleur - March 18, 2025

1       the interview.  I don't know how he made the

2       diagnosis, but I know it was made.

3               Q.      And you didn't talk to Dr. Gamble

4       about it?

5               A.      No.

6               Q.      What is the treatment for impulse

7       control conduct disorder?

8               A.      Talk therapy, talking to patients

9       about how they respond, why they do what they

10      do.  Trying to give them some insight into their

11      behavior so that they can change it.  Because as

12      I said before, it's very difficult to treat

13      personality disorder.

14              Q.      Was Mr. Folks provided with talk

15      therapy or anything like that at Angola?

16              A.      I don't know.

17              Q.      What factors would make impulse

18      control conduct disorder worse?

19              A.      Well, I wouldn't put impulse

20      control before conduct disorder.  I would just

21      say conduct disorder, when you don't act right,

22      when you don't do the right things.

23                      What would make it worse?  Well,

24      if you're used to doing what you want to do when

25      you want to do and you get in prison, that would

Dr. Dan LaFleur - March 18, 2025

Page 142

```
 1      make it worse, because you're in a controlled
 2      environment and you're not happy.
 3           Q.      Now, earlier we talked a little
 4      bit about the Americans with Disabilities Act
 5      very briefly.
 6                   In your view, did Mr. Folks have
 7      any disabilities that would be covered by the
 8      Americans with Disabilities Act?
 9           A.      Not that I'm aware of.
10           Q.      As a doctor, as a medical
11      professional, do you know if someone with a
12      personality disorder is considered disabled
13      under the ADA?
14           A.      Not that I'm aware of.
15           Q.      Let's now discuss the
16      interactions that you had with Mr. Folks
17      personally.  Did you ever personally interact
18      with Mr. Folks, Dr. LaFleur?
19           A.      I don't believe so.  It's
20      possible I may have seen him when he was in the
21      nursing unit, but I don't recall.
22           Q.      Were you involved in any
23      decisions to put Mr. Folks on extreme suicide
24      watch?
25           A.      Not that I'm aware of.  It's
```

Dr. Dan LaFleur - March 18, 2025

Page 143

```
1     possible the social worker could have called me

2     up and told me what was going on and I could

3     have agreed to that.  But I don't recall that.

4          Q.     Were you involved in any

5     decisions to put Mr. Folks in restraints?

6          A.     Again, it's possible I could have

7     okayed suicide watch on him, but I don't recall

8     any specific incidents.

9          Q.     Let's go ahead and introduce an

10    exhibit.  It will be Exhibit 7.

11               MS. WALSH:  This will be,

12    Ms. Murphy, Exhibit 2021-04-14, Mental Health

13    Individual Progress Notes 5.

14               (Exhibit 7, Exhibit 2021-04-14,

15    Mental Health Individual Progress Note 5, marked

16    for identification.)

17    BY MS. WALSH:

18          Q.     I apologize because I know this

19    is very difficult to see.

20               Are you familiar with this type

21    of document, Dr. LaFleur?

22          A.     Yes.

23          Q.     These are the mental health

24    individual progress notes we talked about

25    earlier?
```

Dr. Dan LaFleur - March 18, 2025

Page 144

```
1              A.      Mm-hmm, yes.

2              Q.      What is the date on these notes?

3              A.      3-31-2021.

4              Q.      So I understand that's the

5    arrival date.  Do you see the date on the top

6    left-hand corner?

7              A.      4-12-2021.

8              Q.      So it's likely that this document

9    was created on April 12th, 2021, correct?

10             A.      Yes.

11             MS. WALSH:  Let's scroll down to

12   clinician notes.

13   BY MS. WALSH:

14             Q.      Dr. LaFleur, please read these

15   and let me know when you're ready to discuss.

16             A.      Okay.

17             Q.      Does this refresh your

18   recollection at all about your involvement in

19   Mr. Folks' care?

20             A.      Not really, but it says that I

21   did it and I wouldn't doubt that that's the

22   case.

23             Q.      Why would you put someone on

24   extreme suicide watch?

25             A.      To prevent him from harming
```

