```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF LOUISIANA
 3
 4
 5
 6   JOSHUA FOLKS                 CIVIL ACTION
                                  NO.USM 23-01289
 7
 8   VS.                          CHIEF JUDGE
                                  SHELLY D. DICK
     JEFF LANDRY, ET AL
 9                                MAGISTRATE JUDGE:
                                  RICHARD L. BOURGEOIS
10
11
12                 TESTIMONY
13                    of
14            DR. DAPHNE GLINDMEYER
15   taken on Friday, June 6, 2025, before Caroline D.
16   Escude', Certified Court Reporter in and for the
17   State of Louisiana, via Zoom Videoconferencing.
18
19
20
21
22        COURT REPORTERS OF LOUISIANA, L.L.C.
          9522 Brookline Avenue, Suite 217
23          Baton Rouge, Louisiana 70809
       PHONE (225) 201-9650 * FAX (225) 201-9651
24       E-Mail:  depos@courtreportersla.com
25
```

Page 1

EXHIBIT L

```
1                    I N D E X

2

3                                              Page

4    Caption                                     1

5    Appearances                                 3

6    Agreement of Counsel                        4

7    Examination

8         BY MR. BLANCHFIELD                      5

9    Reporter's Certificate                      69

10                   *   *   *   *   *

11   Exhibits:

12   Exhibit 1                                   65
     (Medical records)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 2
```

```
 1    APPEARANCES:  (All participating via Zoom)
 2
 3    Representing the Plaintiff:
 4         JENNER & BLOCK, LLP
           1155 Avenue of the Americas
 5         New York, New York 10036-2711
 6         BY:  MR. JULIUS J. MITCHELL
                MR. KEVIN SI
 7
                    And
 8
           JENNER & BLOCK, LLP
 9         1099 New York Avenue, NW, Suite 900
           Washington, DC  20001-4412
10
           BY:  MR. KENNETH BEALE
11
12    Representing the Defendants:
13         LIZ MURRILL, ATTORNEY GENERAL
           OFFICE OF THE ATTORNEY GENERAL
14         P. O. Box 1151
           Baton Rouge, Louisiana  70821
15
           BY:  MR. ANDREW BLANCHFIELD
16              Special Assistant Attorney General
                KEOGH, COX & WILSON, LTD.
17              701 Main Street
                Baton Rouge, Louisiana  70802
18
19
20    Reported by:
21         Caroline D. Escude', Certified
           Court Reporter No. 91182 in and
22         for the State of Louisiana
23
24
25
                                          Page 3
```

```
 1                S T I P U L A T I O N

 2

 3        It is stipulated and agreed by and among

 4   Counsel that the deposition of DR. DAPHNE

 5   GLINDMEYER, on Friday, June 6, 2025, is hereby

 6   being taken under the Federal Rules of Civil

 7   Procedure for all purposes as permitted under law.

 8        The witness reserves the right to read and

 9   sign the deposition.  The original is to be

10   delivered to and retained by Mr. Andrew Blanchfield

11   for proper filing with the Clerk of Court.

12        All objections, except those as to the form of

13   the questions and/or the responsiveness of the

14   answers, are reserved until the time of the trial

15   of this cause.

16

17

18

19

20

21                    * * * * *

22      Caroline D. Escude', Certified Court Reporter

23   in and for the State of Louisiana, officiated in

24   administering the oath to the witness.

25
```

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

```
 1                DR. DAPHNE GLINDMEYER
 2   611 River Highland Boulevard, Suite B, Covington,
 3   Louisiana 70433, having been first duly sworn, was
 4   examined and testified as follows:
 5   * * * * * * * * * * * * * * * * * * * * * * * * *
 6                    EXAMINATION
 7   BY MR. BLANCHFIELD:  (Beginning at 9:03 AM)
 8        Q.    Okay.  Good morning, Doctor.  I don't
 9   think we've ever met.  I'm Drew Blanchfield.  I'm
10   an attorney in Baton Rouge.  I represent the
11   defense in this case brought by Mr. Joshua Folks
12   and I'm here to ask you -- you've issued a report
13   dated April 16, 2025.  Do you have that report
14   handy?
15        A.    Yes, sir.
16        Q.    Perfect.  I know you've given many
17   depositions, so I don't really need to go through
18   the rules with you.  All I ask, though, if my
19   questions are unclear or don't make sense or you
20   think I'm confused or you're confused, just holler
21   and I will try to straighten that out.
22             If you want to take a break at any time,
23   please -- please tell us.  We -- we generally go an
24   hour or two and take a break.  I'm not going to be
25   too terribly long today and we'll finish, you know,
```

Page 5

1   probably about lunchtime, maybe a little later, but

2   it shouldn't be that painful.

3              So can you just start by giving the court

4   reporter your full name and business address?

5       A.    Certainly.  Certainly.  My name is Daphne

6   -- and I'll spell it -- D-a-p-h-n-e -- and my last

7   name is Glindmeyer, G-l-i-n-d-m-e-y-e-r, and my

8   office address is 611 River Highlands Boulevard,

9   Suite B, Covington, Louisiana 70433.

10      Q.    Now, your report indicates that you're

11  board certified in adult psychiatry, child and

12  adolescent psychiatry and forensic psychiatry.

13  That's correct?

14      A.    Yes, sir.

15      Q.    Those boards, are they -- (inaudible).

16      A.    You're gone -- you're gone again.  I'm

17  sorry.

18      Q.    Let me switch to my iPad.

19      A.    It's -- if it helps you, I can explain.

20  It's like I get one half of a word and then not the

21  rest.  I don't know if anybody else is experiencing

22  that difficulty.

23                   COURT REPORTER:

24                        Yes.

25                   MR. MITCHELL:

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1              I'm hearing the same.  It's a
2    little bit in and out.
3              (Discussion off the record to address
4    technical issues; 9:05 to 9:07 AM.)
5    BY MR. BLANCHFIELD:
6         Q.    Okay.  Doctor, can you give me an idea of
7    your current practice, what it consists of?
8         A.    Certainly.  So I'm in private practice and
9    in my practice I see patients pretty much every day
10   -- well, not today because I have this deposition,
11   but typically I see patients four days a week in
12   the office.  I have a variety of patient age
13   ranges, diagnoses, backgrounds.
14             A percentage of my practice are children
15   and adolescents.  A percentage of my practice are
16   adults.  A percentage of my practice are
17   individuals with developmental disabilities.  I see
18   a number of individuals who have behavioral or
19   psychiatric sequelae related to their developmental
20   disabilities.
21             In addition to that I do consulting, so I
22   -- for example, I'm a consultant in Rhode Island.
23   I have been designated there as a 706 expert to the
24   federal court for the mediation of -- well, we're
25   attempting to mediate to avoid litigation -- with

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1    regard to the correctional facilities there.  And I
2    do other consulting as well.
3        Q.    Okay.  And I see that you've been involved
4    in a lot of compliance monitoring in the past.
5        A.    Yes, sir.
6        Q.    Was that in the state of Louisiana?
7        A.    I'm sorry?
8        Q.    Any -- any of that compliance work or
9    monitoring work was done in the state of Louisiana?
10        A.    You know, that's -- and that's a hard
11    question for me to answer without giving more
12    detail.  So in the state of Louisiana I was
13    previously the director of clinical operations for
14    the Louisiana State University Health Sciences in
15    the Juvenile Corrections -- Juvenile Justice
16    Program.
17            So basically I was over all health
18    services, be it pediatrics, nursing, dental,
19    psychiatric, behavioral health, for all of the
20    juvenile correctional facilities in Louisiana and
21    that was subsequent to or pursuant to a settlement
22    agreement.  So I wasn't monitoring, but I was
23    providing -- directing the services to comply with
24    that consent decree or that settlement agreement.
25    I'm sorry.

1          Q.     And what were the timeframes of that,
2     Doctor?
3          A.     You mean how long were we under the
4     consent decree?  About four years.
5          Q.     And what years were those?
6          A.     Oh, now you're going to have to -- you're
7     going to make me look at my vitae to give you the
8     exact years.  I think it was 2001 to 2005, but I
9     don't want to be wrong.  (Witness reviews
10    document.)
11         Q.     That's okay.  That gives me a rough idea.
12         A.     Oh --
13         Q.     Go ahead.
14         A.     -- yeah, until 2004.  I had to look again.
15         Q.     Okay.  Have you done any other compliance
16    monitoring in Louisiana?
17         A.     No.  No, sir.
18         Q.     Now, I've got your report, obviously, and
19    I've read it and you start out giving a --
20    essentially a summary -- on the second page anyway
21    -- a summary of the opinions that you have reached
22    in this case.  There's four in number.  I assume
23    that's still your -- those are still your opinions?
24         A.     Yes, sir.
25         Q.     Okay.  Now, you also describe documents

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1    that you have reviewed in this matter.  Have you

2    reviewed any additional documents that are not

3    listed in your report?

4         A.    I don't believe so, no.

5         Q.    Okay.  Have you reviewed the report of Dr.

6    Joseph Penn?

7         A.    Yes.  Yes, I have seen that.

8         Q.    That one would be one document in addition

9    to what's listed.  Obviously you didn't have that

10   at the time you did this?

11        A.    I did not.  I did not.

12        Q.    Do you know Dr. Joseph Penn?

13        A.    I do not.

14        Q.    What about the psychiatrist, Gamble, at

15   the state prison, do you know him?

16        A.    I do not.

17        Q.    And there's also a mention of a

18   psychiatrist, Fleming, I think at Elayn Hunt.  Do

19   you know her?

20        A.    I do not.

21        Q.    All right.  I want to take a look at just

22   briefly the four -- or the summary of your opinions

23   and particularly I'm looking at Number 2 that says

24   other than prolonged isolation on restraints Mr.

25   Folks did not receive appropriate mental health

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

1    treatment such as psychotherapeutic treatment

2    interventions to address the underlying causes of

3    his self-harming.

4            In your review of this matter, including

5    your interview of Mr. Folks, did you ever come to

6    an opinion as to what was the underlying cause of

7    his self-harming behaviors?

8        A.    I think there are multiple etiologies for

9    Mr. Folks' self-harming behavior.  The behavior

10   that he exhibited during his time at -- do you want

11   me to call it LSP or would you rather I said

12   Angola?  Which is better?

13       Q.    I usually say LSP, but you're welcome to

14   call it whatever you want.

15       A.    Okay.  I'll just -- I'll just say LSP.  So

16   I think the etiology for the severe behaviors that

17   he exhibited during the time that he was at LSP

18   were due to his placement in seclusion and

19   restraint.

20       Q.    Now, what is your understanding of the

21   history of self-harm with respect to Mr. Folks?  It

22   had been going on for a long time, correct?

23       A.    He had --

24            MR. MITCHELL:

25                Objection to the form.  I'm

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1    sorry, Dr. Glindmeyer.  You can answer.

2         A.    I apologize.  He -- he does have a history

3    of self-injurious behavior, but the extent and the

4    severity of the self-injury that occurred at LSP is

5    far more serious and severe than any that he had

6    exhibited previously.

7    BY MR. BLANCHFIELD:

8         Q.    Well, he told me in his deposition that

9    instances of self-harm began in kindergarten or

10   before.  Are you aware of that?

11        A.    Yes, when he was very young.

12        Q.    Now, we also know -- and I think it's in

13   your report -- in 2000- -- around the time 2015 he

14   was incarcerated at Elayn Hunt, there were some

15   pretty severe self-harming instances.  Are you

16   aware of that?

17        A.    There were --

18                   MR. MITCHELL:

19                        Object to the form.

20        A.    There were; however, as I stated, the ones

21   at LSP were far more serious, requiring pretty

22   significant surgical intervention, including a

23   small bowel resection and a colectomy.

24   BY MR. BLANCHFIELD:

25        Q.    Well, in your report you go back and look

Page 12

1    at University Medical Center records from 10 years

2    ago, May and June of 2015, where he swallowed

3    multiple pieces of metal, including a razor blade,

4    and had to go to the hospital multiple times.  That

5    -- that seems pretty serious to me.  Would you

6    agree?

7         A.    Yes.

8                   MR. MITCHELL:

9                        Object to the form.

10        A.    Yes, it is serious, but, again, the -- the

11   injuries escalated during the time he was at LSP

12   requiring significant abdominal surgery.

13   BY MR. BLANCHFIELD:

14        Q.    Now, did you look at the records from 2015

15   at Elayn Hunt to evaluate the care that he received

16   while -- while incarcerated there?

17        A.    I did not have those records.

18        Q.    Do you know if he was secluded or

19   restrained at Elayn Hunt during that time period?

20        A.    I do not know.

21        Q.    The third opinion summary:  As a -- reads:

22   As a result of Mr. Folks' repeated isolation and

23   extended physical restraint he likely developed

24   posttraumatic stress disorder for which he was

25   never treated at LSP.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company          www.veritext.com

1              Can you tell me what you base that

2     diagnosis -- PTSD diagnosis on?

3         A.    So I did a psychiatric evaluation of Mr.

4     Folks, which is documented in my report, and during

5     that evaluation I did a review of symptoms looking

6     at the specific symptomatology that Mr. Folks was

7     experiencing at that time.  When looking at those

8     symptoms, they mapped onto a diagnosis of

9     posttraumatic stress disorder.  And I can go

10    through the diagnostic criteria with you if you'd

11    like, but they're outlined in my report.

12        Q.    Yeah, I see that.  And do you have an

13    opinion as to when Mr. Folks first developed PTSD?

14        A.    I'm not certain.  So it could have been

15    prior to this incarceration at LSP then exacerbated

16    due to this incarceration at LSP, but Mr. Folks has

17    a history of trauma so it's difficult in those

18    cases to determine the beginning.  How's that?

19        Q.    Are you aware that Mr. Folks, when he

20    initially arrived at LSP in the spring of 20- --

21    (inaudible) --

22                   COURT REPORTER:

23                   I'm sorry, Drew.  I didn't

24    hear the year.

25    BY MR. BLANCHFIELD:

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

1    Q.    -- 2021 -- that he was not a Department of

2    Corrections prisoner but, in fact, what we refer to

3    as a pretrial detainee?

4                    MR. MITCHELL:

5                        Object to form.

6    A.    Was I aware of that?  Is that what you're

7    asking?

8    BY MR. BLANCHFIELD:

9    Q.    Yes.

10    A.    Hello?

11    Q.    Yes, that's -- that's what I'm asking.

12    Were you -- were you aware that he was a pretrial

13    detainee?

14    A.    That was in the record.

15    Q.    Okay.  Are you aware of the implications

16    of being a pretrial detainee as opposed to being a

17    prisoner or an inmate at LSP?

18    A.    That's really --

19                    MR. MITCHELL:

20                        Object to form.

21    A.    That's really a legal distinction and so

22    my issue would not be his classification at the

23    facility, rather his conditions and his treatment.

24    BY MR. BLANCHFIELD:

25    Q.    Have -- have you ever worked at a jail or

Page 15

1    a prison?

2         A.    Yes.

3         Q.    Where?

4         A.    So Orleans Justice Center, sometimes in

5    Louisiana referred to as OPP, Orleans Parish

6    Prison.  Yeah, all of the juvenile correctional

7    facilities in the state of Louisiana.  Bridge City

8    Center for Youth for many years and then I have

9    consulted in multiple correctional facilities

10   across the country.

11        Q.    Okay.  Your work at Bridge City, were you

12   actually employed in the facility and working there

13   and treating?

14        A.    I was treating, yes.  I wasn't employed by

15   the facility, though.  Back then the State of

16   Louisiana had a contract with LSU Health Sciences

17   Center, the Juvenile Justice Program, and the

18   Juvenile Justice Program provided all of the

19   medical professionals or psychiatrists to provide

20   care.

21        Q.    And during the time that you worked in

22   these prisons did you ever have the opportunity to

23   treat someone who self-harmed?

24        A.    Yes.

25              MR. MITCHELL:

```
 1                        Object to form.
 2    BY MR. BLANCHFIELD:
 3        Q.    Can you give me an idea of how frequent
 4    that was, Doctor?
 5        A.    I still treat --
 6                    MR. MITCHELL:
 7                        Object to form.
 8        A.    I'm sorry.  I still treat people who
 9    engage in self-injurious behavior, so quite
10    frequently.
11    BY MR. BLANCHFIELD:
12        Q.    Now, are you currently working in any
13    jails providing mental health treatment?
14        A.    Treatment?  No.
15        Q.    When is the last time you did?
16        A.    It's been -- I'd have to look at my vitae.
17    (Witness reviews document.)  Probably 2010.
18        Q.    Okay.  Now, back to the question about
19    being a pretrial detainee, are you aware that
20    Louisiana law requires that a pretrial detainee be
21    held in a separate cell from other prisoners?
22        A.    I learned that --
23                    MR. MITCHELL:
24                        Object to form.
25        A.    I learned that during the course of this
```

Page 17

1    case reviewing documents.

2    BY MR. BLANCHFIELD:

3        Q.    Did you review the statute in question

4    that requires that?

5        A.    No, sir.

6                MR. MITCHELL:

7                    Object to form.

8        A.    Again, that's a legal conclusion and a

9    legal status.

10    BY MR. BLANCHFIELD:

11        Q.    Okay.  In your report you kind of quote

12    from -- it looks like you have quotes beginning on

13    page 3 from the complaint filed in this matter; is

14    that correct?

