# EXHIBIT 2

```
1              IN THE UNITED STATES DISTRICT COURT
                 THE MIDDLE DISTRICT OF LOUISIANA
2

3     _____
                             )
4     JOSHUA FOLKS,          )
                             )
5            Plaintiff,      )
                             )
6         vs.                )  Case No.
                             )  23-cv-01289-SDD-
7     LOUISIANA ATTORNEY     )  RLB
      GENERAL JEFF LANDRY,   )
8     et al.,                )
                             )
9            Defendants.     )
      _____)
10

11

12

13

14

15

16

17        VIDEOTAPED EXPERT DEPOSITION UNDER ORAL EXAMINATION

18                                OF

19                        JOSEPH PENN, M.D.

20                       DATE: June 11, 2025

21

22

23

24

25    REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

1
2
3
4
5
6
7
8        TRANSCRIPT of the deposition of the
9    expert JOSEPH PENN, M.D., called for Oral Examination in the
10   above-captioned matter, said deposition being taken
11   by and before MICHAEL FRIEDMAN, a Notary Public and
12   Certified Court Reporter of the State of New Jersey,
13   located at ZOOM VTC, all parties remote, on June 11,
14   2025, commencing at approximately 8:02  in the
15   morning, CST.
16
17
18
19
20
21
22
23
24
25

```
 1     A P P E A R A N C E S:

 2

       JENNER & BLOCK
 3     1155 Avenue of the Americas
       New York, NY  10036
 4     BY:    KEVIN K. SI, ESQ.
              KENNETH D. BEALE, ESQ.
 5            SHAILEE D. SHARMA, ESQ.
       Attorneys for Plaintiff
 6


 7     KEOGH, COX & WILSON
       701 Main Street
 8     Baton Rouge, LA 70801
       BY:    ANDREW BLANCHFIELD, ESQ.
 9     Attorneys for Defendants

10

11     ALSO PRESENT:    GUS PHILLIPS, Videographer

12

13

14                      * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A    Certainly.
 2             So restrictive housing is a term
 3   that's used by custody staff and custody
 4   leadership.  It's meant to, as I understand
 5   it, to any time someone is placed in a higher
 6   security level setting, there used to be
 7   administrative segregation, ad seg, high
 8   custodies, there's a variety of terms.  Super
 9   max.  Every state may have a different
10   variation on how they refer to it.
11             But restrictive housing is when
12   someone is not in general population.
13   They're in a higher level of custody housing
14   and supervision.
15        Q    You do also use the term
16   "administrative segregation" at some point.
17             Does that mean the same thing as
18   restrictive housing, as used in your report?
19        A    If you can show me where in my
20   report you're referring to, I can try to
21   answer your question better.
22        Q    Sure.
23             So on page 34, at the very top.
24             The sentence includes -- sorry.
25   Include administrative segregation,
```

 1      restrictive housing, death row and other high
 2      custody settings.  I'm quoting from the
 3      report there.
 4           A    Yes.  And sorry, what's the
 5      question, please?
 6           Q    Does your use of administrative
 7      segregation here mean the same thing as
 8      restrictive housing?
 9           A    No.
10           Q    How are those different?
11           A    Again, I don't consider myself to
12      be a custody expert.  I'm not a correctional,
13      like, officer or a warden or classification
14      on housing, but I've been doing this close to
15      25, 30 years, so I have a general
16      familiarity.
17                But what I understand
18      administrative segregation, is when
19      individuals that are incarcerated that are,
20      one, they might be in a member of the
21      security threat group, like STG, security
22      threat group.
23                They might be placed in
24      administrative segregation.
25                Or even someone who is not a member

1     of a security threat group, if they have a
2     history of serious violence or assaultive
3     behaviors towards inmates or towards staff or
4     both, and they've incurred disciplinary
5     sanctions, they can be placed into
6     administrative segregation.
7             Restrictive housing is another
8     term.  I'm not sure which one came first but
9     what I understand is, that restrictive
10    housing could include administrative
11    segregation but it might include other
12    individuals that are incarcerated.  Custody
13    might place someone in restrictive housing
14    but it might not be administrative
15    segregation.
16            Like they could be put into
17    prehearing detention.
18            Like let's say they're found with
19    contraband or they're alleged to have been
20    assaulted or been out of place, so they're
21    getting a disciplinary or about to be
22    undergoing a review for disciplinary.  They
23    can be placed into prehearing detention or
24    some other restrictive housing setting while
25    awaiting the ruling, if you will, like the

1    disciplinary review of that charge or
2    infraction.
3        Q    Page 24 of your report, you also
4    use the term "extended lockdown."
5             This is right under the bolded
6    header E.
7             I'm quoting here, "Folks was moved
8    to extended lockdown in September 2022 and
9    was released in November 2022."
10            Do you see that?
11       A    (Witness reviewing.)
12            Yes, I see that.
13       Q    What did you mean by extended
14   lockdown here?
15       A    So that's not a term that we use in
16   the Texas system.  And I would need to
17   refresh my memory by looking at the policy
18   and procedure of what Louisiana Department of
19   Public Safety and Corrections, how they refer
20   to that.
21            So I'm just -- I'm basically just
22   listing it verbatim.  That's what is
23   reflected in the custodial records, that she
24   was moved to extended lockdown.
25            I don't think that I define what

