Joseph Penn, M.D. - June 11, 2025

```
 1                IN THE UNITED STATES DISTRICT COURT
                  THE MIDDLE DISTRICT OF LOUISIANA
 2

 3        _____ )
                                   )
 4   JOSHUA FOLKS,                 )
                                   )
 5           Plaintiff,            )
                                   )
 6      vs.                        )  Case No.
                                   )  23-cv-01289-SDD-
 7   LOUISIANA ATTORNEY            )  RLB
     GENERAL JEFF LANDRY,          )
 8   et al.,                       )
                                   )
 9           Defendants.           )
          _____ )
10

11

12

13

14

15

16

17      VIDEOTAPED EXPERT DEPOSITION UNDER ORAL EXAMINATION

18                              OF

19                     JOSEPH PENN, M.D.

20                  DATE: June 11, 2025

21

22

23

24

25      REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Joseph Penn, M.D. - June 11, 2025

1

2

3

4

5

6

7

8                    TRANSCRIPT of the deposition of the

9      expert JOSEPH PENN, M.D., called for Oral Examination in the

10     above-captioned matter, said deposition being taken

11     by and before MICHAEL FRIEDMAN, a Notary Public and

12     Certified Court Reporter of the State of New Jersey,

13     located at ZOOM VTC, all parties remote, on June 11,

14     2025, commencing at approximately 8:02  in the

15     morning, CST.

16

17

18

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

```
 1      A P P E A R A N C E S:

 2

        JENNER & BLOCK
 3      1155 Avenue of the Americas
        New York, NY  10036
 4      BY:   KEVIN K. SI, ESQ.
              KENNETH D. BEALE, ESQ.
 5            SHAILEE D. SHARMA, ESQ.
        Attorneys for Plaintiff

 6

 7      KEOGH, COX & WILSON
        701 Main Street
 8      Baton Rouge, LA 70801
        BY:   ANDREW BLANCHFIELD, ESQ.
 9      Attorneys for Defendants

10

11      ALSO PRESENT:   GUS PHILLIPS, Videographer

12

13

14                      * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

Joseph Penn, M.D. - June 11, 2025

```
1                    I N D E X

2     WITNESS NAME                          PAGE

3     JOSEPH PENN, M.D.

4            By Mr. Si                        8

5

6

7                    * * * * *

8

9

10                 E X H I B I T S

11    EXHIBIT NO.                            PAGE

12    EXHIBIT 1        CV                      14

13    EXHIBIT 2        Prior Testimony         66

14    EXHIBIT 3        Expert Report           72

15    EXHIBIT 4        NCCHC Standards        166

16    EXHIBIT 5        APA                    206

17

18

19                    * * * * *

20

21

22

23

24

25
```

Joseph Penn, M.D. - June 11, 2025

```
1                          - - -

2                Deposition Support Index

3                          - - -

4

5      Direction to witness not to answer

6      Page Line  Page Line  Page Line  Page Line

7      None

8

9      Request for production of documents

10     Page Line  Page Line  Page Line  Page Line

11     None

12

13     Questions marked

14     Page Line  Page Line  Page Line  Page Line

15     None

16

17

18

19

20

21

22

23

24

25
```

Joseph Penn, M.D. - June 11, 2025

Page 6

```
 1          THE COURT REPORTER:  My name is
 2     Michael Friedman, a Certified Shorthand
 3     Reporter.  This deposition is being held
 4     via videoconferencing equipment.
 5          The witness and reporter are not in
 6     the same room.  The witness will be sworn
 7     in remotely, pursuant to agreement of
 8     all parties.  The parties stipulate that
 9     the testimony is being given as if the
10     witness was sworn in person.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Joseph Penn, M.D. - June 11, 2025

1              THE VIDEOGRAPHER:  We are now on

2       the record for the video deposition of

3       Dr. Joseph Penn.

4              The time is 8:02 a.m., June 11,

5       2025, in the matter of Joshua Folks

6       versus Louisiana Attorney General Jeff

7       Landry, et al., Civil Action Number:

8       23-CV-01289-SDD-RLB, being held in the

9       United States District Court for the

10      Middle District of Louisiana.

11             The court reporter is Michael

12      Friedman.  The videographer is Gus

13      Phillips.  And both are representatives

14      of Gregory Edwards, LLC.

15             All attorneys present will be noted

16      on the stenographic record.

17             Will the court reporter please

18      administer the oath.

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

```
 1     J O S E P H   P E N N,   M. D.,
 2             called as an expert witness, having been
 3     first duly sworn according to law, testifies as
 4     follows:
 5
 6
 7
 8     EXAMINATION BY MR. SI:
 9         Q    Good morning, Dr. Penn.
10         A    Good morning.
11         Q    Where are you located right now?
12              Actually, I'm sorry.  Let me back
13     up.  I didn't introduce myself.
14              My name is Kevin Si.  I'm an
15     attorney with Jenner & Block, representing
16     the plaintiff, Mr. Folks, in this case.  I'm
17     here with my colleagues, Shailee Sharma, and
18     Ken Beale.
19              Now let's get into it.
20              Okay.  Where are you located right
21     now?
22         A    Yes.  I'm in Conroe, Texas.
23     C-O-N-R-O-E, Texas.  It's north of the
24     Woodlands in north Houston.
25         Q    I am actually from Houston, so I'm
```

Joseph Penn, M.D. - June 11, 2025

1       familiar with Conroe.

2              A    Oh.

3              Q    We were just talking about it

4       off -- off the record.

5                   Is there anyone else in the room

6       with you right now?

7              A    No.

8              Q    You understand that you're under

9       oath.  Correct?

10             A    Yes.

11             Q    You understand this means you must

12      tell the whole truth under the penalty of

13      perjury.

14                  Is that right?

15             A    Yes.

16             Q    Are you on any medications or under

17      the influence of any substances that would

18      impair your ability to tell the truth?

19             A    No.

20             Q    Is there any reason you know of

21      that would prevent you from giving a complete

22      and accurate testimony today?

23             A    No.

24             Q    I know you've done this many times,

25      so you're very familiar with the rules of a

Joseph Penn, M.D. - June 11, 2025

1     deposition.

2              But just to remind you and just to

3     make sure that we have it on the record, I

4     want to go over some ground rules.

5              So I will ask you a series of

6     questions and I ask that you please answer

7     each question honestly and truthfully, to the

8     best of your ability.

9              Do you understand that?

10     A     Yes.

11     Q     My questions and your answers will

12     be recorded by the court reporter and also

13     video will be taken of you, by the

14     videographer.

15              Do you understand that?

16     A     Yes.

17     Q     Because the court reporter is

18     transcribing our conversation today, please

19     give verbal responses instead of nodding your

20     head or shaking your head or something like

21     that.

22              Can you do that?

23     A     Yes.

24     Q     Because we're talking remotely,

25     it's a little bit hard to read body language

Joseph Penn, M.D. - June 11, 2025

1    and things like that.  Let's do our best not

2    to talk over each other and I'd ask we let

3    each other -- let me finish a question before

4    you answer and I will let you finish your

5    answer before I ask the next question.

6              Does that make sense?

7        A    Yes, I will do my best.

8        Q    Great.

9              If you don't understand a question

10   that I ask, please feel free to ask me to

11   repeat it.  I may have the court reporter

12   repeat it or I might just rephrase it and

13   clarify it.

14             Does that make sense?

15       A    Yes.

16       Q    And the defendant's attorney, he

17   may object to some of my questions.

18             If he does do that, please pause,

19   then go ahead and answer my question, as if

20   the objection wasn't made.

21             Does that make sense?

22       A    Yes.

23       Q    We can take a break any time that

24   you need one.  I will also periodically be

25   reminding us that, you know, we need a break.

Joseph Penn, M.D. - June 11, 2025

```
1              So any time you need a break, just
2       let me know and we can always pause and go
3       off the record.
4              Is that okay?
5       A    Yes.   Thank you.
6       Q    Do you have any questions for me
7       before we get into the actual substance of
8       the questions?
9       A    No, I don't.
10      Q    Did you do anything to prepare for
11      your deposition today?
12      A    Yes.
13      Q    What did you do to prepare?
14      A    Sure.
15             So I read -- I reread my expert
16      report.  I read the deposition of Dr. Gamble,
17      and I skimmed the attachments that were
18      referenced in his deposition transcript.
19             And then I met with attorney Andrew
20      Blanchfield and his team.
21             And I think that was all I did to
22      prepare for this deposition.
23      Q    Do you remember who you met with on
24      that team with Drew Blanchfield?
25      A     I would have to look up her name.
```

Joseph Penn, M.D. - June 11, 2025

1      I'm sorry, I'm blanking right now.  But it's

2      one of his attorneys.  It's a she.  So -- and

3      I'm sorry, I'm blanking on her name right

4      now.

5          Q    How many times did you meet with

6      defense counsel?

7          A    I'm not sure I understand your

8      question.

9              Are you referring to preparing for

10     this deposition or are you --

11         Q    To prepare for this deposition.

12         A    Okay.  Just once.

13         Q    Did you meet with any attorneys of

14     your own, so attorneys who represent only

15     you?

16         A    No.

17         Q    Other than the documents you

18     mentioned, so your report, Dr. Gamble's

19     deposition, the attachments from that

20     deposition, did you review any other

21     documents in preparation for this today?

22         A    No.

23             MR. SI:  So I would like to show

24         you a document, which I will introduce

25         as Exhibit 1 into the record.

Joseph Penn, M.D. - June 11, 2025

```
 1              (Whereupon the above mentioned was
 2         marked for Identification.)
 3         Q    I will send this over the chat on
 4    Zoom.
 5              So let me know if you can see that,
 6    and let me know once you've gotten that open.
 7         A    I think it's the same as that test
 8    that was sent earlier but I could be wrong,
 9    but yes, I am able to open it.
10         Q    I actually have not opened the test
11    document, so I'm not sure.  But --
12              THE VIDEOGRAPHER:  Counsel, this is
13         the videographer.  I want to be sure.
14              Dr. Penn, there was a new PDF put
15         into the chat that says Exhibit 1.
16              THE WITNESS:  Yes.  Well, you --
17         I'm sorry.  Go ahead.  Sorry.
18              THE VIDEOGRAPHER:  Once the
19         download is done, that blue download
20         icon becomes a green checkmark.  If you
21         double click the green checkmark on the
22         Exhibit one, that should open the new
23         exhibit.
24              MR. SI:  There you go.  Thank you.
25              THE WITNESS:  Oh, I got it.
```

Joseph Penn, M.D. - June 11, 2025

```
1              Okay.  I will open it right now.

2         A    Okay.  Yes, I have it opened.

3         Q    Do you recognize this document,

4    Dr. Penn?

5         A    Yes.

6         Q    Take a second to scroll through it,

7    if you need.

8         A    (Witness reviewing.)

9              Yes, I recognize the document.

10        Q    And what is it?

11        A    Sure.

12             So it's, first, my expert report in

13   this matter.  And I think it goes 50 pages.

14   Yes, 50-page report, expert report dated

15   April 15, 2025, signed by me.

16             And then my resume and probably

17   needs to be updated, but it's November 15 of

18   2024.  That's my most current CV, curriculum

19   vitae.

20             And then, as an attachment or

21   exhibit rather, and then a list of testimony,

22   dated April 14 of 2025, and depositions and

23   trial testimony.

24             And then, lastly, my fee schedule,

25   fee rate, as an exhibit.
```

Joseph Penn, M.D. - June 11, 2025

Page 16

1          So yes, that's my expert report in
2     Exhibits A, B and C.
3          Q    Okay.  We seem to be looking at
4     slightly different documents for whatever
5     reason, but we can go ahead and move forward
6     if that's what you're looking at.
7               Let me just doublecheck that this
8     is the document I intended to send.
9               MR. BLANCHFIELD:  I have the CV --
10          my document is a 33-page curriculum
11          vitae.
12               MR. SI:  Thank you, Drew.
13               Yes, that is the document I
14          intended to send.
15          Q    Dr. Penn, do you mind just
16     downloading -- the document that you just
17     referenced and then downloading the most
18     recent document I uploaded to the chat one
19     more time.
20          A    The one you sent says 8:09 a.m.
21     your time?  And mine says my time.
22          Q    Yes, 8:09 -- yes, 8:09, a.m.,
23     Central.
24          A    Right.
25               So the document I have, Exhibit 1,

Joseph Penn, M.D. - June 11, 2025

```
 1      it says, "Corey Adams, Expert Report of Corey
 2      Adams."
 3           Q    That should not be the document I
 4      sent.
 5                MR. SI:  Drew, are you -- can we
 6           confirm that you were looking at a
 7           curriculum vitae dated November 15,
 8           2024, or a document that's labeled
 9           curriculum vitae, dated November --
10                MR. BLANCHFIELD:  That's what I'm
11           looking at, 33 pages.
12                MR. SI:  Okay.  That is what I'm
13           looking at, too.
14                Is there another -- if I resend the
15           document, would that fix this problem?
16                THE VIDEOGRAPHER:  Counsel, if it's
17           okay, I will go ahead and put what I
18           have in the chat box.
19                MR. SI:  That would be great.
20                THE VIDEOGRAPHER:  Okay.  Dr. Penn,
21           I just put -- re-put Exhibit 1 into the
22           chat box.
23           A    When I click on Exhibit 1, it comes
24      up as Exhibit 1, Dr. Penn report, C. Adams
25      and then Harvard Study Report, January 2025.
```

Joseph Penn, M.D. - June 11, 2025

1       That's what comes up on mine.

2               MR. SI:  Interesting.

3               THE VIDEOGRAPHER:  We are off the

4       record.  The time is 8:15 a.m.

5               (Brief recess taken.)

6               THE VIDEOGRAPHER:  We are back on

7       the record.  The time is 8:19 a.m.

8       Q     Dr. Penn, do you recognize this

9   document?

10      A     Yes.

11      Q     And what is it?

12      A     It's a November 15, 2024 copy of my

13  curriculum vitae, my CV.

14      Q     I just want to go through a couple

15  of things on here with you.

16              So under "professional work

17  history," do you see the role that you

18  designated as current?  The director of

19  mental -- director of mental health services,

20  UTMV Correctional, managed-care in Conroe,

21  Texas.

22              Do you see that?

23      A     Yes.

24      Q     Can you tell me about this role?

25      A     Sure.

Joseph Penn, M.D. — June 11, 2025

```
 1              So I was recruited back to Texas --
 2    I've been working in Rhode Island in
 3    corrections for about ten years.  And I was
 4    recruited to come back to Texas.
 5              And I wear really several hats but
 6    the main hat has to do with state prisoners
 7    and UTMB, University of Texas medical branch,
 8    provides medical, dental, nursing,
 9    psychiatry, mental health and specialty care
10    to about 80 percent of all of the prisoners
11    of the state of Texas.
12              And so my role is, I'm the director
13    of mental health services.  I oversee all the
14    psychology, psychiatry and behavioral health
15    services to about 80 percent of the state
16    prisoners.  I also have additional roles but
17    that's probably the most important role
18    relevant to this litigation, is my direct
19    daily ongoing full-time work in corrections,
20    in state prison corrections, in particular.
21              And then one additional role,
22    that's probably relevant to this case, is my
23    work with county jails where, over time, my
24    role in director of mental health services,
25    we provided mental healthcare and psychiatric
```

Joseph Penn, M.D. – June 11, 2025

Page 20

1      care at various county jails, including
2      Galveston County Jail, Brazorea County Jail,
3      Victoria County Jail and currently Bexar
4      County Jail in San Antonio.
5              And right now we're looking at
6      restarting up with Galveston county jail.
7              So in sum -- that's a really
8      abbreviated -- abbreviated summary of my work
9      but those are really the two most important
10     roles of my day-to-day job that is relevant
11     to this case regarding jail and prison and
12     mental health and psychiatric treatment
13     issues.
14     Q    When you say that you oversee the
15     psychological psychiatric care for 80 percent
16     of the prisoners and also for several county
17     jails, what does "oversee" mean?
18     A    So I'm ultimately responsible for
19     policies and procedures, hiring, firing,
20     disciplining, setting standards and meeting
21     compliance and making sure we're achieving
22     national accreditation.
23             But aside from overseeing, I also
24     roll up my sleeves and see patients.  On a
25     daily basis, I'm involved in the clinical

Joseph Penn, M.D. - June 11, 2025

1       management of patients that are cutting,

2       self-harming.  I put people on suicide watch.

3       I'm involved in the decision of where people

4       should be housed, if they should stay at a

5       regular unit or if they should be admitted to

6       a crisis management unit or be transferred to

7       one of our in-patient psychiatric units or,

8       alternatively, discharged from an in-patient

9       psychiatric unit.

10              And then my day-to-day work also

11      involves patients like, Mr. Folks, that cut

12      or self-harm, end up in free world emergency

13      rooms or free world medical hospitals.

14              And then I'm involved directly in

15      the decision of when and where they should be

16      housed and placed from a mental health

17      treatment perspective to ensure their safety.

18              And I'm also involved in decisions

19      about psychotropic medications and treatment

20      and forced medications and seclusion and

21      restraint, and all those little issues on a

22      day-to-day basis.

23              And also, on weekends, I provide

24      after-hour coverage.  I'm on call.  Weekends

25      and holidays, I'm always available to units

Joseph Penn, M.D. — June 11, 2025

Page 22

1    and staff in the event there's an issue or
2    problem.
3         Q    And that ladder bucket
4    responsibilities that you mentioned, so
5    clinical management of patients who are on
6    suicide watch or self-harming, you know,
7    during a weekend, after-hours coverage, do
8    you have a patient-doctor relationship with
9    those inmates?
10        A    Well, I would consider all the
11   patient -- all the inmates in the TDCJ state
12   prison system to be my patients.
13             I don't specifically delineate who
14   is a patient and who is not a patient.
15             Anyone that comes into our prison
16   system -- and if I can clarify my response.
17   I find out about patients that are coming in
18   from county jail that are cutting or
19   self-harming or on suicide watch or at risk
20   for needing hospitalization due to being
21   psychotic, even before they come to our
22   system.
23             So I'm involved in the decision
24   making and referral of county jail inmates
25   even before they hit the door of TDCJ.

Joseph Penn, M.D. - June 11, 2025

```
 1              But to answer your question, I
 2     consider all of those individuals to be my
 3     patients.
 4         Q    You also mentioned that you're
 5     responsible for policies and procedures.
 6              Can you tell me what your
 7     involvement is with the policies and
 8     procedures?
 9         A    Sure.
10              So it would really -- to answer
11     your question, I probably need to know more,
12     what policies and procedures you're referring
13     to.
14              If you can clarify your question, I
15     would be happy to try to answer it.
16         Q    Let's just take an example of
17     policies and procedures regarding -- well,
18     strike that.
19              What policies and procedures are
20     you dealing with day-to-day in your role as
21     mental health director?
22         A    I don't know if I would say
23     day-to-day but I'm involved in -- so I'm on
24     several committees.  And the way that it
25     works in our system is, it's a joint --
```

Joseph Penn, M.D. - June 11, 2025

```
 1      they're joint committees because TDCJ, Texas

 2      Department of Criminal Justice, is the entity

 3      similar to Louisiana Department of

 4      Corrections.

 5              We're the healthcare provider.  And

 6      when I say "we," that's UTMB.  Out in west

 7      Texas, Texas Tech University does about

 8      20 percent of the state.  So it's a triad.

 9      It's a partnership between UTMB Correctional

10      managed-care on the east end of the state, we

11      do about 80 percent of the state.  Texas --

12      I'm sorry, let me back up.

13              So Texas Tech does about 20 percent

14      of the state and UTMB Correctional

15      Managed-Care does about 80 percent of the

16      state.

17              And then the Texas Department of

18      Criminal Justice, TDCJ -- excuse me -- their

19      office of health services is an audit and

20      oversight role.  They don't provide direct

21      patient care unless it's Texas Correctional,

22      UTMB.  They monitor and audit us to make sure

23      we're in compliance with access to care,

24      continuity of care and other contractual

25      requirements.
```

Joseph Penn, M.D. — June 11, 2025

1           So to answer your question, the

2    policies and procedures, that there is a

3    variety, but there's some that are

4    established by the correctional managed

5    healthcare committee, which is statewide, and

6    then there's some policies and procedures

7    that are specific to the University of Texas

8    medical branch.

9           There's policies and procedures

10   that are specific to mental health services

11   that are UTMB and then there's additional

12   policies and procedures.

13          So I kind of have my hand in all of

14   the above.  So, I'm sorry, I'm not trying to

15   be difficult but there's a lot of different

16   sets of policies and procedures.

17      Q    You mentioned that UTMB specific

18   policies that are done, in turn, specific to

19   mental health services.

20          Are you involved with drafting any

21   of those?

22      A    Yes.

23      Q    Do you do the first draft or do you

24   just review?

25      A    A great question.

Joseph Penn, M.D. - June 11, 2025

1          So I came back to UTMB in 2008 and
2    many of these policies were already in place.
3          But I helped -- I've helped -- our
4    policies, I can't remember if it's every year
5    or every two years, we have to update them.
6          So policies are living and
7    breathing documents.  And so it's not like a
8    one and you're done.  You have to constantly
9    update and revise.
10          So yes, I'm directly involved in
11    the policy review of anything related to
12    mental health services for UTMB Correctional
13    Managed-Care.
14          And then those policies ultimately
15    go up to the correctional managed healthcare
16    committee, which I mentioned earlier,
17    includes Texas Tech, TDCJ and UTMB.
18          But the correctional managed
19    healthcare committee is a government
20    appointed -- I'm sorry, governor appointed
21    committee of physicians and other healthcare
22    individuals that oversee all of the
23    healthcare services that we provide in the
24    state.
25          Q    I know that UTMB has the

Joseph Penn, M.D. - June 11, 2025

1    Correctional Managed-Care system, which

2    you're a part of.

3            There's also a community hospital

4    component.

5            Is that correct?

6        A    So we have several hospitals,

7    Angleton, Danbury.  We have some on the

8    islands in Galveston and some off the island

9    in south Houston.

10           I mentioned Angleton, Danbury

11   hospitals.  There's probably other hospitals

12   I'm forgetting, but most of the companies

13   down on Galveston Island, and that's

14   comprised of several hospitals that are UTMB,

15   John Sealy, Jenny Sealy, Shrine Burns.

16           Again, I'm probably forgetting a

17   bunch.  But there's several hospitals on the

18   island that are UTMB.

19           And then, most importantly, there's

20   the hospital Galveston, which is a medical

21   surgical maximum security state prison

22   hospital.  It's the only one like it -- like

23   it of its type in the U.S. and maybe in the

24   world.

25           And that's a TDCJ prison hospital

Joseph Penn, M.D. - June 11, 2025

```
 1    that we have and we provide healthcare to

 2    down there on the island.

 3         Q    Circling back to the process for

 4    drafting, revising, updating policies for

 5    UTMB's mental health system for Correctional

 6    Managed-Care, you mentioned that you might

 7    draft a version of these, and then they have

 8    to go up to the governor's committee.

 9              Am I understanding you correctly?

10         A    Again, if I could clarify my

11    response.

12              So I don't just sit down and write

13    policy.  Usually we do it as part of a team.

14    Like it's a multidisciplinary team, so we

15    might have psychologists, social workers,

16    psychiatrists, myself.

