**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

Joshua Folks,

        Plaintiff,

        v.

Louisiana Attorney Gen. Jeff Landry, *et al.*,

        Defendants.

Civil Action No. 23-cv-01289-SDD-RLB

## PLAINTIFF JOSHUA FOLKS'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

    A.    Mr. Folks's Arrival Into Defendants' Custody.................................... 2

    B.    Mr. Folks's First Incident of Self-Harm and Defendants' Failure to Act.............. 3

    C.    Mr. Folks's Second Incident of Self-Harm and Defendants' Escalating Punitive Response.................................................................................. 4

    D.    Mr. Folks's Third and Fourth Self-Harm Incidents and Defendants' Ongoing Exacerbation of His Mental Health Symptoms. ................................. 5

    E.    Defendants' Pattern of Punishing Mr. Folks with Isolation and Restraints.......... 8

    F.    Mr. Folks's Pursuit of Administrative Remedies. ............................................. 11

    G.    The Psychiatric Consequences of LDPSC's Punishments. ............................... 13

ARGUMENT ........................................................................................................... 13

I.    Summary Judgment Must Not Be Granted When There Are Genuine Disputes of Material Facts........................................................................................... 13

II.    There Are Triable Issues of Material Fact as to Mr. Folks's Section 1983 Claims......... 14

    A.    There Are Triable Issues of Material Fact as to Mr. Folks's Deliberate Indifference Claim........................................................................................ 14

        1.  Defendants Knew Mr. Folks Faced a Substantial Risk of Self-Harm. ........... 15

        2.  Defendants Disregarded the Substantial Risk of Self-Harm......................... 16

    B.    There Are Triable Issues of Material Fact as to Mr. Folks's Conditions of Confinement Claim. ......................................................................................... 17

        1.  The Conditions Were Inhumane and Prolonged............................................. 17

        2.  Defendants' Justifications Do Not Excuse the Extreme Conditions They Imposed............................................................................................... 18

    C.    Defendants Are Not Entitled to Qualified Immunity as to Mr. Folks's Section 1983 Claims.................................................................................... 19

       1.  Defendants Violated Mr. Folks's Constitutional Rights................................. 19

       2.  Fifth Circuit Law Left No Doubt That Subjecting Mr. Folks to Known Harmful Housing and Restraints Was Unlawful. ............................................... 21

III.    There Are Triable Issues of Material Fact as to Mr. Folks's ADA and RA Claims. ........ 22

IV.    Exhaustion and Prescription Do Not Bar Mr. Folks's Claims. ..................................... 26

    A.      Mr. Folks Exhausted All Available Administrative Remedies and Was Excused From Exhausting Any Others. ........................................................... 26

       1.  ARP 2021-2850. ...................................................................................... 27

       2.  ARP 2022-0859. ...................................................................................... 27

       3.  ARP 2022-1428. ...................................................................................... 28

    B.      Mr. Folks's Claims Are Not Prescribed. ....................................................... 29

       1.  ADA/RA Claims. ..................................................................................... 30

       2.  Section 1983 Claims. ............................................................................... 30

V.    The Court Has Jurisdiction Over Mr. Folks's Remaining Claims (Counts 5 and 7). ....... 31

CONCLUSION ..................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Louisiana Dep't of Corr.*,
No. CV 22-20-SDD-RLB, 2024 WL 4280924, . (M.D. La. Sept. 24, 2024).........................24

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)..............................................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................................14

*Arenas v. Calhoun*,
922 F.3d 616 (5th Cir. 2019)...........................................................................................14, 19

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)..........................................................................................................19, 21

*Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*,
427 F. Supp. 3d 806 (E.D. La. 2019) ...................................................................................30

*Bailey v. Fisher*,
647 F. App'x 472 (5th Cir. 2016) (per curiam)....................................................................18

*Baqer v. St. Tammany Par. Gov't*,
No. CV 20-980, 2025 WL 948167 (E.D. La. Mar. 28, 2025) ..............................................32

*Batiste v. Island Recs. Inc.*,
179 F.3d 217 (5th Cir. 1999)................................................................................................32

*Bennett-Nelson v. Louisiana Bd. of Regents*,
431 F.3d 448 (5th Cir. 2005).................................................................................................23

*Bias v. Woods*,
288 F. App'x 158 (5th Cir. 2008) .........................................................................................21

*Boswell v. Claiborne Par. Det. Ctr.*,
629 F. App'x 580 (5th Cir. 2015) .........................................................................................21

*Brooks v. Menifee*,
No. CV07-0131-A, 2010 WL 7827470 (W.D. La. Sept. 27, 2010), *report and recommendation adopted*, No. CV07-0131-A, 2011 WL 5117600 (W.D. La. Oct. 26, 2011).........................................................................................................................21

*Converse v. City of Kemah, Texas*,
961 F.3d 771, 775 (5th Cir. 2020).................................................................................21, 22

*Estate of Bonilla v. Orange County*,
    982 F.3d 298 (5th Cir. 2020) ................................................................ 23, 24

*Bourne v. Gunnels*,
    921 F.3d 484 (5th Cir. 2019) ...................................................................... 19

*Brown v. Callahan*,
    623 F.3d 249 (5th Cir. 2010) ...................................................................... 19

*Cabrol v. Town of Youngsville*,
    106 F.3d 101 (5th Cir. 1997) ...................................................................... 32

*Cowart v. Erwin*,
    837 F.3d 444 (5th Cir. 2016) ...................................................................... 30

*Crandel v. Hall*,
    5 F.4th 651 (5th Cir. 2021) ................................................................... 23, 24

*Days v. Johnson*,
    322 F.3d 863, 866 (5th Cir. 2003) .............................................................. 28

*Easter v. Powell*,
    467 F.3d 459 (5th Cir. 2006) ...................................................................... 15

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ............................................................................. 16, 17

*Ford v. Anderson County*,
    102 F.4th 292 (5th Cir. 2024) .................................................................... 22

*Foy v. LDPSC, et al.*,
    No. Civ. 17-400-SDDT-EWD (M.D. La. July 23, 2018) ....................... 28, 29

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) ................................................................. 23, 30

*Gates v. Cook*,
    36 F.3d 323 (5th Cir. 2004) ........................................................................ 18

*George v. Louisiana Dep't of Pub. Safety & Corr.*,
    2016 WL 3568109, at *9 (M.D. La. June 23, 2016 ................................ 23, 25

*Gobert v. Caldwell*,
    463 F.3d 339 (5th Cir. 2006) ................................................................. 15, 17

*Harper v. Showers*,
    174 F.3d 716 (5th Cir. 1999) ...................................................................... 17

*Helling v. McKinney*,
   509 U.S. 25 (1993).................................................................................... 15, 17

*Huskey v. Jones*,
   45 F.4th 827 (5th Cir. 2022).............................................................................. 26

*Jacobs v. W. Feliciana Sheriff's Dep't*,
   228 F.3d 388 (5th Cir. 2000)...................................................................... 16, 21, 22

*Jones v. Givens*,
   No. 19-50465, 2021 WL 3889295 (5th Cir. Aug. 30, 2021)........................................ 27, 28

*Joseph v. Franklin*,
   NO. 1:22-CV-03198, 2023 WL 5746938 (W.D. La. Aug. 21, 2023), *report
   and recommendation adopted*, No. 22-CV-3198, 2023 WL 5740385 (W.D.
   La. Sept. 5, 2023).......................................................................................... 27

*Kelly v. Stassi*,
   587 F. Supp. 3d 409 (M.D. La. 2022) .................................................................. 14

*LaVergne v. Stutes*,
   82 F.4th 433 (5th Cir. 2023)............................................................................. 19

*Levy v. Louisiana Dep't of Pub. Safety & Corr.*,
   371 F. Supp. 3d 274 (M.D. La. 2019) .................................................................. 24

*Lewis v. Cain*,
   No. 3:15-CV-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021) .................................. 23

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) (en banc)................................................................ 13

*McBride v. Deer*,
   240 F.3d 1287 (10th Cir. 2001) ........................................................................ 18

*Monceaux v. White*,
   266 F. App'x 362 (5th Cir. 2008) ...................................................................... 15

*Nagle v. Gusman*,
   No. 12-1910, 2016 WL 760628 (E.D. La. 2016)..................................................... 17

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*,
   40 F.3d 698 (5th Cir. 1994).............................................................................. 13

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999)....................................................................................... 26

*Pearson v. Callahan*,
    555 U.S. 223 (2009).............................................................................. 19

