## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| Joshua Folks,<br><br>　　　　　　Plaintiff,<br><br>　　　　　　　　v.<br><br>Louisiana Attorney General Jeff Landry, *et al.*,<br><br>　　　　　　Defendants. | Civ. Case No. 23-cv-01289-SDD-RLB |

### PLAINTIFF'S OPPOSING STATEMENT OF MATERIAL FACTS

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Joshua Folks, who submits these Responses to Defendants' Statements of Undisputed Facts, and this Opposing Statement of Material Facts.

M.D. La. Civ. L.R. 56(f) provides that "[a]n assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Plaintiff respectfully requests that the Court do so here, where Defendants, the moving party, have not supported their factual statements with specific citations to the record.

### PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENTS OF UNDISPUTED FACTS*

1.　　　On March 26, 2021, Joshua Folks was arrested in St. Mary's Parish on a felony charge. He was booked into the local facility. Within two days of being in St. Mary's custody,

---

* For clarity and ease of the Court's review, Plaintiff has reproduced Defendants' statements of fact and cited references, with each statement followed by Plaintiff's response below.

Folks self-harmed twice. St. Mary's Parish requested that Folks be transferred to a DPSC facility due to the self-harm.[1]

**RESPONSE:** Qualified. Mr. Folks was told that he was transferred because he "was a liability."[2] Plaintiff admits that Mr. Folks was arrested in St. Mary Parish for a felony, was booked into the local facility, and self-harmed twice in St. Mary custody. Plaintiff further admits that St. Mary Parish requested that Mr. Folks be transferred to an LDPSC facility due to self-harm.

2.    From March 31, 2021 to November 14, 2022, Joshua Folks was incarcerated at Louisiana State Penitentiary.[3]

**RESPONSE:** Admitted.

3.    From March 31, 2021 to August 10, 2022, Folks was a pretrial detainee.[4] On August 10, 2022, Folks signed his Waiver of Final Revocation Hearing, which revoked his parole, making him a DPSC offender.[5]

**RESPONSE:** Admitted.

4.    Pursuant to La. R.S. 15:824, an individual who has not been convicted or sentenced to DPSC custody may be housed at a DPSC facility if the local facility determines that it has insufficient facility to house the individual and the transfer is necessary to prevent danger to the individual, staff, inmates or general public. However, La. R.S. 15:824 provides that pre-trial detainees housed at DPSC facility shall be housed separate and apart from offenders sentenced to DPSC custody. DPSC's corresponding policy, IS-B-1, tracks this law and requires that pretrial

---

[1] Exhibit C, Email, bates 105.
[2] Declaration of Elizabeth A. Edmondson in Opposition to Defendants' Motion for Summary Judgment ("Edmondson Decl.") Ex. 1 (Folks Deposition) at 42:9.
[3] See Exhibit M.
[4] See Exhibit M.
[5] *Id.*

detainees be housed in a segregated unit at a DPSC facility separate and apart from inmates who have been sentenced to confinement at hard labor.[6]

**RESPONSE:** Defendants' characterization of La. R.S. 15:824 is a legal conclusion, not a statement of fact, and thus no response is required under M.D. La. Civ. L.R. 56. Defendants' characterization of IS-B-1, that it "tracks this law," is also a legal conclusion. To the extent a response to these conclusions is required, Plaintiff denies that IS-B-1 "tracks this law." IS-B-1's language requiring the Secretary to "ensure that the individual is housed <u>in a segregated unit</u>" is not included in the text of La. R.S. 15:824.[7]

5.    HCP40 is the DPSC policy that governs utilization of restraints pursuant to mental health orders.[8] HCP 40 provides that restraints shall be used only when clinically indicated for management of serious threats of self-harm or as a part of an authorized suicide watch.[9]

**RESPONSE:** Qualified. Plaintiff further submits that HCP40 provides that restraints "shall only be used as a last resort and shall limit only the movement that may cause harm."[10] Further, LDPSC policies also permit the use of restraints for non-clinical, security reasons.[11]

6.    HCP 30 governs procedures for suicide prevention. There are two levels of suicide watch: standard and extreme.

**RESPONSE:** Admitted.

7.    An inmate placed on a standard suicide watch shall be assessed by mental health staff at a minimum of every 24 hours.[12]

---

[6] See Exhibit J, IS-B-1, Section (10)(P)(3).
[7] *Compare* R. Doc. 55-21 (LDPSC Regulation No. IS-B-1) at 10 *with* La. R.S. 15:824.
[8] See Affidavit of Dr. Gamble and Exhibit A; Exhibit A-2, HCP40.
[9] *Id.*
[10] R. Doc. 55-6 (HCP40) at 5.
[11] *Id.* at 2.
[12] See Affidavit of Dr. Gamble and Exhibit A; Exhibit A-1, HCP30.

**RESPONSE:** Qualified. Plaintiff admits that HCP 30 provides that an inmate placed on a standard suicide watch shall be assessed by mental health staff at a minimum of every 24 hours.

8.    Extreme suicide watch shall be ordered only for the management of an inmate who presents a clear and continual risk of significant self-injurious behavior, which may include behaviors deemed life threatening/suicidal and non-suicidal self-injurious behaviors.[13] Restraints may be ordered where clinically indicated in accordance with HCP 40.[14] Upon initiation of extreme suicide watch, inmates shall be assessed by mental health staff at least every 12 hours.[15] While in restraints, offenders must be let out of the restraints every two hours and the restraints are checked every 15 minutes for circulation.[16]

**RESPONSE:** Qualified. Plaintiff admits that HCP 30 sets forth the requirements in this paragraph. Plaintiff further submits that HCP30 provides that restraints shall only be used as a "last resort."[17]

9.    Extreme suicide watch shall be downgraded to a standard suicide watch for a length of time sufficient to assess the inmate's stability. In any implementation of an extreme suicide watch, it is LSP's goal to get the offender to a place of less restriction as soon as possible, based on the offender's intent to self-harm.[18]

**RESPONSE:** Denied. LDPSC's goal is not only to get the offender to a place of less restriction as soon as possible. The record suggests that LDPSC used extreme suicide watch and

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] R. Doc. 55-5 (HCP30) at 3.
[18] Deposition of Dr. Gamble, pg. 98-99.

four-point restraints as a method of punishing Mr. Folks for self-harm behavior caused by his mental disorders.[19]

      10.     When Folks arrived at LSP, he was housed in the skilled nursing unit. This was because: (1) Folks was a pre-trial detainee; (2) Folks needed access to 24/7 medical care in his housing area; and (3) so that he would be in a room by himself to minimize his access to foreign objects for self-harm purposes.[20]

     **RESPONSE:** Denied. Plaintiff admits that when Mr. Folks arrived at LSP, he was housed in the skilled nursing unit. However, Plaintiff denies that Mr. Folks was placed in the nursing unit because he was a pre-trial detainee—pre-trial detainees did not need to be placed in the nursing unit or in any specific housing block, as Mr. Folks was housed in a variety of settings during his incarceration.[21] Plaintiff further denies that placing Mr. Folks in a room by himself minimized his access to foreign objects for self-harm, as Mr. Folks self-injured using a metal object while he was placed on four-point restraints.[22]

      11.     On April 11, 2021, Folks cut his neck and knees and refused medical treatment and was placed on suicide watch.[23]

     **RESPONSE:** Denied. Mr. Folks did not refuse medical treatment and was in fact treated for this injury.[24]

---

[19] *See* Plaintiff's Opposing Statement of Material Facts, *infra*.

[20] Deposition of Dr. Gamble, p. 61-62.

[21] Edmondson Decl. Ex. 2 (Master Prison File) at 001415-16 (including NU, various blocks in TU, and DR); Edmondson Decl. Ex. 3 (Rosso Deposition) at 31:11-21.

[22] R. Doc. 55-7 (LSP Mental Health Records) at 002840; Edmondson Decl. Ex. 1 (Folks Deposition) at 55:16-23.

[23] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3356.

[24] Edmondson Decl. Ex. 1 (Folks Deposition) at 51:9-11.

12.    On April 12, 2021, Folks was seen by a social worker. Folks reported that he planned to cause enough problems that DOC would send him back to parish prison.[25] Extreme suicide watch was continued.

**RESPONSE:** Denied. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are contradicted by Mr. Folks's sworn testimony, in which he states that he never threatened to harm anyone while in LDPSC's custody.[26]

13.    April 13, 2021, Folks was seen by a social worker and reported that when he gets off watch he will do something that requires a doctor to fix.[27] Extreme suicide watch was continued.

**RESPONSE:** Denied. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are contradicted Mr. Folks's sworn testimony, in which he states that he never threatened to harm anyone while in LDPSC's custody.[28]

14.    Folks was seen every 12 hours for suicide watch. On April 15, 2021, he was downgraded to a two-point restraint.[29]

**RESPONSE:** Admitted.

---

[25] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3350.
[26] Declaration of Joshua Folks in Opposition to Defendants' Motion for Summary Judgment ("Folks Declaration") ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[27] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3340.
[28] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[29] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3325.

