# EXHIBIT 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSHUA FOLKS                       CIVIL ACTION
                                   NO.USM 23-01289

VS.                                CHIEF JUDGE
                                   SHELLY D. DICK
JEFF LANDRY, ET AL
                                   MAGISTRATE JUDGE:
                                   RICHARD L. BOURGEOIS

CONFIDENTIAL TESTIMONY

of

JOSHUA FOLKS

taken on Wednesday, November 6, 2024, before

Caroline D. Escude', Certified Court Reporter in

and for the State of Louisiana, via Zoom

Videoconferencing.

COURT REPORTERS OF LOUISIANA, L.L.C.
9522 Brookline Avenue, Suite 217
Baton Rouge, Louisiana 70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-Mail:  depos@courtreportersla.com

Confidential
JOSHUA FOLKS

11/06/2024
Page 2

```
 1                    I N D E X

 2

 3                                              Page

 4    Caption                                    1

 5    Appearances                                3

 6    Agreement of Counsel                       4

 7    Examination

 8         BY MR. BLANCHFIELD                     5

 9    Reporter's Certificate                     77

10                     *   *   *   *   *

11    Exhibits:

12         (None.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:   (All participating via Zoom)

 2

 3   Representing the Plaintiff:

 4        MOST LAW OFFICE
          201 St. Charles Avenue,  Suite 2500, No9685
 5        New Orleans, Louisiana   70170

 6        BY:  MR. WILLIAM B. MOST (Counsel not present)

 7                 And

 8        JENNER & BLOCK, LLP
          1155 Avenue of the Americas
 9        New York, New York 10036-2711

10        BY:  MS. SARAH PURTILL

11                 And

12        JENNER & BLOCK, LLP
          1099 New York Avenue, NW, Suite 900
13        Washington, DC  20001-4412

14        BY:  MR. KENNETH BEALE

15

16   Representing the Defendants:

17        LIZ MURRILL, ATTORNEY GENERAL
          OFFICE OF THE ATTORNEY GENERAL
18        P. O. Box 1151
          Baton Rouge, Louisiana  70821

19        BY:  MR. ANDREW BLANCHFIELD
                 Special Assistant Attorney General
20               KEOGH, COX & WILSON, LTD.
                 701 Main Street
21               Baton Rouge, Louisiana   70802

22

23   Reported by:

24        Caroline D. Escude', Certified
          Court Reporter No. 91182 in and
25        for the State of Louisiana
```

Confidential                    JOSHUA FOLKS                    11/06/2024
                                                                    Page 4

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and among

4    Counsel that the deposition of JOSHUA FOLKS, on

5    Wednesday, November 6, 2024, is hereby being taken

6    under the Federal Rules of Civil Procedure for all

7    purposes as permitted under law.

8          The witness reserves the right to read and

9    sign the deposition.  The original is to be

10   delivered to and retained by Mr. Andrew Blanchfield

11   for proper filing with the Clerk of Court.

12         All objections, except those as to the form of

13   the questions and/or the responsiveness of the

14   answers, are reserved until the time of the trial

15   of this cause.

16

17

18

19

20

21                    * * * * *

22         Caroline D. Escude', Certified Court Reporter

23   in and for the State of Louisiana, officiated in

24   administering the oath to the witness.

25

```
 1                    JOSHUA FOLKS

 2   having been first duly sworn, was examined and

 3   testified as follows:

 4   * * * * * * * * * * * * * * * * * * * * * * * * *

 5             (Mr. Beale was not present at the

 6   commencement of the deposition.)

 7                    EXAMINATION

 8   BY MR. BLANCHFIELD:  (Beginning at 10:13 AM)

 9        Q.    Good morning, Mr. Folks.  How are you

10   doing today?

11        A.    I'm doing good.  Thank you.

12        Q.    Good.  So I'm Drew Blanchfield and I

13   represent the defendants in this lawsuit and I'm

14   here today to take your deposition.  Have you ever

15   given a deposition before?

16        A.    No, sir.

17        Q.    Okay.  Let me just go through a few brief

18   ground rules so that we can make this thing run as

19   smoothly as possible, but I'm here to ask you

20   questions.  You're under oath and Ms. Escude' is

21   taking down everything we say and we'll make a

22   transcript of it.  So we need to try not to talk at

23   the same time so that she can get everything down.

24             If you would, let me finish my question

25   before you answer it and I'll be sure to let you
```

Confidential

JOSHUA FOLKS

 1  finish your whole answer before we move on to the

 2  next question so that it makes a good transcript.

 3          If you could, try to speak with yeses and

 4  noes.  Sometimes when we get talking we say uh-huh

 5  and uh-uh and things like that and that doesn't

 6  always come out on the record.  So I'm going to do

 7  my best to use yeses and noes and ask that you do

 8  the same thing.  And if you from time to time say

 9  uh-huh or uh-uh I may ask you for a yes or no just

10  so that we have an accurate record.

11          If you want to take a break at any time,

12  just tell us; we will take a break to accommodate

13  you.  I will try to get through this stuff as

14  quickly as possible.

15          You know, given the nature -- it's not my

16  intent here to pry into your business or to make

17  you uncomfortable.  Given the nature of this claim

18  I'm going to have to ask you some questions about

19  the past and some criminal charges and some medical

20  treatment.  And I don't want you to feel like I'm

21  prying into your personal life, but because of this

22  -- the allegations in this lawsuit, I'm -- I'm --

23  I'm required to ask you some of those questions.

24  Just know that it's not my intent to make you

25  uncomfortable or to pry here.

1            Do you have any questions or concerns

2    before we get started?

3        A.    No, sir.

4        Q.    Okay.  Can you -- can you give me your

5    full name and date of birth, please?

6        A.    Joshua James Folks, 1/17/1978.

7        Q.    And that makes you how old today, sir?

8        A.    46.

9        Q.    Where did you grow up?

10        A.    New Orleans.

11        Q.    Did you go to high school in New Orleans?

12        A.    No, sir.

13        Q.    Did you go to high school somewhere else?

14        A.    No, sir.

15        Q.    Did you attend any schooling during your

16    life?

17        A.    Yes, sir.

18        Q.    Tell me -- tell me what schooling you

19    attended.

20        A.    Kindergarten, middle school.

21        Q.    What was your last grade completed?

22        A.    Eighth.

23        Q.    And where was that?

24        A.    New Iberia.

25        Q.    And do you know what year that was that

1    you completed the eighth grade in New Iberia?

2         A.    I don't remember.

3         Q.    And what was the name of the school in New

4    Iberia?

5         A.    I can't remember the name of the middle

6    school.

7         Q.    And what -- and so at some point you moved

8    from New Orleans to New Iberia?

9         A.    Yes, sir.

10        Q.    Do you know how old you were when you

11   moved to New Iberia?

12        A.    No, not exactly.

13        Q.    When you moved to New Iberia who were you

14   living with?

15        A.    Foster family.

16        Q.    And do you know how old you were when you

17   started living with a foster family?

18        A.    I can't recall.  I was young.

19        Q.    Do you know who your natural-born parents

20   are?

21        A.    Yes, sir.

22        Q.    Do you have -- today, do you have a

23   relationship with your parents?

24        A.    Yes, sir.

25        Q.    Who are you living with today?

 1      A.    Living with a friend.

 2      Q.    In what town?

 3      A.    Channelview.

 4      Q.    I'm sorry.  I missed that.

 5      A.    Channelview.  Houston area.

 6      Q.    Oh, okay.  I'm not familiar with that

 7 town.  How long have you lived there?

 8      A.    Couple of years.

 9      Q.    Okay.  Now, when you finished eighth grade

10 in New Iberia what did you do after that?

11      A.    I went to juvenile.

12      Q.    Okay.  And where was that?

13      A.    Baton Rouge.

14      Q.    Do you remember the name of the facility?

15      A.    LTI.

16      Q.    Okay.  And what -- was there an event that

17 caused you to be placed at LTI?

18      A.    Yes, sir.

19      Q.    And what was that, Mr. Folks?

20      A.    A shoplifting charge.

21            COURT REPORTER:

22                  Say it again, please.

23      A.    Shoplifting.

24      (Mr. Beale joined the Zoom deposition.)

25            MS. PURTILL:

1                     And for the record, I just

2    wanted to note my colleague, Kenneth Beale, has

3    just joined the call.

4               MR. BEALE:

5                     And for the record, I

6    apologize to everybody for my lateness.  I had some

7    technical issues on this side, but pleasure to see

8    everyone.

9               MR. BLANCHFIELD:

10                    No worries.  Thank you.

11   BY MR. BLANCHFIELD:

12        Q.    So the -- was the shoplifting charge in

13   New Iberia?

14        A.    Yes.

15        Q.    And how long did you stay at LTI?

16        A.    A couple of years.

17        Q.    And was the shoplifting charge the only

18   charge that resulted in your placement at LTI?

