# EXHIBIT 13

Joseph Penn, M.D. - June 11, 2025

1          IN THE UNITED STATES DISTRICT COURT
            THE MIDDLE DISTRICT OF LOUISIANA
2

3     _____ )
                              )
4     JOSHUA FOLKS,           )
                              )
5          Plaintiff,         )
                              )
6        vs.                  )   Case No.
                              )   23-cv-01289-SDD-
7     LOUISIANA ATTORNEY      )   RLB
      GENERAL JEFF LANDRY,    )
8     et al.,                 )
                              )
9          Defendants.        )
      _____ )
10

11

12

13

14

15

16

17    VIDEOTAPED EXPERT DEPOSITION UNDER ORAL EXAMINATION

18                            OF

19                   JOSEPH PENN, M.D.

20              DATE: June 11, 2025

21

22

23

24

25    REPORTED BY:  MICHAEL FRIEDMAN, CCR

Joseph Penn, M.D. — June 11, 2025

Page 2

1

2

3

4

5

6

7

8                    TRANSCRIPT of the deposition of the

9     expert JOSEPH PENN, M.D., called for Oral Examination in the

10    above-captioned matter, said deposition being taken

11    by and before MICHAEL FRIEDMAN, a Notary Public and

12    Certified Court Reporter of the State of New Jersey,

13    located at ZOOM VTC, all parties remote, on June 11,

14    2025, commencing at approximately 8:02  in the

15    morning, CST.

16

17

18

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

```
 1      A P P E A R A N C E S:

 2

        JENNER & BLOCK
 3      1155 Avenue of the Americas
        New York, NY  10036
 4      BY:    KEVIN K. SI, ESQ.
               KENNETH D. BEALE, ESQ.
 5             SHAILEE D. SHARMA, ESQ.
        Attorneys for Plaintiff
 6

 7      KEOGH, COX & WILSON
        701 Main Street
 8      Baton Rouge, LA 70801
        BY:    ANDREW BLANCHFIELD, ESQ.
 9      Attorneys for Defendants

10

11      ALSO PRESENT:   GUS PHILLIPS, Videographer

12

13

14                      * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2    WITNESS NAME                          PAGE

 3    JOSEPH PENN, M.D.

 4            By Mr. Si                      8

 5

 6

 7                  * * * * *

 8

 9

10                 E X H I B I T S

11    EXHIBIT NO.                           PAGE

12    EXHIBIT 1      CV                      14

13    EXHIBIT 2      Prior Testimony         66

14    EXHIBIT 3      Expert Report           72

15    EXHIBIT 4      NCCHC Standards        166

16    EXHIBIT 5      APA                    206

17

18

19                  * * * * *

20

21

22

23

24

25
```

Joseph Penn, M.D. - June 11, 2025

Page 5

```
 1                        - - -

 2              Deposition Support Index

 3                        - - -

 4

 5      Direction to witness not to answer

 6      Page Line   Page Line   Page Line   Page Line

 7      None

 8

 9      Request for production of documents

10      Page Line   Page Line   Page Line   Page Line

11      None

12

13      Questions marked

14      Page Line   Page Line   Page Line   Page Line

15      None

16

17

18

19

20

21

22

23

24

25
```

Joseph Penn, M.D. - June 11, 2025

Page 6

1              THE COURT REPORTER:  My name is

2     Michael Friedman, a Certified Shorthand

3     Reporter.  This deposition is being held

4     via videoconferencing equipment.

5              The witness and reporter are not in

6     the same room.  The witness will be sworn

7     in remotely, pursuant to agreement of

8     all parties.  The parties stipulate that

9     the testimony is being given as if the

10     witness was sworn in person.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

Page 7

1          THE VIDEOGRAPHER:  We are now on

2     the record for the video deposition of

3     Dr. Joseph Penn.

4          The time is 8:02 a.m., June 11,

5     2025, in the matter of Joshua Folks

6     versus Louisiana Attorney General Jeff

7     Landry, et al., Civil Action Number:

8     23-CV-01289-SDD-RLB, being held in the

9     United States District Court for the

10    Middle District of Louisiana.

11         The court reporter is Michael

12    Friedman.  The videographer is Gus

13    Phillips.  And both are representatives

14    of Gregory Edwards, LLC.

15         All attorneys present will be noted

16    on the stenographic record.

17         Will the court reporter please

18    administer the oath.

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

Page 8

```
 1    J O S E P H   P E N N,  M.D.,

 2              called as an expert witness, having been

 3    first duly sworn according to law, testifies as

 4    follows:

 5

 6

 7

 8    EXAMINATION BY MR. SI:

 9         Q    Good morning, Dr. Penn.

10         A    Good morning.

11         Q    Where are you located right now?

12              Actually, I'm sorry.  Let me back

13    up.  I didn't introduce myself.

14              My name is Kevin Si.  I'm an

15    attorney with Jenner & Block, representing

16    the plaintiff, Mr. Folks, in this case.  I'm

17    here with my colleagues, Shailee Sharma, and

18    Ken Beale.

19              Now let's get into it.

20              Okay.  Where are you located right

21    now?

22         A    Yes.  I'm in Conroe, Texas.

23    C-O-N-R-O-E, Texas.  It's north of the

24    Woodlands in north Houston.

25         Q    I am actually from Houston, so I'm
```

Joseph Penn, M.D. — June 11, 2025

```
 1     familiar with Conroe.
 2          A    Oh.
 3          Q    We were just talking about it
 4     off -- off the record.
 5               Is there anyone else in the room
 6     with you right now?
 7          A    No.
 8          Q    You understand that you're under
 9     oath.  Correct?
10          A    Yes.
11          Q    You understand this means you must
12     tell the whole truth under the penalty of
13     perjury.
14               Is that right?
15          A    Yes.
16          Q    Are you on any medications or under
17     the influence of any substances that would
18     impair your ability to tell the truth?
19          A    No.
20          Q    Is there any reason you know of
21     that would prevent you from giving a complete
22     and accurate testimony today?
23          A    No.
24          Q    I know you've done this many times,
25     so you're very familiar with the rules of a
```

Joseph Penn, M.D. - June 11, 2025

1      deposition.

2            But just to remind you and just to

3      make sure that we have it on the record, I

4      want to go over some ground rules.

5            So I will ask you a series of

6      questions and I ask that you please answer

7      each question honestly and truthfully, to the

8      best of your ability.

9            Do you understand that?

10     A    Yes.

11     Q    My questions and your answers will

12     be recorded by the court reporter and also

13     video will be taken of you, by the

14     videographer.

15           Do you understand that?

16     A    Yes.

17     Q    Because the court reporter is

18     transcribing our conversation today, please

19     give verbal responses instead of nodding your

20     head or shaking your head or something like

21     that.

22           Can you do that?

23     A    Yes.

24     Q    Because we're talking remotely,

25     it's a little bit hard to read body language

Joseph Penn, M.D. - June 11, 2025

```
 1    and things like that.  Let's do our best not

 2    to talk over each other and I'd ask we let

 3    each other -- let me finish a question before

 4    you answer and I will let you finish your

 5    answer before I ask the next question.

 6               Does that make sense?

 7         A    Yes, I will do my best.

 8         Q    Great.

 9               If you don't understand a question

10    that I ask, please feel free to ask me to

11    repeat it.  I may have the court reporter

12    repeat it or I might just rephrase it and

13    clarify it.

14               Does that make sense?

15         A    Yes.

16         Q    And the defendant's attorney, he

17    may object to some of my questions.

18               If he does do that, please pause,

19    then go ahead and answer my question, as if

20    the objection wasn't made.

21               Does that make sense?

22         A    Yes.

23         Q    We can take a break any time that

24    you need one.  I will also periodically be

25    reminding us that, you know, we need a break.
```

Joseph Penn, M.D. - June 11, 2025

1          So any time you need a break, just
2     let me know and we can always pause and go
3     off the record.
4          Is that okay?
5     A    Yes.  Thank you.
6     Q    Do you have any questions for me
7     before we get into the actual substance of
8     the questions?
9     A    No, I don't.
10    Q    Did you do anything to prepare for
11    your deposition today?
12    A    Yes.
13    Q    What did you do to prepare?
14    A    Sure.
15         So I read -- I reread my expert
16    report.  I read the deposition of Dr. Gamble,
17    and I skimmed the attachments that were
18    referenced in his deposition transcript.
19         And then I met with attorney Andrew
20    Blanchfield and his team.
21         And I think that was all I did to
22    prepare for this deposition.
23    Q    Do you remember who you met with on
24    that team with Drew Blanchfield?
25    A    I would have to look up her name.

Joseph Penn, M.D. — June 11, 2025

1     I'm sorry, I'm blanking right now.  But it's

2     one of his attorneys.  It's a she.  So -- and

3     I'm sorry, I'm blanking on her name right

4     now.

5         Q    How many times did you meet with

6     defense counsel?

7         A    I'm not sure I understand your

8     question.

9              Are you referring to preparing for

10    this deposition or are you --

11        Q    To prepare for this deposition.

12        A    Okay.  Just once.

13        Q    Did you meet with any attorneys of

14    your own, so attorneys who represent only

15    you?

16        A    No.

17        Q    Other than the documents you

18    mentioned, so your report, Dr. Gamble's

19    deposition, the attachments from that

20    deposition, did you review any other

21    documents in preparation for this today?

22        A    No.

23             MR. SI:  So I would like to show

24        you a document, which I will introduce

25        as Exhibit 1 into the record.

Joseph Penn, M.D. - June 11, 2025

```
 1              (Whereupon the above mentioned was

 2         marked for Identification.)

 3         Q    I will send this over the chat on

 4    Zoom.

 5              So let me know if you can see that,

 6    and let me know once you've gotten that open.

 7         A    I think it's the same as that test

 8    that was sent earlier but I could be wrong,

 9    but yes, I am able to open it.

10         Q    I actually have not opened the test

11    document, so I'm not sure.  But --

12              THE VIDEOGRAPHER:  Counsel, this is

13         the videographer.  I want to be sure.

14              Dr. Penn, there was a new PDF put

15         into the chat that says Exhibit 1.

16              THE WITNESS:  Yes.  Well, you --

17         I'm sorry.  Go ahead.  Sorry.

18              THE VIDEOGRAPHER:  Once the

19         download is done, that blue download

20         icon becomes a green checkmark.  If you

21         double click the green checkmark on the

22         Exhibit one, that should open the new

23         exhibit.

24              MR. SI:  There you go.  Thank you.

25              THE WITNESS:  Oh, I got it.
```

Joseph Penn, M.D. — June 11, 2025

```
 1              Okay.  I will open it right now.

 2         A    Okay.  Yes, I have it opened.

 3         Q    Do you recognize this document,

 4    Dr. Penn?

 5         A    Yes.

 6         Q    Take a second to scroll through it,

 7    if you need.

 8         A    (Witness reviewing.)

 9              Yes, I recognize the document.

10         Q    And what is it?

11         A    Sure.

12              So it's, first, my expert report in

13    this matter.  And I think it goes 50 pages.

14    Yes, 50-page report, expert report dated

15    April 15, 2025, signed by me.

16              And then my resume and probably

17    needs to be updated, but it's November 15 of

18    2024.  That's my most current CV, curriculum

19    vitae.

20              And then, as an attachment or

21    exhibit rather, and then a list of testimony,

22    dated April 14 of 2025, and depositions and

23    trial testimony.

24              And then, lastly, my fee schedule,

25    fee rate, as an exhibit.
```

Joseph Penn, M.D. - June 11, 2025

Page 16

```
 1              So yes, that's my expert report in
 2    Exhibits A, B and C.
 3        Q    Okay.  We seem to be looking at
 4    slightly different documents for whatever
 5    reason, but we can go ahead and move forward
 6    if that's what you're looking at.
 7              Let me just doublecheck that this
 8    is the document I intended to send.
 9              MR. BLANCHFIELD:  I have the CV --
10          my document is a 33-page curriculum
11          vitae.
12              MR. SI:  Thank you, Drew.
13              Yes, that is the document I
14          intended to send.
15        Q    Dr. Penn, do you mind just
16    downloading -- the document that you just
17    referenced and then downloading the most
18    recent document I uploaded to the chat one
19    more time.
20        A    The one you sent says 8:09 a.m.
21    your time?  And mine says my time.
22        Q    Yes, 8:09 -- yes, 8:09, a.m.,
23    Central.
24        A    Right.
25              So the document I have, Exhibit 1,
```

Joseph Penn, M.D. — June 11, 2025

```
 1      it says, "Corey Adams, Expert Report of Corey
 2      Adams."
 3           Q    That should not be the document I
 4      sent.
 5                MR. SI:  Drew, are you -- can we
 6           confirm that you were looking at a
 7           curriculum vitae dated November 15,
 8           2024, or a document that's labeled
 9           curriculum vitae, dated November --
10                MR. BLANCHFIELD:  That's what I'm
11           looking at, 33 pages.
12                MR. SI:  Okay.  That is what I'm
13           looking at, too.
14                Is there another -- if I resend the
15           document, would that fix this problem?
16                THE VIDEOGRAPHER:  Counsel, if it's
17           okay, I will go ahead and put what I
18           have in the chat box.
19                MR. SI:  That would be great.
20                THE VIDEOGRAPHER:  Okay.  Dr. Penn,
21           I just put -- re-put Exhibit 1 into the
22           chat box.
23           A    When I click on Exhibit 1, it comes
24      up as Exhibit 1, Dr. Penn report, C. Adams
25      and then Harvard Study Report, January 2025.
```

Joseph Penn, M.D. - June 11, 2025

```
1      That's what comes up on mine.
2                MR. SI:  Interesting.
3                THE VIDEOGRAPHER:  We are off the
4      record.  The time is 8:15 a.m.
5                (Brief recess taken.)
6                THE VIDEOGRAPHER:  We are back on
7      the record.  The time is 8:19 a.m.
8      Q     Dr. Penn, do you recognize this
9  document?
10     A     Yes.
11     Q     And what is it?
12     A     It's a November 15, 2024 copy of my
13 curriculum vitae, my CV.
14     Q     I just want to go through a couple
15 of things on here with you.
16               So under "professional work
17 history," do you see the role that you
18 designated as current?  The director of
19 mental -- director of mental health services,
20 UTMV Correctional, managed-care in Conroe,
21 Texas.
22               Do you see that?
23     A     Yes.
24     Q     Can you tell me about this role?
25     A     Sure.
```

Joseph Penn, M.D. - June 11, 2025

```
 1              So I was recruited back to Texas --
 2     I've been working in Rhode Island in
 3     corrections for about ten years.  And I was
 4     recruited to come back to Texas.
 5              And I wear really several hats but
 6     the main hat has to do with state prisoners
 7     and UTMB, University of Texas medical branch,
 8     provides medical, dental, nursing,
 9     psychiatry, mental health and specialty care
10     to about 80 percent of all of the prisoners
11     of the state of Texas.
12              And so my role is, I'm the director
13     of mental health services.  I oversee all the
14     psychology, psychiatry and behavioral health
15     services to about 80 percent of the state
16     prisoners.  I also have additional roles but
17     that's probably the most important role
18     relevant to this litigation, is my direct
19     daily ongoing full-time work in corrections,
20     in state prison corrections, in particular.
21              And then one additional role,
22     that's probably relevant to this case, is my
23     work with county jails where, over time, my
24     role in director of mental health services,
25     we provided mental healthcare and psychiatric
```

Joseph Penn, M.D. – June 11, 2025

1     care at various county jails, including

2     Galveston County Jail, Brazorea County Jail,

3     Victoria County Jail and currently Bexar

4     County Jail in San Antonio.

5            And right now we're looking at

6     restarting up with Galveston county jail.

7            So in sum -- that's a really

8     abbreviated -- abbreviated summary of my work

9     but those are really the two most important

10    roles of my day-to-day job that is relevant

11    to this case regarding jail and prison and

12    mental health and psychiatric treatment

13    issues.

14        Q    When you say that you oversee the

15    psychological psychiatric care for 80 percent

16    of the prisoners and also for several county

17    jails, what does "oversee" mean?

18        A    So I'm ultimately responsible for

19    policies and procedures, hiring, firing,

20    disciplining, setting standards and meeting

21    compliance and making sure we're achieving

22    national accreditation.

23            But aside from overseeing, I also

24    roll up my sleeves and see patients.  On a

25    daily basis, I'm involved in the clinical

Joseph Penn, M.D. - June 11, 2025

1    management of patients that are cutting,

2    self-harming.  I put people on suicide watch.

3    I'm involved in the decision of where people

4    should be housed, if they should stay at a

5    regular unit or if they should be admitted to

6    a crisis management unit or be transferred to

7    one of our in-patient psychiatric units or,

8    alternatively, discharged from an in-patient

9    psychiatric unit.

10           And then my day-to-day work also

11   involves patients like, Mr. Folks, that cut

12   or self-harm, end up in free world emergency

13   rooms or free world medical hospitals.

14           And then I'm involved directly in

15   the decision of when and where they should be

16   housed and placed from a mental health

17   treatment perspective to ensure their safety.

18           And I'm also involved in decisions

19   about psychotropic medications and treatment

20   and forced medications and seclusion and

21   restraint, and all those little issues on a

22   day-to-day basis.

23           And also, on weekends, I provide

24   after-hour coverage.  I'm on call.  Weekends

25   and holidays, I'm always available to units

Joseph Penn, M.D. - June 11, 2025

Page 22

```
1     and staff in the event there's an issue or
2     problem.
3          Q    And that ladder bucket
4     responsibilities that you mentioned, so
5     clinical management of patients who are on
6     suicide watch or self-harming, you know,
7     during a weekend, after-hours coverage, do
8     you have a patient-doctor relationship with
9     those inmates?
10         A    Well, I would consider all the
11    patient -- all the inmates in the TDCJ state
12    prison system to be my patients.
13              I don't specifically delineate who
14    is a patient and who is not a patient.
15              Anyone that comes into our prison
16    system -- and if I can clarify my response.
17    I find out about patients that are coming in
18    from county jail that are cutting or
19    self-harming or on suicide watch or at risk
20    for needing hospitalization due to being
21    psychotic, even before they come to our
22    system.
23              So I'm involved in the decision
24    making and referral of county jail inmates
25    even before they hit the door of TDCJ.
```

Joseph Penn, M.D. - June 11, 2025

```
1                But to answer your question, I

2      consider all of those individuals to be my

3      patients.

4           Q    You also mentioned that you're

5      responsible for policies and procedures.

6                Can you tell me what your

7      involvement is with the policies and

8      procedures?

9           A    Sure.

10               So it would really -- to answer

11     your question, I probably need to know more,

12     what policies and procedures you're referring

13     to.

14               If you can clarify your question, I

15     would be happy to try to answer it.

16          Q    Let's just take an example of

17     policies and procedures regarding -- well,

18     strike that.

19               What policies and procedures are

20     you dealing with day-to-day in your role as

21     mental health director?

22          A    I don't know if I would say

23     day-to-day but I'm involved in -- so I'm on

24     several committees.  And the way that it

25     works in our system is, it's a joint --
```

Joseph Penn, M.D. - June 11, 2025

1    they're joint committees because TDCJ, Texas

2    Department of Criminal Justice, is the entity

3    similar to Louisiana Department of

4    Corrections.

5            We're the healthcare provider.  And

6    when I say "we," that's UTMB.  Out in west

7    Texas, Texas Tech University does about

8    20 percent of the state.  So it's a triad.

9    It's a partnership between UTMB Correctional

10   managed-care on the east end of the state, we

11   do about 80 percent of the state.  Texas --

12   I'm sorry, let me back up.

13           So Texas Tech does about 20 percent

14   of the state and UTMB Correctional

15   Managed-Care does about 80 percent of the

16   state.

17           And then the Texas Department of

18   Criminal Justice, TDCJ -- excuse me -- their

19   office of health services is an audit and

20   oversight role.  They don't provide direct

21   patient care unless it's Texas Correctional,

22   UTMB.  They monitor and audit us to make sure

23   we're in compliance with access to care,

24   continuity of care and other contractual

25   requirements.

```
1              So to answer your question, the
2    policies and procedures, that there is a
3    variety, but there's some that are
4    established by the correctional managed
5    healthcare committee, which is statewide, and
6    then there's some policies and procedures
7    that are specific to the University of Texas
8    medical branch.
9              There's policies and procedures
10   that are specific to mental health services
11   that are UTMB and then there's additional
12   policies and procedures.
13             So I kind of have my hand in all of
14   the above.  So, I'm sorry, I'm not trying to
15   be difficult but there's a lot of different
16   sets of policies and procedures.
17        Q    You mentioned that UTMB specific
18   policies that are done, in turn, specific to
19   mental health services.
20             Are you involved with drafting any
21   of those?
22        A    Yes.
23        Q    Do you do the first draft or do you
24   just review?
25        A    A great question.
```

Joseph Penn, M.D. – June 11, 2025

1          So I came back to UTMB in 2008 and

2     many of these policies were already in place.

3          But I helped -- I've helped -- our

4     policies, I can't remember if it's every year

5     or every two years, we have to update them.

6          So policies are living and

7     breathing documents.  And so it's not like a

8     one and you're done.  You have to constantly

9     update and revise.

10          So yes, I'm directly involved in

11     the policy review of anything related to

12     mental health services for UTMB Correctional

13     Managed-Care.

14          And then those policies ultimately

15     go up to the correctional managed healthcare

16     committee, which I mentioned earlier,

17     includes Texas Tech, TDCJ and UTMB.

18          But the correctional managed

19     healthcare committee is a government

20     appointed -- I'm sorry, governor appointed

21     committee of physicians and other healthcare

22     individuals that oversee all of the

23     healthcare services that we provide in the

24     state.

25          Q    I know that UTMB has the

Joseph Penn, M.D. - June 11, 2025

1    Correctional Managed-Care system, which

2    you're a part of.

3              There's also a community hospital

4    component.

5              Is that correct?

6    A    So we have several hospitals,

7    Angleton, Danbury.  We have some on the

8    islands in Galveston and some off the island

9    in south Houston.

10             I mentioned Angleton, Danbury

11   hospitals.  There's probably other hospitals

12   I'm forgetting, but most of the companies

13   down on Galveston Island, and that's

14   comprised of several hospitals that are UTMB,

15   John Sealy, Jenny Sealy, Shrine Burns.

16             Again, I'm probably forgetting a

17   bunch.  But there's several hospitals on the

18   island that are UTMB.

19             And then, most importantly, there's

20   the hospital Galveston, which is a medical

21   surgical maximum security state prison

22   hospital.  It's the only one like it -- like

23   it of its type in the U.S. and maybe in the

24   world.

25             And that's a TDCJ prison hospital

Joseph Penn, M.D. - June 11, 2025

Page 28

1    that we have and we provide healthcare to
2    down there on the island.
3         Q    Circling back to the process for
4    drafting, revising, updating policies for
5    UTMB's mental health system for Correctional
6    Managed-Care, you mentioned that you might
7    draft a version of these, and then they have
8    to go up to the governor's committee.
9              Am I understanding you correctly?
10        A    Again, if I could clarify my
11   response.
12             So I don't just sit down and write
13   policy.  Usually we do it as part of a team.
14   Like it's a multidisciplinary team, so we
15   might have psychologists, social workers,
16   psychiatrists, myself.
17             Most of the work is done as a team.
18   But you're right.
19             So any policy that we write or
20   promulgate, ultimately has to be approved or
21   accredited -- I'm sorry, has to be approved
22   by the UTMB Correctional Managed-Care and
23   then the joint medical directors from UTMB,
24   that's my boss, Dr. Owen Murray,
25   Dr. Deshields from Texas Tech, and

```
1    Dr. Lithcomb from TDCJ Health Services, to

2    the joint medical directors approve all the

3    policies.  And then, ultimately, it goes on

4    to the correctional managed healthcare

5    committee for final approval.

6             So it's a complicated process but

7    there's a lot of checks and balances in

8    place.

9        Q    On that multidisciplinary team, do

10   you have any leadership roles?

11       A    Yes.

12       Q    What is your leadership roll?

13       A    So I've been the chair of the Joint

14   Mental Health Work Group.  That's

15   specifically mental health only for Texas

16   Tech, UTMB and TDCJ.

17            And I've been the chair of the --

18   the chair of the Joint Mental Health Work

19   Group.

20            And there's other committees that

21   I'm -- I have chaired or been a member of the

22   committee.

23            There's several committees, such as

24   like the pharmacy and therapeutics committee

25   that decides psychotropic medications and
```

Joseph Penn, M.D. — June 11, 2025

1     policies around use of psych meds.

2              There's suicide prevention

3     committees that I'm a member of.

4              It's probably listed on my resume.

5     I would have to refer to my resume to list

6     them all.

7              But there's several additional

8     committees that I'm involved in that develop

9     or revise policies and procedures.

10     Q    So for the UTMB policies that you

11     are responsible for drafting, updating,

12     reviewing, would those policies -- are there

13     any UTMB entities that those policies would

14     not apply to?

15     A    I'm sorry, I didn't follow your

16     question.

17              Can you ask it again?

18              MR. SI:  Mike, would you mind

19          reading that back?

20              (Whereupon the record was read back

21          by the reporter.)

22     A    I would say it's possible.  If

23     someone were to be admitted to hospital

24     Galveston, that hospital that I mentioned

25     earlier, it is a TDCJ prison hospital.  It's

1    in Galveston on the campus of UTMB.  And

2    there are probably some mental health

3    policies that would not apply there because

4    it's not a designated mental health facility.

5    It's a medical surgical hospital.

6              So that would be an example of

7    where it -- those policies might not

8    necessarily apply.

9              So, for example, seclusion or

10   restraint, forced medications or emergency

11   medications, those policies probably wouldn't

12   apply there nor would they apply to number 2,

13   any of those hospitals that I mentioned

14   earlier that are UTMB campus hospitals, John

15   Sealy, Jenny Sealy, Shrine Burns, because

16   those are not TDCJ Hospitals.  They're not

17   TDCJ facilities.

18             Similarly, any emergency rooms on

19   campus, down at UTMB, our policies -- when I

20   say "our," I'm referring to UTMB Correctional

21   Managed-Care Mental Health policies would not

22   apply.

23             And then, I know that UTMB has some

24   outpatient specialty care clinics down in

25   Lake City.  And similarly, our correctional

Joseph Penn, M.D. - June 11, 2025

Page 32

1      policies would not apply there because those

2      are not TDCJ facilities.

3              So in summary, I think that --

4      that's the bulk of it.  I don't know if UTMB

5      has any other ambulatory or emergency rooms

6      in the greater Houston or, you know, other

7      areas down there on the coast but our

8      policies would not apply.  They would only

9      really apply in the TDCJ state prison or

10     state jail facility.

11        Q     Do they apply to all TDCJ state

12     prisons, state jails?

13        A     In the UTMB sector.

14              As I testified to earlier, the UTMB

15     Correctional Managed-Care mental health

16     policies would apply across the 80 facilities

17     that are within the UTMB sector.

18              Our policies mirror or are parallel

19     to Texas Tech, but they would not apply to

20     the 20 facilities out of the Texas Tech

21     region because Texas Tech would have their

22     own policies for their 20 facilities.

23        Q     Let's move on to a different part

24     of your CV.

