UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSHUA FOLKS | * | CIVIL ACTION |
| | * | |
| | * | |
| VERSUS | * | |
| | * | NO.:  3:23-cv-01289-SDD-RLB |
| LOUISIANA ATTORNEY GENERAL JEFF | * | |
| LANDRY, LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY & CORRECTIONS, | * | |
| WARDEN TIM HOOPER, ASSISTANT | * | JUDGE: SHELLY D. DICK |
| WARDEN FOR HEALTH SERVICES DOE, | * | |
| DIRECTOR OF MEDICAL SERVICES | * | |
| PAUL TOCE, MEDICAL DEPARTMENT | * | |
| DIRECTOR DAN LEFLEUR, ACUTE | * | MAGISTRATE JUDGE: |
| TREATMENT UNIT DIRECTOR DOE, | * | RICHARD L. BOURGEOIS |
| ADA ADMINISTRATOR ASHLI OLIVEAUX, | * | |
| DR. GAMBLE, OFFICER DOE, and | * | |
| EMT DOE | * | |

*************************************************************************

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, come Defendants, the Louisiana Department of Public Safety & Corrections, Tim Hooper, Paul Toce, Dan Lafleur, Ashli Oliveaux and Matthew Gamble, who file this reply memorandum in support of their motion for summary judgment.

## 1.  Plaintiff Failed to Exhaust his Administrative Remedies

Exhaustion of administrative remedies is mandatory.[1] Plaintiff failed to exhaust his administrative remedies for the claims brought in this lawsuit. Plaintiff's attempts to expand administrative remedies unrelated to the issues in this litigation and to excuse his failure to properly exhaust his claims cannot defeat summary judgment on this issue.

---

[1] 42 U.S.C. § 1997e(a).

1

Case 3:23-cv-01289-SDD-RLB     Document 75     08/29/25     Page 2 of 17

In *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004), the Fifth Circuit reiterated that the primary purpose of the administrative exhaustion requirement is to provide fair notice to prison officials of an inmate's specific complaints so as to provide "time and opportunity to address complaints internally."[2] In other words, "the grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit and for many types of problems this will often require, as a practical matter, that the prisoner's grievance identify individuals who are connected with the problem."[3] "Accordingly, to be deemed adequate, an inmate's administrative grievance must be sufficiently specific, both in specifying a complaint and, where appropriate, in identifying the person or persons responsible for the events complained of."[4]

In *Johnson*, plaintiff filed an ARP complaining of the prison's failure to protect him from numerous assaults due to his sexual orientation. That ARP was denied. Plaintiff filed suit and asserted three causes of action: (1) failure to protect Johnson from harm, in violation of the Eighth Amendment, (2) a race-based Equal Protection claim charging that officials denied him protection because he is black, and (3) a sexual-orientation-based Equal Protection claim predicated on the allegation that the defendants denied Johnson protection out of anti-homosexual animus. While the Fifth Circuit found that Plaintiff's ARP adequately put Defendants on notice of Plaintiff's failure to protect claim and the sexual orientation equal protection claim, the ARP did not mention Plaintiff's race and therefore Plaintiff did not properly exhaust that claim.

On November 9, 2021, Plaintiff filed ARP 2021-2850. In this ARP, Plaintiff "requested certain copies of [his] mental health and medical records." Plaintiff asserted that this medical

---

[2] *Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004).
[3] *Johnson*, 385 F.3d at 522.
[4] *Mead v. Cain*, No. CIV.A.08-0672-JVP-CN, 2010 WL 2595000 at p. 2 (M.D. La. May 21, 2010).

records request is "vital to [his] defense of the charge of self-mutilation by prison pending in court of St. Mary Parish."

While Plaintiff now asserts that Defendants "misread ARP 2021-2850 as only a records request," there is no other way to read the ARP. It cannot be disputed that this ARP, requesting Plaintiff's medical records to assist Plaintiff with the defense of a charge pending in St. Mary's Parish,  fails to put Defendants on notice of any claim for deliberate indifference, conditions of confinement or any claim under the ADA/RA. Plaintiff only requested medical records. This ARP unambiguously fails to exhaust the claims at issue here.