Dr. Dan LaFleur - March 18, 2025

```
1    himself.
2              Q.      What actions would a person be
3    taking that would lead you to put them on
4    extreme suicide watch?
5              A.      Whenever he is cutting himself or
6    threatening to do something to harm himself or
7    threatening suicide or doing actions that are
8    hurting him.
9              Q.      Do you recall if Mr. Folks was
10   doing any of those things?
11             A.      Yes.  According to the form,
12   he -- cutting his neck and knees severely.
13             Q.      You don't recall putting
14   Mr. Folks in the restraints?
15             A.      I don't recall the exact
16   moment -- that was several years ago -- but I
17   don't doubt that that's exactly what happened.
18                     MS. WALSH:  Let's take a look at
19   that section, Assessment.  Section 4,
20   Assessment.
21                     Perfect.
22   BY MS. WALSH:
23             Q.      What does the assessment say?
24             A.      "Possible suicide risk currently.
25   Coping skills, poor currently.  Patient with
```

Dr. Dan LaFleur - March 18, 2025

Page 146

1    history of thought disorder."

2            Q.      I want to focus on that thought

3    disorder piece.  Would that have impacted your

4    decision to put Mr. Folks on extreme suicide

5    watch.

6            A.      No.  The fact that he was harming

7    himself is the most important factor, in my

8    opinion.  And the other issue is that that

9    patient with history of thought disorder is

10   written by social worker and not Dr. Gamble.

11              MS. WALSH:  All right.  We can

12   pull this document down, please.

13   BY MS. WALSH:

14           Q.      I want to discuss now this idea

15   of a thought disorder versus a personality

16   disorder a little bit -- a little bit more.

17              How do you determine whether

18   people are mentally ill or just acting out

19   because they're angry or being manipulative?

20           A.      You sit down with them and you

21   talk to them and you do a mental status

22   examination.  And you assess their ability to

23   distinguish real from non-real.

24              And patients with thought

25   disorders generally are psychotic and say

Dr. Dan LaFleur - March 18, 2025

1    disjointed things that aren't connected to the

2    thought process that you're trying to have with

3    them.  And they also exhibit symptoms, like they

4    are dilutional, they're -- they have

5    hallucinations, auditory hallucinations, that

6    sort of thing.

7              Q.     How do -- sorry.

8              A.       If you sit down you and you speak

9    with somebody and you have a conversation with

10   them and it generally is in order, then you are

11   able to say that they have a normal stream of

12   thought, and that also mitigates against a

13   thought disorder.

14             When you sit down with someone

15   and you try to have a conversation with them and

16   you feel confused at the end of the

17   conversation, then there's a good chance that

18   something's going on with that patient, as far

19   as their thought processes.

20             Q.     How do you determine whether a

21   patient is delusional?  Is it that ordering of

22   thoughts?

23             A.     No.  Delusional -- the definition

24   of delusional is a fixed false belief.  And if

25   they believe they have a transmitter implanted

Dr. Dan LaFleur - March 18, 2025

```
 1        in their brain, then it's a good chance that
 2        they are delusional and they're more likely to
 3        be in the area of thought disorder.
 4             Q.      Was Mr. Folks delusional?
 5             A.      I don't think so.  I can't say
 6        from, you know, personal examination, whether he
 7        was delusional or not.  But based upon the
 8        history provided to me, I don't think he was.
 9             Q.      Do you know why Mr. Folks
10        self-harmed?
11             A.      No, I don't know why.  I have my
12        opinions on it, but I don't know exactly why.
13             Q.      What are your opinions?
14                     THE WITNESS:  Can I give my
15        opinions?
16                     MR. BLANCHFIELD:  You can give
17        your opinions.
18                     THE WITNESS:  Okay.  I think that
19        Mr. Folks was unhappy that he was in jail and he
20        was totally out of control and that he didn't
21        have control over his environment, and that made
22        him very unhappy.
23                     And the only thing that he could
24        do to try to control the environment was to
25        self-harm and try to manipulate the system to do
```