15        A.    Yes, sir.

16        Q.    And why did you do that?

17        A.    I always do that.  When I do a forensic

18    case review like this, I like to have the format of

19    what the complaint was so that I know what the

20    plaintiffs, or whoever, thought the issues were so

21    that I can look at those as I go through.

22            Further, I like to have a pretty

23    comprehensive documentation of the records so that

24    I never have to go back and look at them again.

25    Once I've gone through it, it's in my report and

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

1    it's an outline for me for situations just like

2    this when I have to have a deposition or a trial.

3        Q.    And let me ask you, by putting those or

4    recording the complaint in your report, are you

5    assuming that these allegations are, in fact,

6    accurate?

7        A.    No.

8                    MR. MITCHELL:

9                        Object to form.

10       A.    No, I'm not, because these allegations are

11   from the perspective of attorneys and an attorney's

12   perspective and a physician psychiatrist's

13   perspective are often far different.

14   BY MR. BLANCHFIELD:

15       Q.    And there's some -- there are some legal

16   issues within those quotes and I want to ask you,

17   Doctor, in your work as an expert have you ever

18   been challenged by other attorneys claiming that

19   you are giving a legal opinion as opposed to a

20   medical opinion?

21                   MR. MITCHELL:

22                       Object to form.

23       A.    No.

24   BY MR. BLANCHFIELD:

25       Q.    You've never been -- you've never been so

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

```
 1    challenged?
 2        A.    That I was giving a legal opinion as
 3    opposed to a medical opinion?
 4        Q.    Yes.  Correct.
 5        A.    No.
 6        Q.    Okay.  There's mention in there about the
 7    constitution and violating the constitution and the
 8    -- (inaudible) -- civil code charging for
 9    self-harm.  You're not intending to give --
10    (inaudible) -- on those legal issues, are you?
11                    COURT REPORTER:
12                        I didn't get it all, Drew.
13    Could you repeat it, please?
14                    MR. BLANCHFIELD:
15                        Yes.
16    BY MR. BLANCHFIELD:
17        Q.    There's -- there's reference in this area
18    of your report to the U.S. Constitution and some of
19    the Louisiana Criminal Code referencing self-harm
20    and my question is, you're not intending to give
21    any opinions with respect to those legal issues,
22    are you?
23        A.    No.
24                    MR. MITCHELL:
25                        Object to form.
```

Page 20

```
 1        A.    No, sir.  Again, I am not -- I'm not a
 2   lawyer, so I would not be opining on legal statutes
 3   or legal issues.
 4   BY MR. BLANCHFIELD:
 5        Q.    All right.  Let's talk about Mr. Folks.
 6   So if we pick up in the spring of 2021 he was
 7   incarcerated in St. Mary Parish.  Is that your
 8   understanding?
 9                   MR. MITCHELL:
10                        Object to form.
11                   MR. BLANCHFIELD:
12                        What's wrong with that
13   question, Julius?  What's wrong with the form of
14   that question?
15                   MR. MITCHELL:
16                        Um --
17                   MR. BLANCHFIELD:
18                        You have -- every other
19   question you're having a form objection and there's
20   nothing wrong with the form of that question.
21                   MR. MITCHELL:
22                        There are -- there are vague
23   terms and some ambiguity; also, compound.  She can
24   definitely answer it.  I'm just raising the
25   objection.
```

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

1    BY MR. BLANCHFIELD:

2        Q.    Doctor, do you know what question is on

3    the table?

4        A.    I think you asked -- can you repeat it for

5    me, because I got lost in y'all's discourse?

6                      MR. BLANCHFIELD:

7                           Caroline, can you read it

8    back?

9            (The previous question was read back by

10   the court reporter.)

11       A.    Yes.

12   BY MR. BLANCHFIELD:

13       Q.    And during that time -- he was there for

14   -- do you know how many days he was in St. Mary

15   Parish?

16       A.    Not very many.  He wasn't there very long.

17       Q.    And while he was there for a few days he

18   engaged in some pretty serious acts of self-harm?

19       A.    Yes, that's correct.

20       Q.    He had to be hospitalized; is that

21   correct?

22       A.    He went -- he went to the hospital, yes.

23       Q.    And then he came back from the hospital

24   and self-harmed again?

25       A.    Yes.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                 www.veritext.com

1          Q.    And do you know if he was restrained
2    during that time period at St. Mary Parish?
3          A.    I do not know.
4          Q.    Do you know why he self-harmed while he
5    was at St. Mary Parish?
6                     MR. MITCHELL:
7                          Object to form.
8          A.    I'm trying to remember.  Hold on just a
9    second.  (Witness reviews document.)  I think he
10   was experiencing -- I would have to look through my
11   records and I'm trying to find it right now, but I
12   think he was experiencing some frustration and some
13   agitation regarding his arrest in the first place.
14   BY MR. BLANCHFIELD:
15         Q.    And that is your recollection of what led
16   to his instances of self-harm while at St. Mary
17   Parish?
18         A.    I'm still looking.  (Witness reviews
19   document.)  Here we go.  Yes.
20         Q.    Okay.  So when he gets to LSP in -- after
21   his short stay at St. Mary Parish -- well, let me
22   -- let me -- let me start over here.  What is your
23   understanding as to why he ends up at LSP from St.
24   Mary Parish?
25         A.    It was my understanding that St. Mary

                                              Page 23

```
 1   Parish didn't have the resources to manage Mr.
 2   Folks in their facility.
 3        Q.   Give me a second.  I'm going to try to
 4   close out -- (indicating).  I see I had my app
 5   running.  That may be one of the problems here.
 6             And the understanding was that LSP would
 7   be better equipped to handle this type of inmate?
 8        A.   Perhaps that there were more resources.
 9        Q.   Do you know how long Mr. Folks was at LSP
10   before he self-harmed?
11        A.   It looks like he went on an extreme
12   suicide watch in April, on April the 11th, 2021.
13        Q.   And was -- was there an instance of
14   self-harm that caused him to go on extreme suicide
15   watch?
16        A.   It appears that he cut his -- he cut
17   himself.
18        Q.   And do you have an opinion as to what
19   caused him to self-harm in that manner in April of
20   2021?
21        A.   Mr. Folks, like we stated earlier, has a
22   history of self-injurious behavior.  If you look at
23   -- you know, there's actually purported diagnostic
24   criteria -- and I think it's in my report -- for
25   nonsuicidal self-injury where people experience
```

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1    stress, they don't have the coping skills to deal
2    with such stressors, and so they engage in
3    maladaptive coping skills such as self-injury.  So
4    I would opine that it went down that road.
5        Q.    And is it your opinion that the self-harm
6    that occurred in April of 2021 was caused by
7    seclusion and restraint?
8        A.    It's not clear to me where Mr. Folks was
9    initially housed when he came into the facility.  I
10   believe initially he was in an isolation room in
11   nursing, so that is an isolation type of
12   environment.  He didn't go into four-point
13   restraints, that I see, until April the 11th.
14       Q.    Do you agree that someone who is in four-
15   point restraints is less likely to self-harm than
16   someone who is not restrained?
17       A.    Theoretically.
18       Q.    What about in practice?
19       A.    You know, given the documentation that
20   I've reviewed regarding Mr. Folks, he was able or
21   he did engage in self-injurious behavior even while
22   restrained.  So that sort of puts a hole in that
23   theory, right?  Because he was able to self-injure
24   while in four-point restraints.
25       Q.    Do you recall that actual incident with

Page 25

1    what he did when he was in four-point restraints?

2        A.    I believe that was an incident with a

3    sliver of metal.

4        Q.    And can you offer any explanation as to

5    how that can be accomplished when you're in

6    four-point restraints?

7        A.    Well, it's concerning that, A, he had

8    access to that item; B, that the monitoring was --

9    was he being monitored continuously while he was in

10   four-point restraints to keep him from engaging in

11   that type of behavior?  In fact, there was

12   documentation, I think, from University Medical

13   Center about concerns regarding Mr. Folks' access

14   to items to be used to hurt himself.

15          In addition, there was documentation from

16   LSP that he -- mental health staff noted that he

17   had items that he shouldn't have had in his room.

18   So there was a need for better monitoring and

19   self-sweeps to make sure that he didn't have access

20   to items that he could use for self-injury.

21       Q.    Do you know where he was -- well, on April

22   11, 2021 you say he was on extreme suicide watch.

23   What is your understanding of what that means at

24   LSP?  What kind of cell are you in; what does it

25   look like?

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1      A.    You're in a cell by yourself, so -- and

2   you're in four -- in this case he was in four-point

3   restraints.  Now, extreme suicide watch at LSP,

4   according to policy and procedure, can be either

5   four-point or two-point restraints.  At this point

6   he was in four-point restraints.

7      Q.    And the front of his cell is open,

8   permitting observation and a camera; is that

9   correct?

10     A.    And there's -- and there's cameras, yes.

11     Q.    So he remains at LSP from late March or

12  early April until he is actually transferred to

13  death row.  Is that your understanding?

14     A.    Yes.

15     Q.    Do you know when he was transferred to

16  death row?

17     A.    Let me see.  (Witness reviews documents.)

18  Sometime after -- sometime after -- I think

19  sometime after August of 2021, I think.

20     Q.    I think it may be 2022.  I'm not putting

21  words in your mouth, but --

22     A.    It may be.  I may have the wrong year

23  number.

24     Q.    Yeah, because you're -- we know that he

25  was released --

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

1         A.     In November.

2         Q.     -- in '22.  So I'm just going to suggest

3    that I think it was August of 2022, so he would

4    have been in the treatment unit area from April of

5    2021 until August of 2022, to my understanding.

6         A.     Okay.

7         Q.     So some 16 months?

8         A.     Approximately.

9         Q.     Approximately, give or take.  And we know

10   during that time period that he engaged in

11   self-harm a number of times?

12        A.     Yes.

13        Q.     Now, when he -- were you aware that he

14   would not be able to be transferred to death row

15   until he actually became an inmate as opposed to a

16   pretrial detainee?

17        A.     I read --

18                    MR. MITCHELL:

19                         Object to the form.

20        A.     I'm sorry.  I read that in the records.

21   BY MR. BLANCHFIELD:

22        Q.     And once he is transferred to death row

23   he's there from August to November when he is

24   released and we know that there was -- there were

25   no instances of self-harm while on death row.  Is

Page 28

1    that your understanding?

2         A.    That's my understanding.

3         Q.    Do you know the conditions of confinement

4    that he had while on death row from August to

5    November of 2022?

6                   MR. MITCHELL:

7                        Object to form.

8         A.    Based on my conversation with Mr. Folks --

9    and I've been on death row there before; it's been

10   a while, but I remember the area, so yes.

11   BY MR. BLANCHFIELD:

12        Q.    But what is your understanding of that?

13        A.    Mr. Folks indicated that while on death

14   row it was better than where he was before.  He was

15   able to have time out of his cell each day.  I

16   think it was an hour out of his cell.  He was able

17   to speak with other individuals who were

18   incarcerated on death row in that area and he was

19   not subjected to physical restraint during that

20   time.

21        Q.    He was in a single cell by himself,

22   though, wasn't he?

23        A.    That's my understanding, yes.

24        Q.    So when he got out for an hour he was able

25   to talk to other death row inmates?

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

```
 1        A.     That's my understanding from him.
 2        Q.     When's the last time you were on death
 3   row?
 4        A.     It's been a while.  It's been a long time.
 5        Q.     (Inaudible.)
 6        A.     You're gone.  You're gone.
 7        Q.     Oh, I see.  Okay.  I'm back.  I don't know
 8   why, but sometimes the green box around my head
 9   goes away.  I can't figure it out, but it's back,
10   so --
11               Was your last trip to death row before
12   2017?
13        A.     Maybe.  Maybe.  I can't remember the year.
14   I know it was pre-COVID.  How's that?
15        Q.     Okay.  Are you aware of changes that have
16   occurred in the last five years on conditions of
17   confinement on death row?
18        A.     No, sir.
19        Q.     Okay.  So we know that Mr. Folks is
20   released in November of 2022.  I think you told us
21   that he stayed in Louisiana for a while and then
22   eventually ended up in Texas; is that correct?
23        A.     That's my understanding, yes.
24        Q.     Do you know what brought him to Texas?
25        A.     Yes.
```

Page 30

```
 1              MR. MITCHELL:

 2                     Object to form.

 3    BY MR. BLANCHFIELD:

 4         Q.    What?

 5         A.    I'm sorry?

 6         Q.    Why did he go to Texas, your

 7    understanding?

 8         A.    So Mr. Folks' family has a friend named

 9    Ms. Karen Godwin (spelled phonetically), and she's

10    a close friend of the family, and he went to Texas

11    to visit with her and he ultimately made the

12    decision to stay with her.

13         Q.    So do you know approximately when he left

14    Louisiana for Texas?

15         A.    I think I do.  (Witness reviews document.)

16    It was over a year ago.  Over a year ago.  I don't

17    know the exact date, however.  I'm sorry.  (Witness

18    reviews document.)  He has resided with Ms. Godwin

19    for about two years, so about two years.

20         Q.    Okay.  So in rough terms we know he gets

21    out of LSP in November of 2022 and that sometime in

22    2023 he moves to Texas?

23         A.    That's -- yes, approximately.

24         Q.    And we know that that period that he was

25    out of prison and in Louisiana have no instances of
```

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

1    self-harm; is that correct?

2         A.    Not to my knowledge.

3         Q.    We know that when he goes to Texas he

4    actually gets arrested and incarcerated for theft?

5         A.    I don't remember the charges, but, yes, he

6    was arrested.  That's my understanding.

7         Q.    And I think in the report and the record

8    it shows that he was incarcerated in Brazoria

9    County, Texas?

10        A.    Yes, Brazoria.

11        Q.    And do you know approximately how long he

12   was incarcerated?

13        A.    I don't.  I don't have the records from

14   that incarceration.  I would like to, but I don't.

15        Q.    I think he still has to go to jail on

16   Sundays, if I understand that?

17        A.    No.  My understanding is that he has to do

18   community service on Sundays.

19        Q.    Okay.  Is it also your understanding that

20   during that period of incarceration at Brazoria

21   County he did not engage in any instances of

22   self-harm?

23        A.    Not to my knowledge.

24        Q.    And, further, he is -- he's living --

25   living with a mate and has a relationship; is that

Page 32

1    correct?

2        A.    A girlfriend, yes.

3        Q.    A job?

4        A.    He does, yes.

5        Q.    Working from 8 to 5 and no adverse mental

6    health crises or anything like that?

7        A.    When you say it -- when you say crises,

8    okay; however, he is struggling and that's written

9    in my report, that he does have struggles on the

10   daily.  And he functions with a good deal of

11   support from Aunt -- and I use that in quotation

12   marks because she's not actually his aunt, but

13   that's how he refers to her -- quite a bit of

14   support from Aunt Karen.

15       Q.    But he is not treating with any mental

16   healthcare providers, is he?

17       A.    Unfortunately, no.

18       Q.    He's not on any -- any medication either,

19   is he?

20       A.    Not at this time, that's my understanding.

21       Q.    And he has been off his medication for

22   over a year at least?

23       A.    That's my understanding.

24       Q.    Doctor, in your review of these records

25   and including your interview with Mr. Folks, did

Page 33

1    you reach a mental health diagnosis on Mr. Folks?

2        A.    Yes.

3        Q.    And what is that diagnosis?

4        A.    It's my opinion that Mr. Folks meets

5    diagnostic criteria for posttraumatic stress

6    disorder.

7        Q.    And I think you go through that very

8    clearly and you lay it out in your report, so we

9    don't need to go through that.  Is that the full

10   extent of your diagnosis?

11       A.    You know, I discussed briefly nonsuicidal

12   self-injury, but as we talked -- I think we talked

13   about this earlier -- that's a diagnosis under

14   investigation in the Diagnostic and Statistical

15   Manual of Mental Disorders, Fifth Edition -- that's

16   a mouthful, isn't it -- so that's a diagnosis of

17   investigation.

18            So I can't say that he meets criteria for

19   that, although I think he probably has in the past

20   if it was an actual formal diagnosis, but for right

21   now it was my opinion posttraumatic stress

22   disorder.

23       Q.    And when you interviewed him he was not

24   expressing any suicidal ideations -- (inaudible).

25       A.    I'm sorry.  You broke up again.  I

Page 34

1     apologize.

2          Q.    No, that's not your fault.  When you --

3     when you interviewed him he was not -- he did not

4     express any suicidal ideation; is that correct?

5          A.    No.  No, he did not.

6          Q.    In fact, if I understand it, he had not

7     really had any issues with suicidal ideations for

8     quite some time while he was living in Texas?

9          A.    Correct.

10         Q.    Do you know that there are some treating

11    psychiatrists here in Louisiana, including Dr.

12    Gamble and Dr. Fleming, that have diagnosed Mr.

13    Folks with a personality disorder?

14         A.    That was in the record.

15         Q.    Do you disagree with that diagnosis?

16         A.    I'm sorry?  You broke up again.  I'm

17    sorry.

18         Q.    Do you disagree with that diagnosis of

19    personality disorder?

20         A.    I don't disagree with it, per se; however,

21    if you look in my report, what I said was I'm not

22    sure that it was a fair assessment of Mr. Folks'

23    difficulties.

24         Q.    Now, I want to ask you about your

25    appreciation of the use of restraints while at LSP

1    during the 16-month time period.  I assume that you

2    feel that the use of restraints can be appropriate

3    at times?

4         A.    Restraints can be an appropriate

5    intervention when used in an extreme situation of

6    crisis and for a limited time with appropriate

7    monitoring and psychiatric treatment and care --

8    psychiatric and mental health treatment and care.