```
 1      extended lockdown is in my report.
 2          Q    From your recollection of the
 3      custody policies at LSP, do you understand
 4      extended lockdown to involve isolation of an
 5      inmate in a cell for some period of time
 6      during the day?
 7          A    I would need to read the policy to
 8      be able to answer your question.
 9          Q    Would that refresh your memory?
10          A    Yes.
11          Q    Go ahead, if you have it handy.
12          A    I don't.  I don't have the policies
13      handy.
14          Q    What about administrative
15      segregation to get a definition, would that
16      involve isolation of an inmate in a cell for
17      a certain number of hours, in a day as used
18      in your report?
19          A    So I don't have a definition of
20      administrative segregation.  Every state that
21      I'm familiar with has a different definition
22      and they have different parameters on how
23      many hours a day they're out of the cell, if
24      they're allowed recreation or visits or other
25      privileges.
```

```
 1            And so, again, I'd be happy to
 2   answer your question if you want.  I would
 3   need to look at the Louisiana policy to
 4   refresh my memory to answer your question.
 5        Q    What is involved in the TDCJ
 6   system?
 7        A    I don't know that off the top of my
 8   head.  I would need to look at that policy.
 9            Again, I'm not a custody person.
10   My job in TDCJ is I'm a contracted healthcare
11   provider, mental health in particular, so I
12   don't get involved in decisions about
13   administrative segregation.
14        Q    Your report, you also note at
15   various times that Mr. Folks was placed in
16   extreme suicide watch during his
17   incarceration.
18            Is that right?
19        A    That's the terminology, yes, that I
20   understand both from Dr. Gamble's deposition
21   and my review of the medical records, mental
22   health records in the case, yes.
23        Q    And what's your understanding of
24   what extreme suicide watch entailed at LSP?
25        A    So what I understand is, number 1,
```

1     it's extremely rare, extraordinarily rare.  I
2     recall, in Dr. Folks' -- I'm sorry, Dr.
3     Gamble -- I keep messing that up, sorry --
4     Dr. Gamble's deposition, he said it was not
5     very commonly used.  It was extremely rare.
6              What I understand is, that it's
7     only implemented when everything else has
8     failed.
9              Number 3, that it's only employed
10    in situations similar to Mr. Folks when
11    someone continues to engage in severe or
12    serious self-harm or suicide attempts and
13    nothing -- there's no other option but to
14    employ this suicide precaution to keep
15    someone from killing themselves basically.
16             And so, that's my understanding of
17    why it was employed.  I understand that it's
18    medically ordered.
19             I think Dr. Gamble had to be
20    consulted and he gave the order to -- for
21    this -- for use of this type of suicide
22    precautions.
23             And I also understand that it was a
24    multi-disciplinary -- excuse me -- where I
25    think psychology and mental health staff, Dr.

1       while he's incarcerated, while Mr. Folks is
2       incarcerated in the Louisiana system, he
3       definitely met criteria for borderline
4       personality disorder but it's atypical.
5       He -- when he was incarcerated in Texas --
6       I'm blanking on the name of the county jail,
7       he was in two county jails in Texas, I think
8       Brazoria county jail and I think Harris
9       county jail.
10              At neither of those facilities did
11      he cut or self-harm or engage in suicide
12      attempts, and so that's kind of atypical.
13              And number 2, ever since he's been
14      out of the community, which I think has gone
15      on a year, year and a half or longer, he's
16      not -- he endorsed to me that he is not
17      cutting or self-harming or mutating and has
18      had no suicide attempts.
19              So that, I do agree -- under oath,
20      I testified that I do concur with Dr. Gamble
21      on the antisocial personality disorder, on
22      the impulse control disorder you asked me
23      just a second ago, and the borderline
24      personality disorder but it's just atypical
25      that, if anything, it shows how stable he is,

1  that he is not cutting or self-harming. And
2  that's despite not being on any psychotropic
3  medications and not being in any mental
4  health treatment in the community for more
5  than a year.
6      So I just raised the question mark
7  about the borderline personality disorder
8  because you would expect him to continue to
9  cut and self-harm and mutilate whenever he is
10 stressed or upset or having a relational
11 issue, even after his release from prison.
12     So, anyway, that's just -- that's
13 getting way in the weeds but I just wanted to
14 make that point.
15     Q   But it's ultimately your testimony
16 that Mr. Folks had and has borderline
17 personality, antisocial personality and
18 impulse control disorders?
19     A   Yeah, both. And you just said
20 borderline. I would say borderline
21 personality disorder, yes, and the other two
22 that you mentioned, I agree with those, all
23 three.
24     Q   So backing up from Mr. Folks and
25 just talking about your expertise as a

1    psychiatrist in general, how do you go about
2    assessing the cause of a person's self-harm?
3         A    Right.
4              So I'm trained both in adult
5    psychiatry and child psychiatry and forensic
6    psychiatry, so whenever I look at that,
7    there's some conditions that start as young
8    as childhood and infancy.  There's a
9    condition called Lesch-Nynan -- I think it's
10   spelled L-E-S-C-H  N-Y-N-A-N -- where young
11   kids will bite themselves repeatedly and
12   self-harm.  It's a metabolic or genetic
13   disorder.
14             There's children, adolescents, that
15   have severe autism, autistic spectrum or
16   autism, autistic spectrum disorder, autism,
17   and they might head bang, they might punch
18   themselves or bite themselves repeatedly.
19             So you kind of have to look at
20   everything, from childhood, adolescence.  In
21   there, we see kind of the onset of borderline
22   personality where both males and females,
23   mainly females, though, will cut or self-harm
24   whenever they're upset or distressed.
25             And then, the same thing as adults,

Joseph Penn, M.D. - June 11, 2025

Page 225