17              Most of the work is done as a team.

18    But you're right.

19              So any policy that we write or

20    promulgate, ultimately has to be approved or

21    accredited -- I'm sorry, has to be approved

22    by the UTMB Correctional Managed-Care and

23    then the joint medical directors from UTMB,

24    that's my boss, Dr. Owen Murray,

25    Dr. Deshields from Texas Tech, and
```

Joseph Penn, M.D. - June 11, 2025

1    Dr. Lithcomb from TDCJ Health Services, to

2    the joint medical directors approve all the

3    policies.  And then, ultimately, it goes on

4    to the correctional managed healthcare

5    committee for final approval.

6              So it's a complicated process but

7    there's a lot of checks and balances in

8    place.

9         Q    On that multidisciplinary team, do

10   you have any leadership roles?

11        A    Yes.

12        Q    What is your leadership roll?

13        A    So I've been the chair of the Joint

14   Mental Health Work Group.  That's

15   specifically mental health only for Texas

16   Tech, UTMB and TDCJ.

17             And I've been the chair of the --

18   the chair of the Joint Mental Health Work

19   Group.

20             And there's other committees that

21   I'm -- I have chaired or been a member of the

22   committee.

23             There's several committees, such as

24   like the pharmacy and therapeutics committee

25   that decides psychotropic medications and

Joseph Penn, M.D. - June 11, 2025

1      policies around use of psych meds.

2              There's suicide prevention

3      committees that I'm a member of.

4              It's probably listed on my resume.

5      I would have to refer to my resume to list

6      them all.

7              But there's several additional

8      committees that I'm involved in that develop

9      or revise policies and procedures.

10     Q    So for the UTMB policies that you

11     are responsible for drafting, updating,

12     reviewing, would those policies -- are there

13     any UTMB entities that those policies would

14     not apply to?

15     A    I'm sorry, I didn't follow your

16     question.

17             Can you ask it again?

18             MR. SI:  Mike, would you mind

19         reading that back?

20             (Whereupon the record was read back

21         by the reporter.)

22     A    I would say it's possible.  If

23     someone were to be admitted to hospital

24     Galveston, that hospital that I mentioned

25     earlier, it is a TDCJ prison hospital.  It's

Joseph Penn, M.D. - June 11, 2025

1    in Galveston on the campus of UTMB.  And

2    there are probably some mental health

3    policies that would not apply there because

4    it's not a designated mental health facility.

5    It's a medical surgical hospital.

6         So that would be an example of

7    where it -- those policies might not

8    necessarily apply.

9         So, for example, seclusion or

10    restraint, forced medications or emergency

11    medications, those policies probably wouldn't

12    apply there nor would they apply to number 2,

13    any of those hospitals that I mentioned

14    earlier that are UTMB campus hospitals, John

15    Sealy, Jenny Sealy, Shrine Burns, because

16    those are not TDCJ Hospitals.  They're not

17    TDCJ facilities.

18         Similarly, any emergency rooms on

19    campus, down at UTMB, our policies -- when I

20    say "our," I'm referring to UTMB Correctional

21    Managed-Care Mental Health policies would not

22    apply.

23         And then, I know that UTMB has some

24    outpatient specialty care clinics down in

25    Lake City.  And similarly, our correctional

Joseph Penn, M.D. - June 11, 2025

1      policies would not apply there because those

2      are not TDCJ facilities.

3              So in summary, I think that --

4      that's the bulk of it.  I don't know if UTMB

5      has any other ambulatory or emergency rooms

6      in the greater Houston or, you know, other

7      areas down there on the coast but our

8      policies would not apply.  They would only

9      really apply in the TDCJ state prison or

10     state jail facility.

11          Q     Do they apply to all TDCJ state

12     prisons, state jails?

13          A     In the UTMB sector.

14              As I testified to earlier, the UTMB

15     Correctional Managed-Care mental health

16     policies would apply across the 80 facilities

17     that are within the UTMB sector.

18              Our policies mirror or are parallel

19     to Texas Tech, but they would not apply to

20     the 20 facilities out of the Texas Tech

21     region because Texas Tech would have their

22     own policies for their 20 facilities.

23          Q     Let's move on to a different part

24     of your CV.

25              So I also see that you have served

Joseph Penn, M.D. - June 11, 2025

1     on a couple of committees for professional
2     organizations.
3          I would like to talk about the
4     American Psychiatric Association.
5          Could you tell me about the
6     committees you served on here?
7     A    Yeah.  And I'm drawing a blank.
8          If you could reference me in my CV,
9     I'll be happy to try to answer the questions.
10    Q    I believe it's on page 6 of your
11    CV.
12    A    (Witness reviewing.)
13         Yes.  So as listed there on my CV,
14    from page 6, thank you, I've served in
15    different capacities at a national level for
16    the American Psychiatric Association, the
17    work group on persons with mental illness in
18    the criminal justice system, for different
19    terms.
20         I was also the chair of the --
21    sorry.  I was on the council and then I was
22    appointed chair of the council on children's
23    adolescents and their families.
24         And then, currently I'm on the --
25    I'm sorry.  The public psychiatry fellowship

Joseph Penn, M.D. — June 11, 2025

1    selection committee.

2            And then as recently as two days

3    ago, I was invited to serve on a work group

4    regarding transgender individuals that are

5    incarcerated.  And so that's through the

6    American Psychiatric Association.

7            I've also been on several council,

8    the council on psychiatry and the law but I

9    don't think I've reflected that there on my

10   resume.  I probably need to update that.

11           But I have served at different

12   times on the council on psychiatry and the

13   law also.

14   Q    Before we dive too deep into any of

15   those roles, I would like to return really

16   quickly to one last question about policies

17   and procedures.

18           You mentioned that you're part

19   of -- you're the chair of a work group on a

20   team that is responsible for designing the

21   policies and procedures for UTMB mental

22   health for correctional men's care.

23           Before those policies that you

24   drafted that would go up to the CMC committee

25   of the state, the state governor, who has the

Joseph Penn, M.D. - June 11, 2025

1    final say to approve those policies?

2         A    So I'm sorry, your question is

3    confusing to me.

4              Could you -- could you ask it again

5    or repeat it again so I can try to answer it?

6         Q    Sure.  I will break it up a bit.

7              So you mentioned that you're the

8    chair of a Joint Mental Health Work Group on

9    a team that is responsible for drafting UTMB

10   policies.

11             Is that correct?

12        A    No.  So I'm the past chair.  I'm

13   the immediate past chair.  I'm still in the

14   work group but I am not the current chair.

15   I've been -- like I testified earlier, I've

16   been the chair of that maybe two or three

17   times.  It's a three-year -- two or

18   three-year appointment.  But I'm not the

19   current chair right now.  I'm on the

20   committee.  So, sorry, I'm on the Joint Work

21   Group, that's what it's called, Joint Work

22   Group, but I'm not the current chair.

23        Q    After the Joint Work Group approves

24   a draft of the policies, do they then go up

25   to the state governor?

Joseph Penn, M.D. — June 11, 2025

1        A     No.

2        Q     Can you clarify what happens there?

3        A     Sure.  This is not my area of

4    expertise.  This falls under TDCJ and the

5    Texas Department of Criminal Justice, their

6    Division of Health Services, Dr. Lithcomb and

7    her department.

8              It would go, as I understand, to

9    the joint medical directors for review.  And

10   then if they approve it, then it would go to

11   the joint policy and procedure committee for

12   final approval.

13             And then, I think there's a forms

14   committee, also, that has to approve because

15   if there's forms involved or document

16   changes, so it's complicated.  So it's joint

17   medical directors, then it's PNP, policy and

18   procedure, then it's forms committee and then

19   it would go up to the correctional managed

20   healthcare committee for final signoff.

21   That's my understanding of that process.

22       Q     How does the policy make it out of

23   your work group?

24       A     Sure.  So the way that it works is

25   basically a committee meeting is held.  It's

Joseph Penn, M.D. - June 11, 2025

```
 1    added as an agenda item to the committee,
 2    typically policy reviews, and there's a
 3    champion for each policy or two or three
 4    champions appointed for each policy review.
 5              And then they may make a
 6    recommendation.  And then a vote is made.
 7    There's opportunity for discussion.  And
 8    then, ultimately, it's a majority decision,
 9    whoever -- if it's a more complicated type of
10    policy, we might do more of the detailed
11    review.  But if it's just a review of an
12    existing policy, then it would be basically a
13    committee vote and majority would carry the
14    vote.
15        Q    Let's turn to our discussion of
16    your APA work groups.
17              So I see that you were on the work
18    group on persons with mental illness in the
19    criminal justice system.  That is on page 6
20    of your CV.
21              Can you tell me what your role was
22    on that work group?
23        A    Yes.  So what I -- I don't recall
24    all the specifics.  This is going back like,
25    what, 15 years ago, 12 -- I can't do math
```

Joseph Penn, M.D. - June 11, 2025

1    today -- 12, 13, 14 years ago or more.

2            But what I understand one of the

3    main roles of that work group was, we revised

4    a practice resource document, basically a

5    book on psychiatric services for individuals

6    in criminal justice settings.  And then,

7    that's one of the main things we did.

8            But number 2, we also, I think,

9    reviewed physician statements on behalf of

10   the American Psychiatric Association.

11           And then I think, three, we might

12   have advised as -- on issues regarding team

13   amicus briefs, like through the work group

14   on -- to the council on psychiatry -- the law

15   and psychiatry.

16           That there's a council on the law

17   and psychiatry.  And so if an amicus brief

18   was brought to the APA, the American

19   Psychiatric Association, where they wanted

20   the APA to sign on as an amicus curate -- I

21   think it's -- I can't spell it.  Anyways.

22           To sign on an amicus brief and it

23   had relevance with corrections, I think we

24   were asked to review those and provide, you

25   know, comment.

Joseph Penn, M.D. - June 11, 2025

1          Q     Let's talk about the position

2     statements.

3                So let's talk about the position

4     statements.

5                Can you tell me about the process

6     for drafting and approving those position

7     statements for the APA?

8          A     Yeah, I really don't know much

9     about that at all.  I just know that once a

10    document has been drafted and put together,

11    then it will be sent out to the members of

12    the work group for comments, there might be a

13    series of meetings to discuss it,

14    either virtual -- most of them, I think, are

15    virtual teams or Zoom or whatever.

16                And sometimes, if we would meet in

17    person, we might discuss some of the more

18    high profile or controversial types of

19    position statements.

20                So I don't know a lot of the

21    details about how -- what's the process for

22    submitting or getting approval or writing a

23    position statement.

24                All I know is kind of once it's in

25    draft form, then the work group reviews it

Joseph Penn, M.D. - June 11, 2025

1    and then makes a decision of edits or

2    recommendations regarding the document.

3    That's my recollection.

4        Q    Let's just talk about your

5    involvement on that work group with respect

6    to the position statements.

7            What was your involvement?

8        A    So my involvement would have been

9    like respond -- getting e-mails from the

10   chair of the work group about, hey, we're

11   going to meet to discuss this position

12   statement.

13           And actually, we wouldn't meet just

14   for the position statement.  We would have a

15   meeting but that might be an agenda item to

16   discuss position statements that are being

17   updated or new ones in development.  And we

18   would either do it, like I said earlier, join

19   via teams or Zoom or conference call or all

20   of the above.  And I would provide input and

21   give my perspective on position statements.

22           Because the challenge was, some of

23   the members of these committees didn't

24   actually work in corrections or correctional

25   settings.

Joseph Penn, M.D. - June 11, 2025

Page 41

```
1            And so a lot of times you're trying
2    to educate some of the members of the
3    committee, for example, were residents or
4    medical students or psychiatrists that were
5    not actually practicing in correctional
6    settings but they've been appointed to the
7    work group.  So a lot of work was trying to
8    educate people about corrections.
9        Q    Did you take a vote on whether or
10   not to adopt position statements?
11       A    I didn't understand your question.
12   I'm sorry.
13       Q    Did you ever take a vote on whether
14   or not to approve position statements while
15   you were on the work group, on persons with
16   mental illness in the criminal justice
17   system?
18       A    So I'm not sure I understand what
19   you mean, by did I take a vote.  I -- I
20   wasn't the chair of that work group.  I don't
21   recall who the chair or chair woman was but I
22   don't recall the specifics of how that
23   worked.
24       Q    So you never -- did you ever,
25   yourself, vote to approve a position
```

Joseph Penn, M.D. - June 11, 2025

Page 42

1     statement?

2         A     I voted both to approve or not

3     approve or, alternatively, I made

4     recommendations about things that I think

5     were achievable or attainable or not, because

6     those statements are applicable across the

7     United States.  So if you're in New York

8     City, you can't just say, well, everyone will

9     be seen by a psychiatrist when you're talking

10    about rural, you know, Montana or something.

11            So I would give my opinions about

12    the -- let me back up.

13            To answer your question, short

14    answer is yes, I would vote yes or no or give

15    additional input into the reason why I think

16    the group should or should not support a

17    revision to a position statement.

18        Q     You also mentioned that you, as

19    part of your membership on the work group,

20    edited a book on correctional mental

21    healthcare.

22            Is that right?

23        A     Yes.

24        Q     What was your involvement with

25    editing that book?

Joseph Penn, M.D. - June 11, 2025

```
1          A     So I wouldn't say I was the editor.
2    I was going to be a primary author.  But my
3    role -- I think I was involved in the
4    self-harm and suicide section.   And then I
5    was also in the psychotropic medication
6    section and misuse of psychotropic
7    medications.
8               But my role -- I think there were
9    only a handful of us, maybe five or six -- I
10   had input into the entire document.
11              So even sections that I wasn't the
12   lead on, I had input into -- for example,
13   there was a section on staffing ratios and I
14   had input into that.
15              There was a section on transgender
16   healthcare and I had input into that.
17              So I wasn't -- I wasn't an editor.
18   I was actually a first author or primary
19   author of that document.
20         Q     When you say you had input, what do
21   you mean by that; into the other sections?
22         A     So it was similar to the work group
23   meetings when we would have conference calls,
24   we would go through each section line by
25   line.
```

Joseph Penn, M.D. - June 11, 2025

1          Some of the work was done online

2     via e-mail.  And so draft documents were

3     shared and tracked changes.

4          And so people could write their

5     comments online through the track changes

6     format and share via e-mail.  That's one way.

7          And then number 2 was actual

8     conference calls, this is preCOVID so we did

9     more conference calls, but that's how we

10    would provide input in recommendations into

11    the documents.

12    Q    So to be clear, you would provide

13    recommendation and someone might change the

14    final draft or the operative draft of the

15    book based on those recommendations?

16    A    So I don't recall who the main

17    editor of the -- like who was the lead.  I

18    would have to pull the book and look at it.

19         But typically, there's like a

20    primary, like a committee chair or one or two

21    chairs, a chair and an vice chair, and they

22    will solicit input.  And then if it's a

23    controversial topic, then they will ask for

24    input and there will be discussion.  And then

25    the committee ultimately will have to make a

Joseph Penn, M.D. - June 11, 2025

1    decision.  And then the chair might have

2    to -- if there's disagreement, sometimes the

3    chair might have to make a final decision.

4            And say, like, it's 50/50 and

5    there's people -- there's not consensus, the

6    chair might have to make a final decision of,

7    well, we're going to need to do something.

8            So the chair kind of has a little

9    more liberty, if you will, than just the

10   committee members.

11       Q    But is it fair to say that you have

12   a substantial level of involvement in the

13   drafting of the entire document?

14       A    So I would need you to clarify what

15   you mean by substantial, because -- I'm not

16   sure I know what you mean by substantial, how

17   you're defining it, please.

18       Q    Say you can make a material change

19   to the contents of the document, based on

20   your recommendations or your drafting or your

21   edits?

22       A    No, I would not agree with that.  I

23   would say I got outvoted several times.  So

24   there's some people in some of these work

25   groups that are very kind of -- very

Joseph Penn, M.D. - June 11, 2025

1    definitive or very kind of opinionated or

2    kind of powerful or whatever.  So I would

3    say, no, I definitely did not have a

4    substantial role.  I had input but I wouldn't

5    call it a substantial role.

6         Q    Did other people have substantial

7    roles in the sections that you say you

8    primarily drafted?

9              So I believe you mentioned the

10   self-harm and suicide section, the

11   psychotropic interventions section.

12             Did other people have substantial

13   roles in those sections?

14        A    I will answer your question but it

15   wasn't psychiatric or psychotropic

16   interventions.  It was psychotropic

17   medications and abuse or diversion of those.

18             I mean, I would say it's a

19   committee meeting and people -- everyone has

20   input.  But at the end of the day, it's a

21   democratic -- you know, it's a group process,

22   so kind of majority wins or majority rules.

23        Q    When you say you were primarily

24   responsible for those sections, does that

25   mean that you took the first draft?

Joseph Penn, M.D. - June 11, 2025

```
 1          A    Yes.
 2          Q    And you were also involved in the
 3     review and editing of those sections --
 4          A    Yes.
 5          Q    -- as you mentioned earlier?
 6               Let's turn to your very long list
 7     of publications in your CV.
 8               So I believe this starts on page
 9     13.  And I think it continues until the end.
10               Just generally, what is your
11     process for authoring these publications?
12          A    Well, it depends.  So if it's a
13     peer reviewed publication, P-E-E-R reviewed,
14     then that's going into a medical or
15     scientific journal.  And you have to write
16     something that's worthy enough for them to
17     want to write -- to publish it, rather.  You
18     have to show what your methodology is, the
19     background, the methodology, what your
20     findings were and what your conclusions were.
21     Some of it might be a review of the existing
22     literature.  Some of it might actually be
23     data driven or clinical trials.  Or some of
24     it might just be kind of theoretical.
25               So that, in my resume, from pages
```

Joseph Penn, M.D. - June 11, 2025

1    13 through -- sorry, I can't get it to scroll

2    down -- 13 to the top of 16 is approximately

3    30 peer reviewed journal articles.

4            And then there's a lot of articles

5    you might write that are not necessarily peer

6    reviewed but they're still published in a

7    medical or scientific journal.

8            Same thing, you have to like

9    describe your methodology and what you did.

10   But they don't undergo as rigid a peer review

11   by your peers, psychiatrists or psychologists

12   or other, you know, researchers.

13           And that's listed on my resume up

14   to the top of page 18, so that could be like

15   book chapters and other things like that.

16       Q    Is it fair to say that for all of

17   your publications, peer reviewed and non-peer

18   reviewed, you are taking the pen to the first

19   draft, at least on your sections?

20       A    I'm not sure what you mean by pen

21   to the first draft.

22       Q    That you're writing the first

23   draft.

24       A    No, I would not agree with that.

25       Q    What publications are you not

Joseph Penn, M.D. - June 11, 2025

1    writing the first draft for?

2         A    Well, so when you write with

3    several other authors, it's like I mentioned

4    earlier, I testified earlier, it's a team

5    effort, so you might have three or four or

6    five other authors that -- typically, the

7    first author is the person that made the most

8    significant contributions.  But as you can

9    see on my resume, a lot of these include

10   six -- four, five, six or seven, or as few as

11   one or two people.

12        So being the first author means you

13   contributed the most or you had the most

14   involvement or you put the most work into

15   that document.

16        Q    Ultimately, how -- what is the

17   process for deciding what ends up published

18   on the page, if it's a team effort?

19        A    That's a -- so I would say I have

20   to answer your question in two ways.  One,

21   the authors themselves are going to have to

22   decide what -- you have to meet a word count,

23   so some journals, you would like to write,

24   you know, ten, 20 pages but they only allow

25   five pages, so you have to look at your word

Joseph Penn, M.D. - June 11, 2025

Page 50

1    count.  So you're kind of like always trying
2    to keep, be concise and say the most you can
3    but keep it short.
4            But it's a group process, so
5    your -- the team together works and revises
6    and different things are assigned to
7    different people or someone will say, I will
8    take the lead in this section or they might
9    be assigned to take the lead in a section but
10   it's basically a group process.
11       Q    Does everyone in that group have to
12   agree on the ultimate outcome?
13       A    No.
14       Q    So something can be published and
15   several members of the group do not agree
16   with the conclusions in that publication?
17       A    See you're asking me a hypothetical
18   I can't really speak to how that -- and I can
19   only answer questions that I was directly
20   involved in, in publications.
21           So if you ask me a different way, I
22   would be happy to try to answer your
23   question.
24       Q    Let's talk about your involvement
25   then in some of these group efforts.

Joseph Penn, M.D. – June 11, 2025

Page 51

1          Have you ever signed your name to

2    something that you did not agree with?

3          A    There's some things that I've been

4    a committee member or group member or been

5    involved in a practice guideline or position

6    statement or aspirational document that, yes,

7    I -- I agree with the intent or the

8    overarching goal, but I may not agree with

9    each and every single section of it.  So yes,

10   that's fair.

11         Q    And you would sign your name to

12   that?

13             And you have signed your name to

14   that rather?

15         A    So I don't mean to quibble but I

16   don't know what you mean by sign my name to

17   it.

18         Q    I mean that your name appears in

19   the list of authors in the publication.

20         A    I mean, the way that that works is,

21   the editor or the leads are the ones that

22   decide if someone is really going to be

23   recognized as an author.

24             There's been cases or situations

25   that I've been involved in where, for

Joseph Penn, M.D. - June 11, 2025

1    example, you have somebody who doesn't

2    participate.  They don't e-mail.  They don't

3    join meetings.  They -- they're kind of --

4    they -- what am I trying to say?

5                 They -- they don't make any

6    contributions.  And then the editor or lead

7    writer might say, well, I don't think we

8    should include Joe Smith because he didn't

9    really contribute anything.

10                So that's how the decisions are

11   made about authorship and who is first,

12   second and third author.

13                In some journals, if you're the

14   senior author, if you're the last name, then

15   that's actually even more powerful because

16   that means you're mentoring younger people.

17                So to answer your question, I can't

18   really answer that a yes or no.

19        Q    Have you ever decided not to sign

20   your name to something have you ever decided

21   that your name would not appear on a

22   publication because you disagreed with the

23   outcome of the publication?

24        A    I don't recall.

25        Q    Have you ever decided not to sign

Joseph Penn, M.D. - June 11, 2025

1    your name to something because you thought

2    that the methods used in producing the

3    outcome of the publication were not

4    scientifically rigorous enough?

5        A    I don't recall.

6        Q    We have been on the record for a

7    bit, so why don't we take a five-minute break

8    and then reconvene at 10:08 my time, 9:08

9    your time?

10        A    Sounds good.

11            THE VIDEOGRAPHER:  We are off the

12    record.  The time is 9:03 a.m.

13            (Brief recess taken.)

14            THE VIDEOGRAPHER:  We are back on

15    the record.  The time is 9:14 a.m.

16        Q    Dr. Penn, earlier, you mentioned

17    that occasionally you will sign your name to

18    a document for the APA, for example, where

19    you don't necessarily agree with the ultimate

20    outcome.

21            Is that correct?

22        A    So I don't think I testified to

23    that.  I don't sign documents like I may be a

24    listed contributor but I'm not signing

25    documents.

Joseph Penn, M.D. - June 11, 2025

Page 54

1          Q    I'll rephrase that.

2               So you testified that your name

3     might appear on documents that you don't

4     agree with it -- for which you don't agree

5     with the ultimate outcome?

6          A    Yes, I would define my role as a

7     contributor or an author, but not everything

8     within from start to finish in the document,

9     I didn't say that I fully agree with each and

10    every sentence or line in a document.

11              I'm a contributor and I try to

12    provide the -- I try to provide my

13    perspective, my expertise, my input, but yes,

14    absolutely there might be sections of a

15    document that I disagree.  That's fair.

16         Q    Is that ever true for your peer

17    reviewed publications?

18         A    If you could draw me to one I have

19    written and published in a bunch of different

20    areas, so some of them non-correctional, so I

21    would need to be able to look at the

22    particular article and refresh my memory to

23    answer your questions.

24         Q    To be honest, I'm having a hard

25    time distinguishing which of your articles

Joseph Penn, M.D. - June 11, 2025

1     are, for example, scientific studies versus

2     something else.

3             So why don't we just generally talk

4     of the level of a scientific study that you

5     conducted.

6             Does that make sense?  If we just

7     say for a scientific study, would you sign

8     your name or -- sorry.  Would your name

9     appear on a scientific study for which you

10    did not agree with the outcome of that study?

11        A    I would need you to make a more

12    clear question for me to answer your

13    question.  Because, again, I've written and

14    published in a bunch of different areas

15    than -- over 30 years, so I can't answer that

16    in a yes or no.  I would need a specific

17    example.

18        Q    Am I understanding your earlier

19    testimony correctly, in saying that out of

20    your list of peer reviewed publications, some

21    of these, you agree with the conclusions and

22    some of them you don't?

23        A    No, that's not what I'm testifying

24    to.

25            If I could clarify my response.  So

Joseph Penn, M.D. - June 11, 2025

1      when you write an article for a scientific

2      journal, if it's a reliable and accepted

3      scientific journal, that is different than a

4      position statement or a practice guideline.

5      That's not typically peer reviewed.  That's

6      more of a recommendation or aspirational, so

7      we're kind of comparing apples and oranges.

8              A peer review journal is

9      basically,we did a study, this is how we did

10     it, this is the methodology which we

11     employed, these are our results and this is

12     what we can generalize our findings or

13     recommendations from this one study and these

14     are the limitations of the study.  So we

15     can't over generalize because we had -- it

16     was only one location, the sample size was

17     small or what have you, or we had a high

18     refusal rate.

19             So that's -- a scientific study is

20     vastly different from a position statement or

21     an aspirational guideline.

22         Q    So I'm just trying to understand

23     publications that have your name but for

24     which you disagree with the conclusion.

25             Is that ever true of the

```
 1    publications that appear in scientific
 2    journals?
 3         A    Again, I can't answer that in a yes
 4    or no.  I would need to see the specific
 5    article and the -- I need to look at the
 6    article.
 7              And again, I have studies going
 8    back to 1995, so -- but, you know, we're in
 9    2025.  So as we sit here today, I'm not able
10    to answer your question in a yes or no
11    response.
12         Q    Have you ever authored a
13    scientific -- a peer reviewed article that
14    appeared in a scientific journal for which
15    you disagreed with the conclusions at the
16    time it was published?
17         A    I don't recall.
18         Q    So there is a possibility that you
19    would disagree with the ultimate conclusion
20    of a peer reviewed article published in a
21    scientific journal at the time it was
22    published?
23              MR. BLANCHFIELD:  Objection to the
24         form of your question.
25         A    Yeah, I don't understand your
```

Joseph Penn, M.D. - June 11, 2025

1    question.

2            I mean, I think if my name is

3    listed on a scientific peer reviewed

4    publication, then I generally agree with the

5    background, the methodology, the findings,

6    the results and the conclusions.

7            But again, if you want to draw a

8    specific article, I can give -- I can try to

9    answer your question.

10    Q    Let's back up a bit just to be sure

11    I'm understanding you correctly.

12            So you said that your name might

13    appear on a position statement, for example,

14    for the APA, which you agree with generally,

15    but you disagree with specific things because

16    you're part of a working group, a committee

17    and you get outvoted.

18            Is that correct?

19    A    I don't know if I would necessarily

20    agree with that.

21            I mean, I think there's different

22    position statements in different

23    organizations.

24            You had said the APA, but I've also

25    been involved in position statements for the

Joseph Penn, M.D. - June 11, 2025

1    national commission on correctional

2    healthcare, NCCAC, and other American Academy

3    of Psychiatry and the law or American Academy

4    of Child and Adolescent Psychiatry.

5          And each of those organizations has

6    a different role and a different mission.

7          And so the generalizability of a

8    position statement and whoever was on that

9    component or committee that wrote it, can

10   differ vastly.  So -- so no, I can't answer

11   that as a yes or no question.

12       Q    Are you more likely to agree with a

13   position statement adopted by the National

14   Commission on Correctional Healthcare than by

15   the American Psychiatric Association?

16       A    Not necessarily, no.  It would

17   depend on a lot of different variables.

18       Q    That was about position statements.

19          For peer reviewed article appearing

20   in a scientific journal, is it true that you

21   generally agree with the conclusions in those

22   articles that contain your name?

23       A    I would say, generally speaking,

24   that's fair.

25       Q    I also want to talk a little bit

Joseph Penn, M.D. - June 11, 2025

1     about your process for researching these

2     publications.

3              Are you involved in the process of

4     deciding what to cite in the publications of

5     which you're an author?

6         A    I'm not sure I understand.

7              When you say "research and source

8     of supply," if you could clarify what you

9     mean by that.

10        Q    Sure.

11             Do you conduct research for

12    publications that you write?

13        A    How are you defining research?

14        Q    Research can mean a review of the

15    scientific literature.  It can also mean a

16    review of an experimental group that you're

17    in charge of designing.

18        A    I would say generally, yes.

19        Q    And just talking about the research

20    involving outside sources, so sources that

21    are not authored by you, do you review those

22    sources before you cite them?

23        A    When you're asking review, how

24    would you -- how are you defining review?

25        Q    Do you read them?

Joseph Penn, M.D. - June 11, 2025

Page 61

1          A    Yes.

2          Q    And you read them before you cite

3     them.

4               Is that right?

5          A    Yes, I would review them to see if

6     they're current, if it's -- the reason I'm

7     getting -- it's challenging, because there's

8     some things that we do when we're doing

9     research or clinical research that there may

10    not be a lot of studies.  There may be

11    limited clinical information or studies, and

12    so you may have to go look at an article from

13    1960 and then you may have to be like, you

14    have to make decisions about, is this article

15    worth citing or not.  So you have to really

16    look at the methodology and the -- their

17    findings.

18              So yes, I would say yes, you have

19    to review -- I would review those documents

20    and make a determination if that's an article

21    I want to cite.

22              Number 2, you have to think about

23    the length of the document.  The editors have

24    really ridged word count.

25              So in a perfect world, you can cite

Joseph Penn, M.D. - June 11, 2025

1    a hundred studies but your article is not

2    going to be published.  You only want to cite

3    the articles that are most relevant and

4    current to the current study.

5         Q    Is it fair to say that if you have

6    cited an article or a source in something

7    that you're writing, you've determined that,

8    as you say, the methods are up to date, that

9    it's generally up to date?

10        A    No, I would not agree with that.

11        Q    What is a circumstance in which you

12   would cite something and you would, under the

13   belief that the methods are out of date?

14        A    Yes.  So I think I referred to it

15   in my expert report, with the Grassian study,

16   G-R-A-S-S-I-A-N.  That's a great example of a

17   study that's really not a study.

18             It was done in the Massachusetts

19   Department of Corrections system by an

20   attorney, who is also a physician.  And there

21   was no control group.  The sample size was

22   extremely small.  And basically, the

23   methodology remains nebulous at best of how

24   this individual, Dr. Grassian, went and

25   interviewed a bunch of people in restricted

Joseph Penn, M.D. — June 11, 2025

1    housing.  So that's an example I can go on

2    and on.

3           But that's an example of an article

4    that you might reference and might cite and

5    start off the article with research in

6    restrictive housing is limited and then you

7    might cite the Grassian study but you're not

8    saying that you affirm or endorse that study.

9           You're just citing that as a

10   example of a really poor study that was done.

11   If you want to call it a study.  That's an

12   example of how you might cite something in an

13   article but you're not giving it like an

14   endorsement, you're not saying I affirm this

15   was a sound study.  You're basically saying,

16   the literature is extremely limited and here

17   is an example of the limited literature.

18       Q    If you're citing a study in support

19   of your own conclusion, is it fair to say

20   that you endorse the methods of that study?

21       A    Of the study that I'm citing?

22       Q    Of the study that you're citing.

23       A    Not necessarily.  And the

24   Grassian's a great example.  Dr. Grassian

25   study or article, that would be a really good

Joseph Penn, M.D. - June 11, 2025

Page 64

1    example of something that I don't endorse

2    that study.  But I might cite it, I might

3    list it in a -- either in an expert report or

4    in a scientific article but more so to point

5    out the limitations or problems with the

6    design of that -- of that article.

7         Q    Just to make sure we're on the same

8    page.  I'm talking about studies that you're

9    citing to support your ultimate conclusion.

10             Would you cite something like that

11   if you did not endorse its methods?

12        A    And I'm not understanding.

13             Are you saying in a peer reviewed

14   journal or are you referring to in a position

15   statement?  I'm not understanding what -- or

16   in an expert report, like what do you need?

17             I'm not sure what you're asking.

18        Q    Let's take them one at a time.

19   Let's talk about the peer reviewed article.

20             Would you cite something in a peer

21   reviewed article in support of your

22   conclusion if you did not agree with the

23   methods of the source?

24        A    So I think I testified to this

25   earlier that when you write a paper, you

Joseph Penn, M.D. - June 11, 2025

Page 65

1    generally have to give an overview of the
2    existing literature or studies that have been
3    published whether they're very bad or really
4    bad.
5            And so you're not endorsing or
6    saying I believe this or I think this is a
7    good study, you're just giving a background,
8    a narrative for the reader, who may not know
9    the subject content at all.  So that's how it
10   works in a peer reviewed journal.
11           You're -- you might cite some weak
12   or poor or, actually, you might even cite
13   some really good studies and say this is a
14   gold standard study or this is the most well
15   accepted study, a definitive study, but you
16   might cite also the weak, problematic study
17   by project.
18       Q    Would you indicate in the article
19   if you believed that a study was strong or
20   weak?
21       A    I'm sorry.  I didn't mean to
22   interrupt you.  Say -- ask the question
23   again, please.
24       Q    Yes.  Would you indicate in your
25   article that a source or citing is weak if

Joseph Penn, M.D. - June 11, 2025

1    you believed that it did not support your
2    conclusion?
3         A    So I don't know if I would use the
4    word "weak."
5              You might say that a study lacks
6    power or has not been reproduced or had
7    limitations, but you wouldn't say weak,
8    W-E-A-K.  You would just say, there's been
9    some challenges to the study or there's some
10   limitations that -- you don't say studies are
11   good or bad.
12             You don't like put an adjective on
13   study.  You would just describe it from a
14   methodologic or validity or reliability, you
15   know, using scientific terms.
16        Q    I'm going to show you another
17   document, which I will introduce as Exhibit
18   2.
19             (Whereupon the above mentioned was
20        marked for Identification.)
21             MR. SI:  And then, Gus, if you can
22        upload this to the Hightail space when
23        you can.
24        A    Prior testimony, right?
25        Q    That's correct.

Joseph Penn, M.D. - June 11, 2025

```
 1                 So is this a complete and accurate

 2      list of your prior testimony, dating back to

 3      2017?