*Piotrowski v. City of Houston*,
    237 F.3d 567 (5th Cir. 2001) ......................................................... 31

*Rodrigue v. Grayson*,
    557 F. App'x 341 (5th Cir. 2014) .................................................. 22

*Ross v. Blake*,
    136, S.Ct. 1850, 1858-61 (2016)............................................... 26, 29

*Russell v. Bd. of Trustees*,
    968 F.2d 489 (5th Cir.1992) ......................................................... 31

*Shepard v. Hansford County*,
    110 F. Supp. 3d 696 (N.D. Tex. 2015).......................................... 16

*Stevenson v. Tocé*,
    113 F.4th 494 (5th Cir. 2024) ....................................................... 22

*Turner v. Burnside*,
    541 F.3d 1077 (11th Cir. 2008) .................................................... 28

*Wilkinson v. Austin*,
    545 U.S. 209 (2005).......................................................... 18, 19, 21

*Williams v. Lockheed Martin Corp.*,
    No. CV 09-65, 2016 WL 1253562 (E.D. La. Mar. 31, 2016), *aff'd*, 990 F.3d
    852 (5th Cir. 2021) ....................................................................... 32

## Statutes

29 U.S.C. § 794(a)............................................................................... 23

42 U.S.C. § 1997e ............................................................................... 26

42 U.S.C. § 12132 ............................................................................... 23

## Other Authorities

28 C.F.R. § 35.108 .............................................................................. 24

Fed. R. Civ. P. 56(a)........................................................................... 13

## PRELIMINARY STATEMENT

Federal law forbids punishing people for the manifestations of their disabilities. Yet, for 17 months, Defendants subjected Joshua Folks—a mentally ill pretrial detainee held on felony charges of self-mutilation by a prisoner—to conditions they knew aggravated his psychiatric symptoms and self-harming behavior. They kept him in a solitary "time-out" cell for nearly that entire period, and four- and five-point restraints for weeks at a stretch. They did so despite documented deterioration of Mr. Folks's condition and the availability of alternatives, including safer housing. These were not isolated misjudgments but a sustained course of conduct that violated the Eighth and Fourteenth Amendments and denied Mr. Folks access to services and programs in violation of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA).

The record, viewed in the light most favorable to Mr. Folks, contains ample evidence from which a reasonable jury could find that each Defendant knew of the substantial risk these conditions posed, deliberately chose to persist in them, and failed to provide reasonable accommodations. That knowing disregard supports liability for deliberate indifference, establishes unconstitutional conditions of confinement, and defeats both prongs of qualified immunity—it shows an underlying constitutional violation, and Fifth Circuit precedent long before 2022 made the unlawfulness of such conduct beyond debate. The same facts permit a jury to find ADA and RA violations, as Defendants denied Mr. Folks access to programs, services, and activities, including mental health treatment, education, and recreation, because of his disability.

Defendants' procedural defenses fare no better. The continuing violation doctrine defeats the prescription argument because the challenged conditions persisted into the limitations period, and the PLRA exhaustion argument fails where Mr. Folks pursued the grievance process

available to him and any defects were caused by the facility's own procedures. On this record, genuine disputes of material fact exist on every claim and defense, and summary judgment must be denied.

## FACTUAL BACKGROUND

### A.    Mr. Folks's Arrival Into Defendants' Custody.

Mr. Folks suffers from a combination of serious mental illnesses that cause him to compulsively self-harm.[1] Mr. Folks was incarcerated at Louisiana State Penitentiary ("LSP"), a facility under the control of Defendant Louisiana Department of Public Safety and Corrections ("LDPSC"), from March 2021 to November 2022, during which time his self-harm symptoms significantly worsened.[2] Despite his evident serious mental health symptoms, Defendants immediately condemned Mr. Folks to highly restrictive housing conditions that further triggered Mr. Folks's self-harming, and subjected him to ever-more abusive conditions, including four-point metal restraints, to punish what Defendants viewed as disobedient, rather than mental health-induced, behaviors.

Mr. Folks first arrived into LDPSC's custody from St. Mary Parish Correctional Center on charges of self-mutilation by a prisoner, a felony offense in Louisiana.[3] Rather than receiving psychiatric treatment for his mental health symptoms, which were obvious and readily disclosed to Defendants,[4] Mr. Folks was immediately slapped with a felony conviction that punished him for his mental illness and dismissed his symptoms as a "liability."[5] Upon being received into LDPSC custody, Mr. Folks received a level of care ("LOC") of 3, which Defendants' own policies

---

[1] Plaintiff's Opposing Statement of Material Facts ("Pl.'s Opp. SOMF") ¶ 66.
[2] *Id*. ¶ 65.
[3] *Id*. ¶¶ 1-2.
[4] *Id*. ¶ 2.
[5] *Id* ¶¶ 1-2.

reserve for inmates with serious mental illnesses ("SMI").[6] But Mr. Folks's LOC-3 designation belied how little consideration Defendants showed toward his mental illnesses. LDPSC held Mr. Folks in strict isolation from the moment he stepped foot in LSP—beginning with a "locked room" in the Nursing Unit ("NU"), also known as the Treatment Center ("TC").[7] While held in the locked room, Mr. Folks was let out of his cell only to shower and receive medical call-outs.[8]

### B.    Mr. Folks's First Incident of Self-Harm and Defendants' Failure to Act.

Quite predictably for someone with Mr. Folks's mental health diagnoses and history of self-harm, the restrictive conditions quickly triggered Mr. Folks's impulse to self-harm. On April 11, 2021, Mr. Folks slashed his knees and neck.[9] In response, Defendants immediately placed him on extreme suicide watch.[10] Extreme suicide watch almost always entailed placing Mr. Folks in metal handcuffs and leg irons—*i.e.*, four-point restraints—for days on end.[11] Defendants would remove one of Mr. Folks's hands from restraints only to let him eat.[12]

Following Mr. Folks's self-harm on April 11, Defendants held Mr. Folks in four-point restraints for five days, followed by six more days of two-point restraints.[13] During this eleven-day period, Mr. Folks saw a psychiatrist only for LDPSC to repeatedly renew the order for restraints.[14] In all, Mr. Folks waited nearly two weeks to be seen by a treating psychiatrist, Dr. Matthew Gamble.[15] When Dr. Gamble finally saw Mr. Folks, the visit lasted for about "five to ten

---

[6] *Id.* ¶¶ 68-69.
[7] *Id.* ¶ 3.
[8] *Id.* ¶ 4.
[9] R. Doc. 55-2 ("Defs.' SOMF") ¶ 11.
[10] *Id.*; Pl.'s Opp. SOMF ¶ 5.
[11] Pl.'s Opp. SOMF ¶ 18.
[12] *Id.*
[13] *Id.* ¶ 5; Defs.' SOMF ¶¶ 11-15.
[14] Defs.' SOMF ¶ 15.
[15] Pl.'s Opp. SOMF ¶ 7.

minutes,"[16] and Dr. Gamble did not consider accommodating Mr. Folks in less restrictive housing.[17] This started the vicious cycle of Defendants imposing ever-more restrictive conditions on Mr. Folks in response to his tendency to self-harm, which only exacerbated that tendency, leading to further restraints, and so on. At each stage, Defendants failed to consider whether less restrictive and more humane interventions or treatments were available and could have helped.

### C. Mr. Folks's Second Incident of Self-Harm and Defendants' Escalating Punitive Response.

On June 13, 2021, while housed in the TC, Mr. Folks inflicted deep cuts to his legs and stomach and impaled his neck with a sharpened toothbrush.[18] In response to this manifestation of his compulsive tendency to self-harm, LDPSC charged him with a violation of Rule No. 19—self-mutilation by a prisoner—which was punishable by disciplinary segregation.[19] As a result, LDPSC sentenced Mr. Folks to 20 days of disciplinary segregation.[20] In addition, Defendants subjected Mr. Folks to metal restraints again—this time for over two weeks.[21] This period of restraints was just as brutal as the prior one. Mr. Folks again received no evaluation or treatment; nor did Defendants consider any accommodation that could ameliorate Mr. Folks's compulsion to self-harm.