15.     On April 16, 2021, Folks was seen and continued to make threats of self-harm.[30] He was seen every twelve hours for suicide watch. He made threats of self-harm on April 19[31] and April 20.[32] Folks threatened self-harm is suicide watch was not discontinued.[33] On April 21, Dr. Lavespere met with Folks and discontinued extreme suicide watch and downgraded to a standard suicide watch.[34]

**RESPONSE:** Denied. Defendants' statement that Mr. Folks was seen every twelve hours for suicide watch is unsupported. The cited portions of the record at best reflect that a social worker noted that he "will be reassessed within 12 hours per policy."[35] Further, to the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[36]

16.     On April 23, 2021, Folks was seen by Dr. Gamble. The notes reflect that Folks was well known to Dr. Gamble from prior incarceration period. Dr. Gamble noted that Folks had a long history of non-suicidal self-injuries. He was currently on suicide watch. Folks identified no clear plan of self-harm or harm to others. The plan was to continue psychiatric medications and return to clinic in two weeks.[37]

---

[30] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3314.
[31] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3283 and 3285.
[32] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3279.
[33] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3279.
[34] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3271.
[35] R. Doc. 55-7 (LSP Mental Health Records) at 003314.
[36] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[37] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3241.

**RESPONSE:** Admitted.

17.    On April 23, 2021, Folks reported to a social worker that he endorsed suicidal ideations if his demands are not met.[38]

**RESPONSE:** Qualified. Further, to the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[39]

18.    On April 24, 2021, Folks was seen and told social worker that he knew he was not coming off of suicide watch because of his behavior.[40]

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[41]

19.    While Folks reported on April 25 that he was doing well, on April 26, 2021 Folks told security that he wanted to cut himself.[42] He remained on suicide watch.[43]

---

[38] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3242.
[39] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[40] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3239.
[41] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[42] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3225 and 3222.
[43] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3222.

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[44]

20.    On April 28, 2021, Folks told Dr. Lavespere that he would blow up the judge's house if he was not let out of jail.[45] Suicide watch was continued.

**RESPONSE:** Denied. Mr. Folks testified that he never threatened to blow up the judge's house, nor did he threaten to harm anyone else.[46] Plaintiff admits that suicide watch continued.

21.    On April 30, 2021, LSP mental health prepared a Mental Health Plan of Care with Folks. The identified concern was the restrictive housing environment. The goals included compliance with LPS regulations, to demonstrate appropriate activities of daily living is assigned housing area and to demonstrate appropriate boundaries with staff and inmates. The interventions included Folks demonstrating appropriate social skills for living in a less restrictive housing assignment, compliance with medication and remission of symptoms. This plan of care was signed by the clinician, Dr. Gamble and Folks.[47]

**RESPONSE:** Qualified. LSP did complete a mental health plan of care, however, Plaintiff further submits that this was standard policy in LDPSC custody for inmates with serious mental illnesses and thus did not guarantee compliance.[48]

---

[44] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[45] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3203.
[46] Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4; Folks Declaration ¶ 20.
[47] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3191-3193.
[48] Edmondson Decl. Ex. 4 (HCP27) at 000183-84.

22.    From May 1 through May 6, 2021, Folks was seen every 24 hours.[49] During this time, Folks advised he was doing well, but that he could stay on watch. Suicide watch discontinued on May 6, 2021.[50]

**RESPONSE:** Admitted.

23.    Folks was seen by Dr. Gamble on May 24, 2021. Dr Gamble noted that Folks experienced legal related anxieties. Dr. Gamble noted no complaints of depression, mania or psychosis. There were no suicidal ideations and no plans for self-harm. The plan was to continue psychiatric medications and to return to clinic in 8 weeks.[51]

**RESPONSE:** Admitted.

24.    On June 13, 2021, Folks stabbed himself in the neck and stomach.[52] He was placed on extreme suicide watch.

**RESPONSE:** Admitted.

25.    On June 14, 2021, Folks was seen and expressed frustration at being Parish inmate and said he was not meant to be at LSP. Expressed ambivalence towards killing himself. Extreme suicide watch continued.[53]

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony.

---

[49] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3196, 3179, 3175, 3167, 3160, 3152, 3142, 3146.
[50] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3196, 3179, 3175, 3167, 3160, 3152, 3142, 3146.
[51] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3139.
[52] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3134.
[53] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3124.

Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[54]

26.     On June 15, 2021, Folks reported to social worker that he had lunch with Warden Hooper and gave him 96 hours to get Folks out of here. Extreme suicide watch was continued.[55]

**RESPONSE:** Denied. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are contradicted by Mr. Folks's sworn testimony, in which he states that he never threatened to harm anyone while in LDPSC's custody.[56]

27.     On June 16, 2021, Folks was seen by Dr. Gamble. Dr. Gamble noted that the recent self-harm was in the context of placement seeking because he was moved to TU and he has made it known that he would like to stay on skilled nursing unit. Dr. Gamble noted little improvement despite medication, placements, or attempts to offer therapy. Dr. Gamble noted that Folks' behavior is volitional and often aimed at external incentives, i.e., contingent threats. Dr. Gamble noted cluster B character pathology and there was no indication of disorganized mental illness. Folks had good grooming and hygiene, he was calm and cooperative, his weight was appropriate, and he expressed no plan or intent for self-harm. Plan was to continue psychiatric medications and return to clinic in two weeks.[57]

**RESPONSE:** Qualified. Although Dr. Gamble noted that at the time of his visit on June 16, 2021, he believed Mr. Folks's behavior to be volitional and did not observe indications of

---

[54] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[55] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3113.
[56] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[57] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3097.

disorganized mental illness, Mr. Folks's mental health records indicate a variety of such illnesses, including bipolar disorder, depression, thought disorders, and schizophrenia.[58]

28.     From June 16 through June 27, 2021, Folks was seen every twelve hours for extreme suicide watch. Because of his tendency to eat staples and metal objects, he would remain on extreme watch until wounds heal.[59] During this 11 day time period, Folks told social workers that he "can do what he wants to do,"[60] that he wasn't suicidal "yet,"[61] he would confirm that he was suicidal[62] and would express that he is thinking of various ways to kill himself if he was let off of restraints.[63] He was downgraded to a two-point restraint on June 22, 2021, and advised the same day that he would kill himself if they let him off watch.[64] He was then placed back in four-point restraints.

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[65]

---

[58] R. Doc. 55-7 (LSP Mental Health Records) at 001126 (bipolar disorder), 3191 (depression), 3072, 3242, 3259, 3325, 3353 ("history of thought disorder"); Edmondson Decl. Ex. 5 (Emails) at 00107 (bipolar disorder, anxiety); Edmondson Decl. Ex. 6 (UMC Records) at UMC000397, 001366, 001408, 001436, 001613 (bipolar disorder, schizophrenia); *see also* Edmondson Decl. Ex. 1 (Folks Deposition) at 64:8-25 (manic depression, depression, bipolar, schizophrenia).

[59] Affidavit of Dr. Gamble. Deposition of Dr. Toce, pg. 82-83.

[60] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3077.

[61] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3069.

[62] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3060.

[63] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3044.

[64] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 3040.

[65] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.

29.    On June 28, 2021, Folks was seen by Dr. Gamble. Folks adamantly denied suicidal ideation and denies plans for self-harm or harm to others. The notes reflect that Dr. Gamble noted that there were no objective signs of disorganized mental illness, no complaints or depression, anxiety, mania or psychosis. Folks verbally contracted for his safety to Dr. Gamble. As such, Dr. Gamble downgraded the suicide watch to a 2-point restraint.[66]

**RESPONSE:** Qualified. Although Dr. Gamble noted that at the time of his visit on June 28, 2021, he did not observe indications of disorganized mental illness in Mr. Folks, Mr. Folks's mental health records indicate a variety of such illnesses, including bipolar disorder, depression, thought disorders, and schizophrenia.[67]

30.    On June 30, 2021 Folks was seen by Dr. Gamble again. There were no episodes of self-harm in last 48 hours on two-point restraints. No complaints or depression, anxiety, mania or psychosis. Folks verbally contracted for his safety again and Dr. Gamble downgraded to standard suicide watch.[68]

**RESPONSE:** Qualified. Although Dr. Gamble noted that at the time of his visit on June 30, 2021, he did not observe indications of disorganized mental illness in Mr. Folks, Mr. Folks's mental health records indicate a variety of such illnesses, including bipolar disorder, depression, thought disorders, and schizophrenia.[69]

---

[66] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2982.

[67] R. Doc. 55-7 (LSP Mental Health Records) at 001126 (bipolar disorder), 3191 (depression), 3072, 3242, 3259, 3325, 3353 ("history of thought disorder"); Edmondson Decl. Ex. 5 (Emails) at 00107 (bipolar disorder, anxiety); Edmondson Decl. Ex. 6 (UMC Records) at UMC000397, 001366, 001408, 001436, 001613 (bipolar disorder, schizophrenia); *see also* Edmondson Decl. Ex. 1 (Folks Deposition) at 64:8-25 (manic depression, depression, bipolar, schizophrenia).

[68] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2962.