19        A.    Yes.

20        Q.    That seems like quite a long time for

21   shoplifting.  That was the only charge that you

22   were faced with?

23        A.    That's it.

24        Q.    Okay.  Now, what did you do after you got

25   out of LTI?

JOSHUA FOLKS

```
 1        A.    I went -- I went to -- I went to Angola.
 2   They sent me to Angola.
 3        Q.    Okay.  So when you -- do you know how old
 4   you were in eighth grade?
 5        A.    No, sir, I can't recall exactly.
 6        Q.    Do you know that when you left LTI if you
 7   were 18 years of age or older?
 8        A.    I was 17.
 9        Q.    You were 17?  So you went from LTI to
10   Angola?
11        A.    They transferred me, yes.
12        Q.    Why?  Why did they do that?
13              MS. PURTILL:
14                   Objection; calls for
15   speculation.  The witness can answer.
16        A.    Because I attempted to escape.
17   BY MR. BLANCHFIELD:
18        Q.    You attempted to escape LTI?
19        A.    Yes, sir.
20        Q.    Okay.  So at 17 years of age you were then
21   placed at Angola?
22        A.    Yes, sir.
23        Q.    Do you remember where you were housed at
24   Angola, a particular camp or the main prison?
25        A.    Camp J.
```

Confidential
JOSHUA FOLKS

11/06/2024
Page 12

```
 1      Q.    Were you assigned a job there?
 2      A.    No, sir.
 3      Q.    And how long did you stay at Angola?
 4      A.    Two and a half years.
 5      Q.    Okay.  And where did you go after that?
 6      A.    I went to my dad's.
 7      Q.    Where was your dad living?
 8      A.    New Iberia.
 9      Q.    And that's not your foster family; that's
10   your natural dad?
11      A.    Yes, sir.
12      Q.    What's his name, sir?
13      A.    Gilbert Folks.
14      Q.    So at that time you were like 19 or 20
15   years old?
16      A.    Yes, sir.
17      Q.    And that would have been mid to late
18   1990s?
19      A.    Yes, sir.
20      Q.    Was anyone else living with you and your
21   father around that time in New Iberia?
22      A.    Stepbrother.
23      Q.    What's his name?
24      A.    Derek.
25      Q.    And his last name?
```

```
 1        A.      Tauzin.

 2        Q.      Anybody else?

 3        A.      His mom, Betty.

 4        Q.      And was Betty married to your father?

 5        A.      Yes, sir.

 6        Q.      Okay.  All right.  So what did you do in

 7   New Iberia around that time?

 8        A.      We left.

 9        Q.      How long after you moved to Iberia (sic)

10   did y'all leave New Iberia?

11        A.      We went to work immediately when I was

12   released.

13        Q.      And where were you working?

14        A.      North Carolina.

15        Q.      So y'all -- y'all left New Iberia and

16   moved to North Carolina?

17        A.      No, sir, didn't move.

18        Q.      Okay.  How did you -- how were you able to

19   work in North Carolina without moving?

20        A.      Because we get paid per diem.  We put in

21   fiber optics.

22        Q.      Okay.  And when you say "we left", who are

23   you referring to?

24        A.      My dad was the foreman, so me and my

25   father and my brother -- well, stepbrother Derek.
```

Confidential
JOSHUA FOLKS

1    Q.    So you, your dad and your stepbrother went

2    to work laying fiber optics in North Carolina?

3    A.    Yes, sir.

4    Q.    And when you -- were you actually -- would

5    you go out there and live out there for a certain

6    amount of time and then come back or how did that

7    work?

8    A.    They paid per diem for motels or you went

9    in an RV or something for the time that -- however

10    long it takes for the job to be done.

11    Q.    Okay.  And how long did you do that job?

12    A.    Like eight months.

13    Q.    And what did you do after that?

14    A.    Went to South Carolina.

15    Q.    And what did you do there?

16    A.    Same thing.

17    Q.    How long did you do that?

18    A.    About four months.

19    Q.    Okay.  And after that what did you do?

20    A.    Florida.

21    Q.    Same thing?

22    A.    Yes, sir.

23    Q.    Okay.  And how long were you in Florida?

24    A.    Like eight -- I'd say eight months.

25    Q.    Okay.  And what was the name of this

Confidential
JOSHUA FOLKS

```
 1   company that you were working for laying fiber
 2   optics?
 3        A.    Quest.
 4        Q.    Okay.
 5        A.    And I worked construction.
 6        Q.    I'm sorry.  I missed that.
 7        A.    And I worked construction, Network.
 8        Q.    Two different companies?
 9        A.    Yes, sir.
10        Q.    And it was still your father and your
11   stepbrother with you --
12        A.    No, sir.
13        Q.    -- is that correct?
14        A.    No, sir.
15        Q.    Okay.
16        A.    My stepbrother got fired.
17        Q.    All right.  When did he get fired?
18        A.    In North Carolina.
19        Q.    And what did he do?  Did he go back to New
20   Iberia?
21        A.    Yes, sir.
22                  MS. PURTILL:
23                      Objection; calls for
24   speculation.  You can answer.
25        A.    Yes, sir.
```

Confidential

JOSHUA FOLKS

11/06/2024

Page 16

```
 1   BY MR. BLANCHFIELD:

 2        Q.    Okay.  And after Florida what did you do?

 3        A.    Colorado.

 4        Q.    How long in Colorado?

 5        A.    Three months.

 6        Q.    Then where?

 7        A.    Then I went to jail.

 8        Q.    Okay.  Do you know what year that was?

 9        A.    I can't recall specifically.

10        Q.    Where did you go to jail?

11        A.    South Carolina.

12        Q.    All right.  So your last job before going

13   to jail was in Colorado?

14        A.    Yes, sir.

15        Q.    And -- but you had been to South Carolina

16   laying fiber optics sometime before that, correct?

17        A.    Correct.

18        Q.    Were there charges pending in South

19   Carolina?

20        A.    A warrant, yes.

21        Q.    And what was the warrant for?

22        A.    Grand larceny.

23        Q.    And did you plead to that charge or were

24   you convicted?

25                    MS. PURTILL:
```

1                    Objection; compound.  You can

2     answer.

3          A.    Both.

4     BY MR. BLANCHFIELD:

5          Q.    Okay.  Was there -- was there a trial on

6     that or --

7          A.    No, sir.

8          Q.    And were you sentenced?

9          A.    Yes, sir.

10         Q.    And what was the sentence?

11         A.    Six years.

12         Q.    And so you were incarcerated in South

13    Carolina?

14         A.    I was.

15         Q.    Do you know the name of the prison there?

16         A.    Several.

17         Q.    They moved you around?

18         A.    Yes, sir.

19         Q.    Do you know the names of any of the

20    prisons in South Carolina that you were

21    incarcerated in?

22         A.    Yes, sir.

23         Q.    Can you tell me them, please?

24         A.    Broad River Correctional Center.  Kirkland

25    Correctional Center.  A couple more.  I can't

1    recall their actual name.

2        Q.    Okay.  And how much time did you serve in

3    South Carolina?

4        A.    Close to five.

5        Q.    And what was -- the grand larceny, what

6    were the charges, that you stole what?

7        A.    Unauthorized use of a vehicle, except they

8    call it -- they have different terms, different

9    names for it.  It's grand larceny.

10       Q.    Okay.  Can you tell me the circumstances

11   of that charge?  What were you charged with using?

12                   MS. PURTILL:

13                       Objection; asked and

14   answered.  You can respond.

15       A.    My girlfriend's dad's truck.

16   BY MR. BLANCHFIELD:

17       Q.    Okay.  And where was your girlfriend

18   living at that time when you used the truck?

19       A.    With me.

20       Q.    In South Carolina?

21       A.    Yes, sir.

22       Q.    What is her name?

23       A.    Jennifer Inman.

24       Q.    Jennifer -- what's her last name?

25       A.    Inman.

1    Q.    Is that with an E?

2    A.    I.

3    Q.    I-n-m-a-n?

4    A.    Yes, sir.

5    Q.    Where is Jennifer Inman today?

6                MS. PURTILL:

7                    Objection; calls for

8    speculation.  You can answer if you know.

9    A.    South Carolina.

10   BY MR. BLANCHFIELD:

11   Q.    Do you still have a relationship with her?

12   A.    Yes, sir.

13   Q.    And what is that relationship?

14   A.    We have a son.

15   Q.    And what is your son's name?

16   A.    Ethan Folks.

17   Q.    How old is Ethan?

18   A.    24.

19   Q.    Where does he live?

20   A.    South Carolina.

21   Q.    Are you married to Jennifer Inman?

22   A.    No, sir.

23   Q.    Have you ever been married?

24   A.    Yes, sir.

25   Q.    Okay.  When did you marry?

1    A.    2012.

2    Q.    That was your first marriage?

3    A.    Yes, sir.

4    Q.    Okay.  Let me make sure I have the

5    timeline here correct.  So you served about around

6    five years in South Carolina?