25              So I also see that you have served

Joseph Penn, M.D. - June 11, 2025

```
 1    on a couple of committees for professional

 2    organizations.

 3            I would like to talk about the

 4    American Psychiatric Association.

 5            Could you tell me about the

 6    committees you served on here?

 7        A    Yeah.  And I'm drawing a blank.

 8            If you could reference me in my CV,

 9    I'll be happy to try to answer the questions.

10        Q    I believe it's on page 6 of your

11    CV.

12        A    (Witness reviewing.)

13            Yes.  So as listed there on my CV,

14    from page 6, thank you, I've served in

15    different capacities at a national level for

16    the American Psychiatric Association, the

17    work group on persons with mental illness in

18    the criminal justice system, for different

19    terms.

20            I was also the chair of the --

21    sorry.  I was on the council and then I was

22    appointed chair of the council on children's

23    adolescents and their families.

24            And then, currently I'm on the --

25    I'm sorry.  The public psychiatry fellowship
```

Joseph Penn, M.D. – June 11, 2025

1    selection committee.

2           And then as recently as two days

3    ago, I was invited to serve on a work group

4    regarding transgender individuals that are

5    incarcerated.  And so that's through the

6    American Psychiatric Association.

7           I've also been on several council,

8    the council on psychiatry and the law but I

9    don't think I've reflected that there on my

10    resume.  I probably need to update that.

11           But I have served at different

12    times on the council on psychiatry and the

13    law also.

14    Q    Before we dive too deep into any of

15    those roles, I would like to return really

16    quickly to one last question about policies

17    and procedures.

18           You mentioned that you're part

19    of -- you're the chair of a work group on a

20    team that is responsible for designing the

21    policies and procedures for UTMB mental

22    health for correctional men's care.

23           Before those policies that you

24    drafted that would go up to the CMC committee

25    of the state, the state governor, who has the

Joseph Penn, M.D. - June 11, 2025

1    final say to approve those policies?

2         A    So I'm sorry, your question is

3    confusing to me.

4              Could you -- could you ask it again

5    or repeat it again so I can try to answer it?

6         Q    Sure.  I will break it up a bit.

7              So you mentioned that you're the

8    chair of a Joint Mental Health Work Group on

9    a team that is responsible for drafting UTMB

10   policies.

11             Is that correct?

12        A    No.  So I'm the past chair.  I'm

13   the immediate past chair.  I'm still in the

14   work group but I am not the current chair.

15   I've been -- like I testified earlier, I've

16   been the chair of that maybe two or three

17   times.  It's a three-year -- two or

18   three-year appointment.  But I'm not the

19   current chair right now.  I'm on the

20   committee.  So, sorry, I'm on the Joint Work

21   Group, that's what it's called, Joint Work

22   Group, but I'm not the current chair.

23        Q    After the Joint Work Group approves

24   a draft of the policies, do they then go up

25   to the state governor?

Joseph Penn, M.D. - June 11, 2025

Page 36

1        A     No.

2        Q     Can you clarify what happens there?

3        A     Sure.  This is not my area of

4    expertise.  This falls under TDCJ and the

5    Texas Department of Criminal Justice, their

6    Division of Health Services, Dr. Lithcomb and

7    her department.

8              It would go, as I understand, to

9    the joint medical directors for review.  And

10   then if they approve it, then it would go to

11   the joint policy and procedure committee for

12   final approval.

13             And then, I think there's a forms

14   committee, also, that has to approve because

15   if there's forms involved or document

16   changes, so it's complicated.  So it's joint

17   medical directors, then it's PNP, policy and

18   procedure, then it's forms committee and then

19   it would go up to the correctional managed

20   healthcare committee for final signoff.

21   That's my understanding of that process.

22        Q     How does the policy make it out of

23   your work group?

24        A     Sure.  So the way that it works is

25   basically a committee meeting is held.  It's

Joseph Penn, M.D. - June 11, 2025

```
1      added as an agenda item to the committee,

2      typically policy reviews, and there's a

3      champion for each policy or two or three

4      champions appointed for each policy review.

5            And then they may make a

6      recommendation.  And then a vote is made.

7      There's opportunity for discussion.  And

8      then, ultimately, it's a majority decision,

9      whoever -- if it's a more complicated type of

10     policy, we might do more of the detailed

11     review.  But if it's just a review of an

12     existing policy, then it would be basically a

13     committee vote and majority would carry the

14     vote.

15        Q    Let's turn to our discussion of

16     your APA work groups.

17            So I see that you were on the work

18     group on persons with mental illness in the

19     criminal justice system.  That is on page 6

20     of your CV.

21            Can you tell me what your role was

22     on that work group?

23        A    Yes.  So what I -- I don't recall

24     all the specifics.  This is going back like,

25     what, 15 years ago, 12 -- I can't do math
```

Joseph Penn, M.D. - June 11, 2025

1    today -- 12, 13, 14 years ago or more.

2            But what I understand one of the

3    main roles of that work group was, we revised

4    a practice resource document, basically a

5    book on psychiatric services for individuals

6    in criminal justice settings.  And then,

7    that's one of the main things we did.

8            But number 2, we also, I think,

9    reviewed physician statements on behalf of

10   the American Psychiatric Association.

11           And then I think, three, we might

12   have advised as -- on issues regarding team

13   amicus briefs, like through the work group

14   on -- to the council on psychiatry -- the law

15   and psychiatry.

16           That there's a council on the law

17   and psychiatry.  And so if an amicus brief

18   was brought to the APA, the American

19   Psychiatric Association, where they wanted

20   the APA to sign on as an amicus curate -- I

21   think it's -- I can't spell it.  Anyways.

22           To sign on an amicus brief and it

23   had relevance with corrections, I think we

24   were asked to review those and provide, you

25   know, comment.

Joseph Penn, M.D. – June 11, 2025

```
1          Q    Let's talk about the position
2     statements.
3               So let's talk about the position
4     statements.
5               Can you tell me about the process
6     for drafting and approving those position
7     statements for the APA?
8          A    Yeah, I really don't know much
9     about that at all.  I just know that once a
10    document has been drafted and put together,
11    then it will be sent out to the members of
12    the work group for comments, there might be a
13    series of meetings to discuss it,
14    either virtual -- most of them, I think, are
15    virtual teams or Zoom or whatever.
16              And sometimes, if we would meet in
17    person, we might discuss some of the more
18    high profile or controversial types of
19    position statements.
20              So I don't know a lot of the
21    details about how -- what's the process for
22    submitting or getting approval or writing a
23    position statement.
24              All I know is kind of once it's in
25    draft form, then the work group reviews it
```

Joseph Penn, M.D. - June 11, 2025

1    and then makes a decision of edits or

2    recommendations regarding the document.

3    That's my recollection.

4        Q    Let's just talk about your

5    involvement on that work group with respect

6    to the position statements.

7            What was your involvement?

8        A    So my involvement would have been

9    like respond -- getting e-mails from the

10   chair of the work group about, hey, we're

11   going to meet to discuss this position

12   statement.

13           And actually, we wouldn't meet just

14   for the position statement.  We would have a

15   meeting but that might be an agenda item to

16   discuss position statements that are being

17   updated or new ones in development.  And we

18   would either do it, like I said earlier, join

19   via teams or Zoom or conference call or all

20   of the above.  And I would provide input and

21   give my perspective on position statements.

22           Because the challenge was, some of

23   the members of these committees didn't

24   actually work in corrections or correctional

25   settings.

Joseph Penn, M.D. - June 11, 2025

Page 41

```
1              And so a lot of times you're trying
2    to educate some of the members of the
3    committee, for example, were residents or
4    medical students or psychiatrists that were
5    not actually practicing in correctional
6    settings but they've been appointed to the
7    work group.  So a lot of work was trying to
8    educate people about corrections.
9         Q    Did you take a vote on whether or
10   not to adopt position statements?
11        A    I didn't understand your question.
12   I'm sorry.
13        Q    Did you ever take a vote on whether
14   or not to approve position statements while
15   you were on the work group, on persons with
16   mental illness in the criminal justice
17   system?
18        A    So I'm not sure I understand what
19   you mean, by did I take a vote.  I -- I
20   wasn't the chair of that work group.  I don't
21   recall who the chair or chair woman was but I
22   don't recall the specifics of how that
23   worked.
24        Q    So you never -- did you ever,
25   yourself, vote to approve a position
```

Joseph Penn, M.D. — June 11, 2025

Page 42

1    statement?

2        A    I voted both to approve or not

3    approve or, alternatively, I made

4    recommendations about things that I think

5    were achievable or attainable or not, because

6    those statements are applicable across the

7    United States.  So if you're in New York

8    City, you can't just say, well, everyone will

9    be seen by a psychiatrist when you're talking

10   about rural, you know, Montana or something.

11           So I would give my opinions about

12   the -- let me back up.

13           To answer your question, short

14   answer is yes, I would vote yes or no or give

15   additional input into the reason why I think

16   the group should or should not support a

17   revision to a position statement.

18       Q    You also mentioned that you, as

19   part of your membership on the work group,

20   edited a book on correctional mental

21   healthcare.

22           Is that right?

23       A    Yes.

24       Q    What was your involvement with

25   editing that book?

Joseph Penn, M.D. - June 11, 2025

1          A    So I wouldn't say I was the editor.

2     I was going to be a primary author.  But my

3     role -- I think I was involved in the

4     self-harm and suicide section.  And then I

5     was also in the psychotropic medication

6     section and misuse of psychotropic

7     medications.

8               But my role -- I think there were

9     only a handful of us, maybe five or six -- I

10    had input into the entire document.

11              So even sections that I wasn't the

12    lead on, I had input into -- for example,

13    there was a section on staffing ratios and I

14    had input into that.

15              There was a section on transgender

16    healthcare and I had input into that.

17              So I wasn't -- I wasn't an editor.

18    I was actually a first author or primary

19    author of that document.

20         Q    When you say you had input, what do

21    you mean by that; into the other sections?

22         A    So it was similar to the work group

23    meetings when we would have conference calls,

24    we would go through each section line by

25    line.

Joseph Penn, M.D. - June 11, 2025

1          Some of the work was done online

2     via e-mail.  And so draft documents were

3     shared and tracked changes.

4          And so people could write their

5     comments online through the track changes

6     format and share via e-mail.  That's one way.

7          And then number 2 was actual

8     conference calls, this is preCOVID so we did

9     more conference calls, but that's how we

10    would provide input in recommendations into

11    the documents.

12    Q    So to be clear, you would provide

13    recommendation and someone might change the

14    final draft or the operative draft of the

15    book based on those recommendations?

16    A    So I don't recall who the main

17    editor of the -- like who was the lead.  I

18    would have to pull the book and look at it.

19         But typically, there's like a

20    primary, like a committee chair or one or two

21    chairs, a chair and an vice chair, and they

22    will solicit input.  And then if it's a

23    controversial topic, then they will ask for

24    input and there will be discussion.  And then

25    the committee ultimately will have to make a

Joseph Penn, M.D. - June 11, 2025

Page 45

1    decision.  And then the chair might have

2    to -- if there's disagreement, sometimes the

3    chair might have to make a final decision.

4            And say, like, it's 50/50 and

5    there's people -- there's not consensus, the

6    chair might have to make a final decision of,

7    well, we're going to need to do something.

8            So the chair kind of has a little

9    more liberty, if you will, than just the

10   committee members.

11       Q    But is it fair to say that you have

12   a substantial level of involvement in the

13   drafting of the entire document?

14       A    So I would need you to clarify what

15   you mean by substantial, because -- I'm not

16   sure I know what you mean by substantial, how

17   you're defining it, please.

18       Q    Say you can make a material change

19   to the contents of the document, based on

20   your recommendations or your drafting or your

21   edits?

22       A    No, I would not agree with that.  I

23   would say I got outvoted several times.  So

24   there's some people in some of these work

25   groups that are very kind of -- very

Joseph Penn, M.D. - June 11, 2025

1    definitive or very kind of opinionated or

2    kind of powerful or whatever.  So I would

3    say, no, I definitely did not have a

4    substantial role.  I had input but I wouldn't

5    call it a substantial role.

6         Q    Did other people have substantial

7    roles in the sections that you say you

8    primarily drafted?

9             So I believe you mentioned the

10   self-harm and suicide section, the

11   psychotropic interventions section.

12            Did other people have substantial

13   roles in those sections?

14        A    I will answer your question but it

15   wasn't psychiatric or psychotropic

16   interventions.  It was psychotropic

17   medications and abuse or diversion of those.

18            I mean, I would say it's a

19   committee meeting and people -- everyone has

20   input.  But at the end of the day, it's a

21   democratic -- you know, it's a group process,

22   so kind of majority wins or majority rules.

23        Q    When you say you were primarily

24   responsible for those sections, does that

25   mean that you took the first draft?

Case 3:23-cv-01289-SDD-RLB     Document 70-15     08/15/25     Page 48 of 244

1          A     Yes.

2          Q     And you were also involved in the

3    review and editing of those sections --

4          A     Yes.

5          Q     -- as you mentioned earlier?

6                Let's turn to your very long list

7    of publications in your CV.

8                So I believe this starts on page

9    13.  And I think it continues until the end.

10               Just generally, what is your

11   process for authoring these publications?

12         A     Well, it depends.  So if it's a

13   peer reviewed publication, P-E-E-R reviewed,

14   then that's going into a medical or

15   scientific journal.  And you have to write

16   something that's worthy enough for them to

17   want to write -- to publish it, rather.  You

18   have to show what your methodology is, the

19   background, the methodology, what your

20   findings were and what your conclusions were.

21   Some of it might be a review of the existing

22   literature.  Some of it might actually be

23   data driven or clinical trials.  Or some of

24   it might just be kind of theoretical.

25               So that, in my resume, from pages

1    13 through -- sorry, I can't get it to scroll

2    down -- 13 to the top of 16 is approximately

3    30 peer reviewed journal articles.

4            And then there's a lot of articles

5    you might write that are not necessarily peer

6    reviewed but they're still published in a

7    medical or scientific journal.

8            Same thing, you have to like

9    describe your methodology and what you did.

10   But they don't undergo as rigid a peer review

11   by your peers, psychiatrists or psychologists

12   or other, you know, researchers.

13           And that's listed on my resume up

14   to the top of page 18, so that could be like

15   book chapters and other things like that.

16       Q    Is it fair to say that for all of

17   your publications, peer reviewed and non-peer

18   reviewed, you are taking the pen to the first

19   draft, at least on your sections?

20       A    I'm not sure what you mean by pen

21   to the first draft.

22       Q    That you're writing the first

23   draft.

24       A    No, I would not agree with that.

25       Q    What publications are you not

Joseph Penn, M.D. - June 11, 2025

1    writing the first draft for?

2        A    Well, so when you write with

3    several other authors, it's like I mentioned

4    earlier, I testified earlier, it's a team

5    effort, so you might have three or four or

6    five other authors that -- typically, the

7    first author is the person that made the most

8    significant contributions.  But as you can

9    see on my resume, a lot of these include

10    six -- four, five, six or seven, or as few as

11    one or two people.

12        So being the first author means you

13    contributed the most or you had the most

14    involvement or you put the most work into

15    that document.

16        Q    Ultimately, how -- what is the

17    process for deciding what ends up published

18    on the page, if it's a team effort?

19        A    That's a -- so I would say I have

20    to answer your question in two ways.  One,

21    the authors themselves are going to have to

22    decide what -- you have to meet a word count,

23    so some journals, you would like to write,

24    you know, ten, 20 pages but they only allow

25    five pages, so you have to look at your word

Joseph Penn, M.D. - June 11, 2025

Page 50

1    count.  So you're kind of like always trying

2    to keep, be concise and say the most you can

3    but keep it short.

4            But it's a group process, so

5    your -- the team together works and revises

6    and different things are assigned to

7    different people or someone will say, I will

8    take the lead in this section or they might

9    be assigned to take the lead in a section but

10   it's basically a group process.

11        Q    Does everyone in that group have to

12   agree on the ultimate outcome?

13        A    No.

14        Q    So something can be published and

15   several members of the group do not agree

16   with the conclusions in that publication?

17        A    See you're asking me a hypothetical

18   I can't really speak to how that -- and I can

19   only answer questions that I was directly

20   involved in, in publications.

21            So if you ask me a different way, I

22   would be happy to try to answer your

23   question.

24        Q    Let's talk about your involvement

25   then in some of these group efforts.

Joseph Penn, M.D. - June 11, 2025

1          Have you ever signed your name to

2    something that you did not agree with?

3        A    There's some things that I've been

4    a committee member or group member or been

5    involved in a practice guideline or position

6    statement or aspirational document that, yes,

7    I -- I agree with the intent or the

8    overarching goal, but I may not agree with

9    each and every single section of it.  So yes,

10   that's fair.

11       Q    And you would sign your name to

12   that?

13          And you have signed your name to

14   that rather?

15       A    So I don't mean to quibble but I

16   don't know what you mean by sign my name to

17   it.

18       Q    I mean that your name appears in

19   the list of authors in the publication.

20       A    I mean, the way that that works is,

21   the editor or the leads are the ones that

22   decide if someone is really going to be

23   recognized as an author.

24          There's been cases or situations

25   that I've been involved in where, for

Joseph Penn, M.D. - June 11, 2025

Page 52

1     example, you have somebody who doesn't

2     participate.  They don't e-mail.  They don't

3     join meetings.  They -- they're kind of --

4     they -- what am I trying to say?

5              They -- they don't make any

6     contributions.  And then the editor or lead

7     writer might say, well, I don't think we

8     should include Joe Smith because he didn't

9     really contribute anything.

10             So that's how the decisions are

11    made about authorship and who is first,

12    second and third author.

13             In some journals, if you're the

14    senior author, if you're the last name, then

15    that's actually even more powerful because

16    that means you're mentoring younger people.

17             So to answer your question, I can't

18    really answer that a yes or no.

19    Q    Have you ever decided not to sign

20    your name to something have you ever decided

21    that your name would not appear on a

22    publication because you disagreed with the

23    outcome of the publication?

24    A    I don't recall.

25    Q    Have you ever decided not to sign

Joseph Penn, M.D. - June 11, 2025

Page 53

1    your name to something because you thought

2    that the methods used in producing the

3    outcome of the publication were not

4    scientifically rigorous enough?

5        A    I don't recall.

6        Q    We have been on the record for a

7    bit, so why don't we take a five-minute break

8    and then reconvene at 10:08 my time, 9:08

9    your time?

10        A    Sounds good.

11            THE VIDEOGRAPHER:  We are off the

12    record.  The time is 9:03 a.m.

13            (Brief recess taken.)

14            THE VIDEOGRAPHER:  We are back on

15    the record.  The time is 9:14 a.m.

16        Q    Dr. Penn, earlier, you mentioned

17    that occasionally you will sign your name to

18    a document for the APA, for example, where

19    you don't necessarily agree with the ultimate

20    outcome.

21            Is that correct?

22        A    So I don't think I testified to

23    that.  I don't sign documents like I may be a

24    listed contributor but I'm not signing

25    documents.

Joseph Penn, M.D. - June 11, 2025

```
 1        Q    I'll rephrase that.
 2             So you testified that your name
 3   might appear on documents that you don't
 4   agree with it -- for which you don't agree
 5   with the ultimate outcome?
 6        A    Yes, I would define my role as a
 7   contributor or an author, but not everything
 8   within from start to finish in the document,
 9   I didn't say that I fully agree with each and
10   every sentence or line in a document.
11             I'm a contributor and I try to
12   provide the -- I try to provide my
13   perspective, my expertise, my input, but yes,
14   absolutely there might be sections of a
15   document that I disagree.  That's fair.
16        Q    Is that ever true for your peer
17   reviewed publications?
18        A    If you could draw me to one I have
19   written and published in a bunch of different
20   areas, so some of them non-correctional, so I
21   would need to be able to look at the
22   particular article and refresh my memory to
23   answer your questions.
24        Q    To be honest, I'm having a hard
25   time distinguishing which of your articles
```

Joseph Penn, M.D. - June 11, 2025

1    are, for example, scientific studies versus

2    something else.

3              So why don't we just generally talk

4    of the level of a scientific study that you

5    conducted.

6              Does that make sense?  If we just

7    say for a scientific study, would you sign

8    your name or -- sorry.  Would your name

9    appear on a scientific study for which you

10   did not agree with the outcome of that study?

11       A    I would need you to make a more

12   clear question for me to answer your

13   question.  Because, again, I've written and

14   published in a bunch of different areas

15   than -- over 30 years, so I can't answer that

16   in a yes or no.  I would need a specific

17   example.

18       Q    Am I understanding your earlier

19   testimony correctly, in saying that out of

20   your list of peer reviewed publications, some

21   of these, you agree with the conclusions and

22   some of them you don't?

23       A    No, that's not what I'm testifying

24   to.

25              If I could clarify my response.  So

Joseph Penn, M.D. - June 11, 2025

1     when you write an article for a scientific

2     journal, if it's a reliable and accepted

3     scientific journal, that is different than a

4     position statement or a practice guideline.

5     That's not typically peer reviewed.  That's

6     more of a recommendation or aspirational, so

7     we're kind of comparing apples and oranges.

8            A peer review journal is

9     basically,we did a study, this is how we did

10    it, this is the methodology which we

11    employed, these are our results and this is

12    what we can generalize our findings or

13    recommendations from this one study and these

14    are the limitations of the study.  So we

15    can't over generalize because we had -- it

16    was only one location, the sample size was

17    small or what have you, or we had a high

18    refusal rate.

19           So that's -- a scientific study is

20    vastly different from a position statement or

21    an aspirational guideline.

22       Q    So I'm just trying to understand

23    publications that have your name but for

24    which you disagree with the conclusion.

25           Is that ever true of the

Joseph Penn, M.D. - June 11, 2025

1      publications that appear in scientific

2      journals?

3          A    Again, I can't answer that in a yes

4      or no.  I would need to see the specific

5      article and the -- I need to look at the

6      article.

7               And again, I have studies going

8      back to 1995, so -- but, you know, we're in

9      2025.  So as we sit here today, I'm not able

10     to answer your question in a yes or no

11     response.

12         Q    Have you ever authored a

13     scientific -- a peer reviewed article that

14     appeared in a scientific journal for which

15     you disagreed with the conclusions at the

16     time it was published?

17         A    I don't recall.

18         Q    So there is a possibility that you

19     would disagree with the ultimate conclusion

20     of a peer reviewed article published in a

21     scientific journal at the time it was

22     published?

23              MR. BLANCHFIELD:  Objection to the

24         form of your question.

25         A    Yeah, I don't understand your

1    question.

2         I mean, I think if my name is

3    listed on a scientific peer reviewed

4    publication, then I generally agree with the

5    background, the methodology, the findings,

6    the results and the conclusions.

7         But again, if you want to draw a

8    specific article, I can give -- I can try to

9    answer your question.

10    Q    Let's back up a bit just to be sure

11    I'm understanding you correctly.

12         So you said that your name might

13    appear on a position statement, for example,

14    for the APA, which you agree with generally,

15    but you disagree with specific things because

16    you're part of a working group, a committee

17    and you get outvoted.

18         Is that correct?

19    A    I don't know if I would necessarily

20    agree with that.

21         I mean, I think there's different

22    position statements in different

23    organizations.

24         You had said the APA, but I've also

25    been involved in position statements for the

1    national commission on correctional

2    healthcare, NCCAC, and other American Academy

3    of Psychiatry and the law or American Academy

4    of Child and Adolescent Psychiatry.

5              And each of those organizations has

6    a different role and a different mission.

7              And so the generalizability of a

8    position statement and whoever was on that

9    component or committee that wrote it, can

10   differ vastly.  So -- so no, I can't answer

11   that as a yes or no question.

12   Q    Are you more likely to agree with a

13   position statement adopted by the National

14   Commission on Correctional Healthcare than by

15   the American Psychiatric Association?

16   A    Not necessarily, no.  It would

17   depend on a lot of different variables.

18   Q    That was about position statements.

19             For peer reviewed article appearing

20   in a scientific journal, is it true that you

21   generally agree with the conclusions in those

22   articles that contain your name?

23   A    I would say, generally speaking,

24   that's fair.

25   Q    I also want to talk a little bit

Joseph Penn, M.D. - June 11, 2025

1    about your process for researching these

2    publications.

3           Are you involved in the process of

4    deciding what to cite in the publications of

5    which you're an author?

6        A    I'm not sure I understand.

7           When you say "research and source

8    of supply," if you could clarify what you

9    mean by that.

10       Q    Sure.

11          Do you conduct research for

12   publications that you write?

13       A    How are you defining research?

14       Q    Research can mean a review of the

15   scientific literature.  It can also mean a

16   review of an experimental group that you're

17   in charge of designing.

18       A    I would say generally, yes.

19       Q    And just talking about the research

20   involving outside sources, so sources that

21   are not authored by you, do you review those

22   sources before you cite them?

23       A    When you're asking review, how

24   would you -- how are you defining review?

25       Q    Do you read them?

Joseph Penn, M.D. - June 11, 2025

Page 61

```
1          A    Yes.
2          Q    And you read them before you cite
3     them.
4               Is that right?
5          A    Yes, I would review them to see if
6     they're current, if it's -- the reason I'm
7     getting -- it's challenging, because there's
8     some things that we do when we're doing
9     research or clinical research that there may
10    not be a lot of studies.  There may be
11    limited clinical information or studies, and
12    so you may have to go look at an article from
13    1960 and then you may have to be like, you
14    have to make decisions about, is this article
15    worth citing or not.  So you have to really
16    look at the methodology and the -- their
17    findings.
18              So yes, I would say yes, you have
19    to review -- I would review those documents
20    and make a determination if that's an article
21    I want to cite.
22              Number 2, you have to think about
23    the length of the document.  The editors have
24    really ridged word count.
25              So in a perfect world, you can cite
```

Joseph Penn, M.D. – June 11, 2025

Page 62

```
 1    a hundred studies but your article is not
 2    going to be published.  You only want to cite
 3    the articles that are most relevant and
 4    current to the current study.
 5         Q    Is it fair to say that if you have
 6    cited an article or a source in something
 7    that you're writing, you've determined that,
 8    as you say, the methods are up to date, that
 9    it's generally up to date?
10         A    No, I would not agree with that.
11         Q    What is a circumstance in which you
12    would cite something and you would, under the
13    belief that the methods are out of date?
14         A    Yes.  So I think I referred to it
15    in my expert report, with the Grassian study,
16    G-R-A-S-S-I-A-N.  That's a great example of a
17    study that's really not a study.
18              It was done in the Massachusetts
19    Department of Corrections system by an
20    attorney, who is also a physician.  And there
21    was no control group.  The sample size was
22    extremely small.  And basically, the
23    methodology remains nebulous at best of how
24    this individual, Dr. Grassian, went and
25    interviewed a bunch of people in restricted
```

Joseph Penn, M.D. - June 11, 2025

1    housing.  So that's an example I can go on

2    and on.

3            But that's an example of an article

4    that you might reference and might cite and

5    start off the article with research in

6    restrictive housing is limited and then you

7    might cite the Grassian study but you're not

8    saying that you affirm or endorse that study.

9            You're just citing that as a

10   example of a really poor study that was done.

11   If you want to call it a study.  That's an

12   example of how you might cite something in an

13   article but you're not giving it like an

14   endorsement, you're not saying I affirm this

15   was a sound study.  You're basically saying,

16   the literature is extremely limited and here

17   is an example of the limited literature.

18       Q    If you're citing a study in support

19   of your own conclusion, is it fair to say

20   that you endorse the methods of that study?

21       A    Of the study that I'm citing?

22       Q    Of the study that you're citing.

23       A    Not necessarily.  And the

24   Grassian's a great example.  Dr. Grassian

25   study or article, that would be a really good

Joseph Penn, M.D. - June 11, 2025

Page 64

1    example of something that I don't endorse

2    that study.  But I might cite it, I might

3    list it in a -- either in an expert report or

4    in a scientific article but more so to point

5    out the limitations or problems with the

6    design of that -- of that article.