On April 18, 2022, Folks submitted ARP 2022-0859 concerning alleged flooding of his cell and unsanitary conditions from leaks in the roof. At the outset, Plaintiff voluntarily withdrew this ARP and therefore it is not properly exhausted. For the first time, Plaintiff now asserts that he withdrew this ARP because he was afraid that the shift supervisor would withhold privileges. Plaintiff does not state that he was coerced or threatened by the shift supervisor to withdraw this ARP. In fact, he declares that he and the shift supervisor "developed a good rapport" and that Plaintiff did not want the ARP to ruin the relationship. R.Doc. 71-20 ¶16.  Regardless, any alleged threats of retaliation do not excuse an offender from properly exhausting grievances. *Robinson v. LeBlanc*, No. CV 18-491-JWD-EWD, 2019 WL 13255449, at *3 (M.D. La. Oct. 4, 2019), report and recommendation adopted, No. CV 18-491-JWD-EWD, 2019 WL 13255445 (M.D. La. Oct. 29, 2019)(finding that because Plaintiff withdrew his ARP, Plaintiff failed to exhaust administrative remedies with respect his deliberate indifference and ADA claim, despite the fact that Plaintiff alleged he was threatened with adverse consequences if he did not withdraw his ARP, as such a threat is not sufficient to excuse an offender from exhaustion). Even if ARP 2022-0859

was properly exhausted, which it was not, this ARP complains of a leaking cell and in no way placed Defendants on notice of the claims made in this lawsuit.

Lastly, Plaintiff does not dispute that ARP 2022-1428 was not properly exhausted for failure to file within 90 days of the alleged incident. Plaintiff now argues that his ongoing physical and mental injuries precluded him from filing an ARP. This claim is belied by the fact that Plaintiff filed two ARPs on November 9, 2021 requesting his medical records to assist with the defense of pending charges in St. Mary's Parish, and requesting his rap sheet. In fact, these ARPs were filed within 90 days of August 17, 2021, the last date that Plaintiff was on suicide watch.[5] Plaintiff had the means and capacity to exhaust his administrative remedies, but failed to do so. As such, his claims must be dismissed.

### 2. Plaintiff's Claims Are Prescribed

In an effort to revive prescribed claims, Plaintiff asserts that his ADA and §1983 claims accrued when he was released from custody. This argument contrary to the Fifth Circuit cases regarding prisoner claims under the ADA and §1983.

The Fifth Circuit has routinely held that in both the § 1983 and ADA contexts, that even if state law provides the underlying limitations period, federal law establishes the date upon which claims accrue, which is "'when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Jackson v. Johnson*, 950 F.2d 263, 265 (5th Cir.1992) (*quoting Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir.1980)); *Brockman v. Texas Dep't of Crim. Just.*, 397 F. App'x 18, 22 (5th Cir. 2010).

In *Brockman v. Texas Dep't of Crim. Just.*, 397 F. App'x 18, 22 (5th Cir. 2010), the mother of a deceased offender brought claims against the prison following her son's suicide while in

---

[5] R.Doc. 55-4; R.Doc. 55-8, bates 2078.

custody. The Fifth Circuit found that the ADA claims related to the offender's mental health treatment prior to his suicide were prescribed. Relying on the rule that an ADA claim accrues when a plaintiff knows or has reason to know of the injury which is the basis of the action, the Fifth Circuit held that the offender "should have known the quality of the treatment he was receiving for his bipolar disorder before" his suicide.

Here, Plaintiff knew or should have known of his claims when he filed his untimely ARP in July 2022. Suit was filed more than a year later and therefore the claims are prescribed.

### 3. Plaintiff Fails to Meet His Burden of Proof on Summary Judgment

At the outset, Plaintiff attempts to cherry pick portions of testimony to manufacture a question of fact that does not otherwise exist. Plaintiff attempts to paint a picture that Defendants punished Plaintiff with his housing assignment, that the mental health decisions were governed by security, and that the use of restraints were improper mental health care. The evidence directly contradicts this "version" of events.

While Plaintiff asserts that his housing assignment was "punishment," all of the testimony confirms that Plaintiff's housing placement was based solely on the mental health staff's efforts to keep Plaintiff safe. For example, Dr. Gamble testified:

> I guess I would say that I was aware that in -- he might like to stay in the skilled nursing unit, but I also was concerned about, again, lack of visualization. Because it's been my experience with Mr. Folks that no matter where he may be housed, you may well have some self-injury. And for my part, I liked the idea of more visualization with more real, live human eyes, again, visualizing this – this placement, not only from the security booth, but also on the monitored screen.