Dr. Dan LaFleur - March 18, 2025

```
 1      what they -- what he wanted them to do.  That's
 2      my opinion.
 3      BY MS. WALSH:
 4              Q.       In your opinion, what did
 5      Mr. Folks want the prison to do?
 6              A.       Let him go.
 7              Q.       In your opinion, did Mr. Folks
 8      self-harm because he thought the prison would
 9      let him go?
10              A.       Possibility.
11              Q.       Any other possibilities?
12              A.       Not in my opinion.
13              Q.       Why would a person think
14      self-harm would get them out of prison?
15              A.       I can't get into the head of
16      Joshua Folks, so I can't answer that.  But I
17      think that he felt like if he caused enough
18      trouble that they would do something to get him
19      out of prison faster.
20              Q.       Is that a rational belief?
21              A.       What, to do -- to try to control
22      your environment and to get out of prison?  I
23      think that's pretty rational.
24              Q.       Self-harming to try to --
25      self-harming as a method to get out of prison is
```

Dr. Dan LaFleur - March 18, 2025

Page 150

```
1    rational?

2              A.        To him it was.

3              Q.        Was Mr. Folks ever let out of

4    restraints because he self-harmed?

5              A.        Not that I'm aware of.

6              Q.        Was Mr. Folks ever transferred to

7    a less restrictive environment because he

8    self-harmed?

9              A.        I think that might have happened.

10   No, not because he self-harmed, but I think he

11   might have been transferred to a less

12   restrictive environment when he was more

13   compliant with the -- with the protocol.

14             Q.        So that was because he was more

15   compliant, not because he self-harmed?

16             A.        Yes.

17             Q.        Mr. Folks, did he self-harm

18   repeatedly?

19             A.        During the time that I was there,

20   I don't remember him -- I remember a couple of

21   episodes, but I don't remember him being that

22   big of a problem while I was there, no.

23             Q.        Would you classify his self-harm

24   as severe?

25             A.        Excuse me?
```

Dr. Dan LaFleur - March 18, 2025

1          Q.          Would you classify Mr. Folks'
2    self-harm as severe?
3          A.          Which -- which incidence?  I
4    mean --
5          Q.          Generally --
6          A.          Some of them were severe and some
7    of them weren't.
8          Q.          What types of self-harm would you
9    classify as severe?
10          A.          Doing something to your abdomen,
11    stabbing yourself in the abdomen to the point
12    that you had to have surgery, then that would be
13    severe.
14                    A less severe one would be to
15    take a strip of metal that you peel out of a
16    cell and taking that metal and cutting your arm,
17    because, basically, all you have to do is sew
18    that up and you're okay.  Whereas, if you stab
19    yourself in the abdomen, you could die from
20    that.
21          Q.          How certain are you that
22    Mr. Folks' mental illnesses did not contribute
23    to his self-harm?
24          A.          I don't understand your question.
25          Q.          Did Mr. Folks self-harm because

Dr. Dan LaFleur - March 18, 2025

1     of his mental health illnesses or diagnoses?

2              A.        I've already told you my opinion

3     is that he did those things to try to control

4     his environment.

5              Q.        So it is your opinion that his

6     mental health issues did not contribute to his

7     self-harm, correct?

8              A.        Correct.

9              Q.        Do you have the qualifications to

10    judge whether someone is mentally ill?

11             A.        Yes, I do.

12             MS. WALSH:  Let's go ahead, take

13    a five-minute break.  I'm going to confer with

14    counsel to see if I have any further questions,

15    and then, hopefully, we can get out of here at a

16    reasonable time.  Sound good?

17             MR. BLANCHFIELD:  Sounds good.

18    Thank you.

19             THE VIDEOGRAPHER:  We are off the

20    record.  The time is 1:00 p.m.

21             (Recess.)

22             THE VIDEOGRAPHER:  We are back on

23    the record.  The time is 4:06 p.m.

24             MS. WALSH:  We have no further

25    questions for you, Dr. LaFleur.  Thank you so

Dr. Dan LaFleur — March 18, 2025

Page 153

1    much for your time.

2                    MR. BLANCHFIELD:  We're done

3    here.

4                    THE VIDEOGRAPHER:  We are off the

5    record.  The time is 4:06 p.m.