9         Q.    You think it is appropriate to use

10   restraints in order to protect the patient or

11   protect others around the patient?

12                    MR. MITCHELL:

13                         Object to form.

14        A.    That's typically the criteria for the use

15   of restraints.

16   BY MR. BLANCHFIELD:

17        Q.    What is your -- what is your understanding

18   of how often Mr. Folks -- when he was in restraints

19   -- how often did he get out of restraints on a

20   day-to-day basis?

21        A.    I believe that the policy at LSP required

22   every two hours for him to get up for the bathroom

23   and for range of motion.

24        Q.    And to -- and to eat, I think; is that --

25        A.    Yes.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

```
 1        Q.    There's a reference in your report to the
 2   potential transfer of Mr. Folks to Elayn Hunt.  Do
 3   you recall that?
 4        A.    Yes.  Can you remind me what page that was
 5   on?
 6        Q.    Yeah.  It's on page 46.
 7        A.    Thank you.
 8        Q.    You're welcome.
 9        A.    (Witness reviews document.)
10        Q.    It references the potential for
11   transferring Mr. Folks to Elayn Hunt.  Have you
12   ever been to Elayn Hunt?
13        A.    Yes, sir.
14        Q.    What do you know about the mental health
15   system at Elayn Hunt?
16        A.    That's basically where the primary mental
17   health unit is for the system.  I've been there.
18        Q.    Do you know if, in fact -- well, you know
19   that Mr. Folks was incarcerated at Elayn Hunt?
20        A.    Previously, yes.
21        Q.    And he engaged in -- we already talked
22   about self-harm, swallowing metal objects,
23   swallowing razor blades.  That happened while he
24   was at Elayn Hunt?
25        A.    That's my understanding.  Again, I didn't
```

Page 37

1     see the records specifically from Elayn Hunt during

2     that incarceration.

3          Q.    I thought you did.  Let me clear this up,

4     at least in my mind.  (Counsel reviews document.)

5     Okay.  Yeah, so I guess -- yeah, I'm looking at

6     page 21.  It's actually the medical records from a

7     University Medical Center reference being at Hunt

8     Correctional swallowing multiple pieces of metal,

9     including a razor blade.  So you saw the medical

10    records; not the -- not the Hunt records, correct?

11         A.    That's -- yes.

12         Q.    Okay.  And are you aware that Dr. Gamble

13    actually treated Mr. Folks while he was at Elayn

14    Hunt in the 2015 time period?

15         A.    Based on deposition testimony, yes.

16         Q.    And I'm not really sure of what -- when we

17    go back to page 46 in your reference to Elayn Hunt,

18    I don't -- are you saying that in your opinion he

19    should have been transferred to Elayn Hunt?

20         A.    Given the significant difficulties he was

21    experiencing from a behavioral health perspective,

22    Elayn Hunt would have had potentially more

23    resources to address his symptomatology.

24         Q.    When you interviewed Mr. Folks on April

25    10, 2025, did you feel that he was suffering from

Page 38

1     PTSD?

2          A.     That was my opinion.

3          Q.     And, again, you really can't pinpoint when

4     Mr. Folks would have first developed PTSD?

5          A.     No.

6          Q.     Would it be -- would it be accurate to say

7     that in all likelihood he had PTSD years before the

8     occurrences in the spring of 2021 when he was

9     incarcerated at St. Mary Parish?

10         A.     It's very possible, and then the symptoms

11    were -- as I stated -- I think I said this earlier

12    -- were exacerbated by isolation and restraint.

13         Q.     What would be your recommended treatment

14    for Mr. Folks now in the summer of 2025?

15         A.     I think that treatment specifically

16    addressing posttraumatic stress disorder would be

17    appropriate.  I think I actually outlined that in

18    my report.  Let's see if I can find the page.  Page

19    44.

20              So basic -- basic pharmacotherapy,

21    basically psychotropic medication targeting

22    particular symptoms, in this case the anxiety, the

23    sleep, the -- and other symptoms associated with

24    posttraumatic stress disorder, and cognitive

25    behavioral therapy.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

1                   There's actually cognitive behavioral

2     therapy subsets -- that's the best word I can use

3     right now -- essentially trauma-focused cognitive

4     behavioral therapy that would be beneficial for Mr.

5     Folks or could be beneficial.

6          Q.     And he has never -- to your knowledge, he

7     has never engaged in cognitive behavioral therapy?

8          A.     Not to my knowledge.

9          Q.     Did y'all discuss that during your

10    interview?

11         A.     We talked about his history of treatment

12    and it appears that it was mostly

13    psychopharmacology-based other than the inpatient

14    crisis stabilization hospitalizations when he was

15    younger.

16         Q.     I'm going to pull up some medical records

17    and ask you to look at them with me.  Do you want

18    to take a break before we move on to another topic?

19         A.     It's up to you.  I'm good.

20                   MR. BLANCHFIELD:

21                      Julius, are you good?

22                   MR. MITCHELL:

23                      Yeah, I'm good.

24                   MR. BLANCHFIELD:

25                      Okay.  Well, we'll start into

                                              Page 40

```
1    it.  Would y'all prefer me to put them in chat or
2    share screen or what would be best?
3                     MR. MITCHELL:
4                          I think Dr. Glindmeyer's
5    preference.
6                     THE WITNESS:
7                          However they show up best, I
8    guess.
9                     MR. BLANCHFIELD:
10                         All right.  I'm going to try
11   to put them in chat and see if you can open them
12   and take a look at them and, if not, we'll share
13   screen.  Do you see that, Doctor?
14                    THE WITNESS:
15                         I don't see anything but you.
16            (Discussion off the record to address
17   technical issues; 10:10 to 10:15 AM.)
18   BY MR. BLANCHFIELD:
19       Q.   So, for the record, we've got a Bates
20   stamp on this, 003350.  So, Doctor, this is from
21   April 12, 2021, the Clinician Notes on Mr. Folks.
22   I think we discussed that time period, April 11th,
23   when he was on extreme -- and the note says:
24   Offender was seen for extreme watch, four-point
25   reevaluation.  Offender engaged in casual
```

Page 41

1   conversation with social worker and security staff.
2   Offender stated his behavior is because he feels he
3   should not be here; social worker contact his
4   probation officer letting her know he was her (sic)
5   because she told him he would not be violated.
6   Offender plans is to cause enough problems DOC will
7   send him back to the parish.
8            Do you know why Mr. Folks wanted --
9   apparently wanted to go or was at least stating he
10  wanted to go back to the parish in April of 2021?
11       A.    I'm not sure.
12       Q.    We know that he engaged in self-harm on
13  multiple occasions during his brief stay in the
14  parish, correct?
15       A.    That's my understanding, yes.
16       Q.    Would that be fair to assume that he was
17  discontent in the parish in light of the fact that
18  he self-harmed?
19       A.    Apparently.  However, you know, at this
20  point we've got a person under severe stress who's
21  engaging in significant self-injurious behavior.  I
22  don't know that his statements of what he wants or
23  why he's doing it at this point are accurate.
24       Q.    Okay.  If we go to -- the next page is
25  Bates-stamped 003340.  We're now the next day,

1    April the 13th.  So the note is he's still on

2    extreme suicide watch, lying in bed, four-point

3    restraints, no -- security did not report any

4    significant occurrence during the last 12 hours.

5    Offender Folks was calm; stated, I need to know

6    what my bond is.  When I get tired of this I will

7    have something for them.  Social worker explored

8    what offender meant by comment.  Offender stated:

9    I work backwards.  When I get off this I'll do

10   something that will require a doctor to fix.  Now

11   the social worker encouraged Offender not to

12   self-mutilate.

13           So we know the next day he's still on

14   extreme suicide watch, correct --

15        A.    Yes.

16        Q.    -- in four-point restraint and he is

17   essentially threatening to self-harm again.  Is

18   that a fair assessment of this note?

19        A.    Apparently, yes.

20        Q.    So do you feel that at this point that he

21   still needs to remain on restraints in light of his

22   threat to self-harm?

23        A.    So that's kind of a trick question, okay?

24   And let me explain why.  He is in four-point

25   restraints because of self-injurious behavior and

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1    the risks of ongoing self-injurious behavior, but

2    other than isolation and restraints he's not

3    receiving any other interventions targeted at

4    preventing ongoing self-injurious behavior.

5         And by that I mean therapeutic

6    interventions, cognitive behavioral interventions

7    or even a behavior management plan with

8    interventions and rewards for positive behavior.

9         So there are multiple interventions that

10   could be used to reduce the suicidal ideation or

11   the risk of self-harm.

12   Q.   And can those be used while the individual

13   is on extreme suicide watch and restrained in four

14   points?

15   A.   Absolutely.  So teaching a person

16   cognitive behavioral skills or mindfulness stress

17   reduction, this would be a time to do that to help

18   process them out of restraints and the need for

19   more -- than the need for that type of intensive

20   intervention.

21   Q.   Okay.  If we go to the next page, which is

22   003285, we are now 4/19, a few days later.  It

23   appears Mr. Folks is still on extreme suicide

24   watch.  It says that he continues to make threats

25   of self-harm.  Apparently he was reduced to

Page 44

1    two-point restraint but still on extreme suicide

2    watch.  Is that -- is that accurate?

3         A.    Yes.  I apologize, you guys.  My dogs are

4    having a moment.  If you want to take a break, I

5    can go attempt to quell their dissatisfaction.

6         Q.    Well, we can -- we can take a 10-minute

7    break if that -- if that --

8         A.    Only if it bothers you guys.  They might

9    stop now.  I think my mother let them outside.

10        Q.    Okay.  Well, if we need to stop, just

11   holler.

12        A.    Okay.

13        Q.    So at this -- so 4/19 Mr. Folks is still

14   threatening self-harm and you would agree that he

15   is essentially a possible suicide risk at that

16   time?

17        A.    His -- the documentation from the mental

18   health worker who saw him that day documented

19   possible suicide risk and, you know, I think given

20   all of the risk factors that Mr. Folks had, yes, he

21   is a suicide risk.

22             But, again, he's a suicide risk and it's

23   ongoing because other than restraints and isolation

24   there has been no interventions to reduce his

25   overall risk factors.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                 www.veritext.com

1      Q.    Okay.  If we page down to 003280, the next

2   day, morning of 4/20/21, still on extreme suicide

3   watch and he says, He is only on a minor charge and

4   should not be at Angola.  Did he discuss that with

5   you at all during your interview?

6      A.    Superficially that he thought that he

7   should not have been at LSP, but, again -- and we

8   talked about this, I think, at the beginning of the

9   deposition -- his legal status and classification,

10  you know, that's not something that I'm opining on

11  here.

12     Q.    Okay.  And it says that he continues to

13  make threats of self-harm as of 4/20/21.  Is that

14  because he felt like he shouldn't be at Angola?

15     A.    That's unclear.  I think it's a

16  multifactorial reason that he's continuing to make

17  threats of self-harm.  When I talked to him about

18  his history of self-injurious behavior and where he

19  goes in his head when he engages in nonsuicidal

20  self-injury, it's very focused on how he can reduce

21  his negative or his internal anxiety and angst that

22  the self-injurious behavior provides some relief

23  from that internal anxiety and angst so he engages

24  in it.

25     Q.    Okay.  All right.  If we go down to the

Page 46

1    next page, which is Bates 003279, same day, 4/20 at

2    the review 7:30 PM, in here we see that Mr. Folks

3    is verbalizing threats of self-harm if extreme

4    suicide watch was not discontinued.  As a

5    practitioner what do you do with that when you have

6    someone who is saying, you know, I'm going to

7    self-harm if you don't do this?

8         A.    So I think I talked about that earlier,

9    that there has been opportunity for intervention

10   over the course of this -- over the course of this

11   event, right?  Engaging in cognitive behavioral,

12   dialectical behavioral interventions with Mr.

13   Folks, creation of a behavior management plan with

14   specific targeted interventions and rewards for his

15   not engaging in self-injurious behavior.  So I

16   think there are ways to work with Mr. Folks rather

17   than work against him.

18        Q.    Given -- given this record from 4/20/21

19   where it says verbalizing threats of self-harm if

20   extreme suicide watch is not discontinued, would

21   you take this patient out of restraints?

22        A.    If I had done the groundwork that I talked

23   about a minute ago, perhaps, and to see what

24   behavioral interventions we could agree to to

25   support him in not self-injuring.

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

1          Unfortunately, when you look at this

2    record, if you look down at the bottom over and

3    over we see that staff are discounting his behavior

4    as manipulative, which means that he's discounted

5    from the beginning and they are not engaging in the

6    treatment or using treatment interventions.

7          Q.    Do you not think that his behavior was, in

8    fact, manipulative?

9          A.    I think it became that way, or it could be

10   seen that way, but I think when you look at the

11   whole picture of Mr. Folks, he has engaged in

12   nonsuicidal self-injury for a long time.  It

13   increases when he's under stress.  He doesn't know

14   how to manage stress.  It increases when he's

15   subjected to things that he thinks are or that are

16   restrictive or coercive like seclusion and

17   restraint.  So how can we work our way out of

18   seclusion and restraint with interventions and with

19   behavior management?

20         Q.    All right.  The next page is 003259.  It's

21   much of the same stuff, still on extreme suicide

22   watch, two-point restraints, making threats of

23   self-harm if his demands are not met.  Next day,

24   4/22, Offender continues to endorse suicidal

25   ideation if his demands are not met by

Page 48

1    classification; continued on standard suicide

2    watch.  So now we're on April 22nd.

3            Next page, 003242, is the next day, 4/23,

4    much of the same thing.  I want to go to 003097.

5    This is a note from Dr. Gamble.  Do you recall

6    seeing this note?

7        A.    Can you tell me the date at the bottom of

8    that?

9        Q.    Yeah, it's -- I want to say it's -- it's

10   June, I don't know, 16th?  If you can see it, it's

11   kind of scratched through.  I don't remember if he

12   was asked the actual date.

13       A.    I can see it now.  Just before, the side

14   was cut off so I couldn't read the date.  I could

15   only see, like, the beginning of the number 6, but,

16   yes, I've seen it.

17       Q.    So this -- okay.  And this is after the

18   suicide watch of April 20, '21.  So his note says:

19   Patient with recent self-injury that was

20   nonsuicidal and likely in the context of placement-

21   seeking.  He was to be moved to cell at TU but

22   injured himself.  He has made it known that he

23   would like to stay on SNU1, which I believe is

24   Skilled Nursing Unit 1.

25           The doctor continues -- and this is the

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1       treating psychiatrist, Dr. Gamble, at LSP.  You

2       understand that?

3           A.    Yes.

4           Q.    Okay.  It says:  These types of behaviors

5       are very typical of patient's presentation and have

6       shown little improvement despite medication,

7       placements, attempts to offer therapy, et cetera.

8                 Do you know what attempts to offer therapy

9       refers to?

10          A.    No, because in reviewing the record I did

11      not see where Mr. Folks was engaged in therapy,

12      regularly reoccurring therapy.

13          Q.    Okay.  If we go down to the bottom it

14      says:  There is not any part of his presentation I

15      have felt to be in the context of a -- is that

16      disorganized mental health illness?

17          A.    I can only see -- I'm actually -- as

18      you're doing this I'm looking at my mental health

19      record review and that's how I'm following along

20      because we don't see the full page.  And it -- I

21      think it says in the context of a diagnosed mental

22      health illness.  I think that's what it says.

23          Q.    Yeah, I think -- I think you're correct.

24      Which are you in agreement with that, that at this

25      time Mr. Folks being described as not in that

Page 50

1    context of mental health illness?

2                    MR. MITCHELL:

3                         Object to form.

4         A.    Mr. Folks was experiencing some pretty

5    significant symptomatology at this point.  It's

6    unclear what the diagnosis was.  There were

7    multiple diagnoses over the course of his history

8    prior to his entering into the LSP facility for

9    this incarceration.  So the possibility of anxiety

10   disorder, thought disorder, mood disorder exists.

11   BY MR. BLANCHFIELD:

12        Q.    But that -- he was never diagnosed with

13   those illnesses; is that correct?

14        A.    Well, it's my understanding that he was

15   prior to coming into the facility.

16        Q.    Who diagnosed him?

17        A.    It's in his history, that he was diagnosed

18   at the hospital, at St. Mary's, at various places,

19   that there were previous diagnoses purported for

20   him.  At this point I think Dr. Gamble is talking

21   about Cluster B character pathology which goes back

22   to borderline personality disorder or one of the

23   Cluster Bs, right?  There are several.

24        Q.    Is that -- is that, I think, what we refer

25   to as an SMI as a mental --

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1      A.     Well, it could be depending on your

2   definition of SMI.

3      Q.     Well, he's -- Dr. Gamble is saying here in

4   June of '21 that he does not see any mental health

5   illness; is that correct?

6      A.     That's what he says.

7      Q.     And you read his deposition?

8      A.     I did.

9      Q.     And you saw that he has been essentially

10  familiar with Mr. Folks for over 10 years and had

11  always diagnosed a personality disorder as opposed

12  to a mental illness?

13     A.     I did see that.

14                    MR. MITCHELL:

15                        Object to form.

16     A.     I did see that; however, again, it's not

17  clear -- and I think I stated this in my report --

18  Mr. Folks was discounted quite a lot as being

19  manipulative and -- I'll give you this -- this was

20  an extremely difficult case to manage.  No doubt.