```
 1      who work in correctional settings or,
 2      alternatively, are monitors for expert
 3      witnesses or both.
 4              I would need to review the policies
 5      and procedures of the Louisiana prison
 6      system, and then I could answer your question
 7      and tell you if they complied with that
 8      policy and if they documented.  That would be
 9      something that I would need to review to be
10      able to answer your question.
11      Q    If LSP were complying with the
12      aspirational, as you say, policy here, we
13      would expect to see documentation of mental
14      health checks by qualified mental health
15      staff every eight hours.
16              Is that correct?
17      A    No.  This is -- first of all, this
18      is not a policy.  This is a book.  This is
19      a -- specifically, it's a resource document.
20      And I think it says, nursing staff every
21      eight hours.  That's the aspirational.
22      Remember, I already made the clarification
23      that if you don't have 24-hour nursing, you
24      can't have nurses every eight hours, because
25      you don't have enough staff.
```

 1              What I would say is, whatever the
 2      policy the Louisiana Department of
 3      Corrections promulgated, that's what should
 4      have happened, whether it be nursing,
 5      whatever the frequency be, same thing for
 6      mental health staff, whatever the frequency
 7      should be, and that should be able to be
 8      substantiated by documentation in the
 9      healthcare record.
10           Q    On this same page that we were
11      looking at, so page 67 of the book and then
12      page 22 of the PDF, do you see the last
13      bullet, which reads, "Secluded inmates should
14      have access to structured therapeutic
15      programming whenever possible without
16      compromising the security and safety of the
17      institution."
18           A    Yes, I see that.
19           Q    It's the last bullet.
20           A    Yeah.
21           Q    What is structured therapeutic
22      programming?
23           A    So that's a Jeff Metzner.  He's
24      a -- frequently monitored.  That's pretty
25      much a hundred percent of what he does.

```
 1              He doesn't actually work in jails
 2      or prisons.  He's been a monitor for most of
 3      his career.
 4              And I have tremendous respect for
 5      Jeff.
 6              But in my opinion, he's missing the
 7      boat.  Because the wording is, should have
 8      access.
 9              So secluded inmate, like Mr. Folks,
10      who is potentially lethal of trying to kill
11      himself, you have to weigh the risk of
12      killing himself versus the benefit of him
13      being in this structured therapeutic
14      programming.
15              So absolutely, once Mr. Folks is
16      safe and not cutting, not trying to kill
17      himself, not trying to stab his abdomen with
18      a metal instrument or cut his throat with a
19      toothbrush, absolutely.  Then once he's safe,
20      he can have access to structured therapeutic
21      programming.
22              Now, the problem with that is --
23      see, again, remember, he's a pre-trial
24      detainee.  So I'm not -- you know, an example
25      of a structured therapeutic programming would
```

C E R T I F I C A T E

       I, MICHAEL FRIEDMAN, a Certified Court Reporter and Notary Public, qualified in and for the State of New Jersey do hereby certify that prior to the commencement of the examination JOSEPH PENN, MD was duly sworn by me to testify to the truth the whole truth and nothing but the truth.

       I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

       I DO FURTHER certify that I am neither a relative of nor employee nor attorney nor counsel for any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____

MICHAEL FRIEDMAN, CCR of the
State of New Jersey
License No: 30XI00228600
Date: June 21, 2025