 4           A     No.

 5           Q     It is not.

 6                 What is missing from it?

 7           A     I think the Folks -- I'm sorry,

 8      this is Joshua Folks.

 9                 The -- there's another Louisiana

10      case that I think I've been deposed in, and I

11      don't see that reflected on here.

12           Q     Otherwise, it's accurate?

13           A     Yes.

14           Q     And complete?

15           A     Yes.

16           Q     Okay.

17           A     Well, back to -- sorry.

18           Q     2017 is the first year that I see

19      listed on this.

20           A     That's fair, yes, back to 2017.

21           Q     How many times have you testified

22      as an expert since 2017?

23           A     I don't know.  I would have to give

24      a ballpark estimate.

25           Q     I suppose we can also just count
```

Joseph Penn, M.D. - June 11, 2025

1    the number of cases on here, which I have

2    done.  It's 32 but I won't make you agree to

3    that.

4              How many cases in which you

5    testified as an expert have involved lawsuits

6    against correctional facilities?

7        A    So I don't know if I can answer

8    your question.

9              I've testified a fair amount as a

10   30(b)(6) witness and I'm not an attorney nor

11   do I try to play an attorney.

12             But several of the cases that I've

13   testified in, have been in that capacity.  So

14   I just wanted to -- I don't know if that --

15   I'm pretty sure all of the 30(b)(6) witness

16   involved corrections, some lawsuit or issue

17   involving a correctional system.

18             I have provided testimony and been

19   deposed in non-constructional cases also.

20             The one that comes immediately to

21   mind is a New Jersey case, 2020, Ruda,

22   R-U-D-A, versus a bunch of people that are

23   listed.  I've done a couple of cases that

24   were not correctional, jail or prison.

25       Q    I see the Ruda case you're

Joseph Penn, M.D. - June 11, 2025

1      referring to.  And I see listed in the

2      defendants the state of New Jersey,

3      Department of Corrections.  Is that right?

4              Are we looking at the same Ruda?

5          A    Yes.

6          Q    Okay.  So that did not involve a

7      correctional facility?

8          A    No.  I was a defense expert for the

9      Carrier Clinic, C-A-R-R-I-E-R Clinic, which

10     was a hospital, an outpatient day -- I'm

11     sorry, day surgery program, where they did

12     electroshock therapy, now known as

13     electroconvulsive therapy.

14              And I was the retained defense

15     expert for the Carrier Clinic.  I didn't have

16     anything to do -- I had no role with

17     defending the New Jersey Department of

18     Corrections in that case.

19         Q    Just to make sure we're on the same

20     page.  I would like to get an estimate for

21     the number of cases in which you've testified

22     as an expert involving correctional

23     facilities at all.

24              So counting something like Ruda,

25     where there was a correctional facility that

Joseph Penn, M.D. - June 11, 2025

1    was named as a party in the case but for

2    which you did not testify on behalf of the

3    correctional facility.

4            Does that make sense?

5        A    Well, so Ruda wasn't in a

6    correctional facility.  He was housed in a

7    forensic -- state forensic unit.  So I don't

8    know if that matters.

9            But I would ballpark, I have

10   testified between 20 and 30 times in -- as an

11   expert witness, and including 30(b)(6)

12   witness designations, since 2017.

13       Q    You've testified 20, 30 times as an

14   expert in cases involving correctional

15   facilities?

16       A    Since 2017, that's fair.

17       Q    Since 2017.

18       A    And then including kind of my role

19   as a 30(b)(6) witness, also in that.

20       Q    And what proportion of those

21   lawsuits have you testified on behalf of the

22   plaintiff?

23       A    I don't have a running tally or

24   list.  I can only estimate it but I have done

25   some plaintiff's expert work and testified,

Joseph Penn, M.D. - June 11, 2025

Page 71

1     for example -- oh, I'm sorry, this doesn't

2     reflect -- I thought it did.  I testified as

3     a plaintiff's expert in a case in South

4     Carolina, I think earlier this year.  I'm not

5     seeing that on there.  So it -- sorry.  To

6     answer your question, I would say probably 10

7     to 15 percent plaintiff's expert work, 85 to

8     90 percent defense expert.  And I have been

9     appointed as a court appointed expert.

10              But I would say if I have to break

11     it down, 10 to 15 percent is plaintiffs, 85

12     to 90 percent is defense.

13         Q    For the record, could we get an

14     updated copy of your prior testimony,

15     including the Adams case and including the

16     South Carolina case that you just mentioned?

17         A    Sure.

18         Q    In the last five years, has any

19     court rejected your expert testimony for any

20     reason?

21         A    No.

22         Q    In the last five years, has any

23     court found your testimony was not credible

24     for any reason?

25         A    No.

Joseph Penn, M.D. - June 11, 2025

Page 72

1          Q    So in all cases, excuse me, in
2    which you've testified as an expert, the
3    court has relied on your expert testimony?
4          A    I think that's fair.  I think
5    there's been one case that comes to mind
6    where the court put more weight on the
7    plaintiff's expert.  But to the best of my
8    knowledge, I've never had any of my testimony
9    stricken or I've never been barred from being
10    an expert witness in a case.
11          Q    Also, for the record, can we get an
12    updated CV at some point?
13              I know you mentioned that there was
14    committees you served on for the APA.
15          A    Oh, yes, it's law and psychiatry.
16          Q    My apologies, yes.
17          A    Sure.
18          Q    I am going to -- thank you.
19              I'm going to show you another
20    document, which I will introduce as Exhibit
21    3.
22              (Whereupon the above mentioned was
23          marked for Identification.)
24              MR. SI:  I just uploaded that to
25          the chat.

Joseph Penn, M.D. – June 11, 2025

Page 73

```
 1        A    Sorry, it's not populating in the
 2   high tail.
 3             THE VIDEOGRAPHER:  It should be
 4        there right now.
 5             THE WITNESS:  Yes, thank you.
 6        Q    Do you recognize this document,
 7   Dr. Penn?
 8        A    It's still opening.
 9        Q    Sure.
10        A    I don't know why it's taking so
11   long to open.
12             My apologies, it's just circling.
13   It's not opening.
14             Oh, there we go.  I got it.
15             Okay.  Yes, I recognize the
16   document.
17        Q    What is this document?
18        A    Sure.  So this is a copy of my
19   expert report in this matter, Joshua Folks,
20   and 53 pages, signed and dated May 14, 2025.
21        Q    Throughout your report, you use a
22   few terms to refer to Mr. Folks' housing
23   conditions at LSP.
24             What does restrictive housing mean,
25   as used in your report?
```

Joseph Penn, M.D. - June 11, 2025

1        A     Certainly.

2              So restrictive housing is a term

3        that's used by custody staff and custody

4        leadership.  It's meant to, as I understand

5        it, to any time someone is placed in a higher

6        security level setting, there used to be

7        administrative segregation, ad seg, high

8        custodies, there's a variety of terms.  Super

9        max.  Every state may have a different

10       variation on how they refer to it.

11             But restrictive housing is when

12       someone is not in general population.

13       They're in a higher level of custody housing

14       and supervision.

15       Q     You do also use the term

16       "administrative segregation" at some point.

17             Does that mean the same thing as

18       restrictive housing, as used in your report?

19       A     If you can show me where in my

20       report you're referring to, I can try to

21       answer your question better.

22       Q     Sure.

23             So on page 34, at the very top.

24             The sentence includes -- sorry.

25       Include administrative segregation,

Joseph Penn, M.D. - June 11, 2025

```
 1    restrictive housing, death row and other high
 2    custody settings.  I'm quoting from the
 3    report there.
 4         A    Yes.  And sorry, what's the
 5    question, please?
 6         Q    Does your use of administrative
 7    segregation here mean the same thing as
 8    restrictive housing?
 9         A    No.
10         Q    How are those different?
11         A    Again, I don't consider myself to
12    be a custody expert.  I'm not a correctional,
13    like, officer or a warden or classification
14    on housing, but I've been doing this close to
15    25, 30 years, so I have a general
16    familiarity.
17              But what I understand
18    administrative segregation, is when
19    individuals that are incarcerated that are,
20    one, they might be in a member of the
21    security threat group, like STG, security
22    threat group.
23              They might be placed in
24    administrative segregation.
25              Or even someone who is not a member
```

Joseph Penn, M.D. - June 11, 2025

1    of a security threat group, if they have a

2    history of serious violence or assaultive

3    behaviors towards inmates or towards staff or

4    both, and they've incurred disciplinary

5    sanctions, they can be placed into

6    administrative segregation.

7            Restrictive housing is another

8    term.  I'm not sure which one came first but

9    what I understand is, that restrictive

10   housing could include administrative

11   segregation but it might include other

12   individuals that are incarcerated.  Custody

13   might place someone in restrictive housing

14   but it might not be administrative

15   segregation.

16           Like they could be put into

17   prehearing detention.

18           Like let's say they're found with

19   contraband or they're alleged to have been

20   assaulted or been out of place, so they're

21   getting a disciplinary or about to be

22   undergoing a review for disciplinary.  They

23   can be placed into prehearing detention or

24   some other restrictive housing setting while

25   awaiting the ruling, if you will, like the

Joseph Penn, M.D. - June 11, 2025

```
 1     disciplinary review of that charge or
 2     infraction.
 3          Q    Page 24 of your report, you also
 4     use the term "extended lockdown."
 5               This is right under the bolded
 6     header E.
 7               I'm quoting here, "Folks was moved
 8     to extended lockdown in September 2022 and
 9     was released in November 2022."
10               Do you see that?
11          A    (Witness reviewing.)
12               Yes, I see that.
13          Q    What did you mean by extended
14     lockdown here?
15          A    So that's not a term that we use in
16     the Texas system.  And I would need to
17     refresh my memory by looking at the policy
18     and procedure of what Louisiana Department of
19     Public Safety and Corrections, how they refer
20     to that.
21               So I'm just -- I'm basically just
22     listing it verbatim.  That's what is
23     reflected in the custodial records, that she
24     was moved to extended lockdown.
25               I don't think that I define what
```

Joseph Penn, M.D. - June 11, 2025

1    extended lockdown is in my report.

2        Q    From your recollection of the

3    custody policies at LSP, do you understand

4    extended lockdown to involve isolation of an

5    inmate in a cell for some period of time

6    during the day?

7        A    I would need to read the policy to

8    be able to answer your question.

9        Q    Would that refresh your memory?

10       A    Yes.

11       Q    Go ahead, if you have it handy.

12       A    I don't.  I don't have the policies

13   handy.

14       Q    What about administrative

15   segregation to get a definition, would that

16   involve isolation of an inmate in a cell for

17   a certain number of hours, in a day as used

18   in your report?

19       A    So I don't have a definition of

20   administrative segregation.  Every state that

21   I'm familiar with has a different definition

22   and they have different parameters on how

23   many hours a day they're out of the cell, if

24   they're allowed recreation or visits or other

25   privileges.

Joseph Penn, M.D. - June 11, 2025

1           And so, again, I'd be happy to

2    answer your question if you want.  I would

3    need to look at the Louisiana policy to

4    refresh my memory to answer your question.

5        Q    What is involved in the TDCJ

6    system?

7        A    I don't know that off the top of my

8    head.  I would need to look at that policy.

9           Again, I'm not a custody person.

10   My job in TDCJ is I'm a contracted healthcare

11   provider, mental health in particular, so I

12   don't get involved in decisions about

13   administrative segregation.

14       Q    Your report, you also note at

15   various times that Mr. Folks was placed in

16   extreme suicide watch during his

17   incarceration.

18           Is that right?

19       A    That's the terminology, yes, that I

20   understand both from Dr. Gamble's deposition

21   and my review of the medical records, mental

22   health records in the case, yes.

23       Q    And what's your understanding of

24   what extreme suicide watch entailed at LSP?

25       A    So what I understand is, number 1,

Joseph Penn, M.D. - June 11, 2025

```
 1      it's extremely rare, extraordinarily rare.  I
 2      recall, in Dr. Folks' -- I'm sorry, Dr.
 3      Gamble -- I keep messing that up, sorry --
 4      Dr. Gamble's deposition, he said it was not
 5      very commonly used.  It was extremely rare.
 6              What I understand is, that it's
 7      only implemented when everything else has
 8      failed.
 9              Number 3, that it's only employed
10      in situations similar to Mr. Folks when
11      someone continues to engage in severe or
12      serious self-harm or suicide attempts and
13      nothing -- there's no other option but to
14      employ this suicide precaution to keep
15      someone from killing themselves basically.
16              And so, that's my understanding of
17      why it was employed.  I understand that it's
18      medically ordered.
19              I think Dr. Gamble had to be
20      consulted and he gave the order to -- for
21      this -- for use of this type of suicide
22      precautions.
23              And I also understand that it was a
24      multi-disciplinary -- excuse me -- where I
25      think psychology and mental health staff, Dr.
```

Joseph Penn, M.D. - June 11, 2025

Page 81