Instead, less than two months after Mr. Folks first self-harmed in LDPSC's custody, Dr. Gamble wrote off Mr. Folks's self-harming behaviors as volitional and calculated to seek different housing placement.[22] In doing so, Dr. Gamble chose to ignore Mr. Folks's long history of mental

---

[16] *Id.* ¶ 8.
[17] *Id.* ¶ 9.
[18] *Id.* ¶ 12.
[19] *Id.* ¶¶ 13-15.
[20] *Id.* ¶ 13.
[21] *Id.* ¶ 16.
[22] *Id.* ¶ 19.

illnesses, including bipolar disorder, depression, thought disorders, and schizophrenia.[23] Once Defendants wrote off Mr. Folks's self-harm as manipulative, they conveniently excused themselves from addressing Mr. Folks's symptoms and instead resorted to repeated extreme suicide watches to punish him for his self-harming tendencies.[24]

### D.    Mr. Folks's Third and Fourth Self-Harm Incidents and Defendants' Ongoing Exacerbation of His Mental Health Symptoms.

Defendants first considered moving Mr. Folks to an even more restrictive placement known as the "time-out" cell on June 3, 2021, a few days before Mr. Folks self-harmed in LDPSC custody for the second time.[25] The Transitional Unit ("TU") "time-out" cells, as they come to be known at LSP, were *even more isolated* than Mr. Folks's housing in the TC locked rooms.[26] Unlike the TC, where inmates, officers, and staff regularly walked the tier, there were few other people on the "time-out" level.[27] Further, the "time-out" cells were under 24/7-hour video surveillance and closely guarded at all times by an officer stationed feet away.[28] Due to the punishing conditions in "time-out," LSP reserved these cells for inmates who were "behaving quite badly" or "severely problematic."[29]

By this point, Defendants were well-aware that restrictive, isolated housing environments exacerbated Mr. Folks's self-harm. In fact, the mental health care plan for Mr. Folks, signed by Dr. Gamble on April 30, identified "restrictive housing" as a concern for Mr. Folks's mental health.[30] Dr. Gamble also testified that he was aware of the risk that placing Mr. Folks in the TU

---

[23] *Id.* ¶ 66.
[24] R. Doc. 55-23 (Glindmeyer Deposition) at 48:1-6, 52:16-53:7, 54:4-17.
[25] Pl.'s Opp. SOMF ¶ 10.
[26] *Id.* ¶ 21.
[27] *Id.*
[28] *Id.*
[29] *Id.* ¶ 63.
[30] *Id.* ¶ 11.

could increase the risk of harm.[31] LSP's Medical Director, Dr. Paul Toce, similarly testified that he knew Mr. Folks was less likely to self-harm in the TC, and that his symptoms did not improve in the "time-out" cell.[32] Dr. Toce's predecessor, Dr. Dan LaFleur, was also fully aware of Mr. Folks's rapidly worsening symptoms.[33] But instead of attempting to break the cycle of Mr. Folks's self-harm, Defendants moved him to the "time-out" cell.[34]

Almost immediately after Defendants reassigned Mr. Folks to the "time-out" cell, he was prompted to force metal wires through his abdomen on July 6, 2021.[35] This time, Mr. Folks's self-harm was serious enough to require hospitalizing him.[36] LDPSC once again charged Mr. Folks with a violation of Rule No. 19.[37]

Mr. Folks returned from the hospital into LDPSC custody on July 13, 2021, after which he was placed on extreme suicide watch with four-point restraints for an even longer period of time— nearly a month.[38] However, on July 20, halfway through Mr. Folks's third period in restraints, Mr. Folks managed to insert a piece of metal into his stomach.[39] After spending a night in physical pain and four-point restraints, Mr. Folks was hospitalized for his injuries on July 21, 2021.[40] And yet, this incident resulted in the severest and most life-threatening injuries Mr. Folks suffered in LDPSC's custody, requiring removal of parts off his small bowel and colon.[41]

---

[31] *Id*. ¶ 45.
[32] *Id*. ¶ 80.
[33] *Id*. ¶¶ 81-82.
[34] *Id*. ¶¶ 20, 80, 82.
[35] *Id*. ¶ 22.
[36] *Id*. ¶ 24.
[37] *Id*. ¶ 23.
[38] *Id*. ¶¶ 25-31; Defs.' SOMF ¶¶ 31-38.
[39] Pl.'s Opp. SOMF ¶ 26.
[40] *Id*. ¶ 27.
[41] *Id*.

While Mr. Folks received treatment for his injuries at the University Medical Center ("UMC") hospital, he remained partially restrained. However, rather than resorting to the cruelest and most restrictive form of restraints that Mr. Folks was subjected to while in LDPSC custody, UMC shackled only Mr. Folks's right ankle.[42] Mr. Folks did not self-harm while only partially restrained in the hospital.[43]

When Mr. Folks returned to LSP on July 31, 2021, Defendants immediately reimposed extreme suicide watch.[44] On August 2, Dr. Gamble again dismissed Mr. Folks's self-harm as manipulative and motivated by a desire for less restrictive housing.[45] But rather than objectively assessing Mr. Folks's suicide risk or trying to accommodate Mr. Folks's need for less restrictive conditions—meaning anything other than long-term metal four-point restraints—Dr. Gamble continued the extreme suicide watch and restraints.[46] Mr. Folks remained handcuffed and restrained to a bed in a room by himself until August 10, thirty-five days after he was placed on extreme suicide watch for the third time in LDPSC custody.[47]

On the same day Mr. Folks was taken off restraints, he was transferred back to the "time-out" cell, despite the life-threatening incident of self-harm it had triggered a month prior.[48] Despite the fact that Mr. Folks showed no signs of self-harming after being taken off watch—indeed, Dr. Gamble had discontinued suicide watch on August 17, 2021[49]—LDPSC continued to lock Mr. Folks in the ultra-restrictive TU for another year.[50] Finally, on September 16, 2022, Mr. Folks was

---

[42] *Id.* ¶ 28.
[43] *Cf. id.*
[44] *Id.* ¶ 29.
[45] *Id.* ¶ 30.
[46] *Id.*
[47] *Id.* ¶ 31.
[48] *Id.* ¶ 33.
[49] *Id.* ¶ 32.
[50] *Id.* ¶ 34.

moved to "closed cell restriction" on Death Row ("CCR"), even though he had not been sentenced to death.[51] Despite the still-brutal conditions on Death Row, Mr. Folks preferred being there over the ultra-restrictive "time-out" cells.[52] The CCR cells in Death Row were, at a minimum, less isolated, allowed for interaction with other inmates and staff, and had access to medical care.[53] Defendants, including LSP Medical Director Dr. Toce, knew that such conditions were less likely to trigger Mr. Folks's self-harm.[54] And, as expected, Mr. Folks did not self-harm while housed in this less restrictive setting.[55]

**E.    Defendants' Pattern of Punishing Mr. Folks with Isolation and Restraints.**

Despite Defendants' claims to the contrary, Mr. Folks's extended placements in isolation and restraints were intended to punish him and were not "clinically indicated," as LDPSC policies required.[56] Although LDPSC policies purport to permit restraints only "as a last resort" and never "as punishment," they also allow inmates, including those suffering from mental illnesses, to be restrained for non-clinical, security reasons.[57] Indeed, Mr. Folks had arrived at LSP on felony charges of self-mutilation.[58] And he was twice charged with violating the LDPSC disciplinary rule against "self-mutilation" and sentenced to disciplinary segregation as punishment.[59]

Although Defendants now claim that Mr. Folks was kept in "time-out" and restraints to care for his mental illnesses,[60] LDPSC's own psychiatric faculty stated that they did not believe

---

[51] *Id.* ¶ 35.
[52] *Id.* ¶ 37.
[53] *Id.* ¶ 38.
[54] *Id.* ¶ 39.
[55] *Id.* ¶ 40.
[56] *Id.* ¶ 56.
[57] *Id.*
[58] *Id.* ¶ 1.
[59] *Id.* ¶¶ 13, 23.
[60] *See, e.g.*, R. Doc. 55-4 (Affidavit of Matthew Gamble) ¶ 9.

that Mr. Folks had any mental illnesses that caused him to self-harm. Mr. Folks's treating physician, Dr. Gamble, dismissed his self-harm as manipulative and aimed at external incentives, rather than resulting from his mental illnesses,[61] and LSP's medical director echoed Dr. Gamble's assessment.[62] Even still, they approved and indeed advocated for Mr. Folks to be put in isolation and restraints for successively more restrictive and longer periods of time and ignored readily available alternatives.[63]

Even if isolation and restraints could have been useful as a temporary means to administer therapeutic treatment, Mr. Folks was, at one point, held in restraints for over thirty consecutive days, and in isolation for the entire duration of his incarceration. There was no clinical justification for this uniquely cruel treatment. Substantial evidence suggests that isolation can exacerbate mental health symptoms, including symptoms associated with trauma and past restraints.[64] Major healthcare organizations, including the American Psychiatric Association and the National Commission on Correctional Health Care, caution that clinical restraints should only be used as a last resort.[65] Even Dr. Gamble admitted to Mr. Folks that his placement in restraints for over thirty days exceeded all medical and mental health necessity.[66]