[69] R. Doc. 55-7 (LSP Mental Health Records) at 001126 (bipolar disorder), 3191 (depression), 3072, 3242, 3259, 3325, 3353 ("history of thought disorder"); Edmondson Decl. Ex. 5 (Emails) at 00107 (bipolar disorder, anxiety); Edmondson Decl. Ex. 6 (UMC Records) at UMC000397, 001366, 001408, 001436, 001613 (bipolar disorder, schizophrenia); *see also* Edmondson Decl. Ex. 1 (Folks Deposition) at 64:8-25 (manic depression, depression, bipolar, schizophrenia).

31.     From July 1 through July 6, Folks was seen every 24 hours for standard suicide watch.[70] On July 6, 2021, Folks adamantly denied suicide ideations. Standard suicide watch was discontinued.[71] Less than an hour later, after suicide watch was discontinued, Folks was taken to the ATU due to self-harm.[72] Folks presented angry and verbally abusive to ATU staff. Folks repeatedly punched himself in the stomach and said he was ready to die. Social worker was informed that he shoved metal into his stomach. Folks was again placed on extreme suicide watch, four point restraints.[73] Folks was brought to hospital and underwent surgery.

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[74] Otherwise, Plaintiff admits that Mr. Folks was seen every 24 hours for standard suicide watch between July 1 and July 6, that he self-harmed on July 6, that he was placed back on extreme suicide watch in four-point restraints, and that he was hospitalized and underwent surgery.

32.     Folks came back from the hospital on July 13, 2021. He was placed on extreme suicide watch and seen every 12 hours. He refused to talk and was angry that he had surgery.[75]

---

[70] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2955, 2951, 2946, 2933.

[71] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2926.

[72] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2924, 2918.

[73] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2918.

[74] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.

[75] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2914.

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[76] Otherwise, Plaintiff admits that Mr. Folks returned came back the hospital on July 13, 2021, and was placed on extreme suicide watch and seen every 12 hours.

33.    Folks was seen by Dr. Gamble on July 14, 20212. Folks reported anxiety related to recent surgery and GI upset. Dr. Gamble added Naltraxone.[77]

**RESPONSE:** Qualified. The record reflects that this visit was dated July 15, 2021.[78]

34.    From July 15 through July 20, 2021, Folks was seen every 12 hours.[79] Folks would report on some occasions that he wanted to stay on extreme watch[80] and even continued to threaten self-harm if he came off of watch.[81] Folks also expressed that he was aware that he was on suicide watch due to extreme impulsive and unpredictable self-injurious behavior in recent past and stated that he understood that staff were trying to keep him safe.[82] Regardless, due to impulsivity of behavior and severity of self-injuries, he was continued on extreme suicide watch as precaution.

**RESPONSE:** Qualified. To the extent this paragraph takes the statements in the cited portion of the record as true reflections of Mr. Folks's statements, Plaintiff submits that the

---

[76] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.

[77] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2889-2990.

[78] R. Doc. 55-7 (LSP Mental Health Records) at 002889-90.

[79] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2891, 2884, 2886, 2876, 2877, 2868,2870, 2857, 2866, 2064, 2066, 2851.

[80] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2893, 2857.

[81] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2064, 2851.

[82] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2870.

statements in the cited mental health individual progress note only reflect the unsworn characterizations of the note's author and are called into doubt by Mr. Folks's sworn testimony. Contrary to the statement in the mental health progress note cited in Paragraph 20, Mr. Folks testifies that he never threatened to harm anyone while in LDPSC's custody.[83] Otherwise, Plaintiff admits that Mr. Folks was kept on extreme suicide watch from July 15 to July 20, 2021, and was seen every 12 hours.

35.    On July 21, 2021, while on four-point restraint, Folks inserted metal into his body.[84] Folks was taken to the hospital again, where he underwent a small bowel resection, and a colectomy of the transverse colon was performed.[85]

**RESPONSE:** Denied. The portion of the record cited by Defendants in this paragraph reflects that Mr. Folks self-harmed on the prior night, July 20, 2021.[86] However, Mr. Folks was not admitted to the hospital for his injuries until the next day, July 21, 2021, where he underwent an exploratory laparotomy.[87] Plaintiff otherwise admits that Mr. Folks inserted metal into his body while on four-point restraint, was taken to the hospital, and underwent a small bowel resection and transverse colectomy.

36.    Folks was in the hospital for 10 days and returned to LSP on July 31, 2021. He was placed on extreme suicide watch.[88]

---

[83] Folks Declaration ¶ 20; Edmondson Decl. Ex. 1 (Folks Deposition) at 63:14-64:4.
[84] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2843, 2841.
[85] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2843, 2841.
[86] R. Doc. 55-7 (LSP Mental Health Records) at 002841.
[87] Edmondson Decl. Ex. 6 (UMC Records) at UMC000038.
[88] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2820.

**RESPONSE:** Admitted. However, Plaintiff submits that portion of the record cited by Defendants in this paragraph does not do not support their statement that Mr. Folks was returned and placed on extreme suicide watch on July 31, 2021.[89]

37.     Folks was seen by Dr. Gamble on August 2, 2021. Dr. Gamble noted that Folks continued to make arguments for less restrictive housing but then makes threats of self-harm.[90] Extreme watch was continued.

**RESPONSE:** Admitted. However, Plaintiff submits that portion of the record cited by Defendants in this paragraph does not support their statement that Mr. Folks was seen by Dr. Gamble on August 2, 2021.[91]

38.     Between August 3 and August 10, Folks was seen every 12 hours for extreme suicide watch assessment.[92] He was downgraded to standard suicide watch on August 10 and moved to the TU.[93]

**RESPONSE:** Admitted.

39.     Folks was seen by Dr. Gamble on August 11, 2021. Folks expressed sadness and anxiety over recent bowel resection.[94]

**RESPONSE:** Admitted. However, Plaintiff submits that portion of the record cited by Defendants in this paragraph does not support their statement that Mr. Folks was seen by Dr. Gamble on August 11, 2021.[95]

---

[89] The correct pincite is at Bates 002831.
[90] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2810.
[91] The correct pincite is at Bates 002808-09.
[92] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2799, 2807, 2794, 2797, 2780, 2782, 2769, 2771, 2775, 2760, 2767, 2753, 2755, 2742, 2745, 2739.
[93] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2738.
[94] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2106.
[95] The correct pincite is at Bates 002105.

40.    From August 11 through August 17, Folks was seen every 24 hours for standard suicide watch. Each note determined that Folks would remain on watch due to multiple attempts of self-harm and for his safety.[96]

**RESPONSE:**  Denied. The mental health individual progress notes cited by Defendants in this paragraph indicate that Mr. Folks reported no suicidal ideations.[97]

41.    On August 17, 2021, Dr, Gamble discontinued suicide watch.[98]

**RESPONSE:**  Admitted. However, Plaintiff submits that portion of the record cited by Defendants in this paragraph does not support their statement that Dr. Gamble discontinued suicide watch on August 17, 2021.[99]

42.    Folks was seen by mental health on August 18, August 24, November 11 and January 22 and no significant mental health issues were reported.[100]

**RESPONSE:**  Denied. The portions of the record cited by Defendants in this paragraph do not show that Mr. Folks was seen by mental health on January 22.

43.    During his incarceration at LSP during the relevant time period, Folks filed four Administrative Remedy Procedures.[101]

**RESPONSE:**  Admitted.

44.    On November 9, 2021, Folks filed ARP 2021-2850 wherein he requested mental health records, medical records and photographs related to his self-harm at LSP in connection with the "defense of pending charges" in St. Mary's Parish.[102] The First Step Response stated that the

---

[96] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2099, 2093, 2086, 2080, 2073, 2069.
[97] R. Doc. 55-7 (LSP Mental Health Records) at 002101, 2098, 2092, 2085, 2079, 2072, 2068.
[98] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2078.
[99] The correct pincite is at Bates 002068-69.
[100] Exhibit A, Affidavit of Dr. Gamble; Exhibit A-3, Mental Health records, bates 2067, 2061, 2059, 2058, 2056.
[101] Exhibit D; D1-D4.
[102] See Exhibit D-1.

Medical Records Department was processing Folks' request for his records. Folks proceeds to Step two wherein it was found that Folks' request was appropriately addressed.

**RESPONSE:** Qualified. ARP 2021-2850 reflects that Mr. Folks requested records related to self-harm incidents and the use of restraints between March and September of 2021, not just those in connection with his self-mutilation charges at St. Mary Parish. [103]

45.     On November 9, 2021, Folks filed ARP 2021-2851 wherein he requested a copy of his rap sheet and parole hold. [104] The request was backlogged pursuant to the ARP process. In the First Step response, LSP provided the detainer letter and list of pending charges. LSP further outlined that Folks' parole violation will depend on the outcome of the pending charges in St. Mary's Parish. Folks did not proceed to the second step.

**RESPONSE:** Admitted.

46.     On April 18, 2022, Folks submitted ARP 2022-0859 concerning alleged flooding of his cell and unsanitary conditions from leaks in the roof. [105] He requested that the cell be repaired. On May 14, 2022, Folks voluntarily withdrew his ARP.