7    A.    Yes, sir.

8    Q.    And where did you go when you were

9    released?

10    A.    Louisiana.

11    Q.    To New Iberia?

12    A.    Yes, sir.

13    Q.    Do you know what year that was?

14    A.    2006.

15    Q.    Okay.  And so in 2006 -- well, let me take

16    a step back.  So was it your understanding that

17    your girlfriend's father pressed charges for your

18    use of his vehicle?

19    A.    Yeah.

20    Q.    What was his name?

21    A.    Bo (spelled phonetically) Inman.

22    Q.    Okay.  So 2006 you're back to New Iberia.

23    What did you do there?

24    A.    Moved to Franklin.

25    Q.    And what caused you to move to Franklin?

JOSHUA FOLKS

1    A.    My aunt owns land in St. Mary Parish.

2    Q.    Your aunt owns what?

3    A.    Land.

4    Q.    Did you live with your aunt?

5    A.    On her land.

6    Q.    Okay.  Was there a house on her land?

7    A.    Several.

8    Q.    And were you living by yourself or with

9  someone at that time?

10   A.    By myself.

11   Q.    Did you have a job?

12   A.    Maintaining the land.

13   Q.    How much land was there?

14   A.    A sugar cane plantation.  I forget exactly

15  how many acres it is.

16   Q.    So were you working the land in exchange

17  for you staying on one of the properties?

18   A.    Yes, sir.

19   Q.    And how long did you do that?

20   A.    A couple of years.

21   Q.    When did you move from or did you move

22  from Franklin?

23   A.    I still have a home there.

24   Q.    And that's on your aunt's sugar cane

25  plantation?

```
 1        A.    Yes, sir.

 2        Q.    Do you own that home?

 3        A.    I do not.

 4        Q.    But -- well, your aunt owns it with the

 5   understanding that you can live there?

 6        A.    Yes, sir.

 7        Q.    What's your aunt's name?

 8        A.    Wendy Folks.

 9        Q.    Okay.  Where was your next move from the

10   sugar cane plantation?

11        A.    I got married; moved to Alabama.

12        Q.    Okay.  So that was 2012?

13        A.    Yes, sir.

14        Q.    And who did you marry?

15        A.    Robin.

16        Q.    What's her -- what was Robin's maiden

17   name?

18        A.    I'm sorry.  I forgot.

19        Q.    That's okay.  How long -- are you still

20   married to Robin?

21        A.    No, sir.

22        Q.    All right.  So when you married Robin

23   where did you-all move?

24        A.    To Camden, Alabama.

25        Q.    And why -- why there?
```

Confidential

JOSHUA FOLKS

```
 1         A.      To work.

 2         Q.      Okay.  And what was the job -- you got a

 3    job there?

 4         A.      It never materialized.

 5         Q.      And how long did you stay in Alabama?

 6         A.      Over a year.

 7         Q.      Did you work at any time during that year?

 8         A.      Not consistent.

 9         Q.      Did your wife work?

10         A.      She gets disability.

11         Q.      Okay.  And did your -- your son -- did you

12    have your son Ethan with Robin?

13         A.      No, sir.

14         Q.      Okay.  Who is Ethan's mother?

15         A.      Jennifer Inman.

16         Q.      Jennifer who?

17         A.      Inman.

18         Q.      Okay.  Okay.  And so Ethan would have been

19    born sometime around the year 2000?

20         A.      Correct.

21         Q.      And at that time in 2000 where were you

22    living?

23         A.      Between South Carolina and Florida.

24         Q.      Did you meet Jennifer in South Carolina?

25         A.      Yes, sir.
```

JOSHUA FOLKS

```
 1        Q.    Okay.  So, back to Alabama, you married in

 2   2012, you stayed in Alabama for about a year and

 3   then where did you go?

 4        A.    To jail.

 5        Q.    Where?  Where did you go to jail?

 6        A.    In Alabama.

 7        Q.    And why were you incarcerated in Alabama?

 8        A.    From shoplifting.

 9        Q.    What did you shoplift?

10        A.    Computers.

11        Q.    And do you know where you were

12   incarcerated in Alabama?

13        A.    Clarke County.

14        Q.    I'm sorry.  What county?

15        A.    Clarke.

16        Q.    Clarke.  Were you sentenced to time in --

17        A.    No, sir.

18        Q.    I'm sorry?

19        A.    No, sir.

20        Q.    So you were arrested for shoplifting and

21   incarcerated in Clarke County; is that correct?

22        A.    Yes, sir.

23        Q.    And how long were you incarcerated in

24   Clarke County?

25        A.    Six, seven months.
```

Confidential

JOSHUA FOLKS

11/06/2024
Page 25

```
 1        Q.    And what happened after that?

 2        A.    I went back to Louisiana.

 3        Q.    Back to New Iberia?

 4        A.    Back to Franklin.

 5        Q.    Back to Franklin.  And where did you live

 6   in Franklin?

 7        A.    On the plantation.

 8        Q.    And you were living there with your wife,

 9   Robin?

10        A.    No.  We split up in Alabama.

11        Q.    Okay.  Did she stay in Alabama?

12              MS. PURTILL:

13                   Objection; calls for

14   speculation.  You can answer if you know.

15        A.    For a short time, yeah.

16   BY MR. BLANCHFIELD:

17        Q.    Okay.  And then you went back to Franklin

18   and you were kind of doing the same thing, taking

19   care of the land on your aunt's sugar plantation?

20        A.    Yes, sir.

21        Q.    How long did you do that?

22        A.    A couple of years.

23        Q.    And what happened after that?

24        A.    I went to jail.

25        Q.    In Franklin?
```

1        A.     Yes, sir.

2        Q.     St. -- St. Mary Parish?

3        A.     Yes, sir.

4        Q.     And why -- why were you incarcerated in

5    St. Mary Parish?

6        A.     Doing shoplifting.

7        Q.     And what did you shoplift?

8        A.     Various goods.

9        Q.     Did you receive a sentence for those

10   charges?

11       A.     Yes, sir.

12       Q.     What was the sentence?

13       A.     Three years, I believe.

14       Q.     And how much time did you serve in St.

15   Mary Parish?

16       A.     In the parish, not much.

17       Q.     Did they send -- did they move you

18   somewhere else?

19       A.     Yes, sir.

20       Q.     Where did they move you?

21       A.     Hunt.

22       Q.     Okay.  And how long were you at Hunt?

23       A.     32 percent of my time.

24       Q.     32 percent?

25       A.     Yes, sir.

```
 1        Q.    Where were you the other time?

 2        A.    That's the percentage I had to serve on

 3   the three.

 4        Q.    Okay.

 5        A.    I was released.

 6        Q.    All right.  So you were released roughly

 7   after a year of serving time?

 8        A.    Yes, sir.

 9        Q.    Okay.  And where did you go -- so that

10   would have been, what, around 2015?

11        A.    Yes, sir, '16.

12        Q.    '16?  Where did you go in 2016?

13        A.    Franklin.

14        Q.    And how long did you live in Franklin

15   then?

16        A.    Couple of years.

17        Q.    Again, doing the same thing?  Were you

18   taking care of the land?

19        A.    Yes, sir.

20        Q.    Were you living with anyone at that time?

21        A.    All my family was out there.

22        Q.    Okay.  When you say all of your family,

23   who are you referring to?

24        A.    My dad, my aunt, my uncle, my grandma, my

25   siblings in general.
```

Veritext Louisiana-CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company
www.veritext.com

1    Q.    Okay.  You have a stepbrother that we've

2    talked about, right?

3    A.    Yes, sir.

4    Q.    He was not living there, though, was he?

5    A.    No, sir.

6    Q.    And who are your siblings?

7    A.    My sisters.

8    Q.    How many sisters?

9    A.    Four.

10    Q.    They were living on the land as well?

11    A.    Three.

12    Q.    So you worked on the land for I think you

13    said a few years; is that correct?

14    A.    Also rent houses.

15    Q.    What do you mean by -- you mean you were

16    working on rent houses or --

17    A.    She owns 13 of them.

18    Q.    Okay.  Your aunt does?

19    A.    Uh-huh.  Yes, sir.

20    Q.    So you would take care of those rent

21    houses as well?

22    A.    Yes, sir.

23    Q.    And how long did you do that?

24    A.    Couple of years.

25    Q.    And what happened after that?

Veritext Louisiana-CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company
www.veritext.com

1     A.    I went to jail.

2     Q.    Okay.  And why -- what was the reason for

3  incarceration this time?