7        Q    Just to make sure we're on the same

8    page.  I'm talking about studies that you're

9    citing to support your ultimate conclusion.

10            Would you cite something like that

11   if you did not endorse its methods?

12       A    And I'm not understanding.

13            Are you saying in a peer reviewed

14   journal or are you referring to in a position

15   statement?  I'm not understanding what -- or

16   in an expert report, like what do you need?

17            I'm not sure what you're asking.

18       Q    Let's take them one at a time.

19   Let's talk about the peer reviewed article.

20            Would you cite something in a peer

21   reviewed article in support of your

22   conclusion if you did not agree with the

23   methods of the source?

24       A    So I think I testified to this

25   earlier that when you write a paper, you

Joseph Penn, M.D. - June 11, 2025

Page 65

1    generally have to give an overview of the

2    existing literature or studies that have been

3    published whether they're very bad or really

4    bad.

5              And so you're not endorsing or

6    saying I believe this or I think this is a

7    good study, you're just giving a background,

8    a narrative for the reader, who may not know

9    the subject content at all.  So that's how it

10   works in a peer reviewed journal.

11             You're -- you might cite some weak

12   or poor or, actually, you might even cite

13   some really good studies and say this is a

14   gold standard study or this is the most well

15   accepted study, a definitive study, but you

16   might cite also the weak, problematic study

17   by project.

18        Q    Would you indicate in the article

19   if you believed that a study was strong or

20   weak?

21        A    I'm sorry.  I didn't mean to

22   interrupt you.  Say -- ask the question

23   again, please.

24        Q    Yes.  Would you indicate in your

25   article that a source or citing is weak if

Joseph Penn, M.D. - June 11, 2025

1    you believed that it did not support your

2    conclusion?

3         A    So I don't know if I would use the

4    word "weak."

5              You might say that a study lacks

6    power or has not been reproduced or had

7    limitations, but you wouldn't say weak,

8    W-E-A-K.  You would just say, there's been

9    some challenges to the study or there's some

10   limitations that -- you don't say studies are

11   good or bad.

12             You don't like put an adjective on

13   study.  You would just describe it from a

14   methodologic or validity or reliability, you

15   know, using scientific terms.

16        Q    I'm going to show you another

17   document, which I will introduce as Exhibit

18   2.

19             (Whereupon the above mentioned was

20        marked for Identification.)

21             MR. SI:  And then, Gus, if you can

22        upload this to the Hightail space when

23        you can.

24        A    Prior testimony, right?

25        Q    That's correct.

Joseph Penn, M.D. - June 11, 2025

```
1                So is this a complete and accurate

2       list of your prior testimony, dating back to

3       2017?

4            A    No.

5            Q    It is not.

6                What is missing from it?

7            A    I think the Folks -- I'm sorry,

8       this is Joshua Folks.

9                The -- there's another Louisiana

10      case that I think I've been deposed in, and I

11      don't see that reflected on here.

12           Q    Otherwise, it's accurate?

13           A    Yes.

14           Q    And complete?

15           A    Yes.

16           Q    Okay.

17           A    Well, back to -- sorry.

18           Q    2017 is the first year that I see

19      listed on this.

20           A    That's fair, yes, back to 2017.

21           Q    How many times have you testified

22      as an expert since 2017?

23           A    I don't know.  I would have to give

24      a ballpark estimate.

25           Q    I suppose we can also just count
```

Joseph Penn, M.D. - June 11, 2025

Page 68

1    the number of cases on here, which I have

2    done.  It's 32 but I won't make you agree to

3    that.

4          How many cases in which you

5    testified as an expert have involved lawsuits

6    against correctional facilities?

7       A    So I don't know if I can answer

8    your question.

9          I've testified a fair amount as a

10   30(b)(6) witness and I'm not an attorney nor

11   do I try to play an attorney.

12          But several of the cases that I've

13   testified in, have been in that capacity.  So

14   I just wanted to -- I don't know if that --

15   I'm pretty sure all of the 30(b)(6) witness

16   involved corrections, some lawsuit or issue

17   involving a correctional system.

18          I have provided testimony and been

19   deposed in non-constructional cases also.

20          The one that comes immediately to

21   mind is a New Jersey case, 2020, Ruda,

22   R-U-D-A, versus a bunch of people that are

23   listed.  I've done a couple of cases that

24   were not correctional, jail or prison.

25       Q    I see the Ruda case you're

Joseph Penn, M.D. - June 11, 2025

Page 69

1      referring to.  And I see listed in the

2      defendants the state of New Jersey,

3      Department of Corrections.  Is that right?

4              Are we looking at the same Ruda?

5          A    Yes.

6          Q    Okay.  So that did not involve a

7      correctional facility?

8          A    No.  I was a defense expert for the

9      Carrier Clinic, C-A-R-R-I-E-R Clinic, which

10     was a hospital, an outpatient day -- I'm

11     sorry, day surgery program, where they did

12     electroshock therapy, now known as

13     electroconvulsive therapy.

14             And I was the retained defense

15     expert for the Carrier Clinic.  I didn't have

16     anything to do -- I had no role with

17     defending the New Jersey Department of

18     Corrections in that case.

19         Q    Just to make sure we're on the same

20     page.  I would like to get an estimate for

21     the number of cases in which you've testified

22     as an expert involving correctional

23     facilities at all.

24             So counting something like Ruda,

25     where there was a correctional facility that

Joseph Penn, M.D. - June 11, 2025

1    was named as a party in the case but for

2    which you did not testify on behalf of the

3    correctional facility.

4           Does that make sense?

5       A    Well, so Ruda wasn't in a

6    correctional facility.  He was housed in a

7    forensic -- state forensic unit.  So I don't

8    know if that matters.

9           But I would ballpark, I have

10   testified between 20 and 30 times in -- as an

11   expert witness, and including 30(b)(6)

12   witness designations, since 2017.

13      Q    You've testified 20, 30 times as an

14   expert in cases involving correctional

15   facilities?

16      A    Since 2017, that's fair.

17      Q    Since 2017.

18      A    And then including kind of my role

19   as a 30(b)(6) witness, also in that.

20      Q    And what proportion of those

21   lawsuits have you testified on behalf of the

22   plaintiff?

23      A    I don't have a running tally or

24   list.  I can only estimate it but I have done

25   some plaintiff's expert work and testified,

Joseph Penn, M.D. - June 11, 2025

1    for example -- oh, I'm sorry, this doesn't

2    reflect -- I thought it did.  I testified as

3    a plaintiff's expert in a case in South

4    Carolina, I think earlier this year.  I'm not

5    seeing that on there.  So it -- sorry.  To

6    answer your question, I would say probably 10

7    to 15 percent plaintiff's expert work, 85 to

8    90 percent defense expert.  And I have been

9    appointed as a court appointed expert.

10           But I would say if I have to break

11   it down, 10 to 15 percent is plaintiffs, 85

12   to 90 percent is defense.

13        Q    For the record, could we get an

14   updated copy of your prior testimony,

15   including the Adams case and including the

16   South Carolina case that you just mentioned?

17        A    Sure.

18        Q    In the last five years, has any

19   court rejected your expert testimony for any

20   reason?

21        A    No.

22        Q    In the last five years, has any

23   court found your testimony was not credible

24   for any reason?

25        A    No.

Joseph Penn, M.D. — June 11, 2025

Page 72

1      Q   So in all cases, excuse me, in

2  which you've testified as an expert, the

3  court has relied on your expert testimony?

4      A   I think that's fair.  I think

5  there's been one case that comes to mind

6  where the court put more weight on the

7  plaintiff's expert.  But to the best of my

8  knowledge, I've never had any of my testimony

9  stricken or I've never been barred from being

10  an expert witness in a case.

11      Q   Also, for the record, can we get an

12  updated CV at some point?

13      I know you mentioned that there was

14  committees you served on for the APA.

15      A   Oh, yes, it's law and psychiatry.

16      Q   My apologies, yes.

17      A   Sure.

18      Q   I am going to -- thank you.

19      I'm going to show you another

20  document, which I will introduce as Exhibit

21  3.

22      (Whereupon the above mentioned was

23      marked for Identification.)

24      MR. SI:  I just uploaded that to

25      the chat.

Joseph Penn, M.D. — June 11, 2025

Page 73

```
1          A     Sorry, it's not populating in the
2    high tail.
3                THE VIDEOGRAPHER:  It should be
4          there right now.
5                THE WITNESS:  Yes, thank you.
6          Q     Do you recognize this document,
7    Dr. Penn?
8          A     It's still opening.
9          Q     Sure.
10         A     I don't know why it's taking so
11   long to open.
12               My apologies, it's just circling.
13   It's not opening.
14               Oh, there we go.  I got it.
15               Okay.  Yes, I recognize the
16   document.
17         Q     What is this document?
18         A     Sure.  So this is a copy of my
19   expert report in this matter, Joshua Folks,
20   and 53 pages, signed and dated May 14, 2025.
21         Q     Throughout your report, you use a
22   few terms to refer to Mr. Folks' housing
23   conditions at LSP.
24               What does restrictive housing mean,
25   as used in your report?
```

Joseph Penn, M.D. - June 11, 2025

Page 74

```
1        A    Certainly.

2             So restrictive housing is a term

3    that's used by custody staff and custody

4    leadership.  It's meant to, as I understand

5    it, to any time someone is placed in a higher

6    security level setting, there used to be

7    administrative segregation, ad seg, high

8    custodies, there's a variety of terms.  Super

9    max.  Every state may have a different

10   variation on how they refer to it.

11            But restrictive housing is when

12   someone is not in general population.

13   They're in a higher level of custody housing

14   and supervision.

15       Q    You do also use the term

16   "administrative segregation" at some point.

17            Does that mean the same thing as

18   restrictive housing, as used in your report?

19       A    If you can show me where in my

20   report you're referring to, I can try to

21   answer your question better.

22       Q    Sure.

23            So on page 34, at the very top.

24            The sentence includes -- sorry.

25   Include administrative segregation,
```

Joseph Penn, M.D. - June 11, 2025

```
1    restrictive housing, death row and other high

2    custody settings.  I'm quoting from the

3    report there.

4         A    Yes.  And sorry, what's the

5    question, please?

6         Q    Does your use of administrative

7    segregation here mean the same thing as

8    restrictive housing?

9         A    No.

10        Q    How are those different?

11        A    Again, I don't consider myself to

12   be a custody expert.  I'm not a correctional,

13   like, officer or a warden or classification

14   on housing, but I've been doing this close to

15   25, 30 years, so I have a general

16   familiarity.

17             But what I understand

18   administrative segregation, is when

19   individuals that are incarcerated that are,

20   one, they might be in a member of the

21   security threat group, like STG, security

22   threat group.

23             They might be placed in

24   administrative segregation.

25             Or even someone who is not a member
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 844-483-2643

Joseph Penn, M.D. – June 11, 2025

1    of a security threat group, if they have a

2    history of serious violence or assaultive

3    behaviors towards inmates or towards staff or

4    both, and they've incurred disciplinary

5    sanctions, they can be placed into

6    administrative segregation.

7          Restrictive housing is another

8    term.  I'm not sure which one came first but

9    what I understand is, that restrictive

10   housing could include administrative

11   segregation but it might include other

12   individuals that are incarcerated.  Custody

13   might place someone in restrictive housing

14   but it might not be administrative

15   segregation.

16         Like they could be put into

17   prehearing detention.

18         Like let's say they're found with

19   contraband or they're alleged to have been

20   assaulted or been out of place, so they're

21   getting a disciplinary or about to be

22   undergoing a review for disciplinary.  They

23   can be placed into prehearing detention or

24   some other restrictive housing setting while

25   awaiting the ruling, if you will, like the

Joseph Penn, M.D. — June 11, 2025

1    disciplinary review of that charge or

2    infraction.

3        Q    Page 24 of your report, you also

4    use the term "extended lockdown."

5            This is right under the bolded

6    header E.

7            I'm quoting here, "Folks was moved

8    to extended lockdown in September 2022 and

9    was released in November 2022."

10           Do you see that?

11       A    (Witness reviewing.)

12           Yes, I see that.

13       Q    What did you mean by extended

14   lockdown here?

15       A    So that's not a term that we use in

16   the Texas system.  And I would need to

17   refresh my memory by looking at the policy

18   and procedure of what Louisiana Department of

19   Public Safety and Corrections, how they refer

20   to that.

21           So I'm just -- I'm basically just

22   listing it verbatim.  That's what is

23   reflected in the custodial records, that she

24   was moved to extended lockdown.

25           I don't think that I define what

Joseph Penn, M.D. - June 11, 2025

Page 78

1    extended lockdown is in my report.

2         Q    From your recollection of the

3    custody policies at LSP, do you understand

4    extended lockdown to involve isolation of an

5    inmate in a cell for some period of time

6    during the day?

7         A    I would need to read the policy to

8    be able to answer your question.

9         Q    Would that refresh your memory?

10        A    Yes.

11        Q    Go ahead, if you have it handy.

12        A    I don't.  I don't have the policies

13   handy.

14        Q    What about administrative

15   segregation to get a definition, would that

16   involve isolation of an inmate in a cell for

17   a certain number of hours, in a day as used

18   in your report?

19        A    So I don't have a definition of

20   administrative segregation.  Every state that

21   I'm familiar with has a different definition

22   and they have different parameters on how

23   many hours a day they're out of the cell, if

24   they're allowed recreation or visits or other

25   privileges.

Joseph Penn, M.D. — June 11, 2025

Page 79

1              And so, again, I'd be happy to
2    answer your question if you want.  I would
3    need to look at the Louisiana policy to
4    refresh my memory to answer your question.
5         Q    What is involved in the TDCJ
6    system?
7         A    I don't know that off the top of my
8    head.  I would need to look at that policy.
9              Again, I'm not a custody person.
10   My job in TDCJ is I'm a contracted healthcare
11   provider, mental health in particular, so I
12   don't get involved in decisions about
13   administrative segregation.
14        Q    Your report, you also note at
15   various times that Mr. Folks was placed in
16   extreme suicide watch during his
17   incarceration.
18             Is that right?
19        A    That's the terminology, yes, that I
20   understand both from Dr. Gamble's deposition
21   and my review of the medical records, mental
22   health records in the case, yes.
23        Q    And what's your understanding of
24   what extreme suicide watch entailed at LSP?
25        A    So what I understand is, number 1,

Joseph Penn, M.D. - June 11, 2025

1    it's extremely rare, extraordinarily rare.  I

2    recall, in Dr. Folks' -- I'm sorry, Dr.

3    Gamble -- I keep messing that up, sorry --

4    Dr. Gamble's deposition, he said it was not

5    very commonly used.  It was extremely rare.

6            What I understand is, that it's

7    only implemented when everything else has

8    failed.

9            Number 3, that it's only employed

10   in situations similar to Mr. Folks when

11   someone continues to engage in severe or

12   serious self-harm or suicide attempts and

13   nothing -- there's no other option but to

14   employ this suicide precaution to keep

15   someone from killing themselves basically.

16           And so, that's my understanding of

17   why it was employed.  I understand that it's

18   medically ordered.

19           I think Dr. Gamble had to be

20   consulted and he gave the order to -- for

21   this -- for use of this type of suicide

22   precautions.

23           And I also understand that it was a

24   multi-disciplinary -- excuse me -- where I

25   think psychology and mental health staff, Dr.

Joseph Penn, M.D. - June 11, 2025

Page 81

1    Gamble, and custody and nursing.  And I think

2    there was maybe some other maybe a paramedic

3    or some other medical staff that were

4    involved, so it was a multi-disciplinary

5    approach to ensuring that Mr. Folks was kept

6    safe and from killing himself.

7        Q    Is it your understanding that an

8    inmate in extreme suicide watch is held in

9    seclusion?

10       A    I would need you to define

11   "seclusion."  That means different things to

12   different people.

13            I need to understand how you're

14   defining seclusion to answer your question.

15       Q    I believe you used the term

16   "seclusion" in your report.

17            Is that correct?

18       A    It's possible I did.

19       Q    Let's just take an example.  On

20   page 25, at the very top, you note that --

21   I'm quoting from the report here --

22   "Mr. Folks did not require any -- did not

23   require any emergency mental health or

24   psychiatric evaluation, emergency

25   psychotropic medication, in-patient

Joseph Penn, M.D. - June 11, 2025

1    psychiatric hospitalization, seclusion or

2    restraint in an emergency department," et

3    cetera, et cetera.

4        What did you mean by seclusion

5    here?

6        A    Sure.  I probably need to add a

7    clarifier to my response.

8        I don't recall, as we sit here

9    today, if I actually had an opportunity to

10    review the emergency department records.  So

11    it's possible that he was mechanically or

12    physically restrained when he was in the

13    emergency department or maybe he was in

14    cuffs.

15        I would anticipate that, based on

16    my 25 years of working corrections, whenever

17    an inmate, either a jail inmate or a state

18    prison inmate goes to a free world hospital,

19    they're probably going to be handcuffed or

20    shackled to the bed or the -- yeah, to the --

21    what am I trying to say -- the stretcher.

22        But what I want to clarify here is,

23    I'm referring to a medically ordered or

24    therapeutic seclusion or restrained, a

25    medical or therapeutic seclusion or

Joseph Penn, M.D. - June 11, 2025

Page 83

1    restraint.  I wanted to clarify that.

2        Q    You mentioned in your report that

3    you conducted an on-site visit and tour of

4    LSP for a unrelated lawsuit.

5              Is that right?

6        A    Yes.

7        Q    For your reference, this is on page

8    10, if it helps you at all.

9        A    Thank you.

10       Q    You mentioned that you observed an

11   inmate being monitored on suicide watch

12   precautions.

13             Is that right?

14       A    Yes.

15       Q    Do you recall if that was a

16   standard or extreme suicide watch?

17       A    As we sit here today, I don't

18   recall.

19       Q    Did you observe any inmates on

20   extreme suicide watch during this visit?

21       A    I don't recall.

22       Q    Talking about this inmate who was

23   monitored on suicide watch precautions that

24   you referenced in your report, do you

25   remember which cell block that inmate was

Joseph Penn, M.D. - June 11, 2025

Page 84

1    held in?

2        A    No, I do not.  As we sit here

3    today, I don't recall.

4        Q    Was it in the transition unit, the

5    TU?

6        A    It's possible.  Again, I toured the

7    whole facility and I did spend most of the

8    time looking at the transition unit and the

9    cell blocks area and other high custody and

10   restrictive housing.  But as we sit here

11   today, I don't recall.

12       Q    Was that inmate, who you mentioned

13   observing, held in restraints?

14       A    I don't recall.

15       Q    You also observed the restrictive

16   housing settings.

17            Is that right?

18       A    Yes.  At Angola, that's the only

19   facility that I went to, but I also went to a

20   satellite clinic -- I'm sorry, satellite

21   facility.  I think they referred to it as a

22   camp.  And I don't recall the name of the

23   camp but it was a car drive from Angola to --

24   it's technically, I think, still an Angola

25   facility but we had to drive to that

Joseph Penn, M.D. - June 11, 2025

Page 85

```
 1    facility.
 2         Q    In the restrictive housing units
 3    that you observed, did you observe the cells
 4    in those units?
 5         A    Yes.
 6         Q    Can you describe these?
 7         A    I'm not sure I know what you mean
 8    by describe.  Like they're cells, they're
 9    prison cells.
10         Q    How big were they?
11         A    I don't know.
12         Q    Were there objects -- what -- were
13    there objects in the cells?
14         A    Yes.
15         Q    Such as?
16         A    Personal belongings, books, legal
17    materials, hygiene items, toothbrushes,
18    toothpaste, hair products, towels, clothing,
19    other recreational things, drawings, artwork
20    done by inmates.
21         Q    Were there people outside the cells
22    in those cell blocks?
23         A    Yes.
24         Q    How many people would you estimate
25    that you ran into while you were walking the
```

Joseph Penn, M.D. - June 11, 2025

Page 86

1    cell block?

2          A    I don't recall.  I mean, there were

3    a lot of correctional staff.  There were

4    inmates coming and going that might have been

5    going to medical or legal visits.  So as we

6    sit here today, I don't recall specific

7    numbers.

8                And sorry, there was also inmates

9    that were like mopping or sweeping or doing

10   other custodial duties at the facilities.

11         Q    Did you observe any inmates on

12   restraints while you conducted the site

13   visit?

14         A    How would you define "restraints"?

15         Q    However you define it in your

16   report.

17               So let's just say restraints for

18   the purpose of, as you say, I think you used

19   the term medical restraints or therapeutic

20   restraints or something like that?

21         A    I don't recall.  I mean, I saw a

22   lot of people that were being escorted by

23   custody staff from point A to B.  Maybe they

24   were going back to their house or they were

25   going to an appointment or something.  And I

Joseph Penn, M.D. - June 11, 2025

Page 87

```
1      saw a lot of individuals in different custody

2      levels, you know, being escorted by custody

3      staff.

4              But as we sit here today, I don't

5      recall the use of medical or therapeutic

6      restraints.

7      Q    Did you observe the physical

8      restraints that would be used on an inmate if

9      he were held in medical or therapeutic

10     restraints?

11     A    No, I did not.

12     Q    I want to return to something we

13     were talking about earlier, which is your

14     role as mental health director of UTMB.

15             You mentioned that you're

16     responsible for policies and procedures at

17     UTMB for Correctional Managed-Care.

18             Is that right?

19     A    Yes, that's fair.

20     Q    Does UTMB Correctional Managed-Care

21     have a policy for seclusion and restraints?

22     A    There's several policies.  I can't

23     quote the nursing or medical policies.

24             But the mental health services

25     policy does include seclusion and restraint
```

Joseph Penn, M.D. - June 11, 2025

Page 88

1    and then there's probably a correctional

2    managed healthcare policy that has verbiage

3    about seclusion or restraint.

4         Q    Was that policy in place at the

5    time Mr. Folks was incarcerated at LSP, so

6    between 2021 and 2022?

7         A    I would say probably.  I know that

8    that policy has been around since I started

9    employment, which would have been 2008, so

10   February of 2008, and I believe it's still in

11   place as we sit here today.

12        Q    Did you rely on those policies in

13   drafting your report?

14        A    Sorry, did I rely on which

15   policies?

16        Q    The UTMB policies on seclusion and

17   restraint.

18        A    No.

19        Q    What do those policies, the UTMB

20   policies -- sorry, the ultimate mental health

21   services policies that were operative from

22   2021 to 2022 say about the use of seclusion

23   and restraints?

24        A    I don't have it in front of me and

25   I don't know it off the top of my head.  I

Joseph Penn, M.D. — June 11, 2025

1    would need to refer to the policy and

2    procedure to answer your question.

3        Q    Do you have them handy with you?

4        A    No, I don't.

5        Q    Are there —— you said that you

6    didn't rely on these policies for this

7    report.

8             Do those policies inform your

9    expertise in general?

10            MR. BLANCHFIELD:  Object to the

11        form.

12        A    So I would say I've been in high

13    security and restrictive housings centers

14    across the U.S., different prisons and jails,

15    and I wouldn't say that I hold one set of

16    documents regarding seclusion and restraints

17    or restrictive housing to be authoritative.

18             I would say, generally speaking, I

19    look at all of the different policies and

20    procedures and every state prison system and

21    every county jail or state jail or federal

22    prison is different.  They have a different

23    physical layout.  They have a different

24    population.  So...

25             But I would say, generally

Joseph Penn, M.D. - June 11, 2025

1    speaking, I do rely on policies and

2    procedures but I don't hold one to be -- one

3    state or county or federal or ACA, the

4    American Correctional Association or the

5    NCCHC, National Commission on Correctional

6    Healthcare, I don't hold any one document to

7    be authoritative on this topic.

8         Q    When you say you rely on all of the

9    different policies that you just mentioned,

10   what are you relying on them for?

11        A    So I rely on them to inform me and

12   to help with regard to what are best

13   practices and what are the ways to ensure

14   safety to the inmate patient and to staff and

15   to other inmates and to provide access to

16   care and continuity of care, if and when

17   someone is requiring seclusion or restraint

18   or housing in restrictive housing setting.

19        Q    So to make sure I'm understanding

20   you correctly, you rely on the policies from

21   prison systems around the country to inform

22   your opinion about what level of care is due

23   to prisoners under your care?

24        A    I don't think that's what I

25   testified to.

Joseph Penn, M.D. – June 11, 2025

1           I think I said there's best
2    practices.  And so being informed of how
3    every system is constantly trying to do
4    things better, every system has staffing
5    shortages or funding challenges.  And so —
6    and every system is getting more ill inmates,
7    like Mr. Folks, who engaged in severe
8    self-harm and severe self-mutilation.
9           So what I was referring to, I'm a
10   life long learner.  I'm constantly trying to
11   see which system has it figured out, which
12   system is doing the best and it's kind of
13   like a continuous quality improvement, trying
14   to find best practices that might be utilized
15   in different other systems when I'm
16   consulting to other systems or,
17   alternatively, to borrow them and bring them
18   back to Texas.
19       Q    REQUEST:  Can we get a copy of the
20   operative UTMB — the operative UTMB policies
21   for seclusion and restraint from the period
22   of 2021 to 2022?
23       A    Sorry.  I'm confused.  Do I need to
24   answer that?
25       Q    Just preserving it for the record

1      that I would like a copy.

2          A    Okay.

3          Q    But thank you for checking.

4               So you mentioned that you rely on

5      these prison policies for best practices.

6               Is it your testimony that prison

7      policies can inform your medical expertise?

8          A    Yes.

9          Q    Can you explain a little bit more

10     about that?  How would a prison policy inform

11     the relevant medical standard?

12         A    So I'm confused.  You asked me

13     about my expertise and now you're talking

14     about standard.

15              Can you ask it again, so I can try

16     to understand it and answer it better,

17     please?

18         Q    Sure.

19              So earlier we talked about all of

20     the different roles in which you've taken.

21              Currently, you're mental health

22     director at UTMB and that's a —— that's a

23     role in which you have medical expertise, is

24     that correct, or you use medical expertise?

25         A    Right.  I would say medical and

Joseph Penn, M.D. - June 11, 2025

1      psychiatric, both.

2            Q    Medical and psychiatric?

3            A    Right.

4            Q    Understood.

5                 Do prison policies that inform your

6      understanding of the best practices, do those

7      policies inform your medical expertise as

8      UTMB mental health director?

9            A    Yes.

10           Q    Can you explain how you -- how

11     those policies inform your expertise as UTMB

12     mental health director?

13           A    Certainly.

14                So there's several different ways

15     that occurs.

16                My administrative director, Beverly

17     Echols, she belongs to a work group for NIC,

18     the National Institute of Corrections, and

19     every state prison system has one person who

20     is appointed to that council or group and I

21     think maybe three of the largest county jails

22     in the country and then maybe the federal

23     bureau of prisons.

24                And so on an ongoing basis, Beverly

25     Echols is bringing back information from

Joseph Penn, M.D. - June 11, 2025

1    other states on how they're dealing with

2    seclusion and restraint, restrictive housing,

3    trying to keep people out of restrictive

4    housing, individuals with serious mental

5    illness.  So that's one way in which I get

6    information.

7            Another way in which I get

8    information is going to national meetings,

9    such as the American Correctional

10   Association, the National Commission on

11   Correctional Healthcare, through my work in

12   different committees at those conferences,

13   attending hearings, panel hearings for ACA,

14   and my work on the accreditation committee

15   for NCCHC, my work updating the standards,

16   mental health, jail, prison, juvenile, and

17   opioid treatment standards for NCCHC.

18           So those are ways that I keep

19   current.

20           And then I attend presentations

21   that maybe attorneys give or clinical staff

22   give or custody staff give about all the

23   topics that I mentioned earlier at

24   conferences.

25           Then lastly, my consulting or

Joseph Penn, M.D. — June 11, 2025

1    expert witness role, either when I'm

2    consulting to a county jail, Sacramento

3    county jail, San Diego county jail,

4    California prison system, Arizona prison

5    system, Rhode Island prison system, I can go

6    on and on about.  Every time I go to one of

7    those facilities or groups of facilities, I'm

8    trying to learn and identify what are some of

9    the strategies that they're employing and

10   their policies and procedures.

11        So all of that together is like an

12   ongoing, trying to make continuous quality

13   improvements to our Texas prison system.

14   Q    When you decide to adopt a best

15   practice that you observed in a different

16   prison system or from one of your various

17   sources that you mentioned, what goes into

18   that decision?

19   A    Well, there's a bunch of variables.

20   But one would be staffing and resources, like

21   would this involve additional staff, what

22   would be the cost to hire more staff.

23        Number 2, can you actually hire

24   those staff in certain areas of the state

25   that are maybe underserved.

Joseph Penn, M.D. - June 11, 2025

Page 96