> And so it was -- despite the fact that he said he wanted to stay in a nursing unit, he had continued to injure himself in a nursing unit intermittently, and I felt it was safer for him to be in the time-out cell where we could see as much as we could see for consistent monitoring.

R.Doc. 55-17, p. 124. Further, Dr. Toce's testimony directly contradicts Plaintiff's arguments. When asked if Plaintiff was placed on the TU time out cell for behavior issues, Dr. Toce testified:

> That's not -- that cell is not used for punishment. If you want to punish somebody, you don't put them in a timeout cell. You put them in solitary confinement where they don't have such a nice view and access to all the visual input there. So the TU cell, the timeout cell, is not for discipline. It's for observation, therapy.

R.Doc. 55-17, p. 59-60. The testimony is consistent and clear: the TU time out cell is used for mental health patients who require constant observation;[6] the mental health staff determined, based on their professional judgment, that Plaintiff would be safer in a housing environment that provided 24-hour camera access, direct visualization, and less access to foreign objects;[7] Plaintiff's placement in the TU cell was not punishment;[8] Plaintiff's continued threats and actual self-harm necessitated this housing environment, as well as therapeutic restraints as needed.[9]

Plaintiff makes vague arguments that security, not mental health staff, made the decisions on Plaintiff's care. Plaintiff points to vague testimony that regarding "reporting" structures at LSP. However, Warden Hooper testified unambiguously that he does not play a role in mental health decisions for inmates, not would be intervene with a medical professional's decision on how to treat a patient. R.Doc. 55-19, p. 13, 39. Further, while Plaintiffs cites to Oliveaux's testimony regarding generally how she handles accommodation requests under the ADA (not any specific input that Oliveaux on Folks' care), <u>Plaintiff cites to no evidence that Oliveaux, Warden Hooper</u>

---

[6] R.Doc. 55-17, p. 50; 59-60;

[7] R.Doc. 55-17, p. 48-19; R.Doc. 55-16, p. 81; R.Doc. 55-4.

[8] R.Doc. 55-17, p. 59-60.

[9] Plaintiff does not dispute the need for restraints following self-harm or surgical interventions to allow Plaintiff to heal. As indicated in the medical records and as Dr. Toce testified, placement in restraints after his July 2021 surgery was necessary to allow the wounds to heal. Plaintiff would often take stitches out of wounds, reopen wounds with sharp objects, etc.. The "only hope of getting wound healing is to try and keep his hands off the wounds." R.Doc. 55-17, p. 83.

or any other non-medical/mental health staff played any role in the decision making or mental health treatment of Plaintiff.

The undisputed evidence is clear: Plaintiff was continuously treated for his mental health concerns, was placed in a housing assignment needed to abate the risk of his consistent self-harming behavior and the LSP staff was required to use restrictive housing and restraints to address Plaintiff's continue threats and actual self-harm.

**4. Plaintiff Failed to Meet His Burden on Deliberate Indifference Regarding his Mental Health Treatment**

The deliberate indifference standard sets a very high bar. The plaintiff must be able to establish that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001). Plaintiff fails to meet that burden.

Plaintiff argues that Defendants were aware of Plaintiff's serious and chronic self-harming behaviors, yet "subjected him to prolonged isolation and restraints." In fact, the placement in the TU cell and the use of therapeutic restraints when needed were **made in response to the risk of self-harm, and to comply with the duty to protect offenders from self-harm.** If Defendants were to take the therapeutic restraints off after Plaintiff threatened self-harm if the restraints were removed, Defendants would not be abating the risk of self-harm. Likewise, if Defendants were to, as Plaintiff now suggests, house Plaintiff in a cell that would allow Plaintiff to interact with other inmates, Plaintiff would have had access to foreign objects, which Plaintiff routinely used to self-harm. Further, under La. R.S. 15:824, Plaintiff could not have been housed in an area where he could have interaction with DPSC inmates.