6                    (The following is off the video

7    record:)

8                    THE COURT REPORTER:  Counsel, did

9    you want a copy of the transcript?  Do you need

10   it expedited or anything?

11                   MR. BLANCHFIELD:  No.

12                   MS. WALSH:  Whatever we have been

13   doing in the past is what we will continue to

14   do.

15

16

17

18

19

20

21

22

23

24

25

Dr. Dan LaFleur - March 18, 2025

```
1                    C E R T I F I C A T E

2

3

4

5                    I, Karen Friedlander, a

6    Certified Court Reporter of the State of New

7    Jersey, do hereby certify that prior to the

8    commencement of the examination, the witness

9    and/or witnesses were sworn by me to testify to

10   the truth and nothing but the truth.

11                    I do further certify that the

12   foregoing is a true and accurate computer-aided

13   transcript of the testimony as taken

14   stenographically by and before me at the time,

15   place and on the date hereinbefore set forth.

16                    I do further certify that I am

17   neither of counsel nor attorney for any party in

18   this action that I am not interested in the

19   event nor outcome of this litigation.

20

21                    S/Karen Friedlander
                       Certified Court Reporter
22                     License No. XI01282

23

24

25   Dated:  3-26-25
```

Dr. Dan LaFleur - March 18, 2025

```
 1                          LAWYER'S NOTES

 2         PAGE  LINE

 3         ____  ____      _____

 4         ____  ____      _____

 5         ____  ____      _____

 6         ____  ____      _____

 7         ____  ____      _____

 8         ____  ____      _____

 9         ____  ____      _____

10         ____  ____      _____

11         ____  ____      _____

12         ____  ____      _____

13         ____  ____      _____

14         ____  ____      _____

15         ____  ____      _____

16         ____  ____      _____

17         ____  ____      _____

18         ____  ____      _____

19         ____  ____      _____

20         ____  ____      _____

21         ____  ____      _____

22         ____  ____      _____

23         ____  ____      _____

24         ____  ____      _____

25         ____  ____      _____
```

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read the

4    foregoing pages of my deposition testimony in

5    this proceeding, and with the exception of

6    changes and/or corrections, if any, find them to

7    be a true and correct transcription thereof.

8

9        _____

10                       Deponent

11

12       _____

13                         Date

14

15                    NOTARY PUBLIC

16           Subscribed and sworn to before me this

17    _____ day of _____, 20___.

18    _____

19                    Notary Republic

20    My Commission Expires:_____

21

22

23

24

25

1              INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over carefully

4     and make any necessary corrections.  You

5     should state the reason in the appropriate

6     space on the errata sheet for any corrections

7     that are made.

8       After doing so, please sign the errata

9     sheet and date it.

10      You are signing same subject to the changes

11    you have noted on the errata sheet, which

12    will be attached to your deposition.

13      It is imperative that you return the

14    original errata sheet to the deposing

15    attorney within thirty (30) days of

16    receipt of the deposition transcript by

17    you. If you fail to do so, the deposition

18    transcript may be deemed to be accurate

19    and may be used in court.

20

21

22

23

24

25

Dr. Dan LaFleur - March 18, 2025

```
 1                          ERRATA SHEET

 2

 3        PAGE -- LINE -- CORRECTION/REASON

 4        ____    ____    _____

 5        ____    ____    _____

 6        ____    ____    _____

 7        ____    ____    _____

 8        ____    ____    _____

 9        ____    ____    _____

10        ____    ____    _____

11        ____    ____    _____

12        ____    ____    _____

13        ____    ____    _____

14        ____    ____    _____

15        ____    ____    _____

16        ____    ____    _____

17        ____    ____    _____

18        ____    ____    _____

19        ____    ____    _____

20        ____    ____    _____

21        ____    ____    _____

22        ____    ____    _____

23        ____    ____    _____

24        ____    ____    _____

25        ____    ____    _____
```

Dr. Dan LaFleur - March 18, 2025

1                          ERRATA SHEET

2

3       PAGE -- LINE -- CORRECTION/REASON

4       _____    _____    _____

5       _____    _____    _____

6       _____    _____    _____

7       _____    _____    _____

8       _____    _____    _____

9       _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____

25      _____    _____    _____