21           I mean, Mr. Folks' case is extremity

22  difficult and challenging, right?  But I think that

23  discounting what he's doing as manipulative allows

24  for the failure to provide more intensive

25  interventions or to look at him from a specific

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                     www.veritext.com

1  diagnostic perspective.

2          I'll take you back to March 31st, 2021

3  where Mr. Folks first came into the facility and he

4  was given a level of care review at a Level 3,

5  which based on the description of that at LSP is an

6  SMI level of care.  So it was a roundabout way of

7  me asking (sic) your SMI question.

8  BY MR. BLANCHFIELD:

9      Q.    All right.  So let's move on to 003044.

10  We're now in June, June 21.  Apparently Mr. Folks

11  is back on extreme suicide watch.  Alert, oriented,

12  joking inappropriately about thinking of various

13  ways to kill himself if he is let up from four-

14  point.

15          So you have this individual with his

16  history who is now saying essentially if you let me

17  out of four-point restraint I'm going to kill

18  myself.  Is that a fair representation of that

19  note?

20                  MR. MITCHELL:

21                      Object to form.

22      A.    That's what -- that's essentially what it

23  says.

24  BY MR. BLANCHFIELD:

25      Q.    So you mentioned, you know, an extremely

1    difficult case.  I mean, what -- as a practitioner

2    what do you do when you are faced with that kind of

3    a threat?

4        A.    Again, I think had the -- had there been a

5    treatment plan implemented prior to June 21st we

6    might not have been here, right?  Mr. Folks was

7    discounted as manipulative.  They did not do any

8    cognitive behavioral, dialectical behavioral or

9    mindfulness stress reduction interventions or a

10   behavior management plan.

11             So, you know, I don't have the magic wand

12   that had they done this we would have seen

13   something differently, but the issue is that there

14   were no interventions outside of suicide watch,

15   which at this facility equaled -- for an extreme

16   watch -- equaled four- or two-point restraints and

17   isolation.

18       Q.    I want to go down to Bates stamp 002926.

19   We're now in July of 2021.  Offender seen on below

20   date and approximate time at the treatment unit for

21   evaluation.  Offender presented alert, calm; denied

22   any acute complaints.  He reported feeling good,

23   appeared in a good mood.  Offender adamantly denied

24   suicidal or homicidal ideations.  Per Dr. Gamble's

25   order, Offender's standard suicide watch was

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1    discontinued.

2              Do you think that was appropriate to

3    discontinue the suicide watch given the

4    representations made by Mr. Folks?

5        A.    I'm not sure.  And the reason I say that

6    is because people say lots of things, right?  I've

7    had patients say, Oh, no, Dr. Glindmeyer, I'm not

8    suicidal, absolutely I would never hurt myself, and

9    in the same breath they're holding a knife to their

10   wrist.

11             So it's not just what they say.  It's not

12   what a person says, but it's the totality of the

13   risk assessment and that's what as mental health --

14   mental health practitioners, you know, we're

15   supposed to do comprehensive risk assessments for

16   folks.

17             Understand that when it comes to

18   predicting behaviors, we're really not great at it.

19   What we can do is a risk assessment.  You know, we

20   don't have a crystal ball, so we can't predict what

21   the future holds.  But risk assessment is a viable

22   tool in our tool chest.

23             So I think, based on everything, was it

24   appropriate?  I don't know.  It certainly doesn't

25   seem like it was because later that same day I

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1    think Mr. Folks engaged in self-injury yet again

2    and had to go back on an extreme watch.

3         Q.    Okay.  So at least from this note it's

4    clear that he's saying, Hey, I'm good; I'm not --

5    I'm not thinking about suicide; I'm not thinking

6    about hurting myself, and that's what led Dr.

7    Gamble to take him off suicide watch.  Would you

8    agree with that?

9                   MR. MITCHELL:

10                         Object to form.

11        A.    Well, that's what it says.

12   BY MR. BLANCHFIELD:

13        Q.    And the testimony in this case by most of

14   the physicians, I think, is that, you know, the

15   goal is to get them off of four-point restraints.

16   Is that accurate?

17        A.    One would hope, but, again -- and I think

18   I've said this like three times -- if that's the

19   goal, where are the interventions.

20        Q.    And, you know -- and I understand you've

21   said this, but I still have to ask the question and

22   if it's the same answer that's fine, for the

23   record, but it's also clear that -- that as a

24   practicing physician they want to get this

25   individual off of suicide watch if appropriate?

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

1          A.    Correct.  But I also want to point out

2     that at this time I just think this is

3     illustrative, that at this time on July the 6th

4     there is not an independent progress note offered

5     by the psychiatrist.

6          Q.    Well, but he's been talked to?  Isn't it

7     clear that he's engaged here because he's the one

8     who said, Okay, let's take him off suicide watch?

9                     MR. MITCHELL:

10                         Object to form.

11         A.    Well, there's no documentation of an

12    independent evaluation by the psychiatrist.

13    BY MR. BLANCHFIELD:

14         Q.    But he did sign an order discontinuing the

15    suicide watch?

16         A.    He did.

17         Q.    And that's at 8:13 AM --

18         A.    He --

19         Q.    I'm sorry, Doc.

20         A.    He did; however, but if you're going to

21    discontinue a suicide watch in someone with this

22    level of risk and pathology, I think it

23    necessitates an evaluation on the part of the

24    psychiatrist.

25         Q.    Go to the next page, go to 002924.  The

Page 57

1    Treatment Unit Officer Franklin came into the

2    mental health office and informed social worker

3    that Offender just cut himself in the stomach.

4            So we're essentially an hour after Mr.

5    Folks says, I'm fine; I'm not -- I'm not suicidal;

6    I'm not going to harm myself.  He does, in fact,

7    engage in what appears to be a fairly serious act

8    of self-harm; is that correct?

9        A.    Yes.

10       Q.    And I assume that part of the reason this

11   is a difficult case is you have someone who's

12   saying to you, I'm just fine, all is good, and then

13   minutes later is harming himself.  Is that part of

14   the makeup here?

15                    MR. MITCHELL:

16                          Object to form.

17       A.    There are multiple reasons why this is a

18   challenging case and I think part of the reason

19   that it's extra challenging, and I've said this

20   before, is that there have been no treatment

21   interventions, so it just languishes and over time

22   it gets worse.

23   BY MR. BLANCHFIELD:

24       Q.    Do you know when was the last time that

25   Mr. Folks harmed himself?

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company            www.veritext.com

1     A.    It's sometime -- my understanding is it's
2   sometime during the period of his incarceration at
3   LSP and based on -- sometime in 2022.
4     Q.    We know that he was sent to death row in
5   August of 2022, but --
6     A.    So prior to that.
7     Q.    If we look at Bates stamp 2810, 002810
8   from August 2nd, so he's not at the death row yet,
9   but it says, Security did not report any
10  significant occurrence in the last 12 hours.
11  Offender was emotional and crying as he lamented
12  about going too far with his last self-injurious
13  act.  Offender stated, I'm done; I'm not going to
14  hurt myself anymore.  Please let me -- (inaudible).
15                     COURT REPORTER:
16                     I'm sorry, Drew.  Please let
17  me --
18                 MR. BLANCHFIELD:
19                     Off this -- off of this.  I'm
20  sorry.
21  BY MR. BLANCHFIELD:
22    Q.    He is kept on four-point restraints.  I
23  don't have any indication of any self-harm issues
24  after that date.  Do you?
25    A.    I'm looking.  (Witness reviews documents.)

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1    I do not.

2         Q.    Do you have an idea or an understanding of

3    how much time Mr. Folks spent in restraint during

4    his long history of incarceration from age 14 until

5    showing up at LSP in the spring of 2021?

6         A.    I know that in the incarceration between

7    -- in July '19 through 2020 there was some extreme

8    suicide watch, which at this facility would equal

9    physical restraint, but other than that, no.

10        Q.    Are you familiar with what was once called

11   LTI in Louisiana?

12        A.    Yes.

13        Q.    Did you know that he was there?

14        A.    He was in Monroe.

15        Q.    Right.  There's an LTI -- there was an LTI

16   -- I don't know if it's still there in Monroe.  Is

17   it still there?

18        A.    My understanding is it was until -- I

19   haven't looked recently, but Swanson was there

20   before, yes.

21        Q.    And was it your understanding that --

22   well, he was there as a juvenile at age 14?

23        A.    That's my understanding, yes.

24        Q.    He was in seclusion and restraint as a

25   juvenile in Monroe?

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                      www.veritext.com

1     A.     I don't -- I don't know about the

2   information from that incarceration.  I don't --

3   that detention.  I don't have those records.

4     Q.     In Mr. -- in Dr. Penn's report it says

5   that with respect to that time period Mr. Folks

6   reported that he had self-injured while at the LTI

7   in Monroe facility.  He said he cut his wrists open

8   and hit an artery requiring emergency medical

9   evaluation at a hospital.  Are you aware of that?

10     A.     I read that.

11     Q.     Now, I just -- I don't mean to be

12   repetitive, but I want to be sure that I understand

13   here your testimony about some of the legal issues

14   here.  We talked about, you know, the U.S.

15   Constitution, the Eighth Amendment.  Are you

16   familiar with the Eighth Amendment?

17                    MR. MITCHELL:

18                         Object to form.

19     A.     Yes.

20   BY MR. BLANCHFIELD:

21     Q.     What's your understanding of the Eighth

22   Amendment?

23                    MR. MITCHELL:

24                         Object to form.

25     A.     Well, I'm not a lawyer, but, you know, as

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                    www.veritext.com

1    a layperson that's -- I think it's prohibition from

2    cruel and unusual punishment, maybe.

3    BY MR. BLANCHFIELD:

4        Q.    Are you familiar with the concept of

5    deliberate indifference in conjunction with the

6    Eighth Amendment?

7        A.    I am.

8                    MR. MITCHELL:

9                        Object to form.

10       A.    But, again, I think I said this earlier, I

11   am not opining on these legal conclusions and what

12   you're talking about is a legal conclusion found by

13   the court and I don't -- I don't give legal

14   opinions.

15   BY MR. BLANCHFIELD:

16       Q.    Okay.  And you're not -- you're not going

17   to be testifying -- there's some mention about some

18   Louisiana statute that criminalizes self-harm.

19   You're not going to testify about either; is that

20   correct?

21       A.    No, sir.  No, sir.

22                    MR. MITCHELL:

23                        Object to form.

24       A.    That's legal, and I'm opining on what's

25   included in the summary and conclusions of my

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

1    report.

2    BY MR. BLANCHFIELD:

3        Q.    Fair enough.  And the only time you met

4    with Mr. Folks was in April of this year; is that

5    correct?

6        A.    I think it was in April.  I have to look

7    and see the date that I did the evaluation, but if

8    you say April I'm going to go with it.

9        Q.    Yeah, I think the report says April 10th.

10   So, as far as right now, have you been asked to

11   perform any additional work on this case?

12       A.    No.

13       Q.    And you felt like you had sufficient

14   documents in this case in order to render your

15   opinion?

16       A.    There were a few things that I asked

17   Counsel for that I don't have that would be, I

18   think, helpful, but I didn't get them as of yet.

19       Q.    Can you recall -- (inaudible).

20                    COURT REPORTER:

21                    Drew, we didn't hear you.

22   BY MR. BLANCHFIELD:

23       Q.    Yeah.  Can you recall what those items

24   were off the top of your head?

25       A.    Well, some of them.  The St. Mary's

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company          www.veritext.com

1    Behavioral Health Unit records, the St. Mary's
2    Parish Jail records, information from Brazoria
3    County.  I think that was most of it.  Oh, and the
4    Elayn Hunt records.  I don't think I had those.
5        Q.    During your interview with Mr. Folks did
6    you discuss what he did in Brazoria County to
7    result in incarceration?
8        A.    I think I remember that, yes.
9        Q.    What did he -- what did he tell you?
10       A.    I'm trying to remember.  I'm going back
11   into my -- I'm not a hundred percent sure.  It
12   might have been shoplifting or theft, but I'm not a
13   hundred percent certain.
14       Q.    Do you recall what the sentence was?
15       A.    I don't.  I just know that he has
16   probation and has to do -- what do you call that?
17       Q.    Community service?
18       A.    Thank you.  Thank you.  Community service,
19   yes, sir.
20       Q.    Do you know how long he actually spent
21   incarcerated?
22       A.    I do not.
23       Q.    And do you know the conditions of
24   confinement, whether he was in what we call general
25   population or seclusion?

Page 64

```
 1          A.      I don't.

 2          Q.      Okay.

 3          A.      Hence, I would like to see those records.

 4          Q.      Okay.  Doctor, I think that's all the

 5     questions I have.  I sure appreciate your time.

 6          A.      Well, I appreciate you.  I know you've had

 7     a rough morning with technology.  I feel for you.

 8          Q.      Yeah.  Typical Friday.

 9                     MR. BLANCHFIELD:

10                         Let's -- can we go off the

11     record and discuss the transcript and --

12                     COURT REPORTER:

13                         Yes, sir.

14                     MR. BLANCHFIELD:

15                         Well, I'm going to, I guess,

16     e-mail you, Caroline, the global document that we

17     have been referring to and I would just attach it

18     as Exhibit 1 to the deposition.  Are you okay with

19     doing that, Julius?

20                     MR. MITCHELL:

21                         Yeah, I'm all right with

22     that.

23                     MR. BLANCHFIELD:

24                         All right.

25                (Document to be marked for identification
```

Page 65

1     as Exhibit 1.)

2                    (Discussion off the record.)

3

4                    (End of testimony at 11:05 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

```
 1                    WITNESS'S CERTIFICATE

 2

 3

 4        I, DR. DAPHNE GLINDMEYER, the undersigned, do

 5   hereby certify that I have read the foregoing

 6   deposition taken on JUNE 6, 2025, and it contains a

 7   true and accurate transcript of the testimony given

 8   by me:

 9

10

11        (    )  Without corrections

12

13        (    )  With corrections as reflected on the

14   Errata Sheet(s) prepared by me and attached hereto

15   consisting of _____ pages.

16

17

18                         _____

19                         DR. DAPHNE GLINDMEYER

20                         _____

21                         DATE

22

23

24   Reported by:  Caroline D. Escude', CCR

25
```

Page 67

```
 1        R E P O R T E R ' S   C E R T I F I C A T E

 2

 3        I, Caroline D. Escude', Certified Court

 4   Reporter, Certificate #91182, in and for the State

 5   of Louisiana, as the officer before whom this

 6   testimony was taken, do hereby certify that DR.

 7   DAPHNE GLINDMEYER, after having been duly sworn by

 8   me upon authority of R.S. 37:2554, did testify as

 9   hereinbefore set forth in the foregoing 67 pages on

10   June 6, 2025; that this testimony was reported by

11   me in stenographic machine shorthand, was prepared

12   and transcribed by me or under my personal

13   direction and supervision, and is a true and

14   correct transcript to the best of my ability and

15   understanding; that the transcript has been

16   prepared in compliance with transcript format

17   guidelines required by statute or by the rules of

18   the board and that I am informed about the complete

19   arrangement, financial or otherwise, with the

20   person or entity making arrangements for deposition

21   services; that I have acted in compliance with the

22   prohibition on contractual relationships, as

23   defined by Louisiana Code of Civil Procedure

24   Article 1434 and in the rules and advisory opinions

25   of the board; that I have no actual knowledge of
```

Page 68

1   any prohibited employment or contractual

2   relationship, direct or indirect, between a court

3   reporting firm and any party litigant in this

4   matter nor is there any such relationship between

5   myself and a party litigant in this matter; that I

6   am not related to counsel or to the parties herein,

7   nor am I otherwise interested in the outcome of

8   this matter.

9           This certification is valid only for a

10  transcript accompanied by my original signature and

11  original required seal or my certified digital

12  signature on this page.