```
1      Gamble, and custody and nursing.  And I think
2      there was maybe some other maybe a paramedic
3      or some other medical staff that were
4      involved, so it was a multi-disciplinary
5      approach to ensuring that Mr. Folks was kept
6      safe and from killing himself.
7          Q    Is it your understanding that an
8      inmate in extreme suicide watch is held in
9      seclusion?
10         A    I would need you to define
11     "seclusion."  That means different things to
12     different people.
13              I need to understand how you're
14     defining seclusion to answer your question.
15         Q    I believe you used the term
16     "seclusion" in your report.
17              Is that correct?
18         A    It's possible I did.
19         Q    Let's just take an example.  On
20     page 25, at the very top, you note that --
21     I'm quoting from the report here --
22     "Mr. Folks did not require any -- did not
23     require any emergency mental health or
24     psychiatric evaluation, emergency
25     psychotropic medication, in-patient
```

Joseph Penn, M.D. - June 11, 2025

Page 82

1      psychiatric hospitalization, seclusion or

2      restraint in an emergency department," et

3      cetera, et cetera.

4              What did you mean by seclusion

5      here?

6          A    Sure.  I probably need to add a

7      clarifier to my response.

8              I don't recall, as we sit here

9      today, if I actually had an opportunity to

10     review the emergency department records.  So

11     it's possible that he was mechanically or

12     physically restrained when he was in the

13     emergency department or maybe he was in

14     cuffs.

15             I would anticipate that, based on

16     my 25 years of working corrections, whenever

17     an inmate, either a jail inmate or a state

18     prison inmate goes to a free world hospital,

19     they're probably going to be handcuffed or

20     shackled to the bed or the -- yeah, to the --

21     what am I trying to say -- the stretcher.

22             But what I want to clarify here is,

23     I'm referring to a medically ordered or

24     therapeutic seclusion or restrained, a

25     medical or therapeutic seclusion or

Joseph Penn, M.D. - June 11, 2025

1    restraint.  I wanted to clarify that.

2         Q    You mentioned in your report that

3    you conducted an on-site visit and tour of

4    LSP for a unrelated lawsuit.

5              Is that right?

6         A    Yes.

7         Q    For your reference, this is on page

8    10, if it helps you at all.

9         A    Thank you.

10        Q    You mentioned that you observed an

11   inmate being monitored on suicide watch

12   precautions.

13             Is that right?

14        A    Yes.

15        Q    Do you recall if that was a

16   standard or extreme suicide watch?

17        A    As we sit here today, I don't

18   recall.

19        Q    Did you observe any inmates on

20   extreme suicide watch during this visit?

21        A    I don't recall.

22        Q    Talking about this inmate who was

23   monitored on suicide watch precautions that

24   you referenced in your report, do you

25   remember which cell block that inmate was

Joseph Penn, M.D. - June 11, 2025

Page 84

1    held in?

2         A    No, I do not.  As we sit here

3    today, I don't recall.

4         Q    Was it in the transition unit, the

5    TU?

6         A    It's possible.  Again, I toured the

7    whole facility and I did spend most of the

8    time looking at the transition unit and the

9    cell blocks area and other high custody and

10   restrictive housing.  But as we sit here

11   today, I don't recall.

12        Q    Was that inmate, who you mentioned

13   observing, held in restraints?

14        A    I don't recall.

15        Q    You also observed the restrictive

16   housing settings.

17             Is that right?

18        A    Yes.  At Angola, that's the only

19   facility that I went to, but I also went to a

20   satellite clinic -- I'm sorry, satellite

21   facility.  I think they referred to it as a

22   camp.  And I don't recall the name of the

23   camp but it was a car drive from Angola to --

24   it's technically, I think, still an Angola

25   facility but we had to drive to that

Joseph Penn, M.D. - June 11, 2025

1    facility.

2        Q    In the restrictive housing units

3    that you observed, did you observe the cells

4    in those units?

5        A    Yes.

6        Q    Can you describe these?

7        A    I'm not sure I know what you mean

8    by describe.  Like they're cells, they're

9    prison cells.

10       Q    How big were they?

11       A    I don't know.

12       Q    Were there objects -- what -- were

13    there objects in the cells?

14       A    Yes.

15       Q    Such as?

16       A    Personal belongings, books, legal

17    materials, hygiene items, toothbrushes,

18    toothpaste, hair products, towels, clothing,

19    other recreational things, drawings, artwork

20    done by inmates.

21       Q    Were there people outside the cells

22    in those cell blocks?

23       A    Yes.

24       Q    How many people would you estimate

25    that you ran into while you were walking the

Joseph Penn, M.D. - June 11, 2025

Page 86

1    cell block?

2        A    I don't recall.  I mean, there were

3    a lot of correctional staff.  There were

4    inmates coming and going that might have been

5    going to medical or legal visits.  So as we

6    sit here today, I don't recall specific

7    numbers.

8            And sorry, there was also inmates

9    that were like mopping or sweeping or doing

10   other custodial duties at the facilities.

11       Q    Did you observe any inmates on

12   restraints while you conducted the site

13   visit?

14       A    How would you define "restraints"?

15       Q    However you define it in your

16   report.

17           So let's just say restraints for

18   the purpose of, as you say, I think you used

19   the term medical restraints or therapeutic

20   restraints or something like that?

21       A    I don't recall.  I mean, I saw a

22   lot of people that were being escorted by

23   custody staff from point A to B.  Maybe they

24   were going back to their house or they were

25   going to an appointment or something.  And I

Joseph Penn, M.D. - June 11, 2025

1    saw a lot of individuals in different custody

2    levels, you know, being escorted by custody

3    staff.

4            But as we sit here today, I don't

5    recall the use of medical or therapeutic

6    restraints.

7        Q    Did you observe the physical

8    restraints that would be used on an inmate if

9    he were held in medical or therapeutic

10   restraints?

11       A    No, I did not.

12       Q    I want to return to something we

13   were talking about earlier, which is your

14   role as mental health director of UTMB.

15           You mentioned that you're

16   responsible for policies and procedures at

17   UTMB for Correctional Managed-Care.

18           Is that right?

19       A    Yes, that's fair.

20       Q    Does UTMB Correctional Managed-Care

21   have a policy for seclusion and restraints?

22       A    There's several policies.  I can't

23   quote the nursing or medical policies.

24           But the mental health services

25   policy does include seclusion and restraint

1    and then there's probably a correctional

2    managed healthcare policy that has verbiage

3    about seclusion or restraint.

4         Q    Was that policy in place at the

5    time Mr. Folks was incarcerated at LSP, so

6    between 2021 and 2022?

7         A    I would say probably.  I know that

8    that policy has been around since I started

9    employment, which would have been 2008, so

10   February of 2008, and I believe it's still in

11   place as we sit here today.

12        Q    Did you rely on those policies in

13   drafting your report?

14        A    Sorry, did I rely on which

15   policies?

16        Q    The UTMB policies on seclusion and

17   restraint.

18        A    No.

19        Q    What do those policies, the UTMB

20   policies -- sorry, the ultimate mental health

21   services policies that were operative from

22   2021 to 2022 say about the use of seclusion

23   and restraints?

24        A    I don't have it in front of me and

25   I don't know it off the top of my head.  I

Joseph Penn, M.D. - June 11, 2025

1    would need to refer to the policy and

2    procedure to answer your question.

3         Q    Do you have them handy with you?

4         A    No, I don't.

5         Q    Are there -- you said that you

6    didn't rely on these policies for this

7    report.

8              Do those policies inform your

9    expertise in general?

10             MR. BLANCHFIELD:  Object to the

11        form.

12        A    So I would say I've been in high

13   security and restrictive housings centers

14   across the U.S., different prisons and jails,

15   and I wouldn't say that I hold one set of

16   documents regarding seclusion and restraints

17   or restrictive housing to be authoritative.

18             I would say, generally speaking, I

19   look at all of the different policies and

20   procedures and every state prison system and

21   every county jail or state jail or federal

22   prison is different.  They have a different

23   physical layout.  They have a different

24   population.  So...

25             But I would say, generally

Joseph Penn, M.D. - June 11, 2025

1    speaking, I do rely on policies and

2    procedures but I don't hold one to be -- one

3    state or county or federal or ACA, the

4    American Correctional Association or the

5    NCCHC, National Commission on Correctional

6    Healthcare, I don't hold any one document to

7    be authoritative on this topic.

8        Q    When you say you rely on all of the

9    different policies that you just mentioned,

10   what are you relying on them for?

11       A    So I rely on them to inform me and

12   to help with regard to what are best

13   practices and what are the ways to ensure

14   safety to the inmate patient and to staff and

15   to other inmates and to provide access to

16   care and continuity of care, if and when

17   someone is requiring seclusion or restraint

18   or housing in restrictive housing setting.

19       Q    So to make sure I'm understanding

20   you correctly, you rely on the policies from

21   prison systems around the country to inform

22   your opinion about what level of care is due

23   to prisoners under your care?

24       A    I don't think that's what I

25   testified to.

Joseph Penn, M.D. - June 11, 2025

1            I think I said there's best

2    practices.  And so being informed of how

3    every system is constantly trying to do

4    things better, every system has staffing

5    shortages or funding challenges.  And so --

6    and every system is getting more ill inmates,

7    like Mr. Folks, who engaged in severe

8    self-harm and severe self-mutilation.

9            So what I was referring to, I'm a

10   life long learner.  I'm constantly trying to

11   see which system has it figured out, which

12   system is doing the best and it's kind of

13   like a continuous quality improvement, trying

14   to find best practices that might be utilized

15   in different other systems when I'm

16   consulting to other systems or,

17   alternatively, to borrow them and bring them

18   back to Texas.

19        Q    REQUEST:  Can we get a copy of the

20   operative UTMB -- the operative UTMB policies

21   for seclusion and restraint from the period

22   of 2021 to 2022?

23        A    Sorry.  I'm confused.  Do I need to

24   answer that?

25        Q    Just preserving it for the record

Joseph Penn, M.D. — June 11, 2025

1    that I would like a copy.

2        A    Okay.

3        Q    But thank you for checking.

4            So you mentioned that you rely on

5    these prison policies for best practices.

6            Is it your testimony that prison

7    policies can inform your medical expertise?

8        A    Yes.

9        Q    Can you explain a little bit more

10    about that?  How would a prison policy inform

11    the relevant medical standard?

12        A    So I'm confused.  You asked me

13    about my expertise and now you're talking

14    about standard.

15            Can you ask it again, so I can try

16    to understand it and answer it better,

17    please?

18        Q    Sure.

19            So earlier we talked about all of

20    the different roles in which you've taken.

21            Currently, you're mental health

22    director at UTMB and that's a — that's a

23    role in which you have medical expertise, is

24    that correct, or you use medical expertise?

25        A    Right.  I would say medical and

Joseph Penn, M.D. - June 11, 2025

1    psychiatric, both.

2         Q    Medical and psychiatric?

3         A    Right.

4         Q    Understood.

5              Do prison policies that inform your

6    understanding of the best practices, do those

7    policies inform your medical expertise as

8    UTMB mental health director?

9         A    Yes.

10        Q    Can you explain how you -- how

11   those policies inform your expertise as UTMB

12   mental health director?

13        A    Certainly.

14             So there's several different ways

15   that occurs.

16             My administrative director, Beverly

17   Echols, she belongs to a work group for NIC,

18   the National Institute of Corrections, and

19   every state prison system has one person who

20   is appointed to that council or group and I

21   think maybe three of the largest county jails

22   in the country and then maybe the federal

23   bureau of prisons.

24             And so on an ongoing basis, Beverly

25   Echols is bringing back information from

Joseph Penn, M.D. - June 11, 2025

1    other states on how they're dealing with

2    seclusion and restraint, restrictive housing,

3    trying to keep people out of restrictive

4    housing, individuals with serious mental

5    illness.  So that's one way in which I get

6    information.

7            Another way in which I get

8    information is going to national meetings,

9    such as the American Correctional

10   Association, the National Commission on

11   Correctional Healthcare, through my work in

12   different committees at those conferences,

13   attending hearings, panel hearings for ACA,

14   and my work on the accreditation committee

15   for NCCHC, my work updating the standards,

16   mental health, jail, prison, juvenile, and

17   opioid treatment standards for NCCHC.

18           So those are ways that I keep

19   current.

20           And then I attend presentations

21   that maybe attorneys give or clinical staff

22   give or custody staff give about all the

23   topics that I mentioned earlier at

24   conferences.

25           Then lastly, my consulting or

1    expert witness role, either when I'm

2    consulting to a county jail, Sacramento

3    county jail, San Diego county jail,

4    California prison system, Arizona prison

5    system, Rhode Island prison system, I can go

6    on and on about.  Every time I go to one of

7    those facilities or groups of facilities, I'm

8    trying to learn and identify what are some of

9    the strategies that they're employing and

10   their policies and procedures.

11          So all of that together is like an

12   ongoing, trying to make continuous quality

13   improvements to our Texas prison system.

14   Q    When you decide to adopt a best

15   practice that you observed in a different

16   prison system or from one of your various

17   sources that you mentioned, what goes into

18   that decision?

19   A    Well, there's a bunch of variables.

20   But one would be staffing and resources, like

21   would this involve additional staff, what

22   would be the cost to hire more staff.

23          Number 2, can you actually hire

24   those staff in certain areas of the state

25   that are maybe underserved.

Joseph Penn, M.D. - June 11, 2025

1              Three, and probably the most
2    important thing, is, would the custody
3    leadership, would TDCJ, if it's their
4    prisons, they run the prisons.
5              So we can have really good ideas
6    but if we don't have buy-in from custody and
7    leadership, then we're not going to get any
8    traction.
9              So I would say it boils down to
10   funding, staffing, and approval or buy-in
11   from custody that those are some of the
12   different variables that might be involved.
13        Q    Do the mental health needs of
14   prisoners factor into that decision?
15        A    Yes.
16        Q    What about the medical needs of
17   prisoners?
18        A    Yes.
19        Q    Are you able to say -- you
20   mentioned three factors.
21             I also gave you another two that
22   you confirmed are relevant to the decision of
23   whether or not to adopt another best
24   practice.
25             Are you able to give me a sense of

Joseph Penn, M.D. - June 11, 2025

1    which of these is most important?

2        A    I'm sorry, I didn't understand the

3    first part of your question.

4        Q    So out of all the factors that

5    you -- all the variables that you mentioned,

6    are you able to give me a sense of the

7    relative priority of them.

8        A    No, I don't think there's any

9    overarching way you can prioritize that.  I

10   think they're all equally important.

11       Q    You've been a treating psychiatrist

12   for correctional patients, a direct treating

13   psychiatrist.

14       A    Yes.

15       Q    When was the last time you did

16   that?

17       A    How are you defining direct

18   treating professionally?

19            I'm not sure how you asked the

20   question.

21            Direct treating psychiatrist, is

22   that what you asked?

23       Q    Is someone for whom -- is there a

24   difference between your current role as UTMB

25   mental health director -- you mentioned that

Joseph Penn, M.D. - June 11, 2025

1       you have patients all across the TDCJ system.

2                Is there a difference between that

3       and then a psychiatrist who directly sees

4       patients on a day-to-day basis?

5            A    I would say yes and no.

6                In my role, I probably have more

7       administrative responsibilities.  The

8       psychiatrist and psychiatric nurse

9       practitioners that we employ are hired

10      exclusively to do 100 percent patient care.

11               When we have staffing shortages, I

12      roll up my sleeve and help out.  For example,

13      right now one of our gender dysphoria

14      psychiatric providers is out on a medical

15      leave and has been out for three months, so

16      I've been managing all of the gender

17      dysphoria patients, patients on hormones,

18      I've been ordering hormones,

19      stopping/starting/changing hormones.  So I'm

20      providing direct patient care as recently

21      as -- I've been on vacation, so I can't speak

22      for the last two weeks.

23               But the week before my vacation, I

24      saw a patient who was acutely psychotic and

25      worked with nursing and custody and the

Joseph Penn, M.D. - June 11, 2025

Page 99

1    treating psychiatrist and other nursing staff

2    to get that patient transferred from the

3    facility where he was at to another facility.

4          And I do that every day.  I mean

5    every day I'm involved in determinations of

6    patients who are suicidal or self-injurious

7    and where they should be housed and what

8    services they need.

9          Q    We've been on the record for about

10   another hour, Dr. Penn.  How are you doing?

11         A    I probably could take a break, if

12   that's okay.

13         Q    That would be great.

14              Okay, let's take five minutes

15   again.

16         A    All right.

17              THE VIDEOGRAPHER:  We are off the

18         record.

19              The time is 10:15 a.m.

20              (Brief recess taken.)

21              THE VIDEOGRAPHER:  We are back on

22         the record.

23              The time is 10:30 a.m.

24         Q    Dr. Penn, as UTMB mental health

25   director, you oversee the care of

Joseph Penn, M.D. - June 11, 2025

1      incarcerated patients.  Right?

2               You mentioned over maybe or around

3      80 prisons in the state of Texas?

4          A    That's one of my roles.  I have

5      other roles also.

6          Q    You would be familiar with the use

7      of restraints and seclusion in the UTMB

8      system?

9          A    When you say seclusion and

10     restraints, I have an awareness of the

11     medical -- medically ordered or therapeutic

12     seclusion restraint, that's fair.

13         Q    Just so that we're on the same page

14     from now on, when I use the term seclusion

15     and restraints, I will be referring to the

16     medical therapeutic seclusion and restraints,

17     unless I specify otherwise.

18              Does that make sense?

19         A    Yes.  Thank you.

20         Q    Perfect.

21              Have you personally been involved

22     with the use of restraints and seclusion,

23     seclusion and restraints, either by ordering

24     them yourself or approving them?

25         A    When you say "personally involved,"

Joseph Penn, M.D. - June 11, 2025

1      I'm not sure I know what you mean by that.

2          Q    Have you, in your role as UTMB

3      mental health director, personally ordered

4      seclusion and restraints for a patient?

5          A    Yes.

6          Q    Have you approved of another

7      medical professional's order for seclusion

8      and restraints?

9          A    So I don't know if I would use the

10     word "approved." I've been the acting

11     clinical director at two of our in-patient

12     psychiatric prison units at different periods

13     of time in the last 17 years, and there are

14     times that I will get a request to sign -- to

15     cosign. I'm not the -- the restraint already

16     happened or the seclusion already happened.

17              And I think, by policy, the

18     clinical director or a psychiatrist has to

19     cosign that. I could be wrong on that,

20     but -- so I have gone in and cosigned it

21     electronically.

22              But I wouldn't use the word

23     "approve" because it already occurred, so

24     yes, that's fair.

25         Q    Is it fair to call those instances

Joseph Penn, M.D. - June 11, 2025

1    where you cosigned the use of seclusion and

2    restraints, is it fair to call that

3    oversight, you're overseeing the use of

4    seclusion and restraints?

5         A    That's fair, yes.

6         Q    How many times would you say you

7    have either ordered seclusion and restraints

8    for a patient or overseeing the use of

9    seclusion and restraints for a patient in

10   your role as UTMB medical health director?

11        A    I'm sorry, I didn't mean to

12   interrupt you.

13             It would be a total guess.

14   Hundreds, maybe I have done, probably ordered

15   seclusion and restraints.

16        Q    More than 200, if you had to guess?

17        A    It would be a total guess.

18             I don't know if it's that many.  I

19   would say we tend to order more seclusion

20   than physical restraint but I can't answer

21   your question.  It would be a total guess.

22   But it's been several hundred probably.

23        Q    In the last six months, how many

24   times have you either ordered or overseen the

25   use of seclusion and restraints on a patient?

Joseph Penn, M.D. - June 11, 2025

1        A    Five to ten.

2        Q    Is that about average for a

3   six-month period?

4        A    I don't know how you're defining

5   average.  I mean, I take on calls, as I

6   testified to earlier, and it's totally

7   random.  There may be a week or two where

8   there's no seclusion and restraints and a

9   week where you have one patient similar to

10  Mr. Folks who is in and out of restraint on a

11  daily basis, hourly basis.

12            So I can't give you a definitive

13  yes, no or number in the last six months.

14       Q    When seclusion and restraints are

15  ordered at UTMB, would you typically be

16  notified?

17            You mentioned earlier that you

18  cosign some of these orders.

19       A    So I would say I can't answer that

20  in a yes/no.  I have to clarify that.

21            If I'm the on call after-hours

22  psychiatrist, then yes, I would be notified.

23            The nurse would call me and ask for

24  an order and she -- he or she would describe

25  the clinical reason, what has been attempted,

Joseph Penn, M.D. - June 11, 2025

1     all the interventions that have failed and

2     the rationale for why the patient needs to be

3     placed in seclusion and restraints.  So

4     that's why the most common -- what I would

5     say is, we occasionally have patients that

6     severely self-harm, self-injure similar to

7     Mr. Folks where we have to have additional

8     staff meetings or treatment team meetings to

9     discuss how we're going to manage somebody

10    who is repeatedly severely self-harming to

11    the point of killing themselves, like

12    Mr. Folks.

13          So I would say those are the two

14    ways that I'm directly involved in ordering

15    seclusion and restraints.

16    Q     When you're not on call as UTMB

17    mental health director, would you ever not be

18    aware that seclusion and restraints are being

19    used in the UTMB systems on a patient?

20    A     I don't understand your question,

21    I'm sorry.

22    Q     Are there cases in which when

23    you're not on call or ordering the seclusion

24    and restraints yourself, somebody else under

25    your supervision would order seclusion and

Joseph Penn, M.D. - June 11, 2025

1    restraints and you would not be aware of

2    that?

3          A    Yes, that's fair.

4          Q    How often does that happen?

5          A    No idea.

6          Q    So just talking about the cases in

7    which you are aware, in your experience at

8    UTMB, what is the longest period of time you

9    recall keeping a patient in seclusion and

10   restraints?

11         A    I can't -- I don't know if I can

12   answer that because of HIPAA.  Like I can't

13   really discuss a particular patient.

14              We've had several individuals

15   similar to your client, Mr. Folks, that have

16   engaged in severe self-harm to the point of

17   almost killing themselves but I don't know if

18   I can answer that question about -- because

19   it gets into specific cases and I don't know

20   if that's HIPAA protected or not.

21         Q    I am not asking about specific

22   cases.  Please do not give me any information

23   about specific cases.

24              I'm just asking about in the whole

25   of your experience as UTMB mental health

Joseph Penn, M.D. — June 11, 2025

1    director, what is the longest period of time

2    that you recall keeping a patient in

3    seclusion and restraints?

4        A    I don't recall specifically but I

5    would say we have had at least one individual

6    that I recall was in seclusion and restraints

7    for one to two months maybe more.

8            I mean, I'm not the clinical

9    director right now.  Fortunately, we have --

10   we're fully staffed on clinical directors,

11   so...

12           But I am familiar that we

13   occasionally have patients that go one to two

14   months needing repeated seclusion and

15   restraints.

16       Q    When you say "repeated," do you

17   mean one to two months consecutively?

18       A    It varies.  There's some

19   individuals that require extended, like a

20   week or two or longer.  There's some that

21   maybe a couple of days in a row, then they

22   come out of seclusion and restraints.  And

23   then they're okay for a week or two and then

24   they go back in.  So it's totally -- there's

25   not a particular pattern.

Joseph Penn, M.D. - June 11, 2025

1          Q    Just to clarify your answer to the

2    earlier question, the patient that you

3    remember keeping in seclusion and restraints

4    for one to two months, that is the longest

5    amount of time that you recall keeping a

6    patient in seclusion and restraints?

7          A    Could be longer.  As we sit here

8    today, I would probably have to talk to my

9    clinical directors or other senior

10   psychologists.  I'm sure there's been

11   patients that have lasted longer but that's

12   the one that immediately comes to mind

13   without revealing health -- you know,

14   information, protected information.

15          The one that comes to mind was

16   recent and was in and out of seclusion and

17   restraints for at least a month or two.

18          Q    Before that case -- well, first you

19   mentioned that occasionally you've kept

20   patients on seclusion and restraints for one

21   to two months.

22          So before this most recent case,

23   when was the last time that you recall a

24   patient being kept on seclusion and

25   restraints for one to two months?

Joseph Penn, M.D. — June 11, 2025

```
1          A    So I want to answer your question

2     but I just want to make it clear, I'm not the

3     one that's making that determination.

4               You said, you're the one that

5     orders.  I'm -- if I'm on call, I give an

6     order but by policy the seclusion and

7     restraints is time limited.  I don't recall

8     the exact number of hours.  It might be eight

9     hours.  But it has to be renewed.

10              So we don't just like give an order

11    for, you know, restraint for a month.

12              I just want to make that clear --

13    I'm sorry, what was the question again,

14    please?

15         Q    Before this last case that you

16    mentioned of a patient being held in

17    seclusion and restraints for one to two

18    months, when is the last instance, which

19    you're aware of, of a patient being held in

20    seclusion and restraints for that long?

21         A    Again, I testified to this earlier,

22    kind of comes and goes.

23              We have several of these kinds of

24    patients that are repeatedly severe

25    self-harming and they go on seclusion and
```

Joseph Penn, M.D. - June 11, 2025

1    restraints for extended periods of time.

2            But as we sit here today, I can't

3    give you an exact or approximate number of

4    those patients or durations of their

5    seclusion and restraints.

6            MR. SI:  Can you read back the last

7        question?

8            (Whereupon the record was read back

9        by the reporter.)

10    A    So I would say I don't recall.

11    Q    When you or a psychiatrist, who you

12    supervise, see a patient who is in seclusion

13    and restraints, is there any sort of

14    treatment that's administered to the patients

15    while they're on seclusion and restraints?

16    A    Yes.

17    Q    Can you describe that treatment?

18    A    Sure.

19            The treatment that's involved for

20    someone who is acutely suicidal or posing

21    eminent risk of harm to self or others, that

22    requires seclusion and restraints, that's the

23    treatment, is placing them in therapeutic

24    seclusion and restraints.  So that is the

25    mental health treatment modality.

Joseph Penn, M.D. - June 11, 2025

1           The most -- the treatment

2     intervention and the treatment plan is to

3     keep the patient safe, and that's not just in

4     a prison or jail, that goes across

5     psychiatric hospitals, state hospitals,

6     forensic units, intellectually impaired

7     treatment facilities.  So it's ubiquitous.

8           Your treatment, intervention and

9     treatment modality, is to keep them safe.

10    And you do that by placing them in the

11    therapeutic seclusion and restraints and

12    monitoring them for safety.

13          Because even though they are in

14    seclusion and restraints, just like

15    Mr. Folks, he can still get items to

16    self-harm, to swallow or to seriously

17    self-injure himself or herself, even while in

18    seclusion and restraints.  So that's part of

19    the model, is keeping them safe, monitoring

20    them, making sure that they're not having any

21    adverse medical or mental health

22    deterioration while they're in seclusion and

23    restraints.

24          And then the periodic mental health

25    reevaluation, by a social worker or

1    psychologist or other mental health

2    professional -- and I don't recall the

3    frequency in Louisiana.  By policy, I think

4    it was daily or maybe it was every 12 hours,

5    but that's part of the treatment plan.

6         The treatment plan is to ensure the

7    inmate's safety and to restore safety, so the

8    inmate can come out of seclusion and

9    restraints.  So that's the overarching

10   treatment plan or treatment intervention

11   that's being availed to that individual.

12        Q    When would you take the patient off

13   seclusion and restraints?

14        A    It would depend.

15        Ideally, when the individual has

16   calmed down and has demonstrated that they're

17   not agitated or combative or self-harming,

18   they're not actively self-harming, and it's a

19   very complicated calculus.  Because someone

20   might be psychotic, and they might not be

21   self-harming, but then you take them off the

22   suicide watch and they can revert to

23   self-harming.

24        I think the challenge with these

25   kind of patients, like Mr. Folks, where they

Joseph Penn, M.D. - June 11, 2025

1    tell you, I'm not suicidal and they have
2    calmed down and you take them off the suicide
3    watch, and then within a matter of, you know,
4    half an hour, they're engaging in a lethal
5    suicide attempt.
6         So A lot of it is relying on the
7    individual's self-report of their current
8    suicidal intent or plan.  And that's
9    problematic because, as with Mr. Folks, he's
10   unreliable as a historian.
11        So you have to use your clinical
12   judgment.  You have to weigh the risks,
13   benefits and alternatives.
14        And at the end of the day, it's an
15   individualized clinical determination of the
16   individual's risk of harming themselves,
17   you're weighing that versus making an effort
18   to try to get them out of seclusion and
19   restraints and give them more freedom, if you
20   will.
21        And that's a -- that's a real --
22   that's huge challenge clinically that our
23   staff do every day and staff in the Louisiana
24   prison system do every day.
25        Q    You mentioned that staff would make

Joseph Penn, M.D. - June 11, 2025

1    an effort to try to get the patient out of
2    seclusion and restraints and give them more
3    freedom.
4              What goes into that effort?
5         A    So I think I testified to this
6    earlier, it involves a mental health
7    evaluation or a mental health assessment.
8    And as part of that medical assessment is
9    performing a suicide risk assessment and a
10   mental status examination and looking at
11   their cell to see how they're behaving, what
12   the contents of the cell are and that sort of
13   thing.  So it involves a clinical assessment.
14   That's how that decision is made.
15             And sorry, and the other thing, it
16   might involve talking to custody staff who
17   are there 24/7 to learn, is the person
18   eating, are they drinking, are they
19   toileting, are they bathing, are they
20   grooming.
21             So it's not just the self-report of
22   the individual but it's an observation of
23   their -- of their functioning in that housing
24   setting.
25        Q    And the evaluation, does that

Joseph Penn, M.D. - June 11, 2025

```
1      involve any sort of therapy, any sort of
2      treatment?
3           A    Yes.
4           Q    What sort of therapy and treatment?
5           A    Well, as documented in this case,
6      in Mr. Folks' mental health records, mental
7      health staff consistently met with him.  And
8      even Dr. Gamble, in his deposition
9      transcript, you're meeting with the patient,
10     trying to identify how they're doing, their
11     subjective complaints or subjective reports,
12     if they're having any new issues or problems.
13               And then, like I testified to
14     earlier, you're doing an objective evaluation
15     of their thinking, their behavior, their
16     thought processes.  And you're looking to see
17     if they've engaged in any recent self-harm.
18               And then you're doing an assessment
19     of their current risk of harm to self or
20     others.
21               And so that's all part of the
22     treatment that's rendered to someone who is
23     critically at risk for self-harm or suicide.
24          Q    I think I'm having trouble
25     understanding your use of the word
```

Joseph Penn, M.D. - June 11, 2025

1      "treatment" versus "evaluation."

2            I think, in my mind, evaluation

3      intuitively is distinct from treatment.

4            But let's sort of test this here.

5            You mentioned that you would do an

6      objective evaluation of their thinking, their

7      behavior, their thought process, and you're

8      looking to see if they've engaged in any

9      recent self-harm.

10           How does that or does that, rather,

11     move them towards a place where they're able

12     to get off seclusion and restraints?

13        A     Right.

14           So -- and I'll use Dr. Gamble's

15     testimony as an example.

16           In his deposition, he testified

17     that he repeatedly -- he knew Mr. Folks.  He

18     knew him from when he was incarcerated

19     previously and engaging in these same

20     behaviors.

21           He really tried to work with him.

22     He said, what is it going to take for you to

23     not hurt yourself.

24           Dr. Gamble basically offered him

25     whatever medications he wanted.  Both

Joseph Penn, M.D. — June 11, 2025

1    medicines that he prescribed to him are

2    highly trafficked and highly traded and

3    highly desired in a correctional setting.

4    And Dr. Gamble weighed that and was like, I

5    will do whatever it takes.  I'll give him

6    whatever medicines he wants and even

7    prescribe him naltrexone.  And I can say more

8    about that.

9          But Dr. Gamble repeatedly tried to

10   work with and the mental health staff, too,

11   per the records, to try to meet Mr. Folks at

12   a halfway point.  What can we do to ensure

13   your safety?  What can we do to help you to

14   be safe?

15         And so, that's the treatment.  The

16   treatment is you're trying to form a

17   therapeutic alliance with the patient to get

18   them to talk to you.

19         It may appear that you're just

20   shooting the breeze like how's the weather,

21   how did the Saints do last week or whatever.

22   But you're assessing their ability to reality

23   test, are they psychotic, are they hearing

24   voices.

25         So evaluation and treatment kind of

Joseph Penn, M.D. - June 11, 2025

1    go hand-in-hand.  And it's hard to

2    distinguish or differentiate between one and

3    the other.

4              The treatment component is

5    establishing a therapeutic alliance,

6    providing supportive counseling and

7    encouraging this person, you have something

8    to live for, and then offering medications to

9    treat depression or impulse control or

10   problem behaviors, and that's exactly what

11   Dr. Gamble and the other mental health staff

12   tried to do.

13        Q    With something like -- with a

14   treatment plan like the one you just

15   identified, so establishing a therapeutic

16   alliance, support of counseling and

17   encouraging the patient to have something to

18   live for, would those things be documented

19   anywhere?

20        A    They typically are documented in

21   the mental health records or mental health

22   chart.  And what I neglected to mention

23   earlier, I know we're focusing just on mental

24   health staff and Dr. Gamble, but this

25   Mr. Folks was also being assessed by nursing

Joseph Penn, M.D. - June 11, 2025

1    staff and custody staff, were checking up on

2    him.  You know, I think he was on constant

3    one-on-one observation and he was also on

4    video camera 24/7.

5                So there's documentation from

6    custody.  There's documentation from nursing

7    staff.  And ideally, there's documentation in

8    mental health records.

9                I will tell you, and I will

10   acknowledge, we do a lot of things in mental

11   health and psychiatry that we don't document.

12   So we might provide treatment, we might

13   provide supportive therapy, but we may be so

14   busy that we don't write it down.

15               And so that's one of the challenges

16   in a correctional setting, is, we treat the

17   patient rather than nursing the medical

18   record.

19               So which would you prefer, to write

20   an extensive novel in the medical chart or

21   see the patient and treat the patient and

22   keep the patient safe?

23               So, yeah, in a perfect world there

24   would be more no documentation about the

25   treatment that was offered to Mr. Folks, but

Joseph Penn, M.D. — June 11, 2025

1    at the end of the day, the proof is in the

2    pudding, he's alive and he's in the community

3    now and doing very well.

4         Q    In your review of the mental health

5    records from this case, did you see

6    documentation of any of the types of

7    treatments we mentioned before, so

8    establishing a therapeutic alliance,

9    counseling, anything like that?

10        A    Yes.  I don't recall the specific

11   examples but I do recall that the mental

12   health staff were assessing Mr. Folks per

13   policy.  They might not have written

14   everything in the notes, you know, that

15   somebody -- sorry.

16             They might not have written

17   extensive or lengthy notes, but I -- in my

18   professional opinion, their documentation

19   comported with the standard of care for

20   someone who is as seriously suicidal as

21   Mr. Folks.

22             Similarly, Dr. Gamble, in his notes

23   and in his deposition transcript, he did

24   thorough psychiatric evaluations of

25   Mr. Folks.  He knew him going back several

Joseph Penn, M.D. - June 11, 2025

Page 120

1    years.  He knew him for an extended period of

2    time.  And he did document in his notes and

3    also testified to that in his deposition of

4    what he did to provide psychiatric evaluation

5    and psychiatric treatment to Mr. Folks while

6    he was in suicide precautions.

7         Q    What psychiatric treatments do you

8    recall Dr. Gamble documenting?

9         A    Well, I recall him documenting the

10   diagnoses, the diagnostic impressions he had

11   of Mr. Folks.  And then the psychiatric or

12   psychotropic medications that were prescribed

13   were also detailed.  And then the plan to

14   continue him on a suicide watch with an

15   eventual plan to remove him or reduce him

16   from the highest level of suicide watch and

17   restraints to a less restrictive suicide

18   precautions and eventually, ideally, where he

19   would not require any kind of seclusion or

20   restraints.

21        Q    What did the eventual plan to

22   remove Mr. Folks or reduce him from the

23   highest level of suicide -- what did, as you

24   testified, the plan to remove Mr. Folks or

25   reduce him from the highest level of suicide

Joseph Penn, M.D. - June 11, 2025

1    watch and restraints to a less restricted

2    suicide precaution, what did that plan

3    involve?

4        A    I think originally he was in four

5    point restraints, where he was mechanically

6    restrained, his two upper extremities and two

7    lower extremities, as I understand, based on

8    clinical evaluations and reevaluations, the

9    plan was to reduce him to where only two

10   extremities were restrained and then

11   eventually to try to get him off the

12   restraints all together but to house him in

13   that location, in the transitional unit,

14   where items could not be slipped to him by

15   other inmates or staff, that he might use to

16   self-harm or mutilate or kill himself.  And

17   it was having a correctional officer within

18   ten feet of him at all times, 24 hours a day,

19   and also the video monitoring 24 hours a day.

20           So that is my understanding of what

21   the plan was to try to reduce him from four

22   point restraint to two point restraint to no

23   restraint, but to continue to house him there

24   in the transitional unit with 24 hour

25   one-on-one observation and video monitoring

Joseph Penn, M.D. - June 11, 2025

1    observation.

2         Q    So other than the fact of the plan

3    to reduce Mr. Folks from four point to two

4    point to no restraints, did Dr. Gamble

5    document any other interventions that would

6    be a part of that plan?

7         A    Yes.

8         Q    What did he document?

9         A    So I believe he prescribed

10   Wellbutrin and -- I'm sorry, I'm blanking,

11   there was another medication.

12              And then the naltrexone.  I think

13   it was Depakote but I could be wrong on that.

14              So he documented the plan to

15   prescribe those -- I'm sorry, it wasn't

16   Depakote, it was -- he was also on an

17   antipsychotic.  It was Abilify -- oh, no, no,

18   no, I'm sorry, Thorazine, chlorpromazine.  He

19   was on Thorazine.  And also, he was on

20   Artane, and I can spell these if you need me

21   to.

22              But Wellbutrin, Thorazine, Artane

23   and naltrexone.  So he was on four very

24   potent psychotropic medications where he, Dr.

25   Gamble was clearly trying to help Mr. Folks

Joseph Penn, M.D. - June 11, 2025

1     gain better control from his impulses, his

2     impulsivity, his mood liability, his

3     personality disorders, plural, and his severe

4     and lethal self-harm attempts.

5          Q     Okay.

6          A     So Dr. Gamble was trying to treat

7     him with these medications.

8          Q     So other than Mr. Folks' diagnoses,

9     the medication that Mr. Folks was prescribed

10    and the fact of the plan to move him from

11    four point to two point to no restraints, did

12    Dr. Gamble document any other treatment

13    interventions that were attempted for

14    Mr. Folks?

15         A     I believe -- I don't recall if it

16    was Dr. -- Dr. Gamble's handwriting is very

17    difficult to read.  And what I understand

18    was -- and I don't recall if I -- when I

19    interviewed Dr. Gamble directly, if he told

20    me this or if it was in the -- in his

21    deposition transcript, but that wasn't all

22    Dr. Gamble was doing.  Dr. Gamble was also

23    speaking to custody staff.  He was talking to

24    medical leadership.  He was talking to

25    nursing staff.

Joseph Penn, M.D. – June 11, 2025

1          So everyone, including the warden,

2    are trying to put their heads together

3    because, think about it, this is a tremendous

4    amount of resources.  You're pulling

5    correctional officers offline to go work and

6    just be one-on-one with Mr. Folks.  That's a

7    huge burden for a health -- for a prison

8    system.

9          And so everyone was trying to put

10   all of their -- their heads together from

11   multiple disciplines, mental health,

12   psychiatry, nursing, medical, custody, and

13   they were all communicating offline of, hey,

14   what can we do to deal with this.

15         I think the other problem, which

16   you haven't asked me about is, that Mr. Folks

17   is a pre-trial detainee.  He's not even

18   legally a state prisoner.  So that's a whole

19   separate, additional complicating variable.

20         So they have to protect maybe

21   Mr. Folks -- Mr. Folks sight and sound from

22   other state prisoners.

23         So they had a huge -- they had a

24   huge challenge to try to keep Mr. Folks safe.

25   And they worked together as a treatment team

Joseph Penn, M.D. - June 11, 2025

1    and Dr. Folks may have not documented that in

2    his chart, but he definitely spoke about that

3    when we met, when I interviewed him, and also

4    in his deposition transcript.  That's what I

5    recall.

6         Q    You mentioned Mr. Folks being a

7    pretrial detainee when he first arrived at

8    LSP being a complicating variable.

9         A    Yes.

10        Q    What did you mean by that?

11        A    So again, I want to clarify, I

12   don't consider myself a custody expert but I

13   do know from my experience in Texas where

14   we're dealing with -- we deal with different

15   types of custody state jail, state prison, we

16   deal with Operation Lone Star confinees, we

17   deal with juveniles, we have a lot of

18   specialty custody designations that need to

19   be considered.

20             But to answer your question, what I

21   understand was, Mr. Folks could not be safely

22   kept at the Parish Jail, where he was, and

23   had to be sent off site at least once or

24   twice to a free world emergency room and,

25   again, almost killed himself.  And the jail

Joseph Penn, M.D. - June 11, 2025