Finally, were there any conceivable psychiatric justifications for subjecting Mr. Folks to metal restraints for thirty-five days on end or keeping him in "time-out" for over a year (there are not), they would have been irrelevant, as Defendants single-mindedly prioritized security and discipline over psychiatric treatment. Although Dr. Gamble gave the orders to issue and renew

---

[61] Pl.'s Opp. SOMF ¶¶ 19.
[62] Id. ¶ 80.
[63] Id. ¶¶ 30-34.
[64] R. Doc. 55-23 (Glindmeyer Report) at 42-43.
[65] Id. at 42-43.
[66] Id. ¶ 57.

restraints (in spite of his better clinical judgment), per LDPSC practice and procedure, those decisions were ultimately guided by the opinions of security officials, such as Defendant Warden Timothy Hooper and the Deputy Warden of medical and mental health, Defendant Ashli Oliveaux. In other words, Dr. Gamble cannot act on his clinical judgment alone, but rather reports to Defendant Oliveaux.[67] And the Defendant Oliveaux in turn reports to Defendant Hooper.[68] Thus, it is Defendant Hooper, not any psychiatric professional, who has the final say on whether a mentally ill inmate like Mr. Folks can be released from restraints.[69] Indeed, Defendant Hooper visited Mr. Folks twice while he was on extreme suicide watch and warned him that he would be restrained "for a long time."[70] If the punitive nature of the "time-out" cells was not obvious from its given name, mental health faculty at LSP complained that "time-out" cells were not "accessible to mental health," and instead occupied by offenders who were there for "security reasons," including Mr. Folks.[71] According to LSP's mental health staff, this use of the "time-out" cells for security reasons came at the expense of inmates for whom these cells were needed for psychiatric treatment,[72] i.e. for whom ultra-restrictive housing did not trigger such severe and impulsive self-harm.

Defendants had ample alternatives to house Mr. Folks that would not have triggered such severe self-harm symptoms. Even as a pretrial offender, Mr. Folks could have been placed in CCR on Death Row, which Defendants knew to be less likely to trigger Mr. Folks's self-harm.[73] And Mr. Folks became a full-time LDPSC offender on August 10, 2022, meaning that he was eligible

---

[67] *Id.* ¶ 58.
[68] *Id.* ¶ 59.
[69] *Id.*
[70] *Id.* ¶ 60.
[71] *Id.* ¶ 62.
[72] *Id.*
[73] *Id.* ¶¶ 36-40.

for non-segregated housing on that date.[74] Yet, on September 16, 2022, LDPSC moved him to a single, isolated cell in CCR,[75] after more than a year of non-stop isolation and repeated incidents of isolation-induced self-harm. Rather than consider these alternatives, Defendants repeatedly elected to keep Mr. Folks in the most restrictive conditions possible as punishment for, in their view, "manipulative" behavior.

### F.    Mr. Folks's Pursuit of Administrative Remedies.

Mr. Folks filed a series of Administrative Remedy Procedures ("ARPs") with LDPSC to address Defendants' failure to accommodate and punishment of his mental health symptoms. On November 9, 2021, Mr. Folks filed ARP 2021-2850, which detailed his psychiatric disorders and resulting self-injuries.[76] ARP 2021-2850 requested Mr. Folks's mental health records related to self-harm incidents *at LSP*, and specifically those resulting in seclusion and restraint.[77] LDPSC received Mr. Folks's request on November 23, 2021,[78] and denied it on January 4, 2022.[79] Mr. Folks appealed two days later and once again described how his psychiatric disorders caused him to self-harm.[80] His appeal was summarily rejected on February 2, 2022.[81]

Despite LDPSC's clear disregard for Mr. Folks's administrative grievances, on April 18, 2022, Mr. Folks filed another ARP, no. 2022-0859, this time regarding the unsanitary and unlivable conditions in the TU "time-out" cell where he was then confined.[82] Mr. Folks reported repeated flooding and leaks containing feces and other bodily fluids into his cell, and security

---

[74] Defs.' SOMF ¶¶ 3-4; Pl.'s Opp. SOMF ¶ 41.
[75] Pl.'s Opp. SOMF ¶ 41.
[76] *Id*. ¶ 47.
[77] *Id*.
[78] *Id*.
[79] *Id*.
[80] *Id*.
[81] *Id*.
[82] *Id*. ¶ 48.

officers spraying inmates with "chemical munitions."[83] Under duress, however, Mr. Folks

withdrew this ARP.[84] Mr. Folks feared that if he pressed on with his ARP, he would lose certain

privileges from the officer who he believed would have been responsible for addressing his

complaints.[85] Further, after over a year of being isolated and unjustly punished for his mental

illness, Mr. Folks feared jeopardizing the few relationships that helped him survive his

incarceration.[86]

On July 22, 2022, Mr. Folks filed ARP 2022-1428 regarding "cruel and unusual

punishment by use of force by restraints (handcuffs/shackles)."[87] This ARP unambiguously

detailed Defendants' disproportionate use of restraints on Mr. Folks from April 2021 to August

2021.[88] On July 28, 2022, LDPSC summarily rejected Mr. Folks's ARP as untimely.[89]

That Mr. Folks managed to file any ARPs at all defied the odds. Because LDPSC officers

and employees viewed Mr. Folks as a suicide or self-harm risk for nearly the entirety of his

incarceration, prison staff refused to provide him with pens, pencils, or paper with which to write

ARPs.[90] Further, the severe physical injuries he suffered in LDPSC custody disrupted his ability

to write and file ARPs.[91] Finally, Mr. Folks was on high doses of multiple anti-psychotic

medications, including Thorazine, a "major tranquilizer,"[92] which impaired his thinking and

---

[83] *Id.*

[84] *Id.* ¶ 49.

[85] *Id.*

[86] *Id.*

[87] *See Id.* ¶ 50.

[88] *Id.*

[89] *Id.*

[90] *Id.* ¶ 52.

[91] *Id.* ¶ 53.

[92] *Id.* ¶¶ 54, 67.

movement.[93] Mr. Folks was only able to file the few ARPs he did when others passed him items he could use to write, and with the assistance of inmate lawyers.[94]

### G.    The Psychiatric Consequences of LDPSC's Punishments.

Defendants weaponized isolation and restraints to force Mr. Folks into submission and their cruelty was devastating to Mr. Folks's mental health. Following his incarceration at LSP, Mr. Folks exhibited symptoms of Post Traumatic Stress Disorder ("PTSD").[95] From a comprehensive psychological assessment of Mr. Folks, Plaintiff's psychiatric expert Dr. Daphne Glindmyer reported that in addition to his prior history of self-harm, he currently suffers from lasting symptoms of depression, mania, poor sleep, anxiety, and intrusive thoughts.[96] Dr. Glindmyer reported that Mr. Folks has not been able to live independently since being incarcerated,[97] further signaling the extent of his illness.

## ARGUMENT

### I.    Summary Judgment Must Not Be Granted When There Are Genuine Disputes of Material Facts.

Summary judgment must be denied unless the movant shows there are no genuine issues of material fact and they are entitled to judgment as a matter of law.[98] The movant "bears the initial burden of showing that there is no genuine issue for trial."[99] If the movant fails to meet this burden "the motion must be denied, regardless of the nonmovant's response."[100] A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[101]

---

[93] *Id.* ¶ 54.
[94] *Id.* ¶ 51.
[95] *Id.* ¶ 73.
[96] *Id.* ¶ 74.
[97] *Id.* ¶ 75.
[98] Fed. R. Civ. P. 56(a).
[99] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 712 (5th Cir. 1994).
[100] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).
[101] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the facts "in the light most favorable" to the non-movant, who is entitled to all reasonable inferences.[102] "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions,"[103] making summary judgment improper where disposition turns on such assessments. Disputed factual issues and conflicting testimony cannot be resolved at this stage.[104]

## II. There Are Triable Issues of Material Fact as to Mr. Folks's Section 1983 Claims.

### A. There Are Triable Issues of Material Fact as to Mr. Folks's Deliberate Indifference Claim.

The record supports a finding that Defendants knew Mr. Folks faced a substantial risk of serious harm from his self-harming behaviors and chose punitive measures that worsened the risk, specifically prolonged isolation in the "time-out" cell and extended use of restraints that aggravated his self-injurious tendencies and created a foreseeable risk of extreme injury or death.