**RESPONSE:** Denied. Mr. Folks withdrew this ARP out of fear that moving forward with the ARP would cause him to lose privileges that he received from the officer who Mr. Folks believed would have been held responsible for his complaints. [106]

47.     On July 27, 2022, Folks filed ARP 2022-1428. [107] Folks claimed "cruel and unusual punishment by use of force by restraints" between April and August of 2021. On July 28, 2022, ARP 2022-1428 was rejected because it was filed more than 90 days after the incident.

---

[103] R. Doc. 55-12 (ARP LSP-2021-2850) at 3.
[104] See Exhibit D2.
[105] See Exhibit D-3.
[106] Folks Declaration ¶ 15-16.
[107] See Exhibit D-4.

**RESPONSE:** Denied. The record reflects that ARP 2022-1428 was filed on July 22, 2022.[108] Further, Mr. Folks was prevented from filing ARPs for long periods because he was on suicide watch and restraints, recovering from severe physical injuries, taking high doses of anti-psychotic medications that impaired his thinking and movement, and experienced pressure against moving forward with ARPs.[109]

48.     Dr. Gamble, Folks' treating psychiatrist, had previously treated Folks in a prior incarceration period. Dr. Gamble saw Folks at least 12 times between April 2021 and January 2022.[110] In his professional medical judgment, Dr. Gamble felt that the TU cells were the safest place to house Folks given Folks' status as a pre-trial detainee and his intentional and repeated self-harm.[111] The TU cells provided 24-hour camera observation, and included an anterior door such that other offenders could not pass foreign objects to Folks that could provide means for self-harm.[112]

**RESPONSE:** Qualified. Plaintiff denies that Dr. Gamble saw Mr. Folks at least 12 times between April 2021 and January 2022. Dr. Gamble's affidavit only supports that he saw Mr. Folks nine times between April 2021 and January 2022.[113] Plaintiff further denies this statement to the extent that it suggests the TU cells were in fact the safest place to house Mr. Folks. The TU "time-out" cell exacerbated Mr. Folks's risk of self-harm. Mr. Folks self-harmed for the second time in LDPSC custody upon learning that he was to be moved to the "time-out" cell.[114] Immediately after Mr. Folks was transferred to "time-out," he self-harmed seriously enough to warrant

---

[108] R. Doc. 55-15 (ARP LSP-2022-1428) at 3.
[109] Folks Declaration ¶¶ 6-16.
[110] See Affidavit of Dr. Gamble.
[111] Affidavit of Dr. Gamble.
[112] Deposition of Dr. Gamble, pg. 81.
[113] R. Doc. 55-4 (Affidavit of Matthew Gamble) ¶ 7.
[114] R. Doc. 55-7 (LSP Mental Health Records) at 003097.

hospitalization.[115] Further, Dr. Gamble testified that he was aware that placing Mr. Folks in the TU could increase the risk of self-harm.[116] Mr. Folks's mental health plan, signed by Dr. Gamble, also indicated that Mr. Folks's "Restrictive Housing Environment" was a trigger for Mr. Folks's mental health disorders.[117] Otherwise, Plaintiff admits that Dr. Gamble had previously treated Mr. Folks in a prior incarceration period, and that he was Mr. Folks's treating psychiatrist at LSP.

49.     Dr. Toce was the medical director at LSP starting in July 2021. Dr. Toce does not provide mental health care. While he generally oversees the mental health department, he does not review or approve mental health treatment plans.[118]

**RESPONSE:** Denied. Plaintiff admits that Dr. Toce does not provide *mental health* care. However, Dr. Toce provided medical treatment to Mr. Folks—he removed the metal object with which Mr. Folks perforated his bowel while on four-point restraints.[119] Further, Dr. Toce was familiar with Mr. Folks's history of self-harm and his mental health disorders from personal experience with Mr. Folks from prior incarcerations,[120] and from conversations with Dr. Gamble about Mr. Folks's mental health disorders and symptoms.[121] Dr. Toce also knew that the "time-out" cell did not improve Mr. Folks's mental health,[122] and that Mr. Folks was less likely to self-harm in the NU.[123]

---

[115] Edmondson Decl. Ex. 1 (Folks Deposition) at 55:21-57:24; R. Doc. 55-7 (LSP Mental Health Records) at 002918; Edmondson Decl. Ex. 7 (LSP Medical Records) at 001126-27.

[116] R. Doc. 55-16 (Gamble Deposition) at 124:4-10.

[117] R. Doc. 55-7 (LSP Mental Health Records) at 003192 (mental health plan signed by Dr. Gamble identifying "Restrictive Housing Environment" as a concern for Mr. Folks's mental health).

[118] Deposition of Dr. Toce, pg. 28

[119] *Id*. at 75:5-76:18.

[120] *Id*. at 40:21-41:23.

[121] *Id*. at 105:9-12.

[122] *Id*. at 52:9-19.

[123] *Id*. at 70:7-24.

50.     Dr. Toce testified that the TU cell where Folks was housed was the "safest, most high visibility, limited access cells right in front of the guard station."[124] The TU cells were the "best chance at getting him not to hurt himself."[125]

**RESPONSE:** Denied. The TU "time-out" cell exacerbated Mr. Folks's risk of self-harm. Mr. Folks self-harmed for the second time in LDPSC custody upon learning that he was to be moved to the "time-out" cell.[126] Immediately after Mr. Folks was transferred to "time-out," he self-harmed seriously enough to warrant hospitalization.[127] Further, Dr. Gamble testified that placing Mr. Folks in the TU could increase the risk of self-harm.[128] Mr. Folks's mental health plan, signed by Dr. Gamble, also indicated that Mr. Folks's "Restrictive Housing Environment" was a trigger for Mr. Folks's mental health disorders.[129] Additionally, Dr. Toce himself testified that the "time-out" cells were reserved for inmates who were "behaving quite badly," suggesting that Mr. Folks's safety was not the only concern.[130]

51.     Dr. Lafleur was employed by LSP only one month during Folks' incarceration, and he left LSP in May 2021.[131]

**RESPONSE:** Qualified. Dr. LaFleur served as medical director of LSP until May 2021, during which time he supervised the mental health providers at LSP.[132] Dr. LaFleur reviewed incident reports and evaluations describing Mr. Folks's housing and self-harm symptoms.[133] Dr.

---

[124] Deposition of Dr. Toce, pg. 48-49.

[125] Deposition of Dr. Toce, pg. 48-49.

[126] R. Doc. 55-7 (LSP Mental Health Records) at 003097.

[127] Edmondson Decl. Ex. 1 (Folks Deposition) at 55:21-57:24; R. Doc. 55-7 (LSP Mental Health Records) at 002918; Edmondson Decl. Ex. 7 (LSP Medical Records) at 001126-27.

[128] R. Doc. 55-16 (Gamble Deposition) at 124:4-10.

[129] R. Doc. 55-7 (LSP Mental Health Records) at 003192 (mental health plan signed by Dr. Gamble identifying "Restrictive Housing Environment" as a concern for Mr. Folks's mental health).

[130] R. Doc. 55-17 (Toce Deposition) at 50:9-12.

[131] Deposition of Dr. Lafleur, pg. 17, 41.

[132] R. Doc. 55-20 (LaFleur Deposition) at 47:25-49:22; R. Doc. 55-16 (Gamble Deposition) at 19:20-25.

[133] R. Doc. 55-20 (LaFleur Deposition) at 41:19-43:10.

LaFleur did not take corrective action to let Mr. Folks out of restraints or place him in a less restrictive environment.[134]

52.    Warden Hooper, the Warden at LSP during the relevant time period, played no role in medical or mental health decisions for particular inmates.[135] Nor would he intervene with a medical professional's decision on how to treat a patient.[136]

**RESPONSE:** Denied. Warden Hooper testified that LSP psychiatrists report to the warden of medical, who he supervises.[137] Further, administrative and security officials who do not have mental health training are routinely involved in mental health-related decisions. LDPSC policies require "security personal/classification officers," in conjunction with mental health clinicians, to "review and approve any action related to the movement, placement, or disciplinary action of seriously mentally ill or developmentally disabled inmates."[138] This includes giving the Warden final approval over transfers of special needs offenders to other institutions.[139] Consistent with Warden Hooper's testimony, Dr. Gamble testified that he reports to the warden of medical and mental health, who has input into medical and psychiatric issues.[140]

Consistent with Dr. Gamble's testimony, Ashli Oliveaux, the Deputy Warden overseeing Medical,[141] testified that she would have input into mental health-related decisions, such as whether an inmate with a mental disability is entitled to accommodations, but would "probably defer" to Sharita Spears in those decisions.[142] However, Sharita Spears, like Deputy Warden

---

[134] *Id*. at 150:3-16.

[135] Deposition of Hooper, p. 13.

[136] Deposition of Hooper, p. 49.

[137] R. Doc. 55-19 (Hooper Deposition) at 50:6-14, 52:5-18.

[138] Edmondson Decl. Ex. 8 (HCP34) at 000116.

[139] *Id.* at 000118.

[140] R. Doc. 55-16 (Gamble Deposition) at 19:20-20:22.