4     A.    Shoplifting.

5     Q.    And what did you shoplift?

6     A.    Laptops.

7     Q.    And that was in the Franklin area?

8     A.    Yes, sir.

9     Q.    Were you sentenced?

10     A.    Yes, sir.

11     Q.    What was your sentence?

12     A.    Five.

13     Q.    Five years?

14     A.    Yes, sir.

15     Q.    And where did you serve that sentence?

16     A.    Angola.

17     Q.    What year was that?

18     A.    '19.

19     Q.    I'm sorry, I couldn't hear that.  What

20  year?

21     A.    '19.

22     Q.    2019?

23     A.    Yes, sir.

24     Q.    And how long did you serve time at Angola

25  beginning in 2019?

```
 1        A.    32 percent.

 2        Q.    32 percent of five years?

 3        A.    Yes, sir.

 4        Q.    So, what, a year and a half or a little

 5   over that, more than that?

 6        A.    Yes, sir.

 7        Q.    Did you get out of Angola in 2020 or 2021?

 8              MS. PURTILL:

 9                    Objection; compound.  You can

10   answer.

11        A.    2022, I believe.

12   BY MR. BLANCHFIELD:

13        Q.    Okay.  So talking about this sentence of

14   five years for shoplifting the laptops, you served

15   that five-year sentence at Angola?

16        A.    Yes, sir.

17        Q.    And you think you were released sometime

18   in 2022?

19        A.    I believe.

20        Q.    All right.  Now, since 2022 have you been

21   incarcerated anywhere?

22        A.    Yes, sir.

23        Q.    Where?

24        A.    Texas.

25        Q.    And what -- what charges landed you in
```

1    jail in Texas?

2        A.    Theft.

3        Q.    Okay.  And where was the theft?

4        A.    Alvin.

5        Q.    Where?

6        A.    Alvin.

7        Q.    Is that in Texas?

8        A.    Brazoria County.

9        Q.    Okay.  So when you got out of Angola in

10   2022 where did you go?

11       A.    Franklin.

12       Q.    And how long did you stay in Franklin?

13       A.    A year.

14       Q.    All right.  And where did -- so you were

15   in Franklin until 2023?

16       A.    Yes, sir.

17       Q.    And then where did you go?

18       A.    Houston.

19       Q.    Why did you go to Houston?

20       A.    Friends.

21       Q.    Friends?

22       A.    Yes, sir.

23       Q.    You went to live with friends?

24       A.    Yes, sir.

25       Q.    Did you have a job there?

1    A.    I do.

2    Q.    Okay.  Are you currently working?

3    A.    I am.

4    Q.    In the Houston area?

5    A.    Deer Park.

6    Q.    Deer Park?

7    A.    Deer Park, yes, sir.

8    Q.    Okay.  Tell me about being incarcerated in

9  Texas.  When were you incarcerated in Texas?

10   A.    January of 2024.

11   Q.    And for how long?

12   A.    Two months.

13   Q.    At what facility?

14   A.    Brazoria County Jail.

15   Q.    And you were charged with theft of what

16 property?

17   A.    From Walmart.

18   Q.    So you got out of county jail in Texas in

19 February or March of '24?

20   A.    June.

21   Q.    June.  And what have you been doing since

22 June of 2024?

23   A.    Working.

24   Q.    Who are you working for?

25   A.    Environmental -- Rapid Environmental

1   Services.

2       Q.    And what is -- what does that company do?

3       A.    Pick up oil and recycle it and resell it.

4       Q.    And you started work for them in June of

5   2024?

6       A.    Yes, sir.

7       Q.    And how did you get that job?

8       A.    With a friend I live with.

9       Q.    In Houston, Texas?

10      A.    Yes, sir.

11              MR. BLANCHFIELD:

12                  Okay.  All right.  Can we

13  take like a five-minute rest-room break?  Is that

14  okay with y'all?

15              MS. PURTILL:

16                  Sure.

17              MR. BLANCHFIELD:

18                  Great.  Thank you.

19      (A recess was taken at 11:00; starting

20  back at 11:06 AM.)

21  BY MR. BLANCHFIELD:

22      Q.    Okay.  Mr. Folks, so I want to ask you a

23  few questions about your most recent incarceration

24  in Texas.  I think you said you spent about two

25  months in county jail --

 1        A.    Yes, sir.

 2        Q.    -- is that correct?

 3        A.    Yes, sir.

 4        Q.    Tell me about the housing arrangements

 5   there.  Were you housed in a cell?

 6        A.    I was housed in an open ward.

 7        Q.    Okay.  With -- I assume there were -- it

 8   was an open area, like, kind of general population

 9   with other inmates?

10        A.    Yes, sir.

11        Q.    Did you have any problems with the

12   incarceration?

13        A.    No.

14                   MS. PURTILL:

15                        Objection; vague.  You can

16   answer.

17        A.    No, sir.

18   BY MR. BLANCHFIELD:

19        Q.    Did you receive any medical care during

20   that two-month period?

21        A.    Yes, sir.

22        Q.    Can you tell me what kind of medical care

23   you received during that period?

24        A.    Seen by an ortho for a broken wrist.

25        Q.    How did you break your wrist?

1      A.     Ladder slipped.

2      Q.     Was that while you were incarcerated in

3   Texas?

4      A.     No, sir.

5      Q.     It was before you were incarcerated?

6      A.     Yes, sir.

7      Q.     Were you working when that happened?

8      A.     Yes, sir.

9      Q.     Okay.  Did you receive any other medical

10  treatment during that two-month period in Texas?

11     A.     No, sir.

12     Q.     Did you have any disciplinary issues

13  during that two-month period in Texas?

14     A.     No, sir.

15     Q.     Okay.  Can tell me if you're on any

16  medications today, sir?

17     A.     No, sir.

18     Q.     You're not on any medicine?

19     A.     I haven't had it transferred.

20     Q.     I'm sorry.  I didn't understand your

21  answer.

22     A.     My medication is out of St. Mary Parish

23  and it expired.

24     Q.     All right.  And you haven't had it

25  transferred to Houston?

```
 1        A.    Yes, sir.

 2        Q.    And how long -- so you're not taking any

 3   prescription medicine currently?

 4        A.    Due to expiration, yes, sir.

 5        Q.    Okay.  And when is the last time you have

 6   had any prescription medication?

 7        A.    June.

 8        Q.    June of this year?

 9        A.    Yes, sir.

10        Q.    And in June of 2024 what prescription

11   medication were you taking?

12        A.    Thorazine and Artane.

13        Q.    And despite the fact that you're no longer

14   taking those medicines or haven't taken those

15   medicines since June of 2024, are you doing okay?

16        A.    Yes, sir.

17              MS. PURTILL:

18                   Objection; vague.  You can

19   answer.

20        A.    Yes, sir.

21   BY MR. BLANCHFIELD:

22        Q.    Is it your intent to stay off of those

23   medications now?

24        A.    No, sir.

25        Q.    And are you currently treating with any
```

 1  physician in Houston?

 2      A.    No, sir.

 3      Q.    When is the last time you saw a medical

 4  doctor?

 5      A.    June.

 6      Q.    Where was that?

 7      A.    I forget the name of the clinic.

 8      Q.    What town?

 9      A.    Houston.

10      Q.    And do you know what kind of doctor you

11  saw?

12      A.    Psychiatrist.

13      Q.    But he did not prescribe you any

14  medication?

15      A.    I was scheduled to come for an evaluation

16  for Texas.

17      Q.    But that never occurred?

18      A.    Transportation issue.

19      Q.    Okay.  So in -- so -- and that was June of

20  2024?

21      A.    Yes, sir.

22      Q.    And that's when you got out of jail in

23  Texas?

24      A.    Yes, sir.

25      Q.    Have you followed up with a psychiatrist

1    since June of 2024?

2        A.    I was supposed to, but I didn't.

3        Q.    Okay.  And you're still working for Rapid

4    Environmental Services?

5        A.    Yes, sir.

6        Q.    Okay.  And where -- where are you

7    physically located right now?

8                    MS. PURTILL:

9                        Objection; vague.  You can

10   answer.

11       A.    Channelview.

12   BY MR. BLANCHFIELD:

13       Q.    Channelview?

14       A.    Yes, sir.

15       Q.    That's Texas?

16       A.    A suburb of Houston.

17       Q.    And Ms. Sarah is there with you.  Is

18   anyone else with you in that room?

19       A.    No, sir.

20       Q.    And you're in someone's office?

21       A.    In a conference room.

22       Q.    Do you know what office you're in?  Is

23   that a business or --

24       A.    A hotel.

25       Q.    Okay.  Do you have any documents in front

 1    of you today?

 2         A.    No, sir.

 3         Q.    Have you done anything to prepare for this

 4    deposition other than meeting with your lawyer?