```
 1                Three, and probably the most
 2       important thing, is, would the custody
 3       leadership, would TDCJ, if it's their
 4       prisons, they run the prisons.
 5                So we can have really good ideas
 6       but if we don't have buy-in from custody and
 7       leadership, then we're not going to get any
 8       traction.
 9                So I would say it boils down to
10       funding, staffing, and approval or buy-in
11       from custody that those are some of the
12       different variables that might be involved.
13       Q    Do the mental health needs of
14       prisoners factor into that decision?
15       A    Yes.
16       Q    What about the medical needs of
17       prisoners?
18       A    Yes.
19       Q    Are you able to say -- you
20       mentioned three factors.
21                I also gave you another two that
22       you confirmed are relevant to the decision of
23       whether or not to adopt another best
24       practice.
25                Are you able to give me a sense of
```

Joseph Penn, M.D. - June 11, 2025

Page 97

1    which of these is most important?

2       A   I'm sorry, I didn't understand the

3    first part of your question.

4       Q   So out of all the factors that

5    you -- all the variables that you mentioned,

6    are you able to give me a sense of the

7    relative priority of them.

8       A   No, I don't think there's any

9    overarching way you can prioritize that.  I

10    think they're all equally important.

11       Q   You've been a treating psychiatrist

12    for correctional patients, a direct treating

13    psychiatrist.

14       A   Yes.

15       Q   When was the last time you did

16    that?

17       A   How are you defining direct

18    treating professionally?

19           I'm not sure how you asked the

20    question.

21           Direct treating psychiatrist, is

22    that what you asked?

23       Q   Is someone for whom -- is there a

24    difference between your current role as UTMB

25    mental health director -- you mentioned that

Joseph Penn, M.D. — June 11, 2025

1    you have patients all across the TDCJ system.

2            Is there a difference between that

3    and then a psychiatrist who directly sees

4    patients on a day-to-day basis?

5        A    I would say yes and no.

6            In my role, I probably have more

7    administrative responsibilities.  The

8    psychiatrist and psychiatric nurse

9    practitioners that we employ are hired

10    exclusively to do 100 percent patient care.

11            When we have staffing shortages, I

12    roll up my sleeve and help out.  For example,

13    right now one of our gender dysphoria

14    psychiatric providers is out on a medical

15    leave and has been out for three months, so

16    I've been managing all of the gender

17    dysphoria patients, patients on hormones,

18    I've been ordering hormones,

19    stopping/starting/changing hormones.  So I'm

20    providing direct patient care as recently

21    as -- I've been on vacation, so I can't speak

22    for the last two weeks.

23            But the week before my vacation, I

24    saw a patient who was acutely psychotic and

25    worked with nursing and custody and the

Joseph Penn, M.D. - June 11, 2025

1    treating psychiatrist and other nursing staff

2    to get that patient transferred from the

3    facility where he was at to another facility.

4            And I do that every day.   I mean

5    every day I'm involved in determinations of

6    patients who are suicidal or self-injurious

7    and where they should be housed and what

8    services they need.

9        Q    We've been on the record for about

10   another hour, Dr. Penn.  How are you doing?

11       A    I probably could take a break, if

12   that's okay.

13       Q    That would be great.

14            Okay, let's take five minutes

15   again.

16       A    All right.

17            THE VIDEOGRAPHER:  We are off the

18       record.

19            The time is 10:15 a.m.

20            (Brief recess taken.)

21            THE VIDEOGRAPHER:  We are back on

22       the record.

23            The time is 10:30 a.m.

24       Q    Dr. Penn, as UTMB mental health

25   director, you oversee the care of

Joseph Penn, M.D. - June 11, 2025

Page 100

1    incarcerated patients.  Right?

2              You mentioned over maybe or around

3    80 prisons in the state of Texas?

4        A    That's one of my roles.  I have

5    other roles also.

6        Q    You would be familiar with the use

7    of restraints and seclusion in the UTMB

8    system?

9        A    When you say seclusion and

10   restraints, I have an awareness of the

11   medical -- medically ordered or therapeutic

12   seclusion restraint, that's fair.

13       Q    Just so that we're on the same page

14   from now on, when I use the term seclusion

15   and restraints, I will be referring to the

16   medical therapeutic seclusion and restraints,

17   unless I specify otherwise.

18             Does that make sense?

19       A    Yes.  Thank you.

20       Q    Perfect.

21             Have you personally been involved

22   with the use of restraints and seclusion,

23   seclusion and restraints, either by ordering

24   them yourself or approving them?

25       A    When you say "personally involved,"

Joseph Penn, M.D. - June 11, 2025

```
1       I'm not sure I know what you mean by that.
2            Q    Have you, in your role as UTMB
3       mental health director, personally ordered
4       seclusion and restraints for a patient?
5            A    Yes.
6            Q    Have you approved of another
7       medical professional's order for seclusion
8       and restraints?
9            A    So I don't know if I would use the
10      word "approved."  I've been the acting
11      clinical director at two of our in-patient
12      psychiatric prison units at different periods
13      of time in the last 17 years, and there are
14      times that I will get a request to sign -- to
15      cosign.  I'm not the -- the restraint already
16      happened or the seclusion already happened.
17               And I think, by policy, the
18      clinical director or a psychiatrist has to
19      cosign that.  I could be wrong on that,
20      but -- so I have gone in and cosigned it
21      electronically.
22               But I wouldn't use the word
23      "approve" because it already occurred, so
24      yes, that's fair.
25           Q    Is it fair to call those instances
```

Joseph Penn, M.D. — June 11, 2025

1    where you cosigned the use of seclusion and

2    restraints, is it fair to call that

3    oversight, you're overseeing the use of

4    seclusion and restraints?

5         A    That's fair, yes.

6         Q    How many times would you say you

7    have either ordered seclusion and restraints

8    for a patient or overseeing the use of

9    seclusion and restraints for a patient in

10   your role as UTMB medical health director?

11        A    I'm sorry, I didn't mean to

12   interrupt you.

13             It would be a total guess.

14   Hundreds, maybe I have done, probably ordered

15   seclusion and restraints.

16        Q    More than 200, if you had to guess?

17        A    It would be a total guess.

18             I don't know if it's that many.  I

19   would say we tend to order more seclusion

20   than physical restraint but I can't answer

21   your question.  It would be a total guess.

22   But it's been several hundred probably.

23        Q    In the last six months, how many

24   times have you either ordered or overseen the

25   use of seclusion and restraints on a patient?

Joseph Penn, M.D. — June 11, 2025

1        A    Five to ten.

2        Q    Is that about average for a

3    six-month period?

4        A    I don't know how you're defining

5    average.  I mean, I take on calls, as I

6    testified to earlier, and it's totally

7    random.  There may be a week or two where

8    there's no seclusion and restraints and a

9    week where you have one patient similar to

10   Mr. Folks who is in and out of restraint on a

11   daily basis, hourly basis.

12           So I can't give you a definitive

13   yes, no or number in the last six months.

14       Q    When seclusion and restraints are

15   ordered at UTMB, would you typically be

16   notified?

17           You mentioned earlier that you

18   cosign some of these orders.

19       A    So I would say I can't answer that

20   in a yes/no.  I have to clarify that.

21           If I'm the on call after-hours

22   psychiatrist, then yes, I would be notified.

23           The nurse would call me and ask for

24   an order and she -- he or she would describe

25   the clinical reason, what has been attempted,

Joseph Penn, M.D. - June 11, 2025

1    all the interventions that have failed and

2    the rationale for why the patient needs to be

3    placed in seclusion and restraints.  So

4    that's why the most common -- what I would

5    say is, we occasionally have patients that

6    severely self-harm, self-injure similar to

7    Mr. Folks where we have to have additional

8    staff meetings or treatment team meetings to

9    discuss how we're going to manage somebody

10   who is repeatedly severely self-harming to

11   the point of killing themselves, like

12   Mr. Folks.

13        So I would say those are the two

14   ways that I'm directly involved in ordering

15   seclusion and restraints.

16        Q    When you're not on call as UTMB

17   mental health director, would you ever not be

18   aware that seclusion and restraints are being

19   used in the UTMB systems on a patient?

20        A    I don't understand your question,

21   I'm sorry.

22        Q    Are there cases in which when

23   you're not on call or ordering the seclusion

24   and restraints yourself, somebody else under

25   your supervision would order seclusion and

Joseph Penn, M.D. - June 11, 2025

1    restraints and you would not be aware of

2    that?

3        A    Yes, that's fair.

4        Q    How often does that happen?

5        A    No idea.

6        Q    So just talking about the cases in

7    which you are aware, in your experience at

8    UTMB, what is the longest period of time you

9    recall keeping a patient in seclusion and

10   restraints?

11       A    I can't -- I don't know if I can

12   answer that because of HIPAA.  Like I can't

13   really discuss a particular patient.

14            We've had several individuals

15   similar to your client, Mr. Folks, that have

16   engaged in severe self-harm to the point of

17   almost killing themselves but I don't know if

18   I can answer that question about -- because

19   it gets into specific cases and I don't know

20   if that's HIPAA protected or not.

21       Q    I am not asking about specific

22   cases.  Please do not give me any information

23   about specific cases.

24            I'm just asking about in the whole

25   of your experience as UTMB mental health

Joseph Penn, M.D. — June 11, 2025

Page 106

1    director, what is the longest period of time

2    that you recall keeping a patient in

3    seclusion and restraints?

4        A    I don't recall specifically but I

5    would say we have had at least one individual

6    that I recall was in seclusion and restraints

7    for one to two months maybe more.

8             I mean, I'm not the clinical

9    director right now.  Fortunately, we have --

10   we're fully staffed on clinical directors,

11   so...

12            But I am familiar that we

13   occasionally have patients that go one to two

14   months needing repeated seclusion and

15   restraints.

16       Q    When you say "repeated," do you

17   mean one to two months consecutively?

18       A    It varies.  There's some

19   individuals that require extended, like a

20   week or two or longer.  There's some that

21   maybe a couple of days in a row, then they

22   come out of seclusion and restraints.  And

23   then they're okay for a week or two and then

24   they go back in.  So it's totally -- there's

25   not a particular pattern.

Joseph Penn, M.D. - June 11, 2025

Page 107

1          Q    Just to clarify your answer to the

2     earlier question, the patient that you

3     remember keeping in seclusion and restraints

4     for one to two months, that is the longest

5     amount of time that you recall keeping a

6     patient in seclusion and restraints?

7          A    Could be longer.  As we sit here

8     today, I would probably have to talk to my

9     clinical directors or other senior

10    psychologists.  I'm sure there's been

11    patients that have lasted longer but that's

12    the one that immediately comes to mind

13    without revealing health -- you know,

14    information, protected information.

15          The one that comes to mind was

16    recent and was in and out of seclusion and

17    restraints for at least a month or two.

18          Q    Before that case -- well, first you

19    mentioned that occasionally you've kept

20    patients on seclusion and restraints for one

21    to two months.

22          So before this most recent case,

23    when was the last time that you recall a

24    patient being kept on seclusion and

25    restraints for one to two months?

Joseph Penn, M.D. - June 11, 2025

Page 108

```
1          A    So I want to answer your question
2     but I just want to make it clear, I'm not the
3     one that's making that determination.
4               You said, you're the one that
5     orders.  I'm -- if I'm on call, I give an
6     order but by policy the seclusion and
7     restraints is time limited.  I don't recall
8     the exact number of hours.  It might be eight
9     hours.  But it has to be renewed.
10              So we don't just like give an order
11    for, you know, restraint for a month.
12              I just want to make that clear --
13    I'm sorry, what was the question again,
14    please?
15         Q    Before this last case that you
16    mentioned of a patient being held in
17    seclusion and restraints for one to two
18    months, when is the last instance, which
19    you're aware of, of a patient being held in
20    seclusion and restraints for that long?
21         A    Again, I testified to this earlier,
22    kind of comes and goes.
23              We have several of these kinds of
24    patients that are repeatedly severe
25    self-harming and they go on seclusion and
```

Joseph Penn, M.D. — June 11, 2025

1      restraints for extended periods of time.

2              But as we sit here today, I can't

3      give you an exact or approximate number of

4      those patients or durations of their

5      seclusion and restraints.

6              MR. SI:  Can you read back the last

7         question?

8              (Whereupon the record was read back

9         by the reporter.)

10      A     So I would say I don't recall.

11      Q     When you or a psychiatrist, who you

12      supervise, see a patient who is in seclusion

13      and restraints, is there any sort of

14      treatment that's administered to the patients

15      while they're on seclusion and restraints?

16      A     Yes.

17      Q     Can you describe that treatment?

18      A     Sure.

19              The treatment that's involved for

20      someone who is acutely suicidal or posing

21      eminent risk of harm to self or others, that

22      requires seclusion and restraints, that's the

23      treatment, is placing them in therapeutic

24      seclusion and restraints.  So that is the

25      mental health treatment modality.

Joseph Penn, M.D. - June 11, 2025

```
 1              The most -- the treatment

 2      intervention and the treatment plan is to

 3      keep the patient safe, and that's not just in

 4      a prison or jail, that goes across

 5      psychiatric hospitals, state hospitals,

 6      forensic units, intellectually impaired

 7      treatment facilities.  So it's ubiquitous.

 8              Your treatment, intervention and

 9      treatment modality, is to keep them safe.

10      And you do that by placing them in the

11      therapeutic seclusion and restraints and

12      monitoring them for safety.

13              Because even though they are in

14      seclusion and restraints, just like

15      Mr. Folks, he can still get items to

16      self-harm, to swallow or to seriously

17      self-injure himself or herself, even while in

18      seclusion and restraints.  So that's part of

19      the model, is keeping them safe, monitoring

20      them, making sure that they're not having any

21      adverse medical or mental health

22      deterioration while they're in seclusion and

23      restraints.

24              And then the periodic mental health

25      reevaluation, by a social worker or
```

Joseph Penn, M.D. - June 11, 2025

Page 111

```
 1    psychologist or other mental health
 2    professional -- and I don't recall the
 3    frequency in Louisiana.  By policy, I think
 4    it was daily or maybe it was every 12 hours,
 5    but that's part of the treatment plan.
 6            The treatment plan is to ensure the
 7    inmate's safety and to restore safety, so the
 8    inmate can come out of seclusion and
 9    restraints.  So that's the overarching
10    treatment plan or treatment intervention
11    that's being availed to that individual.
12        Q    When would you take the patient off
13    seclusion and restraints?
14        A    It would depend.
15            Ideally, when the individual has
16    calmed down and has demonstrated that they're
17    not agitated or combative or self-harming,
18    they're not actively self-harming, and it's a
19    very complicated calculus.  Because someone
20    might be psychotic, and they might not be
21    self-harming, but then you take them off the
22    suicide watch and they can revert to
23    self-harming.
24            I think the challenge with these
25    kind of patients, like Mr. Folks, where they
```

Joseph Penn, M.D. - June 11, 2025

1    tell you, I'm not suicidal and they have
2    calmed down and you take them off the suicide
3    watch, and then within a matter of, you know,
4    half an hour, they're engaging in a lethal
5    suicide attempt.
6            So A lot of it is relying on the
7    individual's self-report of their current
8    suicidal intent or plan.  And that's
9    problematic because, as with Mr. Folks, he's
10   unreliable as a historian.
11           So you have to use your clinical
12   judgment.  You have to weigh the risks,
13   benefits and alternatives.
14           And at the end of the day, it's an
15   individualized clinical determination of the
16   individual's risk of harming themselves,
17   you're weighing that versus making an effort
18   to try to get them out of seclusion and
19   restraints and give them more freedom, if you
20   will.
21           And that's a -- that's a real --
22   that's huge challenge clinically that our
23   staff do every day and staff in the Louisiana
24   prison system do every day.
25       Q    You mentioned that staff would make

Joseph Penn, M.D. - June 11, 2025

1    an effort to try to get the patient out of

2    seclusion and restraints and give them more

3    freedom.

4             What goes into that effort?

5        A    So I think I testified to this

6    earlier, it involves a mental health

7    evaluation or a mental health assessment.

8    And as part of that medical assessment is

9    performing a suicide risk assessment and a

10   mental status examination and looking at

11   their cell to see how they're behaving, what

12   the contents of the cell are and that sort of

13   thing.  So it involves a clinical assessment.

14   That's how that decision is made.

15            And sorry, and the other thing, it

16   might involve talking to custody staff who

17   are there 24/7 to learn, is the person

18   eating, are they drinking, are they

19   toileting, are they bathing, are they

20   grooming.

21            So it's not just the self-report of

22   the individual but it's an observation of

23   their -- of their functioning in that housing

24   setting.

25       Q    And the evaluation, does that

Joseph Penn, M.D. - June 11, 2025

Page 114

```
 1      involve any sort of therapy, any sort of
 2      treatment?
 3          A    Yes.
 4          Q    What sort of therapy and treatment?
 5          A    Well, as documented in this case,
 6      in Mr. Folks' mental health records, mental
 7      health staff consistently met with him.   And
 8      even Dr. Gamble, in his deposition
 9      transcript, you're meeting with the patient,
10      trying to identify how they're doing, their
11      subjective complaints or subjective reports,
12      if they're having any new issues or problems.
13              And then, like I testified to
14      earlier, you're doing an objective evaluation
15      of their thinking, their behavior, their
16      thought processes.   And you're looking to see
17      if they've engaged in any recent self-harm.
18              And then you're doing an assessment
19      of their current risk of harm to self or
20      others.
21              And so that's all part of the
22      treatment that's rendered to someone who is
23      critically at risk for self-harm or suicide.
24          Q    I think I'm having trouble
25      understanding your use of the word
```

Joseph Penn, M.D. - June 11, 2025

1       "treatment" versus "evaluation."

2              I think, in my mind, evaluation

3       intuitively is distinct from treatment.

4              But let's sort of test this here.

5              You mentioned that you would do an

6       objective evaluation of their thinking, their

7       behavior, their thought process, and you're

8       looking to see if they've engaged in any

9       recent self-harm.

10             How does that or does that, rather,

11      move them towards a place where they're able

12      to get off seclusion and restraints?

13          A    Right.

14             So -- and I'll use Dr. Gamble's

15      testimony as an example.

16             In his deposition, he testified

17      that he repeatedly -- he knew Mr. Folks.  He

18      knew him from when he was incarcerated

19      previously and engaging in these same

20      behaviors.

21             He really tried to work with him.

22      He said, what is it going to take for you to

23      not hurt yourself.

24             Dr. Gamble basically offered him

25      whatever medications he wanted.  Both

Joseph Penn, M.D. - June 11, 2025

```
 1    medicines that he prescribed to him are
 2    highly trafficked and highly traded and
 3    highly desired in a correctional setting.
 4    And Dr. Gamble weighed that and was like, I
 5    will do whatever it takes.  I'll give him
 6    whatever medicines he wants and even
 7    prescribe him naltrexone.  And I can say more
 8    about that.
 9            But Dr. Gamble repeatedly tried to
10    work with and the mental health staff, too,
11    per the records, to try to meet Mr. Folks at
12    a halfway point.  What can we do to ensure
13    your safety?  What can we do to help you to
14    be safe?
15            And so, that's the treatment.  The
16    treatment is you're trying to form a
17    therapeutic alliance with the patient to get
18    them to talk to you.
19            It may appear that you're just
20    shooting the breeze like how's the weather,
21    how did the Saints do last week or whatever.
22    But you're assessing their ability to reality
23    test, are they psychotic, are they hearing
24    voices.
25            So evaluation and treatment kind of
```

Joseph Penn, M.D. - June 11, 2025

1    go hand-in-hand.  And it's hard to

2    distinguish or differentiate between one and

3    the other.

4            The treatment component is

5    establishing a therapeutic alliance,

6    providing supportive counseling and

7    encouraging this person, you have something

8    to live for, and then offering medications to

9    treat depression or impulse control or

10   problem behaviors, and that's exactly what

11   Dr. Gamble and the other mental health staff

12   tried to do.

13        Q    With something like -- with a

14   treatment plan like the one you just

15   identified, so establishing a therapeutic

16   alliance, support of counseling and

17   encouraging the patient to have something to

18   live for, would those things be documented

19   anywhere?

20        A    They typically are documented in

21   the mental health records or mental health

22   chart.  And what I neglected to mention

23   earlier, I know we're focusing just on mental

24   health staff and Dr. Gamble, but this

25   Mr. Folks was also being assessed by nursing

Joseph Penn, M.D. - June 11, 2025

1    staff and custody staff, were checking up on

2    him.  You know, I think he was on constant

3    one-on-one observation and he was also on

4    video camera 24/7.

5          So there's documentation from

6    custody.  There's documentation from nursing

7    staff.  And ideally, there's documentation in

8    mental health records.

9          I will tell you, and I will

10   acknowledge, we do a lot of things in mental

11   health and psychiatry that we don't document.

12   So we might provide treatment, we might

13   provide supportive therapy, but we may be so

14   busy that we don't write it down.

15         And so that's one of the challenges

16   in a correctional setting, is, we treat the

17   patient rather than nursing the medical

18   record.

19         So which would you prefer, to write

20   an extensive novel in the medical chart or

21   see the patient and treat the patient and

22   keep the patient safe?

23         So, yeah, in a perfect world there

24   would be more no documentation about the

25   treatment that was offered to Mr. Folks, but

Joseph Penn, M.D. - June 11, 2025

1    at the end of the day, the proof is in the

2    pudding, he's alive and he's in the community

3    now and doing very well.

4         Q    In your review of the mental health

5    records from this case, did you see

6    documentation of any of the types of

7    treatments we mentioned before, so

8    establishing a therapeutic alliance,

9    counseling, anything like that?

10        A    Yes.  I don't recall the specific

11   examples but I do recall that the mental

12   health staff were assessing Mr. Folks per

13   policy.  They might not have written

14   everything in the notes, you know, that

15   somebody -- sorry.

16             They might not have written

17   extensive or lengthy notes, but I -- in my

18   professional opinion, their documentation

19   comported with the standard of care for

20   someone who is as seriously suicidal as

21   Mr. Folks.

22             Similarly, Dr. Gamble, in his notes

23   and in his deposition transcript, he did

24   thorough psychiatric evaluations of

25   Mr. Folks.  He knew him going back several

Joseph Penn, M.D. - June 11, 2025

1    years.   He knew him for an extended period of

2    time.   And he did document in his notes and

3    also testified to that in his deposition of

4    what he did to provide psychiatric evaluation

5    and psychiatric treatment to Mr. Folks while

6    he was in suicide precautions.

7         Q    What psychiatric treatments do you

8    recall Dr. Gamble documenting?

9         A    Well, I recall him documenting the

10   diagnoses, the diagnostic impressions he had

11   of Mr. Folks.   And then the psychiatric or

12   psychotropic medications that were prescribed

13   were also detailed.   And then the plan to

14   continue him on a suicide watch with an

15   eventual plan to remove him or reduce him

16   from the highest level of suicide watch and

17   restraints to a less restrictive suicide

18   precautions and eventually, ideally, where he

19   would not require any kind of seclusion or

20   restraints.

21        Q    What did the eventual plan to

22   remove Mr. Folks or reduce him from the

23   highest level of suicide -- what did, as you

24   testified, the plan to remove Mr. Folks or

25   reduce him from the highest level of suicide

Joseph Penn, M.D. - June 11, 2025

```
1     watch and restraints to a less restricted

2     suicide precaution, what did that plan

3     involve?

4           A    I think originally he was in four

5     point restraints, where he was mechanically

6     restrained, his two upper extremities and two

7     lower extremities, as I understand, based on

8     clinical evaluations and reevaluations, the

9     plan was to reduce him to where only two

10    extremities were restrained and then

11    eventually to try to get him off the

12    restraints all together but to house him in

13    that location, in the transitional unit,

14    where items could not be slipped to him by

15    other inmates or staff, that he might use to

16    self-harm or mutilate or kill himself.  And

17    it was having a correctional officer within

18    ten feet of him at all times, 24 hours a day,

19    and also the video monitoring 24 hours a day.