As the Supreme Court explained in *Farmer*, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844, 114 S.Ct. 1970. Defendants responded reasonably to the threats of self-harm by placing Plaintiff in a cell with 24-hour monitoring and less access to foreign objects. Therapeutic restraints were used to abate Plaintiff's threats of self-harm, or to protect Plaintiff following a self-harm event. Defendants responded reasonably to the substantial risk of suicide. As the Fifth Circuit had noted regarding case law on substantial risk of harm in the context of suicide, the "common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Est. of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 306 (5th Cir. 2020)

Further, Plaintiff does not dispute that he was "continuously treated for his mental health concerns." R.Doc. 71-2, p. 21. Plaintiff attempts to argue that the issue is not whether some mental health care was provided, but whether the care provided created a risk of harm. However, even Plaintiff's opposition demonstrate that Plaintiff merely disagrees with the care provided, which is not actionable under the Eighth or Fourteenth Amendments.

For example, Plaintiff asserts that Defendants failed to consider whether less restrictive or other interventions or treatments could have helped (R.Doc. 71-2, p. 11); that Defendants did not address Plaintiff's self-harming symptoms and instead resorted to suicide watches (R.Doc. 71-2, p. 12); that Dr. Gamble did not assess Plaintiff's suicide risk and only continued the extreme suicide watch (R.Doc. 71-2, p. 14). Plaintiff further suggests that he could have been housed in a different single man isolated cell that did not have 24-hour camera monitoring and where Plaintiff could have contact with other inmates. All of these complaints relate to the mental health care he

received, i.e., that there were other treatment options available. Where, as here, treatment was in fact provided, federal constitutional protections are not violated just because that treatment was unsuccessful. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Williams v. Chief of Medical Operations, Tarrant County Jail*, No. 94-10115, 1994 WL 733493, at *2 (5th Cir. Dec. 27, 1994). See also *Young v. McCain*, 760 F. App'x 251, 256–57 (5th Cir. 2019)(Finding that plaintiff's allegation that Dr. Gamble failed to exercise adequate professional judgment in determining via teleconference that his problems related to his character and that he did not need mental health treatment amounted to, at most, gross negligence in treating his mental health problems, which is insufficient to establish deliberate indifference); *Zavala v. City of Baton Rouge/Par. of E. Baton Rouge*, No. CV 17-656-JWD-EWD, 2018 WL 4517461, at *16 (M.D. La. Sept. 20, 2018)("At most, she has alleged that Dr. Blanche negligently treated Fano's mental health condition and that she disagreed with the care provided by Dr. Blanche, but even gross negligence is insufficient to satisfy the deliberate-indifference standard. So too are "[d]isagreements regarding the proper course of treatment or the failure to provide optimal care.").

### 5. Plaintiff Failed to meet His Burden of Proof on His Conditions of Confinement Claim

Plaintiff's arguments and allegations regarding conditions of confinement claim fall short of a constitutional violation. Not only did he fail to show unconstitutional conditions of confinement, but he fails to show deliberate indifference.

In *Imbraguglio v. LeBlanc*, No. CV 22-18-JWD-EWD, 2023 WL 2601909, at *12–13 (M.D. La. Mar. 22, 2023), an offender incarcerated at LSP brought §1983 claims arising from solitary confinement for 2,708 days.  Plaintiff alleged that his prolonged exposure to solitary confinement resulted in mental health disabilities. This Court noted that to meet the first *Farmer v. Brennan* requirement for a conditions of confinement claim, "the prisoner must show that the

conditions, either alone or in combination, constitute an unquestioned and serious deprivation of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." The Court held:

> Here, Plaintiff specifically alleges that his "excessive prolonged exposure to solitary confinement" has resulted in "extreme mental health disabilities *for which he was prescribed* Loxapine 10 mg for schizophrenia, Trazadone 150 mg for depression and anxiety, and Sertraline 50 mg for social anxiety, phobia, obsessive compulsive disorder, post-traumatic stress disorder, self-harm, and depression, which conditions continue to exacerbate." (Compl. ¶ 24, Doc. 1 (emphasis added).) Thus, although "[t]he Court does not question that Plaintiff's [many] years in solitary confinement have caused him significant harm," there is no deliberate indifference because "Plaintiff is, by all accounts, actively being treated for the injuries of which he complains." *Fussell*, 2016 WL 3538376, at *4 (citing, inter alia, *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (acknowledging that "a prisoner's disagreement with his medical treatment" does not constitute deliberate indifference, absent exceptional circumstances); see also *Hernandez*, 522 F.3d at 561–62 (dismissing impairment of health claim because, "[v]iewing this evidence in the light most favorable to Hernandez, it does not show that Defendants wantonly disregarded his medical needs. Rather, it shows that Hernandez was provided with medical care as he requested it.").
>
> Thus, even assuming that Plaintiff had adequately alleged that each Defendant was aware of Plaintiff's severe mental distress and the severe risk of harm to him from his time in solitary, (see Compl. ¶¶ 28–46, Doc. 1), a burden which can by itself be difficult to meet, see *Fussell*, 2016 WL 3538376, at *4 (finding no deliberate indifference because defendant was "not, nor has he ever been, a member of LSP's Mental Health Department" such that he would have "some level of control over" that department), Plaintiff has failed to allege that Defendants disregarded that risk so as to be deliberately indifferent to it. For this additional reason, Plaintiff's Eighth Amendment claims fail.