13          Signed:  June 9, 2025

14      _____

15          Caroline D. Escude', CCR #91182

16

17

18

19

20

21

22

23

24

25

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com

A Veritext Company                        www.veritext.com

```
1   Folks, Joshua v. Landry, Jeff Et Al.

2   Dr. Daphne Glindmeyer Job No. 7392802

3                    E R R A T A   S H E E T

4   PAGE_____  LINE_____  CHANGE_____

5   _____

6   REASON_____

7   PAGE_____  LINE_____  CHANGE_____

8   _____

9   REASON_____

10  PAGE_____  LINE_____  CHANGE_____

11  _____

12  REASON_____

13  PAGE_____  LINE_____  CHANGE_____

14  _____

15  REASON_____

16  PAGE_____  LINE_____  CHANGE_____

17  _____

18  REASON_____

19  PAGE_____  LINE_____  CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Dr. Daphne Glindmeyer                              Date

25
```

Page 70

```
1   Folks, Joshua v. Landry, Jeff Et Al.

2   Dr. Daphne Glindmeyer 7392802

3                 ACKNOWLEDGEMENT OF DEPONENT

4       I, Dr. Daphne Glindmeyer, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____    _____

12  Dr. Daphne Glindmeyer                       Date

13  *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

                                          Page 71
```

```
 1    <PSYCHDOCTORS@GMAIL.COM>
 2                          June 9, 2025
 3    RE: Folks, Joshua v. Landry, Jeff Et Al.
 4    DEPOSITION OF: Dr. Daphne Glindmeyer 7392802
 5         The above-referenced witness transcript is
 6    available for read and sign.
 7         Within the applicable timeframe, the witness
 8    should read the testimony to verify its accuracy. If
 9    there are any changes, the witness should note those
10    on the attached Errata Sheet.
11         The witness should sign and notarize the
12    attached Errata pages and return to Veritext at
13    errata-tx@veritext.com.
14         According to applicable rules or agreements, if
15    the witness fails to do so within the time allotted,
16    a certified copy of the transcript may be used as if
17    signed.
18                         Yours,
19                         Veritext Legal Solutions
20
21
22
23
24
25
```

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[& - 9:05]**

| & | |
|---|---|
| **&** | 3:4,8,16 |

**0**

**002810**  59:7
**002924**  57:25
**002926**  54:18
**003044**  53:9
**003097**  49:4
**003242**  49:3
**003259**  48:20
**003279**  47:1
**003280**  46:1
**003285**  44:22
**003340**  42:25
**003350**  41:20

**1**

**1**  2:4,12 49:24
  65:18 66:1
**10**  13:1 38:25
  45:6 52:10
**10036-2711**  3:5
**1099**  3:9
**10:10**  41:17
**10:15**  41:17
**10th**  63:9
**11**  26:22
**1151**  3:14
**1155**  3:4
**11:05**  66:4
**11th**  24:12
  25:13 41:22
**12**  41:21 43:4
  59:10

**13th**  43:1
**14**  60:4,22
**1434**  68:24
**16**  5:13 28:7
  36:1
**16th**  49:10
**19**  60:7

**2**

**2**  10:23
**20**  14:20 49:18
  71:15
**2000**  12:13
**20001-4412**  3:9
**2001**  9:8
**2004**  9:14
**2005**  9:8
**201-9650**  1:23
**201-9651**  1:23
**2010**  17:17
**2015**  12:13
  13:2,14 38:14
**2017**  30:12
**2020**  60:7
**2021**  15:1 21:6
  24:12,20 25:6
  26:22 27:19
  28:5 39:8
  41:21 42:10
  53:2 54:19
  60:5
**2022**  27:20
  28:3,5 29:5
  30:20 31:21
  59:3,5

**2023**  31:22
**2025**  1:15 4:5
  5:13 38:25
  39:14 67:6
  68:10 69:13
  72:2
**21**  38:6 49:18
  52:4 53:10
**217**  1:22
**21st**  54:5
**22**  28:2
**225**  1:23,23
**22nd**  49:2
**23-01289**  1:6
**2810**  59:7
**2nd**  59:8

**3**

**3**  2:5 18:13
  53:4
**31st**  53:2
**37:2554**  68:8

**4**

**4**  2:6
**4/19**  44:22
  45:13
**4/20**  47:1
**4/20/21**  46:2,13
  47:18
**4/22**  48:24
**4/23**  49:3
**44**  39:19
**46**  37:6 38:17

**5**

**5**  2:8 33:5

**6**

**6**  1:15 4:5
  49:15 67:6
  68:10
**611**  5:2 6:8
**65**  2:12
**67**  68:9
**69**  2:9
**6th**  57:3

**7**

**701**  3:17
**70433**  5:3 6:9
**706**  7:23
**70802**  3:17
**70809**  1:23
**70821**  3:14
**7392802**  70:2
  71:2 72:4
**7:30**  47:2

**8**

**8**  33:5
**8:13**  57:17

**9**

**9**  69:13 72:2
**900**  3:9
**91182**  3:21
  68:4 69:15
**9522**  1:22
**9:03**  5:7
**9:05**  7:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[9:07 - april]**

| | |
|---|---|
| **9:07** 7:4 | |
| **a** | |

**abdominal**
  13:12
**ability** 68:14
**able** 25:20,23
  28:14 29:15,16
  29:24
**above** 71:7
  72:5
**absolutely**
  44:15 55:8
**access** 26:8,13
  26:19
**accompanied**
  69:10
**accomplished**
  26:5
**accuracy** 72:8
**accurate** 19:6
  39:6 42:23
  45:2 56:16
  67:7
**acknowledge...**
  71:3
**act** 58:7 59:13
**acted** 68:21
**action** 1:6
**acts** 22:18
**actual** 25:25
  34:20 49:12
  68:25
**actually** 16:12
  24:23 27:12
  28:15 32:4

33:12 38:6,13
  39:17 40:1
  50:17 64:20
**acute** 54:22
**adamantly**
  54:23
**addition** 7:21
  10:8 26:15
**additional** 10:2
  63:11
**additions** 71:6
**address** 6:4,8
  7:3 11:2 38:23
  41:16
**addressing**
  39:16
**administering**
  4:24
**adolescent** 6:12
**adolescents**
  7:15
**adult** 6:11
**adults** 7:16
**adverse** 33:5
**advisory** 68:24
**age** 7:12 60:4
  60:22
**agitation** 23:13
**ago** 13:2 31:16
  31:16 47:23
**agree** 13:6
  25:14 45:14
  47:24 56:8
**agreed** 4:3

**agreement** 2:6
  8:22,24 50:24
**agreements**
  72:14
**ahead** 9:13
**al** 1:8 70:1 71:1
  72:3
**alert** 53:11
  54:21
**allegations**
  19:5,10
**allotted** 72:15
**allows** 52:23
**ambiguity**
  21:23
**amendment**
  61:15,16,22
  62:6
**americas** 3:4
**andrew** 3:15
  4:10
**angola** 11:12
  46:4,14
**angst** 46:21,23
**answer** 8:11
  12:1 21:24
  56:22
**answers** 4:14
**anxiety** 39:22
  46:21,23 51:9
**anybody** 6:21
**anymore** 59:14
**anyway** 9:20
**apologize** 12:2
  35:1 45:3

**app** 24:4
**apparently**
  42:9,19 43:19
  44:25 53:10
**appearances**
  2:5 3:1
**appeared** 54:23
**appears** 24:16
  40:12 44:23
  58:7
**appended** 71:7
**applicable** 72:7
  72:14
**appreciate** 65:5
  65:6
**appreciation**
  35:25
**appropriate**
  10:25 36:2,4,6
  36:9 39:17
  55:2,24 56:25
**approximate**
  54:20
**approximately**
  28:8,9 31:13
  31:23 32:11
**april** 5:13
  24:12,12,19
  25:6,13 26:21
  27:12 28:4
  38:24 41:21,22
  42:10 43:1
  49:2,18 63:4,6
  63:8,9

**[area - blanchfield]**

**area** 20:17 28:4
  29:10,18
**arrangement**
  68:19
**arrangements**
  68:20
**arrest** 23:13
**arrested** 32:4,6
**arrived** 14:20
**artery** 61:8
**article** 68:24
**asked** 22:4
  49:12 63:10,16
**asking** 15:7,11
  53:7
**assessment**
  35:22 43:18
  55:13,19,21
**assessments**
  55:15
**assistant** 3:16
**associated**
  39:23
**assume** 9:22
  36:1 42:16
  58:10
**assuming** 19:5
**attach** 65:17
**attached** 67:14
  72:10,12
**attempt** 45:5
**attempting**
  7:25
**attempts** 50:7,8

**attorney** 3:13
  3:13,16 5:10
**attorney's**
  19:11
**attorneys** 19:11
  19:18
**august** 27:19
  28:3,5,23 29:4
  59:5,8
**aunt** 33:11,12
  33:14
**authority** 68:8
**available** 72:6
**avenue** 1:22 3:4
  3:9
**avoid** 7:25
**aware** 12:10,16
  14:19 15:6,12
  15:15 17:19
  28:13 30:15
  38:12 61:9

**b**

**b** 5:2 6:9 26:8
  51:21
**back** 12:25
  16:15 17:18
  18:24 22:8,9
  22:23 30:7,9
  38:17 42:7,10
  51:21 53:2,11
  56:2 64:10
**backgrounds**
  7:13
**backwards**
  43:9

**ball** 55:20
**base** 14:1
**based** 29:8
  38:15 40:13
  53:5 55:23
  59:3
**basic** 39:20,20
**basically** 8:17
  37:16 39:21
**basis** 36:20
**bates** 41:19
  42:25 47:1
  54:18 59:7
**bathroom**
  36:22
**baton** 1:23 3:14
  3:17 5:10
**beale** 3:10
**bed** 43:2
**began** 12:9
**beginning** 5:7
  14:18 18:12
  46:8 48:5
  49:15
**behavior** 11:9,9
  12:3 17:9
  24:22 25:21
  26:11 42:2,21
  43:25 44:1,4,7
  44:8 46:18,22
  47:13,15 48:3
  48:7,19 54:10
**behavioral**
  7:18 8:19
  38:21 39:25

40:1,4,7 44:6
  44:16 47:11,12
  47:24 54:8,8
  64:1
**behaviors** 11:7
  11:16 50:4
  55:18
**believe** 10:4
  25:10 26:2
  36:21 49:23
**beneficial** 40:4
  40:5
**best** 40:2 41:2,7
  68:14
**better** 11:12
  24:7 26:18
  29:14
**bit** 7:2 33:13
**blade** 13:3 38:9
**blades** 37:23
**blanchfield** 2:8
  3:15 4:10 5:7,9
  7:5 12:7,24
  13:13 14:25
  15:8,24 17:2
  17:11 18:2,10
  19:14,24 20:14
  20:16 21:4,11
  21:17 22:1,6
  22:12 23:14
  28:21 29:11
  31:3 36:16
  40:20,24 41:9
  41:18 51:11
  53:8,24 56:12

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                     www.veritext.com

**[blanchfield - comment]**

57:13 58:23
59:18,21 61:20
62:3,15 63:2
63:22 65:9,14
65:23
**block** 3:4,8
**board** 6:11
68:18,25
**boards** 6:15
**bond** 43:6
**borderline**
51:22
**bothers** 45:8
**bottom** 48:2
49:7 50:13
**boulevard** 5:2
6:8
**bourgeois** 1:9
**bowel** 12:23
**box** 3:14 30:8
**brazoria** 32:8
32:10,20 64:2
64:6
**break** 5:22,24
40:18 45:4,7
**breath** 55:9
**bridge** 16:7,11
**brief** 42:13
**briefly** 10:22
34:11
**broke** 34:25
35:16
**brookline** 1:22
**brought** 5:11
30:24

**bs** 51:23
**business** 6:4

**c**

**c** 68:1,1
**call** 11:11,14
64:16,24
**called** 60:10
**calm** 43:5
54:21
**camera** 27:8
**cameras** 27:10
**caption** 2:4
**care** 13:15
16:20 36:7,8
53:4,6
**caroline** 1:15
3:21 4:22 22:7
65:16 67:24
68:3 69:15
**case** 5:11 9:22
18:1,18 27:2
39:22 52:20,21
54:1 56:13
58:11,18 63:11
63:14
**cases** 14:18
**casual** 41:25
**cause** 4:15 11:6
42:6
**caused** 24:14
24:19 25:6
**causes** 11:2
**ccr** 67:24 69:15
**cell** 17:21 26:24
27:1,7 29:15

29:16,21 49:21
**center** 13:1
16:4,8,17
26:13 38:7
**certain** 14:14
64:13
**certainly** 6:5,5
7:8 55:24
**certificate** 2:9
67:1 68:4
**certification**
69:9
**certified** 1:16
3:21 4:22 6:11
68:3 69:11
72:16
**certify** 67:5
68:6
**cetera** 50:7
**challenged**
19:18 20:1
**challenging**
52:22 58:18,19
**change** 70:4,7
70:10,13,16,19
**changes** 30:15
71:6 72:9
**character**
51:21
**charge** 46:3
**charges** 32:5
**charging** 20:8
**chat** 41:1,11
**chest** 55:22

**chief** 1:7
**child** 6:11
**children** 7:14
**city** 16:7,11
**civil** 1:6 4:6
20:8 68:23
**claiming** 19:18
**classification**
15:22 46:9
49:1
**clear** 25:8 38:3
52:17 56:4,23
57:7
**clearly** 34:8
**clerk** 4:11
**clinical** 8:13
**clinician** 41:21
**close** 24:4
31:10
**cluster** 51:21
51:23
**code** 20:8,19
68:23
**coercive** 48:16
**cognitive** 39:24
40:1,3,7 44:6
44:16 47:11
54:8
**colectomy**
12:23
**come** 11:5
**comes** 55:17
**coming** 51:15
**comment** 43:8

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                www.veritext.com

**[community - date]**

| | | | |
|---|---|---|---|
| **community** 32:18 64:17,18 | **consent** 8:24 9:4 | 32:1 33:1 35:4 35:9 38:10 | **cox** 3:16 |
| **complaint** 18:13,19 19:4 | **consisting** 67:15 | 42:14 43:14 50:23 51:13 | **creation** 47:13 |
| **complaints** 54:22 | **consists** 7:7 | 52:5 57:1 58:8 62:20 63:5 | **criminal** 20:19 |
| **complete** 68:18 71:8 | **constitution** 20:7,7,18 61:15 | 68:14 71:8 | **criminalizes** 62:18 |
| **compliance** 8:4 8:8 9:15 68:16 68:21 | **consultant** 7:22 | **correctional** 8:1,20 16:6,9 38:8 | **crises** 33:6,7 |
| **comply** 8:23 | **consulted** 16:9 | **corrections** 8:15 15:2 | **crisis** 36:6 40:14 |
| **compound** 21:23 | **consulting** 7:21 8:2 | 67:11,13 71:6 | **criteria** 14:10 24:24 34:5,18 36:14 |
| **comprehensive** 18:23 55:15 | **contact** 42:3 | **counsel** 2:6 4:4 38:4 63:17 69:6 | **cruel** 62:2 |
| **concept** 62:4 | **contains** 67:6 | **country** 16:10 | **crying** 59:11 |
| **concerning** 26:7 | **context** 49:20 50:15,21 51:1 | **county** 32:9,21 64:3,6 | **crystal** 55:20 |
| **concerns** 26:13 | **continued** 49:1 | **course** 17:25 47:10,10 51:7 | **current** 7:7 |
| **conclusion** 18:8 62:12 | **continues** 44:24 46:12 48:24 49:25 | **court** 1:1,16,22 3:21 4:11,22 | **currently** 17:12 |
| **conclusions** 62:11,25 | **continuing** 46:16 | 6:3,23 7:24 14:22 20:11 | **cut** 24:16,16 49:14 58:3 61:7 |
| **conditions** 15:23 29:3 30:16 64:23 | **continuously** 26:9 | 22:10 59:15 62:13 63:20 | **d** |
| **confinement** 29:3 30:17 64:24 | **contract** 16:16 | 65:12 68:3 69:2 | **d** 1:8,15 2:1 3:21 4:22 6:6,7 67:24 68:3 69:15 |
| **confused** 5:20 5:20 | **contractual** 68:22 69:1 | **courtreporter...** 1:24 | **daily** 33:10 |
| **conjunction** 62:5 | **conversation** 29:8 42:1 | **covid** 30:14 | **daphne** 1:14 4:4 5:1 6:5 67:4,19 68:7 70:2,24 71:2,4 71:12 72:4 |
| | **coping** 25:1,3 | **covington** 5:2 6:9 | **date** 31:17 49:7 49:12,14 54:20 59:24 63:7 67:21 70:24 71:12 |
| | **copy** 72:16 | | |
| | **correct** 6:13 11:22 18:14 20:4 22:19,21 27:9 30:22 | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[dated - doctor]**

| | | | |
|---|---|---|---|
| **dated** 5:13 | **depending** 52:1 | **diagnoses** 7:13 | **discontinued** |
| **day** 7:9 29:15 | **deponent** 71:3 | 51:7,19 | 47:4,20 55:1 |
| 36:20,20 42:25 | **depos** 1:24 | **diagnosis** 14:2 | **discontinuing** |
| 43:13 45:18 | **deposition** 4:4 | 14:2,8 34:1,3 | 57:14 |
| 46:2 47:1 | 4:9 7:10 12:8 | 34:10,13,16,20 | **discounted** |
| 48:23 49:3 | 19:2 38:15 | 35:15,18 51:6 | 48:4 52:18 |
| 55:25 71:15 | 46:9 52:7 | **diagnostic** | 54:7 |
| **days** 7:11 22:14 | 65:18 67:6 | 14:10 24:23 | **discounting** |
| 22:17 44:22 | 68:20 72:4 | 34:5,14 53:1 | 48:3 52:23 |
| **dc** 3:9 | **depositions** | **dialectical** | **discourse** 22:5 |
| **deal** 25:1 33:10 | 5:17 | 47:12 54:8 | **discuss** 40:9 |
| **death** 27:13,16 | **describe** 9:25 | **dick** 1:8 | 46:4 64:6 |
| 28:14,22,25 | **described** | **different** 19:13 | 65:11 |
| 29:4,9,13,18,25 | 50:25 | **differently** | **discussed** 34:11 |
| 30:2,11,17 | **description** | 54:13 | 41:22 |
| 59:4,8 | 53:5 | **difficult** 14:17 | **discussion** 7:3 |
| **decision** 31:12 | **designated** | 52:20,22 54:1 | 41:16 66:2 |
| **declare** 71:4 | 7:23 | 58:11 | **disorder** 13:24 |
| **decree** 8:24 9:4 | **despite** 50:6 | **difficulties** | 14:9 34:6,22 |
| **deemed** 71:6 | **detail** 8:12 | 35:23 38:20 | 35:13,19 39:16 |
| **defendants** | **detainee** 15:3 | **difficulty** 6:22 | 39:24 51:10,10 |
| 3:12 | 15:13,16 17:19 | **digital** 69:11 | 51:10,22 52:11 |
| **defense** 5:11 | 17:20 28:16 | **direct** 69:2 | **disorders** 34:15 |
| **defined** 68:23 | **detention** 61:3 | **directing** 8:23 | **disorganized** |
| **definitely** 21:24 | **determine** | **direction** 68:13 | 50:16 |
| **definition** 52:2 | 14:18 | **director** 8:13 | **dissatisfaction** |
| **deliberate** 62:5 | **developed** | **disabilities** | 45:5 |
| **delivered** 4:10 | 13:23 14:13 | 7:17,20 | **distinction** |
| **demands** 48:23 | 39:4 | **disagree** 35:15 | 15:21 |
| 48:25 | **developmental** | 35:18,20 | **district** 1:1,2 |
| **denied** 54:21 | 7:17,19 | **discontent** | **doc** 42:6 57:19 |
| 54:23 | **diagnosed** | 42:17 | **doctor** 5:8 7:6 |
| **dental** 8:18 | 35:12 50:21 | **discontinue** | 9:2 17:4 19:17 |
| **department** | 51:12,16,17 | 55:3 57:21 | 22:2 33:24 |
| 15:1 | 52:11 | | 41:13,20 43:10 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[doctor - expert]**