```
 1        didn't have any psychiatric staff.  They
 2        didn't have mental health staff or enough
 3        medical staff to keep Mr. Folks safe.  And so
 4        they had an arrangement.  And I think this
 5        had happened before when a county jail or,
 6        sorry, Parish Jail in Louisiana has an
 7        individual that their medical or mental
 8        health needs cannot be safely met by that
 9        facility, they need to be transferred to a
10        state prison.  And that's what occurred, what
11        I understand, with Mr. Folks.  He had to have
12        nursing care.  He had to have skilled nursing
13        care and be housed in nursing -- in like a
14        specialized nursing area to get wound care
15        because of the severity of his self-harm.
16        And he had to be kept sight and sound
17        separate from other Louisiana state
18        prisoners.  That's what I understand.
19            Q    Did the fact Mr. Folks have --
20        strike that.  I'm sorry.
21                 Did the fact that Mr. Folks had to
22        be kept separate from the general population
23        at LSP prevent him from receiving any sort of
24        treatment that would otherwise be received by
25        a member of the general population?
```

Joseph Penn, M.D. - June 11, 2025

1          A      When you say "general population,"
2     can you clarify?  Like are you saying a
3     general population or person with a mental
4     illness similar to Mr. Folks?
5          Q      Let's take both of those.  Let's
6     start with a person in the general population
7     with a mental illness similar to Mr. Folks.
8          A      So my sense is, if the Louisiana
9     prison system had an inmate that was
10    engaging -- that had a history and recent
11    history of severe lethal -- potentially
12    lethal self-harm, they probably would have
13    housed that individual in the same exact
14    housing, seclusion and restraints, and
15    everything that Mr. Folks received.
16              So it would have been a very
17    parallel type of evaluation and treatment
18    plan.
19              I don't think that there would have
20    been any significant differences, whether it
21    was a pre-trial, you know, Parish Jail
22    detainee versus a state prisoner.  They would
23    have probably done the exact same thing and I
24    think that would have fell within the
25    standard of care.

Joseph Penn, M.D. – June 11, 2025

1         Q    Earlier you testified that the fact

2    Mr. Folks was a pre-trial detainee would

3    present complicated factors for his

4    treatment.

5              If he would have been treated the

6    same way, regardless of whether he was a

7    pre-trial detainee or a member of the general

8    population, how is that true?

9         A    I'm not sure I understand your

10   question.

11             I think -- I will try to answer it.

12             I think your expert, Dr. Glenda

13   Meyer, who doesn't really have any state

14   prison experience, she -- I think she

15   asserted Mr. Folks should have gotten more

16   treatment but he can't do group therapy

17   because to do group therapy, you would have

18   to have other pre-trial detainees.  You can't

19   do group therapy with state prisoners because

20   he can't be sight and sound of other state

21   prisoners.  So group therapy is kind of off

22   the table.  Like you can't do group therapy

23   with one person.  You need more than one

24   person to do group.  So that's not possible.

25             The individual therapy that he was

Joseph Penn, M.D. - June 11, 2025

1    getting was focused solely on keeping him

2    safe, maintaining his safety and getting him

3    off of seclusion and restraint status so he

4    could be back in the therapeutic transitional

5    unit.

6         Q    Is there anything else that

7    Mr. Folks would not have been able to -- any

8    other treatments that Mr. Folks would not

9    have been able to receive as a pre-trial

10   detainee as opposed to a member of the state

11   prison population?

12        A    I don't know if you would call

13   employment or work a part of treatment but

14   certainly keeping people busy and not having

15   them in their cell, like being able to go and

16   sweep or clean or do laundry or work in the

17   kitchen, that could be part of a treatment

18   plan.  But he would not have been eligible

19   for that because he was a pre-trial detainee.

20   That's my understanding.

21        Q    Just to be sure we're exhausting

22   this line of questioning, is there anything

23   else?

24        A    There may have been other things

25   that he might have had the opportunity to

Joseph Penn, M.D. - June 11, 2025

1    engage in, like go to the law library or like

2    I mentioned, employment or vocational

3    activities or doing other things, you know,

4    working on his GED or high school diploma or

5    vocational work or what have you.

6          But because they would have had to

7    probably do that one by himself, he wouldn't

8    have been able to do it as part of a group or

9    cohort of other individuals. So he would

10   have been the lone person doing that. That's

11   what I understand.

12       Q    Earlier you mentioned that you

13   understand that Dr. Gamble spoke to custody

14   staff and nursing staff and medical

15   partnerships.

16          Were any of those conversations

17   documented, conversations about Mr. Folks?

18       A    Yes. Those were actually in Dr.

19   Gamble's -- my interview with him and, also,

20   I think that was in the deposition transcript

21   where Dr. Gamble talked about -- I actually

22   toured where his office is and I watched him

23   in action. I watched him sitting at the

24   table where he was speaking about and custody

25   staff came in and talked to him and nursing

Joseph Penn, M.D. - June 11, 2025

1      staff and mental health staff.

2              And I also observed Dr. Gamble,

3      from the second we entered the facility, he

4      knew all of the wardens by name, he knew

5      their life story, he knew what they would be

6      doing that weekend or their families.

7              So they kind of have this ongoing

8      dialogue and, yes, Dr. Gamble communicated to

9      me that he knew Mr. Folks extremely well, he

10     knew about him and was put on notice even

11     before Mr. Folks hit the facility.

12              From the second he was -- he

13     arrived at the facilities, Dr. Gamble worked

14     with nursing, medical, the medical director,

15     custody, the warden, deputy warden, and other

16     custody staff on an ongoing basis to try to

17     address and try to get Mr. Folks off of the

18     seclusion and restraints status.

19       Q    Other than the treatments that

20     you've mentioned already, the medications,

21     the fact of there being a plan to downgrade

22     Mr. Folks from four point to two point,

23     general restraints, were any other treatments

24     documented in those conversations with

25     custody staff, medical partnership, et

Joseph Penn, M.D. - June 11, 2025

1    cetera?

2        A    I don't recall if nursing or the

3    mental health staff that were going up and

4    checking up on Mr. Folks every day or twice a

5    day, if there was any documentation about

6    their collaboration or communication with

7    custody staff.  But -- so that's the only

8    thing that I'm not aware of.

9        Q    Is there any reason to think that

10   they pursued any other course of treatment

11   that was not documented that you have not

12   already mentioned?

13       A    I mean, it's possible.

14            I will say that the fact that Dr.

15   Gamble prescribed naltrexone, that is sine

16   quo non.  That's hands down evidence that Dr.

17   Gamble tried to exhaust each and everything

18   he could within his ability.

19            That's a medicine that's rarely

20   used in a correctional setting, and it's a

21   medicine that's used for severe and extreme

22   self-harm, self-injury.  And again, it's an

23   opioid, opiate kind of medication.  It has

24   significant risks.  And again, I think Dr.

25   Gamble really tried to uncover every stone to

Joseph Penn, M.D. - June 11, 2025

1    try to get Mr. Folks safe and keep him safe.

2         Q    Earlier, you testified that

3    Mr. Folks' treatment comported with the

4    standard of care in state prisons.

5              What is your understanding of that

6    standard of care?

7         A    Well, the standard of care for

8    keeping someone who is acutely suicidal and

9    repeatedly suicidal and potentially lethally

10   suicidal, would be to assess them and

11   reassess them.  And based on the suicide risk

12   assessment, to keep them on suicide

13   precautions and to continue to reassess them

14   and provide a multi-disciplinary approach,

15   which included, in Mr. Folks' case,

16   psychological reevaluations and

17   reassessments, psychiatric evaluations and

18   reevaluations, and treatment, medication

19   treatment, and psychotropic meds and follow

20   up.  And so that all comported with the

21   standard of care.  And at the end of the day,

22   they were able to successfully keep Mr. Folks

23   alive.

24        Q    Is that standard of care different

25   in state prisons as opposed to a jail, for

Joseph Penn, M.D. - June 11, 2025

1    example?

2        A    So I don't think the standard of

3    care -- again, I'm not an attorney or judge

4    or whatever.

5            So I think standard of care is

6    determined by the fact finder.  And what I

7    understand the standard of care would be,

8    what would be expected to be available in the

9    community.  And so what I would say is, a

10   correctional health standard of care would be

11   the same as what would be available in a

12   community health facility or a state hospital

13   or a private psychiatric hospital.

14           And yes, I think Mr. Folks received

15   or got more than he would have in the

16   community for sure, but he got services and

17   treatment that comported with what he would

18   have received in a private or state

19   psychiatric hospital.

20           If he was that suicidal, cutting,

21   self-harming, shoving things into his abdomen

22   and doing other things like that in a state

23   psychiatric hospital or private psychiatric

24   hospital, he would have had seclusion and

25   restraints and he would have been held

Joseph Penn, M.D. — June 11, 2025

1    against his will as long as needed.

2         Q    To confirm, the standard of care

3    for a correctional facility is the same as

4    the standard of care for a community health

5    facility?

6              MR. BLANCHFIELD:  Objection to

7         form.

8         A    No, that's not what I testified to.

9              I said there's different nuances in

10   a jail, in a correctional system, whether it

11   be a juvenile facility, a jail, a prison, an

12   ICE facility.

13             Every one of those probably has

14   some different requirements.  But I would say

15   the overarching —— AND that's why there's

16   actually different standards for jails,

17   prisons, juvenile, opioid treatment programs.

18             So the standard —— the healthcare

19   standards may differ in their application and

20   who provides those may differ, but the

21   standard of care, that's —— at the end of the

22   day, that's the fact finder decision.  That's

23   not my decision.

24        Q    So the health standards between

25   jails and prisons are different.

Joseph Penn, M.D. - June 11, 2025

1              Is that your understanding?

2        A    Yes.  Well -- yes.

3        Q    How are they different?

4        A    Well, there's a lot of differences.

5             The healthcare standards, like

6    NCCAC, the National Commission on

7    Correctional Healthcare, has had healthcare

8    standards going back to like the 1970s.  And

9    they have separate designations for

10   healthcare standards, for jails and

11   healthcare standards for prisons.

12            And it's -- there's a lot of

13   different reasons why that is, but there's a

14   lot of different -- the length of stay, the

15   legal status, there's just a lot of different

16   reasons why you need different healthcare

17   standards for jails and prisons.  There is

18   some overlap.

19            The overarching things are access

20   to care and continuity of care and providing

21   a constitutional level of healthcare,

22   medical, dental, nursing and other, but there

23   are nuances.  That's why you have jail

24   standards, health standards and prison health

25   standards.

Joseph Penn, M.D. - June 11, 2025

```
 1              MR. SI:  Off the record for a
 2      couple minutes.
 3              THE VIDEOGRAPHER:  We are off the
 4      record.
 5              The time is 11:20 a.m.
 6              (Brief recess taken.)
 7              THE VIDEOGRAPHER:  We are back on
 8      the record.
 9              The time is 11:33 a.m.
10      Q    Dr. Penn, earlier we were
11      discussing the difference in the health
12      standard between state prisons and jails.
13              Is that correct?
14      A    Yes, you were asking me about that.
15      Q    So you were talking about some of
16      the differences, some of the reasons why you
17      might need a different health standard in a
18      state prison or a jail.
19              I want to try to lock down how
20      those standards require different things.
21              So what is required of a community
22      health provider or, sorry, of a health
23      provider in a state prison that is not
24      required in a jail?
25      A    See, I don't know if I can answer
```

1      your question because there's just so many

2      different -- you're saying a very broad,

3      casting a wide net, like health provider.

4               Are you referring to mental health,

5      nursing, dental, a specialist?  Like, I can't

6      answer your question because it's so like --

7      it's a big -- it's a big -- you're casting a

8      huge net.  So I -- if you could clarify that,

9      I'd be happy to try to answer it.

10       Q     What is required of a mental health

11     provider who works in a state prison that's

12     not required of a mental health provider who

13     works in a county jail?

14       A     So to answer your question, I would

15     have to clarify that because some county

16     jails may have such a small population.

17              Like if you have a small county

18     jail that, say, has, you know, 20, 30, 50

19     inmates, you may only have a mental health

20     provider on site once a week or once every

21     other week.  So are we -- I guess I still

22     need more clarification about the size of the

23     facility, the population.

24              Are you dealing with, like -- and

25     state prisons vary.  Like there's some state

Joseph Penn, M.D. — June 11, 2025

1    prisons that we have basically nursing home

2    inmates, that are like bed bound, they're

3    never going to get out of their bed.

4         We have people that are hard core

5    gang members that are violent, aggressive and

6    assaultive.

7         So if you can clarify, again, I'd

8    be happy to try to answer your question.

9    Q    Let's just try to get a sense of

10   the factors that would make the health

11   standard different then.

12        You mentioned size.  You mentioned

13   the composition of the population.

14        Is there anything else that would

15   make a health standard different for one

16   facility as opposed to a different facility?

17   A    Sure.

18        So probably length of stay would

19   probably be the most important thing.

20        A jail, somebody might be there for

21   a few hours.  You know, they're intoxicated.

22   They -- they're assaultive.  They cause

23   problems.  And they bond out and they're out,

24   the next day in court.

25        So the length of stay can vary

Joseph Penn, M.D. — June 11, 2025

Page 140

1      significantly.

2              I would say in a state prison, we

3      have people for years at a time, you know,

4      two to three to five, ten, 20 years, life

5      sentence, multiple life sentences, death,

6      death row.

7              So I think the length of stay in a

8      prison setting -- in a jail setting, people

9      can sleep their time away.  So like you're

10     really not expected to do anything in a jail

11     except go to your court hearing, meet with

12     your lawyer and not cause problems.

13             But in a prison, you probably have

14     to have a job, you have to work.

15             I testified to this earlier,

16     there's more vocational and work and

17     rehabilitative assignment.

18             So I would say from a mental health

19     perspective, the big difference is -- and I

20     think this is where your expert, Dr. Glenda

21     Meyer, might be a little confused, that you

22     can do long-term therapy in a prison setting

23     because people are with you for months to

24     years at a time.  So you could do long-term

25     individual therapy.  You can do long-term

Joseph Penn, M.D. - June 11, 2025

1       group therapy.

2               But you don't really do that in a

3       jail setting because people are in and out so

4       quickly.  You have such high turnover.

5               So I would say that's probably

6       just, from a mental health perspective, the

7       biggest difference would be the type and

8       duration of therapies would differ

9       significantly.

10              Additionally, in a jail setting,

11      they're pre-trial, so they have not been

12      found guilty.

13              And in group therapy, people spill

14      their guts and start talking about their

15      offenses or who was with them or their -- you

16      know, how they're going to plead their case

17      out or whatever.

18              So again, it's really thorny to try

19      to do therapy, group therapy in a jail

20      setting, because they -- they're going to

21      start talking about their crime, how they're

22      going to fight their crime or their charges.

23      So those -- those are some examples that --

24      off the top of my head, that come to mind,

25      that are differences, when surviving mental

Joseph Penn, M.D. - June 11, 2025

1    healthcare, to jail and prison.

2          The other big thing would be, in a

3    jail setting, you have much more

4    intoxication, people are coming off the

5    street high or under the influence, people

6    are going to be withdrawing from drugs or

7    substances in a jail setting.  You're

8    probably not going to have as much of that in

9    a prison setting.  You will have

10   intoxication, where people are doing drugs in

11   a prison setting, but not so much withdrawals

12   from drugs in a prison setting.

13         Then lastly, chronic diseases, in a

14   prison setting you have people that have, you

15   know, hypertension, diabetes, Hepatitis B and

16   C and HIV and other chronic diseases, cancer

17   and what have you.  So you have years to

18   manage those diseases.

19         Whereas in the jail, you're just

20   pretty much continuing whatever treatments

21   they were on or not on in the community.

22         So short-term, I think that's the

23   easiest way to think about it.  Jail is super

24   short term and prison is really long term.

25     Q    Prison sentences are long term and

1    patients tend to be housed in prisons long

2    term.

3              Would you typically expect

4    health -- mental healthcare providers working

5    in the state prisons to also provide longer

6    term care?

7         A    It would depend.

8         Q    What does it depend on?

9         A    Well, just as I told you,

10   something -- you know, some people that do a

11   lot of their time in jail, they might have

12   done five, ten, 15 years, if it's a series

13   crime, in jail, and then they come to prison

14   and they're released within a year or two.

15             So I guess the take-home point is,

16   yes, people stay in prison for long periods

17   of time, but there are some people that come

18   to prison and are only with us six months, a

19   year or two years and that's very short term.

20             What I would say -- I'm sorry.

21   What -- say the question again, please.

22             I apologize, I'm rambling here.

23             MR. SI:  Can you read the question

24        back.

25             (Whereupon the record was read back

Joseph Penn, M.D. - June 11, 2025

1           by the reporter.)

2      A    Thank you.

3           When you say mental health

4    providers, can you clarify what you're

5    referring to?

6      Q    A psychiatrist.

7      A    Okay.  Again, it would depend on

8    the patient.

9           There's some patients that refuse

10   treatment and so we can have the psychiatrist

11   see them.  They might refuse to come to

12   appointments.  They might refuse to take

13   their medications.  So that's an example of

14   something that -- one of the challenges of

15   being in a prison is, you have a lot of

16   refusal.  People refuse to come out for their

17   appointments and they refuse to take their

18   psychotropic medications.

19           The other difference in a prison

20   and jail, for a psychiatrist, would be, in a

21   jail setting, if someone is unstable, you're

22   probably going to send them to a emergency

23   room, unless you're a really large county

24   jail, like, say, New Orleans.  Maybe their

25   parish jail.  But anywhere else, maybe Baton

Joseph Penn, M.D. - June 11, 2025

1    Rouge, too.

2         But any other large county jail, a

3    parish jail in Louisiana, they're probably

4    going to send -- the psychiatrists are not

5    going to manage those patients on site at the

6    jail.  They're going to send them to an

7    emergency room or they're going to send them

8    to the prison system.

9         Whereas, like using Dr. Gamble as

10   an example, she's able to manage all of these

11   people, longer term state prisoners, at the

12   state prison and not always have to refer

13   them off site because she is on site.  She's

14   an on-site psychiatrist, which is very rare

15   in a state prison system.

16   Q     You mentioned several facts that

17   might affect the kind of treatments you would

18   expect in a jail versus a prison.

19        So, for example, you mentioned

20   there are some patients that refuse

21   treatment.  You mentioned size.

22        Would any of those factors affect

23   the standard, the health standard that a

24   psychiatrist that is working in a jail would

25   be expected to live up to as opposed to a

Joseph Penn, M.D. - June 11, 2025

1    psychiatrist who is working in a state

2    prison?

3         A    I'm not sure I know what you mean

4    by "live up to."

5              If you can maybe ask it a different

6    way, I will try to answer your question.

7         Q    So as a psychiatrist, you are held

8    to certain standards for the quality and you

9    mentioned continuity of their care.

10             Is that right?

11        A    No, that's not what I testified to.

12             As a psychiatrist -- as a

13   physician, a medical physician, we're bound

14   to follow the Medical Practice Act, so we

15   have to make sure that we're providing safe

16   and appropriate medical or psychiatric care

17   to our patients.

18             The thing about standards, that's

19   all because of attorneys and lawyers and

20   litigation.

21             The standards are all due to

22   Estelle V. Gamble in litigation, where

23   prisoners are felt to be a vulnerable class.

24   And so you have to provide access to care.

25   Care that's provided to inmates has to be

Joseph Penn, M.D. - June 11, 2025

1    medically ordered.  And if medically ordered,

2    it has then to be availed to them and there

3    has to be access to care and continuity of

4    care.

5              And I would argue that that is true

6    in jails and it's true in prisons, and it

7    applies to psychiatrists working in both

8    systems.

9              So there isn't a higher or lower

10    standard of care.  Jails and prisons'

11    psychiatrists would be doing the same types

12    of treatment to ensure access to care and

13    continuity of care for mental disorders and

14    mental health and suicide.

15        Q    When you're referring to standard

16    of care and -- in your last answer, is that a

17    legal standard, is that a professional

18    standard, is that a medical standard?

19        A    So there's not really an

20    established standard of care.

21              Like every day that I see a

22    patient, I don't think about, does this meet

23    the standard of care, yes or no.  That's a

24    legally-imposed standard.

25              Usually, after there's a bad

Joseph Penn, M.D. - June 11, 2025

1    outcome or there's an alleged bad outcome,

2    usually we're just trying to provide good

3    medical or psychiatric care.

4            And the standard of care stuff has

5    come up, I think, through lawsuits and

6    litigation.

7            And so -- I think I answered your

8    question but short answer is, we try to

9    provide appropriate and medically necessary

10   healthcare to prisoners, whether they're in a

11   jail or prison.  That -- that's access to

12   care and continuity of care.

13   Q    So when you say that you're trying

14   to provide good medical or psychiatric care

15   and necessary and appropriate care, how do

16   you determine whether care is good, medically

17   necessary and appropriate?

18   A    Right.

19           So a couple of things.  So one is

20   the risks, benefits and alternatives to the

21   care.

22           Two, the morbidity and mortality

23   associated with if you provide the care or

24   don't provide the care, what is going to

25   happen.

Joseph Penn, M.D. - June 11, 2025

```
 1            And Mr. Folks is a great example
 2    of, he was doing potentially lethal things to
 3    harm himself or kill himself, even if he
 4    didn't really mean to, on some occasions.
 5    But the goal was to keep, ensure his safety
 6    and to relieve suffering to address any
 7    mental illness or mental disorder and to
 8    clinically stabilize him so he would not
 9    engage in further self-harm or acts of
10    self-harm.
11        Q    So there is some standard that
12    would allow you, as a medical professional,
13    to judge in your medical expertise, whether
14    care was good, appropriate, medically
15    necessary, according to those factors that
16    you just outlined?
17        A    No, not necessarily.
18            And I think you look at what would
19    a reasonable or prudent provider or
20    practitioner with the same level of knowledge
21    or training in their shoes, what would they
22    have done.  And I think it's a challenge
23    because there's very few prison systems
24    across the country that have an on-site
25    psychiatrist physically working in a prison.
```

Joseph Penn, M.D. - June 11, 2025

1          Most healthcare that's provided to
2    prisoners nowadays is done via telepsych,
3    telepsychiatry.
4          So the fact that Dr. Gamble is on
5    site five days a week, seeing patients,
6    meeting with staff, knows these patients by
7    first name basis, and they know him by his
8    last name, that's just remarkable.
9          So those were examples of how I --
10   my opinion and I wrote this in my report, I
11   think Dr. Gamble did everything that he could
12   within his ability and the other mental
13   health and medical staff and the custody
14   staff, to try to ensure Mr. Folks' safety and
15   to keep him from killing himself.
16   Q    Earlier, you had mentioned the
17   community health standard.
18         So what is a reasonable or prudent
19   provider or practitioner with the same level
20   of knowledge or training who works in a
21   community health facility different than what
22   a reasonable prudent provider with the same
23   level of knowledge would do in a correctional
24   facility?
25   A    I would say it would depend.  I

Joseph Penn, M.D. - June 11, 2025

1    can't answer yes or no, because you don't see

2    the extent and severity of this kind of

3    lethal self-harm in community settings.

4           This is something -- this is an

5    animal, if you will, you only see in jails,

6    prisons, and state forensic units.

7           You don't see this in -- I've

8    worked in community health center settings.

9    You don't see this extent of severe stabbing

10   through someone's neck or cutting open their

11   abdomen and putting a piece of sharp metal in

12   their bowel.  You don't see that in a

13   community setting.  Because it's kind of like

14   you're comparing apples and oranges.

15          Well, in this case, the standard of

16   care would dictate -- if someone were to show

17   up to a community health center, that's

18   self-harming, like Mr. Folks, they would have

19   sent him to an emergency room.  They would

20   not be managing him in a community health

21   center setting.  They would send him to an

22   emergency room.

23      Q   And under your understanding of the

24   health standard, that would allow you, as a

25   medical professional, to judge whether that

1    care was good and appropriate, would sending

2    a patient, who self-harms, to the emergency

3    room be an appropriate response, under that

4    health standard?

5         A    So I don't know if I feel

6    comfortable good or appropriate.  That's

7    seems kind of subjective.

8              If you could ask me a different

9    way, I'll be happy to try to answer your

10   question.

11        Q    Sure.

12             So I was just borrowing what you

13   said earlier.

14             You've mentioned there's some sort

15   of standard that you, as a medical

16   professional, have to be held to and it has

17   something to do with what a reasonable

18   medical professional, in your shoes, would

19   do, given a patient's circumstances.

20             So if a reasonable medical

21   professional, in a community health setting,

22   were confronted with a patient like

23   Mr. Folks, what would the standard for

24   providing good and appropriate care or

25   providing reasonably necessary care in those

Joseph Penn, M.D. - June 11, 2025

1    circumstances require?

2         A    So I think I testified to this

3    earlier.

4              You don't see these kind of

5    patients in community health settings,

6    medical or mental health settings.

7              But if you did, they would probably

8    have to call 911 and call for rescue, like an

9    ambulance, and possibly police, and the

10   person would probably have to be restrained

11   and taken against their will to an emergency

12   room.

13             And then probably same thing in the

14   emergency room, a lot of these folks might

15   try to sign out against medical advice, that

16   they probably would have to be held against

17   their will on a hold until a mental health --

18   excuse me -- a mental health professional

19   could assess them and make a determination of

20   how to keep them safe.

21             And in an emergency room setting --

22   I've worked in many -- emergency room

23   physicians are real quick to give emergency

24   medications and to use seclusion and

25   restraints if and when needed.

Joseph Penn, M.D. - June 11, 2025

```
 1        Q    Would the community health provider
 2   seclude and restrain that patient?
 3        A    If needed, yes.  Or the police or
 4   the hospital security or all the above.
 5        Q    So I'm just trying to understand
 6   the kind of care Mr. Folks would have
 7   received if he were in a community health
 8   facility as opposed to being at LSP.
 9             Do you believe that that care would
10   have been different if he were held at a
11   community health facility?
12        A    Could you define -- I need to
13   really get my head around how you're defining
14   community health facility.
15             Are you saying a hospital, are you
16   saying a psychiatric hospital, are you saying
17   a medical hospital, are you saying an
18   emergency room?
19             I need to understand how you're
20   defining a community health facility.
21        Q    In your report, you use the term
22   "community health standard."
23             Is that right?
24        A    If you can draw my attention to
25   where.
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 844-483-2643

Joseph Penn, M.D. - June 11, 2025

```
 1         Q     This is on page 34, under numeral
 2    1.
 3               Starting with, quote, "availed to
 4    Mr. Folks was well within accepted community
 5    and correctional health standards."
 6               Do you see that?
 7         A     I'm sorry, I'm having trouble
 8    pulling it up.
 9         Q     Take your time.
10         A     You said page 34?
11         Q     Thirty-four.
12         A     Okay.  I see it.
13         Q     What did you mean by "accepted
14    community and correctional health standards"?
15         A     Okay.  So if Mr. Folks was engaging
16    in severe self-harm, like he did in the
17    Parish Jail, and also in the Angola LSP
18    facility, in the community he probably would
19    have been sent to an emergency room.
20               Whether he was seen in a primary
21    care, like a family medicine, or primary
22    community health clinic, is what I'm trying
23    to say, or if he was seen in a mental health
24    center or if he was -- he would have probably
25    been sent to an emergency room by police,
```

Joseph Penn, M.D. - June 11, 2025

1    restrained, given medications and required an

2    emergency hold or an evaluation for an

3    emergency hold.