Defendants contend they were not deliberately indifferent because Mr. Folks "was continuously treated for his mental health concerns."[105] That argument misstates the claim. The issue is not whether some mental health care was provided, but whether Defendants subjected Mr. Folks to conditions they knew would risk intensifying the danger.

A prison official violates the Eighth and Fourteenth Amendments when the official is deliberately indifferent to a substantial risk of serious harm to an inmate.[106] "Deliberate indifference requires a showing that the official was subjectively aware of and disregarded a risk

---

[102] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[103] *Anderson*, 477 U.S. at 255.

[104] *Kelly v. Stassi*, 587 F. Supp. 3d 409, 414 (M.D. La. 2022) (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016)).

[105] R. Doc. 55-1 ("MSJ") at 17.

[106] *Arenas v. Calhoun*, 922 F.3d 616, 620-21 (5th Cir. 2019).

of serious harm to the inmate."[107] The evidence here creates genuine disputes of material fact as to both knowledge and disregard.

### 1. Defendants Knew Mr. Folks Faced a Substantial Risk of Self-Harm.

Defendants do not dispute that Mr. Folks's severe and repeated self-harming behaviors posed a substantial risk to his health.[108] That risk was obvious and serious because repeated self-inflicted injuries can cause permanent bodily damage or death, as with the permanent damage to Mr. Folks's digestive system.[109]

A prison official has subjective knowledge of a substantial health risk when there is a "cognizable" threat to an inmate's health, even if the harm has not yet occurred, and knowledge may be inferred when the risk is obvious, long-standing, or previously documented by staff.[110] The official's conduct before the risk materializes is relevant to deliberate indifference. "A remedy need not await a tragic event."[111] In *Gobert*, for example, the Fifth Circuit held that an officer's awareness of an open wound and its inherent health risks satisfied this element.[112] The same is true here. Defendants knew of Mr. Folks's serious and chronic self-harming behaviors, yet subjected him to prolonged isolation and restraints as punishment that not only failed to reduce the risk but predictably worsened it.

Defendants' reliance on cases about misjudging suicide risk is misplaced.[113] *Domino* involved an incorrect assessment of whether a suicide threat was genuine, a predictive judgment the court recognized is inherently difficult in the prison setting. This case is different. There was

---

[107] *Monceaux v. White*, 266 F. App'x 362, 366 (5th Cir. 2008).
[108] Defs.' SOMF ¶¶ 10, 13, 17-18, 25-26.
[109] Pl.'s Opp. SOMF ¶¶ 26-27.
[110] *Gobert v. Caldwell*, 463 F.3d 339, 349 & n.30 (5th Cir. 2006); *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).
[111] *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).
[112] *Id.* at 349.
[113] MSJ at 17 (citing *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

no uncertainty to resolve. Mr. Folks engaged in severe self-harm repeatedly, in Defendants' presence, under conditions they imposed. The risk was neither speculative nor difficult to predict. It was ongoing and obvious, and Defendants chose to punish Mr. Folks by continuing the very measures of prolonged isolation and restraints that intensified it.

### 2. Defendants Disregarded the Substantial Risk of Self-Harm.

Defendants kept Mr. Folks in conditions that intensified, rather than mitigated, his self-harming behavior. Prolonged isolation in the TU "time-out" cell and extended use of restraints aggravated his mental health and did not prevent harm. While restrained, Mr. Folks continued to injure himself.

Defendants claim the time-out cell was "the safest place" for Mr. Folks because he was a pretrial detainee and because of his self-harm history.[114] The record contradicts both assertions. Mr. Folks could have been housed in the TC/NU or Death Row CCR for his entire stay,[115] which, though still restrictive, at least allowed for routine interaction with inmates, officers, and mental health staff.[116] And Defendants kept Mr. Folks isolated even after he was eligible for non-segregated housing with the general population as early as August 10, 2022.[117] Other viable placements existed that would not have triggered his self-harm as severely.

The law is clear that deliberately choosing obviously inadequate measures to address a known risk meets the disregard prong of deliberate indifference.[118] In *Shepard v. Hansford County*, the court found deliberate indifference where jailers left a suicidal detainee in conditions

---

[114] MSJ at 15.
[115] Pl.'s Opp. SOMF ¶¶ 3, 36.
[116] Pl.'s Opp. SOMF ¶¶ 21, 38.
[117] *Id.* ¶ 41; Defs.' SOMF ¶ 3.
[118] *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 396 (5th Cir. 2000) (placing suicidal detainee in cell with tie-off points was "obviously inadequate").

that facilitated self-harm.[119] Likewise, here, Defendants kept Mr. Folks in conditions that predictably provoked self-harm.[120]

## B.    There Are Triable Issues of Material Fact as to Mr. Folks's Conditions of Confinement Claim.

The evidence would allow a reasonable jury to find that Mr. Folks was confined for 17 months in conditions so harsh they deprived him of basic human needs and posed a substantial risk to his health. The Eighth Amendment requires humane conditions of confinement, including "adequate food, clothing, shelter, and medical care," and reasonable safety.[121] To establish an unconstitutional condition of confinement, a plaintiff must show conditions so serious as to deprive him of "the minimal measure of life's necessities," and that officials acted with deliberate indifference to those conditions.[122]

### 1.    The Conditions Were Inhumane and Prolonged.

For 17 months, Mr. Folks was held in near-total isolation in an unsanitary "time-out" cell, with almost no human contact. He was frequently shackled to his bed with five-point restraints for weeks at a time, denied access to programming or activities, and confined in an environment that would cause a person with serious medical needs such as his to deteriorate.

The duration of these conditions magnified their severity. As the Fifth Circuit has recognized, "truly onerous conditions for a brief period of time may not be atypical; less onerous

---

[119] 110 F. Supp. 3d 696, 710 (N.D. Tex. 2015).

[120] *See Nagle v. Gusman*, No. 12-1910, 2016 WL 760628, at *4, 6 (E.D. La. 2016) (same principle applies to non-suicidal self-harm); *Gobert*, 463 F.3d at 349 n.30 ("A Remedy need not await a tragic event." (quoting *Helling v. McKinney*, 509 U.S. at 33)).

[121] *Farmer*, 511 U.S. at 832.

[122] *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999).

conditions for an extended period of time may be."[123] Exposure to unsanitary conditions such as feces and bodily fluids for even very brief periods has also been held unconstitutional.[124]

Mr. Folks's confinement was harsher than the conditions courts have found constitutionally permissible. For 17 months, he endured the same deprivations at issue in *Wilkinson v. Austin*.[125] In *Wilkinson*, the Supreme Court described extreme restrictions as a solid metal door that prevented communication and only one hour of isolated indoor exercise a day.[126] Mr. Folks endured these same deprivations, with the added harm of prolonged physical restraints and highly unsanitary conditions, for well over a year.

### 2. Defendants' Justifications Do Not Excuse the Extreme Conditions They Imposed.

Defendants contend that the "time-out" cell was necessary because he was a pretrial detainee and allegedly safer there, and that restraints can be appropriate in some situations.[127] Even if separation or restraint might be justified for limited periods, the extreme and prolonged nature of these measures over 17 months exceeds anything the Eighth Amendment permits. Further, Defendants chose conditions, such as prolonged isolation, unsanitary housing, and extended physical restraints, that predictably worsened his mental and then physical health. These measures were not reasonable responses to a known risk. Instead, they intensified the danger to Mr. Folks by worsening the very self-harming behaviors defendants were required to address.

The Fifth Circuit's decision in *LaVergne v. Stutes* underscores the severity of Mr. Folks's confinement.[128] There, no violation was found where the prisoner in segregation could have

---

[123] *Bailey v. Fisher*, 647 F. App'x 472, 476 (5th Cir. 2016) (per curiam).
[124] *See, e.g., Gates v. Cook*, 36 F.3d 323, 338 (5th Cir. 2004) (collecting cases); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (holding that three days in a feces-covered cell states a claim).
[125] 545 U.S. 209 (2005).
[126] 545 U.S. at 124, 224.
[127] Defs.' SOMF ¶ 10.
[128] 82 F.4th 433 (5th Cir. 2023).

contact visits twice a month, make phone calls, cook food, exercise an hour daily, enjoy three hours of outdoor recreation weekly, and converse with other inmates.[129] Mr. Folks had none of this. His conditions were instead comparable to those in *Wilkinson*, with the added harm of prolonged restraints, and persisted for 17 months.[130] Defendants offer no authority suggesting that such conditions are permissible.