[141] R. Doc. 55-18 (Oliveaux Deposition) at 30:3-4; R. Doc. 55-16 (Gamble Deposition) at 20:1-6.

[142] R. Doc. 55-18 (Oliveaux Deposition) at 37:17-21, 40:10:18.

Oliveaux, is not a mental health professional.[143] Ms. Spears further testified that she "guess[ed]" a prison warden "could" veto ADA accommodations for mental health disabilities, suggesting that there is no hard rule against security officials like Warden Hooper intervening in mental health decisions.[144]

53.     Ashli Oliveaux started at LSP in March 2022,[145] months after Folks' last time period in restraints. Oliveaux was not involved in Folks' medical or mental health treatment. She did not know Folks during his incarceration, did not have any conversations with him, did not review any ARPs from Folks and did not review any ADA requests.[146]

**RESPONSE:** Denied. Plaintiffs submit that as the warden of medical, Deputy Warden Oliveaux would have had input into medical and psychiatric issues.[147] This includes the decision of whether to accommodate a mental health disability, but Deputy Warden Oliveaux testified that she would have input into mental health-related decisions, such as whether an inmate with a mental disability is entitled to accommodations, but would "probably defer" to Sharita Spears in those decisions,[148] despite the fact that Sharita Spears, like Deputy Warden Oliveaux, is not a mental health professional.[149]

---

[143] Edmondson Decl. Ex. 9 (Spears Deposition) at 17:21-23.
[144] Edmondson Decl. Ex. 9 (Spears Deposition) at 25:5-12.
[145] Deposition of Oliveaux, p. 13.
[146] Deposition of Oliveaux, p. 10-11.
[147] R. Doc. 55-18 (Oliveaux Deposition) at 30:3-4; R. Doc. 55-16 (Gamble Deposition) at 19:20-20:22.
[148] R. Doc. 55-18 (Oliveaux Deposition) at 37:17-21, 40:10:18.
[149] Edmondson Decl. Ex. 9 (Spears Deposition) at 17:21-23.

## PLAINTIFF'S OPPOSING STATEMENT OF MATERIAL FACTS

1.      While Mr. Folks was detained at St. Mary Parish, he self-injured twice, resulting in two hospitalizations at Franklin Hospital.[150] For self-harming, he was charged with the felony of self-mutilation by a prisoner.[151]

2.      Mr. Folks was transferred to Louisiana State Penitentiary ("LSP"), in the custody of Louisiana Department of Public Safety and Corrections ("LDPSC"), on March 31, 2021, following the two self-harm incidents.[152] In the transfer, Defendants received mental health records reflecting Mr. Folks's mental health disorders.[153] Mr. Folks was told that he was transferred because he "was a liability."[154]

3.      While in LDPSC custody, Mr. Folks was first placed in a single cell "locked room" in the Treatment Center ("TC") of the Skilled Nursing Unit ("NU").[155]

4.      In the TC, Mr. Folks was only let out of his cell to shower and conduct medical call-outs.[156]

5.      Following Mr. Folks's first incident of self-harm in which he slashed his knees and neck, Defendants subjected Mr. Folks to four-point restraints between April 11 and April 15, followed by two-point restraints until April 21, 2021.[157]

6.      While he was subjected to restraints, Mr. Folks was partially released from the restraints only for brief periods to eat.[158]

---

[150] Edmondson Decl. Ex. 1 (Folks Deposition) at 43:11-17; Edmondson Decl. Ex. 5 (Emails) at 00123, 129.

[151] Edmondson Decl. Ex. 2 (Master Prison File) at 001513; Edmondson Decl. Ex. 1 (Folks Deposition) at 41:7-17.

[152] Edmondson Decl. Ex. 2 (Master Prison File) at 001349, 1509; Edmondson Decl. Ex. 5 (Emails) at 00007.
[153] Edmondson Decl. Ex. 5 (Emails) at 00107.

[154] Edmondson Decl. Ex. 1 (Folks Deposition) at 42:9.

[155] Edmondson Decl. Ex. 1 (Folks Deposition) at 48:8-15; R. Doc. 55-16 (Gamble Deposition) at 61:8-62:13; Edmondson Decl. Ex. 2 (Master Prison File) at 001416.

[156] Edmondson Decl. Ex. 1 (Folks Deposition) at 49:17-24.

[157] R. Doc. 55-7 (LSP Mental Health Records) at 003271-3356.

[158] Edmondson Decl. Ex. 1 (Folks Deposition) at 52:2-4.

7.      Dr. Gamble did not see Mr. Folks until April 23, 2021, while Mr. Folks was on restraints.[159]

8.      When Mr. Folks was finally seen by Dr. Gamble, the visit lasted for about "five to ten minutes."[160]

9.      Dr. Gamble did not consider accommodating Mr. Folks in less restrictive housing.[161]

10.     Defendants considered transferring Mr. Folks to a TU "time-out" cell as early as June 3, 2021.[162]

11.     Defendants considered this transfer despite the fact that Dr. Gamble and other mental health staff were aware that Mr. Folks's self-harm was exacerbated by restrictive housing conditions like "time-out."[163]

12.     On June 13, 2021, Mr. Folks self-harmed again.[164] This time, Mr. Folks inflicted deep cuts to his legs and stomach, and impaled his neck with a sharpened toothbrush, requiring it to be medically removed.[165]

13.     For self-harming, Mr. Folks received a disciplinary charge for self-mutilation in violation of Rule No. 19 of the LDPSC's Disciplinary Rules and Procedures for Adult Offenders.[166] For this violation, Mr. Folks was sentenced to "20 days disciplinary seg."[167]

---

[159] R. Doc. 55-7 (LSP Mental Health Records) at 003241.
[160] R. Doc. 55-16 (Gamble Deposition) at 63:25-64:8.
[161] *Cf.* R. Doc. 55-7 (LSP Mental Health Records) at 003241; R. Doc. 55-16 (Gamble Deposition) at 63:17-24.
[162] Edmondson Decl. Ex. 5 (Emails) at 00003; *see also* R. Doc. 55-7 (LSP Mental Health Records) at 003097 (noting that Mr. Folks "was to be moved to TO cell at TU" before he self-harmed).
[163] R. Doc. 55-16 (Gamble Deposition) at 124:4-10; R. Doc. 55-7 (LSP Mental Health Records) at 003192 (identifying "Restrictive Housing Environment" as a concern for Mr. Folks's mental health).
[164] R. Doc. 55-7 (LSP Mental Health Records) at 003134.
[165] *Id.* at 001500; Edmondson Decl. Ex. 10 (June 14, 2021 Disciplinary Investigation Report) at 001246.
[166] Edmondson Decl. Ex. 2 (Master Prison File) at 001270, 1500-1502.
[167] *Id.*

14.    LDPSC's Disciplinary Rules and Procedures for Adult Offenders provide[168]:

No offender shall deliberately inflict or attempt to inflict injury upon himself or upon another consenting offender or consent to have an injury inflicted upon him. . . . Clear and obvious suicide, attempted suicide, or self-harm related to mental distress shall not be considered a violation of this rule.

15.    The punishment for self-mutilation includes disciplinary segregation.[169]

16.    Defendants then kept Mr. Folks on extreme suicide watch from June 13, 2021, to June 30, 2021.[170]

17.    Extreme suicide watch meant that Mr. Folks was subjected to two- or four-point restraints.[171]

18.    Mr. Folks's restraints frequently included metal handcuffs and leg irons.[172] One handcuff would be periodically removed to allow him to eat.[173]

19.    On June 16, 2021, while Mr. Folks was on extreme suicide watch, Dr. Gamble visited Mr. Folks and concluded that his self-harming was "volitional" and motivated by "placement seeking."[174] In concluding as such, Dr. Gamble ignored Mr. Folks's long history of mental illnesses, including bipolar disorder, depression, thought disorders, and schizophrenia.[175]

---

[168] Edmondson Decl. Ex. 11 (LDPSC Regulation No. OP-C-1) at 001599, 1629.

[169] *Id.* at 001629.

[170] R. Doc. 55-7 (LSP Mental Health Records) at 002962-3134.

[171] *See* R. Doc. 55-5 (HCP30) at 8; R. Doc. 55-6 (HCP40) at 4.

[172] *See, e.g.,* R. Doc. 55-7 (LSP Mental Health Records) at 002748, 2768, 2851, 3282, 3293, 3300, 3314, 3332, 3353 (describing "metal restraints" used on Mr. Folks); R. Doc. 55-15 (administrative grievance describing use of handcuffs and leg irons); Edmondson Decl. Ex. 1 (Folks Deposition) at 51:24, 69:18 (testifying that he was shackled).

[173] Edmondson Decl. Ex. 1 (Folks Deposition) at 52:2-5.

[174] R. Doc. 55-7 (LSP Mental Health Records) at 003097.