 5         A.    No, sir.

 6         Q.    You haven't read any documents?

 7         A.    Yes, sir.

 8         Q.    Yes, you have or, yes, you have not read

 9    any documents?

10         A.    Yes, sir, I have.

11         Q.    Okay.  What documents have you read?

12         A.    ARPs that I filed.

13         Q.    Okay.  Anything else?

14         A.    No, sir.

15         Q.    And those are ARPs that you filed while

16    incarcerated at Angola?

17         A.    Yes, sir.

18         Q.    What is your understanding of the claims

19    that have been brought on your behalf in this

20    lawsuit?

21         A.    That I was violated.

22         Q.    And how -- how so?  How were you violated?

23         A.    I don't understand the exact nature of the

24    law on that.

25         Q.    Okay.  But you did read your ARPs that

1    were filed while you were at Angola, correct?

2        A.    Yes, sir.

3        Q.    And is it -- is it accurate to say that

4    the complaints that you made in those ARPs are

5    similar to the complaints that you have made in

6    this lawsuit?

7                    MS. PURTILL:

8                         Objection; calls for a legal

9    conclusion.  The witness can provide his lay

10   answer.

11       A.    Possibly.

12   BY MR. BLANCHFIELD:

13       Q.    And as we sit here today what is your

14   recollection of the complaints that you made in the

15   ARPs at Angola?

16                   MS. PURTILL:

17                        Objection; compound.  You can

18   answer.

19       A.    It varies.

20   BY MR. BLANCHFIELD:

21       Q.    Well, why don't you try and tell me as

22   much as you recall?

23       A.    Unsanitary living conditions.

24       Q.    Okay.  What else?

25       A.    Excessive use of restraint.

```
 1        Q.    Okay.  Anything else?

 2        A.    The use of solitary confinement.

 3        Q.    Okay.  Anything else?

 4        A.    Inadequate medical treatment.

 5        Q.    All right.  Anything else?

 6        A.    That pretty much covers it.

 7        Q.    Okay.  Thank you.  So my understanding is

 8  that before being transferred to Angola you were in

 9  parish prison in St. Mary Parish?

10        A.    That's correct.

11        Q.    And can you refresh my recollection, the

12  charges for that incarceration were what?

13        A.    Aggravated flight from an officer,

14  self-mutilation by a prisoner.

15                  COURT REPORTER:

16                       Say that again, please.

17        A.    Self-mutilation by a prisoner.

18  BY MR. BLANCHFIELD:

19        Q.    Any other charges?

20        A.    No, sir.

21        Q.    Okay.  How much time did you spend in the

22  parish jail before you were transferred to Angola?

23        A.    Approximately three days.

24        Q.    And where were you housed in St. Mary

25  Parish Jail?
```

```
 1        A.    A building.
 2        Q.    That was a -- was that a single cell?
 3        A.    They had me alone, yes.
 4        Q.    Do you know why you were transferred to
 5   Angola?
 6                    MS. PURTILL:
 7                         Objection; calls for
 8   speculation.  You can answer.
 9        A.    They said I was a liability.
10   BY MR. BLANCHFIELD:
11        Q.    Was that due to the self-mutilation issue?
12                    MS. PURTILL:
13                         Objection; calls for
14   speculation.  You can answer.
15        A.    Yes, sir.
16   BY MR. BLANCHFIELD:
17        Q.    Do you know what -- the date that you were
18   first incarcerated in St. Mary Parish before being
19   transferred to Angola?
20        A.    I can't recall exactly.
21        Q.    And what specifically was the act of
22   self-mutilation?  Do you recall what you did?
23        A.    I cut my -- my wrists and thighs.
24        Q.    Did you receive medical treatment for
25   that?
```

```
 1        A.     At the hospital, yes.

 2        Q.     Do you remember the name of the hospital?

 3        A.     Franklin Foundation.

 4        Q.     And it was after that treatment that you

 5   were transferred to Angola?

 6        A.     No, sir.

 7        Q.     You went back to St. Mary Parish from the

 8   hospital?

 9        A.     Yes, sir.

10        Q.     And then you were transferred to Angola?

11        A.     No, sir.  I went back to the hospital.

12        Q.     Okay.  All right.  So let me make sure

13   that I understand.  So you were first in the parish

14   jail; there was an incident of self-mutilation; you

15   went to Franklin Foundation Hospital and then back

16   to parish jail and then back to the hospital?

17        A.     Yes, sir.

18        Q.     Was that just for a follow-up visit the

19   second time or --

20        A.     No, sir.

21        Q.     Tell me, what were the circumstances for

22   the second visit to the hospital?

23        A.     I stabbed myself in the throat and

24   swallowed some metal objects.

25        Q.     And that happened in the parish jail?
```

 1      A.    Yes, sir.

 2      Q.    Okay.  So the first trip to Franklin

 3  Foundation Hospital was for your wrists and your

 4  thighs, correct?

 5      A.    Yes, sir.

 6      Q.    And you received medical treatment for

 7  that?

 8      A.    Yes, sir.

 9      Q.    What did they do for you?

10      A.    They put staples in them.

11      Q.    Then you went back to the parish jail and

12  you stabbed yourself in the throat and swallowed

13  metal objects and then you had to go back to the

14  hospital again?

15      A.    I was admitted.

16      Q.    Okay.  And all this -- the two instances

17  of self-mutilation and the hospital treatment, that

18  all took place in a three-day period, is that my

19  understanding?

20      A.    Yes, sir.

21      Q.    Now, right before being placed in the

22  parish jail in I believe it was the spring of 2021,

23  were you seeing -- actively seeing a psychiatrist?

24      A.    Yes, sir.

25      Q.    And who is that?

1    A.    St. Mary Parish Behavioral Center in

2  Morgan City, Louisiana.  St. Mary Parish.

3    Q.    And was that in Franklin?

4    A.    It's in St. Mary Parish.  It's in Morgan

5  City.

6    Q.    Morgan City, I'm sorry.  And how long had

7  you been treating at that center?

8    A.    Since I was a child.

9    Q.    And were you on prescription medication

10  when you were incarcerated in St. Mary Parish in

11  2021?

12    A.    Yes, sir.

13    Q.    Do you know what medications you were on?

14    A.    Thorazine, Artane and Wellbutrin.

15    Q.    And do you know how long you had been on

16  those three medications?

17    A.    As long as I can remember.

18    Q.    Was it more than a year?

19    A.    Most of my life.

20    Q.    Now, when you were placed in the parish

21  prison in 2021 did you continue to take those three

22  medicines?

23    A.    They wouldn't give them to me.

24    Q.    Do you know why?

25         MS. PURTILL:

1                    Objection; calls for

2    speculation.  You can answer.

3         A.    They claimed that I had to be diagnosed by

4    their doctor.

5    BY MR. BLANCHFIELD:

6         Q.    Now, did you see a psychiatrist during

7    that three-day period that you were in St. Mary

8    Parish?

9         A.    Not in person.

10        Q.    Did you see one by way of telemedicine or

11   by Zoom or something like that?

12        A.    Yes, sir, over the phone.

13        Q.    Over the phone?  When did you see that

14   physician?

15        A.    The last day I was there.

16        Q.    Do you know who that was?

17        A.    I can't recall her name.

18        Q.    Did she prescribe medication for you?

19        A.    She ordered all the medicines that I had,

20   yes.

21        Q.    And to your recollection that was -- we'll

22   call it Day 3 of being in St. Mary Parish?

23        A.    Yes, sir.

24        Q.    When you went to Franklin Hospital for the

25   two instances of self-mutilation did you see a

JOSHUA FOLKS

1    psychiatrist then?

2        A.    No, sir.

3        Q.    Okay.  So the -- before you were

4    transferred to Angola you received a prescription

5    for those three medicines that we discussed from

6    this psychiatrist in South Louisiana?

7        A.    Yes, sir.

8        Q.    And those prescriptions were filled, I

9    assume?

10        A.    They were.

11        Q.    And you started taking them?

12        A.    Right -- right before I was transferred

13    they gave me a dose, yeah.

14        Q.    Okay.  And did those medicines accompany

15    you to Angola?

16        A.    Yes, sir.

17        Q.    And were those medicines -- were you able

18    to -- did you keep those medicines on your person

19    or would you have to go to pill call?

20        A.    Yes, sir, pill call.

21        Q.    Pill call?  Did you have any medications

22    on your person at Angola?

23        A.    No, sir.

24        Q.    And how often did you go to pill call?

25        A.    It was brought to me three times a day.

1    Q.    My understanding is that you were at

2  Angola for about 17 months.  Does that sound

3  correct?

4    A.    16.

5    Q.    Okay.  And during that 16 months were

6  there any instances of self-mutilation?

7    A.    Several.

8    Q.    Okay.  When you arrived at Angola where

9  were you placed?