20            So that is my understanding of what

21    the plan was to try to reduce him from four

22    point restraint to two point restraint to no

23    restraint, but to continue to house him there

24    in the transitional unit with 24 hour

25    one-on-one observation and video monitoring
```

Joseph Penn, M.D. - June 11, 2025

Page 122

```
 1      observation.
 2          Q    So other than the fact of the plan
 3      to reduce Mr. Folks from four point to two
 4      point to no restraints, did Dr. Gamble
 5      document any other interventions that would
 6      be a part of that plan?
 7          A    Yes.
 8          Q    What did he document?
 9          A    So I believe he prescribed
10      Wellbutrin and -- I'm sorry, I'm blanking,
11      there was another medication.
12              And then the naltrexone.  I think
13      it was Depakote but I could be wrong on that.
14              So he documented the plan to
15      prescribe those -- I'm sorry, it wasn't
16      Depakote, it was -- he was also on an
17      antipsychotic.  It was Abilify -- oh, no, no,
18      no, I'm sorry, Thorazine, chlorpromazine.  He
19      was on Thorazine.  And also, he was on
20      Artane, and I can spell these if you need me
21      to.
22              But Wellbutrin, Thorazine, Artane
23      and naltrexone.  So he was on four very
24      potent psychotropic medications where he, Dr.
25      Gamble was clearly trying to help Mr. Folks
```

Joseph Penn, M.D. - June 11, 2025

1    gain better control from his impulses, his

2    impulsivity, his mood liability, his

3    personality disorders, plural, and his severe

4    and lethal self-harm attempts.

5         Q    Okay.

6         A    So Dr. Gamble was trying to treat

7    him with these medications.

8         Q    So other than Mr. Folks' diagnoses,

9    the medication that Mr. Folks was prescribed

10   and the fact of the plan to move him from

11   four point to two point to no restraints, did

12   Dr. Gamble document any other treatment

13   interventions that were attempted for

14   Mr. Folks?

15        A    I believe -- I don't recall if it

16   was Dr. -- Dr. Gamble's handwriting is very

17   difficult to read.  And what I understand

18   was -- and I don't recall if I -- when I

19   interviewed Dr. Gamble directly, if he told

20   me this or if it was in the -- in his

21   deposition transcript, but that wasn't all

22   Dr. Gamble was doing.  Dr. Gamble was also

23   speaking to custody staff.  He was talking to

24   medical leadership.  He was talking to

25   nursing staff.

Joseph Penn, M.D. — June 11, 2025

```
 1              So everyone, including the warden,
 2      are trying to put their heads together
 3      because, think about it, this is a tremendous
 4      amount of resources.  You're pulling
 5      correctional officers offline to go work and
 6      just be one-on-one with Mr. Folks.  That's a
 7      huge burden for a health -- for a prison
 8      system.
 9              And so everyone was trying to put
10      all of their -- their heads together from
11      multiple disciplines, mental health,
12      psychiatry, nursing, medical, custody, and
13      they were all communicating offline of, hey,
14      what can we do to deal with this.
15              I think the other problem, which
16      you haven't asked me about is, that Mr. Folks
17      is a pre-trial detainee.  He's not even
18      legally a state prisoner.  So that's a whole
19      separate, additional complicating variable.
20              So they have to protect maybe
21      Mr. Folks -- Mr. Folks sight and sound from
22      other state prisoners.
23              So they had a huge -- they had a
24      huge challenge to try to keep Mr. Folks safe.
25      And they worked together as a treatment team
```

Joseph Penn, M.D. - June 11, 2025

Page 125

1    and Dr. Folks may have not documented that in

2    his chart, but he definitely spoke about that

3    when we met, when I interviewed him, and also

4    in his deposition transcript.  That's what I

5    recall.

6         Q    You mentioned Mr. Folks being a

7    pretrial detainee when he first arrived at

8    LSP being a complicating variable.

9         A    Yes.

10        Q    What did you mean by that?

11        A    So again, I want to clarify, I

12   don't consider myself a custody expert but I

13   do know from my experience in Texas where

14   we're dealing with -- we deal with different

15   types of custody state jail, state prison, we

16   deal with Operation Lone Star confinees, we

17   deal with juveniles, we have a lot of

18   specialty custody designations that need to

19   be considered.

20            But to answer your question, what I

21   understand was, Mr. Folks could not be safely

22   kept at the Parish Jail, where he was, and

23   had to be sent off site at least once or

24   twice to a free world emergency room and,

25   again, almost killed himself.  And the jail

Joseph Penn, M.D. - June 11, 2025

Page 126

```
1       didn't have any psychiatric staff.  They
2       didn't have mental health staff or enough
3       medical staff to keep Mr. Folks safe.  And so
4       they had an arrangement.  And I think this
5       had happened before when a county jail or,
6       sorry, Parish Jail in Louisiana has an
7       individual that their medical or mental
8       health needs cannot be safely met by that
9       facility, they need to be transferred to a
10      state prison.  And that's what occurred, what
11      I understand, with Mr. Folks.  He had to have
12      nursing care.  He had to have skilled nursing
13      care and be housed in nursing -- in like a
14      specialized nursing area to get wound care
15      because of the severity of his self-harm.
16      And he had to be kept sight and sound
17      separate from other Louisiana state
18      prisoners.  That's what I understand.
19           Q    Did the fact Mr. Folks have --
20      strike that.  I'm sorry.
21                Did the fact that Mr. Folks had to
22      be kept separate from the general population
23      at LSP prevent him from receiving any sort of
24      treatment that would otherwise be received by
25      a member of the general population?
```

Joseph Penn, M.D. - June 11, 2025

Page 127

```
 1        A    When you say "general population,"
 2   can you clarify?  Like are you saying a
 3   general population or person with a mental
 4   illness similar to Mr. Folks?
 5        Q    Let's take both of those.  Let's
 6   start with a person in the general population
 7   with a mental illness similar to Mr. Folks.
 8        A    So my sense is, if the Louisiana
 9   prison system had an inmate that was
10   engaging -- that had a history and recent
11   history of severe lethal -- potentially
12   lethal self-harm, they probably would have
13   housed that individual in the same exact
14   housing, seclusion and restraints, and
15   everything that Mr. Folks received.
16             So it would have been a very
17   parallel type of evaluation and treatment
18   plan.
19             I don't think that there would have
20   been any significant differences, whether it
21   was a pre-trial, you know, Parish Jail
22   detainee versus a state prisoner.  They would
23   have probably done the exact same thing and I
24   think that would have fell within the
25   standard of care.
```

Joseph Penn, M.D. — June 11, 2025

Page 128

1       Q    Earlier you testified that the fact

2   Mr. Folks was a pre-trial detainee would

3   present complicated factors for his

4   treatment.

5            If he would have been treated the

6   same way, regardless of whether he was a

7   pre-trial detainee or a member of the general

8   population, how is that true?

9       A    I'm not sure I understand your

10  question.

11           I think -- I will try to answer it.

12           I think your expert, Dr. Glenda

13  Meyer, who doesn't really have any state

14  prison experience, she -- I think she

15  asserted Mr. Folks should have gotten more

16  treatment but he can't do group therapy

17  because to do group therapy, you would have

18  to have other pre-trial detainees.  You can't

19  do group therapy with state prisoners because

20  he can't be sight and sound of other state

21  prisoners.  So group therapy is kind of off

22  the table.  Like you can't do group therapy

23  with one person.  You need more than one

24  person to do group.  So that's not possible.

25           The individual therapy that he was

Joseph Penn, M.D. - June 11, 2025

1    getting was focused solely on keeping him

2    safe, maintaining his safety and getting him

3    off of seclusion and restraint status so he

4    could be back in the therapeutic transitional

5    unit.

6        Q    Is there anything else that

7    Mr. Folks would not have been able to -- any

8    other treatments that Mr. Folks would not

9    have been able to receive as a pre-trial

10   detainee as opposed to a member of the state

11   prison population?

12       A    I don't know if you would call

13   employment or work a part of treatment but

14   certainly keeping people busy and not having

15   them in their cell, like being able to go and

16   sweep or clean or do laundry or work in the

17   kitchen, that could be part of a treatment

18   plan.  But he would not have been eligible

19   for that because he was a pre-trial detainee.

20   That's my understanding.

21       Q    Just to be sure we're exhausting

22   this line of questioning, is there anything

23   else?

24       A    There may have been other things

25   that he might have had the opportunity to

Joseph Penn, M.D. - June 11, 2025

Page 130

1     engage in, like go to the law library or like

2     I mentioned, employment or vocational

3     activities or doing other things, you know,

4     working on his GED or high school diploma or

5     vocational work or what have you.

6              But because they would have had to

7     probably do that one by himself, he wouldn't

8     have been able to do it as part of a group or

9     cohort of other individuals.  So he would

10    have been the lone person doing that.  That's

11    what I understand.

12        Q    Earlier you mentioned that you

13    understand that Dr. Gamble spoke to custody

14    staff and nursing staff and medical

15    partnerships.

16              Were any of those conversations

17    documented, conversations about Mr. Folks?

18        A    Yes.  Those were actually in Dr.

19    Gamble's -- my interview with him and, also,

20    I think that was in the deposition transcript

21    where Dr. Gamble talked about -- I actually

22    toured where his office is and I watched him

23    in action.  I watched him sitting at the

24    table where he was speaking about and custody

25    staff came in and talked to him and nursing

Joseph Penn, M.D. - June 11, 2025

Page 131

1      staff and mental health staff.

2              And I also observed Dr. Gamble,

3      from the second we entered the facility, he

4      knew all of the wardens by name, he knew

5      their life story, he knew what they would be

6      doing that weekend or their families.

7              So they kind of have this ongoing

8      dialogue and, yes, Dr. Gamble communicated to

9      me that he knew Mr. Folks extremely well, he

10     knew about him and was put on notice even

11     before Mr. Folks hit the facility.

12             From the second he was -- he

13     arrived at the facilities, Dr. Gamble worked

14     with nursing, medical, the medical director,

15     custody, the warden, deputy warden, and other

16     custody staff on an ongoing basis to try to

17     address and try to get Mr. Folks off of the

18     seclusion and restraints status.

19        Q    Other than the treatments that

20     you've mentioned already, the medications,

21     the fact of there being a plan to downgrade

22     Mr. Folks from four point to two point,

23     general restraints, were any other treatments

24     documented in those conversations with

25     custody staff, medical partnership, et

Joseph Penn, M.D. - June 11, 2025

Page 132

1    cetera?

2        A    I don't recall if nursing or the

3    mental health staff that were going up and

4    checking up on Mr. Folks every day or twice a

5    day, if there was any documentation about

6    their collaboration or communication with

7    custody staff.  But -- so that's the only

8    thing that I'm not aware of.

9        Q    Is there any reason to think that

10   they pursued any other course of treatment

11   that was not documented that you have not

12   already mentioned?

13       A    I mean, it's possible.

14            I will say that the fact that Dr.

15   Gamble prescribed naltrexone, that is sine

16   quo non.  That's hands down evidence that Dr.

17   Gamble tried to exhaust each and everything

18   he could within his ability.

19            That's a medicine that's rarely

20   used in a correctional setting, and it's a

21   medicine that's used for severe and extreme

22   self-harm, self-injury.  And again, it's an

23   opioid, opiate kind of medication.  It has

24   significant risks.  And again, I think Dr.

25   Gamble really tried to uncover every stone to

Joseph Penn, M.D. — June 11, 2025

Page 133

```
1       try to get Mr. Folks safe and keep him safe.
2            Q    Earlier, you testified that
3       Mr. Folks' treatment comported with the
4       standard of care in state prisons.
5                 What is your understanding of that
6       standard of care?
7            A    Well, the standard of care for
8       keeping someone who is acutely suicidal and
9       repeatedly suicidal and potentially lethally
10      suicidal, would be to assess them and
11      reassess them.  And based on the suicide risk
12      assessment, to keep them on suicide
13      precautions and to continue to reassess them
14      and provide a multi-disciplinary approach,
15      which included, in Mr. Folks' case,
16      psychological reevaluations and
17      reassessments, psychiatric evaluations and
18      reevaluations, and treatment, medication
19      treatment, and psychotropic meds and follow
20      up.  And so that all comported with the
21      standard of care.  And at the end of the day,
22      they were able to successfully keep Mr. Folks
23      alive.
24           Q    Is that standard of care different
25      in state prisons as opposed to a jail, for
```

Joseph Penn, M.D. — June 11, 2025

Page 134

1    example?

2        A    So I don't think the standard of

3    care -- again, I'm not an attorney or judge

4    or whatever.

5            So I think standard of care is

6    determined by the fact finder.  And what I

7    understand the standard of care would be,

8    what would be expected to be available in the

9    community.  And so what I would say is, a

10   correctional health standard of care would be

11   the same as what would be available in a

12   community health facility or a state hospital

13   or a private psychiatric hospital.

14           And yes, I think Mr. Folks received

15   or got more than he would have in the

16   community for sure, but he got services and

17   treatment that comported with what he would

18   have received in a private or state

19   psychiatric hospital.

20           If he was that suicidal, cutting,

21   self-harming, shoving things into his abdomen

22   and doing other things like that in a state

23   psychiatric hospital or private psychiatric

24   hospital, he would have had seclusion and

25   restraints and he would have been held

Joseph Penn, M.D. - June 11, 2025

Page 135

1    against his will as long as needed.

2        Q    To confirm, the standard of care

3    for a correctional facility is the same as

4    the standard of care for a community health

5    facility?

6            MR. BLANCHFIELD:  Objection to

7        form.

8        A    No, that's not what I testified to.

9            I said there's different nuances in

10   a jail, in a correctional system, whether it

11   be a juvenile facility, a jail, a prison, an

12   ICE facility.

13           Every one of those probably has

14   some different requirements.  But I would say

15   the overarching -- AND that's why there's

16   actually different standards for jails,

17   prisons, juvenile, opioid treatment programs.

18           So the standard -- the healthcare

19   standards may differ in their application and

20   who provides those may differ, but the

21   standard of care, that's -- at the end of the

22   day, that's the fact finder decision.  That's

23   not my decision.

24       Q    So the health standards between

25   jails and prisons are different.

Joseph Penn, M.D. — June 11, 2025

1              Is that your understanding?

2         A    Yes.   Well —— yes.

3         Q    How are they different?

4         A    Well, there's a lot of differences.

5              The healthcare standards, like

6    NCCAC, the National Commission on

7    Correctional Healthcare, has had healthcare

8    standards going back to like the 1970s.   And

9    they have separate designations for

10   healthcare standards, for jails and

11   healthcare standards for prisons.

12             And it's —— there's a lot of

13   different reasons why that is, but there's a

14   lot of different —— the length of stay, the

15   legal status, there's just a lot of different

16   reasons why you need different healthcare

17   standards for jails and prisons.   There is

18   some overlap.

19             The overarching things are access

20   to care and continuity of care and providing

21   a constitutional level of healthcare,

22   medical, dental, nursing and other, but there

23   are nuances.   That's why you have jail

24   standards, health standards and prison health

25   standards.

Joseph Penn, M.D. - June 11, 2025

1          MR. SI:  Off the record for a

2     couple minutes.

3          THE VIDEOGRAPHER:  We are off the

4     record.

5          The time is 11:20 a.m.

6          (Brief recess taken.)

7          THE VIDEOGRAPHER:  We are back on

8     the record.

9          The time is 11:33 a.m.

10     Q    Dr. Penn, earlier we were

11  discussing the difference in the health

12  standard between state prisons and jails.

13          Is that correct?

14     A    Yes, you were asking me about that.

15     Q    So you were talking about some of

16  the differences, some of the reasons why you

17  might need a different health standard in a

18  state prison or a jail.

19          I want to try to lock down how

20  those standards require different things.

21          So what is required of a community

22  health provider or, sorry, of a health

23  provider in a state prison that is not

24  required in a jail?

25     A    See, I don't know if I can answer

Joseph Penn, M.D. - June 11, 2025

1    your question because there's just so many

2    different -- you're saying a very broad,

3    casting a wide net, like health provider.

4        Are you referring to mental health,

5    nursing, dental, a specialist?  Like, I can't

6    answer your question because it's so like --

7    it's a big -- it's a big -- you're casting a

8    huge net.  So I -- if you could clarify that,

9    I'd be happy to try to answer it.

10       Q    What is required of a mental health

11   provider who works in a state prison that's

12   not required of a mental health provider who

13   works in a county jail?

14       A    So to answer your question, I would

15   have to clarify that because some county

16   jails may have such a small population.

17       Like if you have a small county

18   jail that, say, has, you know, 20, 30, 50

19   inmates, you may only have a mental health

20   provider on site once a week or once every

21   other week.  So are we -- I guess I still

22   need more clarification about the size of the

23   facility, the population.

24       Are you dealing with, like -- and

25   state prisons vary.  Like there's some state

Joseph Penn, M.D. - June 11, 2025

Page 139

1    prisons that we have basically nursing home

2    inmates, that are like bed bound, they're

3    never going to get out of their bed.

4            We have people that are hard core

5    gang members that are violent, aggressive and

6    assaultive.

7            So if you can clarify, again, I'd

8    be happy to try to answer your question.

9        Q    Let's just try to get a sense of

10   the factors that would make the health

11   standard different then.

12           You mentioned size.  You mentioned

13   the composition of the population.

14           Is there anything else that would

15   make a health standard different for one

16   facility as opposed to a different facility?

17       A    Sure.

18           So probably length of stay would

19   probably be the most important thing.

20           A jail, somebody might be there for

21   a few hours.  You know, they're intoxicated.

22   They -- they're assaultive.  They cause

23   problems.  And they bond out and they're out,

24   the next day in court.

25           So the length of stay can vary

Joseph Penn, M.D. - June 11, 2025

1    significantly.

2            I would say in a state prison, we

3    have people for years at a time, you know,

4    two to three to five, ten, 20 years, life

5    sentence, multiple life sentences, death,

6    death row.

7            So I think the length of stay in a

8    prison setting -- in a jail setting, people

9    can sleep their time away.  So like you're

10    really not expected to do anything in a jail

11    except go to your court hearing, meet with

12    your lawyer and not cause problems.

13            But in a prison, you probably have

14    to have a job, you have to work.

15            I testified to this earlier,

16    there's more vocational and work and

17    rehabilitative assignment.

18            So I would say from a mental health

19    perspective, the big difference is -- and I

20    think this is where your expert, Dr. Glenda

21    Meyer, might be a little confused, that you

22    can do long-term therapy in a prison setting

23    because people are with you for months to

24    years at a time.  So you could do long-term

25    individual therapy.  You can do long-term

Joseph Penn, M.D. - June 11, 2025

1    group therapy.

2           But you don't really do that in a

3    jail setting because people are in and out so

4    quickly.  You have such high turnover.

5           So I would say that's probably

6    just, from a mental health perspective, the

7    biggest difference would be the type and

8    duration of therapies would differ

9    significantly.

10           Additionally, in a jail setting,

11    they're pre-trial, so they have not been

12    found guilty.

13           And in group therapy, people spill

14    their guts and start talking about their

15    offenses or who was with them or their -- you

16    know, how they're going to plead their case

17    out or whatever.

18           So again, it's really thorny to try

19    to do therapy, group therapy in a jail

20    setting, because they -- they're going to

21    start talking about their crime, how they're

22    going to fight their crime or their charges.

23    So those -- those are some examples that --

24    off the top of my head, that come to mind,

25    that are differences, when surviving mental

Joseph Penn, M.D. – June 11, 2025

1      healthcare, to jail and prison.

2           The other big thing would be, in a

3      jail setting, you have much more

4      intoxication, people are coming off the

5      street high or under the influence, people

6      are going to be withdrawing from drugs or

7      substances in a jail setting.  You're

8      probably not going to have as much of that in

9      a prison setting.  You will have

10     intoxication, where people are doing drugs in

11     a prison setting, but not so much withdrawals

12     from drugs in a prison setting.

13          Then lastly, chronic diseases, in a

14     prison setting you have people that have, you

15     know, hypertension, diabetes, Hepatitis B and

16     C and HIV and other chronic diseases, cancer

17     and what have you.  So you have years to

18     manage those diseases.

19          Whereas in the jail, you're just

20     pretty much continuing whatever treatments

21     they were on or not on in the community.

22          So short-term, I think that's the

23     easiest way to think about it.  Jail is super

24     short term and prison is really long term.

25     Q     Prison sentences are long term and

Joseph Penn, M.D. - June 11, 2025

Page 143

1    patients tend to be housed in prisons long

2    term.

3            Would you typically expect

4    health -- mental healthcare providers working

5    in the state prisons to also provide longer

6    term care?

7        A    It would depend.

8        Q    What does it depend on?

9        A    Well, just as I told you,

10   something -- you know, some people that do a

11   lot of their time in jail, they might have

12   done five, ten, 15 years, if it's a series

13   crime, in jail, and then they come to prison

14   and they're released within a year or two.

15           So I guess the take-home point is,

16   yes, people stay in prison for long periods

17   of time, but there are some people that come

18   to prison and are only with us six months, a

19   year or two years and that's very short term.

20           What I would say -- I'm sorry.

21   What -- say the question again, please.

22           I apologize, I'm rambling here.

23           MR. SI:  Can you read the question

24       back.

25           (Whereupon the record was read back

1       by the reporter.)

2       A    Thank you.

3            When you say mental health

4    providers, can you clarify what you're

5    referring to?

6       Q    A psychiatrist.

7       A    Okay.  Again, it would depend on

8    the patient.

9            There's some patients that refuse

10   treatment and so we can have the psychiatrist

11   see them.  They might refuse to come to

12   appointments.  They might refuse to take

13   their medications.  So that's an example of

14   something that -- one of the challenges of

15   being in a prison is, you have a lot of

16   refusal.  People refuse to come out for their

17   appointments and they refuse to take their

18   psychotropic medications.

19           The other difference in a prison

20   and jail, for a psychiatrist, would be, in a

21   jail setting, if someone is unstable, you're

22   probably going to send them to a emergency

23   room, unless you're a really large county

24   jail, like, say, New Orleans.  Maybe their

25   parish jail.  But anywhere else, maybe Baton

Joseph Penn, M.D. - June 11, 2025

Page 145

1        Rouge, too.

2              But any other large county jail, a

3    parish jail in Louisiana, they're probably

4    going to send -- the psychiatrists are not

5    going to manage those patients on site at the

6    jail.  They're going to send them to an

7    emergency room or they're going to send them

8    to the prison system.

9              Whereas, like using Dr. Gamble as

10   an example, she's able to manage all of these

11   people, longer term state prisoners, at the

12   state prison and not always have to refer

13   them off site because she is on site.  She's

14   an on-site psychiatrist, which is very rare

15   in a state prison system.

16      Q    You mentioned several facts that

17   might affect the kind of treatments you would

18   expect in a jail versus a prison.

19              So, for example, you mentioned

20   there are some patients that refuse

21   treatment.  You mentioned size.

22              Would any of those factors affect

23   the standard, the health standard that a

24   psychiatrist that is working in a jail would

25   be expected to live up to as opposed to a

Joseph Penn, M.D. - June 11, 2025

Page 146

1    psychiatrist who is working in a state
2    prison?
3         A    I'm not sure I know what you mean
4    by "live up to."
5              If you can maybe ask it a different
6    way, I will try to answer your question.
7         Q    So as a psychiatrist, you are held
8    to certain standards for the quality and you
9    mentioned continuity of their care.
10             Is that right?
11        A    No, that's not what I testified to.
12             As a psychiatrist -- as a
13   physician, a medical physician, we're bound
14   to follow the Medical Practice Act, so we
15   have to make sure that we're providing safe
16   and appropriate medical or psychiatric care
17   to our patients.
18             The thing about standards, that's
19   all because of attorneys and lawyers and
20   litigation.
21             The standards are all due to
22   Estelle V. Gamble in litigation, where
23   prisoners are felt to be a vulnerable class.
24   And so you have to provide access to care.
25   Care that's provided to inmates has to be

Joseph Penn, M.D. – June 11, 2025

1    medically ordered.  And if medically ordered,

2    it has then to be availed to them and there

3    has to be access to care and continuity of

4    care.

5              And I would argue that that is true

6    in jails and it's true in prisons, and it

7    applies to psychiatrists working in both

8    systems.

9              So there isn't a higher or lower

10   standard of care.  Jails and prisons'

11   psychiatrists would be doing the same types

12   of treatment to ensure access to care and

13   continuity of care for mental disorders and

14   mental health and suicide.

15        Q    When you're referring to standard

16   of care and -- in your last answer, is that a

17   legal standard, is that a professional

18   standard, is that a medical standard?

19        A    So there's not really an

20   established standard of care.

21              Like every day that I see a

22   patient, I don't think about, does this meet

23   the standard of care, yes or no.  That's a

24   legally-imposed standard.

25              Usually, after there's a bad

Joseph Penn, M.D. - June 11, 2025

Page 148

1    outcome or there's an alleged bad outcome,

2    usually we're just trying to provide good

3    medical or psychiatric care.

4            And the standard of care stuff has

5    come up, I think, through lawsuits and

6    litigation.

7            And so -- I think I answered your

8    question but short answer is, we try to

9    provide appropriate and medically necessary

10   healthcare to prisoners, whether they're in a

11   jail or prison.  That -- that's access to

12   care and continuity of care.

13      Q    So when you say that you're trying

14   to provide good medical or psychiatric care

15   and necessary and appropriate care, how do

16   you determine whether care is good, medically

17   necessary and appropriate?

18      A    Right.

19           So a couple of things.  So one is

20   the risks, benefits and alternatives to the

21   care.

22           Two, the morbidity and mortality

23   associated with if you provide the care or

24   don't provide the care, what is going to

25   happen.

Joseph Penn, M.D. - June 11, 2025

Page 149

```
 1              And Mr. Folks is a great example
 2      of, he was doing potentially lethal things to
 3      harm himself or kill himself, even if he
 4      didn't really mean to, on some occasions.
 5      But the goal was to keep, ensure his safety
 6      and to relieve suffering to address any
 7      mental illness or mental disorder and to
 8      clinically stabilize him so he would not
 9      engage in further self-harm or acts of
10      self-harm.
11          Q    So there is some standard that
12      would allow you, as a medical professional,
13      to judge in your medical expertise, whether
14      care was good, appropriate, medically
15      necessary, according to those factors that
16      you just outlined?
17          A    No, not necessarily.
18              And I think you look at what would
19      a reasonable or prudent provider or
20      practitioner with the same level of knowledge
21      or training in their shoes, what would they
22      have done.  And I think it's a challenge
23      because there's very few prison systems
24      across the country that have an on-site
25      psychiatrist physically working in a prison.
```

Joseph Penn, M.D. - June 11, 2025

1          Most healthcare that's provided to

2     prisoners nowadays is done via telepsych,

3     telepsychiatry.

4          So the fact that Dr. Gamble is on

5     site five days a week, seeing patients,

6     meeting with staff, knows these patients by

7     first name basis, and they know him by his

8     last name, that's just remarkable.

9          So those were examples of how I --

10    my opinion and I wrote this in my report, I

11    think Dr. Gamble did everything that he could

12    within his ability and the other mental

13    health and medical staff and the custody

14    staff, to try to ensure Mr. Folks' safety and

15    to keep him from killing himself.

16    Q    Earlier, you had mentioned the

17    community health standard.

18         So what is a reasonable or prudent

19    provider or practitioner with the same level

20    of knowledge or training who works in a

21    community health facility different than what

22    a reasonable prudent provider with the same

23    level of knowledge would do in a correctional

24    facility?

25    A    I would say it would depend.  I

Joseph Penn, M.D. - June 11, 2025

Page 151

```
 1    can't answer yes or no, because you don't see
 2    the extent and severity of this kind of
 3    lethal self-harm in community settings.
 4              This is something -- this is an
 5    animal, if you will, you only see in jails,
 6    prisons, and state forensic units.
 7              You don't see this in -- I've
 8    worked in community health center settings.
 9    You don't see this extent of severe stabbing
10    through someone's neck or cutting open their
11    abdomen and putting a piece of sharp metal in
12    their bowel.  You don't see that in a
13    community setting.  Because it's kind of like
14    you're comparing apples and oranges.
15              Well, in this case, the standard of
16    care would dictate -- if someone were to show
17    up to a community health center, that's
18    self-harming, like Mr. Folks, they would have
19    sent him to an emergency room.  They would
20    not be managing him in a community health
21    center setting.  They would send him to an
22    emergency room.
23        Q    And under your understanding of the
24    health standard, that would allow you, as a
25    medical professional, to judge whether that
```

Joseph Penn, M.D. — June 11, 2025

Page 152

1    care was good and appropriate, would sending

2    a patient, who self-harms, to the emergency

3    room be an appropriate response, under that

4    health standard?

5        A    So I don't know if I feel

6    comfortable good or appropriate.  That's

7    seems kind of subjective.

8            If you could ask me a different

9    way, I'll be happy to try to answer your

10   question.

11       Q    Sure.

12           So I was just borrowing what you

13   said earlier.

14           You've mentioned there's some sort

15   of standard that you, as a medical

16   professional, have to be held to and it has

17   something to do with what a reasonable

18   medical professional, in your shoes, would

19   do, given a patient's circumstances.

20           So if a reasonable medical

21   professional, in a community health setting,

22   were confronted with a patient like

23   Mr. Folks, what would the standard for

24   providing good and appropriate care or

25   providing reasonably necessary care in those

Joseph Penn, M.D. - June 11, 2025

Page 153

```
 1    circumstances require?

 2         A    So I think I testified to this

 3    earlier.

 4              You don't see these kind of

 5    patients in community health settings,

 6    medical or mental health settings.

 7              But if you did, they would probably

 8    have to call 911 and call for rescue, like an

 9    ambulance, and possibly police, and the

10    person would probably have to be restrained

11    and taken against their will to an emergency

12    room.