The same reasoning applies here. Plaintiff alleges that his confinement to the TU cells exacerbated his mental health conditions which constitutes deliberate indifference. However, Plaintiff does not dispute he was continuously treated by mental health staff. He admits he was prescribed medications. He does not dispute that he continuously made threats of self-harm, necessitating

10

restrictive housing and at time therapeutic restraints. The fact that Plaintiff was continuously treated for his mental health concerns evidence that Defendants did not disregard any substantial risk of harm. As such, the conditions of confinement claim fails.

### 6. Defendants are Entitled to Qualified Immunity

Plaintiff's opposition to the qualified immunity defense ignores an important step in the analysis: If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were **objectively reasonable** in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir.2004) (citations omitted). The question becomes whether defendants were objectively reasonable in recognizing the serious risk of suicide, placing Plaintiff in a cell to protect him from himself, placing Plaintiff on suicide watch following threats or actual self-harm, and utilizing therapeutic restraints to abate the risk of self-harm. Given a jailer's duty to protect pre-trial detainees and offenders from the risk of self-harm, it cannot be said that the actions were objectively unreasonable.

Further, to find that a right is clearly established, existing precedent must have replaced beyond debate the unconstitutionality of the officials' actions, **as those actions unfolded in the specific context of the case at hand**. *Taylor*, 135 S.Ct. at 2044. The cases cited by Plaintiff do not support that jailers violate the constitution if they take measures to protect offenders who consistently make threats of self-harm.

In fact, cases cited by Plaintiff support a finding of qualified immunity. For example, Plaintiff relies on a *Converse v. City of Kemah, Texas*, 961 F.3d 771, 778 (5th Cir. 2020) for the proposition that "Placing an inmate in housing known to be harmful to them despite knowing of safer placements is clearly established as a constitutional violation." R.Doc. 71-2, p. 29. In

*Converse*, Plaintiff sued jailers after their family member committed suicide in the jail with a blanket that one of the officers gave him. The decedent was arrested after threatening to jump off a bridge. The officers who arrested him were present when he was booked into the jail, and gave him a blanket. The decedent was yelling while in the cell and stating that "he should have jumped." The decedent hung himself with the blanket, and he was not discovered for 45 minutes.

On the qualified immunity issue, the Fifth Circuit held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. On the second prong of qualified immunity issue, the court had to determine "whether the [D]efendants' conduct was objectively unreasonable in light of clearly established law at the time of [Silvis's] suicide." The Fifth Circuit stated that an official shows a deliberate indifference to that risk "by failing to take reasonable measures to abate it." The Fifth Circuit held that Defendants were aware of the risk of suicide, were aware that the decedent was provided a blanket, and were aware that suicidal detainees should not be provided blankets. As such, Defendants were not entitled to qualified immunity.

Here, Defendants were aware of the risk of suicide and self-harm. To address this risk, Plaintiff was placed in a cell that had 24-hour camera access and direct visual observation. LSP placed Plaintiff on suicide watches in response to threats of suicide or self-harm. Following self-harm event, LSP placed Plaintiff in therapeutic restraints to prevent serious injury or death. LSP officials responded reasonably to the risk of self-harm. Plaintiff seems to argue that despite the continued and realized threats of self-harm, Defendants responded too harshly to address the risk of self-harm. Plaintiff's theory would hold Defendants liable for taking measures to abate a known risk of self-harm, a theory which attempts to flout the purpose of qualified immunity.