49:25 65:4
**document** 9:10
10:8 17:17
23:9,19 31:15
31:18 37:9
38:4 65:16,25
**documentation**
18:23 25:19
26:12,15 45:17
57:11
**documented**
14:4 45:18
**documents**
9:25 10:2 18:1
27:17 59:25
63:14
**dogs** 45:3
**doing** 42:23
50:18 52:23
65:19
**doubt** 52:20
**dr** 1:14 4:4 5:1
10:5,12 12:1
35:11,12 38:12
41:4 49:5 50:1
51:20 52:3
54:24 55:7
56:6 61:4 67:4
67:19 68:6
70:2,24 71:2,4
71:12 72:4
**drew** 5:9 14:23
20:12 59:16
63:21

**due** 11:18
14:16
**duly** 5:3 68:7

**e**

**e** 1:24 2:1 6:6,7
6:7 65:16 68:1
68:1,1,1 70:3,3
70:3
**earlier** 24:21
34:13 39:11
47:8 62:10
**early** 27:12
**eat** 36:24
**edition** 34:15
**eighth** 61:15,16
61:21 62:6
**either** 27:4
33:18 62:19
**elayn** 10:18
12:14 13:15,19
37:2,11,12,15
37:19,24 38:1
38:13,17,19,22
64:4
**emergency**
61:8
**emotional**
59:11
**employed**
16:12,14
**employment**
69:1
**encouraged**
43:11

**ended** 30:22
**endorse** 48:24
**ends** 23:23
**engage** 17:9
25:2,21 32:21
58:7
**engaged** 22:18
28:10 37:21
40:7 41:25
42:12 48:11
50:11 56:1
57:7
**engages** 46:19
46:23
**engaging** 26:10
42:21 47:11,15
48:5
**entering** 51:8
**entity** 68:20
**environment**
25:12
**equal** 60:8
**equaled** 54:15
54:16
**equipped** 24:7
**errata** 67:14
72:10,12,13
**escalated** 13:11
**escude** 1:16
3:21 4:22
67:24 68:3
69:15
**essentially** 9:20
40:3 43:17
45:15 52:9

53:16,22 58:4
**et** 1:8 50:7 70:1
71:1 72:3
**etiologies** 11:8
**etiology** 11:16
**evaluate** 13:15
**evaluation** 14:3
14:5 54:21
57:12,23 61:9
63:7
**event** 47:11
**eventually**
30:22
**exacerbated**
14:15 39:12
**exact** 9:8 31:17
**examination**
2:7 5:6
**examined** 5:4
**example** 7:22
**except** 4:12
**exhibit** 2:12
65:18 66:1
**exhibited** 11:10
11:17 12:6
**exhibits** 2:11
**exists** 51:10
**experience**
24:25
**experiencing**
6:21 14:7
23:10,12 38:21
51:4
**expert** 7:23
19:17

**[explain - four]**

| | | | |
|---|---|---|---|
| **explain** 6:19 | **fact** 15:2 19:5 | **fine** 56:22 58:5 | 61:5 63:4 64:5 |
| 43:24 | 26:11 35:6 | 58:12 | 70:1 71:1 72:3 |
| **explanation** | 37:18 42:17 | **finish** 5:25 | **following** 50:19 |
| 26:4 | 48:8 58:6 | **firm** 69:3 | **follows** 5:4 |
| **explored** 43:7 | **factors** 45:20 | **first** 5:3 14:13 | **foregoing** 67:5 |
| **express** 35:4 | 45:25 | 23:13 39:4 | 68:9 71:5 |
| **expressing** | **fails** 72:15 | 53:3 | **forensic** 6:12 |
| 34:24 | **failure** 52:24 | **five** 30:16 | 18:17 |
| **extended** 13:23 | **fair** 35:22 | **fix** 43:10 | **form** 4:12 |
| **extent** 12:3 | 42:16 43:18 | **fleming** 10:18 | 11:25 12:19 |
| 34:10 | 53:18 63:3 | 35:12 | 13:9 15:5,20 |
| **extra** 58:19 | **fairly** 58:7 | **focused** 40:3 | 17:1,7,24 18:7 |
| **extreme** 24:11 | **familiar** 52:10 | 46:20 | 19:9,22 20:25 |
| 24:14 26:22 | 60:10 61:16 | **folks** 1:6 5:11 | 21:10,13,19,20 |
| 27:3 36:5 | 62:4 | 10:25 11:5,9 | 23:7 28:19 |
| 41:23,24 43:2 | **family** 31:8,10 | 11:21 13:22 | 29:7 31:2 |
| 43:14 44:13,23 | **far** 12:5,21 | 14:4,6,13,16,19 | 36:13 51:3 |
| 45:1 46:2 47:3 | 19:13 59:12 | 21:5 24:2,9,21 | 52:15 53:21 |
| 47:20 48:21 | 63:10 | 25:8,20 26:13 | 56:10 57:10 |
| 53:11 54:15 | **fault** 35:2 | 29:8,13 30:19 | 58:16 61:18,24 |
| 56:2 60:7 | **fax** 1:23 | 31:8 33:25 | 62:9,23 |
| **extremely** | **federal** 4:6 7:24 | 34:1,4 35:13 | **formal** 34:20 |
| 52:20 53:25 | **feel** 36:2 38:25 | 35:22 36:18 | **format** 18:18 |
| **extremity** | 43:20 65:7 | 37:2,11,19 | 68:16 |
| 52:21 | **feeling** 54:22 | 38:13,24 39:4 | **forth** 68:9 |
| | **feels** 42:2 | 39:14 40:5 | **found** 62:12 |
| **f** | **felt** 46:14 50:15 | 41:21 42:8 | **four** 7:11 9:4 |
| | 63:13 | 43:5 44:23 | 9:22 10:22 |
| **f** 68:1 | **fifth** 34:15 | 45:13,20 47:2 | 25:12,14,24 |
| **faced** 54:2 | **figure** 30:9 | 47:13,16 48:11 | 26:1,6,10 27:2 |
| **facilities** 8:1,20 | **filed** 18:13 | 50:11,25 51:4 | 27:2,5,6 41:24 |
| 16:7,9 | **filing** 4:11 | 52:10,18,21 | 43:2,16,24 |
| **facility** 15:23 | **financial** 68:19 | 53:3,10 54:6 | 44:13 53:13,17 |
| 16:12,15 24:2 | **find** 23:11 | 55:4,16 56:1 | 54:16 56:15 |
| 25:9 51:8,15 | 39:18 | 58:5,25 60:3 | 59:22 |
| 53:3 54:15 | | | |
| 60:8 61:7 | | | |

Page 8
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                               www.veritext.com

**[franklin - hereinbefore]**

| | | | |
|---|---|---|---|
| **franklin** 58:1 | 53:4 55:3 67:7 | 28:2 40:16 | 46:13,17 47:3 |
| **frequent** 17:3 | 71:9 | 41:10 47:6 | 47:7,19 48:23 |
| **frequently** | **gives** 9:11 | 53:17 57:20 | 58:6,8 59:23 |
| 17:10 | **giving** 6:3 8:11 | 58:6 59:12,13 | 62:18 |
| **friday** 1:15 4:5 | 9:19 19:19 | 62:16,19 63:8 | **harmed** 16:23 |
| 65:8 | 20:2 | 64:10 65:15 | 22:24 23:4 |
| **friend** 31:8,10 | **glindmeyer** | **good** 5:8 33:10 | 24:10 42:18 |
| **front** 27:7 | 1:14 4:5 5:1 | 40:19,21,23 | 58:25 |
| **frustration** | 6:7 12:1 55:7 | 54:22,23 56:4 | **harming** 11:3,7 |
| 23:12 | 67:4,19 68:7 | 58:12 | 11:9 12:15 |
| **full** 6:4 34:9 | 70:2,24 71:2,4 | **great** 55:18 | 58:13 |
| 50:20 | 71:12 72:4 | **green** 30:8 | **head** 30:8 |
| **functions** 33:10 | **glindmeyer's** | **groundwork** | 46:19 63:24 |
| **further** 18:22 | 41:4 | 47:22 | **health** 8:14,17 |
| 32:24 | **global** 65:16 | **guess** 38:5 41:8 | 8:19 10:25 |
| **future** 55:21 | **gmail.com** 72:1 | 65:15 | 16:16 17:13 |
| **g** | **go** 5:17,23 9:13 | **guidelines** | 26:16 33:6 |
| **g** 6:7 | 12:25 13:4 | 68:17 | 34:1 36:8 |
| **gamble** 10:14 | 14:9 18:21,24 | **guys** 45:3,8 | 37:14,17 38:21 |
| 35:12 38:12 | 23:19 24:14 | **h** | 45:18 50:16,18 |
| 49:5 50:1 | 25:12 31:6 | **h** 6:6 70:3 | 50:22 51:1 |
| 51:20 52:3 | 32:15 34:7,9 | **half** 6:20 | 52:4 55:13,14 |
| 56:7 | 38:17 42:9,10 | **handle** 24:7 | 58:2 64:1 |
| **gamble's** 54:24 | 42:24 44:21 | **handy** 5:14 | **healthcare** |
| **general** 3:13,13 | 45:5 46:25 | **happened** | 33:16 |
| 3:16 64:24 | 49:4 50:13 | 37:23 | **hear** 14:24 |
| **generally** 5:23 | 54:18 56:2 | **hard** 8:10 | 63:21 |
| **girlfriend** 33:2 | 57:25,25 63:8 | **harm** 11:21 | **hearing** 7:1 |
| **give** 7:6 9:7 | 65:10 | 12:9 20:9,19 | **held** 17:21 |
| 17:3 20:9,20 | **goal** 56:15,19 | 22:18 23:16 | **hello** 15:10 |
| 24:3 28:9 | **godwin** 31:9,18 | 24:14,19 25:5 | **help** 44:17 |
| 52:19 62:13 | **goes** 30:9 32:3 | 25:15 28:11,25 | **helpful** 63:18 |
| **given** 5:16 | 46:19 51:21 | 32:1,22 37:22 | **helps** 6:19 |
| 25:19 38:20 | **going** 5:24 9:6 | 42:12 43:17,22 | **hereinbefore** |
| 45:19 47:18,18 | 9:7 11:22 24:3 | 44:11,25 45:14 | 68:9 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                            www.veritext.com

**[hereto - intending]**

**hereto** 67:14 71:7
**hey** 56:4
**highland** 5:2
**highlands** 6:8
**history** 11:21 12:2 14:17 24:22 40:11 46:18 51:7,17 53:16 60:4
**hit** 61:8
**hold** 23:8
**holding** 55:9
**holds** 55:21
**hole** 25:22
**holler** 5:20 45:11
**homicidal** 54:24
**hope** 56:17
**hospital** 13:4 22:22,23 51:18 61:9
**hospitalizatio...** 40:14
**hospitalized** 22:20
**hour** 5:24 29:16,24 58:4
**hours** 36:22 43:4 59:10
**housed** 25:9
**how's** 14:18 30:14

**hundred** 64:11 64:13
**hunt** 10:18 12:14 13:15,19 37:2,11,12,15 37:19,24 38:1 38:7,10,14,17 38:19,22 64:4
**hurt** 26:14 55:8 59:14
**hurting** 56:6

**i**

**idea** 7:6 9:11 17:3 60:2
**ideation** 35:4 44:10 48:25
**ideations** 34:24 35:7 54:24
**identification** 65:25
**illness** 50:16,22 51:1 52:5,12
**illnesses** 51:13
**illustrative** 57:3
**implemented** 54:5
**implications** 15:15
**improvement** 50:6
**inappropriately** 53:12
**inaudible** 6:15 14:21 20:8,10

30:5 34:24 59:14 63:19
**incarcerated** 12:14 13:16 21:7 29:18 32:4,8,12 37:19 39:9 64:21
**incarceration** 14:15,16 32:14 32:20 38:2 51:9 59:2 60:4 60:6 61:2 64:7
**incident** 25:25 26:2
**included** 62:25
**including** 11:4 12:22 13:3 33:25 35:11 38:9
**increases** 48:13 48:14
**independent** 57:4,12
**indicated** 29:13
**indicates** 6:10
**indicating** 24:4
**indication** 59:23
**indifference** 62:5
**indirect** 69:2
**individual** 44:12 53:15 56:25

**individuals** 7:17,18 29:17
**information** 61:2 64:2
**informed** 58:2 68:18
**initially** 14:20 25:9,10
**injure** 25:23
**injured** 49:22 61:6
**injuries** 13:11
**injuring** 47:25
**injurious** 12:3 17:9 24:22 25:21 42:21 43:25 44:1,4 46:18,22 47:15 59:12
**injury** 12:4 24:25 25:3 26:20 34:12 46:20 48:12 49:19 56:1
**inmate** 15:17 24:7 28:15
**inmates** 29:25
**inpatient** 40:13
**instance** 24:13
**instances** 12:9 12:15 23:16 28:25 31:25 32:21
**intending** 20:9 20:20

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[intensive - legal]**

**intensive** 44:19
52:24
**interested** 69:7
**internal** 46:21
46:23
**intervention**
12:22 36:5
44:20 47:9
**interventions**
11:2 44:3,6,6,8
44:9 45:24
47:12,14,24
48:6,18 52:25
54:9,14 56:19
58:21
**interview** 11:5
33:25 40:10
46:5 64:5
**interviewed**
34:23 35:3
38:24
**investigation**
34:14,17
**involved** 8:3
**ipad** 6:18
**island** 7:22
**isolation** 10:24
13:22 25:10,11
39:12 44:2
45:23 54:17
**issue** 15:22
54:13
**issued** 5:12
**issues** 7:4 18:20
19:16 20:10,21

21:3 35:7
41:17 59:23
61:13
**item** 26:8
**items** 26:14,17
26:20 63:23

**j**

**j** 3:6
**jail** 15:25 32:15
64:2
**jails** 17:13
**jeff** 1:8 70:1
71:1 72:3
**jenner** 3:4,8
**job** 33:3 70:2
**joking** 53:12
**joseph** 10:6,12
**joshua** 1:6 5:11
70:1 71:1 72:3
**judge** 1:7,9
**julius** 3:6 21:13
40:21 65:19
**july** 54:19 57:3
60:7
**june** 1:15 4:5
13:2 49:10
52:4 53:10,10
54:5 67:6
68:10 69:13
72:2
**justice** 8:15
16:4,17,18
**juvenile** 8:15
8:15,20 16:6
16:17,18 60:22

60:25

**k**

**karen** 31:9
33:14
**keep** 26:10
**kenneth** 3:10
**keogh** 3:16
**kept** 59:22
**kevin** 3:6
**kill** 53:13,17
**kind** 18:11
26:24 43:23
49:11 54:2
**kindergarten**
12:9
**knife** 55:9
**know** 5:16,25
6:21 8:10
10:12,15,19
12:12 13:18,20
18:19 22:2,14
23:1,3,4 24:9
24:23 25:19
26:21 27:15,24
28:9,24 29:3
30:7,14,19,24
31:13,17,20,24
32:3,11 34:11
35:10 37:14,18
37:18 42:4,8
42:12,19,22
43:5,13 45:19
46:10 47:6
48:13 49:10
50:8 53:25

54:11 55:14,19
55:24 56:14,20
58:24 59:4
60:6,13,16
61:1,14,25
64:15,20,23
65:6
**knowledge**
32:2,23 40:6,8
68:25
**known** 49:22

**l**

**l** 1:9 4:1 6:7
**l.l.c.** 1:22
**lamented** 59:11
**landry** 1:8 70:1
71:1 72:3
**languishes**
58:21
**late** 27:11
**law** 4:7 17:20
**lawyer** 21:2
61:25
**lay** 34:8
**layperson** 62:1
**learned** 17:22
17:25
**led** 23:15 56:6
**left** 31:13
**legal** 15:21
18:8,9 19:15
19:19 20:2,10
20:21 21:2,3
46:9 61:13
62:11,12,13,24

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

**[legal - mental]**

72:19
**letting** 42:4
**level** 53:4,4,6
   57:22
**light** 42:17
   43:21
**likelihood** 39:7
**likely** 13:23
   25:15 49:20
**limited** 36:6
**line** 70:4,7,10
   70:13,16,19
**listed** 10:3,9
**litigant** 69:3,5
**litigation** 7:25
**little** 6:1 7:2
   50:6
**living** 32:24,25
   35:8
**liz** 3:13
**llp** 3:4,8
**long** 5:25 9:3
   11:22 22:16
   24:9 30:4
   32:11 48:12
   60:4 64:20
**look** 9:7,14
   10:21 12:25
   13:14 17:16
   18:21,24 23:10
   24:22 26:25
   35:21 40:17
   41:12 48:1,2
   48:10 52:25
   59:7 63:6