4          If he was in a psychiatric

5    hospital, it would probably depend -- I doubt

6    he would have been in a psychiatric hospital

7    because of his legal status.

8          But, hypothetically, if he would

9    have been placed into a community or

10   profit -- for profit or private psychiatric

11   hospital, he would have been placed in

12   seclusion and restraints.  And whenever he

13   self-harmed, he would have been sent to an

14   emergency room.

15         And then, if he was in a state

16   hospital, same thing, he probably would have

17   been placed in seclusion and restraints.

18         And if he cut or self-harmed

19   seriously, he would have been sent to an

20   emergency room.

21         So that's what I'm referring to,

22   community.  Whether it be local or state,

23   profit, nonprofit, public, VA, the Veterans

24   Administration, same thing, he probably would

25   have been seclusion and restraints.  And if

Joseph Penn, M.D. - June 11, 2025

1    and when he cut or self-harmed, he would have

2    been sent to an emergency department.

3         Q    So the type of treatment that

4    Mr. Folks probably would have received in the

5    community is what is considered the community

6    standard, the community health standard?

7         A    So I would not agree with that.

8              I would say each of those

9    facilities probably has a different level of

10   care, different staffing, different mission.

11   It's complicated because Mr. Folks was there

12   for legal issues.

13             Most people that are in all those

14   facilities that I mentioned earlier, that I

15   testified to, they're voluntary, individuals

16   seeking healthcare.  They're not pre-trial

17   detainees.  So -- except for maybe the

18   forensic unit, if they were undergoing, say,

19   a competency to stand trial or competency to

20   stand trial restoration, that would probably

21   be the nearest class of individuals.

22             And I'm prepared to testify today

23   that if Mr. Folks was a pre-trial detainee in

24   a forensic unit undergoing competency to

25   stand trial evaluation and/or restoration and

Joseph Penn, M.D. - June 11, 2025

1    he engaged in the same behaviors of severe

2    self-harm and lethal suicide attempts, the

3    forensic unit would have done exactly what

4    the state prison did.

5        Q    Is there a baseline level of care

6    that must be provided at each of these

7    facilities?

8        A    I'm not sure I understand.  You

9    said baseline.  That's not a term that I'm

10    familiar with.

11        Q    Sure.

12            So I assume that -- and please tell

13    me if you disagree -- if you had a patient

14    like Mr. Folks who were acutely suicidal and

15    threatening to self-harm, that the mental

16    health staff at any of these facilities could

17    just not do nothing.

18            Is that right?

19        A    So the problem with that is a

20    community medical and health facility, heath

21    center, they're probably not going to have

22    mental health staff, so they're going to be,

23    you know, family physicians or nurse

24    practitioners but they're not mental health

25    staff.

Joseph Penn, M.D. - June 11, 2025

```
1              So as soon as they hear suicide,
2     self-harm, they're going to refer him
3     elsewhere.
4              I would say psychiatric hospital,
5     VA psychiatric hospital or unit, or state
6     hospital, yes, they are prepared and equipped
7     and the healthcare staff would do the exact
8     same thing.  They would do an intake
9     screening, an assessment, probably by nursing
10    staff, like a nursing assessment, and then
11    mental health evaluations and ongoing mental
12    health and psychiatric evaluations and
13    treatment.
14         Q    When you say they probably would
15    have done those things, is there anything
16    else that they should be doing?
17         A    I understand Mr. Folks took his
18    medications voluntarily.
19              But if Mr. Folks were not to take
20    his medications voluntarily or a similar
21    patient in one of those settings, they have a
22    different way of forcibly medicating people
23    against their will.  There's some nuances
24    that are different in private or public
25    hospitals compared to prison units or prison,
```

Joseph Penn, M.D. - June 11, 2025

1      state prisons.

2            Q    Do these facilities ever -- strike

3      that.

4            Do psychiatric hospitals ever put

5      patients in seclusion and restraints?

6            A    Yes.

7            Q    And when they put a patient in

8      seclusion and restraints, are there standards

9      that would govern what they're supposed to do

10     to that patient?

11           A    Yes.

12           Q    What are those standards?

13           A    So what I understand is, the

14     overarching standard for most hospitals would

15     be the Joint Commission and there's very

16     clear standards that they have.  And I'm not

17     an expert in that, so I don't -- I don't

18     pretend to know their standards.

19           But Joint Commission accredits

20     hospitals and medical and psychiatric

21     hospitals in the community that are not

22     prisons.  And so yes, you would have to

23     comport with their standards and have

24     policies and procedures in place and meet

25     those standards to be able to have a Joint

Joseph Penn, M.D. - June 11, 2025

1    Commission accreditation for your hospital or

2    psychiatric unit.

3         Q    When you say the Joint Commission,

4    what commission are you referring to?

5         A    So that's the name of the

6    organization.  It's called the Joint

7    Commission.

8              It used to be JACO or something

9    like that, Joint Commission for Accreditation

10   for hospital organizations, something like

11   that.  But it used to be JACO, but now it's

12   just called The Joint Commission.

13        Q    Is there a similar type of

14   commission that would set standards for how

15   restraints are used in correctional

16   facilities?

17        A    Not a national commission.  I think

18   every -- every state -- I can only speak for

19   Texas.  I don't know about Louisiana.

20             But I know Texas has a jail

21   commission, the Texas Jail Commission.  And

22   their job is to oversee the standards,

23   hygiene and safety issues regarding jails,

24   because there's like 220 of those in Texas.

25             I don't know if there's a similar

Joseph Penn, M.D. - June 11, 2025

```
 1      entity in Louisiana or not.

 2              But to answer your question, the

 3      only -- there's actually three different

 4      entities that accredit jails or prisons.

 5              And that would be the American

 6      Correctional Association, ACA.  And I believe

 7      Louisiana has -- Angola, in particular, has

 8      accreditation under ACA.

 9              There's also the National

10      Commission on Correctional Healthcare, NCCHC,

11      that's national.

12              And then lastly, such facilities

13      might have CALEA.  It's like something about

14      law enforcement organizations, but that's

15      more for jails.  They get C-A-L-E-O (sic)

16      accreditation.

17         Q    Is it your understanding that these

18      commissions, so the Joint Commission for

19      accreditation and psychiatric hospitals, the

20      ACA, the NCCHC, CALEA, is it your

21      understanding that these commissions set

22      standards that medical professionals are

23      expected to abide by?

24         A    I would say yes.

25              The only one that I'm not certain
```

Joseph Penn, M.D. - June 11, 2025

1      about is CALEA.  I think it's CALEA,

2      C-A-L-E-A.

3              I know for certain NCCHC does.

4      Joint Commission does.

5              ACA is more correctional in focus,

6      but they do have healthcare standards also.

7              But NCCHC is the only -- to the

8      best of my knowledge, is the only accrediting

9      body that solely provides healthcare

10     standards and healthcare accreditation for

11     jails and prisons nationally.

12         Q    Are they informed by appropriate

13     medical practice, the standards?

14         A    Yes.

15         Q    Are they informed by anything else?

16         A    Yes.

17         Q    Like what?

18         A    Well -- so, for example, during

19     COVID, when we have things that kind of come

20     out of nowhere, like COVID, for example, or

21     transgender, gender dysphoria, things can

22     happen in jails and prisons that people

23     weren't expecting, like multi-resistant

24     tuberculosis, drug -- sorry, multi-drug

25     resistant tuberculosis.

Joseph Penn, M.D. - June 11, 2025

1              So you have entities that you'll

2      only see in jails and prisons.  And so, yes,

3      those, aside from medical practice, you have

4      to think about the illnesses that you see and

5      mainly in correctional settings, like

6      infectious diseases, mental illness, serious

7      mental illness, drug, drug use.

8              So it is informed by medical

9      practice but it's also informed by your

10     patient population and the illnesses that

11     they carry or they have.

12        Q    Are they -- are those statements,

13     are they based on any outside authorities?

14             So for example -- let's just take

15     one in particular.

16             So, for example, the NCCHC

17     standards for the use of seclusion and

18     restraints that you mentioned, is that based

19     on any outside sources?

20        A    Sorry.  Which standards are you

21     referring to, please?

22        Q    You mentioned there were NCCHC

23     standards for the use of seclusion and

24     restraints.

25        A    Well, they -- there -- so there's

Joseph Penn, M.D. — June 11, 2025

1    jail standards, there's — I've testified to

2    this earlier.  There's jail, prison,

3    juvenile, opioid and mental health standards.

4         So if you can maybe direct me which

5    standard you're referring to, then I can try

6    to answer your question.

7         Q    Let's talk about the prison

8    standards.

9         A    Okay.

10        Q    Are those based on any outside

11   sources?

12        A    So NCCHC, when they update and

13   revise their standards, they do look at best

14   practices in healthcare and it's a

15   multi-disciplinary team of nurses,

16   physicians, that are maybe more primary care,

17   psychiatrists, I've been on several of those,

18   standard revision, task forces, pharmacists.

19        They have different people on those

20   healthcare administrators.  And yes, we look

21   at what are current practices in the

22   community and VA settings and other

23   healthcare settings, yes.

24        Q    Okay.  I'd like to show you a

25   document, which I will enter as — I believe

1     we are on Exhibit 4.

2            (Whereupon the above mentioned was

3        marked for Identification.)

4            THE VIDEOGRAPHER:  We are off the

5        record.

6            The time is 12:13 p.m.

7            (Lunch recess taken.)

8            THE VIDEOGRAPHER:  We are back on

9        the record.

10           The time is 1:03 p.m.

11       Q    Okay.  Dr. Penn, I was just about

12   to, before we took a break, show you another

13   document, which I am dropping in the chat

14   now.

15           And I will enter this as Exhibit 4.

16           Let me know when you have it open,

17   please.

18       A    I'm just waiting for it to

19   populate.

20       Q    Sure.

21           (Whereupon a discussion was held

22   off the record.)

23       A    Okay.  Got it.  Thank you.

24       Q    Do you recognize this?

25           Please feel free to scroll through.

Joseph Penn, M.D. - June 11, 2025

```
 1          A    Just one second, please.  Sorry,
 2     someone is knocking on my door.  I'm just
 3     going to mute.
 4               (Whereupon a discussion was held
 5     off the record.)
 6          A    My apologies about that.
 7               So "NCCHC, the Standard for Mental
 8     Health Services 2015," yes.
 9          Q    Okay.  Earlier we had been
10     discussing a few NCCHC standards for mental
11     health in correctional facilities.
12               Is this one of the standards that
13     we had been discussing?
14          A    Yes.
15          Q    Let's turn to Roman V in this
16     document.
17               Do you see under "tank force
18     members," is that your name listed?
19               I think it's fifth or fourth.
20          A    (Witness reviewing.)
21               Yes, I'm on there.
22          Q    So, am I right in understanding
23     that you were part of the group that crafted
24     these standards?
25          A    Yes.
```

Joseph Penn, M.D. - June 11, 2025

```
 1        Q    Let's turn to page Roman Numeral
 2   VII, so V-I-I.
 3             It should be the page that starts
 4   with "Preface."
 5             Do you see the line?  It's the
 6   third paragraph that reads, "These standards
 7   are NCCHC's recommended requirements for the
 8   proper management of a correctional mental
 9   health services delivery system."
10        A    (Witness reviewing.)
11             I'm so sorry.
12             And where do you -- you said the
13   preface?
14        Q    Yes, the preface.
15        A    Okay.
16        Q    It should be Roman VII.
17        A    Okay.  And so what was the line you
18   were asking about or --
19        Q    First sentence, third paragraph
20   down, "These standards are intended for
21   prison -- oh, I'm sorry.
22             Sorry.  Second paragraph down,
23   second sentence, "These standards are NCCHC's
24   recommended requirements for the proper
25   management of a correctional mental health
```

Joseph Penn, M.D. - June 11, 2025

1      services delivery system."

2              Do you see that line?

3      A    Yes.

4      Q    What does that mean?

5      A    Okay.  Well, first of all, these

6      standards are outdated.

7              I was actually on the current

8      revision to be coming out in a couple months.

9              So there's going to be kind of, if

10     you will, a new and improved mental health

11     standards.

12             But what is important is, what the

13     standards that apply to a prison would be the

14     prison standards.

15             These mental health standards are

16     meant for mental health facilities in prison

17     settings.

18             So basically -- let me back up.

19             Number 1, the prison system,

20     Louisiana Department of Corrections, is not

21     NCCHC accredited, so they would not, first of

22     all, have to meet these standards.

23             Two, these mental health standards

24     are geared more like, say, Elaine Hunt, which

25     is a dedicated psychiatric facility, or they

Joseph Penn, M.D. - June 11, 2025

1    have a psychiatric unit at Elaine Hunt, than

2    these standards would apply at that facility.

3         But they would not apply just to a

4    regular non-mental health facility.

5    Q    Now, let's look at the third

6    paragraph, the first line of that.

7         Do you see where it reads, "These

8    standards are intended for prisons and jails

9    of any size?

10   A    Yes.

11   Q    So in light of what you just told

12   me, that these standards are only meant to

13   apply to facilities like Elaine Hunt, what

14   does this sentence mean?

15   A    Sure.

16        So what it means is, if you're --

17   and I guess I need to do a deeper dive.

18        The reason why mental health

19   standards were created was the recognition

20   that more people, like Mr. Folks, that have

21   severe self-harm or cutting or self-injuring,

22   or have a serious mental illness, say, like

23   schizophrenia, which Mr. Folks does not have,

24   but serious mental illness, jails and prisons

25   need to be put on notice that they have

Joseph Penn, M.D. - June 11, 2025

1      patients that have mental health needs.

2              The -- there were some facilities

3      that could not meet NCCHC accreditation

4      because of their medical or nursing care, but

5      they wanted to meet it for mental healthcare.

6              And so that's kind of what

7      happened, was facilities -- well, I don't

8      know if lobbying would be a good word, but

9      they requested of NCCHC of, hey, if we're

10     providing good enough mental healthcare in

11     our mental health facilities, could we get

12     NCCHC accreditation under the mental health

13     standards.  So they might not meet it for the

14     medical, under the jail or prison standards,

15     but they could meet it under the mental

16     health standards.

17             So I think the new version that's

18     coming out this year will spell that out even

19     more clearly.

20             So -- but it's a moot point because

21     the Louisiana system is not NCCHC accredited.

22        Q    Has the Louisiana state prison

23     system ever sought NCCHC accreditation?

24        A    I don't know.

25        Q    What's the purpose of these

Joseph Penn, M.D. - June 11, 2025

1      standards?

2           A     Well -- the mental health

3      standards?

4           Q     Yes.

5           A     Okay.  Yeah, I just testified to

6      that.

7                 They're to help facilities or

8      systems that want to achieve mental health

9      accreditation under NCCHC.  Again, they might

10     not be able to meet it under medical or

11     dental or nursing, but they feel that their

12     mental health services are so robust, that

13     they could meet accreditation under the NCCHC

14     mental health standards.

15                And so that's -- that's kind of

16     like -- it's like a carve out, is the easiest

17     way to think about it.

18                Just so mental health can get kind

19     of their kudos for doing a great job in the

20     event that medical and the non-psychiatric or

21     psychological care is not up to snuff.

22          Q     Let's back up.

23                What is the purpose of having NCCHC

24     standards for any type of facility, so

25     medical standards, mental health standards?

Joseph Penn, M.D. - June 11, 2025

1        A    Sure.

2             Actually, it details it there in

3    the preface, if you refer back to that.

4             It talks about how in the 1970s,

5    the healthcare in jails and prisons in the

6    United States was so abysmal that the

7    American Medical Association partnered and

8    created kind of this nonprofit organization,

9    NCCHC.

10            And so the purpose of having

11   standards is to help facilities know what

12   kind of benchmarks are and to provide

13   guidance to help them develop their policies

14   and procedures and to know, this is what you

15   need to provide just to be able to achieve

16   accreditation.

17       Q    Other than achieving accreditation,

18   are there any other goals that these

19   standards purport to serve?

20       A    Yes.

21       Q    What are those?

22       A    So again, it helps -- it helps, for

23   example, if you have a system where budgets

24   are being cut.  And not to point fingers, but

25   healthcare in prisons and jails is not the

Joseph Penn, M.D. - June 11, 2025

1    top priority for a lot of legislators.  And

2    so when there's tight budgets, they can come

3    in and say, you need to cut 10 percent of

4    your staff, or you need to reduce your budget

5    by 10 percent.

6            I've been through two of those in

7    Texas.  So that happens to systems.

8            And so long story short, having the

9    NCCHC or the ACA standards, they help explain

10   to legislators, who are not clinical, or they

11   may be clinical, the need, the why you need

12   to provide healthcare to inmates.

13           And I testified earlier that

14   inmates are a protected class, under the --

15   you know, under the U.S. Supreme Court ruling

16   in Estelle V Gamble.

17           And so it's a way to kind of

18   explain and justify to county commissioners

19   or to budget people of why you need to pay

20   more and have more staff, nursing, medical,

21   dental and other healthcare staff.

22   Q    Earlier, you mentioned that certain

23   prison systems and facilities can seek NCCHC

24   accreditation.

25           Why would a prison seek to do that?

Joseph Penn, M.D. — June 11, 2025

Page 175

1          A    As noted in the first page or two

2    of the NCCHC standards and also on their home

3    page, it's a voluntary accreditation.

4               So I testified earlier, Joint

5    Commission, a lot of Medicare, Medicaid and

6    private commercial insurance companies won't

7    pay for hospital care if it's not a Joint

8    Commission accredited hospital.

9               So you have to get Joint Commission

10   accreditation if you're going to bill for

11   your services.

12              Jails and prisons don't bill

13   anyone.  They have to pay for their own

14   healthcare.

15              So again, NCCHC and the standards

16   are a way to help educate prison people, jail

17   people and public policy people of, hey, you

18   need to fund healthcare and healthcare staff

19   and services or else you're going to risk

20   lawsuits and liability.

21         Q    So a prison that has an NCCHC

22   accreditation would be more likely to be able

23   to tell a state government that they require

24   funding for healthcare and healthcare staff?

25         A    It's possible, yes.  But it's not

Joseph Penn, M.D. - June 11, 2025

1    definitive.  It's not cause and effect.

2              Like just because you're NCCHC

3    accredited, that doesn't mean you're going to

4    avoid lawsuits, that doesn't mean you're

5    going to get steady funding from your

6    legislature.  It is what it is.  If you have

7    accreditation you've achieved it but it's

8    only good for three years.  And only 10 -- 5

9    to 10 percent of facilities nationally are

10   NCCHC accredited.

11             It's kind of the Rolls Royce.  It's

12   not easy to achieve and every third year you

13   have to reapply to get recertified.  I'm

14   sorry, not certified, reaccredited.

15             So it's a daunting task.  It's not

16   a one and you're done.  You have to do it

17   every three years, similar to ACA

18   accreditation.

19       Q    I'm seeing in the preface, again,

20   these standards have helped correctional

21   facilities improve the mental health of their

22   inmates, increase the efficiency of their

23   mental health services delivery.

24             Do you believe that NCCHC

25   accredited facilities are facilities that

Joseph Penn, M.D. - June 11, 2025

1    comply with NCCHC standards such that they

2    could be accredited, have better mental

3    health services than facilities that don't?

4        A    I'm not sure how you're defining

5    "better."

6            If you can make it more clear, put

7    it into a term that -- we don't really use

8    better in healthcare.

9            So if you can help me.  I want to

10   answer your question but I -- better seems

11   kind of subjective.

12       Q    More effective, is that more

13   objective?

14           How about reduces -- reduces the

15   likelihood of, earlier you had said, rates of

16   mortality -- morbidity, I'm sorry.

17       A    Well, actually, you're probably

18   going ask me about this.

19           There's -- there's a recent study

20   that was just published, the Harvard Study.

21   That's how they refer to it.  They actually

22   proved that I've been very active in NCCHC

23   for 25 years or so.

24           And NCCHC used to kind of

25   promulgate that if you become NCCHC

Joseph Penn, M.D. – June 11, 2025

1    accredited, you have a lower risk of being

2    sued, you know, in state or federal court.

3              But the Harvard study, which I

4    think was published a month or two months

5    ago.  Is now the first study that I'm aware

6    of where Harvard University researchers did

7    an actual scientific study and did look at

8    facilities and they did find that facilities,

9    jails or prisons that were NCCHC accredited,

10   did better with regard to lawsuits and

11   morbidity and mortality and such.

12             But again, this is just one study

13   and it's only been published recently.

14        Q    The NCCHC standards that we're

15   looking at contain a standard regarding the

16   use of seclusion and restraints.

17             Is that correct?

18        A    They do but they're very clear.

19   They define between custody restraints and

20   therapeutic or medical restraints.

21        Q    Just talking about clinical

22   restraints, let's turn to page 133.

23             It won't be 133 in the document

24   because this is just an excerpt but I think

25   you'll see it.

Joseph Penn, M.D. - June 11, 2025

1           This is the page that has

2    "Restraint and Seclusion" at the top.

3        A    I'm sorry.  What page, please?

4        Q    It's 133 in the scan, so I'm not

5    sure what page it would be in the PDF file.

6           But it has "Restraint and

7    Seclusion" at the top.

8           MR. BLANCHFIELD:  Can you tell me

9       how many page documents this is?

10          I'm not sure I have the right

11       document.

12          MR. SI:  Yeah, I will pull it up on

13       my computer so I can look at it with

14       you.

15       Q    There are 11 pages in the PDF file.

16          MR. BLANCHFIELD:  That's what I

17       have, yeah.

18          MR. SI:  I'm looking at page 10.

19       Q    If you can go to page 10.

20          MR. BLANCHFIELD:  Great.  Thank

21       you.

22       A    I'm there.  Thank you.

23       Q    Is this the NCCHC standard for

24    clinical restraints and seclusion?

25       A    This is the standard for mental

Joseph Penn, M.D. - June 11, 2025

Page 180

1     health standards.

2              Again, this is not the standard

3     for -- I just wanted to drive the point home.

4     This document MHI-01 Restraint and Seclusion,

5     this is from the NCCHC Mental Health

6     Standards.

7              This is not the same standards that

8     would be in the jail health standards or the

9     prison health standards.  And those are much

10    more current, as recent as 2018 and 2022.

11             So this is outdated.

12             This document is, number 1,

13    outdated.

14             Two, it's from an incorrect

15    standard.  It's from the mental health

16    standards not the prison standards.  That's

17    what would apply to Louisiana, if they were,

18    in fact, NCCHC accredited.

19    Q    So let's just get your opinion on

20    how some of those jail and prison standards

21    would differ from the standard that we're

22    looking at.

23             Do you see under Compliance

24    Indicators, numbered 1D, "The treatment plan

25    provides for removing patients from

Joseph Penn, M.D. — June 11, 2025

1    restraints or seclusion as soon as possible"?

2    　　A　　Yes, I see that.

3    　　Q　　So what does that mean in this

4    context for the mental health standards?

5    　　A　　Well, again, I need to drive the

6    point home, this is referring to mental

7    health units or a behavioral health facility

8    or an in-patient psychiatric prison unit, not

9    what is going on at the Louisiana

10    penitentiary, state penitentiary at Angola.

11    That is not a dedicated in-patient

12    psychiatric facility.

13    　　　　　So I don't know if Elaine Hunt is.

14    I -- my sense is, it probably is, if they

15    have more of a mental health designation.

16    　　　　　But that -- I don't know

17    definitively if that's true.  But the point

18    is, the Angola is not a dedicated behavioral

19    health facility or a in-patient psychiatric

20    prison unit.

21    　　Q　　I just want to get your sense of

22    what the differences are between the

23    standards then.

24    　　　　　So do you see, under 1D, under

25    Compliance Indicator where it says, "The

Joseph Penn, M.D. - June 11, 2025

1    treatment plan provides for removing patients

2    from restraints or seclusion as soon as

3    possible"?

4         A    Yes, I see that.

5         Q    Is this different from the jail or

6    prison standard that, in your opinion, would

7    apply to Angola?

8         A    You would have to show me the most

9    current version of the jail or prison

10   standards, and I would be happy to compare

11   those and tell you if they're the same or

12   different or slightly different.

13            Sorry, as we sit here today, I

14   don't know off the top of my head how they're

15   similar or different.  I don't have like a

16   track of changes document, so I could

17   speculate but I think you want to hear my

18   sworn testimony.

19        Q    In your role as a director of the

20   NCCHC, do you expect that the jail or prison

21   standard would be lower than this standard?

22        A    So I'm not a director for NCCHC.

23   I'm -- I serve on the board of

24   representatives.  I've been -- I'm a delegate

25   from the American Academy of Psychiatry and

Joseph Penn, M.D. - June 11, 2025

1    the Law.  I'm not in any way a director.