### C.    Defendants Are Not Entitled to Qualified Immunity as to Mr. Folks's Section 1983 Claims.

Qualified immunity shields government officials from liability if the plaintiff fails to show both that (1) the official violated a constitutional right, and (2) the right was clearly established at the time.[131] Once invoked, the burden shifts to the plaintiff to produce evidence creating a factual issue on both prongs.[132] The record here does exactly that for each Defendant.

### 1.    Defendants Violated Mr. Folks's Constitutional Rights.

The Eighth and Fourteenth Amendment prohibition against acting with deliberate indifference applies to both custody and medical staff, and requires taking reasonable steps to address a known risk.[133]

The record contains ample evidence from which a jury could find that each Defendant knew Mr. Folks's prolonged placement in the TU "time-out" cell and in restraints aggravated his severe mental illness and self-harming behavior, and that safer alternatives were available.

#### *Medical Staff: Dr. Matthew Gamble, Dr. Dean Toce, and Dr. Dan LaFleur*

The medical Defendants each knew that the TU "time-out" cell and prolonged four- and five-point restraints aggravated Mr. Folks's severe mental illness and self-harm, yet allowed those

---

[129] *Id.* at 436.
[130] *See Wilkinson*, 545 U.S. at 124, 224.
[131] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).
[132] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).
[133] *See Arenas*, 922 F.3d at 620–21.

conditions to continue for months. On April 30, 2021, Dr. Gamble signed a mental health care plan identifying "restrictive housing" as a concern for Mr. Folks's mental health and later testified he knew placing him in the "time-out" cell increased the risk of harm.[134] He nevertheless approved continued extreme suicide watch and restraints despite knowing they were not clinically indicated, and did not consider less restrictive housing.[135] As Medical Director, Dr. Toce received reports from Dr. Gamble and staff about Mr. Folks's deterioration, knew the "time-out" cell was used punitively for "behaving . . . badly," and did not act to remove him.[136] While serving for a shorter period, Former LSP Medical Director Dr. Dan LaFleur reviewed incident reports and evaluations confirming the same harmful effects but took no corrective action.[137]

### *Custody Staff: Warden Tim Hooper and Assistant Warden Ashli Oliveaux*

The custody Defendants also knew these conditions caused harm and disregarded available alternatives. Warden Hooper approved and extended Mr. Folks's restraints, told him he would remain restrained "for a long time," and knew from reports and direct observation that the restraints aggravated rather than prevented self-harm.[138] As Deputy Warden for medical and mental health, Oliveaux supervised LSP's mental health providers and had authority over mental health decisions, including whether to release inmates from restraints, and knew of alternative housing options[139]— including CCR on Death Row, which officials recognized as less likely to trigger self-harm.[140]

---

[134] Pl.'s Opp. SOMF ¶ 11; R. Doc. 55-7 (LSP Mental Health Records) at 003192.
[135] *Id*. ¶¶ 9, 30.
[136] *Id*. ¶¶ 63, 80.
[137] *Id*. ¶¶ 81-82.
[138] *Id*. ¶¶ 57-60.
[139] *Id*. ¶ 59, 83.
[140] *Id*. ¶ 38-39.

used

Both participated in decisions to keep Mr. Folks in the TU cell under prolonged restraints rather than transfer him to safer housing.[141]

Fifth Circuit precedent confirms that such disregard violates the Constitution. The Fifth Circuit has "repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide."[142] Moreover, a prison official's deliberate indifference to a substantial risk of serious harm, including suicide, may be inferred from the obviousness of that risk.[143] Here, the individual defendants' actions only aggravated Mr. Folks's notorious and well-documented tendency to seriously self-harm in "time-out," and they unreasonably "placed [him] in conditions [they] knew to be obviously inadequate."[144] Their chosen course of action— transferring or permitting Mr. Folks to be transferred to "time-out" and subjecting him to successively longer periods of four-point restraint. This conduct satisfies the first prong of the qualified immunity analysis.

> ### 2. Fifth Circuit Law Left No Doubt That Subjecting Mr. Folks to Known Harmful Housing and Restraints Was Unlawful.

Showing that a constitutional right is clearly established "do[es] not require a case directly on point," only that "existing precedent must have placed the statutory or constitutional question beyond debate."[145] By 2022, it was beyond debate that both custody and medical officials violate the Constitution when they knowingly force inmates into conditions of prolonged isolation and which aggravate a serious risk of suicide or self-harm, particularly when safer alternatives are available and known to ameliorate the risk.

---

[141] *Id.* ¶¶ 57-60, 83.

[142] *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020).

[143] *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008).

[144] *Jacobs*, 228 F.3d at 397.

[145] *Ashcroft*, 563 U.S. at 741.

As the Fifth Circuit recognized in *Stevenson v. Tocé*, applying pre-2022 law, disregarding explicit medical restrictions and continuing an assignment known to cause harm violates clearly established rights.[146] It was beyond debate in 2022 that both custody and medical staff have an independent duty to act when they know of a serious risk and cannot avoid liability by deferring to each other.[147] Placing an inmate in housing known to be harmful to them despite knowing of safer placements is clearly established as a constitutional violation.[148]

This case fits squarely within that body of law. Like officials in *Stevenson*, Defendants were confronted with explicit professional warnings that the TU "time-out" cell and prolonged restraints would cause harm, yet persisted in those conditions for months.[149] Their inaction also mirrored *Ford*, where the court held that both custody and medical staff have an independent duty to intervene when they know of a serious risk, and cannot shield themselves by deferring to others.[150] And as in *Jacobs*, they maintained conditions of confinement that posed a suicide risk despite knowing of safer options.[151]

Because the law was clear, the risk was obvious, and Defendants knowingly disregarded it, their qualified immunity defense fails.

## III. There Are Triable Issues of Material Fact as to Mr. Folks's ADA and RA Claims.

The record shows that Defendants excluded Mr. Folks from safe housing and meaningful access to mental health services because of his mental health disabilities, and failed to provide

---

[146] 113 F.4th 494, 505–06 (5th Cir. 2024),

[147] *Ford v. Anderson County*, 102 F.4th 292, 307, 311, 315-17 (5th Cir. 2024).

[148] *Converse*, 961 F.3d at 775.

[149] 113 F.4th at 505–06.

[150] 102 F.4th at 307, 311, 315-17.

[151] *Jacobs*, 228 F.3d at 397; *Rodrigue v. Grayson*, 557 F. App'x 341, 346–47 (5th Cir. 2014) (officials with subjective knowledge of worsening condition who persisted in ineffective measures acted with deliberate indifference).

reasonable modifications that would have mitigated his risk of harm. Instead, they chose housing and restraint conditions they knew would aggravate his disabilities and self-harming behavior.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits . . . of a public entity, or be subjected to discrimination by any such entity."[152] Section 504 of the RA imposes the same prohibition on entities receiving federal funds.[153] The ADA and RA are interpreted the same way, and the rights and remedies under each are generally identical.[154]

To prevail, a plaintiff must establish that "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity."[155] In the prison setting, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA."[156]

Defendants do not address, and therefore concede, that Mr. Folks has a qualifying disability. The record contains extensive medical and mental health documentation showing that he has been diagnosed with depression, bipolar disorder, and schizophrenia.[157] ADA regulations recognize these impairments "virtually always" substantially limit major life activities such as

---

[152] 42 U.S.C. § 12132.

[153] 29 U.S.C. § 794(a).

[154] *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 (5th Cir. 2005).

[155] *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *43 (M.D. La. Mar. 31, 2021) (quoting *George v. Louisiana Dep't of Pub. Safety & Corr.*, 2016 WL 3568109, at *8-9 (M.D. La. June 23, 2016)) (Dick, J.).

[156] *George*, 2016 WL 3568109, at *9 (citing *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 209–10 (1998) and *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011)).

[157] Pl.'s Opp. SOMF ¶ 66.

thinking, concentrating, communicating, and caring for oneself.[158] These disorders manifested in repeated episodes of severe self-injury, further limiting his ability to care for himself and manage his behavior, and required ongoing psychiatric medication.[159]

Defendants also concede that Mr. Folks requested accommodation in connection with his mental health conditions. He specifically requested to be transferred from the "time-out cell" and to be removed from prolonged restraints, both of which exacerbated his risk of self-harm.[160] Further, Mr. Folks was transferred from St. Mary Parish because his mental health had caused a pattern of self-injury, which Defendants knew at the time of his transfer.[161] Even assuming Mr. Folks had failed to seek an accommodation, which he did not, given that Defendants knew of his mental health conditions, "the ADA and RA do not require [him] to specifically request a certain accommodation in order to prevail on a claim of disability discrimination."[162]

Defendants seek summary judgment solely on the basis that they used therapeutic measures, including the "time-out" cell and restraints, to protect Mr. Folks from the risk of self-harm.[163] But whether those measures were reasonable accommodations is disputed, precluding summary judgment.