[175] Edmondson Decl. Ex. 7 (LSP Medical Records) at 001126 (bipolar disorder); R. Doc. 55-7 (LSP Mental Health Records) at 003191 (depression), 3072, 3242, 3259, 3325, 3353 ("history of thought disorder"); Edmondson Decl. Ex. 5 (Emails) at 00107 (bipolar disorder, anxiety); Edmondson Decl. Ex. 6 (UMC Records) at UMC000397, 001366, 001408, 001436, 001613 (bipolar disorder, schizophrenia); *see also* Edmondson Decl. Ex. 1 (Folks Deposition) at 64:8-25 (manic depression, depression, bipolar, schizophrenia).

20.     Following this period of seclusion and restraint, Mr. Folks was transferred to the "time-out" cell in the Transitional Unit ("TU").[176]

21.     The "time-out" cell was even more restrictive than the TC locked rooms.[177] In addition to being a single cell like the TC locked room, the "time-out" cells was under 24/7-hour video surveillance, closely guarded at all times, and completely isolated from other inmates, officers, and staff.[178]

22.     Almost immediately after Mr. Folks was transferred, he self-harmed on July 6, 2021 by forcing metal wires into his abdomen.[179]

23.     Defendants once again charged Mr. Folks with a violation of Rule No. 19 and sentenced him to 15 days cell confinement.[180]

24.     Mr. Folks's injuries from forcing metal wires into his abdomen were severe enough to require hospitalization.[181]

25.     After Mr. Folks returned to LSP, he was placed back on four-point restraints.[182]

26.     Despite being subjected to four-point restraints, Mr. Folks self-harmed again by inserting a metal object into his stomach on July 20, 2021.[183]

27.     This incident, which shortly followed Mr. Folks's transfer to the "time-out" cell, resulted in the severest and most life-threatening injuries Mr. Folks suffered in LDPSC's

---

[176] Edmondson Decl. Ex. 2 (Master Prison File) at 001416, 1479-81, 1488; Edmondson Decl. Ex. 1 (Folks Deposition) at 48:20-49:23, 55:10-15; R. Doc. 55-16 (Gamble Deposition) at 84:1-13 (describing the location of the "time-out" cell in the TU).

[177] Edmondson Decl. Ex. 1 (Folks Deposition) at 49:7-16.

[178] R. Doc. 55-16 (Gamble Deposition) at 81:23-82:21; Edmondson Decl. Ex. 1 (Folks Deposition) at 49:7-16; R. Doc. 55-22 (Glindmeyer Report) at 35 (reporting that in the TU, "there were no cells next to you … nobody walking past … no traffic" (ellipses in original)).

[179] Edmondson Decl. Ex. 2 (Master Prison File) at 001479-81, 1486-88.

[180] Edmondson Decl. Ex. 2 (Master Prison File) at 001270, 1479-88.

[181] Folks Deposition at 55:21-57:24; Edmondson Decl. Ex. 7 (LSP Medical Records) at 001126-27.

[182] R. Doc. 55-7 (LSP Mental Health Records) at 2914.

[183] R. Doc. 55-7 (LSP Mental Health Records) at 002481.

custody.[184] Mr. Folks's injuries required removing parts of his small bowel and colon.[185] However, Mr. Folks was not admitted to the hospital for his injuries until the next day, July 21, 2021, where he underwent an exploratory laparotomy.[186]

28.     While Mr. Folks received treatment at the University Medical Center hospital for his injuries, only Mr. Folks's right ankle was shackled.[187] Mr. Folks did not self-harm while he was only partially restrained at UMC.[188]

29.     Mr. Folks returned to LSP on July 31, and his extreme suicide watch resumed.[189]

30.     On August 2, 2021, Dr. Gamble visited Mr. Folks again and concluded that his self-harm was manipulative and motivated by a desire for less restrictive housing.[190] Dr. Gamble approved continued extreme suicide watch and restraints.[191]

31.     Mr. Folks's extreme suicide watch continued until August 10, 2021, thirty-five days after this period of restraints first began.[192]

32.     Dr. Gamble discontinued standard suicide watch on August 17, 2021.[193]

33.     On the same day Mr. Folks was taken off restraints, he was transferred back to the "time-out" cell.[194]

---

[184] R. Doc. 55-16 (Gamble Deposition) at 66:23-25.
[185] Edmondson Decl. Ex. 1 (Folks Deposition) at 55:19-56:18; Edmondson Decl. Ex. 6 (UMC Records) at UMC000038; R. Doc. 55-7 (LSP Mental Health Records) at 002841, 2843.
[186] Edmondson Decl. Ex. 6 (UMC Records) at UMC000038.
[187] Edmondson Decl. Ex. 6 (UMC Records) at UMC000108, 381, 386; Edmondson Decl. Ex. 1 (Folks Deposition) at 68:10-13.
[188] Id.
[189] R. Doc. 55-7 (LSP Mental Health Records) at 002831.
[190] R. Doc. 55-7 (LSP Mental Health Records) at 002820.
[191] Id.
[192] R. Doc. 55-7 (LSP Mental Health Records) at 002738.
[193] R. Doc. 55-7 (LSP Mental Health Records) at 002078.
[194] Id.

34.     Although Mr. Folks had ceased exhibiting signs of severe self-harm, Defendants kept him isolated in the TU for around another year.[195]

35.     On September 16, 2022, he was moved to "closed cell restriction" on Death Row ("CCR"), despite not having been sentenced to death.[196]

36.     Death Row cells were used to house pretrial inmates.[197]

37.     Despite the still-brutal conditions on Death Row, Mr. Folks preferred being there over the ultra-restrictive "time-out" cells.[198]

38.     The CCR cells in Death Row were, at a minimum, less isolated, allowed for interaction with other inmates, officers, and mental health staff, and had access to medical care.[199]

39.     LSP's medical director, Dr. Toce, *knew* that the conditions in CCR were less likely to trigger Mr. Folks's self-harm.[200]

40.     Mr. Folks did not self-harm while housed in this less restrictive setting.[201]

41.     Mr. Folks was eligible for housing in the general population as early as August 10, 2022, when his parole was revoked and he became a LDPSC inmate.[202]

---

[195] R. Doc. 55-16 (Gamble Deposition) at 104:14-105:16 (recalling a drop-off in Mr. Folks's self-harm symptoms after the summer of 2021), 106:4-6 (recalling that Mr. Folks was moved out of TU when he became a full-time LDPSC offender); Edmondson Decl. Ex. 2 (Master Prison File) at 001415-16.

[196] *See* R. Doc. 55-24 (Master Prison File Excerpts) at 001415; R. Doc. 55-16 (Gamble Deposition) at 106:4-107:9; Edmondson Decl. Ex. 3 (Rosso Deposition) at 31:11-21.

[197] Edmondson Decl. Ex. 3 (Rosso Deposition) at 31:11-21; R. Doc. 55-16 (Gamble Deposition) at 107:12-24.

[198] R. Doc. 55-22 (Glindmeyer Report) at 36.

[199] R. Doc. 55-17 (Toce Deposition) at 89:23-90:23.

[200] R. Doc. 55-17 (Toce Deposition) at 89:17-22.

[201] R. Doc. 55-16 (Gamble Deposition) at 107:25-108:2.

[202] Edmondson Decl. Ex. 2 (Master Prison File) at 001312-19.

42.    While Mr. Folks was kept on seclusion and restraints, he repeatedly made clear that he believed the restraints were cruel, excessive, and unnecessary, and would seriously risk further injury, both self and externally inflicted injury.[203]

43.    Mr. Folks also repeatedly requested medical care for injuries and health issues he sustained while he was held in restraints.[204]

44.    Mr. Folks also specifically alerted Defendants of his desire to be placed in the NU, not the "time-out" cell.[205]

45.    As early as June 16, 2021, Dr. Gamble was aware that placing Mr. Folks in the "time-out" cell would exacerbate the risk that Mr. Folks engaged in self-harm.[206]

46.    Following his prolonged restraint and confinement in the "time-out" cell, Mr. Folks filed several Administrative Remedy Procedures ("ARPs") with LDPSC to address his potential claims.[207] Exhaustion of an ARP occurs "[w]hen the relief requested has been granted; [w]hen the Second Step response has been issued; or [w]hen the grievance has been screened and rejected for one of the reasons specified in Chapter 5 'Grievance Screening'."[208]

---

[203] R. Doc. 55-7 (LSP Mental Health Records) at 003283, 3285, 3279 (noting Mr. Folks's frustration and heightened impulse to self-injure while on restraints).

[204] Edmondson Decl. Ex. 7 (LSP Medical Records) at 001119-1124, 1138-40, 1151-54 (documenting requests for medical treatment by Mr. Folks from June 24 to June 30, 2021, during his second period of restraints); R. Doc. 55-16 (Gamble Deposition) at 93:15-94:22 (explaining that these forms comprised offender-initiated medical requests).

[205] R. Doc. 55-7 (LSP Mental Health Records) at 003097 (Dr. Gamble's psychiatric notes dated June 16, 2021; noting that Mr. Folks "made it known that he would like to stay on Skilled Nursing Unit 1"), 003192 (mental health care plan signed by Dr. Gamble; identifying "Restrictive Housing Environment" as a concern for Mr. Folks's mental health), 3283, 3285, 3279 (all noting Mr. Folks's frustration with prolonged restraints and heightened impulse to self-injure while on restraints); R. Doc. 55-16 (Gamble Deposition) at 123:4-124:11 (testifying that Mr. Folks had expressed that he preferred being in the skilled nursing unit to the time-out cell).