10    A.    Isolation in medical.

11    Q.    And is that what is referred to as the

12  treatment unit or the treatment center?

13    A.    Treatment center.

14    Q.    Treatment center?

15    A.    Yes, sir.

16    Q.    You were in a cell or in the open?

17    A.    A cell.

18    Q.    You were by yourself?

19    A.    Yes, sir.

20    Q.    And how long did you stay there in the

21  treatment center in a cell?

22    A.    Four months.

23    Q.    And after four months where did you go?

24    A.    Solitary confinement.

25    Q.    And where was solitary confinement?

```
 1        A.      The TU.

 2        Q.      TU?

 3        A.      Yes, sir.

 4        Q.      And where -- where is that in relationship

 5   to the treatment center?

 6        A.      Right next to it.

 7        Q.      And how did the housing arrangements at

 8   the treatment unit differ from the treatment

 9   center?

10        A.      I was in a cell isolated away from any

11   other inmate activity.

12        Q.      Now, when you were at the treatment center

13   you were in your own cell, but you had more

14   interaction with other inmates?

15        A.      Yes, sir.  The cell is next door and

16   inmates outside the cell.

17        Q.      Okay.  Did you have out-of-cell time when

18   you were at the treatment center for four months?

19        A.      To shower.

20        Q.      Just to shower?

21        A.      In the bed of my treatments or call-outs.

22        Q.      And were all of your call-outs medical

23   treatment related?

24        A.      Yes, sir.

25        Q.      Who were you seeing; do you remember?
```

```
 1        A.    Dr. Lavespere, Dr. Touchet (sic), some

 2   nurse practitioners.  I can't really recall their

 3   names.

 4        Q.    Did you ever see a Dr. Gamble?

 5        A.    That's the psychiatrist.

 6        Q.    Yeah.

 7        A.    Yes, sir.

 8        Q.    You saw him?  Okay.  And how often did you

 9   see these medical providers?

10                   MS. PURTILL:

11                         Objection; vague.

12        A.    Once a month, maybe.

13   BY MR. BLANCHFIELD:

14        Q.    And do you know why you were transferred

15   from the treatment center to the treatment unit?

16                   MS. PURTILL:

17                         Objection; calls for

18   speculation.  You can answer.

19        A.    I have no -- I have no knowledge of

20   security reasons.

21   BY MR. BLANCHFIELD:

22        Q.    So when you went to the treatment unit, if

23   I understand your testimony, you were more isolated

24   than you were in the treatment center?

25        A.    Yes, sir.
```

```
 1        Q.    You also mentioned that there were a
 2   number of instances of self-mutilation.  Do you
 3   know when was the first instance?
 4        A.    Maybe a week -- within a week of when I
 5   arrived.
 6        Q.    And can you tell me the specifics of that
 7   event, what -- what occurred?
 8        A.    I cut my knees and legs up.
 9        Q.    And what was -- did you receive medical
10   treatment there at Angola?
11        A.    I was stitched.
12        Q.    Were you sent out to an outside hospital
13   at all?
14              MS. PURTILL:
15                   Objection; vague.
16        A.    Not that time, no.
17   BY MR. BLANCHFIELD:
18        Q.    Okay.  So you received medical treatment
19   and then you stayed at the treatment center,
20   correct?
21        A.    I was restrained for two weeks.
22        Q.    And you were restrained in a cell in the
23   treatment center for two weeks?
24        A.    Handcuffs and shackles to a bed.
25        Q.    And that was in the treatment center?
```

Veritext Louisiana-CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company
www.veritext.com

1    A.    Yes, sir.

2    Q.    During that two-week period were the

3  handcuffs and shackles ever removed?

4    A.    One hand was removed to allow me to eat.

5    Q.    Okay.  And did you see physicians during

6  that two-week period?

7    A.    Yes, sir.

8    Q.    And how often did you see a physician

9  during that two-week period?

10   A.    Every time they would prescribe a blood

11  thinner.

12   Q.    Do you know why they were prescribing a

13  blood thinner?

14   A.    Because keeping me strapped down can cause

15  complications.

16   Q.    And you were -- you were still on your

17  psychiatric medications, the three medications we

18  discussed?

19   A.    Yes, sir.

20   Q.    And they would bring you those medicines

21  each day?

22   A.    Yes, sir.

23   Q.    Okay.  So after two weeks the handcuffs

24  and shackles were removed?

25   A.    Yes, sir.

```
 1        Q.     And you remained in the treatment center
 2   after that for some time, correct?
 3        A.     I did.
 4        Q.     Okay.  And when was the next act of
 5   self-mutilation?
 6        A.     I think a couple of months after.
 7        Q.     Was it after you were moved to the
 8   treatment unit?
 9        A.     I was still in the treatment center.
10        Q.     Okay.  And tell me about that incident.
11        A.     I cut my throat and swallowed some razors.
12        Q.     Okay.  And did you receive medical
13   treatment for that?
14        A.     Yes, sir.
15        Q.     Do you know who treated you for that?
16        A.     I was sent out.  New Orleans.
17        Q.     That was University Medical Center?
18        A.     Yes, sir.
19        Q.     How long were you there?
20        A.     Several days.
21        Q.     And what did they do for you there at
22   University Medical Center?
23        A.     Made sure that there wasn't no
24   perforations and that the foreign objects passed.
25        Q.     With respect to your throat injury, did
```

1     you receive stitches for that?

2          A.     Yes, sir.

3          Q.     That was done at United Medical Center?

4          A.     University.

5          Q.     I'm sorry, University Medical Center.

6          A.     Yes, sir.

7          Q.     And after several days you were returned

8     to Angola?

9          A.     Yes, sir.

10         Q.     And were you placed at the treatment

11    center when you returned?

12         A.     I was restrained for 12 days.

13         Q.     And was that restraint -- did that occur

14    at the treatment center?

15         A.     Yes, sir.

16         Q.     It was similar to the prior two-week

17    period of restraint?

18         A.     Exactly.

19         Q.     And you were seen by healthcare providers

20    during that 12-day period?

21         A.     Yes, sir.

22         Q.     And then you were released from restraint

23    after 12 days?

24         A.     Yes, sir.

25         Q.     Okay.  Were there any other acts of

1  self-mutilation after that?

2       A.    I was transferred to TU.

3       Q.    Okay.  Did anyone ever tell you why you

4  were being transferred to TU?

5       A.    No, sir.

6       Q.    But your recollection is that you were at

7  the treatment center for four months and then

8  transferred to the treatment unit?

9       A.    That's correct.

10      Q.    So the remaining 12 months of your stay,

11 was it spent at the treatment unit?

12      A.    In solitary confinement.

13      Q.    During that -- and am I right it was

14 around 12 months at the treatment unit?

15      A.    Yes, sir.

16      Q.    Were there any acts of self-mutilation at

17 the treatment unit?

18      A.    Yes, sir.

19      Q.    Okay.  Tell me about -- when did it --

20 when it happened and what was the event.

21      A.    Maybe a month after arrival I stabbed

22 myself with five foreign objects into my body

23 cavity.

24      Q.    And did you receive medical treatment for

25 that incident?

```
1      A.    I had emergency surgery and they removed

2  13 feet of my intestines.

3      Q.    Was that also at University Medical

4  Center?

5      A.    Yes, sir.

6      Q.    And how much of the -- of your intestine

7  was removed?

8      A.    13 feet.

9      Q.    And what were the foreign objects?  What

10 were they that you stabbed yourself with?

11     A.    Long nails.

12     Q.    Where did you get those -- the long nails

13 from?

14     A.    I broke the button on the sink and took

15 the spring and stretched it out.

16     Q.    How long were you at University Medical

17 Center that time?

18     A.    Couple of weeks.

19     Q.    And after that you were returned to the

20 treatment unit at Angola?

21     A.    I was restrained in the treatment center

22 for 30 days.

23     Q.    Okay.  So you went back to the treatment

24 center?

25     A.    Yes, sir.
```

1    Q.    Okay.  And you say for 30 days?

2    A.    Correct.

3    Q.    And it was similar to the two prior

4    incidents of restraint?

5    A.    Exactly.

6    Q.    And after the 30 days you were removed

7    from the restraints?

8    A.    Yes, sir.

9    Q.    And did you stay at the treatment center?

10    A.    Temporarily to receive physical therapy so

11    I could walk.

12    Q.    And how long -- how long did you stay at

13    the treatment center?

14    A.    A couple of days.

15    Q.    And then you went back to the treatment

16    unit?

17    A.    Yes, sir.

18    Q.    Okay.  Were there any other acts of

19    self-mutilation after that incident?

20    A.    No, sir.

21    Q.    So you stayed at the treatment unit until

22    you finished your sentence and then you were

23    released?