13              And then probably same thing in the

14    emergency room, a lot of these folks might

15    try to sign out against medical advice, that

16    they probably would have to be held against

17    their will on a hold until a mental health --

18    excuse me -- a mental health professional

19    could assess them and make a determination of

20    how to keep them safe.

21              And in an emergency room setting --

22    I've worked in many -- emergency room

23    physicians are real quick to give emergency

24    medications and to use seclusion and

25    restraints if and when needed.
```

1      Q   Would the community health provider

2 seclude and restrain that patient?

3      A   If needed, yes. Or the police or

4 the hospital security or all the above.

5      Q   So I'm just trying to understand

6 the kind of care Mr. Folks would have

7 received if he were in a community health

8 facility as opposed to being at LSP.

9      Do you believe that that care would

10 have been different if he were held at a

11 community health facility?

12      A   Could you define -- I need to

13 really get my head around how you're defining

14 community health facility.

15      Are you saying a hospital, are you

16 saying a psychiatric hospital, are you saying

17 a medical hospital, are you saying an

18 emergency room?

19      I need to understand how you're

20 defining a community health facility.

21      Q   In your report, you use the term

22 "community health standard."

23      Is that right?

24      A   If you can draw my attention to

25 where.

Joseph Penn, M.D. - June 11, 2025

Page 155

```
 1        Q    This is on page 34, under numeral
 2   1.
 3             Starting with, quote, "availed to
 4   Mr. Folks was well within accepted community
 5   and correctional health standards."
 6             Do you see that?
 7        A    I'm sorry, I'm having trouble
 8   pulling it up.
 9        Q    Take your time.
10        A    You said page 34?
11        Q    Thirty-four.
12        A    Okay.  I see it.
13        Q    What did you mean by "accepted
14   community and correctional health standards"?
15        A    Okay.  So if Mr. Folks was engaging
16   in severe self-harm, like he did in the
17   Parish Jail, and also in the Angola LSP
18   facility, in the community he probably would
19   have been sent to an emergency room.
20             Whether he was seen in a primary
21   care, like a family medicine, or primary
22   community health clinic, is what I'm trying
23   to say, or if he was seen in a mental health
24   center or if he was -- he would have probably
25   been sent to an emergency room by police,
```

Joseph Penn, M.D. - June 11, 2025

Page 156

```
 1    restrained, given medications and required an
 2    emergency hold or an evaluation for an
 3    emergency hold.
 4           If he was in a psychiatric
 5    hospital, it would probably depend -- I doubt
 6    he would have been in a psychiatric hospital
 7    because of his legal status.
 8           But, hypothetically, if he would
 9    have been placed into a community or
10    profit -- for profit or private psychiatric
11    hospital, he would have been placed in
12    seclusion and restraints.  And whenever he
13    self-harmed, he would have been sent to an
14    emergency room.
15           And then, if he was in a state
16    hospital, same thing, he probably would have
17    been placed in seclusion and restraints.
18           And if he cut or self-harmed
19    seriously, he would have been sent to an
20    emergency room.
21           So that's what I'm referring to,
22    community.  Whether it be local or state,
23    profit, nonprofit, public, VA, the Veterans
24    Administration, same thing, he probably would
25    have been seclusion and restraints.  And if
```

1    and when he cut or self-harmed, he would have

2    been sent to an emergency department.

3         Q    So the type of treatment that

4    Mr. Folks probably would have received in the

5    community is what is considered the community

6    standard, the community health standard?

7         A    So I would not agree with that.

8              I would say each of those

9    facilities probably has a different level of

10   care, different staffing, different mission.

11   It's complicated because Mr. Folks was there

12   for legal issues.

13             Most people that are in all those

14   facilities that I mentioned earlier, that I

15   testified to, they're voluntary, individuals

16   seeking healthcare.  They're not pre-trial

17   detainees.  So -- except for maybe the

18   forensic unit, if they were undergoing, say,

19   a competency to stand trial or competency to

20   stand trial restoration, that would probably

21   be the nearest class of individuals.

22             And I'm prepared to testify today

23   that if Mr. Folks was a pre-trial detainee in

24   a forensic unit undergoing competency to

25   stand trial evaluation and/or restoration and

Joseph Penn, M.D. — June 11, 2025

1     he engaged in the same behaviors of severe

2     self-harm and lethal suicide attempts, the

3     forensic unit would have done exactly what

4     the state prison did.

5          Q     Is there a baseline level of care

6     that must be provided at each of these

7     facilities?

8          A     I'm not sure I understand.  You

9     said baseline.  That's not a term that I'm

10    familiar with.

11         Q     Sure.

12               So I assume that -- and please tell

13    me if you disagree -- if you had a patient

14    like Mr. Folks who were acutely suicidal and

15    threatening to self-harm, that the mental

16    health staff at any of these facilities could

17    just not do nothing.

18               Is that right?

19         A     So the problem with that is a

20    community medical and health facility, heath

21    center, they're probably not going to have

22    mental health staff, so they're going to be,

23    you know, family physicians or nurse

24    practitioners but they're not mental health

25    staff.

Joseph Penn, M.D. - June 11, 2025

Page 159

```
 1              So as soon as they hear suicide,
 2      self-harm, they're going to refer him
 3      elsewhere.
 4              I would say psychiatric hospital,
 5      VA psychiatric hospital or unit, or state
 6      hospital, yes, they are prepared and equipped
 7      and the healthcare staff would do the exact
 8      same thing.  They would do an intake
 9      screening, an assessment, probably by nursing
10      staff, like a nursing assessment, and then
11      mental health evaluations and ongoing mental
12      health and psychiatric evaluations and
13      treatment.
14          Q    When you say they probably would
15      have done those things, is there anything
16      else that they should be doing?
17          A    I understand Mr. Folks took his
18      medications voluntarily.
19              But if Mr. Folks were not to take
20      his medications voluntarily or a similar
21      patient in one of those settings, they have a
22      different way of forcibly medicating people
23      against their will.  There's some nuances
24      that are different in private or public
25      hospitals compared to prison units or prison,
```

Joseph Penn, M.D. - June 11, 2025

1    state prisons.

2         Q    Do these facilities ever -- strike

3    that.

4              Do psychiatric hospitals ever put

5    patients in seclusion and restraints?

6         A    Yes.

7         Q    And when they put a patient in

8    seclusion and restraints, are there standards

9    that would govern what they're supposed to do

10   to that patient?

11        A    Yes.

12        Q    What are those standards?

13        A    So what I understand is, the

14   overarching standard for most hospitals would

15   be the Joint Commission and there's very

16   clear standards that they have.  And I'm not

17   an expert in that, so I don't -- I don't

18   pretend to know their standards.

19             But Joint Commission accredits

20   hospitals and medical and psychiatric

21   hospitals in the community that are not

22   prisons.  And so yes, you would have to

23   comport with their standards and have

24   policies and procedures in place and meet

25   those standards to be able to have a Joint

Joseph Penn, M.D. - June 11, 2025

1    Commission accreditation for your hospital or

2    psychiatric unit.

3        Q    When you say the Joint Commission,

4    what commission are you referring to?

5        A    So that's the name of the

6    organization.  It's called the Joint

7    Commission.

8            It used to be JACO or something

9    like that, Joint Commission for Accreditation

10   for hospital organizations, something like

11   that.  But it used to be JACO, but now it's

12   just called The Joint Commission.

13       Q    Is there a similar type of

14   commission that would set standards for how

15   restraints are used in correctional

16   facilities?

17       A    Not a national commission.  I think

18   every -- every state -- I can only speak for

19   Texas.  I don't know about Louisiana.

20           But I know Texas has a jail

21   commission, the Texas Jail Commission.  And

22   their job is to oversee the standards,

23   hygiene and safety issues regarding jails,

24   because there's like 220 of those in Texas.

25           I don't know if there's a similar

Joseph Penn, M.D. - June 11, 2025

Page 162

1    entity in Louisiana or not.

2            But to answer your question, the

3    only -- there's actually three different

4    entities that accredit jails or prisons.

5            And that would be the American

6    Correctional Association, ACA.  And I believe

7    Louisiana has -- Angola, in particular, has

8    accreditation under ACA.

9            There's also the National

10   Commission on Correctional Healthcare, NCCHC,

11   that's national.

12           And then lastly, such facilities

13   might have CALEA.  It's like something about

14   law enforcement organizations, but that's

15   more for jails.  They get C-A-L-E-O (sic)

16   accreditation.

17       Q    Is it your understanding that these

18   commissions, so the Joint Commission for

19   accreditation and psychiatric hospitals, the

20   ACA, the NCCHC, CALEA, is it your

21   understanding that these commissions set

22   standards that medical professionals are

23   expected to abide by?

24       A    I would say yes.

25           The only one that I'm not certain

Joseph Penn, M.D. - June 11, 2025

1    about is CALEA.  I think it's CALEA,

2    C-A-L-E-A.

3            I know for certain NCCHC does.

4    Joint Commission does.

5            ACA is more correctional in focus,

6    but they do have healthcare standards also.

7            But NCCHC is the only -- to the

8    best of my knowledge, is the only accrediting

9    body that solely provides healthcare

10    standards and healthcare accreditation for

11    jails and prisons nationally.

12        Q    Are they informed by appropriate

13    medical practice, the standards?

14        A    Yes.

15        Q    Are they informed by anything else?

16        A    Yes.

17        Q    Like what?

18        A    Well -- so, for example, during

19    COVID, when we have things that kind of come

20    out of nowhere, like COVID, for example, or

21    transgender, gender dysphoria, things can

22    happen in jails and prisons that people

23    weren't expecting, like multi-resistant

24    tuberculosis, drug -- sorry, multi-drug

25    resistant tuberculosis.

Joseph Penn, M.D. - June 11, 2025

1          So you have entities that you'll

2    only see in jails and prisons.  And so, yes,

3    those, aside from medical practice, you have

4    to think about the illnesses that you see and

5    mainly in correctional settings, like

6    infectious diseases, mental illness, serious

7    mental illness, drug, drug use.

8          So it is informed by medical

9    practice but it's also informed by your

10   patient population and the illnesses that

11   they carry or they have.

12   Q    Are they -- are those statements,

13   are they based on any outside authorities?

14        So for example -- let's just take

15   one in particular.

16        So, for example, the NCCHC

17   standards for the use of seclusion and

18   restraints that you mentioned, is that based

19   on any outside sources?

20   A    Sorry.  Which standards are you

21   referring to, please?

22   Q    You mentioned there were NCCHC

23   standards for the use of seclusion and

24   restraints.

25   A    Well, they -- there -- so there's

1    jail standards, there's -- I've testified to

2    this earlier.  There's jail, prison,

3    juvenile, opioid and mental health standards.

4         So if you can maybe direct me which

5    standard you're referring to, then I can try

6    to answer your question.

7         Q    Let's talk about the prison

8    standards.

9         A    Okay.

10        Q    Are those based on any outside

11   sources?

12        A    So NCCHC, when they update and

13   revise their standards, they do look at best

14   practices in healthcare and it's a

15   multi-disciplinary team of nurses,

16   physicians, that are maybe more primary care,

17   psychiatrists, I've been on several of those,

18   standard revision, task forces, pharmacists.

19        They have different people on those

20   healthcare administrators.  And yes, we look

21   at what are current practices in the

22   community and VA settings and other

23   healthcare settings, yes.

24        Q    Okay.  I'd like to show you a

25   document, which I will enter as -- I believe

Joseph Penn, M.D. - June 11, 2025

1       we are on Exhibit 4.

2                  (Whereupon the above mentioned was

3           marked for Identification.)

4                  THE VIDEOGRAPHER:  We are off the

5           record.

6                  The time is 12:13 p.m.

7                  (Lunch recess taken.)

8                  THE VIDEOGRAPHER:  We are back on

9           the record.

10                 The time is 1:03 p.m.

11      Q    Okay.  Dr. Penn, I was just about

12      to, before we took a break, show you another

13      document, which I am dropping in the chat

14      now.

15                 And I will enter this as Exhibit 4.

16                 Let me know when you have it open,

17      please.

18      A    I'm just waiting for it to

19      populate.

20      Q    Sure.

21                 (Whereupon a discussion was held

22      off the record.)

23      A    Okay.  Got it.  Thank you.

24      Q    Do you recognize this?

25                 Please feel free to scroll through.

Joseph Penn, M.D. - June 11, 2025

```
1           A    Just one second, please.  Sorry,
2     someone is knocking on my door.  I'm just
3     going to mute.
4                (Whereupon a discussion was held
5     off the record.)
6           A    My apologies about that.
7                So "NCCHC, the Standard for Mental
8     Health Services 2015," yes.
9           Q    Okay.  Earlier we had been
10    discussing a few NCCHC standards for mental
11    health in correctional facilities.
12               Is this one of the standards that
13    we had been discussing?
14          A    Yes.
15          Q    Let's turn to Roman V in this
16    document.
17               Do you see under "tank force
18    members," is that your name listed?
19               I think it's fifth or fourth.
20          A    (Witness reviewing.)
21               Yes, I'm on there.
22          Q    So, am I right in understanding
23    that you were part of the group that crafted
24    these standards?
25          A    Yes.
```

```
 1          Q    Let's turn to page Roman Numeral
 2    VII, so V-I-I.
 3               It should be the page that starts
 4    with "Preface."
 5               Do you see the line?  It's the
 6    third paragraph that reads, "These standards
 7    are NCCHC's recommended requirements for the
 8    proper management of a correctional mental
 9    health services delivery system."
10          A    (Witness reviewing.)
11               I'm so sorry.
12               And where do you -- you said the
13    preface?
14          Q    Yes, the preface.
15          A    Okay.
16          Q    It should be Roman VII.
17          A    Okay.  And so what was the line you
18    were asking about or --
19          Q    First sentence, third paragraph
20    down, "These standards are intended for
21    prison -- oh, I'm sorry.
22               Sorry.  Second paragraph down,
23    second sentence, "These standards are NCCHC's
24    recommended requirements for the proper
25    management of a correctional mental health
```

Joseph Penn, M.D. — June 11, 2025

Page 169

1    services delivery system."

2              Do you see that line?

3       A    Yes.

4       Q    What does that mean?

5       A    Okay.  Well, first of all, these

6    standards are outdated.

7              I was actually on the current

8    revision to be coming out in a couple months.

9              So there's going to be kind of, if

10   you will, a new and improved mental health

11   standards.

12             But what is important is, what the

13   standards that apply to a prison would be the

14   prison standards.

15             These mental health standards are

16   meant for mental health facilities in prison

17   settings.

18             So basically -- let me back up.

19             Number 1, the prison system,

20   Louisiana Department of Corrections, is not

21   NCCHC accredited, so they would not, first of

22   all, have to meet these standards.

23             Two, these mental health standards

24   are geared more like, say, Elaine Hunt, which

25   is a dedicated psychiatric facility, or they

Joseph Penn, M.D. - June 11, 2025

Page 170

```
 1    have a psychiatric unit at Elaine Hunt, than
 2    these standards would apply at that facility.
 3             But they would not apply just to a
 4    regular non-mental health facility.
 5        Q    Now, let's look at the third
 6    paragraph, the first line of that.
 7             Do you see where it reads, "These
 8    standards are intended for prisons and jails
 9    of any size?
10        A    Yes.
11        Q    So in light of what you just told
12    me, that these standards are only meant to
13    apply to facilities like Elaine Hunt, what
14    does this sentence mean?
15        A    Sure.
16             So what it means is, if you're --
17    and I guess I need to do a deeper dive.
18             The reason why mental health
19    standards were created was the recognition
20    that more people, like Mr. Folks, that have
21    severe self-harm or cutting or self-injuring,
22    or have a serious mental illness, say, like
23    schizophrenia, which Mr. Folks does not have,
24    but serious mental illness, jails and prisons
25    need to be put on notice that they have
```

Joseph Penn, M.D. - June 11, 2025

Page 171

1      patients that have mental health needs.

2              The -- there were some facilities

3      that could not meet NCCHC accreditation

4      because of their medical or nursing care, but

5      they wanted to meet it for mental healthcare.

6              And so that's kind of what

7      happened, was facilities -- well, I don't

8      know if lobbying would be a good word, but

9      they requested of NCCHC of, hey, if we're

10     providing good enough mental healthcare in

11     our mental health facilities, could we get

12     NCCHC accreditation under the mental health

13     standards.  So they might not meet it for the

14     medical, under the jail or prison standards,

15     but they could meet it under the mental

16     health standards.

17             So I think the new version that's

18     coming out this year will spell that out even

19     more clearly.

20             So -- but it's a moot point because

21     the Louisiana system is not NCCHC accredited.

22         Q    Has the Louisiana state prison

23     system ever sought NCCHC accreditation?

24         A    I don't know.

25         Q    What's the purpose of these

Joseph Penn, M.D. - June 11, 2025

1    standards?

2        A    Well -- the mental health

3    standards?

4        Q    Yes.

5        A    Okay.  Yeah, I just testified to

6    that.

7            They're to help facilities or

8    systems that want to achieve mental health

9    accreditation under NCCHC.  Again, they might

10   not be able to meet it under medical or

11   dental or nursing, but they feel that their

12   mental health services are so robust, that

13   they could meet accreditation under the NCCHC

14   mental health standards.

15           And so that's -- that's kind of

16   like -- it's like a carve out, is the easiest

17   way to think about it.

18           Just so mental health can get kind

19   of their kudos for doing a great job in the

20   event that medical and the non-psychiatric or

21   psychological care is not up to snuff.

22       Q    Let's back up.

23           What is the purpose of having NCCHC

24   standards for any type of facility, so

25   medical standards, mental health standards?

Joseph Penn, M.D. — June 11, 2025

1          A    Sure.

2                Actually, it details it there in

3    the preface, if you refer back to that.

4                It talks about how in the 1970s,

5    the healthcare in jails and prisons in the

6    United States was so abysmal that the

7    American Medical Association partnered and

8    created kind of this nonprofit organization,

9    NCCHC.

10               And so the purpose of having

11   standards is to help facilities know what

12   kind of benchmarks are and to provide

13   guidance to help them develop their policies

14   and procedures and to know, this is what you

15   need to provide just to be able to achieve

16   accreditation.

17         Q    Other than achieving accreditation,

18   are there any other goals that these

19   standards purport to serve?

20         A    Yes.

21         Q    What are those?

22         A    So again, it helps -- it helps, for

23   example, if you have a system where budgets

24   are being cut.  And not to point fingers, but

25   healthcare in prisons and jails is not the

Joseph Penn, M.D. – June 11, 2025

Page 174

1    top priority for a lot of legislators.    And

2    so when there's tight budgets, they can come

3    in and say, you need to cut 10 percent of

4    your staff, or you need to reduce your budget

5    by 10 percent.

6            I've been through two of those in

7    Texas.    So that happens to systems.

8            And so long story short, having the

9    NCCHC or the ACA standards, they help explain

10   to legislators, who are not clinical, or they

11   may be clinical, the need, the why you need

12   to provide healthcare to inmates.

13           And I testified earlier that

14   inmates are a protected class, under the --

15   you know, under the U.S. Supreme Court ruling

16   in Estelle V Gamble.

17           And so it's a way to kind of

18   explain and justify to county commissioners

19   or to budget people of why you need to pay

20   more and have more staff, nursing, medical,

21   dental and other healthcare staff.

22       Q    Earlier, you mentioned that certain

23   prison systems and facilities can seek NCCHC

24   accreditation.

25           Why would a prison seek to do that?

Joseph Penn, M.D. - June 11, 2025

Page 175

```
1        A    As noted in the first page or two

2    of the NCCHC standards and also on their home

3    page, it's a voluntary accreditation.

4             So I testified earlier, Joint

5    Commission, a lot of Medicare, Medicaid and

6    private commercial insurance companies won't

7    pay for hospital care if it's not a Joint

8    Commission accredited hospital.

9             So you have to get Joint Commission

10   accreditation if you're going to bill for

11   your services.

12            Jails and prisons don't bill

13   anyone.  They have to pay for their own

14   healthcare.

15            So again, NCCHC and the standards

16   are a way to help educate prison people, jail

17   people and public policy people of, hey, you

18   need to fund healthcare and healthcare staff

19   and services or else you're going to risk

20   lawsuits and liability.

21       Q    So a prison that has an NCCHC

22   accreditation would be more likely to be able

23   to tell a state government that they require

24   funding for healthcare and healthcare staff?

25       A    It's possible, yes.  But it's not
```

Joseph Penn, M.D. - June 11, 2025

1    definitive.  It's not cause and effect.

2           Like just because you're NCCHC

3    accredited, that doesn't mean you're going to

4    avoid lawsuits, that doesn't mean you're

5    going to get steady funding from your

6    legislature.  It is what it is.  If you have

7    accreditation you've achieved it but it's

8    only good for three years.  And only 10 -- 5

9    to 10 percent of facilities nationally are

10   NCCHC accredited.

11          It's kind of the Rolls Royce.  It's

12   not easy to achieve and every third year you

13   have to reapply to get recertified.  I'm

14   sorry, not certified, reaccredited.

15          So it's a daunting task.  It's not

16   a one and you're done.  You have to do it

17   every three years, similar to ACA

18   accreditation.

19      Q    I'm seeing in the preface, again,

20   these standards have helped correctional

21   facilities improve the mental health of their

22   inmates, increase the efficiency of their

23   mental health services delivery.

24          Do you believe that NCCHC

25   accredited facilities are facilities that

Joseph Penn, M.D. - June 11, 2025

1    comply with NCCHC standards such that they

2    could be accredited, have better mental

3    health services than facilities that don't?

4        A    I'm not sure how you're defining

5    "better."

6            If you can make it more clear, put

7    it into a term that -- we don't really use

8    better in healthcare.

9            So if you can help me.  I want to

10   answer your question but I -- better seems

11   kind of subjective.

12       Q    More effective, is that more

13   objective?

14           How about reduces -- reduces the

15   likelihood of, earlier you had said, rates of

16   mortality -- morbidity, I'm sorry.

17       A    Well, actually, you're probably

18   going ask me about this.

19           There's -- there's a recent study

20   that was just published, the Harvard Study.

21   That's how they refer to it.  They actually

22   proved that I've been very active in NCCHC

23   for 25 years or so.

24           And NCCHC used to kind of

25   promulgate that if you become NCCHC

Joseph Penn, M.D. - June 11, 2025

1    accredited, you have a lower risk of being

2    sued, you know, in state or federal court.

3            But the Harvard study, which I

4    think was published a month or two months

5    ago.  Is now the first study that I'm aware

6    of where Harvard University researchers did

7    an actual scientific study and did look at

8    facilities and they did find that facilities,

9    jails or prisons that were NCCHC accredited,

10   did better with regard to lawsuits and

11   morbidity and mortality and such.

12           But again, this is just one study

13   and it's only been published recently.

14       Q    The NCCHC standards that we're

15   looking at contain a standard regarding the

16   use of seclusion and restraints.

17           Is that correct?

18       A    They do but they're very clear.

19   They define between custody restraints and

20   therapeutic or medical restraints.

21       Q    Just talking about clinical

22   restraints, let's turn to page 133.

23           It won't be 133 in the document

24   because this is just an excerpt but I think

25   you'll see it.

Joseph Penn, M.D. - June 11, 2025

Page 179

```
 1            This is the page that has
 2      "Restraint and Seclusion" at the top.
 3        A    I'm sorry.  What page, please?
 4        Q    It's 133 in the scan, so I'm not
 5      sure what page it would be in the PDF file.
 6            But it has "Restraint and
 7      Seclusion" at the top.
 8            MR. BLANCHFIELD:  Can you tell me
 9        how many page documents this is?
10            I'm not sure I have the right
11        document.
12            MR. SI:  Yeah, I will pull it up on
13        my computer so I can look at it with
14        you.
15        Q    There are 11 pages in the PDF file.
16            MR. BLANCHFIELD:  That's what I
17        have, yeah.
18            MR. SI:  I'm looking at page 10.
19        Q    If you can go to page 10.
20            MR. BLANCHFIELD:  Great.  Thank
21        you.
22        A    I'm there.  Thank you.
23        Q    Is this the NCCHC standard for
24      clinical restraints and seclusion?
25        A    This is the standard for mental
```

Joseph Penn, M.D. - June 11, 2025

Page 180

1      health standards.

2            Again, this is not the standard

3      for -- I just wanted to drive the point home.

4      This document MHI-01 Restraint and Seclusion,

5      this is from the NCCHC Mental Health

6      Standards.

7            This is not the same standards that

8      would be in the jail health standards or the

9      prison health standards.  And those are much

10     more current, as recent as 2018 and 2022.

11           So this is outdated.

12           This document is, number 1,

13     outdated.

14           Two, it's from an incorrect

15     standard.  It's from the mental health

16     standards not the prison standards.  That's

17     what would apply to Louisiana, if they were,

18     in fact, NCCHC accredited.

19     Q    So let's just get your opinion on

20     how some of those jail and prison standards

21     would differ from the standard that we're

22     looking at.

23           Do you see under Compliance

24     Indicators, numbered 1D, "The treatment plan

25     provides for removing patients from

Joseph Penn, M.D. - June 11, 2025

1    restraints or seclusion as soon as possible"?

2         A    Yes, I see that.

3         Q    So what does that mean in this

4    context for the mental health standards?

5         A    Well, again, I need to drive the

6    point home, this is referring to mental

7    health units or a behavioral health facility

8    or an in-patient psychiatric prison unit, not

9    what is going on at the Louisiana

10   penitentiary, state penitentiary at Angola.

11   That is not a dedicated in-patient

12   psychiatric facility.

13              So I don't know if Elaine Hunt is.

14   I -- my sense is, it probably is, if they

15   have more of a mental health designation.

16              But that -- I don't know

17   definitively if that's true.  But the point

18   is, the Angola is not a dedicated behavioral

19   health facility or a in-patient psychiatric

20   prison unit.

21        Q    I just want to get your sense of

22   what the differences are between the

23   standards then.

24              So do you see, under 1D, under

25   Compliance Indicator where it says, "The

Joseph Penn, M.D. — June 11, 2025

Page 182