In *Alexander v. Philip R. Taft Psy D & Assocs., P.L.L.C.*, 143 F.4th 569, 581 (5th Cir. 2025), the Fifth Circuit addressed the interplay between a jailer duty to ensure the safety of suicidal pretrial detainees and the measures taken to protect pre-trial detainees. The Court held:

> County jails have a constitutional duty to ensure the safety of potentially suicidal detainees. *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992) ("The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights."). Allowing this allegation to bootstrap Alexander's complaint past a motion to dismiss would create a minefield we decline to enter. Consider the dangers of requiring officers to second-guess every inmate's report of suicidal ideation. If they believe and transfer a  dishonest detainee, as here, they would be liable for conditions that are designed to protect suicidal inmates. But if they disbelieve and do not transfer an honest detainee, they would also be liable, and the detainee would be in serious danger of self-harm. This standard is unworkable and would result in the denial of constitutional protections, and we therefore reject it.

Plaintiff seeks to apply the same standard that the Fifth Circuit rejected here. Plaintiff admits that he self-harmed or made threats of self-harm throughout his incarceration at LSP. Plaintiff does not dispute that even when he was in restraints due to prior self-harm, he would threaten self-harm if let out of the restraints.[10] LSP had a duty to protect Plaintiff. See R.Doc. 55-17 ("[You cant let somebody out [of restraints] that you know dang good and well is going to hurt themselves…you have to protect the inmate"). Qualified mental health professionals determined that restraints and the cell with 24 hour camera monitoring were the best method to protect Plaintiff. Had LSP not placed Plaintiff in restraints, and provided a lesser form of protection, LSP would have been liable if Plaintiff ultimately succeeded in his attempts of self-harm. LSP was required to react to Plaintiff's continued threats of self-harm. To now hold Defendants liable for their reaction to Plaintiff's behaviors creates an "unworkable solution."

---

[10] R.Doc. 55-17, p. 83-84; R.Doc. 55-4; R.Doc. 55-8, p. 314.

Plaintiff failed to meet his burden to overcome the qualified immunity defense for each defendant:

***Dr. Gamble***

Plaintiff argues that Dr. Gamble is not entitled to qualified immunity because he allegedly knew that placing Plaintiff in the time-out cell increased the risk of harm. R.Doc. 71-2, p. 27. Plaintiff cites to Dr. Gamble's testimony where he states that he was aware that Plaintiff wanted to stay in the skilled nursing unit, but Dr. Gamble was concerned with the visualization in the nursing unit and therefore "felt it was safer for him to be in the time-out cell where we could see as much as we could see for consistent monitoring." R.Doc. 55-16, p. 124. This testimony belies Plaintiff's assertions that Dr. Gamble acted objectively unreasonable with regards to Plaintiff's risk of self-harm.

Dr. Gamble saw Folks at least 12 times between April 2021 and January 2022, prescribed Plaintiff medications, tried various housing placements and offered therapy. R.Doc. 55-4. This mental health treatment was objectively reasonable, and Dr. Gamble is entitled to qualified immunity.

***Dr. Toce***

Plaintiff argues that Dr. Toce is not entitled to qualified immunity because he "received reports from Dr. Gamble and staff about Mr. Folks's deterioration, knew the "time-out" cell was used punitively for "behaving . . . badly," and did not act to remove him." R.Doc. 71-2, p. 27. First, Dr. Toce testified explicitly that then time out cell was not used to punish offenders. R.Doc. 55-17, p. 59-60. Second, in Dr. Toce's medical judgment, TU cell where Folks was housed was the "safest, most high visibility, limited access cells right in front of the guard station" and were the "best chance at getting him not to hurt himself." R.Doc. 55-17, p. 48-49. When specifically considering

the effects of solitary confinement, Dr. Toce believed that the impact of a one-man cell placements pales in comparison to the impact of Folk's continued self-harm. R.Doc. 55-17, p. 52. The decisions to house Plaintiff in the TU cells were based on professional medical judgment, which will not be second guessed under a deliberate indifference standard. Dr. Toce's treatment of Plaintiff was objectively reasonable and he is therefore entitled to qualified immunity.

### Dr. Lefluer

Plaintiff does not dispute that Dr. Lafleur was employed by LSP only one month during Folks' incarceration. Nor does he dispute that during that one month period, Folks was housed in the skilled nursing unit; self-harmed 11 days after he arrived at LSP;  reported that he planned to cause enough problems that DOC would send him back to parish prison;  threatened self-harm if he came off suicide watch;  made three more threats of self-harm; and came off of extreme suicide watch.