**looked** 60:19
**looking** 10:23
   14:5,7 23:18
   38:5 50:18
   59:25
**looks** 18:12
   24:11
**lost** 22:5
**lot** 8:4 52:18
**lots** 55:6
**louisiana** 1:2
   1:17,22,23
   3:14,17,22
   4:23 5:3 6:9
   8:6,9,12,14,20
   9:16 16:5,7,16
   17:20 20:19
   30:21 31:14,25
   35:11 60:11
   62:18 68:5,23
**lsp** 11:11,13,15
   11:17 12:4,21
   13:11,25 14:15
   14:16,20 15:17
   23:20,23 24:6
   24:9 26:16,24
   27:3,11 31:21
   35:25 36:21
   46:7 50:1 51:8
   53:5 59:3 60:5
**lsu** 16:16
**lti** 60:11,15,15
   61:6
**lunchtime** 6:1

**lying** 43:2

## m

**m** 6:7
**machine** 68:11
**made** 31:11
   49:22 55:4
   71:5
**magic** 54:11
**magistrate** 1:9
**mail** 1:24 65:16
**main** 3:17
**make** 5:19 9:7
   26:19 44:24
   46:13,16
**makeup** 58:14
**making** 48:22
   68:20
**maladaptive**
   25:3
**manage** 24:1
   48:14 52:20
**management**
   44:7 47:13
   48:19 54:10
**manipulative**
   48:4,8 52:19
   52:23 54:7
**manner** 24:19
**manual** 34:15
**mapped** 14:8
**march** 27:11
   53:2
**marked** 65:25
**marks** 33:12

**mary** 21:7
   22:14 23:2,5
   23:16,21,24,25
   39:9
**mary's** 51:18
   63:25 64:1
**mate** 32:25
**matter** 10:1
   11:4 18:13
   69:4,5,8
**mean** 9:3 44:5
   52:21 54:1
   61:11
**means** 26:23
   48:4
**meant** 43:8
**mediate** 7:25
**mediation** 7:24
**medical** 2:12
   13:1 16:19
   19:20 20:3
   26:12 38:6,7,9
   40:16 61:8
**medication**
   33:18,21 39:21
   50:6
**meets** 34:4,18
**mental** 10:25
   17:13 26:16
   33:5,15 34:1
   34:15 36:8
   37:14,16 45:17
   50:16,18,21
   51:1,25 52:4
   52:12 55:13,14

Page 12
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

**[mental - offender]**

58:2
**mention** 10:17
20:6 62:17
**mentioned**
53:25
**met** 5:9 48:23
48:25 63:3
**metal** 13:3 26:3
37:22 38:8
**middle** 1:2
**mind** 38:4
**mindfulness**
44:16 54:9
**minor** 46:3
**minute** 45:6
47:23
**minutes** 58:13
**mitchell** 3:6
6:25 11:24
12:18 13:8
15:4,19 16:25
17:6,23 18:6
19:8,21 20:24
21:9,15,21
23:6 28:18
29:6 31:1
36:12 40:22
41:3 51:2
52:14 53:20
56:9 57:9
58:15 61:17,23
62:8,22 65:20
**moment** 45:4
**monitored** 26:9

**monitoring** 8:4
8:9,22 9:16
26:8,18 36:7
**monroe** 60:14
60:16,25 61:7
**month** 36:1
**months** 28:7
**mood** 51:10
54:23
**morning** 5:8
46:2 65:7
**mother** 45:9
**motion** 36:23
**mouth** 27:21
**mouthful** 34:16
**move** 40:18
53:9
**moved** 49:21
**moves** 31:22
**multifactorial**
46:16
**multiple** 11:8
13:3,4 16:9
38:8 42:13
44:9 51:7
58:17
**murrill** 3:13
**mutilate** 43:12

**n**

**n** 2:1 4:1 6:6,7
**name** 6:4,5,7
**named** 31:8
**necessary** 71:6
**necessitates**
57:23

**need** 5:17 26:18
34:9 43:5
44:18,19 45:10
**needs** 43:21
**negative** 46:21
**never** 13:25
18:24 19:25,25
40:6,7 51:12
55:8
**new** 3:5,5,9
**no.usm** 1:6
**nonsuicidal**
24:25 34:11
46:19 48:12
49:20
**notarize** 72:11
**notary** 71:13
71:19
**note** 41:23 43:1
43:18 49:5,6
49:18 53:19
56:3 57:4 72:9
**noted** 26:16
71:7
**notes** 41:21
**november** 28:1
28:23 29:5
30:20 31:21
**number** 7:18
9:22 10:23
27:23 28:11
49:15
**nursing** 8:18
25:11 49:24

**nw** 3:9

**o**

**o** 3:14 4:1 68:1
**oath** 4:24
**object** 12:19
13:9 15:5,20
17:1,7,24 18:7
19:9,22 20:25
21:10 23:7
28:19 29:7
31:2 36:13
51:3 52:15
53:21 56:10
57:10 58:16
61:18,24 62:9
62:23
**objection** 11:25
21:19,25
**objections** 4:12
**objects** 37:22
**observation**
27:8
**obviously** 9:18
10:9
**occasions** 42:13
**occurred** 12:4
25:6 30:16
**occurrence**
43:4 59:10
**occurrences**
39:8
**offender** 41:24
41:25 42:2,6
43:5,8,8,11
48:24 54:19,21

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[offender - person]**

| | | | |
|---|---|---|---|
| 54:23 58:3 59:11,13 | **ongoing** 44:1,4 45:23 | **outlined** 14:11 39:17 | **particularly** 10:23 |
| **offender's** 54:25 | **open** 27:7 41:11 61:7 | **outside** 45:9 54:14 | **parties** 69:6 |
| **offer** 26:4 50:7 50:8 | **operations** 8:13 | **overall** 45:25 | **party** 69:3,5 |
| **offered** 57:4 | **opine** 25:4 | **p** | **past** 8:4 34:19 |
| **office** 3:13 6:8 7:12 58:2 | **opining** 21:2 46:10 62:11,24 | **p** 3:14 4:1 6:6 68:1 | **pathology** 51:21 57:22 |
| **officer** 42:4 58:1 68:5 | **opinion** 11:6 13:21 14:13 19:19,20 20:2 20:3 24:18 25:5 34:4,21 38:18 39:2 63:15 | **page** 2:3 9:20 18:13 37:4,6 38:6,17 39:18 39:18 42:24 44:21 46:1 47:1 48:20 49:3 50:20 57:25 69:12 70:4,7,10,13,16 70:19 | **patient** 7:12 36:10,11 47:21 49:19 |
| **officiated** 4:23 | | | **patient's** 50:5 |
| **oh** 9:6,12 30:7 55:7 64:3 | | | **patients** 7:9,11 55:7 |
| **okay** 5:8 7:6 8:3 9:11,15,25 10:5 11:15 15:15 16:11 17:18 18:11 20:6 23:20 28:6 30:7,15 30:19 31:20 32:19 33:8 38:5,12 40:25 42:24 43:23 44:21 45:10,12 46:1,12,25 49:17 50:4,13 56:3 57:8 62:16 65:2,4 65:18 | **opinions** 9:21 9:23 10:22 20:21 62:14 68:24 | **pages** 67:15 68:9 72:12 | **pediatrics** 8:18 |
| | **opp** 16:5 | **painful** 6:2 | **penn** 10:6,12 |
| | **opportunity** 16:22 47:9 | **parish** 16:5 21:7 22:15 23:2,5,17,21,24 24:1 39:9 42:7 42:10,14,17 64:2 | **penn's** 61:4 |
| | **opposed** 15:16 19:19 20:3 28:15 52:11 | | **people** 17:8 24:25 55:6 |
| | **order** 36:10 54:25 57:14 63:14 | | **percent** 64:11 64:13 |
| | **oriented** 53:11 | **part** 50:14 57:23 58:10,13 58:18 | **percentage** 7:14,15,16 |
| | **original** 4:9 69:10,11 | | **perfect** 5:16 |
| | | | **perform** 63:11 |
| | **orleans** 16:4,5 | **participating** 3:1 | **period** 13:19 23:2 28:10 31:24 32:20 36:1 38:14 41:22 59:2 61:5 |
| **once** 18:25 28:22 60:10 | **outcome** 69:7 | **particular** 39:22 | **permitted** 4:7 |
| **ones** 12:20 | **outline** 19:1 | | **permitting** 27:8 |
| | | | **person** 42:20 44:15 55:12 |

Page 14
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[person - providers]**

68:20
personal  68:12
personality
  35:13,19 51:22
  52:11
perspective
  19:11,12,13
  38:21 53:1
pharmacothe...
  39:20
phone  1:23
phonetically
  31:9
physical  13:23
  29:19 60:9
physician
  19:12 56:24
physicians
  56:14
pick  21:6
picture  48:11
pieces  13:3
  38:8
pinpoint  39:3
place  23:13
placement
  11:18 49:20
placements
  50:7
places  51:18
plaintiff  3:3
plaintiffs  18:20
plan  44:7 47:13
  54:5,10

plans  42:6
please  5:23,23
  20:13 59:14,16
pm  47:2
point  25:12,15
  25:24 26:1,6
  26:10 27:2,5,5
  27:5,6 41:24
  42:20,23 43:2
  43:16,20,24
  45:1 48:22
  51:5,20 53:14
  53:17 54:16
  56:15 57:1
  59:22
points  44:14
policy  27:4
  36:21
population
  64:25
positive  44:8
possibility  51:9
possible  39:10
  45:15,19
posttraumatic
  13:24 14:9
  34:5,21 39:16
  39:24
potential  37:2
  37:10
potentially
  38:22
practice  7:7,8,9
  7:14,15,16
  25:18

practicing
  56:24
practitioner
  47:5 54:1
practitioners
  55:14
pre  30:14
predict  55:20
predicting
  55:18
prefer  41:1
preference  41:5
prepared  67:14
  68:11,16
presentation
  50:5,14
presented
  54:21
pretrial  15:3,12
  15:16 17:19,20
  28:16
pretty  7:9
  12:15,21 13:5
  18:22 22:18
  51:4
preventing
  44:4
previous  22:9
  51:19
previously  8:13
  12:6 37:20
primary  37:16
prior  14:15
  51:8,15 54:5
  59:6

prison  10:15
  16:1,6 31:25
prisoner  15:2
  15:17
prisoners  17:21
prisons  16:22
private  7:8
probably  6:1
  17:17 34:19
probation  42:4
  64:16
problems  24:5
  42:6
procedure  4:7
  27:4 68:23
process  44:18
professionals
  16:19
program  8:16
  16:17,18
progress  57:4
prohibited  69:1
prohibition
  62:1 68:22
prolonged
  10:24
proper  4:11
protect  36:10
  36:11
provide  16:19
  52:24
provided  16:18
providers
  33:16

Page 15
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

**[provides - regarding]**

| | | | |
|---|---|---|---|
| **provides**  46:22 | **puts**  25:22 | **reached**  9:21 | **recording**  19:4 |
| **providing**  8:23 | **putting**  19:3 | **read**  4:8 9:19 | **records**  2:12 |
| 17:13 | 27:20 | 22:7,9 28:17 | 13:1,14,17 |
| **psychdoctors** | | 28:20 49:14 | 18:23 23:11 |
| 72:1 | **q** | 52:7 61:10 | 28:20 32:13 |
| **psychiatric** | **quell**  45:5 | 67:5 71:5 72:6 | 33:24 38:1,6 |
| 7:19 8:19 14:3 | **question**  8:11 | 72:8 | 38:10,10 40:16 |
| 36:7,8 | 17:18 18:3 | **reads**  13:21 | 61:3 64:1,2,4 |
| **psychiatrist** | 20:20 21:13,14 | **really**  5:17 | 65:3 |
| 10:14,18 50:1 | 21:19,20 22:2 | 15:18,21 35:7 | **reduce**  44:10 |
| 57:5,12,24 | 22:9 43:23 | 38:16 39:3 | 45:24 46:20 |
| **psychiatrist's** | 53:7 56:21 | 55:18 | **reduced**  44:25 |
| 19:12 | **questions**  4:13 | **reason**  46:16 | **reduction** |
| **psychiatrists** | 5:19 65:5 | 55:5 58:10,18 | 44:17 54:9 |
| 16:19 35:11 | **quite**  17:9 | 70:6,9,12,15,18 | **reevaluation** |
| **psychiatry**  6:11 | 33:13 35:8 | 70:21 | 41:25 |
| 6:12,12 | 52:18 | **reasons**  58:17 | **refer**  15:2 |
| **psychopharm...** | **quotation** | **recall**  25:25 | 51:24 |
| 40:13 | 33:11 | 37:3 49:5 | **reference**  20:17 |
| **psychotherap...** | **quote**  18:11 | 63:19,23 64:14 | 37:1 38:7,17 |
| 11:1 | **quotes**  18:12 | **receive**  10:25 | **referenced**  72:5 |
| **psychotropic** | 19:16 | **received**  13:15 | **references** |
| 39:21 | **r** | **receiving**  44:3 | 37:10 |
| **ptsd**  14:2,13 | **r**  6:7 68:1,1,1,1 | **recent**  49:19 | **referencing** |
| 39:1,4,7 | 70:3,3 | **recently**  60:19 | 20:19 |
| **public**  71:19 | **r.s.**  68:8 | **recollection** | **referred**  16:5 |
| **pull**  40:16 | **raising**  21:24 | 23:15 | **referring**  65:17 |
| **punishment** | **range**  36:23 | **recommended** | **refers**  33:13 |
| 62:2 | **ranges**  7:13 | 39:13 | 50:9 |
| **purported** | **rather**  11:11 | **record**  7:3 | **reflected**  67:13 |
| 24:23 51:19 | 15:23 47:16 | 15:14 32:7 | **regard**  8:1 |
| **purposes**  4:7 | **razor**  13:3 | 35:14 41:16,19 | **regarding** |
| **pursuant**  8:21 | 37:23 38:9 | 47:18 48:2 | 23:13 25:20 |
| **put**  41:1,11 | **reach**  34:1 | 50:10,19 56:23 | 26:13 |
| | | 65:11 66:2 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[regularly - rouge]**

| | | | |
|---|---|---|---|
| **regularly** 50:12 | 61:4 63:1,9 | **respect** 11:21 | **reviewed** 10:1 |
| **related** 7:19 | **reported** 3:20 | 20:21 61:5 | 10:2,5 25:20 |
| 69:6 | 54:22 61:6 | **responsiveness** | **reviewing** 18:1 |
| **relationship** | 67:24 68:10 | 4:13 | 50:10 |
| 32:25 69:2,4 | **reporter** 1:16 | **rest** 6:21 | **reviews** 9:9 |
| **relationships** | 3:21 4:22 6:4 | **restrained** | 17:17 23:9,18 |
| 68:22 | 6:23 14:22 | 13:19 23:1 | 27:17 31:15,18 |
| **released** 27:25 | 20:11 22:10 | 25:16,22 44:13 | 37:9 38:4 |
| 28:24 30:20 | 59:15 63:20 | **restraint** 11:19 | 59:25 |
| **relief** 46:22 | 65:12 68:4 | 13:23 25:7 | **rewards** 44:8 |
| **remain** 43:21 | **reporter's** 2:9 | 29:19 39:12 | 47:14 |
| **remains** 27:11 | **reporters** 1:22 | 43:16 45:1 | **rhode** 7:22 |
| **remember** 23:8 | **reporting** 69:3 | 48:17,18 53:17 | **richard** 1:9 |
| 29:10 30:13 | **represent** 5:10 | 60:3,9,24 | **right** 4:8 10:21 |
| 32:5 49:11 | **representation** | **restraints** | 21:5 23:11 |
| 64:8,10 | 53:18 | 10:24 25:13,15 | 25:23 34:20 |
| **remind** 37:4 | **representations** | 25:24 26:1,6 | 40:3 41:10 |
| **render** 63:14 | 55:4 | 26:10 27:3,5,6 | 46:25 47:11 |
| **reoccurring** | **representing** | 35:25 36:2,4 | 48:20 51:23 |
| 50:12 | 3:3,12 | 36:10,15,18,19 | 52:22 53:9 |
| **repeat** 20:13 | **require** 43:10 | 43:3,21,25 | 54:6 55:6 |
| 22:4 | **required** 36:21 | 44:2,18 45:23 | 60:15 63:10 |
| **repeated** 13:22 | 68:17 69:11 | 47:21 48:22 | 65:21,24 |
| **repetitive** | 71:13 | 54:16 56:15 | **risk** 44:11 |
| 61:12 | **requires** 17:20 | 59:22 | 45:15,19,20,21 |
| **report** 5:12,13 | 18:4 | **restrictive** | 45:22,25 55:13 |
| 6:10 9:18 10:3 | **requiring** | 48:16 | 55:15,19,21 |
| 10:5 12:13,25 | 12:21 13:12 | **result** 13:22 | 57:22 |
| 14:4,11 18:11 | 61:8 | 64:7 | **risks** 44:1 |
| 18:25 19:4 | **resection** 12:23 | **retained** 4:10 | **river** 5:2 6:8 |
| 20:18 24:24 | **reserved** 4:14 | **return** 72:12 | **road** 25:4 |
| 32:7 33:9 34:8 | **reserves** 4:8 | **review** 11:4 | **room** 25:10 |
| 35:21 37:1 | **resided** 31:18 | 14:5 18:3,18 | 26:17 |
| 39:18 43:3 | **resources** 24:1 | 33:24 47:2 | **rouge** 1:23 3:14 |
| 52:17 59:9 | 24:8 38:23 | 50:19 53:4 | 3:17 5:10 |