2          I do serve on the accreditation

3    committee also but I just wanted to clarify

4    that if you can ask your question a different

5    way, I don't -- I don't want to be

6    mischaracterized.  I don't have any

7    leadership or directorship role for NCCHC.

8      Q    You said in your CV you're on the

9    Commission that's responsible for updating an

10   NCCHC policy.  Right?  I actually don't

11   recall which one.

12     A    So I've been appointed to --

13   they're called work groups.  I believe

14   they're called work groups.

15          But again, I've been appointed as

16   part of a large committee, 10, 15 people, to

17   help review standards.  But again, I'm not in

18   any way in a directorship.

19          I think I was the chair of the

20   juvenile health standards but I'm not in a

21   leadership role in jail or the prison or the

22   standards.  I'm just a committee member.

23     Q    Are you aware of any correctional

24   facilities that are accredited under these

25   standards that we're looking at, the mental

Joseph Penn, M.D. - June 11, 2025

1    health standards for correctional facilities?

2        A    As we sit here today, I think I

3    know maybe of one for certain, but I don't

4    know nationally how many there are and the

5    names of them.  That's not something I'm

6    privy to.

7            When we do reviews on the

8    accreditation committee, the review is

9    blinded, so we never really know the name of

10   the facility.

11           I believe there's a facility in

12   California, in the California Department of

13   Corrections, CDCR and Rehabilitation,

14   Tehachapi.

15           And I can't -- I don't know if I

16   can spell that.  But it's out there.  And I

17   think they've got a mental health

18   accreditation.

19           But I don't believe there's any

20   other facilities.  I could be wrong on that.

21   It changes.

22           Our accreditation committee meets

23   four times a year.  And so, as we sit here

24   today, I know that facility had gone for and

25   achieved mental health accreditation.

Joseph Penn, M.D. - June 11, 2025

1              But I'm not aware of -- I can't

2    recall or I don't have access to any other

3    facilities that have NCCHC mental health

4    accreditation.

5         Q    Is that the -- that Tehachapi

6    facility you mentioned, is that a state

7    prison, a county jail, what kind of facility

8    is that?

9         A    It's a state prison, a CDCR, the

10   California prison system.

11        Q    Just to clarify your testimony

12   earlier about how these standards apply

13   versus the NCCHC jail and prison standards,

14   is there any bar to a facility like Angola,

15   like LSP, to achieving accreditation under

16   these standards that we're looking at?

17        A    I'm not sure I know what you mean

18   by "a bar" or bars.

19        Q    A rule under the NCCHC

20   accreditation system that would say Angola is

21   not the kind of facility that would achieve

22   this kind of accreditation under the mental

23   health standards?

24        A    So I would say I'm -- that would be

25   a question for the director of accreditation

Joseph Penn, M.D. - June 11, 2025

1    for NCCHC.

2              I believe that any jail or

3    prison -- well, let me back up.

4              I don't know.  That's a question

5    for the accreditation director of NCCHC.

6              I don't know which program is

7    eligible or ineligible for NCCHC

8    accreditation for mental health standards.

9              I was under the belief that you had

10   to be a mental health facility or unit or

11   have a designated mental health treatment

12   mission, like have a pod or a wing where you

13   have inmates that are mentally ill, similar

14   to like an in-patient facility.

15             But -- so as we sit here today, I

16   don't know if a facility like Angola, which

17   is a state prison, not a mental health

18   facility, or state prison psychiatric

19   facility, I don't know if they can apply for

20   or would be eligible for NCCHC mental health

21   accreditation or not.

22        Q    But to clarify, the Tehachapi

23   facility that you mentioned earlier, that

24   does have accreditation under the standards

25   that is a state prison.  Correct?

Joseph Penn, M.D. - June 11, 2025

1      A    Yes.  I actually have been there
2  and I believe they have psychiatric
3  in-patient.  They have a pod there.  They
4  have dedicated wings that have in-patient
5  psychiatric patients.
6      Q    Just to make sure that we can
7  access the other standards that you were
8  referencing for jails and prisons after this,
9  you mentioned there's a 2018 version of the
10  jail and prison healthcare standards.
11          Is that right?
12      A    I believe.  Don't hold me to the
13  numbers.  I think it's 2015, 2018, and then
14  because of COVID, it kind of got messed up,
15  and I think it's 2022.  And now they're
16  currently updating the jail and prison
17  standards, as we sit here today, and they
18  should be out later this year.
19      Q    Do those standards have -- do those
20  books of standards have standards that apply
21  to the provision of mental healthcare in
22  jails and prisons?
23      A    Yes.
24      Q    Do they also contain standards that
25  are not related to mental healthcare?

Joseph Penn, M.D. – June 11, 2025

1        A    Yes.

2        Q    If you had to estimate, what

3    proportion of the standards in those books of

4    standards are about mental healthcare?

5        A    Five to 10 percent.

6        Q    So is it fair to say that they're

7    primarily related to non-mental health

8    operations in jails and prisons?

9        A    No.   What I would say is, a lot of

10    it has to do with like electronic medical

11    records or written medical records or

12    infection control, like screening inmate

13    workers that work in the kitchen, so they

14    don't have infectious disease or parasites or

15    ectoparasites.

16            There's things in there about

17    pregnant females or credentialing of staff.

18    So there's a lot of kind of administrative

19    things, research, research with inmates,

20    diets, medical diets.

21            So I would say probably 75 to

22    85 percent of that might just generally be

23    medical administration, the need for

24    morbidity and mortality reviews, continuous

25    quality improvement, peer reviews, those sort

Joseph Penn, M.D. - June 11, 2025

Page 189

1      of things.

2             And then they talk about dental,

3      medical, nursing and then mental health.

4             So mental health is probably one of

5      the smallest pieces, maybe 5 to 10 percent,

6      but seclusion and restraints is definitely

7      part of that.

8      Q    There's a policy on seclusion and

9      restraints in that 2018 jails and prisons

10     policy?

11     A    Yes, on clinically ordered or

12     medically ordered seclusion and restraints,

13     yes.

14     Q    Those policies would be different

15     from the ones that we were just looking at?

16     A    I don't know.

17     Q    I'm going to ask you to turn back

18     to your report very briefly.

19            This was Exhibit 3.  I believe on

20     page 37.

21            I will give you a second to get

22     there.

23     A    I'm sorry, page 37?

24     Q    Thirty-seven?

25     A    Okay.  I'm there.

Joseph Penn, M.D. - June 11, 2025

1          Q     In what is labeled as paragraph

2     number 12 here, do you see the sentence that

3     reads, "There are a variety of mental

4     disorders that may be associated with

5     self-harming behaviors.  There are also many

6     instances where individuals engage in

7     self-harm but have no mental disorder."

8               Do you see that?

9          A     Yes.

10         Q     So how do you go about assessing

11    the cause of a person's self-harm?

12         A     Sure.  That's exactly what happened

13    in this case.  There's a medical evaluation,

14    nursing, medical and then medical treatment

15    for the bleeding or self-injury or harm and

16    then a psychological or mental health

17    evaluation followed by a psychiatric

18    evaluation.

19               And so Dr. Gamble looked at all

20    those different issues and he looked at, you

21    know, is there bipolar disorder, is this

22    person manic, are they psychotic, do they

23    have schizophrenia.

24               He kind of went through like a

25    laundry list in his head of different

Joseph Penn, M.D. - June 11, 2025

Page 191

1    diseases or disorders, mental disorders that

2    might be associated with self-harming

3    behaviors.

4            And Dr. Gamble validated the past

5    diagnosis of borderline personality disorder

6    and then he gave another diagnosis, which is

7    kind of new.  It's only been in the DSM for a

8    bit.  It's the impulse control.

9            It used to be impulse control

10   disorder not otherwise specified.  It's got a

11   fancy new title.

12           But anyway, Dr. Gamble diagnosed

13   Mr. Folks with those two in addition to

14   antisocial personality disorder.

15   Q    You wrote earlier that you

16   concurred with Dr. Gamble's diagnosis of

17   borderline and antisocial personality

18   disorders.

19           Is that right?

20   A    Yes.

21   Q    What's your opinion on the impulse

22   control and specified disorder?

23   A    Yes.  If I may, I think the

24   borderline personality disorder, the thing

25   that raises questions in my mind, I think

Joseph Penn, M.D. - June 11, 2025

```
 1        while he's incarcerated, while Mr. Folks is
 2        incarcerated in the Louisiana system, he
 3        definitely met criteria for borderline
 4        personality disorder but it's atypical.
 5        He -- when he was incarcerated in Texas --
 6        I'm blanking on the name of the county jail,
 7        he was in two county jails in Texas, I think
 8        Brazoria county jail and I think Harris
 9        county jail.
10                At neither of those facilities did
11        he cut or self-harm or engage in suicide
12        attempts, and so that's kind of atypical.
13                And number 2, ever since he's been
14        out of the community, which I think has gone
15        on a year, year and a half or longer, he's
16        not -- he endorsed to me that he is not
17        cutting or self-harming or mutating and has
18        had no suicide attempts.
19                So that, I do agree -- under oath,
20        I testified that I do concur with Dr. Gamble
21        on the antisocial personality disorder, on
22        the impulse control disorder you asked me
23        just a second ago, and the borderline
24        personality disorder but it's just atypical
25        that, if anything, it shows how stable he is,
```

Joseph Penn, M.D. — June 11, 2025

1     that he is not cutting or self-harming.  And

2     that's despite not being on any psychotropic

3     medications and not being in any mental

4     health treatment in the community for more

5     than a year.

6              So I just raised the question mark

7     about the borderline personality disorder

8     because you would expect him to continue to

9     cut and self-harm and mutilate whenever he is

10    stressed or upset or having a relational

11    issue, even after his release from prison.

12             So, anyway, that's just -- that's

13    getting way in the weeds but I just wanted to

14    make that point.

15    Q     But it's ultimately your testimony

16    that Mr. Folks had and has borderline

17    personality, antisocial personality and

18    impulse control disorders?

19    A     Yeah, both.  And you just said

20    borderline.  I would say borderline

21    personality disorder, yes, and the other two

22    that you mentioned, I agree with those, all

23    three.

24    Q     So backing up from Mr. Folks and

25    just talking about your expertise as a

Joseph Penn, M.D. — June 11, 2025

1    psychiatrist in general, how do you go about

2    assessing the cause of a person's self-harm?

3        A    Right.

4             So I'm trained both in adult

5    psychiatry and child psychiatry and forensic

6    psychiatry, so whenever I look at that,

7    there's some conditions that start as young

8    as childhood and infancy.  There's a

9    condition called Lesch-Nynan -- I think it's

10   spelled L-E-S-C-H  N-Y-N-A-N -- where young

11   kids will bite themselves repeatedly and

12   self-harm.  It's a metabolic or genetic

13   disorder.

14             There's children, adolescents, that

15   have severe autism, autistic spectrum or

16   autism, autistic spectrum disorder, autism,

17   and they might head bang, they might punch

18   themselves or bite themselves repeatedly.

19             So you kind of have to look at

20   everything, from childhood, adolescence.  In

21   there, we see kind of the onset of borderline

22   personality where both males and females,

23   mainly females, though, will cut or self-harm

24   whenever they're upset or distressed.

25             And then, the same thing as adults,

Joseph Penn, M.D. - June 11, 2025

1    people will engage in self-injurious

2    behavior.

3          And then you need to consider

4    malingering or fictitious disorders, where

5    people will cut or self-harm or engage in

6    suicide or threaten suicide to avoid

7    prosecution or to maybe go to a psych

8    hospital instead of going to a jail or

9    prison.

10          So those are some examples.  I'm

11    probably missing a bunch.  But those are

12    examples of mental disorders that I would

13    consider, in my differential, when thinking

14    about self-harming behaviors.

15          And then, in particular, in jails

16    and prisons, we have people that repeatedly,

17    like Mr. Folks, cut, self-harm, mutilate,

18    injure their genitals, anucleate their eye,

19    cut open their abdomen, insert things into

20    their anus or their penis and urethra, and do

21    all sorts of -- swallow razor blades, like

22    Mr. Folks used to do.

23          We have all that and above.  And so

24    those sometimes -- and that gets to the

25    second sentence, many of those individuals

Joseph Penn, M.D. - June 11, 2025

1      may not even have a -- meet criteria for

2      mental disorder.  They're doing that for

3      either medication or for a diagnosis, like

4      disability, or location seeking where they

5      want to go to an air conditioned facility or

6      they're following a loved one or they're

7      trying to get to a different prison where

8      they can engage in antisocial behavior.

9              So there's a lot of reasons why

10     people self-harm or engage in self-harming

11     behaviors.

12         Q    There was a lot there.  I want to

13     doublecheck.

14             You are of the opinion that

15     borderline personality disorder is one

16     potential cause of self-harming behavior.

17             Is that right?

18         A    Yes.

19         Q    You mentioned that in jail and

20     prison settings, you have many instances of

21     prisoners who self-harm because they have

22     some other motivation other than a mental

23     disorder?

24         A    If I can clarify, they may or they

25     may not have mental disorder.  Sometimes

1    their mental disorder might be stable.  Like

2    they could have had methamphetamines, you

3    know, addiction or depression or bipolar.

4    And it has nothing to do with why they're

5    cutting or self-harming.  They're trying to

6    go to a different facility to get air

7    conditioning or they're trying to -- they're

8    about to leave the prison and they want to

9    get on disability so they can get money.  So

10   there's a lot of different reasons why people

11   self-harm.

12        Q    How do you make that assessment,

13   whether somebody is self-harming because of a

14   mental disorder that they have, for example,

15   borderline personality disorder versus

16   self-harming because they want to get

17   disability benefits?

18        A    So I -- I would employ the same

19   methodology or skills that Dr. Gamble did,

20   which is basically to do a diagnostic

21   evaluation and interview of the patient to

22   review their chart or record, which is what

23   Dr. Gamble did, to talk to collateral people

24   that know history on the individual.  And

25   that's exactly what Dr. Gamble did.

Joseph Penn, M.D. - June 11, 2025

1          So I would look at all of the above
2      and -- say you want to do a thorough
3      evaluation and then you probably want to see
4      the person over time, that's exactly what Dr.
5      Gamble and the mental health staff at the
6      facility did.
7          Q    Back to Mr. Folks specifically.
8              What is your understanding of why
9      Mr. Folks self-harmed -- why Mr. Folks
10     self-harmed?  Apologies.
11         A    As I understand, and I think Dr.
12     Gamble would know the best because he has the
13     longest treatment relationship with
14     Mr. Folks, for many, many years, and he saw
15     him before at Elaine Hunt and then saw him
16     again at Angola.
17             What I understand from Dr. Folks --
18     oh, sorry -- Dr. Gamble was the reason why
19     Mr. Folks cuts or self-harms, is he does that
20     when he's upset, he does that as a way when
21     he is feeling that he has to prove himself,
22     like his back is up against a wall and he's
23     going to prove it to others that he's in
24     control.
25             And I think my expert report is

Joseph Penn, M.D. – June 11, 2025

1    replete with records of Mr. Folks making

2    direct threats or statements that if he

3    didn't get his way, he would engage in

4    self-harm or –– so it's conditional.  It's

5    based on, if I don't get my way, I'm going to

6    cut or self-harm.  So that's what I base that

7    on.

8         Q    Are those motives for

9    self-harming –– so when Mr. Folks was upset,

10   when he felt the need to prove himself, are

11   those motives inconsistent with the self-harm

12   being caused by his borderline personality

13   disorder?

14        A    So what I would say is, it's

15   possible that it could be caused by the

16   borderline personality disorder.

17             But the fact that he is now in the

18   community, in the free world, is not in any

19   mental health treatment, is not on any

20   psychotropic medications, he's actively

21   working and is going once a week to the jail

22   to do community service, that's very

23   stressful.  He's in a relationship with a

24   girlfriend.  He lives with her.

25             Someone with borderline personality

Joseph Penn, M.D. - June 11, 2025

1    disorder, they would continue to have mood

2    lability, changes in their mood state, and --

3    and so the point I'm trying to make is, for

4    whatever reason, he's not showing his

5    borderline personality pathology in the

6    community right now.

7        Q    Are you aware of any instances in

8    which Mr. Folks has been secluded or

9    restrained, either clinically or for

10   disciplinary reasons, after August 2022?

11       A    I would have to look at my report

12   to clarify of when he was released from -- I

13   think he was in death row, if I'm not

14   mistaken.  I think that was the last place he

15   was housed before he went back to the

16   community or he might have gone to the Parish

17   Jail.  I don't recall the dates.

18       Q    Are you aware of any incidents of

19   Mr. Folks being held in seclusion and

20   restraints after he was released from Angola?

21       A    I don't believe so.

22            According to my interview with

23   Mr. Folks and interviews with Dr. Gamble and

24   record review, I don't recall any further

25   restraints, that's fair.

Joseph Penn, M.D. - June 11, 2025

1        Q    So to clarify, earlier I think I

2   gave you the wrong date.  I said August of

3   2022, I meant August of 2021.

4            So after Mr. Folks had been

5   secluded and restrained for several periods

6   over the course of 2021, you're not aware of

7   any incidents in which he was again secluded

8   and restrained?

9        A    So I would need to look at my

10  report to verify that.

11           I generally recall that he

12  improved.  He transitioned from four point to

13  two point to no restraint and then was, I

14  think, transferred to death row, even though

15  he's not a death row inmate, he served his

16  sentence and then he was released.

17           To the best of my knowledge, he did

18  not require any subsequent restraints

19  after -- after the extreme suicide watch

20  period where he was in and out of restraints.

21       Q    Let's turn to something you said in

22  your report on page 35.  This is paragraph 4.

23           You said that, quote, "Mr. Folks

24  has a clear and distinct pattern of repeated

25  intentional, planned, methodical and

Joseph Penn, M.D. - June 11, 2025

1    purposeful pattern of recurrent, severe and

2    potentially lethal self-injury.

3              Is that right?

4        A    Yes.

5        Q    Is that consistent with your

6    earlier testimony that you believe Mr. Folks

7    self-harmed when he was upset and needed to

8    prove himself?

9        A    Yes.  He -- he very carefully --

10   and I learned this from my interview with Dr.

11   Gamble, that Mr. Folks was a master or an

12   artist, if you will, at being able to get a

13   hold of items, even on a suicide watch and

14   even when his cell was monitored for any

15   items that he could use for self-harm, he was

16   able to get a hold of items and screws,

17   paperclips, razor blades.  It's possible that

18   maybe sometimes he was upset or angry and

19   that's why that impulse control diagnosis

20   would -- is valid and accurate.

21             And it is also possible, at the

22   same time, that he became upset or angry or

23   frustrated and that would go along with the

24   borderline personality disorder.

25             But there were also clear episodes

Joseph Penn, M.D. - June 11, 2025

Page 203

1    where he purposefully and methodically

2    inserted a toothbrush that he had whittled

3    down to where it was very sharp, a plastic

4    toothbrush, through the anterior portion of

5    his throat.

6         There's other clearly -- like when

7    he stabbed himself in the abdomen and

8    perforated his bowel with a metal object,

9    those are very clear intentional, planned,

10   methodical, where the records that I

11   reviewed, he was not angry or upset or out of

12   control prior to doing those things.

13        Q    So, when you say that those

14   incidents of self -- sorry.  When you say

15   that those episodes of self-harm were

16   intentional, planned, methodical and

17   purposeful, is it your testimony that they

18   were not a result of any mental disorder

19   diagnosis?

20        A    There's no clear DSM-5 diagnosis

21   that has severe self-harm or severe

22   mutilation, except for borderline personality

23   disorder.

24        What I would say is, Mr. Folks has

25   both.  He has antisocial personality

Joseph Penn, M.D. - June 11, 2025

1    disorder, which means he disregards the

2    rights of others and societal norms.  He

3    steals and shoplifts and takes things,

4    without any kind of personal accountability.

5    He also does have borderline personality

6    disorder, so I think it's a combination of

7    both.

8         He -- it's almost like he is, okay,

9    I will show you, you're not giving me what I

10   want, you're not letting me go back into the

11   nursing area, when I first came in, so I will

12   show you.  And same thing, he kept wanting to

13   go back to St. Mary's, the Parish Jail,

14   there's quotations in my report, and Dr.

15   Gamble also, in his deposition, where he

16   repeatedly stated, if I don't get to go back

17   to St. Mary's, then I'm going to do A,B and

18   C.

19        There's also records where

20   Mr. Folks threatened to kill or bomb, I

21   think, a judge.

22        So Mr. Folks clearly has problems

23   with making poor choices, in my opinion, are

24   related to his antisocial personality

25   disorder, but he also has co-occurring

Joseph Penn, M.D. — June 11, 2025

1      borderline personality disorder.

2            So I think the combination of the

3      two, in my opinion, are why he engages in

4      these behaviors.

5        Q    So it is your testimony that a

6      combination of Mr. Folks' borderline

7      personality disorder and his antisocial

8      personality disorder were responsible for his

9      self-harm?

10       A    And the third diagnosis, the

11     impulse control disorder.  I would say yes,

12     all three of those were the causal or

13     precipitants for self-harm.  That's fair.

14            MR. SI:  I think we've been on for

15         almost another hour.  So why don't we

16         take a five-minute break off the record.

17            THE VIDEOGRAPHER:  We are off the

18         record.

19            The time is 1:58 p.m.

20            (Brief recess taken.)

21            THE VIDEOGRAPHER:  We are back on

22         the record.

23            The time is 2:06 p.m.

24       Q    Dr. Penn, I know you have a hard

25     out in a little bit, so I'm going to try to

Joseph Penn, M.D. - June 11, 2025

1    get through the last set of questions as fast

2    as possible but we're nearing the end here,

3    so please bare with me.

4        A    Thank you.

5        Q    I will show you one last document.

6    What I hope will be the last document, which

7    I will enter as Exhibit 5.

8            (Whereupon the above mentioned was

9        marked for Identification.)

10       Q    The file is a bit large.  I expect

11   that this might take a second.

12           Let me know when you have that

13   open, please.

14       A    It's taking a while, sorry.

15       Q    I figured.

16       A    Now we've got it.  Very good.

17   Thank you.

18       Q    Do you recognize this document?

19           Feel free to scroll through.

20       A    Yes.  This is that book that I

21   mentioned earlier.  Yes, I recognize this.

22       Q    Earlier, you testified this was a

23   book that you co-authored as a part of your

24   work on an APA work group.

25           Is that right?

Joseph Penn, M.D. - June 11, 2025

1           A    Yes.

2           Q    You testified that you had input

3     into the whole book.

4                Is that right?

5           A    Right.  All the authors were

6     supposed to have read the book, start to

7     finish, but we were each -- like the chair of

8     the committee, Bob Tressman, kind of asked,

9     does anyone have a real interest in a

10    particular topic or content area.  And so we

11    would write those areas and then the whole

12    group looked at the whole document.

13          Q    I believe you testified that you

14    were responsible for, among other sections,

15    the self-harm and self-injury section?

16          A    I think so.

17               I know for certain I was the one

18    with the psychotropic medication, abuse and

19    diversion and misuse.  This was a long time

20    ago.  I don't remember -- how many years ago

21    was this?

22          Q    I believe this was -- is it 2014,

23    2016?

24          A    2016, yes.  So my memory is a

25    little vague on that.

Joseph Penn, M.D. - June 11, 2025

1          Q    Would you mind going to page -- I

2     think it's page 17 in the PDF.  I'm sorry,

3     page -- the document is being a little slow

4     for me as well.  Page 16 in the PDF.

5               You should see on the right-hand

6     side a section titled "Non-Suicidal

7     Self-Injury."

8          A    (Witness reviewing.)

9               Yes.

10         Q    If you need to, please feel free to

11    skim through, but is this one of the sections

12    that you primarily authored?

13         A    I believe so.

14              Again, this is like 15 years ago or

15    something like that, so I remember having

16    significant input into this section, yes.

17         Q    Just to confirm, we're looking at

18    the page that's numbered 43 in the scan.

19              At the top right, there on that

20    same page in the top right, do you see the

21    page number 43?

22         A    Yes.

23         Q    Thank you.

24              MR. BLANCHFIELD:  I'm sorry, I --

25              the document I have is only 33 pages.

Joseph Penn, M.D. - June 11, 2025

```
 1            MR. SI:  That's correct, Drew.  I'm
 2       referring to in the scan, the page
 3       that's actually scanned in the book is
 4       43 at the top right.
 5            Do you see that, on page 16 of the
 6       PDF?
 7            MR. BLANCHFIELD:  Perfect.  Yes.
 8       Thank you.
 9            MR. SI:  Great.
10       Q    Dr. Penn, do you mind scrolling up
11   one page from that page we were just
12   discussing, please.
13            This should be the section titled
14   "Trauma and Post-Traumatic Stress Disorder"?
15       A    I'm sorry.  My scroller, I'm having
16   issues here.
17            I'm sorry, what page again?
18       Q    Yeah.  This is page 15, in the PDF.
19       A    Thank you.
20       Q    On the right-hand side, there's a
21   section titled "Trauma and Post-Traumatic
22   Stress Disorder."
23       A    Yes.
24       Q    Is this a section that you had
25   substantial input into?
```

Joseph Penn, M.D. - June 11, 2025

1          A    I made comments and I suggested
2    edits, but I don't recall.  It wasn't like my
3    lead.  That wasn't like my assignment.
4          Q    Do you see the sentence, in the
5    last paragraph of this page, that reads, "The
6    use of seclusion, restraint or forced
7    medication raises special concerns in the
8    context of trauma histories"?
9          A    Yes, I do.
10          Q    And the next sentence, "These
11    methods of control may inadvertently
12    re-traumatize inmates who had similar
13    experiences in the past both in and out of
14    institutional settings."
15          A    Yes.
16          Q    What does that mean?
17          A    So, again, I think we're under a
18    word count.
19               I think the point being, if someone
20    had a trauma history, let's say someone is a
21    victim of rape or some other -- I would say
22    rape or kidnapping, probably some serious,
23    like, traumatic event like that, if they are
24    being held by custody staff or by other
25    inmates, it's possible that they might

Joseph Penn, M.D. - June 11, 2025

1    have -- that it could kind of bring back

2    memories of past traumatic events.

3            And so, for example, like if

4    someone was a victim of childhood sexual

5    abuse and they are being sodomized or being

6    raped while in prison, that might kindle or

7    bring back previous traumatic events.

8            So yes, that's certainly possible.

9    It's a possible thing but it's not cause and

10   effect.  No everyone that has had seclusion

11   or restraint or forced meds, who has a trauma

12   history, and that's why it's very important

13   the word "may," these methods of control may

14   inadvertently re-traumatize.

15       Q    In past instances of seclusion and

16   restraint, clinical seclusion and restraint,

17   be considered a trauma history under this

18   statement?

19       A    I'm sorry, I didn't understand the

20   question.

21       Q    So if an inmate had experienced

22   clinical seclusion and restraint in the past,

23   can that be considered a traumatic event that

24   might be triggered by later seclusion and

25   restraint?