Indeed, it is disputed whether those were intended to be therapeutic at all, or instead punitive. Mr. Folks was twice charged and punished for self-injuring, with sanctions including disciplinary segregation.[164] LDPSC officials testified that the "time-out" cell, which he was sentenced to after a self-harm incident, could be used for prisoners "behaving quite badly" or who

---

[158] 28 C.F.R. § 35.108(d)(2)(iii)(K).
[159] Pl.'s Opp. SOMF *Id*. ¶¶ 66-67.
[160] *Id*. ¶ 44.
[161] *Id*. ¶ 2.
[162] *Adams v. Louisiana Dep't of Corr.*, No. CV 22-20-SDD-RLB, 2024 WL 4280924, at *10 n. 124. (M.D. La. Sept. 24, 2024) (Dick, J.); *Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d 274, 285 (M.D. La. 2019).
[163] MSJ at 26-27.
[164] Pl.'s Opp. SOMF ¶¶ 13, 23.

were "severely problematic."[165] LDPSC officials cited security reasons for his placement in the "time-out" cell and disciplinary segregation,[166] and acknowledged that the warden could veto any ADA accommodation.[167] Mr. Folks remained in the "time-out" cell long after he no longer exhibited signs of self-harm, and testimony confirms that LSP had less restrictive housing alternatives available for Mr. Folks.[168]

Defendants also failed to ensure meaningful access to mental health services. As a "public entity," LDPSC has "an affirmative obligation to make reasonable modifications . . . so that a disabled prisoner can have meaningful access to existing public services or programs," and the failure to do so constitutes intentional discrimination under the ADA.[169] LDPSC policies require accommodations for other disabilities, such as deafness and hardness of hearing,[170]J but none for prisoners with mental health disabilities, and no policy requires cost assessments for such accommodations.[171] Defendants never meaningfully considered modifications for Mr. Folks, thus discriminating against him.

Defendants' assertion that Mr. Folks received continuous treatment for his risk of self-harm is insufficient to warrant summary judgment where he has adduced evidence to create a material issue of disputed fact about whether such treatment constituted a "reasonable modification" in light of his known mental health conditions.[172]

---

[165] *Id*. ¶ 63.

[166] *Id*. ¶ 62.

[167] *Id*. ¶ 59.

[168] *Id*. ¶ 36-40.

[169] *George*, 2016 WL 3568109, at *9.

[170] Pl.'s Opp. SOMF ¶ 76.

[171] *Id*. ¶ 77.

[172] Defendants contend that Mr. Folks relies on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), which does not apply to the prison context. MSJ at 26-27. Mr. Folks cited the case in his complaint to assert one of his legal theories under the ADA. The Supreme Court in *Olmstead* found that "undue institutionalization" is a legal basis for disability discrimination under the ADA. Defendants' focus on whether *Olmstead* applies in a prison setting is a red herring because Mr. Folks relies on *Olmstead* for the more precise proposition that incarceration, especially under the

**IV.     Exhaustion and Prescription Do Not Bar Mr. Folks's Claims.**

Exhaustion and prescription do not bar Mr. Folks' claims. On exhaustion, Mr. Folks either

properly exhausted his claims through the ARP process or should be excused for non-exhaustion.

Defendants' prescription arguments fail because Mr. Folks filed his complaint within one year.

**A.     Mr. Folks Exhausted All Available Administrative Remedies and Was Excused From Exhausting Any Others.**

Mr. Folks exhausted all *available* ARPs related to the deterioration of his mental health in

LDPSC's custody. It is undisputed that ARP 2021-2850 was properly exhausted, and that ARP

placed Defendants on notice of Mr. Folks' claims. However, Mr. Folks was not required to exhaust

administrative remedies for the grievances complained of in ARP 2022-0859 and ARP 2022-1428,

as his physical injuries, psychiatric medications, and treatment by LDPSC employees made these

administrative remedies unavailable to him.

Under the Prison Litigation Reform Act ("PLRA"), prisoners must "exhaust *available*

remedies" prior to filing suit in federal court.[173] "Because exhaustion is an affirmative defense,

the burden is on [Defendants] to demonstrate that [Plaintiff] failed to exhaust." If not "available",

the prisoner "need not exhaust" remedies.[174] At summary judgment, the question whether

remedies are available is a "fact-specific inquiry,"[175] and the Fifth Circuit requires district courts

to consider "facts that, if true, very well might render the grievance system unavailable."[176]

---

punitive conditions and subpar treatment available at LSP, was not the least restrictive setting for treatment of individuals with a similarly unique and severe set of mental health conditions like Mr. Folks.

[173] 42 U.S.C. § 1997e (emphasis added)

[174] *Huskey v. Jones*, 45 F.4th 827, 831 (5th Cir. 2022) (citing *Ross v. Blake*, 578 U.S. 632, 642 (2016)).

[175] *Joseph v. Franklin*, NO. 1:22-CV-03198, 2023 WL 5746938, at *4 (W.D. La. Aug. 21, 2023), *report and recommendation adopted*, No. 22-CV-3198, 2023 WL 5740385 (W.D. La. Sept. 5, 2023).

[176] *See, e.g.*, *Jones v. Givens*, No. 19-50465, 2021 WL 3889295, *4 (5th Cir. Aug. 30, 2021).

### 1.    ARP 2021-2850.

Defendants misread ARP 2021-2850 as only a records request, but it placed Defendants on sufficient notice of the facts underlying his claims.[177] In addition to requesting medical and mental health records *directly linked* to self-harm while in LDPSC's custody, it identified his psychiatric disorders and self-injury incidents at LSP.[178] The First Step denial noted that "[p]ictures may be located in your file, within the Investigation Department," without any further instruction about how to obtain them.[179] When Mr. Folks appealed, he once again described how his psychiatric disorders caused him to self-injure.[180] LDPSC denied his Second Step request and, again, provided no instruction for obtaining photos from the Investigation Department.[181] Further, the ARP file contains an executed medical release form in which Mr. Folks stated that he needed medical records "in regard to self-harm" for "court cases."[182] Mr. Folks thus exhausted this ARP.[183]

### 2.    ARP 2022-0859.

Mr. Folks asserted that his unsanitary and unsafe "time-out" cell conditions worsened his physical and mental state in ARP 2022-0859.[184] While it was formally withdrawn, Mr. Folks withdrew the ARP out of fear that the shift supervisor for his housing unit at the time would be blamed for the unsanitary and unsafe conditions in his "time-out" cell, and he did not want the prison official to retaliate against him in response.[185] Because Mr. Folks requested numerous times to be transferred out of the "time-out" cell, it is reasonable to infer that he withdrew the grievance

---

[177] Pl.'s Opp. SOMF ¶ 47.
[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.* ¶ 46.
[184] *Id.* ¶ 48.
[185] *Id.* ¶ 49.

to avoid making his housing condition worse through retaliation.[186] In fact, there is no specific policy prohibiting LDPSC officers and employees from pressuring prisoners not to file new ARPs or to withdraw already-submitted ARPs.[187] Absent such a policy, and fearing the loss of future privileges or benefits from the shift supervisor, Mr. Folks was prohibited from further pursuing this grievance due to perceived threats of retaliation. Thus, the threat of retaliation "ma[d]e administrative remedies unavailable" to Mr. Folks and excused his failure to exhaust this ARP.[188]

### 3.    ARP 2022-1428.

Defendants' argument that ARP 2022-1428 was rejected as untimely by LDPSC should fail.[189] Fifth Circuit precedent excuses exhaustion where a prisoner's mental or physical injury causes untimely filing, the prisoner still submits the grievance, and the grievance is rejected as untimely.[190] In *Days v. Johnson*, the Fifth Circuit excused exhaustion where a prisoner's broken hand prevented him from filing on time, and the prison returned his untimely grievances as unprocessed.[191]

Here, Mr. Folks faced ongoing mental and physical injuries that precluded him from filing a timely grievance about his history of self-injury and related conditions at LSP until and through July 2022. As detailed above, Mr. Folks was suffering from acute mental health crises while isolated and restrained in LDPSC custody. He sustained permanent bodily damage requiring extensive recovery time.[192] He also took prescribed medications that limited his mobility and