[206] R. Doc. 55-7 (LSP Mental Health Records) at 003097 (Dr. Gamble's psychiatric notes dated June 16, 2021; noting that Mr. Folks self-harmed after he was to be transferred to the "time-out" cell in the TU); R. Doc. 55-16 (Gamble Deposition) at 123:4-124:11; R. Doc. 55-7 (LSP Mental Health Records) at 003192 (mental health care plan signed by Dr. Gamble; identifying "Restrictive Housing Environment" as a concern for Mr. Folks's mental health).

[207] *See* R. Docs. 55-12, 55-13, 55-14, 55-15.

[208] Edmondson Decl. Ex. 15 (LDPSC Regulation No. OP-C-13) at 001989.

47.     On November 9, 2021, Mr. Folks filed an ARP 2021-2850 requesting mental health records related to self-harm incidents at LSP, and specifically those resulting in seclusion and restraint.[209] ARP 2021-2850 detailed Mr. Folks's psychiatric disorders and their resulting self-injury.[210] It further stated that Mr. Folks needed medical records "in regard to self-harm" for "court cases."[211] LDPSC received Mr. Folks's request on November 23, 2021,[212] and denied it on January 4, 2022.[213] The first step denial noted that "[p]ictures may be located in your file, within the Investigation Department," without any further instruction about how to obtain them.[214] Mr. Folks appealed two days later and once again described how his psychiatric disorders caused him to self-injure. Mr. Folks appealed two days later and once again described how his psychiatric disorders caused him to self-harm.[215] His appeal was summarily rejected on February 2, 2022, and again provided no instruction for obtaining photos from the Investigation Department.[216]

48.     On April 18, 2022, Mr. Folks filed ARP 2022-0859 regarding the unsanitary and unlivable conditions in the TU "time-out" cell where he was then confined.[217] He reported repeated flooding and leaks containing feces and other bodily fluids into his cell.[218] Further, he described security officers spraying inmates with "chemical munitions."[219]

49.     On May 14, 2022, Mr. Folks withdrew this ARP.[220] He did so because he feared that moving forward with the ARP would cause him to lose privileges that he received from the

---

[209] R. Doc. 55-12 (ARP LSP-2021-2850) at 3.
[210] Id.
[211] Id. at 3, 6.
[212] Id. at 2.
[213] Id. at 17.
[214] Id. at 4.
[215] Id. at 17-18.
[216] Id. at 20.
[217] R. Doc. 55-14 (ARP LSP-2022-0859) at 3.
[218] Id.
[219] Id.
[220] Id. at 4.

officer who Mr. Folks believed would have been held responsible for his complaints.[221] That officer was one people with whom I had developed a solid rapport after being isolated for over a year at that point at LSP.[222]

50.    On July 22, 2022, Mr. Folks filed ARP 2022-1428 regarding "cruel and unusual punishment by use of force by restraints (handcuffs/shackles)."[223] This ARP unambiguously detailed Defendants' disproportionate use of restraints on Mr. Folks over from April 2021 to August 2021.[224] On July 28, 2022, LDPSC summarily rejected Mr. Folks's ARP as untimely.[225]

51.    Mr. Folks was prevented from filing ARPs for long periods.[226] Mr. Folks only managed to file the few ARPs he did with the assistance of sympathetic inmates, including inmate lawyers who helped him write ARPs or inmates who let him borrow pencils and paper to write ARPs himself.[227]

52.    Defendants viewed Mr. Folks as a suicide or self-harm risk for nearly the entirety of his incarceration, and prison staff refused to provide him with pens, pencils, or paper with which to write ARPs upon request.[228]

53.    Mr. Folks suffered multiple severe physical injuries in LDPSC custody for which he underwent surgery, and experienced physical pain and other symptoms like nausea and vomiting that regularly disrupted his ability to write and file ARPs.[229]

---

[221] Folks Declaration ¶¶ 15-16.
[222] *Id.*
[223] R. Doc. 55-15 (ARP LSP-2022-1428) at 3-4.
[224] *Id.*
[225] *Id.* at 2.
[226] Folks Declaration ¶¶ 6-16.
[227] *Id.* ¶¶ 17-19.
[228] Folks Declaration ¶¶ 13.
[229] Folks Declaration ¶¶ 6-7, 11.

54.     During the entirety of his incarceration, Mr. Folks was on high doses of multiple anti-psychotic medications, including Thorazine, which impaired his thinking and movement.[230] Mr. Folks's medications caused him to miss meals and bathroom breaks because he could not move or get up, and rendered him unable to focus on writing and understanding the process for filing ARPs.[231]

55.     LDPSC and its officers and employees put Mr. Folks under pressure not to file ARPs, for example, by threatening to withhold certain privileges or provide certain benefits in exchange.[232] This pressure was not prohibited by any LDPSC policy.[233]

56.     LDPSC policies purportedly permit the use of restraints during extreme suicide watch only "as a last resort" and where "clinically indicated."[234] LDPSC prohibits the use of restraints "as punishment."[235] However, LDPSC policies also permit the use of restraints for non-clinical, security reasons.[236]

57.     Dr. Gamble informed Mr. Folks that his placement in restraints for 30 days (from approximately July 13 to August 10, 2021) exceeded his psychiatric or mental health needs, in Dr. Gamble's own judgment.[237] However, Mr. Folks was told by Dr. Gamble that Warden Hooper had control over the decision to keep Mr. Folks in restraints.[238]

---

[230] Folks Declaration ¶¶ 9-10, 14.
[231] Folks Declaration ¶¶ 9-10, 14.
[232] Folks Declaration ¶¶ 15-16.
[233] Edmondson Decl. Ex. 12 (Shipley Deposition) at 20:15-17.
[234] R. Doc. 55-5 (HCP30) at 3, 8.
[235] R. Doc. 55-6 (HCP40) at 1.
[236] R. Doc. 55-6 (HCP40) at 2.
[237] Edmondson Decl. Ex. 1 (Folks Deposition) at 69:10-23, 72:8-23.
[238] Edmondson Decl. Ex. 1 (Folks Deposition) at 69:21-70:10.

58.    Dr. Gamble reports to the Warden of medical and mental health, a security official, and the Warden has input into Dr. Gamble's psychiatric decisions.[239]

59.    The Warden of medical and mental health reports to Warden Hooper, who thus indirectly supervises LSP psychiatrists like Dr. Gamble.[240] Moreover, Warden Hooper and other security officials could veto decisions related to ADA accommodations.[241]

60.    Mr. Folks was told by Warden Hooper on two occasions that he would be restrained "for a long time."[242]

61.    Mr. Folks understood that when he was incarcerated at Elayn Hunt Correctional Center under Dr. Gamble's care, he had been restrained as a "deterrent" against self-harm, not as treatment.[243]

62.    Mental health faculty at LSP complained that "time-out" cells were not "accessible to mental health," and instead occupied by offenders who LDPSC held there for "security reasons," including Mr. Folks.[244] According to LSP's mental health staff, using the "time-out" cells for security reasons came at the expense of inmates for whom these cells were needed for psychiatric treatment.[245]

63.    LSP officials instead described "time-out" cells as being used for offenders who were "behaving quite badly" or who were "severely problematic."[246]

---

[239] R. Doc. 55-16 (Gamble Deposition) at 19:20-20:22.

[240] R. Doc. 55-19 (Hooper Deposition) at 50:6-14, 52:5-18

[241] Edmondson Decl. Ex. 9 (Spears Deposition) at 25:5-12.

[242] Edmondson Decl. Ex. 1 (Folks Deposition) at 71:6-16.

[243] Edmondson Decl. Ex. 1 (Folks Deposition) at 67:19-68:3; R. Doc. 55-16 (Gamble Deposition) at 47:15-21, 66:4-10 (testifying that he treated Mr. Folks at Elayn Hunt).

[244] Edmondson Decl. Ex. 5 (Emails) at 00001; *see also* R. Doc. 55-16 (Gamble Deposition) at 101:20-102:23, 103:24-104:6.

[245] Edmondson Decl. Ex. 5 (Emails) at 00001; *see also* R. Doc. 55-16 (Gamble Deposition) at 101:20-102:23, 103:24-104:6.

[246] R. Doc. 55-17 (Toce Deposition) at 50:9-12; Edmondson Decl. Ex. 3 (Rosso Deposition) at 29:14-16.

64.     Mr. Folks has a history of self-harming beginning in his childhood.[247] This pattern of self-harm continued into his adulthood, and he self-harmed several times in correctional settings prior to being in LDPSC's custody.[248]

65.     However, Mr. Folks's pattern of self-injuring significantly worsened in LDPSC's custody.[249] In settings where Mr. Folks was not secluded and restrained Mr. Folks did not exhibit serious self-harm symptoms.[250]

66.     Mr. Folks suffers from a combination of psychiatric disorders which cause him to compulsively self-injure, including depression, bipolar disorder, schizophrenia, borderline personality disorder, antisocial personality disorder, and impulse control disorder.[251]

67.     Mr. Folks was treated with several medications while he was in LDPSC custody, including Thorazine, Artane, and Wellbutrin.[252] These medications are typically used to treat patients with psychotic symptoms, anxiety symptoms, or depression.[253]

68.     Upon being received into LDPSC's custody, Mr. Folks was assigned a Mental Health Level of Care ("LOC") designation of 3.[254]

---

[247] Edmondson Decl. Ex. 1 (Folks Deposition) at 65:2-6.