24    A.    I went home, yes.

25    Q.    Okay.  And if I understand it, that was in

1    November of 2022?

2        A.    Yes, sir.

3        Q.    So, if I understand it, in your -- in your

4    ARPs that you reviewed I think you mentioned three

5    instances of being restrained and we just walked

6    through those three instances; is that correct?

7                    MS. PURTILL:

8                        Objection; calls for

9    speculation.  You can answer.

10       A.    For that time period, yes.  Yes, sir.

11   BY MR. BLANCHFIELD:

12       Q.    Now -- so you went home in November of

13   2022, correct?

14       A.    Yes, sir.

15       Q.    And home was Franklin?

16       A.    Yes, sir.

17       Q.    And you've been -- did you -- did you

18   return to St. Mary Parish Behavioral Center --

19       A.    Yes, sir.

20       Q.    -- after November of 2022?

21       A.    Yes, sir.

22       Q.    And how long did you stay in Franklin

23   before moving on?

24       A.    Until mid '23.  Maybe before, maybe

25   beginning of '23.

1    Q.    And that's when you went to Texas?

2    A.    Yes, sir.

3    Q.    And there was only one other incarceration

4    after November of 2022; is that correct?

5    A.    Yes, sir.

6    Q.    And that was a two-month stay in Texas,

7    correct?

8    A.    Brazoria County.

9    Q.    Okay.  And there were no -- you did not

10   engage in any acts of self-mutilation during that

11   two-month period?

12   A.    No, sir.

13   Q.    Now, we talked earlier on about a number

14   of other incarcerations prior to the Angola

15   incarceration in 2021 and 2022.  Did you engage in

16   any acts of self-mutilation at any of the other

17   facilities?

18   A.    Yes, sir.

19   Q.    Okay.  Can you tell me where and when?

20   A.    Hunt Correctional Center in Baton Rouge at

21   the time I was there.

22   Q.    Was there more than one instance of

23   self-mutilation at Hunt?

24   A.    Yes, sir.

25   Q.    Do you know how many instances there were?

JOSHUA FOLKS

```
 1        A.     I can't recall.

 2        Q.     How long were you incarcerated at Hunt?

 3        A.     Maybe a year.

 4        Q.     Were you ever incarcerated at David Wade

 5   Correctional Center?

 6        A.     Yes, sir.

 7        Q.     When -- do you know when that was?

 8        A.     2013.

 9        Q.     How long were you at David Wade?

10        A.     A month, maybe two.

11        Q.     Do you know why you were transferred to

12   David Wade?

13        A.     Yes, sir.

14        Q.     Why was that?

15        A.     Because I self-mutilated.

16        Q.     You self-mutilated while you were at Hunt

17   and they transferred you to David Wade?

18        A.     While I was at Wade.

19        Q.     I'm sorry.  I missed where -- you went to

20   David Wade because you self-mutilated or --

21        A.     I went to David Wade because I had an

22   escape charge.

23        Q.     And was that an escape from Elayn Hunt?

24        A.     From St. Mary Parish.

25        Q.     Okay.  And when you -- tell me about the
```

 1   incidents of self-mutilation at Hunt.  What
 2   happened there?
 3         A.    A lot of things.
 4         Q.    More than one instance?
 5         A.    Yes, sir.
 6         Q.    How many?
 7         A.    I can't recall the number.
 8         Q.    Would it be more than three?
 9         A.    Yes, sir.
10         Q.    Yes?
11         A.    Yes, sir.
12         Q.    And did you receive treatment at the
13   outside hospitals, Our Lady of the Lake or
14   something like that, when you were at Hunt?
15         A.    That's correct.
16         Q.    Since being released from Angola in
17   November of 2022 you've treated at the Behavioral
18   Center in St. Mary Parish, correct?
19         A.    Correct.
20         Q.    Have you treated with any other healthcare
21   providers since November of 2022?
22         A.    Brazoria County.
23         Q.    And how many times did you treat in
24   Brazoria County?
25         A.    Two.

1     Q.    And who did you treat with there?

2     A.    Psychiatrist.

3     Q.    Do you know the name of the psychiatrist?

4     A.    No, sir, I don't know -- I can't recall

5     their name.

6     Q.    Okay.  Do you know the name of the

7     facility that they were working at?

8     A.    Brazoria County.

9     Q.    Okay.  And the last time you saw her was

10    in June of 2024 I think you told me?

11    A.    Yes, sir.

12    Q.    Do you have any visits scheduled with a

13    psychiatrist?

14    A.    As of this moment, no.  I have referrals.

15    Q.    Now, you mentioned earlier being charged

16    with self-mutilation of a prisoner.

17    A.    Yes, sir.

18    Q.    Was that more than one time?

19    A.    Yes, sir.

20    Q.    And was that from St. Mary Parish?  The

21    charges were from St. Mary Parish?

22    A.    Every time.

23    Q.    And were those charges dismissed, if you

24    know?

25    A.    Eventually.

JOSHUA FOLKS

1      Q.    Okay.  What about your general overall

2   health currently today, are you in good health?

3                  MS. PURTILL:

4                       Objection; vague.  You can

5   answer.

6      A.    Yes, sir.

7   BY MR. BLANCHFIELD:

8      Q.    While you were at Angola were you ever on

9   suicide watch?

10      A.    My entire incarceration.

11      Q.    You were on suicide watch your entire

12   incarceration?

13      A.    Yes, sir.

14      Q.    There's a reference in some of the records

15   I saw that at an appearance before Judge Vincent

16   Borne your bond was set at $75,000 and you

17   threatened to burn his house down.  Is that -- is

18   that correct?

19      A.    No, sir.

20      Q.    What part of that is not correct?

21      A.    That's hearsay.  A deputy claimed that I

22   said that.

23      Q.    Okay.  But you did -- you were -- you did

24   make an appearance before Judge Borne and he did

25   set your bond at $75,000; is that correct?

JOSHUA FOLKS

1    A.    Yes, sir.

2    Q.    And the deputy said that you said you were

3    going to burn his house down but you dispute that?

4    A.    Absolutely.

5    Q.    Okay.  Did you ever serve time in the

6    military?

7    A.    No, sir.

8    Q.    Do you know about when or how old you were

9    when you first saw a physician for mental health

10   issues?

11   A.    I was in single digits.

12   Q.    So you were under 10 years old?

13   A.    Yes, sir.

14   Q.    And I think you told me that you've been

15   treating with the Behavioral Center in Morgan City

16   for most of your life?

17   A.    Yes, sir.

18   Q.    Do you know if you ever received a

19   diagnosis from that place?

20   A.    Yes, sir.

21   Q.    Do you know what the diagnosis was?

22   A.    Not what they are, but I was told.

23   Q.    What were you told?

24   A.    Manic depressive disorder, depression,

25   bipolar, schizophrenia and a narcissist and severe

```
 1   self-mutilation.
 2        Q.    Do you know when the first instance of
 3   self-mutilation occurred in your life?
 4        A.    When I was a kid.
 5        Q.    But while you were still in grade school?
 6        A.    Kindergarten, maybe before.
 7        Q.    Do you have any knowledge of what damages
 8   you are seeking in this lawsuit?
 9        A.    No, sir.
10        Q.    Have you -- have you filed any other
11   lawsuits besides the current one that brings us
12   here today?
13        A.    No, sir.
14        Q.    Do you know why Angola Warden Tim Hooper
15   was named as a defendant in this case?
16                   MS. PURTILL:
17                       Objection; calls for a legal
18   conclusion.  I'm going to instruct the witness not
19   to answer to the extent that that requires talking
20   about any confidential conversations he's had with
21   his attorneys.  But subject to that objection you
22   can answer the question.  You're welcome to.
23        A.    Because he's the warden and he signs off
24   on everything.
25   BY MR. BLANCHFIELD:
```

```
 1        Q.    You doing all right?  You need a break?

 2        A.    No, sir.

 3        Q.    Okay.  We're getting -- we're getting

 4   there.  Is it your understanding that you were

 5   never a Department of Corrections prisoner?

 6              MS. PURTILL:

 7                    Objection; calls for a legal

 8   conclusion.  You can provide your lay testimony.

 9        A.    I was a parish inmate until the late part

10   of my incarceration at Angola and then I became a

11   state prisoner.

12   BY MR. BLANCHFIELD:

13        Q.    Do you know when you feel you became a

14   state prisoner as opposed to a St. Mary Parish

15   prisoner?

16              MS. PURTILL:

17                    Objection; calls for a legal

18   conclusion.  You can provide your lay answer.

19        A.    When my parole was revoked.  When I

20   revoked myself and I pled guilty to the pending

21   charge and got credit for time served is when I

22   became a state prisoner.

23   BY MR. BLANCHFIELD:

24        Q.    Okay.  And when did that happen?

25        A.    A few months prior to my release.
```

```
 1        Q.    And when you got -- I mean, getting credit

 2   for time served, is that what led to your

 3   entitlement to being released?

 4        A.    The judge thought so.

 5        Q.    Do you remember who the judge was?

 6        A.    I can't recall his name, but he was pretty

 7   active in the negotiations of getting credit for

 8   time served.

 9        Q.    Okay.  And he was in St. Mary Parish --

10        A.    Yes, sir.

11        Q.    -- that judge?

12        A.    Yes, sir.

13        Q.    During the time that you were at Elayn

14   Hunt were you ever restrained?

15        A.    Absolutely.

16        Q.    Do you know how many times you were

17   restrained?

18        A.    No, sir.

19        Q.    Was the -- in your mind was the restraint

20   related to acts of self-mutilation?

21        A.    Yes, sir.

22        Q.    It was your understanding that they were

23   restraining you so as to prohibit acts of

24   self-mutilation?

25                    MS. PURTILL:
```

1                    Objection; mischaracterizes

2    the witness's testimony.  You can answer.