```
1     treatment plan provides for removing patients
2     from restraints or seclusion as soon as
3     possible"?
4          A    Yes, I see that.
5          Q    Is this different from the jail or
6     prison standard that, in your opinion, would
7     apply to Angola?
8          A    You would have to show me the most
9     current version of the jail or prison
10    standards, and I would be happy to compare
11    those and tell you if they're the same or
12    different or slightly different.
13         Sorry, as we sit here today, I
14    don't know off the top of my head how they're
15    similar or different.  I don't have like a
16    track of changes document, so I could
17    speculate but I think you want to hear my
18    sworn testimony.
19         Q    In your role as a director of the
20    NCCHC, do you expect that the jail or prison
21    standard would be lower than this standard?
22         A    So I'm not a director for NCCHC.
23    I'm -- I serve on the board of
24    representatives.  I've been -- I'm a delegate
25    from the American Academy of Psychiatry and
```

Joseph Penn, M.D. - June 11, 2025

Page 183

1      the Law.  I'm not in any way a director.

2             I do serve on the accreditation

3      committee also but I just wanted to clarify

4      that if you can ask your question a different

5      way, I don't -- I don't want to be

6      mischaracterized.  I don't have any

7      leadership or directorship role for NCCHC.

8      Q    You said in your CV you're on the

9      Commission that's responsible for updating an

10     NCCHC policy.  Right?  I actually don't

11     recall which one.

12     A    So I've been appointed to --

13     they're called work groups.  I believe

14     they're called work groups.

15            But again, I've been appointed as

16     part of a large committee, 10, 15 people, to

17     help review standards.  But again, I'm not in

18     any way in a directorship.

19            I think I was the chair of the

20     juvenile health standards but I'm not in a

21     leadership role in jail or the prison or the

22     standards.  I'm just a committee member.

23     Q    Are you aware of any correctional

24     facilities that are accredited under these

25     standards that we're looking at, the mental

Joseph Penn, M.D. - June 11, 2025

1     health standards for correctional facilities?

2         A    As we sit here today, I think I

3     know maybe of one for certain, but I don't

4     know nationally how many there are and the

5     names of them.   That's not something I'm

6     privy to.

7             When we do reviews on the

8     accreditation committee, the review is

9     blinded, so we never really know the name of

10    the facility.

11            I believe there's a facility in

12    California, in the California Department of

13    Corrections, CDCR and Rehabilitation,

14    Tehachapi.

15            And I can't -- I don't know if I

16    can spell that.   But it's out there.   And I

17    think they've got a mental health

18    accreditation.

19            But I don't believe there's any

20    other facilities.   I could be wrong on that.

21    It changes.

22            Our accreditation committee meets

23    four times a year.   And so, as we sit here

24    today, I know that facility had gone for and

25    achieved mental health accreditation.

Joseph Penn, M.D. - June 11, 2025

1          But I'm not aware of -- I can't

2    recall or I don't have access to any other

3    facilities that have NCCHC mental health

4    accreditation.

5          Q    Is that the -- that Tehachapi

6    facility you mentioned, is that a state

7    prison, a county jail, what kind of facility

8    is that?

9          A    It's a state prison, a CDCR, the

10   California prison system.

11         Q    Just to clarify your testimony

12   earlier about how these standards apply

13   versus the NCCHC jail and prison standards,

14   is there any bar to a facility like Angola,

15   like LSP, to achieving accreditation under

16   these standards that we're looking at?

17         A    I'm not sure I know what you mean

18   by "a bar" or bars.

19         Q    A rule under the NCCHC

20   accreditation system that would say Angola is

21   not the kind of facility that would achieve

22   this kind of accreditation under the mental

23   health standards?

24         A    So I would say I'm -- that would be

25   a question for the director of accreditation

Joseph Penn, M.D. — June 11, 2025

Page 186

1      for NCCHC.

2                  I believe that any jail or

3      prison — well, let me back up.

4                  I don't know.  That's a question

5      for the accreditation director of NCCHC.

6                  I don't know which program is

7      eligible or ineligible for NCCHC

8      accreditation for mental health standards.

9                  I was under the belief that you had

10     to be a mental health facility or unit or

11     have a designated mental health treatment

12     mission, like have a pod or a wing where you

13     have inmates that are mentally ill, similar

14     to like an in-patient facility.

15                 But — so as we sit here today, I

16     don't know if a facility like Angola, which

17     is a state prison, not a mental health

18     facility, or state prison psychiatric

19     facility, I don't know if they can apply for

20     or would be eligible for NCCHC mental health

21     accreditation or not.

22         Q    But to clarify, the Tehachapi

23     facility that you mentioned earlier, that

24     does have accreditation under the standards

25     that is a state prison.  Correct?

Joseph Penn, M.D. - June 11, 2025

1          A      Yes.  I actually have been there

2    and I believe they have psychiatric

3    in-patient.  They have a pod there.  They

4    have dedicated wings that have in-patient

5    psychiatric patients.

6          Q      Just to make sure that we can

7    access the other standards that you were

8    referencing for jails and prisons after this,

9    you mentioned there's a 2018 version of the

10   jail and prison healthcare standards.

11              Is that right?

12         A      I believe.  Don't hold me to the

13   numbers.  I think it's 2015, 2018, and then

14   because of COVID, it kind of got messed up,

15   and I think it's 2022.  And now they're

16   currently updating the jail and prison

17   standards, as we sit here today, and they

18   should be out later this year.

19         Q      Do those standards have -- do those

20   books of standards have standards that apply

21   to the provision of mental healthcare in

22   jails and prisons?

23         A      Yes.

24         Q      Do they also contain standards that

25   are not related to mental healthcare?

Joseph Penn, M.D. - June 11, 2025

1          A    Yes.

2          Q    If you had to estimate, what

3    proportion of the standards in those books of

4    standards are about mental healthcare?

5          A    Five to 10 percent.

6          Q    So is it fair to say that they're

7    primarily related to non-mental health

8    operations in jails and prisons?

9          A    No.  What I would say is, a lot of

10   it has to do with like electronic medical

11   records or written medical records or

12   infection control, like screening inmate

13   workers that work in the kitchen, so they

14   don't have infectious disease or parasites or

15   ectoparasites.

16              There's things in there about

17   pregnant females or credentialing of staff.

18   So there's a lot of kind of administrative

19   things, research, research with inmates,

20   diets, medical diets.

21              So I would say probably 75 to

22   85 percent of that might just generally be

23   medical administration, the need for

24   morbidity and mortality reviews, continuous

25   quality improvement, peer reviews, those sort

Joseph Penn, M.D. - June 11, 2025

Page 189

1      of things.

2               And then they talk about dental,

3      medical, nursing and then mental health.

4               So mental health is probably one of

5      the smallest pieces, maybe 5 to 10 percent,

6      but seclusion and restraints is definitely

7      part of that.

8           Q    There's a policy on seclusion and

9      restraints in that 2018 jails and prisons

10     policy?

11          A    Yes, on clinically ordered or

12     medically ordered seclusion and restraints,

13     yes.

14          Q    Those policies would be different

15     from the ones that we were just looking at?

16          A    I don't know.

17          Q    I'm going to ask you to turn back

18     to your report very briefly.

19               This was Exhibit 3.  I believe on

20     page 37.

21               I will give you a second to get

22     there.

23          A    I'm sorry, page 37?

24          Q    Thirty-seven?

25          A    Okay.  I'm there.

Joseph Penn, M.D. — June 11, 2025

1          Q     In what is labeled as paragraph

2     number 12 here, do you see the sentence that

3     reads, "There are a variety of mental

4     disorders that may be associated with

5     self-harming behaviors.  There are also many

6     instances where individuals engage in

7     self-harm but have no mental disorder."

8               Do you see that?

9          A     Yes.

10         Q     So how do you go about assessing

11    the cause of a person's self-harm?

12         A     Sure.   That's exactly what happened

13    in this case.  There's a medical evaluation,

14    nursing, medical and then medical treatment

15    for the bleeding or self-injury or harm and

16    then a psychological or mental health

17    evaluation followed by a psychiatric

18    evaluation.

19              And so Dr. Gamble looked at all

20    those different issues and he looked at, you

21    know, is there bipolar disorder, is this

22    person manic, are they psychotic, do they

23    have schizophrenia.

24              He kind of went through like a

25    laundry list in his head of different

Joseph Penn, M.D. - June 11, 2025

1    diseases or disorders, mental disorders that

2    might be associated with self-harming

3    behaviors.

4         And Dr. Gamble validated the past

5    diagnosis of borderline personality disorder

6    and then he gave another diagnosis, which is

7    kind of new.  It's only been in the DSM for a

8    bit.  It's the impulse control.

9         It used to be impulse control

10   disorder not otherwise specified.  It's got a

11   fancy new title.

12        But anyway, Dr. Gamble diagnosed

13   Mr. Folks with those two in addition to

14   antisocial personality disorder.

15        Q    You wrote earlier that you

16   concurred with Dr. Gamble's diagnosis of

17   borderline and antisocial personality

18   disorders.

19             Is that right?

20        A    Yes.

21        Q    What's your opinion on the impulse

22   control and specified disorder?

23        A    Yes.  If I may, I think the

24   borderline personality disorder, the thing

25   that raises questions in my mind, I think

Joseph Penn, M.D. - June 11, 2025

Page 192

```
 1      while he's incarcerated, while Mr. Folks is
 2      incarcerated in the Louisiana system, he
 3      definitely met criteria for borderline
 4      personality disorder but it's atypical.
 5      He -- when he was incarcerated in Texas --
 6      I'm blanking on the name of the county jail,
 7      he was in two county jails in Texas, I think
 8      Brazoria county jail and I think Harris
 9      county jail.
10              At neither of those facilities did
11      he cut or self-harm or engage in suicide
12      attempts, and so that's kind of atypical.
13              And number 2, ever since he's been
14      out of the community, which I think has gone
15      on a year, year and a half or longer, he's
16      not -- he endorsed to me that he is not
17      cutting or self-harming or mutating and has
18      had no suicide attempts.
19              So that, I do agree -- under oath,
20      I testified that I do concur with Dr. Gamble
21      on the antisocial personality disorder, on
22      the impulse control disorder you asked me
23      just a second ago, and the borderline
24      personality disorder but it's just atypical
25      that, if anything, it shows how stable he is,
```

Joseph Penn, M.D. — June 11, 2025

```
 1    that he is not cutting or self-harming.  And
 2    that's despite not being on any psychotropic
 3    medications and not being in any mental
 4    health treatment in the community for more
 5    than a year.
 6          So I just raised the question mark
 7    about the borderline personality disorder
 8    because you would expect him to continue to
 9    cut and self-harm and mutilate whenever he is
10    stressed or upset or having a relational
11    issue, even after his release from prison.
12          So, anyway, that's just -- that's
13    getting way in the weeds but I just wanted to
14    make that point.
15       Q    But it's ultimately your testimony
16    that Mr. Folks had and has borderline
17    personality, antisocial personality and
18    impulse control disorders?
19       A    Yeah, both.  And you just said
20    borderline.  I would say borderline
21    personality disorder, yes, and the other two
22    that you mentioned, I agree with those, all
23    three.
24       Q    So backing up from Mr. Folks and
25    just talking about your expertise as a
```

Joseph Penn, M.D. - June 11, 2025

1    psychiatrist in general, how do you go about

2    assessing the cause of a person's self-harm?

3        A    Right.

4            So I'm trained both in adult

5    psychiatry and child psychiatry and forensic

6    psychiatry, so whenever I look at that,

7    there's some conditions that start as young

8    as childhood and infancy.  There's a

9    condition called Lesch-Nynan -- I think it's

10   spelled L-E-S-C-H  N-Y-N-A-N -- where young

11   kids will bite themselves repeatedly and

12   self-harm.  It's a metabolic or genetic

13   disorder.

14           There's children, adolescents, that

15   have severe autism, autistic spectrum or

16   autism, autistic spectrum disorder, autism,

17   and they might head bang, they might punch

18   themselves or bite themselves repeatedly.

19           So you kind of have to look at

20   everything, from childhood, adolescence.  In

21   there, we see kind of the onset of borderline

22   personality where both males and females,

23   mainly females, though, will cut or self-harm

24   whenever they're upset or distressed.

25           And then, the same thing as adults,

Joseph Penn, M.D. – June 11, 2025

1    people will engage in self-injurious

2    behavior.

3            And then you need to consider

4    malingering or fictitious disorders, where

5    people will cut or self-harm or engage in

6    suicide or threaten suicide to avoid

7    prosecution or to maybe go to a psych

8    hospital instead of going to a jail or

9    prison.

10            So those are some examples. I'm

11    probably missing a bunch. But those are

12    examples of mental disorders that I would

13    consider, in my differential, when thinking

14    about self-harming behaviors.

15            And then, in particular, in jails

16    and prisons, we have people that repeatedly,

17    like Mr. Folks, cut, self-harm, mutilate,

18    injure their genitals, anucleate their eye,

19    cut open their abdomen, insert things into

20    their anus or their penis and urethra, and do

21    all sorts of -- swallow razor blades, like

22    Mr. Folks used to do.

23            We have all that and above. And so

24    those sometimes -- and that gets to the

25    second sentence, many of those individuals

Joseph Penn, M.D. - June 11, 2025

1    may not even have a -- meet criteria for

2    mental disorder.  They're doing that for

3    either medication or for a diagnosis, like

4    disability, or location seeking where they

5    want to go to an air conditioned facility or

6    they're following a loved one or they're

7    trying to get to a different prison where

8    they can engage in antisocial behavior.

9         So there's a lot of reasons why

10   people self-harm or engage in self-harming

11   behaviors.

12        Q    There was a lot there.  I want to

13   doublecheck.

14        You are of the opinion that

15   borderline personality disorder is one

16   potential cause of self-harming behavior.

17        Is that right?

18        A    Yes.

19        Q    You mentioned that in jail and

20   prison settings, you have many instances of

21   prisoners who self-harm because they have

22   some other motivation other than a mental

23   disorder?

24        A    If I can clarify, they may or they

25   may not have mental disorder.  Sometimes

Joseph Penn, M.D. — June 11, 2025

1    their mental disorder might be stable.  Like

2    they could have had methamphetamines, you

3    know, addiction or depression or bipolar.

4    And it has nothing to do with why they're

5    cutting or self-harming.  They're trying to

6    go to a different facility to get air

7    conditioning or they're trying to —— they're

8    about to leave the prison and they want to

9    get on disability so they can get money.  So

10   there's a lot of different reasons why people

11   self-harm.

12        Q    How do you make that assessment,

13   whether somebody is self-harming because of a

14   mental disorder that they have, for example,

15   borderline personality disorder versus

16   self-harming because they want to get

17   disability benefits?

18        A    So I —— I would employ the same

19   methodology or skills that Dr. Gamble did,

20   which is basically to do a diagnostic

21   evaluation and interview of the patient to

22   review their chart or record, which is what

23   Dr. Gamble did, to talk to collateral people

24   that know history on the individual.  And

25   that's exactly what Dr. Gamble did.

Joseph Penn, M.D. – June 11, 2025

1          So I would look at all of the above

2     and -- say you want to do a thorough

3     evaluation and then you probably want to see

4     the person over time, that's exactly what Dr.

5     Gamble and the mental health staff at the

6     facility did.

7          Q    Back to Mr. Folks specifically.

8               What is your understanding of why

9     Mr. Folks self-harmed -- why Mr. Folks

10    self-harmed?  Apologies.

11         A    As I understand, and I think Dr.

12    Gamble would know the best because he has the

13    longest treatment relationship with

14    Mr. Folks, for many, many years, and he saw

15    him before at Elaine Hunt and then saw him

16    again at Angola.

17              What I understand from Dr. Folks --

18    oh, sorry -- Dr. Gamble was the reason why

19    Mr. Folks cuts or self-harms, is he does that

20    when he's upset, he does that as a way when

21    he is feeling that he has to prove himself,

22    like his back is up against a wall and he's

23    going to prove it to others that he's in

24    control.

25              And I think my expert report is

Joseph Penn, M.D. - June 11, 2025

1     replete with records of Mr. Folks making

2     direct threats or statements that if he

3     didn't get his way, he would engage in

4     self-harm or -- so it's conditional.  It's

5     based on, if I don't get my way, I'm going to

6     cut or self-harm.  So that's what I base that

7     on.

8         Q    Are those motives for

9     self-harming -- so when Mr. Folks was upset,

10    when he felt the need to prove himself, are

11    those motives inconsistent with the self-harm

12    being caused by his borderline personality

13    disorder?

14        A    So what I would say is, it's

15    possible that it could be caused by the

16    borderline personality disorder.

17         But the fact that he is now in the

18    community, in the free world, is not in any

19    mental health treatment, is not on any

20    psychotropic medications, he's actively

21    working and is going once a week to the jail

22    to do community service, that's very

23    stressful.  He's in a relationship with a

24    girlfriend.  He lives with her.

25         Someone with borderline personality

Joseph Penn, M.D. - June 11, 2025

1    disorder, they would continue to have mood

2    lability, changes in their mood state, and --

3    and so the point I'm trying to make is, for

4    whatever reason, he's not showing his

5    borderline personality pathology in the

6    community right now.

7         Q    Are you aware of any instances in

8    which Mr. Folks has been secluded or

9    restrained, either clinically or for

10   disciplinary reasons, after August 2022?

11        A    I would have to look at my report

12   to clarify of when he was released from -- I

13   think he was in death row, if I'm not

14   mistaken.  I think that was the last place he

15   was housed before he went back to the

16   community or he might have gone to the Parish

17   Jail.  I don't recall the dates.

18        Q    Are you aware of any incidents of

19   Mr. Folks being held in seclusion and

20   restraints after he was released from Angola?

21        A    I don't believe so.

22             According to my interview with

23   Mr. Folks and interviews with Dr. Gamble and

24   record review, I don't recall any further

25   restraints, that's fair.

Joseph Penn, M.D. - June 11, 2025

```
 1         Q    So to clarify, earlier I think I
 2    gave you the wrong date.  I said August of
 3    2022, I meant August of 2021.
 4              So after Mr. Folks had been
 5    secluded and restrained for several periods
 6    over the course of 2021, you're not aware of
 7    any incidents in which he was again secluded
 8    and restrained?
 9         A    So I would need to look at my
10    report to verify that.
11              I generally recall that he
12    improved.  He transitioned from four point to
13    two point to no restraint and then was, I
14    think, transferred to death row, even though
15    he's not a death row inmate, he served his
16    sentence and then he was released.
17              To the best of my knowledge, he did
18    not require any subsequent restraints
19    after -- after the extreme suicide watch
20    period where he was in and out of restraints.
21         Q    Let's turn to something you said in
22    your report on page 35.  This is paragraph 4.
23              You said that, quote, "Mr. Folks
24    has a clear and distinct pattern of repeated
25    intentional, planned, methodical and
```

Joseph Penn, M.D. - June 11, 2025

1    purposeful pattern of recurrent, severe and

2    potentially lethal self-injury.

3          Is that right?

4    A    Yes.

5    Q    Is that consistent with your

6    earlier testimony that you believe Mr. Folks

7    self-harmed when he was upset and needed to

8    prove himself?

9    A    Yes.  He -- he very carefully --

10   and I learned this from my interview with Dr.

11   Gamble, that Mr. Folks was a master or an

12   artist, if you will, at being able to get a

13   hold of items, even on a suicide watch and

14   even when his cell was monitored for any

15   items that he could use for self-harm, he was

16   able to get a hold of items and screws,

17   paperclips, razor blades.  It's possible that

18   maybe sometimes he was upset or angry and

19   that's why that impulse control diagnosis

20   would -- is valid and accurate.

21          And it is also possible, at the

22   same time, that he became upset or angry or

23   frustrated and that would go along with the

24   borderline personality disorder.

25          But there were also clear episodes

Joseph Penn, M.D. - June 11, 2025

1    where he purposefully and methodically

2    inserted a toothbrush that he had whittled

3    down to where it was very sharp, a plastic

4    toothbrush, through the anterior portion of

5    his throat.

6            There's other clearly -- like when

7    he stabbed himself in the abdomen and

8    perforated his bowel with a metal object,

9    those are very clear intentional, planned,

10   methodical, where the records that I

11   reviewed, he was not angry or upset or out of

12   control prior to doing those things.

13       Q    So, when you say that those

14   incidents of self -- sorry.  When you say

15   that those episodes of self-harm were

16   intentional, planned, methodical and

17   purposeful, is it your testimony that they

18   were not a result of any mental disorder

19   diagnosis?

20       A    There's no clear DSM-5 diagnosis

21   that has severe self-harm or severe

22   mutilation, except for borderline personality

23   disorder.

24            What I would say is, Mr. Folks has

25   both.  He has antisocial personality

Joseph Penn, M.D. - June 11, 2025

Page 204

```
 1      disorder, which means he disregards the

 2      rights of others and societal norms.  He

 3      steals and shoplifts and takes things,

 4      without any kind of personal accountability.

 5      He also does have borderline personality

 6      disorder, so I think it's a combination of

 7      both.

 8           He -- it's almost like he is, okay,

 9      I will show you, you're not giving me what I

10      want, you're not letting me go back into the

11      nursing area, when I first came in, so I will

12      show you.  And same thing, he kept wanting to

13      go back to St. Mary's, the Parish Jail,

14      there's quotations in my report, and Dr.

15      Gamble also, in his deposition, where he

16      repeatedly stated, if I don't get to go back

17      to St. Mary's, then I'm going to do A,B and

18      C.

19           There's also records where

20      Mr. Folks threatened to kill or bomb, I

21      think, a judge.

22           So Mr. Folks clearly has problems

23      with making poor choices, in my opinion, are

24      related to his antisocial personality

25      disorder, but he also has co-occurring
```

Joseph Penn, M.D. - June 11, 2025

Page 205

1      borderline personality disorder.

2            So I think the combination of the

3      two, in my opinion, are why he engages in

4      these behaviors.

5      Q    So it is your testimony that a

6      combination of Mr. Folks' borderline

7      personality disorder and his antisocial

8      personality disorder were responsible for his

9      self-harm?

10     A    And the third diagnosis, the

11     impulse control disorder.  I would say yes,

12     all three of those were the causal or

13     precipitants for self-harm.  That's fair.

14            MR. SI:  I think we've been on for

15          almost another hour.  So why don't we

16          take a five-minute break off the record.

17            THE VIDEOGRAPHER:  We are off the

18          record.

19            The time is 1:58 p.m.

20            (Brief recess taken.)

21            THE VIDEOGRAPHER:  We are back on

22          the record.

23            The time is 2:06 p.m.

24     Q    Dr. Penn, I know you have a hard

25     out in a little bit, so I'm going to try to

Joseph Penn, M.D. - June 11, 2025

1    get through the last set of questions as fast

2    as possible but we're nearing the end here,

3    so please bare with me.

4         A    Thank you.

5         Q    I will show you one last document.

6    What I hope will be the last document, which

7    I will enter as Exhibit 5.

8              (Whereupon the above mentioned was

9         marked for Identification.)

10        Q    The file is a bit large.  I expect

11   that this might take a second.

12             Let me know when you have that

13   open, please.

14        A    It's taking a while, sorry.

15        Q    I figured.

16        A    Now we've got it.  Very good.

17   Thank you.

18        Q    Do you recognize this document?

19             Feel free to scroll through.

20        A    Yes.  This is that book that I

21   mentioned earlier.  Yes, I recognize this.

22        Q    Earlier, you testified this was a

23   book that you co-authored as a part of your

24   work on an APA work group.

25             Is that right?

Joseph Penn, M.D. - June 11, 2025

1        A    Yes.

2        Q    You testified that you had input

3    into the whole book.

4             Is that right?

5        A    Right.  All the authors were

6    supposed to have read the book, start to

7    finish, but we were each -- like the chair of

8    the committee, Bob Tressman, kind of asked,

9    does anyone have a real interest in a

10   particular topic or content area.  And so we

11   would write those areas and then the whole

12   group looked at the whole document.

13       Q    I believe you testified that you

14   were responsible for, among other sections,

15   the self-harm and self-injury section?

16       A    I think so.

17            I know for certain I was the one

18   with the psychotropic medication, abuse and

19   diversion and misuse.  This was a long time

20   ago.  I don't remember -- how many years ago

21   was this?

22       Q    I believe this was -- is it 2014,

23   2016?

24       A    2016, yes.  So my memory is a

25   little vague on that.

Joseph Penn, M.D. - June 11, 2025

Page 208

1          Q    Would you mind going to page -- I

2    think it's page 17 in the PDF.  I'm sorry,

3    page -- the document is being a little slow

4    for me as well.  Page 16 in the PDF.

5              You should see on the right-hand

6    side a section titled "Non-Suicidal

7    Self-Injury."

8          A    (Witness reviewing.)

9              Yes.

10         Q    If you need to, please feel free to

11   skim through, but is this one of the sections

12   that you primarily authored?

13         A    I believe so.

14             Again, this is like 15 years ago or

15   something like that, so I remember having

16   significant input into this section, yes.

17         Q    Just to confirm, we're looking at

18   the page that's numbered 43 in the scan.

19             At the top right, there on that

20   same page in the top right, do you see the

21   page number 43?

22         A    Yes.

23         Q    Thank you.

24             MR. BLANCHFIELD:  I'm sorry, I --

25             the document I have is only 33 pages.

Joseph Penn, M.D. - June 11, 2025

```
1              MR. SI:  That's correct, Drew.  I'm
2        referring to in the scan, the page
3        that's actually scanned in the book is
4        43 at the top right.
5              Do you see that, on page 16 of the
6        PDF?
7              MR. BLANCHFIELD:  Perfect.  Yes.
8        Thank you.
9              MR. SI:  Great.
10       Q    Dr. Penn, do you mind scrolling up
11   one page from that page we were just
12   discussing, please.
13             This should be the section titled
14   "Trauma and Post-Traumatic Stress Disorder"?
15       A    I'm sorry.  My scroller, I'm having
16   issues here.
17             I'm sorry, what page again?
18       Q    Yeah.  This is page 15, in the PDF.
19       A    Thank you.
20       Q    On the right-hand side, there's a
21   section titled "Trauma and Post-Traumatic
22   Stress Disorder."
23       A    Yes.
24       Q    Is this a section that you had
25   substantial input into?
```

Joseph Penn, M.D. - June 11, 2025

1          A    I made comments and I suggested

2     edits, but I don't recall.  It wasn't like my

3     lead.  That wasn't like my assignment.

4          Q    Do you see the sentence, in the

5     last paragraph of this page, that reads, "The

6     use of seclusion, restraint or forced

7     medication raises special concerns in the

8     context of trauma histories"?

9          A    Yes, I do.

10          Q    And the next sentence, "These

11     methods of control may inadvertently

12     re-traumatize inmates who had similar

13     experiences in the past both in and out of

14     institutional settings."

15          A    Yes.

16          Q    What does that mean?

17          A    So, again, I think we're under a

18     word count.

19               I think the point being, if someone

20     had a trauma history, let's say someone is a

21     victim of rape or some other -- I would say

22     rape or kidnapping, probably some serious,

23     like, traumatic event like that, if they are

24     being held by custody staff or by other

25     inmates, it's possible that they might

Joseph Penn, M.D. - June 11, 2025

1    have -- that it could kind of bring back

2    memories of past traumatic events.

3            And so, for example, like if

4    someone was a victim of childhood sexual

5    abuse and they are being sodomized or being

6    raped while in prison, that might kindle or

7    bring back previous traumatic events.

8            So yes, that's certainly possible.

9    It's a possible thing but it's not cause and

10   effect.  No everyone that has had seclusion

11   or restraint or forced meds, who has a trauma

12   history, and that's why it's very important

13   the word "may," these methods of control may

14   inadvertently re-traumatize.

15       Q    In past instances of seclusion and

16   restraint, clinical seclusion and restraint,

17   be considered a trauma history under this

18   statement?

19       A    I'm sorry, I didn't understand the

20   question.

21       Q    So if an inmate had experienced

22   clinical seclusion and restraint in the past,

23   can that be considered a traumatic event that

24   might be triggered by later seclusion and

25   restraint?

Joseph Penn, M.D. - June 11, 2025

Page 212

```
 1        A    So I would say it's possible, in
 2    theory.
 3             But in my experience, most
 4    individuals that go into jail or prison, they
 5    are restrained.  They are handcuffed.
 6    They're put in shackles, leg irons, whatever
 7    you want to call it.  And they don't
 8    immediately have flooding or PTSD symptoms.
 9    So I think it varies and depends.  And again,
10    it's not cause and effect.
11        Q    You conducted an evaluation of
12    Mr. Folks.
13             Is that right?
14        A    Yes.
15        Q    During that evaluation, did you
16    consider any possible trauma history that
17    Mr. Folks might have had?
18        A    Absolutely.  Yes.  And I went into
19    great detail asking him about his childhood,
20    his placement into foster care.  I asked him
21    about past sexual abuse, physical abuse,
22    exposure to domestic violence or other
23    traumatic events.
24             I specifically asked him if he'd
25    ever been a witness to shooting, stabbing,
```

Joseph Penn, M.D. - June 11, 2025

Page 213

1    killing or anything, and he denied all of the

2    above.

3         Q    Did you ask about his past

4    experience before LSP with clinical seclusion

5    and restraint?

6         A    Yes.

7         Q    What did he tell you?

8         A    Yes.  So again, I've worked in

9    juvenile correctional systems previously and

10   I continue to do that now in my current

11   position.

12             And I did ask him about juvenile

13   correctional involvement.

14             And I understood from him that he

15   had been incarcerated and placed in at least

16   two Louisiana -- and this is in my report --

17   juvenile correctional facilities.

18             And I don't know where it is in my

19   report but that he had been -- had seclusion

20   and restrained in those facilities.

21        Q    Did you consider the possibility

22   that those incidents of seclusion and

23   restraint, when Mr. Folks was a juvenile,

24   could have been traumatic?

25        A    Yes.

Joseph Penn, M.D. - June 11, 2025

Page 214

1          Q    Given you concluded that Mr. Folks

2     did not have PTSD, is it correct to assume

3     that you ruled out that possibility?

4          A    Yes.  So based on my review of the

5     totality of all the information available,

6     Mr. Folks' mental health records, my

7     interview of Dr. Gamble, which I conducted

8     after I had evaluated Mr. Folks, and my

9     review of Dr. Glenda Meyer's expert report --

10    and I neglected to mention this earlier, I

11    did skim Dr. Glenda Meyer's deposition.  I'm

12    not sure if I read it in detail, but I did

13    skim it.

14               So based on the totality of all

15    that, yes, I did consider that.

16               But in my professional opinion, as

17    we sit here today, I am unable to determine

18    that that previous report, because those

19    records aren't available, and I would gladly

20    review those if available but those records

21    are not.

22               But based on my evaluation and

23    based on my interview of Dr. Gamble and all

24    the other records, at this time it's not

25    possible, in my opinion, to determine that

Joseph Penn, M.D. - June 11, 2025

Page 215

```
1     any seclusion and restraint while
2     incarcerated as a juvenile in the Louisiana
3     system resulted in, number 1, PTSD, or two,
4     traumatized or caused a re-traumatization
5     when Mr. Folks was in the Angola state
6     penitentiary.
7          Q    Is it possible that juvenile
8     seclusion and restraints could induce PTSD?
9          A    It is possible.  But I found no
10    evidence of that in my evaluation of
11    Mr. Folks.
12         Q    Okay.
13         A    Further arguing against it was the
14    history that Mr. Folks provided that he had
15    been incarcerated in South Carolina for three
16    years and during that period of time had no
17    seclusion and restraint, had no psychotropic
18    medications, treatment did not require any
19    psychiatric hospitalizations or transfers.
20             So he did very well when he was in
21    the Louisiana -- sorry, when he was in the
22    South Carolina correctional system.
23         Q    During that time, from your
24    understanding, he was not placed in seclusion
25    and restraint.
```

Joseph Penn, M.D. - June 11, 2025

Page 216

1              Is that right?

2         A    Mr. Folks did not report that he

3    required seclusion and restraint in either

4    the South Carolina correctional system nor,

5    as I testified to earlier, the Brazoria

6    county jail or the Harris county jail in

7    Texas.

8         Q    Would you mind turning to page 22

9    in that same exhibit.  Page 22 in the PDF

10   file.

11        A    Yes, I have it up.  Thank you.

12        Q    Do you see the section titled

13   "Seclusion and Restraint" on the left?

14        A    Yes.

15        Q    Is this a section in which you had

16   substantial contributions?

17        A    I could be wrong on this but I

18   think Jeff -- Dr. Jeff Metzner and Dr. Bob

19   Tressman were the leads on this, I believe.

20        Q    Do you see the first sentence in

21   that section that reads, "The principles and

22   guidelines in this report are intended to

23   supplement the standards published by the

24   NCCHC, which require implementation of

25   healthcare-related seclusion or restraint in

Joseph Penn, M.D. - June 11, 2025

Page 217

```
 1     a manner consistent with current community

 2     practice"?