There is no evidence that Folks' housing placement, mental health treatment, or time in therapeutic restraints, was unreasonable during his entire incarceration period, much less April 2021 to May 2021. Dr. Lafleur is entitled to qualified immunity.

### Warden Hooper

Plaintiff cites to no evidence, other than his unsubstantiated self-serving statements, that Warden Hooper has any involvement whatsoever in Plaintiff's mental health treatment at LSP. However, even if Warden Hooper "approved" the use of therapeutic restraints, the medical records are replete with evidence that restraints were necessary when used. Restraints were implemented following self-harm events, and were maintained in response to Plaintiff's continued threats of self-harm. Further, the evidence shows that restraints were required to ensure Plaintiff healed following events of self-harm because Plaintiff had a history of attempting to open prior wounds

if not restrained. Given this evidence, any decision to place Plaintiff in therapeutic restraints was objectively reasonable.

***Ashli Oliveaux***

Plaintiff asserts that Oliveaux is not entitled to qualified immunity because "As Deputy Warden for medical and mental health, Oliveaux supervised LSP's mental health providers and had authority over mental health decisions, including whether to release inmates from restraints, and knew of alternative housing options." R.Doc. 71-2, p. 21.

The vague evidence regarding LSP's reporting structure in no way evidences personal involvement by Oliveaux. Plaintiff cites to no evidence of personal involvement, which is an essential element of a §1983 claim. Oliveaux is entitled to qualified immunity.

**7. Plaintiff Failed to Meet His Burden of Proof For His ADA/RA Claims**

Plaintiff asserts that there are issues of fact as to whether his placement in the TU cell and the use of restraints were therapeutic and therefore the ADA/RA claims should proceed. Plaintiff misstates and cherry picks testimony, none of which create an issue of fact.

Contrary to plaintiff's arguments, Dr. Toce and Dr. Gamble consistently testified that the TU cell was not used for punishment, was instead used for mental health patients, and that Folks' placement in the TU cell was solely driven by the need for direct visual observation given Folks' repeated self-harm. Plaintiff cites to an email that specifically states that Folks should remain in the TU cell given his self-harm, and not for security reasons. Plaintiff further argues that a warden *could* veto an accommodation decision. Plaintiff cites to the following Sharita Spears' testimony, in response to the hypothetical question of whether a warden could veto an accommodation: "I guess they could. I'm not saying that they do or they don't. I'm not sure." This evidence fails to create an issue of fact.

The evidence establishes that Folks was placed in the most integrated setting appropriate for his needs, which complies with 28 CFR § 35.130(d).

Plaintiff further argues that LSP failed to ensure meaningful access to mental health services. However, plaintiff does not dispute that he was seen by mental health over 146 times from March 2021 to November 2022. Folks was seen by Dr. Gamble 12 times April 2021 and January 2022. See R.Doc. 55-9. Any argument that meaningful access to mental health care was denied is simply misplaced.

Folks was not being discriminated against by reason of any disability; he was continuously being treated for his constant risk of self-harm. Plaintiff cannot show a violation of the ADA.

For the reasons set forth herein, Defendants pray that their motion for summary judgment be granted, dismissing Joshua Folks' claims, with prejudice.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, which will provide electronic notice of the filing to all CM/ECF participants. I further certify that all parties in this action are represented by CM/ECF participants.

Baton Rouge, Louisiana, this 29th day of August, 2025.

_____s/ Andrew Blanchfield_____
Andrew Blanchfield

Respectfully submitted,

**LIZ MURRILL**
**Attorney General**

By:     s/ Andrew Blanchfield
       Andrew Blanchfield, T.A. (#16812)
       Email: ablanchfield@keoghcox.com
       Collin J. LeBlanc (#24519)
       Email: cleblanc@keoghcox.com
       C. Reynolds LeBlanc (#33937)
       Email: rleblanc@keoghcox.com
       Catherine S. Giering (#26495)
       Email: cgiering@keoghcox.com
       Chelsea A. Payne (#35952)
       Email: cpayne@keoghcox.com
       Special Assistant Attorneys General
       701 Main Street (70802)
       Post Office Box 1151
       Baton Rouge, Louisiana 70821
       Telephone: (225) 383-3796
       Facsimile: (225) 343-9612