Page 17
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[rough - sir]**

| | | | |
|---|---|---|---|
| **rough** 9:11 31:20 65:7 | **se** 35:20 | 25:15,21,23 26:19,20 28:11 | **share** 41:2,12 |
| **roundabout** 53:6 | **seal** 69:11 | 28:25 32:1,22 | **sheet** 67:14 72:10 |
| **row** 27:13,16 | **secluded** 13:18 | 34:12 37:22 | **shelly** 1:8 |
| 28:14,22,25 | **seclusion** 11:18 | 42:12,18,21 | **shoplifting** 64:12 |
| 29:4,9,14,18,25 | 25:7 48:16,18 | 43:12,17,22,25 | **short** 23:21 |
| 30:3,11,17 | 60:24 64:25 | 44:1,4,11,25 | **shorthand** 68:11 |
| 59:4,8 | **second** 9:20 | 45:14 46:13,17 | **show** 41:7 |
| **rules** 4:6 5:18 | 23:9 24:3 | 46:18,20,22 | **showing** 60:5 |
| 68:17,24 72:14 | **security** 42:1 | 47:3,7,15,19,25 | **shown** 50:6 |
| **running** 24:5 | 43:3 59:9 | 48:12,23 49:19 | **shows** 32:8 |

**s**

| | | | |
|---|---|---|---|
| **s** 4:1 67:14 68:1 70:3 | **see** 7:9,11,17 8:3 14:12 24:4 | 56:1 58:8 59:12,23 61:6 | **si** 3:6 |
| **saw** 38:9 45:18 52:9 | 25:13 27:17 30:7 38:1 | 62:18 | **sic** 42:4 53:7 |
| **saying** 38:18 | 39:18 41:11,13 | **send** 42:7 | **side** 49:13 |
| 47:6 52:3 | 41:15 47:2,23 | **sense** 5:19 | **sign** 4:9 57:14 72:6,11 |
| 53:16 56:4 | 48:3 49:10,13 | **sent** 59:4 | **signature** 69:10 69:12 |
| 58:12 | 49:15 50:11,17 | **sentence** 64:14 | **signed** 69:13 72:17 |
| **says** 10:23 | 50:20 52:4,13 | **separate** 17:21 | **significant** 12:22 13:12 |
| 41:23 44:24 | 52:16 63:7 | **sequelae** 7:19 | 38:20 42:21 |
| 46:3,12 47:19 | 65:3 | **serious** 12:5,21 | 43:4 51:5 |
| 49:18 50:4,14 | **seeing** 49:6 | 13:5,10 22:18 | 59:10 |
| 50:21,22 52:6 | **seeking** 49:21 | 58:7 | **single** 29:21 |
| 53:23 55:12 | **seem** 55:25 | **service** 32:18 | **sir** 5:15 6:14 |
| 56:11 58:5 | **seems** 13:5 | 64:17,18 | 8:5 9:17,24 |
| 59:9 61:4 63:9 | **seen** 10:7 41:24 | **services** 8:18 | 18:5,15 21:1 |
| **sciences** 8:14 | 48:10 49:16 | 8:23 68:21 | 30:18 37:13 |
| 16:16 | 54:12,19 | **set** 68:9 | 62:21,21 64:19 |
| **scratched** 49:11 | **self** 11:3,7,9,21 | **settlement** 8:21 | 65:13 |
| **screen** 41:2,13 | 12:3,4,9,15 | 8:24 | |
| | 16:23 17:9 | **several** 51:23 | |
| | 20:9,19 22:18 | **severe** 11:16 | |
| | 22:24 23:4,16 | 12:5,15 42:20 | |
| | 24:10,14,19,22 | **severity** 12:4 | |
| | 24:25 25:3,5 | | |

**[situation - swanson]**

| | | | |
|---|---|---|---|
| **situation** 36:5 | 23:25 39:9 | 49:23 | 44:13,23 45:1 |
| **situations** 19:1 | 51:18 63:25 | **stayed** 30:21 | 45:15,19,21,22 |
| **skilled** 49:24 | 64:1 | **stenographic** | 46:2 47:4,20 |
| **skills** 25:1,3 | **stabilization** | 68:11 | 48:21 49:1,18 |
| 44:16 | 40:14 | **stipulated** 4:3 | 53:11 54:14,25 |
| **sleep** 39:23 | **staff** 26:16 42:1 | **stomach** 58:3 | 55:3 56:5,7,25 |
| **sliver** 26:3 | 48:3 | **stop** 45:9,10 | 57:8,15,21 |
| **small** 12:23 | **stamp** 41:20 | **straighten** 5:21 | 60:8 |
| **smi** 51:25 52:2 | 54:18 59:7 | **street** 3:17 | **suite** 1:22 3:9 |
| 53:6,7 | **stamped** 42:25 | **stress** 13:24 | 5:2 6:9 |
| **snu1** 49:23 | **standard** 49:1 | 14:9 25:1 34:5 | **summary** 9:20 |
| **social** 42:1,3 | 54:25 | 34:21 39:16,24 | 9:21 10:22 |
| 43:7,11 58:2 | **start** 6:3 9:19 | 42:20 44:16 | 13:21 62:25 |
| **solutions** 72:19 | 23:22 40:25 | 48:13,14 54:9 | **summer** 39:14 |
| **sorry** 6:17 8:7 | **state** 1:17 3:22 | **stressors** 25:2 | **sundays** 32:16 |
| 8:25 12:1 | 4:23 8:6,9,12 | **struggles** 33:9 | 32:18 |
| 14:23 17:8 | 8:14 10:15 | **struggling** 33:8 | **superficially** |
| 28:20 31:5,17 | 16:7,15 68:4 | **stuff** 48:21 | 46:6 |
| 34:25 35:16,17 | **stated** 12:20 | **subjected** | **supervision** |
| 57:19 59:16,20 | 24:21 39:11 | 29:19 48:15 | 68:13 |
| **sort** 25:22 | 42:2 43:5,8 | **subscribed** | **support** 33:11 |
| **speak** 29:17 | 52:17 59:13 | 71:14 | 33:14 47:25 |
| **special** 3:16 | **statements** | **subsequent** | **supposed** 55:15 |
| **specific** 14:6 | 42:22 | 8:21 | **sure** 26:19 |
| 47:14 52:25 | **states** 1:1 | **subsets** 40:2 | 35:22 38:16 |
| **specifically** | **stating** 42:9 | **suffering** 38:25 | 42:11 55:5 |
| 38:1 39:15 | **statistical** | **sufficient** 63:13 | 61:12 64:11 |
| **spell** 6:6 | 34:14 | **suggest** 28:2 | 65:5 |
| **spelled** 31:9 | **status** 18:9 | **suicidal** 34:24 | **surgery** 13:12 |
| **spent** 60:3 | 46:9 | 35:4,7 44:10 | **surgical** 12:22 |
| 64:20 | **statute** 18:3 | 48:24 54:24 | **swallowed** 13:2 |
| **spring** 14:20 | 62:18 68:17 | 55:8 58:5 | **swallowing** |
| 21:6 39:8 60:5 | **statutes** 21:2 | **suicide** 24:12 | 37:22,23 38:8 |
| **st** 21:7 22:14 | **stay** 23:21 | 24:14 26:22 | **swanson** 60:19 |
| 23:2,5,16,21,23 | 31:12 42:13 | 27:3 43:2,14 | |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com

A Veritext Company                          www.veritext.com

**[sweeps - tool]**

| | | | |
|---|---|---|---|
| sweeps   26:19 | teaching   44:15 | thing   49:4 | threat   43:22 |
| switch   6:18 | technical   7:4 | things   48:15 |    54:3 |
| sworn   5:3 68:7 |    41:17 |    55:6 63:16 | threatening |
|    71:14 | technology |    think   5:9,20 |    43:17 45:14 |
| symptomatol... |    65:7 |    9:8 10:18 11:8 | threats   44:24 |
|    14:6 38:23 | tell   5:23 14:1 |    11:16 12:12 |    46:13,17 47:3 |
|    51:5 |    49:7 64:9 |    22:4 23:9,12 |    47:19 48:22 |
| symptoms   14:5 | terms   21:23 |    24:24 26:12 | three   56:18 |
|    14:8 39:10,22 |    31:20 |    27:18,19,20 | time   4:14 5:22 |
|    39:23 | terribly   5:25 |    28:3 29:16 |    10:10 11:10,17 |
| system   37:15 | testified   5:4 |    30:20 31:15 |    11:22 12:13 |
|    37:17 | testify   62:19 |    32:7,15 34:7 |    13:11,19 14:7 |
| | |    68:8 |    34:12,19 36:9 |    16:21 17:15 |
| **t** | testifying   62:17 |    36:24 39:11,15 |    22:13 23:2 |
| t   4:1,1 68:1,1,1 | testimony   1:12 |    39:17 41:4,22 |    28:10 29:15,20 |
|    70:3,3 |    38:15 56:13 |    45:9,19 46:8 |    30:2,4 33:20 |
| table   22:3 |    61:13 66:4 |    46:15 47:8,16 |    35:8 36:1,6 |
| take   5:22,24 |    67:7 68:6,10 |    48:7,9,10 |    38:14 41:22 |
|    10:21 28:9 |    71:8 72:8 |    50:21,22,23,23 |    44:17 45:16 |
|    40:18 41:12 | texas   30:22,24 |    51:20,24 52:17 |    48:12 50:25 |
|    45:4,6 47:21 |    31:6,10,14,22 |    52:22 54:4 |    54:20 57:2,3 |
|    53:2 56:7 57:8 |    32:3,9 35:8 |    55:2,23 56:1 |    58:21,24 60:3 |
| taken   1:15 4:6 | thank   37:7 |    56:14,17 57:2 |    61:5 63:3 65:5 |
|    67:6 68:6 |    64:18,18 |    57:22 58:18 |    72:15 |
| talk   21:5 29:25 | theft   32:4 |    62:1,10 63:6,9 | timeframe   72:7 |
| talked   34:12,12 |    64:12 |    63:18 64:3,4,8 | timeframes   9:1 |
|    37:21 40:11 | theoretically |    65:4 | times   13:4 |
|    46:8,17 47:8 |    25:17 | thinking   53:12 |    28:11 36:3 |
|    47:22 57:6 | theory   25:23 |    56:5,5 |    56:18 |
|    61:14 | therapeutic | thinks   48:15 | tired   43:6 |
| talking   51:20 |    44:5 | third   13:21 | today   5:25 7:10 |
|    62:12 | therapy   39:25 | thought   18:20 | told   12:8 30:20 |
| targeted   44:3 |    40:2,4,7 50:7,8 |    38:3 46:6 |    42:5 |
|    47:14 |    50:11,12 |    51:10 | tool   55:22,22 |
| targeting   39:21 | | | |

Page 20
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                     www.veritext.com

**[top - wanted]**

| | | | |
|---|---|---|---|
| **top** 63:24 | **trip** 30:11 | **understand** | **v** |
| **topic** 40:18 | **true** 67:7 68:13 | 32:16 35:6 | |
| **totality** 55:12 | 71:8 | 50:2 55:17 | **v** 70:1 71:1 |
| **transcribed** | **try** 5:21 24:3 | 56:20 61:12 | 72:3 |
| 68:12 | 41:10 | **understanding** | **vague** 21:22 |
| **transcript** | **trying** 23:8,11 | 11:20 21:8 | **valid** 69:9 |
| 65:11 67:7 | 64:10 | 23:23,25 24:6 | **variety** 7:12 |
| 68:14,15,16 | **tu** 49:21 | 26:23 27:13 | **various** 51:18 |
| 69:10 71:5,8 | **two** 5:24 27:5 | 28:5 29:1,2,12 | 53:12 |
| 72:5,16 | 31:19,19 36:22 | 29:23 30:1,23 | **verbalizing** |
| **transfer** 37:2 | 45:1 48:22 | 31:7 32:6,17 | 47:3,19 |
| **transferred** | 54:16 | 32:19 33:20,23 | **verify** 72:8 |
| 27:12,15 28:14 | **tx** 72:13 | 36:17 37:25 | **veritext** 72:12 |
| 28:22 38:19 | **type** 24:7 25:11 | 42:15 51:14 | 72:19 |
| **transferring** | 26:11 44:19 | 59:1 60:2,18 | **veritext.com.** |
| 37:11 | **types** 50:4 | 60:21,23 61:21 | 72:13 |
| **trauma** 14:17 | **typical** 50:5 | 68:15 | **viable** 55:21 |
| 40:3 | 65:8 | **unfortunately** | **videoconfere...** |
| **treat** 16:23 | **typically** 7:11 | 33:17 48:1 | 1:17 |
| 17:5,8 | 36:14 | **unit** 28:4 37:17 | **violated** 42:5 |
| **treated** 13:25 | | 49:24 54:20 | **violating** 20:7 |
| 38:13 | **u** | 58:1 64:1 | **visit** 31:11 |
| **treating** 16:13 | | **united** 1:1 | **vitae** 9:7 17:16 |
| 16:14 33:15 | **u** 4:1 | **university** 8:14 | **vs** 1:7 |
| 35:10 50:1 | **u.s.** 20:18 61:14 | 13:1 26:12 | |
| **treatment** 11:1 | **ultimately** | 38:7 | **w** |
| 11:1 15:23 | 31:11 | **unusual** 62:2 | |
| 17:13,14 28:4 | **um** 21:16 | **use** 26:20 33:11 | **wand** 54:11 |
| 36:7,8 39:13 | **unclear** 5:19 | 35:25 36:2,9 | **want** 5:22 9:9 |
| 39:15 40:11 | 46:15 51:6 | 36:14 40:2 | 10:21 11:10,14 |
| 48:6,6 54:5,20 | **under** 4:6,7 9:3 | **used** 26:14 36:5 | 19:16 35:24 |
| 58:1,20 | 34:13 42:20 | 44:10,12 72:16 | 40:17 45:4 |
| **trial** 4:14 19:2 | 48:13 68:12 | **using** 48:6 | 49:4,9 54:18 |
| **trick** 43:23 | **underlying** | **usually** 11:13 | 56:24 57:1 |
| | 11:2,6 | | 61:12 |
| | **undersigned** | | **wanted** 42:8,9 |
| | 67:4 | | 42:10 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

**[wants - zoom]**

| | | |
|---|---|---|
| **wants** 42:22 | **words** 27:21 | 31:16,16 33:22 |
| **washington** 3:9 | **work** 8:8,9 | 63:4 |
| **watch** 24:12,15 | 16:11 19:17 | **years** 9:4,5,8 |
| 26:22 27:3 | 43:9 47:16,17 | 13:1 16:8 |
| 41:24 43:2,14 | 48:17 63:11 | 30:16 31:19,19 |
| 44:13,24 45:2 | **worked** 15:25 | 39:7 52:10 |
| 46:3 47:4,20 | 16:21 | **york** 3:5,5,9 |
| 48:22 49:2,18 | **worker** 42:1,3 | **young** 12:11 |
| 53:11 54:14,16 | 43:7,11 45:18 | **younger** 40:15 |
| 54:25 55:3 | 58:2 | **youth** 16:8 |
| 56:2,7,25 57:8 | **working** 16:12 | **z** |
| 57:15,21 60:8 | 17:12 33:5 | **zoom** 1:17 3:1 |
| **way** 48:9,10,17 | **worse** 58:22 | |
| 53:6 | **wrist** 55:10 | |
| **ways** 47:16 | **wrists** 61:7 | |
| 53:13 | **written** 33:8 | |
| **we've** 5:9 41:19 | **wrong** 9:9 | |
| 42:20 | 21:12,13,20 | |
| **week** 7:11 | 27:22 | |
| **welcome** 11:13 | **x** | |
| 37:8 | **x** 2:1 | |
| **went** 22:22,22 | **y** | |
| 24:11 25:4 | | |
| 31:10 | **y** 6:7 | |
| **when's** 30:2 | **y'all** 40:9 41:1 | |
| **wilson** 3:16 | **y'all's** 22:5 | |
| **witness** 4:8,24 | **yeah** 9:14 | |
| 9:9 17:17 23:9 | 14:12 16:6 | |
| 23:18 27:17 | 27:24 37:6 | |
| 31:15,17 37:9 | 38:5,5 40:23 | |
| 41:6,14 59:25 | 49:9 50:23 | |
| 72:5,7,9,11,15 | 63:9,23 65:8 | |
| **witness's** 67:1 | 65:21 | |
| **word** 6:20 40:2 | **year** 14:24 | |
| | 27:22 30:13 | |

Louisiana Code of Civil Procedure

Article 1445 and 1446

Art. 1445. Submission to Witness; Changes; Signing
When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by him, unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness unless the parties by stipulation waive
the signing or the witness is ill or is absent from
the parish where the deposition was taken or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion
to suppress under Article 1456 the court holds that

the reasons given for the refusal to sign require
rejection of the deposition in whole or in part. A
video deposition does not have to comply with the
requirements of reading and signing by the
deponents.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.