Joseph Penn, M.D. — June 11, 2025

1        A    So I would say it's possible, in
2    theory.
3            But in my experience, most
4    individuals that go into jail or prison, they
5    are restrained.   They are handcuffed.
6    They're put in shackles, leg irons, whatever
7    you want to call it.   And they don't
8    immediately have flooding or PTSD symptoms.
9    So I think it varies and depends.   And again,
10    it's not cause and effect.
11        Q    You conducted an evaluation of
12    Mr. Folks.
13            Is that right?
14        A    Yes.
15        Q    During that evaluation, did you
16    consider any possible trauma history that
17    Mr. Folks might have had?
18        A    Absolutely.   Yes.   And I went into
19    great detail asking him about his childhood,
20    his placement into foster care.   I asked him
21    about past sexual abuse, physical abuse,
22    exposure to domestic violence or other
23    traumatic events.
24            I specifically asked him if he'd
25    ever been a witness to shooting, stabbing,

1    killing or anything, and he denied all of the

2    above.

3         Q    Did you ask about his past

4    experience before LSP with clinical seclusion

5    and restraint?

6         A    Yes.

7         Q    What did he tell you?

8         A    Yes.  So again, I've worked in

9    juvenile correctional systems previously and

10   I continue to do that now in my current

11   position.

12            And I did ask him about juvenile

13   correctional involvement.

14            And I understood from him that he

15   had been incarcerated and placed in at least

16   two Louisiana -- and this is in my report --

17   juvenile correctional facilities.

18            And I don't know where it is in my

19   report but that he had been -- had seclusion

20   and restrained in those facilities.

21        Q    Did you consider the possibility

22   that those incidents of seclusion and

23   restraint, when Mr. Folks was a juvenile,

24   could have been traumatic?

25        A    Yes.

Joseph Penn, M.D. - June 11, 2025

1          Q    Given you concluded that Mr. Folks

2    did not have PTSD, is it correct to assume

3    that you ruled out that possibility?

4          A    Yes.  So based on my review of the

5    totality of all the information available,

6    Mr. Folks' mental health records, my

7    interview of Dr. Gamble, which I conducted

8    after I had evaluated Mr. Folks, and my

9    review of Dr. Glenda Meyer's expert report --

10   and I neglected to mention this earlier, I

11   did skim Dr. Glenda Meyer's deposition.  I'm

12   not sure if I read it in detail, but I did

13   skim it.

14             So based on the totality of all

15   that, yes, I did consider that.

16             But in my professional opinion, as

17   we sit here today, I am unable to determine

18   that that previous report, because those

19   records aren't available, and I would gladly

20   review those if available but those records

21   are not.

22             But based on my evaluation and

23   based on my interview of Dr. Gamble and all

24   the other records, at this time it's not

25   possible, in my opinion, to determine that

Joseph Penn, M.D. - June 11, 2025

1    any seclusion and restraint while

2    incarcerated as a juvenile in the Louisiana

3    system resulted in, number 1, PTSD, or two,

4    traumatized or caused a re-traumatization

5    when Mr. Folks was in the Angola state

6    penitentiary.

7         Q    Is it possible that juvenile

8    seclusion and restraints could induce PTSD?

9         A    It is possible.  But I found no

10   evidence of that in my evaluation of

11   Mr. Folks.

12        Q    Okay.

13        A    Further arguing against it was the

14   history that Mr. Folks provided that he had

15   been incarcerated in South Carolina for three

16   years and during that period of time had no

17   seclusion and restraint, had no psychotropic

18   medications, treatment did not require any

19   psychiatric hospitalizations or transfers.

20             So he did very well when he was in

21   the Louisiana -- sorry, when he was in the

22   South Carolina correctional system.

23        Q    During that time, from your

24   understanding, he was not placed in seclusion

25   and restraint.

Joseph Penn, M.D. - June 11, 2025

1            Is that right?

2        A     Mr. Folks did not report that he

3    required seclusion and restraint in either

4    the South Carolina correctional system nor,

5    as I testified to earlier, the Brazoria

6    county jail or the Harris county jail in

7    Texas.

8        Q     Would you mind turning to page 22

9    in that same exhibit.  Page 22 in the PDF

10   file.

11       A     Yes, I have it up.  Thank you.

12       Q     Do you see the section titled

13   "Seclusion and Restraint" on the left?

14       A     Yes.

15       Q     Is this a section in which you had

16   substantial contributions?

17       A     I could be wrong on this but I

18   think Jeff -- Dr. Jeff Metzner and Dr. Bob

19   Tressman were the leads on this, I believe.

20       Q     Do you see the first sentence in

21   that section that reads, "The principles and

22   guidelines in this report are intended to

23   supplement the standards published by the

24   NCCHC, which require implementation of

25   healthcare-related seclusion or restraint in

Joseph Penn, M.D. – June 11, 2025

```
 1    a manner consistent with current community
 2    practice"?
 3         A    Yes.
 4         Q    Are the standards that this
 5    sentence is referring to, do you know if
 6    those standards are the standards we were
 7    looking at, the mental health standards or
 8    the jail and prison standards?
 9         A    I would have to look at the
10    standards.  I think they reference 2014, so
11    that's again very outdated.
12              But I -- I don't -- as we sit here
13    today, I don't know which standards they're
14    referring to.  That could be a position
15    statement.  It could be the standards.  I
16    don't know.
17         Q    They do use the term "standards"
18    here.
19              Is that right?
20         A    I'm sorry?
21         Q    They do use the term "standards"
22    here, the standards published by the NCCHC?
23         A    Yes.
24         Q    I have the book --
25         A    Yeah.  If you want to scroll to the
```

Joseph Penn, M.D. - June 11, 2025

1    appendix, it should have a 2014A and 2014B

2    should be listed.

3        Q    Yes, I have the book in front of

4    me.  I don't think I actually included it in

5    the excerpt I gave you but I'm going to

6    doublecheck just out of curiosity.

7        A    I have that book in my office.  May

8    I refer to the book also?

9        Q    Absolutely.  Sure.  Of course.

10   Even better.

11            I can tell you what page that

12   reference is on.

13            And I believe this reference is on

14   76 but feel free to check me on that.

15       A    Thank you.

16            Yes.  So it is the jail standards

17   but that's the 2014 version.  And then it's

18   the prison standards.  Again, the 2014

19   version.

20            And these -- they don't -- this is

21   not citing the mental health standards

22   because that would have been -- that is cited

23   separately.

24            And they refer to -- sorry, 2008,

25   so that's not -- that's not cited here.

Joseph Penn, M.D. - June 11, 2025

1              2014A is the jail health standards

2      and 2014B is the prison health standards.

3          Q    Understood.

4              So back to page 66 of the book, 22

5      of the PDF, this statement that the NCCHC

6      jail and prison standards that we just looked

7      at in the references require implementation

8      of healthcare related seclusion or restraint

9      in a manner consistent with community

10     practice."

11         A    Yes, that's what it says.

12         Q    Is it your understanding that those

13     standards have changed since 2014?

14         A    I don't have an opinion about that.

15     I don't know what the standards were back --

16     I mean, in the community or in corrections in

17     2014?

18         Q    In the NCCHC standards, whether

19     that statement, that seclusion or restraint

20     in prisons and jails should be consistent

21     with current community practice, whether that

22     statement has changed from 2014 afterwards,

23     onwards.

24         A    I'm sorry, I'm not following your

25     question.

Joseph Penn, M.D. - June 11, 2025

1          Q    So NCCHC standards, according to
2     this, in 2014, say that seclusion or
3     restraint should just be implemented in a
4     manner consistent with current community
5     practice.  Correct?
6          A    Well, no, that's -- I think you're
7     mischaracterizing this.
8               This is what the authors of this
9     book are saying.  That basically you -- if
10    you're going to do seclusion and restraint,
11    you want to follow NCCHC standards, which
12    mirror healthcare practices seclusion and
13    restraint in the community practice.
14               So -- and then they just cite
15    NCCHC, the standards.
16               That's -- that's what I think
17    they're trying to communicate or convey.
18          Q    I think we might have a different
19    understanding of, quote, "which require
20    implementation of healthcare related
21    seclusion and restraint," but that's okay.
22               And when you say the authors of
23    this book, just to make it clear, you are one
24    of these authors.  Correct?
25          A    Yes.

Joseph Penn, M.D. - June 11, 2025

1          Q     Do you see on page 67 -- this is on
2     the same page in the PDF but it's on the
3     right-hand side.
4               Do you see the line that reads --
5     and this is in one of the bullet points.  I
6     think it's the third one down.
7               "Inmates on clinical seclusion
8     should be monitored at least every eight
9     hours with documented wellbeing checks by
10    registered nursing staff."
11         A     Yes.
12         Q     Do you agree with that?
13         A     Yes, I think that's fair.  Wait.
14    Sorry.  With the caveat, if you have 24-hour
15    nursing.  Many facilities don't have 24-hour
16    nursing.
17              Prior to COVID, nursing staffing
18    was a challenge.  And after COVID, it's even
19    become more problematic.
20              So what I would say is, in a system
21    that you do have 24-hour nursing capabilities
22    or coverage, then, yes, ideally, in a perfect
23    world, you should have your nursing staff
24    checking them at least every eight hours.
25         Q     Just to clarify, so registered

Joseph Penn, M.D. - June 11, 2025

1    nursing staff in that statement, does that

2    mean registered nurses?

3         A    No.  Because it would -- I think

4    that would say -- again, I'm not a nurse, but

5    the way that I interpret this, it could be a

6    licensed practical nurse, it can be a

7    registered nurse.

8              I think we probably should have

9    made that more clear.

10             I think what their -- really, the

11   term should be, should be qualified or

12   licensed -- well, actually, licensed would be

13   a better term than registered.  Because it

14   introduces confusion, like you're bringing up

15   right now.

16        Q    Are you aware of records from this

17   case documenting that Mr. Folks was observed

18   by a licensed professional, medical

19   professional, every eight hours while he was

20   on restraints?

21        A    Sorry.  It's been some time since I

22   looked at the records in their entirety.

23             As we sit here today, I don't

24   recall the frequency with which nursing were

25   documenting.

Joseph Penn, M.D. - June 11, 2025

1           But I do know that, according to my
2    review, mental health staff were seeing him,
3    I believe, every 12 hours.
4        Q    Do you recall seeing documentations
5    of those reviews from every 12 hours while
6    Mr. Folks was on restraints?
7        A    I believe so.  And I could -- it
8    could be 12 hours, it could be 24 hours, but
9    I do believe mental health was seeing him on
10   a daily basis.
11       Q    When you say mental health, does
12   that include only a licensed nursing staff,
13   as we were talking about before, or does that
14   also include social workers and other staff?
15       A    I'm sorry, I'm not understanding
16   the question.
17       Q    When you say that he was seen by --
18   Mr. Folks was seen by mental health staff at
19   least every 12 hours, when you use the term
20   "mental health staff," who are you referring
21   to?
22       A    So I think I clarified my
23   testimony.  It was either 12 or every day 24
24   hours.
25           What I -- I believe he was being

Joseph Penn, M.D. - June 11, 2025

1      seen by mental health staff, Master's level.

2              He -- in NCCHC terminology, they

3      refer to them as qualified mental health

4      professionals.  They could be a social

5      worker, they could be a psychologist, they

6      could be a substance abuse counselor, there's

7      a lot of leeway, or they could even be a

8      psychiatrist.

9              So again, we probably should

10     have -- the registered thing here is very

11     confusing.  And I probably would have changed

12     that to licensed or qualified healthcare

13     staff or qualified healthcare professionals.

14         Q    Are each of those visits by

15     qualified mental health staff, either every

16     12 hours or 24 hours, we would expect to see

17     documentation of those.

18              Is that correct?

19         A    I would need to refer to the

20     policy.

21              Again, this is aspirational.  This

22     document is not the policy and procedure of

23     the Louisiana Department of Corrections.

24              This is an aspirational document,

25     written by psychiatrists across the country,

Joseph Penn, M.D. - June 11, 2025

Page 225

1    who work in correctional settings or,

2    alternatively, are monitors for expert

3    witnesses or both.

4            I would need to review the policies

5    and procedures of the Louisiana prison

6    system, and then I could answer your question

7    and tell you if they complied with that

8    policy and if they documented.  That would be

9    something that I would need to review to be

10   able to answer your question.

11   Q    If LSP were complying with the

12   aspirational, as you say, policy here, we

13   would expect to see documentation of mental

14   health checks by qualified mental health

15   staff every eight hours.

16           Is that correct?

17   A    No.  This is -- first of all, this

18   is not a policy.  This is a book.  This is

19   a -- specifically, it's a resource document.

20   And I think it says, nursing staff every

21   eight hours.  That's the aspirational.

22   Remember, I already made the clarification

23   that if you don't have 24-hour nursing, you

24   can't have nurses every eight hours, because

25   you don't have enough staff.

1           What I would say is, whatever the
2    policy the Louisiana Department of
3    Corrections promulgated, that's what should
4    have happened, whether it be nursing,
5    whatever the frequency be, same thing for
6    mental health staff, whatever the frequency
7    should be, and that should be able to be
8    substantiated by documentation in the
9    healthcare record.
10      Q    On this same page that we were
11   looking at, so page 67 of the book and then
12   page 22 of the PDF, do you see the last
13   bullet, which reads, "Secluded inmates should
14   have access to structured therapeutic
15   programming whenever possible without
16   compromising the security and safety of the
17   institution."
18      A    Yes, I see that.
19      Q    It's the last bullet.
20      A    Yeah.
21      Q    What is structured therapeutic
22   programming?
23      A    So that's a Jeff Metzner.  He's
24   a -- frequently monitored.  That's pretty
25   much a hundred percent of what he does.

Joseph Penn, M.D. — June 11, 2025

Page 227

1          He doesn't actually work in jails
2    or prisons.  He's been a monitor for most of
3    his career.
4          And I have tremendous respect for
5    Jeff.
6          But in my opinion, he's missing the
7    boat.  Because the wording is, should have
8    access.
9          So secluded inmate, like Mr. Folks,
10   who is potentially lethal of trying to kill
11   himself, you have to weigh the risk of
12   killing himself versus the benefit of him
13   being in this structured therapeutic
14   programming.
15         So absolutely, once Mr. Folks is
16   safe and not cutting, not trying to kill
17   himself, not trying to stab his abdomen with
18   a metal instrument or cut his throat with a
19   toothbrush, absolutely.  Then once he's safe,
20   he can have access to structured therapeutic
21   programming.
22         Now, the problem with that is --
23   see, again, remember, he's a pre-trial
24   detainee.  So I'm not -- you know, an example
25   of a structured therapeutic programming would

Joseph Penn, M.D. - June 11, 2025

Page 228

1    be out of cell group therapy.  You can't do

2    group therapy with N of one.  So again --

3    with one -- sorry, with an N of one.  With a

4    sample size of one person.  You can't do

5    group therapy with one person.

6            So again, this is meant to be

7    pie-in-the-sky, aspirational, whenever

8    possible, should have access, whenever

9    possible.  Those are the key verbiage.

10           But every patient in a correctional

11   system, you have to take it on a

12   patient-by-patient basis.

13           And in my professional opinion, the

14   Louisiana system and Dr. Gamble, they saw the

15   risks that Mr. Folks presented by his history

16   and by his repeated pattern of severe

17   self-harm.  And they said, We need to

18   mitigate those risks and keep him safe.  And

19   then once he's stabilized, through therapy,

20   through seeing Dr. Gamble, through the four

21   psychotropic med -- three or four medications

22   he was on, he improved and then he was able

23   to be afforded out of cell time and be in a

24   less restrictive housing setting.

25           Q    Other than group therapy, are you

Joseph Penn, M.D. — June 11, 2025

```
1       aware of any other types of structured

2       therapeutic programming that this section

3       could be referring to?

4            A    Yes.

5            Q    What are those?

6            A    Yes.  So that -- and I testified to

7       this earlier.

8                 That would be things like

9       recreation, out in the day yard, outside or

10      in the dayroom, recreation, eating, chow,

11      eating in the dining room -- dining hall,

12      rather, being able to have a job, being able

13      to go to school or have some education or

14      vocational programming.

15                So those are all examples of

16      therapeutic programming.

17                The structure implies that there

18      needs to be some predictability, like you

19      have a week-to-week schedule, like Mondays

20      you can have this, Tuesdays you have that.

21                But again, as I testified to

22      several times, the problem was he is a

23      pre-trial detainee and he can't intermingle

24      with state prisoners because of his legal

25      status of being pre-trial or being a jail
```

Joseph Penn, M.D. - June 11, 2025

1    detainee.

2        Q    Is there any structured therapeutic

3    programming that would not require someone

4    like Mr. Folks to intermingle with the

5    general population?

6        A    Yes.

7        Q    What are those?

8        A    I would say individual

9    psychotherapy or counseling.  That would

10   probably be the main thing.

11            He could probably have access to a

12   dayroom by himself or recreation by himself.

13            But again, that would be up to

14   custody staff and that would be a decision

15   that would be clinically determined once

16   Mr. Folks is safe and has demonstrated that

17   he is safe and no longer at risk for killing

18   himself.

19       Q    Are you aware of any individual

20   structural therapeutic programming that was

21   offered to Mr. Folks while he was secluded?

22       A    So Mr. Folks was seen by

23   psychiatrists with 20 years of experience.

24   He was seen by mental health staff.

25            So yes, he did receive therapeutic

Joseph Penn, M.D. - June 11, 2025

1    treatment efforts but I'm not prepared to say

2    it was structured because, like I said

3    earlier, he wasn't out of his cell, he wasn't

4    in a dayroom, he wasn't in group therapy

5    because he was at eminent risk of killing

6    himself.

7         Q    He didn't receive individual

8    psychotherapy, correct, or counseling?

9         A    I believe that when the staff --

10   the mental health staff were evaluating him,

11   cell side, every day while he was in the

12   extreme suicide watch, in my opinion, that

13   would be psychotherapy.  They're trying to

14   work with him and to help stabilize him and

15   do suicide safety planning with him.

16        Q    Earlier, you testified that most of

17   those cell side suicide watch checks were

18   conducted by nursing staff and not by

19   psychiatrists.  Right?

20        A    No.  I think what I said was --

21   what I understand from the record and from

22   Dr. Gamble was, nursing were checking on him

23   periodically, mental health staff was

24   checking on him, I believe, at least daily

25   and then Dr. Gamble saw him for his

Joseph Penn, M.D. - June 11, 2025

Page 232

1    psychotropic reevaluations for medications

2    and for periodic psychiatric evaluations,

3    that's what I understood.

4           So he was being seen by three

5    different sets of professionals.

6        Q    Just to be sure I'm understanding

7    you, is psychotherapy something that can be

8    performed by somebody who is not a

9    psychiatrist?

10       A    Absolutely, yes.

11       Q    Let's talk about those visits with

12   Dr. Gamble and the other mental health staff

13   you mentioned.

14          How long would these visits

15   typically last?

16       A    I don't have the numbers.  I don't

17   have -- I don't think they wrote down the

18   duration in the notes.  I could be wrong.

19       Q    In your experience, when you have

20   observed cell side suicide watch check-ins,

21   how long do these last?

22       A    A few minutes.

23       Q    More than five minutes?

24       A    Not typically, no.

25       Q    So less than five minutes?

Joseph Penn, M.D. - June 11, 2025

1        A    Yes.

2        Q    Less?  We don't have to get more

3   specific than that.

4             What about how they're conducted.

5             So are these face-to-face?

6        A    Yes.

7        Q    Is it face-to-face in the same

8   room?

9        A    No.  The inmate is in the cell on

10  suicide watch and the clinician, either the

11  nurse, the psychologist or other mental

12  health professional or the psychiatrist,

13  typically these are done by Master's levels

14  social workers or Master's level therapists.

15  They're coming by.  They're standing at the

16  cell front.  They're talking to the inmate

17  directly and trying to not talk in a loud

18  voice, so other individuals might not

19  overhear the conversation.

20       Q    So is your opinion that a check-in

21  that is conducted while a patient is on

22  restraints, for less than five minutes,

23  through a cell, can be considered

24  psychotherapy?

25       A    Yes.

Joseph Penn, M.D. – June 11, 2025

Page 234

1          Q    What are you basing this opinion

2    on?

3          A    On my 30 years as a board certified

4    adult, child and forensic psychiatrist, who's

5    exclusively worked in correctional systems.

6    And in my opinion, psychotherapy doesn't have

7    to be the traditional one hour or --

8    actually, not even one hour, it's 50 minutes

9    in a therapist's office.  You can do

10   psychotherapy in a five or ten-minute

11   medication check.  You can do psychotherapy

12   when a nurse goes and encourages a patient to

13   take their medication or be compliant with

14   their bloodwork or their shots or their

15   medications.

16          So psychotherapy, I think everyone

17   kind of makes it out it has to be once a week

18   or three times a week for 50 minutes.  That's

19   maybe how it was 40, 50 years ago but that's

20   not how it is now.

21          Q    Have you seen patients' conditions

22   improve as a result of these sub five-minute

23   psychotherapy sessions?

24          A    Yes.

25          Q    How often would you say, somebody

Joseph Penn, M.D. - June 11, 2025

1    who is acutely suicidal, improves due to one

2    of these check-ins or a course of these

3    check-ins?

4         A    I can speak to -- we have two

5    in-patient psychiatric prison units in Texas

6    I oversee, where on a daily basis we have 50

7    to a hundred inmates coming in, they're in

8    crisis management for a day or two or three

9    and they're being seen -- they're being

10   evaluated at cell side by qualified mental

11   health professionals.

12        And the majority of them are able

13   to be stabilized and either returned to their

14   regular prison unit or, if not, they can be

15   admitted to a higher level of care.

16        So yes, you know, on a daily basis,

17   this treatment approach can work if the

18   patient is ready, willing and able to make

19   improvement.

20        To the contrary, if the patient is

21   like Mr. Folks and wants to get into a battle

22   and continually tell people he's not suicidal

23   or threaten that he is suicidal and make it

24   conditional, then those kind of patients, it

25   can take longer for them to improve.

Joseph Penn, M.D. — June 11, 2025

Page 236

```
 1              And that's what we saw with
 2    Mr. Folks.  It took approximately two or
 3    three months for him to improve but he
 4    ultimately did improve.
 5         Q    You mentioned that sometimes
 6    patients are admitted to a higher level of
 7    care.
 8              What did you mean by that?
 9         A    If we have a patient that's
10    psychotic, hearing voices, has schizophrenia,
11    is manic from bipolar disorder, can't groom,
12    eat or feed or perform their activities of
13    daily living, and they're grossly
14    disorganized or not able to reality test,
15    then yes, we would move those patients to a
16    higher level of care.  None of those were the
17    situation with Mr. Folks.
18         Q    What does the higher level of care
19    entail?
20         A    So it would be probably similar to
21    your Elaine Hunt facility in Baton Rouge or
22    south of Baton Rouge, where you have
23    dedicated psychiatric cells, you have a
24    milieu where you can do individual therapy
25    and group therapy, either in cell or out of
```

Joseph Penn, M.D. - June 11, 2025

Page 237

```
 1    cell, or in an office setting.  You have a

 2    structured day of activities.

 3              So that would be for patients that

 4    are psychotic and not able to do their

 5    activities of daily living due to a serious

 6    mental illness, which Mr. Folks did not

 7    have --

 8         Q    Okay.

 9         A    -- in my opinion.

10              MR. SI:  Can we go off the record

11    for just a couple minutes.

12              THE VIDEOGRAPHER:  We are off the

13    record.

14              The time is 2:49 p.m.

15              (Brief recess taken.)

16              THE VIDEOGRAPHER:  We are back on

17    the record.

18              The time is 2:50 p.m.

19              MR. SI:  Thank you, Dr. Penn.

20              That is all the questions that I

21    have.

22              MR. BLANCHFIELD:  Okay.  We're

23    done.

24              THE VIDEOGRAPHER:  We are off the

25    record.
```

Joseph Penn, M.D. - June 11, 2025

1          The time is 2:50 p.m.

2          THE COURT REPORTER:  We have

3     standing orders on file, any changes?

4          MR. SI:  No.

5          MR. BLANCHFIELD:  No, regular is

6     good for us.

7          (Witness was excused.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E
2              I, MICHAEL FRIEDMAN, a Certified Court
3    Reporter and Notary Public, qualified in and for
4    the State of New Jersey do hereby certify that
5    prior to the commencement of the examination JOSEPH
6    PENN, MD was duly sworn by me to testify to the
7    truth the whole truth and nothing but the truth.
8              I DO FURTHER CERTIFY that the foregoing
9    is a true and accurate transcript of the testimony
10   as taken stenographically by and before me at the
11   time, place and on the date hereinbefore set forth.
12             I DO FURTHER certify that I am neither a
13   relative of nor employee nor attorney nor counsel
14   for any of the parties to this action, and that I
15   am neither a relative nor employee of such attorney
16   or counsel, and that I am not financially
17   interested in the action.
18
19
20
21   _____
22   MICHAEL FRIEDMAN, CCR of the
23   State of New Jersey
24   License No:  30XI00228600
25   Date:  June 21, 2025
```

Joseph Penn, M.D. - June 11, 2025

Page 240

```
 1                    LAWYER'S NOTES

 2        PAGE  LINE

 3        ____  ____      _____

 4        ____  ____      _____

 5        ____  ____      _____

 6        ____  ____      _____

 7        ____  ____      _____

 8        ____  ____      _____

 9        ____  ____      _____

10        ____  ____      _____

11        ____  ____      _____

12        ____  ____      _____

13        ____  ____      _____

14        ____  ____      _____

15        ____  ____      _____

16        ____  ____      _____

17        ____  ____      _____

18        ____  ____      _____

19        ____  ____      _____

20        ____  ____      _____

21        ____  ____      _____

22        ____  ____      _____

23        ____  ____      _____

24        ____  ____      _____

25        ____  ____      _____
```

Joseph Penn, M.D. - June 11, 2025

Page 241

DEPOSITION ERRATA SHEET

Case Caption:  Folks v. LAG

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury
that I have read the entire transcript of
my Deposition taken in the captioned matter
or the same has been read to me, and
the same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.

Signed on the _____ day of
_____, 20____

_____
JOSEPH PENN, M.D.

Joseph Penn, M.D. - June 11, 2025

```
1                    DEPOSITION ERRATA SHEET

2        Page No._____Line No._____Change to:_____

3        _____

4        Reason for change:_____

5        Page No._____Line No._____Change to:_____

6        _____

7        Reason for change:_____

8        Page No._____Line No._____Change to:_____

9        _____

10       Reason for change:_____

11       Page No._____Line No._____Change to:_____

12       _____

13       Reason for change:_____

14       Page No._____Line No._____Change to:_____

15       _____

16       Reason for change:_____

17       Page No._____Line No._____Change to:_____

18       _____

19       Reason for change:_____

20       Page No._____Line No._____Change to:_____

21       _____

22       Reason for change:_____

23

24       SIGNATURE:_____DATE:_____

25                 JOSEPH PENN, M.D.
```

Joseph Penn, M.D. - June 11, 2025

Page 243

```
 1              DEPOSITION ERRATA SHEET

 2      Page No. _____Line No. _____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No. _____Line No. _____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No. _____Line No. _____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No. _____Line No. _____Change to:_____

12      _____

13      Reason for change:_____

14      Page No. _____Line No. _____Change to:_____

15      _____

16      Reason for change:_____

17      Page No. _____Line No. _____Change to:_____

18      _____

19      Reason for change:_____

20      Page No. _____Line No. _____Change to:_____

21      _____

22      Reason for change:_____

23

24      SIGNATURE:_____DATE:_____

25              JOSEPH PENN, M.D.
```