---

[186] *Id.* ¶ 44.
[187] *Id.* ¶ 55.
[188] *Jones*, No. 19-50465, 2021 WL 3889295, at *3-4; *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008) ("The circuits that have considered this issue have held that it is possible for retaliation or the threat of retaliation to make administrative remedies unavailable.").
[189] MSJ at 13.
[190] *Foy v. LDPSC, et al.*, No. Civ. 17-400-SDDT-EWD (M.D. La. July 23, 2018), R. Doc. 23 at *7-8 (citing cases).
[191] 322 F.3d 863, 866 (5th Cir. 2003).
[192] Defs.' SOMF ¶¶ 31, 35; Pl.'s Opp. SOMF ¶¶ 24, 27.

ability to think clearly, to the point where he missed meals and bathroom breaks because he could not move or get up. [193] Despite the deterioration of his medical condition in LDPSC's custody, Mr. Folks persisted and filed ARP 2022-1428, which describes the use of restraints, his self-harm incidents, and other brutal conditions he suffered in LDPSC's custody. [194] Mr. Folks should therefore be excused because he "pursued his administrative remedies when he was physically and mentally capable of doing so, "filed an untimely grievance, and [] Defendant rejected such grievance for untimeliness." [195]

Even assuming Mr. Folks had not fully exhausted his administrative remedies as to his ARPs, which he has done, there were systemic issues with the ARP process that created a simple dead end. [196] Both on and off suicide watch, prison staff saw Mr. Folks as a suicide risk and thus did not give him access to materials needed to file ARPs, such as pens, pencils, or paper. [197] When he asked, prison staff refused. [198] On the few occasions he did successfully file ARPs, it was "only with the assistance of sympathetic inmates" who let him borrow pen and paper or helped him write ARPs. [199]

**B.    Mr. Folks's Claims Are Not Prescribed.**

Mr. Folks' claims are not prescribed. Defendants argue that "Plaintiff knew or had reason to know of the injury complained of in July 2022 when he filed his untimely ARP concerning alleged excessive force due to restraints" and filed his complaint "more than a year later." [200] The parties

---

[193] Pl.'s Opp. SOMF ¶ 54.
[194] Id. ¶ 50.
[195] Foy, No. 17-400-SDD-EWD, R. Doc. 23 at *8.
[196] Ross, 578 U.S. at 633 ("A grievance procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." (internal quotation marks omitted)).
[197] Pl.'s Opp. SOMF ¶ 52.
[198] Id.
[199] Id. ¶ 51.
[200] MSJ at 14.

agree the one-year prescription period applies for Mr. Folks's ADA/RA and Section 1983 claims. Mr. Folks's claims accrued on November 14, 2022, when he was released from LDPSC custody.[201] Mr. Folks's September 12, 2023 complaint is thus timely.

### 1. ADA/RA Claims.

Mr. Folks' ADA/RA claims accrued no earlier than November 14, 2022, when he was released from LDPSC custody. Before then, Mr. Folks was continually and discriminatorily denied housing transfers which should have been readily available to him as both a pretrial detainee, and later, as a full-time LDPSC offender.

"Although we borrow a limitations period from state law, the particular accrual date of a federal cause of action is a matter of federal law . . . the rule is that accrual occurs when a plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."[202] Under Fifth Circuit precedent, ADA claims can accrue for as long as the discriminatory condition persists.[203] Here, every day that Mr. Folks remained isolated in the "time-out" cell or in prolonged restraints despite the availability of safer, less harmful alternatives, and every day he was denied meaningful access to mental health services, constituted a new violation within the one-year limitations period.

### 2. Section 1983 Claims.

Mr. Folks's § 1983 claims also accrued no earlier than November 14, 2022. Accrual of a § 1983 claim is governed by federal law: "Under federal law, the [limitations] period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information

---

[201] Defs.' SOMF ¶ 2.

[202] *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011) (citations omitted).

[203] *See, e.g.*, *Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, 427 F. Supp. 3d 806, 819 (E.D. La. 2019).

to know that he has been injured."[204] "A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. . . . A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support a claim."[205] Mr. Folks's Section 1983 claims are based on Defendants' placement of him in conditions that they knew would exacerbate his self-harming, under the pretext of "care." Defendants intentionally refused to lessen restrictions every time they were presented with the opportunity to—they placed him in "time-out" when he could have been in CCR or the NU, and in single-cell CCR when he was eligible for non-segregated housing. They aggressively ordered restraints to punish him for self-harming in the way they knew he would and justified successively longer restraints in response. Defendants' failure to entertain alternate ways of housing, restraining, and treating Mr. Folks due to his mental health symptoms constituted a continuing and indeed, worsening, series of deliberate omissions that did not resolve until Mr. Folks's release in November 2022.[206] Thus, Mr. Folks's § 1983 claims are not prescribed.

## V.    The Court Has Jurisdiction Over Mr. Folks's Remaining Claims (Counts 5 and 7).

The Court should retain supplemental jurisdiction over Mr. Folks's negligence claim, as his Equal Protection claim remains pending and presents a federal question.[207] Even if all federal claims were dismissed, the Court may still adjudicate the state-law claims in its discretion.[208] That discretion favors retention here—discovery is complete, Defendants' request to dismiss state law

---

[204] *Russell v. Bd. of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992).

[205] *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001).

[206] *Boswell v. Claiborne Par. Det. Ctr.*, 629 F. App'x. 580, 583 (5th Cir. 2015) (claim based on an ongoing "failure to provide needed and requested medical attention alleged a continuing violation and was timely when filed); *Brooks v. Menifee*, No. CV07-0131-A, 2010 WL 7827470, at *3 (W.D. La. Sept. 27, 2010), *report and recommendation adopted*, No. CV07-0131-A, 2011 WL 5117600 (W.D. La. Oct. 26, 2011) (1983 claim based on improper housing placement accrued when the plaintiff was removed from the improper environment and thus the continuing violation ended).

[207] *See Baqer v. St. Tammany Par. Gov't*, No. CV 20-980, 2025 WL 948167, at *13 (E.D. La. Mar. 28, 2025) (exercising supplemental jurisdiction over state law claims where Section 1983 claims survived).

[208] *See Cabrol v. Town of Youngsville*, 106 F.3d 101, 110 (5th Cir. 1997).

claims was filed on the last day set by the scheduling order,[209] and trial is approaching. Judicial

economy, fairness, and convenience favor retaining supplemental jurisdiction.[210] Over nearly two

years of litigation, the Court has become familiar with the facts and legal issues, and Mr. Folks's

negligence claim raises no novel or complex state-law issues.[211]

## CONCLUSION

For these reasons, Defendants' motion for summary judgment should be denied in its

entirety, and Mr. Folks's claims should proceed to trial.


Dated: August 18, 2025                         Respectfully submitted,

*/s/ Caroline Gabriel*                          */s/ Elizabeth A. Edmondson*
Caroline Gabriel (La. Bar No. 38224)           Elizabeth A. Edmondson
William Most (La. Bar No. 36914)               Sarah A. Purtill
MOST & ASSOCIATES                              Julius J. Mitchell
201 St. Charles Ave., Ste. 2500, # 9685        Kevin K. Si
New Orleans, LA 70170                          Shailee Diwanji Sharma (*pro hac vice*
Telephone: (504) 509-5023                      forthcoming)
Email: williammost@gmail.com                   JENNER & BLOCK LLP
                                               1155 Avenue of the Americas
                                               New York, NY 10036-2711
                                               Telephone: (212) 891-1600
                                               EEdmondson@jenner.com
                                               SPurtill@jenner.com
                                               Julius.Mitchell@jenner.com
                                               KSi@jenner.com
                                               SSharma@jenner.com

                                               Kenneth D. Beale
                                               JENNER & BLOCK LLP
                                               1099 New York Ave NW # 900
                                               Washington, DC 20001
                                               Telephone: (202) 639-6000
                                               KBeale@jenner.com

---

[209] R. Doc. 36.

[210] *See Batiste v. Island Recs. Inc.*, 179 F.3d 217, 228 (5th Cir. 1999).

[211] *Williams v. Lockheed Martin Corp.*, No. CV 09-65, 2016 WL 1253562, at *5 (E.D. La. Mar. 31, 2016), *aff'd*, 990 F.3d 852 (5th Cir. 2021).

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of August, 2025, I electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, which will provide electronic notice of the filing to all CM/ECF participants. I further certify that all parties in this action are represented by CM/ECF participants.

*/s/ Elizabeth A. Edmondson*
Elizabeth A. Edmondson