[248] Edmondson Decl. Ex. 1 (Folks Deposition) at 59:13-61:11; R. Doc. 55-16 (Gamble Deposition) at 66:16-67:13, 77:10-19.

[249] R. Doc. 55-22 (Glindmeyer Report) at 34; R. Doc. 55-16 (Gamble Deposition) at 66:23-25.

[250] Edmondson Decl. Ex. 13 (Penn Deposition) at 215:13-216:7.

[251] R. Doc. 55-9 (Penn Report) at 38 (borderline personality disorder, antisocial personality disorder); Edmondson Decl. Ex. 13 (Penn Deposition) at 205:5-13 (same, and impulse control disorder); R. Doc. 55-16 (Gamble Deposition) at 71:7-23; R. Doc. 55-7 (LSP Mental Health Records) at 001126 (bipolar disorder), 3191 (depression), 3072, 3242, 3259, 3325, 3353 ("history of thought disorder"); Edmondson Decl. Ex. 5 (Emails) at 00107 (bipolar disorder, anxiety); Edmondson Decl. Ex. 6 (UMC Records) at UMC000397, 001366, 001408, 001436, 001613 (bipolar disorder, schizophrenia); *see also* Edmondson Decl. Ex. 1 (Folks Deposition) at 64:8-25 (manic depression, depression, bipolar, schizophrenia).

[252] Edmondson Decl. Ex. 1 (Folks Deposition) at 45:13-17; R. Doc. 55-16 (Gamble Deposition) at 45:18-21.

[253] R. Doc. 55-16 (Gamble Deposition) at 44:17-46:8 (explaining the functions of these medications); R. Doc. 55-20 (LaFleur Deposition) at 100:18-101:3, 102:7-14 (same).

[254] R. Doc. 55-7 (LSP Mental Health Records) at 003365.

69.     According to LDPSC policies, a LOC-3 designation reserved for inmates with serious mental illness ("SMI").[255] This designation required, at a minimum, documented individualized contact every 90 days and an annually-reviewed treatment plan, including consideration of housing assignments.[256]

70.     Mr. Folks, even as a pretrial detainee, could have received individual counseling and psychotherapy, or individual recreation.[257]

71.     In fact, Mr. Folks was recommended for individual counseling and therapy by a mental health provider at LSP.[258] Individual therapy was also a part of Mr. Folks's treatment plan.[259]

72.     La. R.S. 15:824 and the associated LDPSC regulation, No. IS-B-1, did not prevent these interventions because they only apply to the <u>housing</u> of inmates, and do not restrict, *e.g.*, vocational training, educational programs, access to medical and mental health care, work assignments, or group programming.[260]

73.     Following his incarceration by LDPSC, Mr. Folks exhibited symptoms of Post Traumatic Stress Disorder ("PTSD").[261] Mr. Folks's PTSD went untreated while in LDPSC custody.[262]

---

[255] Edmondson Decl. Ex. 4 (HCP27) at 000182.

[256] *Id.* at 000183-84.

[257] Edmondson Decl. Ex. 13 (Penn Deposition) at 230:2-12; R. Doc. 55-7 (LSP Mental Health Records) at 003194.

[258] R. Doc. 55-7 (LSP Mental Health Records) at 003194.

[259] R. Doc. 55-7 (LSP Mental Health Records) at 003191.

[260] R. Doc. 55-21 (LDPSC Regulation No. IS-B-1) at 6-11.

[261] R. Doc. 55-22 (Glindmeyer Report) at 43-44; R. Doc. 55-23 (Glindmeyer Deposition) at 34:4-6.

[262] R. Doc. 55-22 (Glindmeyer Report) at 2, 48.

74. From a comprehensive psychological assessment of Mr. Folks, Dr. Glindmeyer reported that in addition to his prior history of self-harm, he currently suffers from lasting symptoms of depression, mania, poor sleep, anxiety, and intrusive thoughts.[263]

75. Further, Dr. Glindmeyer reported that Mr. Folks has not been able to live independently since being incarcerated.[264]

76. LDPSC policies do not provide a standard set of accommodations for prisoners with mental health disabilities, even though it does so for other disabilities, such as for deaf and hard-of-hearing prisoners.[265]

77. LDPSC does not maintain policies requiring ADA-covered facilities to conduct cost assessments for disability accommodations.[266]

78. Dr. Toce, as medical director of LSP in 2021, oversaw the mental health department at LSP.[267] In that role, he receives reports from social workers and mental health providers at LSP.[268]

79. Dr. Toce provided medical treatment for Mr. Folks in connection with his self-harm—Dr. Toce removed the metal object with which Mr. Folks perforated his bowel while on four-point restraints.[269] Further, Dr. Toce was familiar with Mr. Folks's history of self-harm and his mental health disorders from treating Mr. Folks during prior incarcerations,[270] and from conversations with Dr. Gamble about Mr. Folks's mental health disorders and symptoms.[271]

---

[263] R. Doc. 55-22 (Glindmeyer Report) at 34-36.
[264] R. Doc. 55-23 (Glindmeyer Deposition) at 33:7-14.
[265] Edmondson Decl. Ex. 14 (HCP37) at 001883-84; Edmondson Decl. Ex. 9 (Spears Deposition) at 34:5-13.
[266] Edmondson Decl. Ex. 9 (Spears Deposition) at 25:13-21.
[267] R. Doc. 55-17 (Toce Deposition) at 13:19-20, 28:13-18, 92:24-93:1.
[268] *Id*. at 93:5-11.
[269] *Id*. at 75:5-76:18.
[270] *Id*. at 40:21-41:23.
[271] *Id*. at 105:9-12.

80.    Dr. Toce did not attempt to ameliorate Mr. Folks's self-harm symptoms, because he did not believe that they were the result of a mental health condition.[272] Dr. Toce also knew that the "time-out" cell did not improve Mr. Folks's mental health,[273] and that Mr. Folks was less likely to self-harm in the NU.[274]

81.    Dr. LaFleur served as medical director of LSP until May 2021, during which time he supervised the mental health providers at LSP.[275] Dr. LaFleur reviewed incident reports and evaluations describing Mr. Folks's housing and self-harm symptoms.[276]

82.    Dr. LaFleur did not take corrective action to let Mr. Folks out of restraints or place him in a less restrictive environment.[277]

83.    As the ADA coordinator at LSP starting in March 2022,[278] Deputy Warden Oliveaux had authority over decisions regarding the housing of LSP inmates.[279] In this role, Deputy Warden Oliveaux also had authority over medical and mental health decisions.[280]

Dated: August 18, 2025                    Respectfully submitted,

/s/ Caroline Gabriel                      /s/ Elizabeth A. Edmondson
Caroline Gabriel (La. Bar No. 38224)      Elizabeth A. Edmondson
William Most (La. Bar No. 36914)          Sarah A. Purtill
MOST & ASSOCIATES                         Julius J. Mitchell
201 St. Charles Ave., Ste. 2500, # 9685   Kevin K. Si
New Orleans, LA 70170                      Shailee Diwanji Sharma (*pro hac vice* forthcoming)

---

[272] *See id*. at 40:1-5, 96:6-9.
[273] *Id*. at 52:9-19.
[274] *Id*. at 70:7-24.
[275] R. Doc. 55-20 (LaFleur Deposition) at 47:25-49:22; R. Doc. 55-16 (Gamble Deposition) at 19:20-25.
[276] R. Doc. 55-20 (LaFleur Deposition) at 41:19-43:10.
[277] *Id*. at 150:3-16.
[278] R. Doc. (Oliveaux Deposition) at 13:22-23, 31:6-10.
[279] R. Doc. (Oliveaux Deposition) at 36:17-38:1.
[280] *Id*. at 30:3-4; R. Doc. 55-16 (Gamble Deposition) at 19:20-20:23.

Telephone: (504) 509-5023
Email: williammost@gmail.com

JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600
EEdmondson@jenner.com
SPurtill@jenner.com
Julius.Mitchell@jenner.com
KSi@jenner.com
SSharma@jenner.com

Kenneth D. Beale
JENNER & BLOCK LLP
1099 New York Ave NW # 900
Washington, DC 20001
Telephone: (202) 639-6000
KBeale@jenner.com

*Attorneys for Plaintiff*

Case 3:23-cv-01289-SDD-RLB    Document 70-1    08/15/25    Page 41 of 41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of August, I electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, which will provide electronic notice of the filing to all CM/ECF participants. I further certify that all parties in this action are represented by CM/ECF participants.

*/s/ Elizabeth A. Edmondson*
Elizabeth A. Edmondson