3         A.    My understanding was it was a deterrent.

4    BY MR. BLANCHFIELD:

5         Q.    Were you ever restrained in the parish

6    jail?

7         A.    No, sir.

8         Q.    What about David Wade?

9         A.    No, sir.

10        Q.    What about University Hospital or

11   University Medical Center?

12        A.    For security purposes, just one leg

13   shackled.

14        Q.    Okay.  And what about Our Lady of the

15   Lake?

16        A.    After a surgery, yes.

17        Q.    Has any physician told you that any of the

18   medical care you received at Angola was improper?

19        A.    Off the record, yeah.

20        Q.    Who?  Who told you that?

21        A.    Several nurses.

22        Q.    Nurses from where?

23        A.    That treated me.

24        Q.    Treated you where?

25        A.    Treatment center.

1      Q.    In Morgan City?

2      A.    No, at Angola.

3      Q.    So several of the nurses at Angola told

4  you you were receiving inappropriate medical care

5  at Angola?

6      A.    Yes, sir.

7      Q.    Do you remember the names of any of those

8  nurses?

9      A.    No, I can't recall their names.

10      Q.    Did any -- has any medical doctor ever

11  told you that you received inappropriate medical

12  care at Angola?

13      A.    Yes, sir.

14      Q.    Who?

15      A.    Dr. Gamble.

16      Q.    What did Dr. Gamble tell you?

17      A.    That he couldn't control the time period

18  of when I was strapped down, chained down for 30

19  days, that if it was his decision I wouldn't be

20  like that.

21      Q.    So he told you if it was his decision you

22  would not have been in restraints for 30 days?

23      A.    Yes.

24      Q.    Whose decision was it?

25            MS. PURTILL:

1                    Objection; calls for a legal

2      conclusion.  You can provide your lay testimony.

3           A.    I was told by Dr. Gamble that it was Tim

4      Hooper.

5      BY MR. BLANCHFIELD:

6           Q.    That it was who?

7           A.    The ultimate decision came down to Tim

8      Hooper.

9           Q.    The warden?

10          A.    Absolutely.

11          Q.    Have you ever met Warden Hooper?

12          A.    Yes, sir.

13          Q.    How many times?

14          A.    A few.

15          Q.    Tell me the circumstances.  Where did you

16     meet him?

17          A.    The first time was at Hunt.

18          Q.    Did you meet him at Angola?

19          A.    He was transferred and became warden and

20     then I was transferred, yes.

21          Q.    When did you meet him at Angola?

22          A.    After I first got there and I was

23     restrained.

24          Q.    Did he come to your cell?

25          A.    He did.

```
 1        Q.    More than once?

 2        A.    Yes, sir.

 3        Q.    And did you have a conversation with

 4   Warden Hooper?

 5        A.    I listened to him.

 6        Q.    What did he tell you?

 7        A.    That I was going to be like that for a

 8   long time.

 9        Q.    And when you say "like that", are you

10   referring to being restrained?

11        A.    Yes, sir.

12        Q.    And did that occur -- we mentioned, I

13   think, three separate periods of restraint.  Did

14   that occur on more than one of those periods of

15   restraint?

16        A.    On two of them.

17        Q.    Two of the three?

18        A.    Yes, sir.

19        Q.    Okay.  And did he tell you essentially the

20   same thing both times?

21        A.    The second time he was transferring me

22   back to Hunt.

23        Q.    He was transferring you where?

24        A.    That he was going to have me transferred

25   back to Hunt.
```

Veritext Louisiana-CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company
www.veritext.com

1    Q.    But that never happened?

2    A.    It never happened.

3    Q.    What did you tell him?  Did you respond to

4  his comments?

5    A.    No, sir.

6    Q.    Do you remember telling him anything?

7    A.    No, sir.

8    Q.    But you do remember that Gamble -- Dr.

9  Gamble told you that it was ultimately the warden's

10  decision whether or not you would be in restraints?

11    A.    I inquired why he was signing off on it

12  after such a long period.

13    Q.    You asked Gamble why Gamble was signing

14  off on it?

15    A.    Yes, sir.

16    Q.    And that's what he told you, that it was

17  ultimately the warden's decision?

18    A.    And that he didn't have any training to

19  make that decision.

20    Q.    That Dr. Gamble told you he didn't have

21  any training to make the decision whether or not

22  you were to be held in restraints?

23    A.    Yes, sir.

24    Q.    Mr. Folks, I think that's -- that's all

25  the questions I have.  I appreciate your time.

1    Thank you.

2        A.    Yes, sir.

3                    MS. PURTILL:

4                        Can we just take a

5    five-minute break and then come back on the record?

6    I just want to go through my notes and see if

7    there's anything else we have.

8                    MR. BLANCHFIELD:

9                        Sure.  Sure.

10                    MS. PURTILL:

11                        All right.  Thank you.

12                    MR. BLANCHFIELD:

13                        Thank you.

14           (A recess was taken; starting back at

15    12:21 PM)

16                    MS. PURTILL:

17                        Yes, we have no further

18    questions and I would ask -- I know that Mr.

19    Blanchfield and I are currently working on a

20    protective order and I would ask that the

21    transcript of this deposition be, you know,

22    provisionally designated as confidential, you know,

23    pending the finalization of that protective order

24    and just note if there are any rights that we would

25    have under a protective order, you know, to be

 1    entered.

 2                    MR. BLANCHFIELD:

 3                         Yep, that sounds good.

 4              (End of testimony at 12:23 PM)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   WITNESS'S CERTIFICATE

 2

 3

 4          I, JOSHUA FOLKS, the undersigned, do hereby

 5    certify that I have read the foregoing deposition

 6    taken on November 6, 2024, and it contains a true

 7    and accurate transcript of the testimony given by

 8    me:

 9

10

11          (   )  Without corrections

12

13          (   )  With corrections as reflected on the

14    Errata Sheet(s) prepared by me and attached hereto

15    consisting of _____ pages.

16

17

18          _____

19                   JOSHUA FOLKS

20          _____

21                   DATE

22

23

24    Reported by:  Caroline D. Escude', CCR

25
```

1          R E P O R T E R ' S   C E R T I F I C A T E

2

3          I, Caroline D. Escude', Certified Court

4    Reporter, Certificate #91182, in and for the State

5    of Louisiana, as the officer before whom this

6    testimony was taken, do hereby certify that JOSHUA

7    FOLKS, after having been duly sworn by me upon

8    authority of R.S. 37:2554, did testify as

9    hereinbefore set forth in the foregoing 75 pages on

10   November 6, 2024; that this testimony was reported

11   by me in stenographic machine shorthand, was

12   prepared and transcribed by me or under my personal

13   direction and supervision, and is a true and

14   correct transcript to the best of my ability and

15   understanding; that the transcript has been

16   prepared in compliance with transcript format

17   guidelines required by statute or by the rules of

18   the board and that I am informed about the complete

19   arrangement, financial or otherwise, with the

20   person or entity making arrangements for deposition

21   services; that I have acted in compliance with the

22   prohibition on contractual relationships, as

23   defined by Louisiana Code of Civil Procedure

24   Article 1434 and in the rules and advisory opinions

25   of the board; that I have no actual knowledge of

1  any prohibited employment or contractual

2  relationship, direct or indirect, between a court

3  reporting firm and any party litigant in this

4  matter nor is there any such relationship between

5  myself and a party litigant in this matter; that I

6  am not related to counsel or to the parties herein,

7  nor am I otherwise interested in the outcome of

8  this matter.

9         This certification is valid only for a

10 transcript accompanied by my original signature and

11 original required seal or my certified digital

12 signature on this page.

13      Signed:  November 12, 2024

14         *Caroline D. Escude'*

15         Caroline D. Escude', CCR #91182

16

17

18

19

20

21

22

23

24

25