 3          A    Yes.

 4          Q    Are the standards that this

 5     sentence is referring to, do you know if

 6     those standards are the standards we were

 7     looking at, the mental health standards or

 8     the jail and prison standards?

 9          A    I would have to look at the

10     standards.  I think they reference 2014, so

11     that's again very outdated.

12               But I -- I don't -- as we sit here

13     today, I don't know which standards they're

14     referring to.  That could be a position

15     statement.  It could be the standards.  I

16     don't know.

17          Q    They do use the term "standards"

18     here.

19               Is that right?

20          A    I'm sorry?

21          Q    They do use the term "standards"

22     here, the standards published by the NCCHC?

23          A    Yes.

24          Q    I have the book --

25          A    Yeah.  If you want to scroll to the
```

Joseph Penn, M.D. - June 11, 2025

Page 218

1    appendix, it should have a 2014A and 2014B

2    should be listed.

3         Q    Yes, I have the book in front of

4    me.  I don't think I actually included it in

5    the excerpt I gave you but I'm going to

6    doublecheck just out of curiosity.

7         A    I have that book in my office.  May

8    I refer to the book also?

9         Q    Absolutely.  Sure.  Of course.

10   Even better.

11              I can tell you what page that

12   reference is on.

13              And I believe this reference is on

14   76 but feel free to check me on that.

15        A    Thank you.

16              Yes.  So it is the jail standards

17   but that's the 2014 version.  And then it's

18   the prison standards.  Again, the 2014

19   version.

20              And these -- they don't -- this is

21   not citing the mental health standards

22   because that would have been -- that is cited

23   separately.

24              And they refer to -- sorry, 2008,

25   so that's not -- that's not cited here.

1          2014A is the jail health standards

2    and 2014B is the prison health standards.

3          Q    Understood.

4          So back to page 66 of the book, 22

5    of the PDF, this statement that the NCCHC

6    jail and prison standards that we just looked

7    at in the references require implementation

8    of healthcare related seclusion or restraint

9    in a manner consistent with community

10   practice."

11         A    Yes, that's what it says.

12         Q    Is it your understanding that those

13   standards have changed since 2014?

14         A    I don't have an opinion about that.

15   I don't know what the standards were back --

16   I mean, in the community or in corrections in

17   2014?

18         Q    In the NCCHC standards, whether

19   that statement, that seclusion or restraint

20   in prisons and jails should be consistent

21   with current community practice, whether that

22   statement has changed from 2014 afterwards,

23   onwards.

24         A    I'm sorry, I'm not following your

25   question.

Joseph Penn, M.D. – June 11, 2025

Page 220

```
1        Q    So NCCHC standards, according to
2   this, in 2014, say that seclusion or
3   restraint should just be implemented in a
4   manner consistent with current community
5   practice.  Correct?
6        A    Well, no, that's -- I think you're
7   mischaracterizing this.
8             This is what the authors of this
9   book are saying.  That basically you -- if
10  you're going to do seclusion and restraint,
11  you want to follow NCCHC standards, which
12  mirror healthcare practices seclusion and
13  restraint in the community practice.
14            So -- and then they just cite
15  NCCHC, the standards.
16            That's -- that's what I think
17  they're trying to communicate or convey.
18       Q    I think we might have a different
19  understanding of, quote, "which require
20  implementation of healthcare related
21  seclusion and restraint," but that's okay.
22            And when you say the authors of
23  this book, just to make it clear, you are one
24  of these authors.  Correct?
25       A    Yes.
```

Joseph Penn, M.D. — June 11, 2025

Page 221

```
 1         Q     Do you see on page 67 -- this is on
 2    the same page in the PDF but it's on the
 3    right-hand side.
 4              Do you see the line that reads --
 5    and this is in one of the bullet points.  I
 6    think it's the third one down.
 7              "Inmates on clinical seclusion
 8    should be monitored at least every eight
 9    hours with documented wellbeing checks by
10    registered nursing staff."
11         A     Yes.
12         Q     Do you agree with that?
13         A     Yes, I think that's fair.  Wait.
14    Sorry.  With the caveat, if you have 24-hour
15    nursing.  Many facilities don't have 24-hour
16    nursing.
17              Prior to COVID, nursing staffing
18    was a challenge.  And after COVID, it's even
19    become more problematic.
20              So what I would say is, in a system
21    that you do have 24-hour nursing capabilities
22    or coverage, then, yes, ideally, in a perfect
23    world, you should have your nursing staff
24    checking them at least every eight hours.
25         Q     Just to clarify, so registered
```

Joseph Penn, M.D. - June 11, 2025

Page 222

1    nursing staff in that statement, does that

2    mean registered nurses?

3         A    No.   Because it would -- I think

4    that would say -- again, I'm not a nurse, but

5    the way that I interpret this, it could be a

6    licensed practical nurse, it can be a

7    registered nurse.

8              I think we probably should have

9    made that more clear.

10             I think what their -- really, the

11   term should be, should be qualified or

12   licensed -- well, actually, licensed would be

13   a better term than registered.   Because it

14   introduces confusion, like you're bringing up

15   right now.

16        Q    Are you aware of records from this

17   case documenting that Mr. Folks was observed

18   by a licensed professional, medical

19   professional, every eight hours while he was

20   on restraints?

21        A    Sorry.   It's been some time since I

22   looked at the records in their entirety.

23             As we sit here today, I don't

24   recall the frequency with which nursing were

25   documenting.

Joseph Penn, M.D. - June 11, 2025

Page 223

```
1              But I do know that, according to my
2    review, mental health staff were seeing him,
3    I believe, every 12 hours.
4         Q    Do you recall seeing documentations
5    of those reviews from every 12 hours while
6    Mr. Folks was on restraints?
7         A    I believe so.  And I could -- it
8    could be 12 hours, it could be 24 hours, but
9    I do believe mental health was seeing him on
10   a daily basis.
11        Q    When you say mental health, does
12   that include only a licensed nursing staff,
13   as we were talking about before, or does that
14   also include social workers and other staff?
15        A    I'm sorry, I'm not understanding
16   the question.
17        Q    When you say that he was seen by --
18   Mr. Folks was seen by mental health staff at
19   least every 12 hours, when you use the term
20   "mental health staff," who are you referring
21   to?
22        A    So I think I clarified my
23   testimony.  It was either 12 or every day 24
24   hours.
25             What I -- I believe he was being
```

Joseph Penn, M.D. — June 11, 2025

Page 224

1    seen by mental health staff, Master's level.

2         He —— in NCCHC terminology, they

3    refer to them as qualified mental health

4    professionals.  They could be a social

5    worker, they could be a psychologist, they

6    could be a substance abuse counselor, there's

7    a lot of leeway, or they could even be a

8    psychiatrist.

9         So again, we probably should

10   have —— the registered thing here is very

11   confusing.  And I probably would have changed

12   that to licensed or qualified healthcare

13   staff or qualified healthcare professionals.

14   Q    Are each of those visits by

15   qualified mental health staff, either every

16   12 hours or 24 hours, we would expect to see

17   documentation of those.

18        Is that correct?

19   A    I would need to refer to the

20   policy.

21        Again, this is aspirational.  This

22   document is not the policy and procedure of

23   the Louisiana Department of Corrections.

24        This is an aspirational document,

25   written by psychiatrists across the country,

Joseph Penn, M.D. - June 11, 2025

Page 225

1    who work in correctional settings or,

2    alternatively, are monitors for expert

3    witnesses or both.

4            I would need to review the policies

5    and procedures of the Louisiana prison

6    system, and then I could answer your question

7    and tell you if they complied with that

8    policy and if they documented.  That would be

9    something that I would need to review to be

10   able to answer your question.

11   Q    If LSP were complying with the

12   aspirational, as you say, policy here, we

13   would expect to see documentation of mental

14   health checks by qualified mental health

15   staff every eight hours.

16           Is that correct?

17   A    No.  This is -- first of all, this

18   is not a policy.  This is a book.  This is

19   a -- specifically, it's a resource document.

20   And I think it says, nursing staff every

21   eight hours.  That's the aspirational.

22   Remember, I already made the clarification

23   that if you don't have 24-hour nursing, you

24   can't have nurses every eight hours, because

25   you don't have enough staff.

Joseph Penn, M.D. - June 11, 2025

Page 226

```
1              What I would say is, whatever the
2     policy the Louisiana Department of
3     Corrections promulgated, that's what should
4     have happened, whether it be nursing,
5     whatever the frequency be, same thing for
6     mental health staff, whatever the frequency
7     should be, and that should be able to be
8     substantiated by documentation in the
9     healthcare record.
10         Q    On this same page that we were
11    looking at, so page 67 of the book and then
12    page 22 of the PDF, do you see the last
13    bullet, which reads, "Secluded inmates should
14    have access to structured therapeutic
15    programming whenever possible without
16    compromising the security and safety of the
17    institution."
18         A    Yes, I see that.
19         Q    It's the last bullet.
20         A    Yeah.
21         Q    What is structured therapeutic
22    programming?
23         A    So that's a Jeff Metzner.  He's
24    a -- frequently monitored.  That's pretty
25    much a hundred percent of what he does.
```

Joseph Penn, M.D. - June 11, 2025

Page 227

1          He doesn't actually work in jails

2     or prisons.  He's been a monitor for most of

3     his career.

4          And I have tremendous respect for

5     Jeff.

6          But in my opinion, he's missing the

7     boat.  Because the wording is, should have

8     access.

9          So secluded inmate, like Mr. Folks,

10    who is potentially lethal of trying to kill

11    himself, you have to weigh the risk of

12    killing himself versus the benefit of him

13    being in this structured therapeutic

14    programming.

15          So absolutely, once Mr. Folks is

16    safe and not cutting, not trying to kill

17    himself, not trying to stab his abdomen with

18    a metal instrument or cut his throat with a

19    toothbrush, absolutely.  Then once he's safe,

20    he can have access to structured therapeutic

21    programming.

22          Now, the problem with that is --

23    see, again, remember, he's a pre-trial

24    detainee.  So I'm not -- you know, an example

25    of a structured therapeutic programming would

Joseph Penn, M.D. - June 11, 2025

1       be out of cell group therapy.  You can't do

2       group therapy with N of one.  So again --

3       with one -- sorry, with an N of one.  With a

4       sample size of one person.  You can't do

5       group therapy with one person.

6              So again, this is meant to be

7       pie-in-the-sky, aspirational, whenever

8       possible, should have access, whenever

9       possible.  Those are the key verbiage.

10             But every patient in a correctional

11      system, you have to take it on a

12      patient-by-patient basis.

13             And in my professional opinion, the

14      Louisiana system and Dr. Gamble, they saw the

15      risks that Mr. Folks presented by his history

16      and by his repeated pattern of severe

17      self-harm.  And they said, We need to

18      mitigate those risks and keep him safe.  And

19      then once he's stabilized, through therapy,

20      through seeing Dr. Gamble, through the four

21      psychotropic med -- three or four medications

22      he was on, he improved and then he was able

23      to be afforded out of cell time and be in a

24      less restrictive housing setting.

25             Q    Other than group therapy, are you

Joseph Penn, M.D. - June 11, 2025

Page 229

1     aware of any other types of structured

2     therapeutic programming that this section

3     could be referring to?

4          A    Yes.

5          Q    What are those?

6          A    Yes.   So that -- and I testified to

7     this earlier.

8               That would be things like

9     recreation, out in the day yard, outside or

10    in the dayroom, recreation, eating, chow,

11    eating in the dining room -- dining hall,

12    rather, being able to have a job, being able

13    to go to school or have some education or

14    vocational programming.

15              So those are all examples of

16    therapeutic programming.

17              The structure implies that there

18    needs to be some predictability, like you

19    have a week-to-week schedule, like Mondays

20    you can have this, Tuesdays you have that.

21              But again, as I testified to

22    several times, the problem was he is a

23    pre-trial detainee and he can't intermingle

24    with state prisoners because of his legal

25    status of being pre-trial or being a jail

Joseph Penn, M.D. - June 11, 2025

Page 230

1     detainee.

2          Q    Is there any structured therapeutic

3     programming that would not require someone

4     like Mr. Folks to intermingle with the

5     general population?

6          A    Yes.

7          Q    What are those?

8          A    I would say individual

9     psychotherapy or counseling.  That would

10    probably be the main thing.

11              He could probably have access to a

12    dayroom by himself or recreation by himself.

13              But again, that would be up to

14    custody staff and that would be a decision

15    that would be clinically determined once

16    Mr. Folks is safe and has demonstrated that

17    he is safe and no longer at risk for killing

18    himself.

19         Q    Are you aware of any individual

20    structural therapeutic programming that was

21    offered to Mr. Folks while he was secluded?

22         A    So Mr. Folks was seen by

23    psychiatrists with 20 years of experience.

24    He was seen by mental health staff.

25              So yes, he did receive therapeutic

Joseph Penn, M.D. - June 11, 2025

1    treatment efforts but I'm not prepared to say

2    it was structured because, like I said

3    earlier, he wasn't out of his cell, he wasn't

4    in a dayroom, he wasn't in group therapy

5    because he was at eminent risk of killing

6    himself.

7        Q    He didn't receive individual

8    psychotherapy, correct, or counseling?

9        A    I believe that when the staff --

10   the mental health staff were evaluating him,

11   cell side, every day while he was in the

12   extreme suicide watch, in my opinion, that

13   would be psychotherapy.  They're trying to

14   work with him and to help stabilize him and

15   do suicide safety planning with him.

16       Q    Earlier, you testified that most of

17   those cell side suicide watch checks were

18   conducted by nursing staff and not by

19   psychiatrists.  Right?

20       A    No.  I think what I said was --

21   what I understand from the record and from

22   Dr. Gamble was, nursing were checking on him

23   periodically, mental health staff was

24   checking on him, I believe, at least daily

25   and then Dr. Gamble saw him for his

Joseph Penn, M.D. — June 11, 2025

Page 232

```
1     psychotropic reevaluations for medications
2     and for periodic psychiatric evaluations,
3     that's what I understood.
4            So he was being seen by three
5     different sets of professionals.
6     Q     Just to be sure I'm understanding
7     you, is psychotherapy something that can be
8     performed by somebody who is not a
9     psychiatrist?
10    A     Absolutely, yes.
11    Q     Let's talk about those visits with
12    Dr. Gamble and the other mental health staff
13    you mentioned.
14           How long would these visits
15    typically last?
16    A     I don't have the numbers.  I don't
17    have -- I don't think they wrote down the
18    duration in the notes.  I could be wrong.
19    Q     In your experience, when you have
20    observed cell side suicide watch check-ins,
21    how long do these last?
22    A     A few minutes.
23    Q     More than five minutes?
24    A     Not typically, no.
25    Q     So less than five minutes?
```

Joseph Penn, M.D. - June 11, 2025

Page 233

```
1        A    Yes.
2        Q    Less?  We don't have to get more
3    specific than that.
4             What about how they're conducted.
5             So are these face-to-face?
6        A    Yes.
7        Q    Is it face-to-face in the same
8    room?
9        A    No.  The inmate is in the cell on
10   suicide watch and the clinician, either the
11   nurse, the psychologist or other mental
12   health professional or the psychiatrist,
13   typically these are done by Master's levels
14   social workers or Master's level therapists.
15   They're coming by.  They're standing at the
16   cell front.  They're talking to the inmate
17   directly and trying to not talk in a loud
18   voice, so other individuals might not
19   overhear the conversation.
20       Q    So is your opinion that a check-in
21   that is conducted while a patient is on
22   restraints, for less than five minutes,
23   through a cell, can be considered
24   psychotherapy?
25       A    Yes.
```

Joseph Penn, M.D. – June 11, 2025

1      Q    What are you basing this opinion

2    on?

3      A    On my 30 years as a board certified

4    adult, child and forensic psychiatrist, who's

5    exclusively worked in correctional systems.

6    And in my opinion, psychotherapy doesn't have

7    to be the traditional one hour or --

8    actually, not even one hour, it's 50 minutes

9    in a therapist's office.  You can do

10    psychotherapy in a five or ten-minute

11    medication check.  You can do psychotherapy

12    when a nurse goes and encourages a patient to

13    take their medication or be compliant with

14    their bloodwork or their shots or their

15    medications.

16          So psychotherapy, I think everyone

17    kind of makes it out it has to be once a week

18    or three times a week for 50 minutes.  That's

19    maybe how it was 40, 50 years ago but that's

20    not how it is now.

21      Q    Have you seen patients' conditions

22    improve as a result of these sub five-minute

23    psychotherapy sessions?

24      A    Yes.

25      Q    How often would you say, somebody

Joseph Penn, M.D. - June 11, 2025

Page 235

1    who is acutely suicidal, improves due to one
2    of these check-ins or a course of these
3    check-ins?
4        A    I can speak to -- we have two
5    in-patient psychiatric prison units in Texas
6    I oversee, where on a daily basis we have 50
7    to a hundred inmates coming in, they're in
8    crisis management for a day or two or three
9    and they're being seen -- they're being
10   evaluated at cell side by qualified mental
11   health professionals.
12          And the majority of them are able
13   to be stabilized and either returned to their
14   regular prison unit or, if not, they can be
15   admitted to a higher level of care.
16          So yes, you know, on a daily basis,
17   this treatment approach can work if the
18   patient is ready, willing and able to make
19   improvement.
20          To the contrary, if the patient is
21   like Mr. Folks and wants to get into a battle
22   and continually tell people he's not suicidal
23   or threaten that he is suicidal and make it
24   conditional, then those kind of patients, it
25   can take longer for them to improve.

1          And that's what we saw with

2    Mr. Folks.  It took approximately two or

3    three months for him to improve but he

4    ultimately did improve.

5          Q    You mentioned that sometimes

6    patients are admitted to a higher level of

7    care.

8          What did you mean by that?

9          A    If we have a patient that's

10   psychotic, hearing voices, has schizophrenia,

11   is manic from bipolar disorder, can't groom,

12   eat or feed or perform their activities of

13   daily living, and they're grossly

14   disorganized or not able to reality test,

15   then yes, we would move those patients to a

16   higher level of care.  None of those were the

17   situation with Mr. Folks.

18         Q    What does the higher level of care

19   entail?

20         A    So it would be probably similar to

21   your Elaine Hunt facility in Baton Rouge or

22   south of Baton Rouge, where you have

23   dedicated psychiatric cells, you have a

24   milieu where you can do individual therapy

25   and group therapy, either in cell or out of

Joseph Penn, M.D. - June 11, 2025

1    cell, or in an office setting.  You have a

2    structured day of activities.

3           So that would be for patients that

4    are psychotic and not able to do their

5    activities of daily living due to a serious

6    mental illness, which Mr. Folks did not

7    have --

8       Q    Okay.

9       A    -- in my opinion.

10          MR. SI:  Can we go off the record

11   for just a couple minutes.

12          THE VIDEOGRAPHER:  We are off the

13   record.

14          The time is 2:49 p.m.

15          (Brief recess taken.)

16          THE VIDEOGRAPHER:  We are back on

17   the record.

18          The time is 2:50 p.m.

19          MR. SI:  Thank you, Dr. Penn.

20          That is all the questions that I

21   have.

22          MR. BLANCHFIELD:  Okay.  We're

23   done.

24          THE VIDEOGRAPHER:  We are off the

25   record.

Joseph Penn, M.D. - June 11, 2025

1          The time is 2:50 p.m.

2          THE COURT REPORTER:  We have

3    standing orders on file, any changes?

4          MR. SI:  No.

5          MR. BLANCHFIELD:  No, regular is

6    good for us.

7          (Witness was excused.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Penn, M.D. - June 11, 2025

Page 239

```
 1              C E R T I F I C A T E

 2              I, MICHAEL FRIEDMAN, a Certified Court

 3     Reporter and Notary Public, qualified in and for

 4     the State of New Jersey do hereby certify that

 5     prior to the commencement of the examination JOSEPH

 6     PENN, MD was duly sworn by me to testify to the

 7     truth the whole truth and nothing but the truth.

 8              I DO FURTHER CERTIFY that the foregoing

 9     is a true and accurate transcript of the testimony

10     as taken stenographically by and before me at the

11     time, place and on the date hereinbefore set forth.

12              I DO FURTHER certify that I am neither a

13     relative of nor employee nor attorney nor counsel

14     for any of the parties to this action, and that I

15     am neither a relative nor employee of such attorney

16     or counsel, and that I am not financially

17     interested in the action.

18

19

20

21              _____

22              MICHAEL FRIEDMAN, CCR of the

23              State of New Jersey

24              License No:  30XI00228600

25              Date:  June 21, 2025
```

Joseph Penn, M.D. - June 11, 2025

Page 240

1                        LAWYER'S NOTES

2        PAGE  LINE

3        ____  ____      _____

4        ____  ____      _____

5        ____  ____      _____

6        ____  ____      _____

7        ____  ____      _____

8        ____  ____      _____

9        ____  ____      _____

10       ____  ____      _____

11       ____  ____      _____

12       ____  ____      _____

13       ____  ____      _____

14       ____  ____      _____

15       ____  ____      _____

16       ____  ____      _____

17       ____  ____      _____

18       ____  ____      _____

19       ____  ____      _____

20       ____  ____      _____

21       ____  ____      _____

22       ____  ____      _____

23       ____  ____      _____

24       ____  ____      _____

25       ____  ____      _____

Joseph Penn, M.D. — June 11, 2025

Page 241

```
1                 DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  Folks v. LAG

5

6

7           DECLARATION UNDER PENALTY OF PERJURY

8              I declare under penalty of perjury

9      that I have read the entire transcript of

10     my Deposition taken in the captioned matter

11     or the same has been read to me, and

12     the same is true and accurate, save and

13     except for changes and/or corrections, if

14     any, as indicated by me on the DEPOSITION

15     ERRATA SHEET hereof, with the understanding

16     that I offer these changes as if still under

17     oath.

18

19

20

21            Signed on the _____ day of

22            _____, 20____

23

24         _____

25                JOSEPH PENN, M.D.
```

Joseph Penn, M.D. — June 11, 2025

Page 242

```
 1                  DEPOSITION ERRATA SHEET
 2       Page No. _____Line No. _____Change to:_____
 3       _____
 4       Reason for change:_____
 5       Page No. _____Line No. _____Change to:_____
 6       _____
 7       Reason for change:_____
 8       Page No. _____Line No. _____Change to:_____
 9       _____
10       Reason for change:_____
11       Page No. _____Line No. _____Change to:_____
12       _____
13       Reason for change:_____
14       Page No. _____Line No. _____Change to:_____
15       _____
16       Reason for change:_____
17       Page No. _____Line No. _____Change to:_____
18       _____
19       Reason for change:_____
20       Page No. _____Line No. _____Change to:_____
21       _____
22       Reason for change:_____
23
24       SIGNATURE:_____DATE:_____
25              JOSEPH PENN, M.D.
```

Joseph Penn, M.D. — June 11, 2025

```
 1                    DEPOSITION ERRATA SHEET
 2      Page No. _____Line No. _____Change to:_____
 3      _____
 4      Reason for change:_____
 5      Page No. _____Line No. _____Change to:_____
 6      _____
 7      Reason for change:_____
 8      Page No. _____Line No. _____Change to:_____
 9      _____
10      Reason for change:_____
11      Page No. _____Line No. _____Change to:_____
12      _____
13      Reason for change:_____
14      Page No. _____Line No. _____Change to:_____
15      _____
16      Reason for change:_____
17      Page No. _____Line No. _____Change to:_____
18      _____
19      Reason for change:_____
20      Page No. _____Line No. _____Change to:_____
21      _____
22      Reason for change:_____
23
24      SIGNATURE:_____DATE:_____
25                  JOSEPH PENN, M.D.
```